$CV$

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

APPLETON PAPERS, INC.
and NCR CORPORATION,

    Plaintiff(s),

v.

GEORGE A. WHITING PAPER
COMPANY,

    Defendant(s).

**ORIGINAL** FEB 15 P4:25

Case No. 08-C-16
Green Bay, Wisconsin
February 6, 2008
1:27 p.m.


TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

McDERMOTT WILL & EMERY LLP, by **LINDA M. DOYLE**,
Attorney at Law, 227 W. Monroe Street, Suite 4400,
Chicago, Illinois 60606-5096, appearing on behalf
of    Appleton Papers, Inc., a plaintiff.

GASS WEBER MULLINS LLC, by **J. RIC GASS**, Attorney at Law,
309 N. Water Street, Suite 700, Milwaukee, Wisconsin
53202, appearing on behalf of NCR Corporation, a
plaintiff.

SIDLEY AUSTIN LLP, by **J. ANDREW SCHLICKMAN**, Attorney at
Law, 1 S. Dearborn Street, Chicago, Illinois  60603,
appearing on behalf of NCR Corporation, a plaintiff.

DiRENZO & BOMIER LLC, by **PHILIP A. MUNROE,** Attorney at
Law, Two Neenah Center, Suite 701, PO Box 788, Neenah,
Wisconsin 54957-0788, appearing on behalf of George A.
Whiting Paper Company, a defendant.


Pages 1 though 40

1          P R O C E E D I N G S

2                  THE DEPUTY CLERK:  The Court calls

3     Case No. 08-16, Appleton Papers and NCR Corporation

4     v. George A. Whiting Paper Company, for a status

5     conference.

6          May I have the appearances, please.

7                  MR. GASS:  For the plaintiff, Ric

8     Gass and Andy Schlickman.

9                  MR. MUNROE:  For Whiting Paper,

10    Philip Munroe.

11                 MS. DOYLE:  And Linda Doyle

12    appearing as well, by telephone.

13                 THE COURT:  You made it up here.

14                 MR. GASS:  Yes.

15                 THE COURT:  Mr. Gass, you were

16    supposed to be in Florida, weren't you?

17                 MR. GASS:  Right.  It was a trek

18    yesterday, Judge, ending at 1:00 this morning

19    arriving here.  So...

20                 THE COURT:  Well, I'm honored.

21    That much effort.

22         (Laughter)

23                 THE COURT:  Okay, and Ms. Doyle,

24    you flew in this morning as I understand?

25                 MS. DOYLE:  I did, from New York,

1    and I think I got lucky.  I seem to be the only

2    one.  My earlier flights were canceled, but I did

3    manage to get in and get to my office about 10

4    minutes ago.

5                THE COURT:  And is Milwaukee getting

6    its second foot of snow, is that what you're on

7    now?

8                MS. DOYLE:  Yes.

9                THE COURT:  I know they closed the

10   Federal court down there.  It sounds like much

11   was closed, but --

12               MS. DOYLE:  Yes, it is closed, and

13   schools were ending as well.

14               THE COURT:  Okay.  Well, as the

15   parties here can tell you, we're bereft of snow.

16   The temperature has dropped, it's a little windy,

17   but other than that, everything is working.

18   So...

19               MR. SCHLICKMAN:  Well, Your

20   Honor, unfortunately I have to drive back through

21   all that to get to Chicago tonight --

22               MS. DOYLE:  It was 50 degrees in

23   New York, so it's quite a shock.

24               THE COURT:  Mr. Schlickman is

25   looking forward to his trip to Chicago too.

1    Maybe you want to try one of our hotels, yes.

2         Well, this was put on as a status conference.

3    I think it was at your request, Mr. Gass, right?

4                   MR. GASS:  It was.

5                   THE COURT:  And I'm not clear

6    exactly -- I know you've sent us information

7    concerning -- it looks like what could be a

8    related action that was the subject of a consent

9    decree in front of Judge Adelman?

10                   MR. GASS:  Yes.

11                   THE COURT:  And I did mention it

12   to him, and he said, "Yep."

13       (Laughter)

14                   THE COURT:  We thought maybe we

15   would see a Motion to Consolidate or some sort

16   of indication as to what the significance and

17   what action -- how they're related.

18                   MR. GASS:  Okay.  If it's okay

19   with you, Andy and I would tag-team you this

20   afternoon.

21                   THE COURT:  That's fine.  I want

22   to make sure, though, that Ms. Doyle can hear.

23   Are you picking it up all right?

24                   MS. DOYLE:  Yes, I am.

25                   THE COURT:  Okay.  Let us know --

1  we're in the process of modifying our phone system,

2  and we're still on an old one that every now and

3  then cuts in and out. So let us know if you can't

4  hear anything.

5          MS. DOYLE: Okay.

6          THE COURT: Go ahead, Mr. Gass.

7          MR. GASS: Okay. Judge, what I'll

8  try and do is give you a thumbnail of what I think

9  would be a workable procedure going forward

10  because, as you're going to learn, this case is

11  an unusual animal.

12      It's been pending in various ways into

13  decades now, and it involves obviously a very

14  significant environmental issue, the Fox River.

15      Having grown up here, we all know how

16  important that is to this state, and it ultimately

17  will be one of the largest environmental dredging

18  clean-ups in history.

19      I come late to the issue. Andy has been

20  living the case for years, and so the way we

21  thought we could help you best today is if I gave

22  you my take on procedurally how to get the case

23  off the ground, and then Andy will add on the

24  complexities that are involved with the issues

25  in the case.

1        There were, over the years, three or four

2    consent decrees relating to small discrete

3    parts of the clean-up.  And the river, in terms of

4    clean-up, is divided into operating units.

5        In the last of those consent decrees, all

6    of which are handled by Judge Adelman, a party

7    by the name of Glatfelter has moved to reopen part

8    of it.

9        And this case involves the equitable

10   allocation of contribution of all the potentially

11   responsible parties for the clean-up costs.

12       So what Glatfelter is getting involved in

13   in attempting to reopen part of that consent

14   decree is related, on the substance and the merits,

15   with this case.

16       And the issue of potential consolidation

17   is obviously one that should be looked at closely

18   as we start to go forward here.

19       The two things that relate to getting this

20   case off the launching pad are that the parties

21   -- the major -- major isn't the right word.  The

22   parties that have been focused upon for clean-up

23   by the Government have been attempting to settle

24   it with extensive mediation.  And that mediation

25   is going to finish the end of this month.

1        The second thing that is background is that

2    for that mediation to happen and for working with

3    the Government on the clean-up merits, the type of

4    clean-up, the cost, et cetera, the parties all

5    entered into Standstill and Tolling Agreements.

6    Those agreements will expire by the end of this

7    month.

8        So this action was filed to start the

9    process.  The things that would interfere with

10    it going forward will be done at the end of the

11    month, and at that point, it will be appropriate

12    to get all parties added to this litigation.

13        We filed one motion, which you granted, to

14    add Glatfelter.  A motion was filed today, just

15    coming through the ECF system as we speak here,

16    to add the other parties.

17        And so our suggestion procedurally is to try

18    and make the process of getting all the appropriate

19    parties in front of you and get us to a scheduling

20    conference.

21        We'd like to suggest the following:  that

22    there be an order that the rest of the parties can

23    be added without having to do individual motions

24    for leave of court and that we have all of the

25    parties that we're aware of added by the end of

1    February.

2                THE COURT:  Now are there more

3    parties than are included in this motion?

4                MR. GASS:  Yes.

5                THE COURT:  Insurers or --

6                MR. GASS:  No.  The Government

7    focused on six or seven of the parties.  But there

8    are other individual papermills and/or waste

9    treatment operations.

10               THE COURT:  How many in all?

11               MR. GASS:  Andy?

12               MR. SCHLICKMAN:  I think

13   approximately 30.

14               THE COURT:  Okay.  Are they all

15   involved in the mediation?

16               MR. SCHLICKMAN:  No, they aren't.

17   The six or seven parties that the Government has

18   focused on in the past are the ones that have

19   been participating in that mediation process,

20   Your Honor.

21               THE COURT:  Okay.  Go ahead,

22   Mr. Gass.  You can continue.

23               MR. GASS:  So the plan -- the kind

24   of a schedule that we would see is that we would

25   add, under a general grant of leave to amend, all

1   of the parties that we think should be in by

2   the end of February for kind of these major

3   parties that the Government has focused on.

4        And we would have them added by March 4th,

5   at the latest, and then all of those parties

6   -- I think it would expedite the process if they

7   all had a responsive pleading deadline of no

8   later than March 24th.

9        And we would then orchestrate the

10  communication with all of those parties to develop

11  a proposed scheduling order that would be submitted

12  to you no later than April 14th.  And I think those

13  dates would fit with what the rules provide.

14       The only three confounders to having this case

15  ready for you with a proposed scheduling order by

16  the middle of April -- the three confounders are

17  these:  one, the parties that we add may want to

18  add other parties, but I think we can deal with

19  that in the scheduling conference order.

20       The second issue is that because of the

21  number of parties involved and the fact that

22  these are major corporations, there are some

23  conflicts issues in terms of retaining counsel.

24       We believe that all of the parties that

25  the Government has focused on so far have

1    national counsel selected, and so there's no

2    problem there with conflicts.  But we're going

3    to run out of local counsels in Wisconsin because

4    of conflicts.

5        So if your order provided that, for all

6    future amended pleadings adding parties, that a

7    copy of the scheduling order had to be part of

8    that packet, it would underline for the new

9    parties the urgency of getting their local counsel

10   selected.

11       The only other confounder in terms of getting

12   us off the launching pad is that as you -- I can

13   see you thinking about the possibility of

14   insurance defendants coming in.  That's possible

15   for some of the smaller players, but I believe

16   that most of the parties that have been focused

17   on by the Government either already have their own

18   insurance litigation commenced -- in fact, one of

19   the parties is going to go to trial next week

20   across the street.

21                    THE COURT:  I'm summoned for jury

22   duty.

23       (Laughter)

24                    THE COURT:  So far I've not been

25   excused.

1                MR. GASS: Well, you have a conflict

2    now.

3                THE COURT: I thought I did before,

4    but Judge Zuidmulder (phonetic) is a strict Judge.

5    Are any of you involved in that case?

6                MR. GASS: No, we are not.

7                THE COURT: Okay. How does an

8    insurance issue end up -- and multiple insurance

9    -- end up in a jury trial?

10               MR. GASS: Oh --

11               THE COURT: Oh, I don't know. It'll

12    be interesting. They're talking four to six weeks

13    or something.

14               MR. GASS: Right. Right, yes.

15      So at least from the parties that the

16    Government has focused on that will come in to

17    this case, either their litigation has been

18    commenced or settlements have been reached.

19      But no guarantee that on some of the smaller

20    players, they might say, "Hey, we've got to get

21    our insurer in here," but I don't see that as a big

22    confounder.

23      When we get to the actual schedule of laying

24    out dates, the Court should be aware that there

25    will be a very big focus on smaller players in

1    attempting to do settlements of the smaller people.

2    So that ultimately it would be our hope that when

3    we get down to having to try the allocation in

4    front of you, you will have a manageable number

5    of players that you'd be dealing with.

6                    THE COURT:  But it would still most

7    likely require a courtroom larger than this?

8                    MR. GASS:  Yes.

9                    THE COURT:  This is a case that

10   probably should be heard in the Milwaukee

11   courthouse.  I can go down there.  I'm not saying

12   that means it would be transferred, but unless

13   things move much more quickly toward construction

14   of a new courthouse here, it does appear this is

15   the kind of case --

16                    MR. GASS:  It is --

17                    THE COURT:  -- that would be handled

18   down there.  You foresee, though, that this would

19   require a trial?  This is not going to be a

20   motion --

21                    MR. GASS:  No.

22                    THE COURT:  -- disposed of by motion

23   in your view?

24                    MR. GASS:  No.

25                    THE COURT:  And how many parties do

1    you think will end up and how long down the road

2    a trial and how long a trial? Have you given those

3    matters any thought or is that really getting way

4    ahead of the things?

5           MR. GASS: Oh, no. No. We have

6    thought that out, and Andy knows the facts and the

7    players better than I do. So...

8           MR. SCHLICKMAN: Well, Your Honor,

9    first of all, you know, with respect to the number

10    of parties that would be presumably still in the

11    case at that point, you know, that will turn, I

12    think, on some of the discovery that's taken.

13    Clearly there are parties who discharge

14    PCBs to the river that are smaller than some of

15    the other parties. And as Mr. Gass indicated, we

16    would make every effort to take some focused

17    discovery earlier in the case; try to verify that

18    that is, in fact, the case; that there are smaller

19    parties and see if we can --

20           MS. DOYLE: This is Linda Doyle.

21    I can no longer hear.

22           THE COURT: Speak a little more

23    directly into the microphone and she'll pick it

24    up.

25           MR. SCHLICKMAN: I'm sorry, Linda.

1    I'm getting as close to the microphone as I can

2    here.  Does that sound better?

3              MS. DOYLE:  Yes.

4              MR. SCHLICKMAN:  With that caveat,

5    you know, that discovery will probably tell us,

6    you know, who will be in for the long run and who

7    may get out early.  I would imagine that this is a

8    case, once it goes to trial -- I think the issue is

9    such that it won't be disposed of on motion; it

10   will go to trial.  It's the application of

11   equitable factors to determine allocable shares

12   of a large sum of money.

13        We'd be talking probably 10 to 12 parties at

14   trial is my best guess based on what I know right

15   now.

16        Just a little bit of background.  This is a

17   case that involves activities that occurred in

18   the 1950s, 1960s, 1970s in terms of the actual

19   discharges of PCBs to the river.  And as you're

20   well aware, there have been a lot of activities

21   over the last 15-20 years on just how to address

22   the problem from the regulatory EPA perspective.

23        Because there's not a lot of direct evidence

24   of PCB discharges, Your Honor, there's going to

25   have to be a fair amount of reconstruction of

1    activities that occurred in that timeframe.

2         There's going to have to be -- once the

3    facts are reconstructed, there's going to have to

4    be expert analysis of what those facts meant for

5    actual discharges into the river.  There's going

6    to be expert testimony about once PCBs were

7    discharged, how they moved in a river system, how

8    they ended up in the various areas that are to be

9    cleaned up, which is to say, you know, we'll have

10   to sit down with the other counsel and work out a

11   proposed scheduling order.

12        But, you know, my view right now is that we're

13   looking at both fact and expert discovery --

14   probably about two years of discovery before the

15   case would be ready for final pretrial work and

16   putting pretrial orders together.

17        So our best guess would be, you know, if

18   discovery really started in earnest in April or

19   May, we're probably looking at a trial date in the

20   latter half of 2010.

21                  THE COURT:  And a trial of a number

22   of weeks or you think months?

23                  MR. SCHLICKMAN:  I would like to

24   think a number of weeks.  Again, sitting here right

25   now, it's going to be a lengthy trial.  I would

hope that through stipulations and whatnot, we could do that in a manageable period of time.

Again, my best guess, six to eight weeks here, but I could see things that could occur that might make it longer than that.

THE COURT: Is now a good time to see what Ms. Doyle and Mr. Munroe's views are or has this been a discussion that's been going on between those parties that are already in the case? Mr. Munroe?

MR. MUNROE: Your Honor, this morning Mr. Schlickman and I had a very brief conversation --

THE COURT: Are you hearing, Ms. Doyle?

MS. DOYLE: No, nothing past a good morning.

THE COURT: Is your microphone on?

MR. MUNROE: The green light is -- one second. It is now.

THE COURT: That helps too.

MR. MUNROE: All right. Mr. Schlickman and I spoke for maybe five or ten minutes this morning, and he sort of

1    outlined the basic idea of getting the parties

2    added by the end of this month and have

3    responsive pleadings by the end of March.

4         So I haven't had a lot of time to think

5    about this.  And my client is a very, very small

6    player in this matter according to the information

7    I've been able to obtain.  The documentation shows

8    that over the course of three years, we discharged

9    something on the order of 1.8 pounds of PCBs into

10   Little Lake Butte des Morts.

11        But in any event, as I look at what the

12   deadlines are that they're proposing -- that have

13   been proposed here, I certainly have no concern

14   about when they want to add the parties.

15        Their suggestion that responsive pleadings

16   be filed by everybody by March 24 I think is also

17   -- that's okay.  But the schedule doesn't account

18   for any crossclaims that may be filed or

19   counterclaims that may be filed in the first round

20   of responsive pleadings and the time it will take

21   to respond to those.

22        I would assume, if we're talking contribution

23   actions, there will inevitably be crossclaims and

24   counterclaims as well.  And those will need

25   responses before we just sit down and start trying

1    to prepare a scheduling order.

2         And Whiting is one of the parties that

3    Mr. Gass talked about as presenting a possible

4    confounder with respect to insurance coverage.

5    I think in our particular case when we got the

6    complaint, we had to take a look at both the

7    policies that are currently in effect and those

8    that were in effect at the time of the alleged

9    discharges.

10        And so we can't even find some of those

11   old policies, but we know who the carriers are.

12   And we've tendered the defense to the carriers

13   that were on the risk back at the time that

14   these discharges supposedly occurred.

15        And I can see, because of the time that's

16   involved and these insurance companies having to

17   go back and trying to recreate their files or

18   locate the policies and verify the coverage,

19   that resolving even whether or not insurance

20   companies are going to accept a tender of defense

21   and to what extent, there will need to be

22   insurance -- you know, litigation over insurance

23   coverage is probably going to take at least month

24   and maybe two to finish sorting out.

25        Under the Wisconsin rules, I would assume that

1        the duty to defend in Wisconsin is the same as it

2        is here (unintelligible) in Federal court, and

3        many of those companies may very well assume the

4        tender and then file summary judgment motions to

5        have -- in this case, to have coverage

6        determinations made.

7                And I just bring this up because that's

8        probably going to have some effect on the

9        scheduling.  And you're probably going to be

10       presented with Motions to Stay proceedings on

11       the merits pending the outcome of the insurance

12       disputes.

13                        THE COURT:  Ms. Doyle, do you wish

14       to add anything on that?

15                        MS. DOYLE:  Hello?

16                        THE COURT:  Yes.  Ms. Doyle, do

17       you wish to add anything?

18                        MS. DOYLE:  Oh, I'm sorry.  All

19       I got was Ms. Doyle.  No, I don't, Your Honor.

20       Unfortunately, I haven't had a chance to talk to

21       counsel before this call, and so this is the first

22       time hearing it.  And I've talked to my

23       partner in Boston who is representing the client.

24                But my general reaction is I don't see any

25       objections to the schedule that's been outlined,

1    but certainly we have to talk to our client.

2                    THE COURT:  Mr. --

3                    MS. DOYLE:  I don't see -- we,

4    unfortunately, all didn't have an opportunity to

5    talk before this call.

6                    THE COURT:  Go ahead, Mr. --

7                    MS. DOYLE:  I know Andy had called

8    me, but I was traveling back from New York, so

9    I wasn't able to return your call.

10                   THE COURT:  Go ahead, Mr.

11   Schlickman, if you want to comment on Mr. Munroe's

12   concerns.  And why the urgency here?

13                   MR. SCHLICKMAN:  Well, let me --

14   I'll specifically address his comment, and I'll

15   answer the urgency question.

16       I think there's a possibility what Mr. Munroe

17   describes could happen.  Our view here is that

18   given some events I'll describe in a minute, it's

19   time to start moving this type of litigation

20   forward because the parties need to get some sort

21   of resolution as to what the share issues are

22   because lots of money needs to be spent in the near

23   term to begin work at the site that EPA is

24   requiring.

25       We propose the schedule that Mr. Gass

1   outlined because we want to move this forward.

2   We don't want to move it unnecessarily quickly, and

3   we don't want to move it unnecessarily slowly.  We

4   want to move it in the right way.

5       And I would expect that if Mr. Munroe is

6   correct, that we see crossclaims and counterclaims

7   and issues having to do with, you know, insurance

8   defense questions, the parties can talk about that

9   at the scheduling conference, you know, we

10  contemplate occurring sometime in the latter part

11  of March.

12      And it may be that we need the Court's

13  assistance, you know, a scheduling conference

14  shortly after that time.  But I think our view is

15  let's at least see where we're at at that point,

16  sit down and talk about it.  If we need the Court's

17  assistance, we can let you know.

18      On the urgency question, you know, I

19  personally have been dealing with the Fox River

20  matter since 1995, almost 13 years now, and I've

21  told some people in some respects, you know, this

22  matter is just beginning in this sense.

23      The EPA and the State of Wisconsin issued an

24  order back in November because they were not

25  satisfied with how settlement discussions had been

1  progressing, requiring the seven or eight parties

2  they had been focusing on to start doing the work

3  and start doing the work right away in the river.

4      Things had been moving forward in that

5  direction, but they really tried to jumpstart it.

6  And we've been required by this order, which they

7  have the authority to issue and which there's

8  fairly drastic consequences if you don't comply

9  with it, they're requiring work that is going to

10  cost hundreds of millions of dollars over the next

11  several years and even in the near term, tens, if

12  not hundreds, of millions of dollars.

13      And it's at the point now where if the parties

14  cannot voluntarily decide how to share these rather

15  substantial costs, there's going to have to be a

16  decision by this Court setting those shares.

17      And unfortunately we may have to wait two

18  or three years to get that decision, but given

19  that order and given some other developments, you

20  know, we feel this is the time.

21      If the Court would just allow me a couple more

22  minutes of comments, I'd like to comment on the

23  Glatfelter issue, the other proceeding.  What

24  Glatfelter has done is once this order came out

25  requiring work in the river, you know, it sought

1   to reopen a consent decree proceeding that was

2   closed to, in essence, have a hearing on some of

3   its liability defenses, the same defenses that

4   would be relevant to this case, this allocation

5   case.

6        And it proposed a case management order to

7   Judge Adelman that would limit that hearing just

8   to the parties on the consent decree.  There are

9   two private parties on the consent decree and

10  two governmental parties.  NCR would not be able

11  to participate in that proceeding if the motion

12  were granted.

13       We feel that this is the case where the

14  allocation should be decided with all the parties

15  in it, which is why we brought that case.  And it's

16  our view that a consent decree proceeding, which

17  was really just a vehicle for entering a consent

18  decree that set forth the terms and conditions

19  of doing some work in the river, is not the proper

20  vehicle for dealing with the allocation issues,

21  which is why we've made no effort to consolidate

22  the cases.  We really think this case alone is the

23  correct one.

24       There was the order from EPA.  There was

25  Glatfelter's effort essentially to try to litigate

1    these issues without the other parties. That had

2    some real motivation for us bringing this

3    litigation at this time too because we wanted the

4    Courts to know -- Judge Adelman to know that the

5    client felt they did have another forum in which

6    to litigate its issues and a more proper forum

7    than that consent decree.

8        The other reason behind the urgency of all

9    this is, frankly, we've made reference to the

10    mediation, we've made reference to settlement

11    discussions. There have been settlement

12    discussions on and off over the last four or five

13    years in varying contexts with varying parties --

14              MS. DOYLE: This is Linda Doyle.

15    I'm sorry, but I can no longer hear.

16              MR. SCHLICKMAN: I'm sorry, Linda.

17    We've never reached a resolution on

18    anything, and we do have some more mediation

19    sessions scheduled. I have to say we're not

20    optimistic that we're going to make any more

21    progress than we have over the last several

22    months.

23        So it's those factors together that have

24    converged to -- this is why now's the time to

25    do it, and given the expenses we're going to be

1    incurring over the next several years, why it's

2    important to move this forward and not just let it

3    sit for a while.

4                    THE COURT:  Tell me about the

5    litigation before Judge Adelman and how is this

6    separate.  I mean, if there are other parties

7    that should be in that litigation, wouldn't you

8    just normally add other parties or how old is

9    that?  And if --

10                   MR. SCHLICKMAN:  Well, it's a

11   consent decree that was lodged and entered by

12   Judge Adelman, I believe four or five years ago --

13   I think 2003.

14       It was an action brought by the Government.

15   After the settlement had been negotiated, the

16   consent decree to do the work -- and it's to do

17   the work in one part of the river, the area known

18   as Little Lake Butte des Morts, and it's referred

19   to as operable unit one.  So the geographic focus

20   of the consent decree is just that part of the

21   river.

22       The only two defendants are Glatfelter and

23   another company called WTM1, used to be known as

24   Wisconsin Tissue.  There were no other parties of

25   the 30 I mentioned before that are involved in

1　　that case, and the case is over.

2　　　　I mean, the consent decree was entered.  The

3　　Court retained jurisdiction over the consent

4　　decree in case there were issues about the clean-up

5　　as the work unfolded.  But it was not a case that

6　　was intended to litigate the allocation questions,

7　　you know, what each party's share should be for

8　　the clean-up of OU1 and the rest of the river.

9　　　　This case that we have brought is designed to

10　　do that.  It's litigation among the private parties

11　　to determine the share.  The Government is not a

12　　party to this case.  It's possible that one agency

13　　of the United States will be a defendant to this

14　　case because of activities they undertook on the

15　　river.

16　　　　And it's also the Justice Department of the

17　　United States has vehemently opposed the reopening

18　　of the consent decree.

19　　　　There's sort of two issues that Judge Adelman

20　　has before him:  number one, should the consent

21　　decree even be reopened.  Is it proper to reopen

22　　it, and is it being used for some sort of

23　　improper purpose?

24　　　　If he decides that issue, that it should be

25　　reopened, then there's a question of, you know,

1    what type of management -- case management order

2    he should enter in that proceeding to deal with

3    the issues that Glatfelter has raised.

4        So there's a chance -- and from my

5    perspective, there's a good chance that that case

6    is going to go nowhere; that it won't be reopened,

7    and then we'll be left with this case which has,

8    you know, been, in my view, designed to really

9    address the full array of allocation issues that

10   the parties need to deal with here to sort out

11   what the proper share should be.

12           MR. GASS:  Judge, a couple of

13   things.  Amplifying on what Andy just said, that

14   case in front of -- the consent order in front of

15   Judge Adelman involving PCB contamination of

16   operating unit one, OU1, if Glatfelter were to

17   reopen that, it gets into the messy intertwining

18   of issues of did those PCBs just stay in OU1 or

19   did they, over the years, migrate to two, three

20   and four.

21       What's in front of you is the global --

22   who's responsible in what percentage for every one

23   of those operating units.  So you have, at the

24   end of the day, that global allocation.  And so

25   hopefully Judge Adelman will agree with the

1    Government it's not appropriate to reopen it, and

2    it is not appropriate to have just a partial

3    allocation done with one party relative to one

4    operating unit when really the big question is all

5    of them.

6        The second thing I wanted to comment on was

7    one of Mr. Munroe's comments that there would be

8    crossclaims and counterclaims.  In this particular

9    set of circumstances, those crossclaims and

10   counterclaims will in no way be a

11   side show.

12               THE COURT:  The whole thing is the

13   apportionment.

14               MR. GASS:  Exactly.

15               THE COURT:  So they're -- not even

16   really necessary to make a crossclaim in the

17   sense of what you're seeking is an

18   apportionment.

19               MR. GASS:  Exactly.  Right on point.

20       The last comment was whether the insurance

21   carriers might move to stay, et cetera.  I know,

22   from having done some recent research that you've

23   written on that, Judge Crabb has written on it

24   also, and I think, at least in Judge Crabb's case,

25   she did not stay because of the unique

1    circumstances of the case.

2                THE COURT:  I know it's

3    discretionary.  But it does put the insurers,

4    given Wisconsin law, in some very difficult

5    positions, I know, if I don't stay.  But I know

6    it says, in Federal courts in particular, we have

7    a fair amount of discretion.

8                MR. GASS:  Right, and my ending

9    comment on that was that's an issue to take up

10   at the scheduling conference if the insurance

11   carriers really do appear and do that.

12               THE COURT:  And I take it by

13   entering this order, I mean, if I go along with

14   this and grant the Motion for Leave to Amend and

15   also grant authority to add other parties on or

16   before whatever date, add the parties by March 4th

17   without further order, without requiring you to

18   seek further leave of the Court, and then requiring

19   responsive pleadings by the 24th, all of these

20   objections and defenses can be raised, including if

21   someone thinks this action doesn't even belong

22   here, or that really this is -- whether it's some

23   sort of claim preclusion or res judicata or some

24   argument that somehow Judge Adelman's action is the

25   operative one or along those lines, those issues

1     can be raised -- I can address those later.

2         It seems to me that if there are difficulties

3     with this in terms of fairness and prejudice to

4     other parties, I'll hear about it, and a better

5     way to resolve it might be to try to address it

6     as it comes up.  At least this will ensure that

7     those issues get raised in a timely manner.

8                     MR. GASS:  Correct.  Yes.

9                     THE COURT:  All right.  Mr. Munroe

10    or Ms. Doyle, anything else?  Mr. Munroe?

11                    MR. MUNROE:  I'm making I think --

12    Whiting Paper is in the case.  Whiting Paper has

13    an extension, and Mr. Schlickman has agreed that

14    if you set this order up, that our time to answer

15    will be extended to March 24th as well.

16        So I'm sort of making observations here,

17    I think more -- not as an advocate.  First of

18    all, let me put it to you this way.  Whiting

19    Paper was approached probably four or five years

20    ago to enter into a Standstill Agreement similar

21    to the one that has been described here, and

22    Whiting Paper did not do that and heard nothing

23    further about this litigation until it was served

24    with the summons and complaint in early January.

25        Now it seems to me that there are probably

1    going to be other parties, and I don't know if

2    there are. And once we got this pleading, they

3    came to me because I've done work for them

4    before and said, "What are we dealing with here?"

5         And quite frankly, I'm probably just interim

6    counsel until either the insurance company accepts

7    the tender of defense or declines and then we hire

8    somebody who has more experience in this type of

9    law, even for the purposes of pleading.

10        Now if there are other small parties who are

11   in the same situation as Whiting, they may have the

12   same issues and problems, trying to answer timely

13   -- I mean, I recognize once they're served, they

14   have 20 days, and if they don't -- so maybe this

15   isn't a concern because it's within the framework

16   of the rules.

17        But I just raise these issues because I

18   guess what I'm thinking here is if you enter this

19   order now, are you setting the stage for lots of

20   people to come to you and raise objections that

21   are going to have to be dealt with then? And

22   maybe this is so hypothetical you don't really

23   want to worry about it.

24                    THE COURT: No. It's very possible

25   I am. I recognize that given the complexity of

1    this area of law and the lack of familiarity that

2    most of the attorneys in this area are going to

3    have, that there is going to be some uneasiness

4    about moving quickly to file a response.  But

5    then the rules allowing amendment are liberal.

6         I certainly can't see denying someone an

7    opportunity to add affirmative defenses that they

8    simply were unaware of at the time.  I don't

9    believe that should -- I think what the plaintiffs

10   are really trying to do is get the ball rolling --

11                 MR. GASS:  Yes.

12                 THE COURT:  -- and recognizing that

13   there's no guarantee this is going to move things

14   as rapidly as they will want, but it certainly

15   will move things faster than simply letting

16   everything take the normal route because in the

17   normal route, they'd wait until whatever -- file

18   multiple motions to add new parties.  We'd wait

19   for pleadings, and then there'd be crossclaims,

20   whether they're needed or not, and counterclaims.

21   And then it might be September, October,

22   November before it's on my calendar for a

23   scheduling conference.

24        And if these issues are going to slow things

25   down, they'll slow things down now rather than

1    later.  And I think that makes some sense.

2         Ms. Doyle, do you have anything you wish to

3    add?

4              MS. DOYLE:  No, I do not, Your

5    Honor.

6              THE COURT:  Okay.  I'll go ahead

7    and enter the order then that's --

8              MR. SCHLICKMAN:  Your Honor, excuse

9    me.  Can I make just one clarification?

10             THE COURT:  Yes.

11             MR. SCHLICKMAN:  I just want to make

12   sure that there's no doubt about this.

13        What we are asking for is with respect to

14   leave of Court to file and join additional parties

15   without seeking a written motion, we're only

16   seeking that through the date of March 4th.  We're

17   seeking that through the time a scheduling order is

18   entered because we are in the process of

19   terminating a number of Standstill and Tolling

20   Agreements.   Each of those run for 30 days from

21   the time notice is served before you can actually

22   join the parties.  So there may be some parties

23   that slip beyond the 4th.

24        But what we had in mind is that at least the

25   more significant parties and the ones that we can

1    join, if they can file their responsive pleadings

2    by the 24th, then we can meet shortly afterwards --

3    yeah, by the 24th -- and meet shortly afterwards

4    for this initial scheduling conference. We should

5    be in a good position to get many of these issues

6    out on the table that we're talking about here

7    and start trying to deal with them in an organized

8    fashion.

9                THE COURT:  Well, that may leave

10   some of those parties, if they're served after the

11   4th, less than 20 days to file an answer.  Those

12   are parties I'd likely hear from.

13               MR. SCHLICKMAN:  And what we had

14   requested was that the parties that are served

15   by March 3rd or March 4th -- it doesn't matter,

16   one of those two dates -- if they're served by

17   that date, they would respond on the 24th.  If

18   they're served after that date, they would just

19   respond in the normal course, again unless the

20   scheduling conference dealt with it in a different

21   way.

22               THE COURT:  Okay.  Well, why don't

23   you -- did you do a proposed order or do you want

24   to do one?

25               MR. SCHLICKMAN:  We will.

1       THE COURT:  Why don't you prepare

2  a proposed order, submit it to my proposed

3  mailbox or proposed order mailbox.  Provide

4  Mr. Munroe and Ms. Doyle with a copy.  Give me --

5  a 24-hour turnaround I'll give you to object.

6       But essentially it's along the lines of what

7  you've asked for here.  I don't have -- given the

8  description of the events, I'll certainly allow

9  adding additional parties without further leave.

10       In fact, I'll go ahead and grant your most

11  recent motion today.  And I'll direct the Clerk

12  to enter a margin order granting that.  So you

13  can add those parties.  Others, by March 4th

14  without leave of the Court, or up until, did you

15  say, the scheduling order?

16       MR. SCHLICKMAN:  Yes, up until

17  issuance of the scheduling order.  We wish --

18       THE COURT:  Okay.  You may add

19  further parties without leave of the Court up

20  until the issuance of the scheduling order.

21       Parties who are served on or before March 4th,

22  the responsive pleadings are due by March 24th.

23  And then I'll direct that all parties that have

24  appeared then submit -- well, now how do you want

25  to handle the proposed scheduling order?

1        You want a proposed scheduling order by

2  April 14th, and you envision meeting with those

3  parties and then seeing if you can reach agreement?

4        MR. SCHLICKMAN:  What we would

5  envision, Your Honor, is sometime before March

6  31st, between March 24th, when we get the

7  responsive pleadings, and then March 31st, we

8  would try to organize an initial meeting of those

9  parties that have appeared to begin discussing

10  the scheduling issues, with the goal of submitting

11  to the Court -- and then the Court could put this

12  in an order if it would prefer that -- that the

13  report on the scheduling conference be submitted

14  by April 14th.

15       As I understand the rules, the 90 day period

16  for issuing the scheduling order would run on

17  April 21st, 90 days after Mr. Munroe filed his

18  appearance.

19       So we could do that.  We could schedule it for

20  an actual scheduling conference around that time.

21  But we would be prepared to try to work with the

22  other parties to get you a report on scheduling

23  by April 14th.

24        THE COURT:  Okay.  I think that

25  makes sense, and then I think it also makes sense

1    to give a scheduling conference date where parties

2    can appear if they wish to be heard on that matter.

3    Given the number of parties, it seems to me that

4    that should probably be a live hearing if we're

5    going to have disputes and --

6                    MS. DOYLE:  Hello?

7                    THE COURT:  I'm looking at a

8    calendar, Ms. Doyle.  Just a moment.

9                    MS. DOYLE:  Oh, okay.

10        (Pause)

11                    THE COURT:  How about April 23rd,

12   9:00 in the morning?  Let's make it 9:30.

13   All right?

14                    MR. SCHLICKMAN:  Yes.

15                    MR. GASS:  Yes.

16                    THE COURT:  Okay.  I'll look for

17   the proposed order then and issue that.  And

18   anything further we can do today?

19                    MR. MUNROE:  Two clarifications,

20   Your Honor.

21                    THE COURT:  Yes?

22                    MR. MUNROE:  Am I correct that my

23   client is included among the parties who have

24   until March 24th to file responsive pleadings?

25                    THE COURT:  Yes.

1          MR. MUNROE:  And where will the

2      scheduling conference take place?  You had

3      mentioned the possibility of Milwaukee?

4          THE COURT:  I wasn't thinking that

5      quickly.  Here for the scheduling purposes.  I'm

6      thinking if this matter would go to trial -- and

7      there will be -- I mean, at some point, I don't

8      know -- this would be considered a related case

9      with the one in front of Judge Adelman.

10      See, there's a number of factors here.  This

11      would clearly be a case that arises in the division

12      of the District that I'm responsible for.  So

13      this case, were it to come to me -- and when I

14      first took office, Judges transferred cases that

15      would have been assigned to me anyhow, subject to

16      a number of exceptions.

17      Now I guess it may depend on how much

18      involvement Judge Adelman has had in the matter,

19      how much he's invested in it, and I don't have a

20      feel for any of those things.  So I'm not sure

21      if I will ultimately, even assuming they remain

22      separate, if this would be consolidated there --

23      but in terms of this action right now, the

24      scheduling conference will be here in Green Bay

25      in this courtroom.  All right.

1          MR. SCHLICKMAN:  Judge, if I can ask
2     you one question, and it's really in terms of an
3     offer.  You've probably picked up pretty quickly
4     that there's some jargon associated with this case,
5     OU1, OU2, et cetera.
6          THE COURT:  Uh-huh.
7          MR. SCHLICKMAN:  Would it be helpful
8     to you to have a non-adversarial, two to three-page
9     backgrounder with maybe the map showing these
10    various units and some of the glossary of terms?
11         THE COURT:  Sure.  You want to
12    e-file that?
13         MR. SCHLICKMAN:  Yes.
14         THE COURT:  Yes, that would be
15    great.  Everyone would have access to it.  And
16    I appreciate it.
17      Okay.  Anything further then?
18         MR. SCHLICKMAN:  Nothing.
19         THE COURT:  All right.  Well, have a
20    nice drive or maybe a retreat.  Goodbye, Ms. Doyle.
21         MS. DOYLE:  Thank you very much.
22         THE COURT:  Yes.
23      (Whereupon, at 2:13 p.m., the proceedings
24    were concluded.)

## REPORTER'S CERTIFICATION

I, JOHN W. GALES, Notary Public and

Registered    Professional Reporter in and for the

State of  Wisconsin, certify:

That the foregoing proceedings were recorded

digitally and were thereafter transcribed;

That the foregoing is a true and accurate

record of the proceeding;

I further certify that I am not a relative or

employee of any attorney or any of the parties, nor

financially interested in the action.

I declare under the penalty of perjury under

the laws of the State of Wisconsin that the

foregoing is true and correct.

Dated this ___14___ day of February, 2008.

_____

JOHN W. GALES

Registered Professional Reporter

Registered Merit Reporter

Notary Public, State of Wisconsin

My commission expires 10/23/2011.