**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | | |
|---|---|---|
| APPLETON PAPERS INC. and NCR CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 08-CV-00016-WCG |
| GEORGE A. WHITING PAPER COMPANY, et al., | ) ) ) ) | |
| Defendants. | ) | |

**CERTAIN DEFENDANTS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to Civil L.R. 56.2(a) of the United States District Court for the Eastern District of Wisconsin, the City of Appleton, Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC (collectively, "Georgia-Pacific"), CBC Coating, Inc., Menasha Corporation, Neenah-Menasha Sewerage Commission, P.H. Glatfelter Company, US Paper Mills Corporations, and WTM I Company (collectively, the "Defendants"), respectfully submit the following [proposed] findings of fact, all of which are undisputed, in support of their motion for summary judgment in the above-captioned action. Defendants also respectfully submit the following conclusions of law.

**[PROPOSED] FINDINGS OF FACT**

**I. BACKGROUND ON THE PARTIES**

1. Plaintiffs NCR Corporation ("NCR") and Appleton Papers Inc. ("API") seek contribution from Defendants under CERCLA Section 113(f)(1) for response costs and/or

1

natural resource damages associated with polychlorinated biphenyl ("PCB") contamination in the Lower Fox River. Doc. #265 [Seventh Amended Complaint].

2.  Defendants and Counterclaimants who are parties to the Motion for Summary Judgment for which these [Proposed] Findings of Fact are filed include: the City of Appleton, Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC (collectively, "Georgia-Pacific"), CBC Coating, Inc., Menasha Corporation, Neenah-Menasha Sewerage Commission, P.H. Glatfelter Company, US Paper Mills Corporations, and WTM I Company.

3.  The City of Appleton is a Wisconsin municipal corporation organized under the laws of the State of Wisconsin, with its principal place of business located in Appleton, Wisconsin. Doc. #258 [Defendant City of Appleton's Answer To Sixth Amended Complaint, filed September 26, 2008].

4.  Defendant Georgia-Pacific Consumer Products LP is a Delaware limited partnership with its principal place of business in Atlanta, Georgia and was formerly known as Fort James Operating Company. Doc. #310 [Defendants Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC's Amended Answer, Affirmative Defenses and Counterclaim to Plaintiffs' Seventh Amended Complaint, filed October 17, 2008].

5.  Defendant Georgia-Pacific LLC is a Delaware limited liability corporation with its principal place of business in Atlanta, Georgia. *Id*.

6.  Defendant Fort James Corporation is a Virginia corporation with its principal place of business in Atlanta, Georgia. *Id*.

7. Defendant CBC Coating, Inc. is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin. Doc. #327 [Defendant CBC Coating, Inc.'s Amended Answer, Affirmative Defenses and Counterclaim to Plaintiffs' Seventh Amended Complaint, filed October 24, 2008].

8. Defendant Menasha Corporation is a Wisconsin corporation with its principal place of business in Neenah, Wisconsin. Doc. #293 [Defendant Menasha Corporation's Answer to Seventh Amended Complaint and Counterclaims, filed October 13, 2008].

9. Defendant Neenah-Menasha Sewerage Commission ("Neenah-Menasha SC") operates a publicly owned treatment works. Doc. #261 [Defendant Neenah-Menasha Sewerage Commission's Answer and Affirmative Defenses to Plaintiffs' Six Amended Complaint, filed September 29, 2008].

10. Defendant P.H. Glatfelter Company is a Pennsylvania corporation with its principal place of business in York, Pennsylvania. Doc. #298 [Defendant P.H. Glatfelter Company's Answer, Affirmative Defenses, and Counterclaim to Plaintiffs' Seventh Amended Complaint, filed October 15, 2008].

11. Defendant U.S. Paper Mills Corp. is a Wisconsin corporation with its principal place of business in De Pere, Wisconsin. Doc. #283 [Defendant U.S. Paper Mill Corp.'s Answer To Seventh Amended Complaint, Affirmative Defenses and Counterclaim, filed October 6, 2008].

12. Defendant WTM I Company is a Delaware corporation with its principal place of business in Las Vegas, Nevada. Doc. #300 [Answer and Counterclaims of WTM I Company To The Seventh Amended Complaint, filed October 16, 2008].

## II.  BACKGROUND ON THE CORPORATE HISTORY OF NCR CORPORATION AND APPLETON PAPERS, INC.

13.     In 1884, NCR was founded in Ohio.  Declaration of Patrick J. Ferguson In Support of Certain Defendant's Motion For Summary Judgment Regarding Defendant's Knowledge ("PJF Decl."), Ex. 3 [http://www.ncr.com/about_ncr/company_overview /history.jsp].

14.     In 1889 the Combined Locks Paper Company was founded at Combined Locks, Wisconsin.  *Id*., Ex. 4 [Appleton Papers Chronology].

15.     In 1966, the Combined Locks Paper Company changed its name to Combined Paper Mills, Inc. ("CPM").  *Id*.

16.     In 1969, NCR acquired CPM.  *Id*.

17.     In 1907, ACPC was founded in Appleton, Wisconsin.  *Id*.

18.     In 1970, NCR acquired Appleton Coated Paper Company ("ACPC") as a wholly-owned subsidiary of NCR.  *Id*.

19.     On June 21, 1971, NCR merged its two subsidiaries, Combined Paper Mills, Inc. and Appleton Coated Paper Company, to create Appleton Papers, Inc., a subsidiary of NCR.  *Id*.

20.     On January 1, 1973 Appleton Papers, Inc. merged with NCR and changed from a subsidiary of NCR to a division of NCR.  *Id*.

## III.  OVERVIEW OF THE DEVELOPMENT AND MANUFACTURE OF PCBS AND NCR PAPER

21.     Monsanto Chemical Company ("Monsanto") manufactured a PCB called Aroclor 1242.  PJF Decl., Ex. 2 [NCR's Responses To Georgia-Pacific's First Set Of Interrogatories] at 8 and 4-5.

22.     NCR used Aroclor 1242 as a solvent to suspend dyes inside the carbonless copy paper ("CCP") emulsion capsules that it manufactured at plants located in Dayton, Ohio (from

4

approximately 1953 through 1971), Portage, Wisconsin (from approximately 1968 through 1971), and Borehamwood, United Kingdom (from approximately 1957 through 1971).  *Id.*, Ex. 2 [NCR's Responses To Georgia-Pacific's First Set Of Interrogatories] at 4-5, 8.

23.     Beginning in 1953 or 1954 and ending in 1971, under contract to NCR, Appleton Coated Papers Company ("ACPC") applied this emulsion to preformed paper at a coating facility in Appleton, Wisconsin.  *Id.*, Ex. 2 at 5-6.

24.     Beginning in late 1969 and ending in 1971, CCP was also produced at a facility in Combined Locks, Wisconsin that NCR acquired in 1969.  *Id.*, Ex. 2 at 5.

25.     CCP was also manufactured in the United Kingdom ("UK") from approximately 1955 to 1970 at two facilities operated by Wiggins Teape Ltd ("WT"), NCR's exclusive licensee for CCP production in Europe.  *Id.*, Ex. 2 at 6, 8.

26.     WT produced CCP at coating plants located in Treforest, England and Nivelles, Belgium from approximately 1956 to 1970.  *Id.*

27.     ACPC sold the paper that became scrap during the CCP manufacturing process production, called "broke," to brokers, who in turn sold it to recycling mills.  Doc. #334 [Plaintiffs Appleton Papers Inc. and NCR Corporation's Answer To Defendant Menasha Corporation's Counterclaim] at 4-6.

28.     Printers and converters of business forms sold their production scrap, which contained PCBs from manufacturing forms on NCR Paper, to recycling mills.  PJF Decl., Ex. 1 [Record of Decision for Operable Units 1 and 2, Wisconsin DNR and U.S. EPA, December 2002 ("2002 ROD")] at 4; Ex. 6 [August 11, 2009 Revised Expert Opinion of Joseph V. Rodricks] at 25.

29.     Post-consumer wastepaper, which contained varying, but very small, amounts of

PCBs from NCR Paper, were recycled by recycling mills.  *Id.*, Ex. 1 [2002 ROD, at 4]; Ex. 6

[Aug. 11, 2009 Revised Expert Opinion of Joseph V. Rodricks] at 25.

## IV.     NCR CORPORATION'S MANUFACTURING OF CCP AND PLAINTIFFS' KNOWLEDGE REGARDING RECYCLING AND DDT

30.     NCR developed patentable technologies ranging from cash registers to

encapsulation processes.  *Id.*, Ex. 10 [1963 Annual Report Excerpts] at 2-4, 16-17.

31.     NCR first produced No Carbon Required ("NCR") Paper in 1954.  *Id.*, Ex. 10 at

16; Ex. 11 [June 30, 2009 H. Schwab Depo. Excerpts at 175:8-189:18].

32.      The NCR Materials Research Department employed 146 scientists between 1951

and 1971.  *Id.*

33.     The scientists employed by NCR's Materials Research Department all had

scientific degrees, and at least 42 of the scientists had advanced scientific degrees.  *Id.*

34.     The scientists employed by NCR's Materials Research Department also

experimented with microencapsulation in other applications using a wide variety of chemicals

other than PCBs.  *Id.*, Ex. 12 [Aug. 12, 2009 J. Herbig Depo. Excerpts at 28:20-30:15].

35.     The first part of Rachel Carson's *Silent Spring* was published in the *New Yorker*

in 1962 and brought public attention to the widespread use and harmful ecological effects of

DDT.  *Id.*, Ex. 13 [*Silent Spring* Excerpt].

36.     ACPC knew from the time it began manufacturing CCP that broke would be

recycled.  *Id.*, Ex. 14 [Mar. 3, 2009 A. Kresch Depo. Excerpts at 80:20-81:20]; Ex. 15 [March

25, 2009 D. Christenson Depo. Excerpts at 47:5-49:19].

37.     NCR knew that broke from the manufacturing of CCP would be recycled by the

mid-1960s at the latest.  *Id.*

6

38.     NCR also knew that CCP capsules would also rupture when subjected to the pressure, heat, and pH conditions that occur in the recycling process. *Id*., Ex. 12 [Aug. 12, 2009 J. Herbig Depo. Excerpts at 237:13-241:21]; Ex. 16 [June 16, 2009 G. Taylor Depo. Excerpts at 65:19-67:16, 224:3-228:22]; Ex 11 [June 30, 2009 H. Schwab Depo. Excerpts at 143:14-145:24]; Ex. 17 [Apr. 24, 2009 W. Goetz Depo. Excerpts at 102:6-105:5, 156:19-157:19; 226:11-232:13; 257:24-258:6]; Ex 18 [Herbig Encapsulation Article, marked and authenticated as Exhibit 868-J during Aug. 12, 2009 J. Herbig Depo. (Ex. 12) at 173:7-12]; Ex. 19 [Goetz Paper on NCR Pressure Sensitive Copy Paper Excerpts, marked and authenticated as Exhibit 560 during Apr. 24, 2009 W. Goetz Depo. (17) at 82:12-84:22].

39.     NCR studied both DDT and PCBs for encapsulation purposes. *Id*., Ex. 12 [Aug. 12, 2009 J. Herbig Depo. Excerpts at 28:20-30:15]; Ex. 20 [June 18, 2009 J. Stutz Depo. Excerpts at 81:3-83:19].

## V.     RELATIONSHIP BETWEEN NCR, WT AND MONSANTO, PLAINTIFFS' KNOWLEDGE REGARDING PCBS, AND PLAINTIFFS' FAILURE TO INFORM DEFENDANTS

40.     In 1964, NCR began an in-depth technical exchange program with its European licensee, WT, that continued well into the 1970's. *C.f.* PJF Decl., Ex. 71 [November 1964 NCR Progress Report]; Ex. 72 [February 1965 NCR Progress Report]. This type of report was kept in the ordinary course of NCR's business. *C.f. Id.,* Ex. 83 [February 12, 2009 P. Phillips Depo. Excerpt at 54:9-55:23 (Feb. 1961 Progress Report authenticated and marked as Exhibit 27)].

41.     In the latter part of 1964, WT became interested in recycling its own broke. *Id.*, Ex. 68 [Nov. 5, 1964 C. Ayers' Letter].

42.     In 1965, WT's Butler's Court research group began an extensive broke recycling testing program. *Id.*, Ex. 68 [Nov. 5, 1964 C. Ayers' Letter]; Ex. 69 [Apr. 23, 1965 WT Letter].

7

43.     WT's broke recycling testing program had laboratory support from British American Tobacco Ltd., WT's then part owner.  *Id.*, Ex. 68 [Nov. 5, 1964 C. Ayers' Letter]; Ex. 69 [Apr. 23, 1965 WT Letter].

44.     WT's broke recycling testing program had input from Monsanto on analytic techniques.  *Id.*

45.     The results of this program revealed the presence of PCBs in all media sampled, including the broke itself, paper products made from recycled broke, and the wastewater generated during the recycling process.  *Id.*, Ex. 70 [Oct. 5, 1964 WT Letter].

46.     There is no evidence that NCR conducted any investigation of the fate of its PCB-containing paper.

47.     In 1965, NCR asked Monsanto for toxicity information on Aroclor 1242 and 1254, *id.*, Ex. 74 [Dec. 30, 1965 letter,], and began searching for a replacement for PCBs.  *Id.*, Ex. 73 [Nov. 1965 Progress Report]; Ex. 72 [Feb. 1965 Progress Report].

48.     On December 15, 1966, a Swedish scientist, Soren Jensen, reported findings of widespread evidence of PCBs in the environment in the publication, *New Scientist.  Id.*, Ex. 21 [*New Scientist* Article].

49.     Jensen's findings demonstrated that PCBs were widely dispersed and persistent in the environment, having been found in fish, eagles, egg shells, and human hair.  *Id.*, Ex. 21 [*New Scientist* Article]; Ex. 22 [May 24, 1967 *Medical Tribune* Article].

50.      In February 1967, at NCR's request, Dr. Emmet Kelly at Monsanto forwarded copies of Jensen's report to Mr. D. Wood and Mr. M.J. Thomas, both NCR employees.  *Id.*, Ex. 23 [Feb. 10, 1967 Letter from Kelly to Wood]; Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas (letter and attached Jensen report marked and authenticated as Exhibits 468 and 469

during April 8, 2009 E. McKinney Depo. (Ex. 34) at 91:13-95:17)]; Ex. 39 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 12:5-14:24].

51.     Between 1967 and 1969, several scientific studies on PCBs were completed and published in the UK and US popular and scientific press.  *Id.*, Ex. 6 [Aug. 11, 2009 Revised Expert Opinion of Joseph V. Rodricks at 42-43]; *c.f.* Ex. 25 [Dec. 14, 1968 Publication "[PCBs] in the Global Ecosystem" Excerpt].

52.     These studies confirmed Jensen's 1966 findings.  *C.f. Id.*, Ex. 25 [Dec. 14, 1968 Publication "[PCBs] in the Global Ecosystem" Excerpt]

53.     While Monsanto did not share these scientific studies with its other Aroclor customers, it told NCR about the scientific studies because "Monsanto enjoy[ed] a strong position in this industry which [was] dominated by NCR."  NCR determined to contact NCR regarding "adverse publicity" and stating that "[i]t is recommended that with the exception of NCR, we do not bring this publicity to the attention of our Aroclor customers." *Id.*, Ex. 26 [March 12, 1969 Monsanto Memo] at 1-2, 9; Ex. 26 [Mar. 12, 1969 Monsanto Memo] at 1 (In 1969, Monsanto stated in an internal memorandum entitled "Future Plans for Aroclor Plasticizers" that "the adverse publicity" associated with these studies "may be very damaging."); Ex. 27 [Aug. 26, 2009 C. Paton Depo. Excerpts (Rough) at 21:13-22:8] ("we [Monsanto] did everything we could to keep [NCR] informed [about scientific information concerning PCBs].").

54.     On March 27, 1969, Monsanto visited NCR's home office in Dayton.  *Id.*, Ex. 28 [Apr. 18, 1969 Monsanto Memo, marked and authenticated as Exhibit 971-C during Aug. 26, 2009 C. Paton Depo. (Rough) (Ex. 27) at 18:4-23:19].  Mr. Haier, Mr. Wilde and Mr. Paton

attended this meeting on behalf of Monsanto and Mr. Lauer, Mr. Thacker and Mr. Fitzpatrick attended on behalf of NCR. *Id*.

55.     During this March 27, 1969 meeting Monsanto and NCR discussed PCB contamination and a recent *San Francisco Chronicle* article regarding PCB pollution in San Francisco Bay. *Id*., Ex. 28 [Apr. 18, 1969 Monsanto Memo]. During this same meeting, NCR's representative, Howard Lauer, stated that "NCR would take no action unless a second article appeared specifically naming their paper as the source of pollution." *Id*. at 1-2; Ex. 27 [C. Paton Depo. (Rough) at 57:10-58:4].

56.     In a subsequent April 28, 1969 telephone conversation with Mr. Paton of Monsanto, NCR's Gordon Taylor called the same article "just another in the series of articles on the toxicity of PCBs," and also said that "there was always the possibility that the second shoe would drop." *Id*., Ex. 29 [Apr. 29, 1969 Taylor/Paton Phone Memo, marked and authenticated as Exhibit 971-F during Aug. 26, 2009 C. Paton Depo. (Rough) (Ex. 27) at 34:22-38:17].

57.     Each year between 1954 and 1970, NCR purchased increasing amounts of PCBs from Monsanto for use in the manufacture of CCP — from 0.6 million pounds in 1957 to 6.6 million pounds in 1970. *Id*., Ex. 30 [Jan. 19, 1976 NCR Letter].

58.     After the date of the Jensen report, NCR increased its consumption of Aroclor from 4.4 million pounds (1967), to 5.8 million pounds (1968), to 6.3 million pounds (1969), to 6.6 million pounds in 1970. *Id*.

59.     NCR produced millions of pounds of CCP at the Appleton coating plant — with production increasing from 0.2 million pounds in 1954 to 11.8 million pounds in 1970. *Id*., Ex. 31 [US Production NCR Paper Capsules 1954-1972].

60.     After the date of the Jensen report, NCR increased its production from 7.8 million pounds (1967), to 10.3 million pounds (1968), to 11.3 million pounds (1969), to 11.8 million pounds in 1970.  *Id*.

61.     Around the late 1960's and 1970, CCP was one of NCR's most lucrative products.  *Id*., Ex. 32 [Apr. 2, 2009 C. Rench Depo. Excerpts at 131:17-21] (NCR's Vice President of Research and Development, Carl Rench, described CCP as "one of [NCR's] cash cows").

62.     Between 1970 and 1972, certain of NCR's other product lines failed (cash registers and computing systems).  *Id*., Ex. 32 [Apr. 2, 2009 C. Rench Depo. Excerpts at 189:2-190:2]; Ex. 34 [Apr. 8, 2009 E. McKinney Depo. Excerpts at 151:23-153:20].

63.     In 1969, NCR was concerned that public disclosure of PCBs in CCP could cause NCR to lose market share to its main CCP competitor, 3M.  *Id*., Ex. 33 [Apr. 7, 2009 D. McIntosh Depo. Excerpts at 119:1-25]; Ex. 11 [June 30, 2009 H. Schwab Depo. Excerpts at 118:13-24]; Ex. 28 [Apr. 18, 1969 C. Paton Monsanto Memo to File] at 1-2; Ex. 27 [Aug. 26, 2009 C. Paton Depo. (Rough) at 18:4-23:19].

64.     On October 31, 1969, Dr. H.A. Vodden of Monsanto's research department in Ruabon, South Wales, was made responsible for the environmental aspects of PCB contamination in the United Kingdom, including on-going studies of the potential biodegradation of Aroclor 1242, the investigation of PCB releases at Monsanto's Newport, UK PCB production facility, and information regarding PCB disposal by Monsanto's major Aroclor customers in the UK.  *Id*., Ex. 35 [Oct. 30, 1969 Monsanto Memo]; Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 18:11- 19; 20:10-15; 23:11-15].

65. In late 1969, Dr. Vodden arranged a meeting with Martin Kelly of NCR's Borehamwood CCP emulsion production facility. *Id*., Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 26:8-20].

66. During this 1969 meeting, Dr. Vodden explained to Martin Kelly that Aroclor 1242 had constituents that were persistent and would bioaccumulate, that even though Aroclor 1242 was not detected in the environment, its degradation residues resulting from Aroclor 1242 releases would pose those problems, that the production of NCR Paper resulted in open and uncontrolled releases of Aroclor 1242, and that because of these environmental concerns, Monsanto was going to stop selling it for use in the production of NCR Paper. *Id*., Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 27:24-28:5].

67. In early January 1970, Monsanto told NCR that recycling NCR Paper broke could also create environmental problems. *Id*., Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 32:18-33:13].

68. In December 1969 and January 1970, Monsanto tested the effluent from NCR's facilities in the US and UK. *Id*., Ex. 37 [1969 Monsanto Aroclor Water Samples]; Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; Ex. 39 [Aug. 19, 2009 E. Tucker Depo. at 39:18-41:20]. Effluent samples from an NCR facility had "quite high" levels of Aroclor 1242, and the mud in the stream taking the surface water drainage contained 150 ppb PCBs. *Id*., Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970] .

69. Between December 1969 and February 1970, NCR, Monsanto and WT held several high-level meetings. *Id*., Ex. 40 [December 19, 1969 minutes, marked and authenticated using different Bates version as Exhibit 971-L during Aug. 26, 2009 C. Paton Depo. (Rough) (Ex. 27) at 50:18-57:9]; Ex. 41 [Jan. 26, 1970 Meeting Minutes]; Ex. 42 [February 19, 1970

Meeting Minutes, marked and authenticated as Exhibits 949 and 951 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 35:12-40:9; 43:15-50:3].

70.     During these meetings, the following subjects were discussed:  (a) effluent testing results from NCR's facilities in the US and UK; (b) effluent testing results from WT's UK and Belgium facilities; (c) PCB contamination of US and UK waterbodies; (d) appropriate responses to governmental investigations regarding the source of PCB contamination; and (e) replacement of PCBs in CCP with another solvent.  *Id.*, Ex. 40 [December 19, 1969 minutes]; Ex. 41 [Jan. 26, 1970 Minutes,]; Ex. 42 [February 19, 1970 Minutes]; Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 35:12-40:9; 43:15-50:3]; Ex. 27 [C. Paton Depo. (Rough) at 50:18-57:9].

71.     There is no evidence that the Defendants knew anything about any of the topics discussed during the meetings between NCR, Monsanto and WT between December 1969 and February 1970.

72.     In June 1970, Monsanto sent a letter to Monsanto's customers, including NCR, stating that it was discontinuing the sale of PCBs for use in plasticizer applications (including the Aroclor used in CCP) because of worldwide concern over environmental contamination.  *Id.*, Ex. 43 [Monsanto Customer Warning]; Ex. 44 [June 1970 Monsanto Letter, marked and authenticated as Exhibit 601 at April 30, 2009 T. Clark Depo. (Ex. 82) at 173:21-174:25].

73.     The information regarding discontinuing the sale of PCBs for use in plasticizer applications because of worldwide concern over environmental contamination was not communicated to the Defendants.  *Id.*, Ex. 45 [Jan. 28, 2009 F. Heinritz Depo. Excerpts at 94:9-96:4]; *Id.*, Ex. 15 [Mar. 25, 2009 D. Christensen Depo. Excerpts at 72:2-73:15].

74.     NCR continued to sell broke for recycling until mid-1971.  *Id.*, Ex. 45 [Jan. 28, 2009 F. Heinritz Depo. Excerpts at 96:14-96:23].

13

75. The broker who sold broke to Defendants was never told by NCR that the broke may have been coated with PCB emulsion, or was coated with anything harmful to the environment. *Id.*, Ex. 46 [Aug. 26, 2009 L. Golper Depo. Excerpts at 15:22-18:4].

76. Before 1971, NCR used approximately 30 million pounds of PCBs to make CCP. *Id.*, Ex. 1 [2002 ROD] at 4.

## VI.   PLAINTIFFS' FAILURE TO INFORM GOVERNMENT AGENCIES REGARDING PCBS IN NCR PAPER AND TOXICITY OF PCBS

77. Between 1969 and 1971, NCR and Monsanto received US and UK governmental inquiries about PCB use. PJH Decl., Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report, marked and authenticated as Exhibit 950 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 40:10-43:12]; Ex. 50 [April 9, 1970 Congressman Ryan Letter].

78. On January 27, 1970, Monsanto met with the UK Ministry of Agriculture. *Id.*, Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report]; Ex. 36 [Aug. 25, 2009 H. Vodden Depo. (Rough) at 40:10-43:12].

79. Attendees for Monsanto included Mr. Cameron and Mr. Vodden, and for the UK Ministry, Mr. Portman and Mr. Wood. *Id.*

80. The UK Ministry of Agriculture was investigating the sources of recently discovered PCB contamination in the Irish Sea and Severn Estuary, *id.*, Ex. 51 [1969 Irish Sea Article], and in food products—cashew nuts packaged in recycled cardboard made from NCR broke. *Id.*, Ex. 52 [May 30, 1970 *Chemical Industry* Article; October 28, 1971 *Science News* Article].

81. On January 26, 1970, Monsanto met with NCR in advance of Monsanto's meeting with the UK Ministry of Agriculture. *Id.*, Ex. 41 [Jan. 26, 1970 Minutes]; Ex. 36 [Aug. 25, 2009 H. Vodden Depo. (Rough) at 35:12-40:9].

14

82.     NCR asked Monsanto not to identify NCR paper as a "major outlet" for Aroclor at the meeting between Monsanto and the UK Ministry.  *Id*., Ex. 41 [Jan. 26, 1970 Minutes] at 1. NCR wanted to make sure their "housekeeping" was in order first.  *Id*.

83.     At its meeting with the UK Ministry of Agriculture on January 27, 1970, Monsanto did not disclose the use of PCBs in NCR Paper.  *Id*., Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report] ("No mention was made of NCR but it will become increasingly difficult to maintain this position.").

84.     In April 1970, WT decided "that, in their own self interest, they could remain silent no longer about their usage of Aroclor 1242."  *Id.*  Ex. 53 [Apr. 16, 1970 WT/Monsanto Meeting Report, marked and authenticated as Exhibit 955 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 55:11-60:19].

85.     In April 1970, after WT's disclosure, Monsanto disclosed the presence of PCBs in NCR Paper to the British Government in confidence.  *Id*., Ex. 53 [Apr. 16, 1970 WT/Monsanto Meeting Report] at 1; Ex. 54 [Apr. 17, 1970 UK Ministry/Monsanto Meeting Report, marked and authenticated as Exhibit 956 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 60:20-63:2].

86.     At about the same time, in April 1970, United States Congressman William Ryan began investigating PCB contamination in the US and contacted Monsanto for information.  *Id*., Ex. 50 [April 9, 1970 Congressman Ryan Letter].

87.     Congressman William Ryan specifically asked Monsanto to release to the public a list of all uses of Aroclor.  *Id*.

88.     On April 10, 1970, in response to Congressman Ryan's inquiries, Monsanto issued a press release about PCBs.  *Id*., Ex. 55 [Apr. 10, 1970 Monsanto Press Release].

89.     The April 10, 1970 press release does not list NCR Paper. *Id*.

90.     NCR was generally secretive about the contents of its products. *Id*., Ex. 58 [Aug. 19, 2009 D. Schumaker Depo. Excerpts at 43:20-24] (PCBs in CCP was "a deep, dark secret and it was protected by NCR with their lifeblood. And that's an understatement."); Ex. 59 [Mar. 13, 2009 M. Stevens Depo. Excerpts at 44:24-45:15] ("We didn't like to give out our sources of solvents, dyes, or methodology to anyone. . . . [NCR] sure as hell weren't publicizing it. It was a very confidential system."); Ex. 12 [Aug. 12, 2009 J. Herbig Depo. Excerpts at 74:19-75:17] (fundamental research group "too proud" to give information regarding CCP to capsular research department).

91.     NCR shipped its PCB-containing emulsion in milk trucks and contaminated milk as a result. *Id*., Ex. 60 [Milk Truck Hauling PCB Emulsion]; Ex. 61 [July 23, 1970 NCR Memo].

92.     In April 1970, Monsanto revised its warning labels for Aroclor 1242 that specifically warned of environmental risks, *id*., Ex. 43 [April 1970 Monsanto Warning Labels], and these labels were sent to NCR. *Id*., Ex. 27 [Aug. 26, 2009 C. Paton Depo. (Rough) at 81:10-84:5].

## VII.     CONTAMINATION OF THE FOX RIVER WITH PCBS FROM 1954 UNTIL MID-1971 (THE "PRODUCTION PERIOD")

93.     Discharges of PCBs to the Lower Fox River during the Production Period resulted from both the production and recycling of CCP made with NCR's PCB-containing coating emulsions. PJH Decl., Ex. 1 [2002 ROD] at 4.

94.     EPA and WDNR estimated that during the Production Period hundreds of thousands of pounds of these PCBs were released into the Fox River. *Id*., Ex. 1 [2002 ROD] at 4.

95.     EPA and WDNR also estimated that the vast majority of total PCBs released to the Lower Fox River were discharged before PCB use was stopped in 1971. *Id.* (estimating that 98% of PCBs released into the Lower Fox River had been released by 1971).

96.     During the Production Period, NCR/API released PCBs through effluent discharges from its emulsion production facility at Portage and its coating operations in Appleton and Combined Locks. *Id.*, Ex. 5 [Dec. 12, 1969 Tucker Letter]; Ex. 2 [NCR's Interrogatory Responses] at 5-6.

97.     PCBs were also released during the Production Period through the recycling of several forms of NCR Paper. *Id.*, Ex. 1 [2002 ROD] at 4.

98.     By WDNR estimates, more PCBs were released into the Fox River in 1970 than in any other year. *Id.*, Ex. 47 [WDNR Tech Memo 2d] at Figure-9.

## VIII.   DEFENDANTS' KNOWLEDGE REGARDING PCBS IN NCR PAPER

99.     The earliest document identified by NCR that NCR claims a Defendant may have seen which stated that NCR Paper contained PCBs is a January 12, 1971 letter from a paper industry group (the American Paper Institute) to members of its Combination Paperboard Subgroup. PJF Decl., Ex. 62 [NCR's Responses To P.H. Glatfelter's First Set Of Interrogatories] at 5; Ex. 63 [Jan. 12, 1971 Letter from American Paper Institute] at 22. There is no evidence that any of the Defendants were members of this Subgroup or received this letter when it was sent.

100.     The earliest time that any Defendant can confirm it was made aware that NCR Paper contained PCBs was in August 1971 when Bergstrom Paper Company (Defendant Glatfelter) was told by the American Paper Institute that NCR Paper contained PCBs. *Id.*, Ex. 64 [Glatfelter's Responses To NCR's First Set of Interrogatories] at 7.

17

101.    The year 1971 is the earliest time that any Defendant likely learned of the presence of PCBs in NCR Paper.  *Id*., Ex. 65 [Aug. 26, 2009 M. Williams Depo. Excerpts at 92:18-93:9].

102.    Numerous NCR employees confirmed that NCR did not disclose the presence of PCBs in its paper until 1971.  *Id*., Ex. 66 [M. Williams' Interview Notes] (stating that NCR's John Stutz stated that "customers wouldn't have known that CCP had previously contained Aroclor until much later and after the replacement had been completed [in 1971]," *id*. at 5, NCR's Bob Sandberg explained that knowledge that CCP contained PCBs "would not have been well known until the time that PCBs became a public focus and by that time, NCR had ceased its use of PCBs," *id*. at 17, and NCR's Jerry Taylor "did not think it was widely known among brokers and customers that NCR used Aroclor in its CCP," *id*. at 20).

103.    The *Los Angeles Times* published an article stating that NCR Paper contained PCBs in the latter half of 1971, when the FDA announced that it had traced shredded wheat PCB contamination to a recycling mill that had used NCR broke.  *Id*., Ex. 56 [Sept. 1971 Congressional Record, Ryan Statement]; Ex. 57 [Sept. 1971 Article Re: PCBs in Foods].

104.    In 1975, NCR acknowledged that the recycling companies were the innocent victims of circumstances created by carbonless copy paper manufacturers.  *Id*., Ex. 67 [Oct. 24, 1975 NCR Memo] (NCR acknowledges that "the recycling companies are the innocent victims of circumstances created by carbonless manufacturers which are still a part of the paper industry.").

## IX. DEFENDANTS' RECYCLING OF WASTEPAPER AFTER MID-1971 (THE "POST PRODUCTION PERIOD")

105.     In 1976, the Wisconsin legislature passed a law prohibiting the manufacturing and purchasing for use of PCBs within the state.  PJF Decl., Ex. 75 [1975 Wisconsin Assembly Bill 1342].

106.     Assembly Bill 1342 expressly exempted the recycling of paper containing PCBs from its prohibition.  *Id*.  Specifically, the prohibition did *not* apply to "any product containing PCBs" if "the product is wastepaper, pulp, or other paper products or materials, in which case such product may be purchased for use within this state in the manufacture of recycled paper products."  *Id*.

107.     Assembly Bill 1342 also required WDNR to adopt rules governing the disposal of PCBs and PCB- containing products, which again exempted "the manufacture or sale of recycled paper products to which PCBs have not been intentionally added during or after manufacture for any of the uses set forth in sub. (1) (c)."  *Id*. (sub. (1) (c) exempts paper products).

108.     Wisconsin set effluent limitations for discharges containing PCBs to abate any risks from the continued recycling of post-consumer waste paper.  PJF Decl., Ex. 76 [Wisconsin Natural Resources Board draft PCB effluent limits]; Ex. 77 [Wisconsin Natural Resources Board revised draft PCB effluent limits]; Wis. Adm. Code NR 212.01 (effective Oct. 1, 1981).

109.     In 1972, EPA recognized that while some paper companies may have relatively high PCB residues from recycled paper, those would diminish since PCBs were no longer being used in carbonless carbon paper.  Declaration of Andrea Hogan in Support of Certain Defendant's Request for Judicial Notice ("AMH Decl."), Ex. 3 [Feb. 4, 1972 EPA Memo] at 3.

110.     In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), which includes certain prohibitions against the manufacturing, processing, distribution in commerce or use of PCBs.  15 U.S.C. §§ 2605(e)(2)-(3).

111.     In 1979, EPA adopted a rule that included an exception to TSCA's PCB prohibition allowing for the continued use of carbonless copy paper.  EPA, *Final Rule, Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibition*s, 44 Fed. Reg. 31,514 (May 31, 1979); *see also* PJF Decl., Ex. 78 [Brigham Expert Report] at 2; Ex. 79 [Aug. 21, 2009 J. Brigham Depo. Excerpts at 74:3-4; 74:16-25; 75:1-2; 98:5-11] (U.S. expert analyzing the 1979 use authorization and opining that it exempted recycling paper from TSCA); Ex. 80 [1984 American Paper Institute Letter] (American Paper Institute stating its position that by reason of the 1979 use authorization, no other exception for paper recycling was needed).

112.     The 1979 EPA use authorization for the continued use of carbonless copy paper concluded that such use did not present an unreasonable risk.  44 Fed. Reg. at 31,535.

113.     In 1984, EPA adopted an express exemption for "recycled PCBs."  EPA, *Final Rule, Toxic Substances Control Act; Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions; Exclusions, Exemptions and Use Authorizations*, 49 Fed. Reg. 28,172, 28,175 (July 10, 1984).

114.     In 1984, EPA concluded that the exemption for "recycled PCBs" did not present an unreasonable risk of injury to health or the environment.  49 Fed. Reg. at 28,180; *see also* 52 Fed. Reg. 25,838, 25, 839 (July 8, 1987).

115.     In the 1970's EPA implemented programs to promote recycling based on its many environmental benefits.  AMH Decl., Ex. 1 [1975 EPA Recycling Pamphlet]; *Id*., Ex. 2 [1977

EPA Fourth Report to Congress] at 38-39; *cf.* PJF Decl., Ex. 81 [Aug. 24, 2009 M. Williams Supp. Rebuttal Expert Report] ("EPA saw its role as duel [sic]– to encourage recycling and to protect public health and the environment").

116.   In the 1970's Congress passed laws that promoted recycling. *See e.g.*, 42 U.S.C. 4331(b) (National Environmental Policy Act) (including the goal of "enhanc[ing] the quality of renewable resources and approach[ing] the maximum attainable recycling of depletable resources").

## X.   CONTAMINATION OF THE FOX RIVER WITH PCBS DURING THE POST PRODUCTION PERIOD

117.   The principal source of PCB discharges during the Post Production Period was the recycling of wastepaper that contained CCP produced before mid-1971.  PJF Decl., Ex. 7 [PCBs-Issue & Evaluation].

118.   During the Post Production Period, PCB discharges were drastically reduced.  *Id*., Ex. 1 [2002 ROD] at 4; *Id*., Ex. 8 [July 10, 2009 C. Klass Expert Report at 13, 15]; *Id*., Ex. 9 [1977 Versar Report] at 4-5.

119.   The WDNR estimated that only a minimal amount of PCB discharges occurred after NCR stopped using PCBs in mid-1971.  *Id*., Ex. 1 [2002 ROD] at 4.

## CONCLUSIONS OF LAW

1.   Section 113(f)(1) of CERCLA provides that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).

2.   A court may allocate response costs under CERCLA Section 113(f)(1) on a summary judgment motion where there is no genuine issue of material fact.  *Envtl. Transp. Sys. Inc. v. ENSCO, Inc*., 969 F.2d 503, 509-10 (7th Cir. 1992) (affirming allocation of 100% of

response costs on summary judgment motion to subcontractor trucking company who was entirely responsible).

3.      Courts have broad discretion in this equitable allocation, and may consider "several factors, a few factors, or only one determining factor" in allocating response costs. *Envtl. Transp. Sys*., 969 F.2d at 509; *see also Town of Munster, Indiana v. Sherwin-Williams Co., Inc.*, 27 F.3d 1268, 1272 (7th Cir. 1994).

4.      Two factors that courts may consider in allocating response costs under Section 113(f)(1) are knowledge and fault.  *See Envtl. Transp. Sys*., 969 F.2d at 509; Doc. #252 [Scheduling Order] at 4 (stating "that knowledge and fault could constitute the principal bases on which contribution may be allocated").

5.      A court may allocate zero response costs to a party based on the equitable factor of knowledge.  *Gopher Oil Co. v. Union Oil Co.*, 955 F.2d 519, 527 (8th Cir. 1992) (affirming allocation of 100% of response costs to party who knew of contamination, and zero response costs to party who "did not have specific knowledge of the contamination"); *Folino v. Hampden Color & Chem. Co.*, 832 F. Supp. 757, 765 (D. Vt. 1993) (precluding recovery of response costs where party had knowledge of and concealed contamination).

6.      In evaluating the equitable factor of knowledge, a court may find that the party in the better position to know is liable for 100% of response costs.  *See Danella Southwest, Inc. v. Southwestern Bell Tele. Co.*, 775 F. Supp. 1227, 1234 (E.D. Mo. 1991) (contractor not required to contribute to response costs where it did not know of and had no reason to suspect contamination).

7.    A court may allocate zero response costs to a party based on that party's minimal contribution to the contamination.  *See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 274 F.3d 1043, 1048 (6th Cir. 2001) (affirming allocation of 100% of costs to party who released "exponentially more" PCBs and zero response costs to the party whose releases were minimal in comparison); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F. 3d 610, 616 (7th Cir. 1998) (affirming allocation of zero response costs to the party whose releases "may have been too inconsequential to affect the cost of cleaning up significantly"); *Gopher Oil Co. v. Union Oil Co.*, 955 F.2d 519, 527 (8th Cir. 1992) (affirming allocation of zero response costs to the party who did not "materially contribute to the contamination").

8.    A court may consider compliance with law as an equitable factor in allocating response costs.  *Environmental Transp. Sys. v. Ensco, Inc.*, 969 F.2d 503, 510 (7th Cir. 1992) ("compliance with industry regulations is an indication of the degree of care a party exercises with respect to hazardous substances").

9.    To the extent natural resource damages are subject to contribution under Section 113(f)(1) of CERCLA, equitable factors likewise may be considered to allocate natural resource damages.  *Champion Laboratories, Inc. v. Metex Corp.*, 2008 WL 1808309, *6-7 (D. N.J. 2008).

10.    Wisconsin state laws and federal regulations promoted the continued use of CCPs and the continued recycling of post-consumer waste paper containing CCP.  PJF Decl., Ex. 75 [1975 Wisconsin Assembly Bill 1342]; EPA, *Final Rule, Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibition*s, 44 Fed. Reg. 31,514 (May 31, 1979); EPA, *Final Rule, Toxic Substances Control Act; Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions; Exclusions, Exemptions and Use Authorizations*, 49 Fed. Reg. 28,172, 28,175 (July 10, 1984).

23

11.     There are no genuine issues of material fact that in the Production Period, prior to Plaintiffs having ceased manufacturing carbonless copy paper with PCBs in mid-1971, Plaintiffs "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage."

12.     There are no genuine issues of material fact that in the Production Period, prior to Plaintiffs having ceased manufacturing carbonless copy paper with PCBs in mid-1971, no Defendant "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage."

13.     There are no genuine issues of material fact that in the Production Period, prior to Plaintiffs having ceased manufacturing carbonless copy paper with PCBs in mid-1971, Plaintiffs "were in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless paper.

14.     Defendants should not be allocated any response costs and/or natural resource damages incurred as a result of PCB discharges before June 1971.

15.     There are no genuine issues of material fact that in the Post Production Period, after Plaintiffs ceased manufacturing carbonless copy paper with PCBs in mid-1971, continued recycling of post-consumer CCP was promoted by both the State of Wisconsin and the EPA and resulted in only minor and diminishing risks that were greatly outweighed by the ecological benefits of continued waste paper recycling.

16.     Defendants should not be allocated any response costs and/or natural resource damages incurred as a result of PCB discharges after June 1971.

Dated:  August 28, 2009

Respectfully Submitted,

 /s/   *Karl Lytz*
Karl S. Lytz


Ernest J. Getto
CA Bar No. 55662
Karl S. Lytz
CA Bar No. 110895
Andrea M. Hogan
CA Bar No. 238209
Patrick J. Ferguson
CA Bar No. 252778
Latham & Watkins LLP
505 Montgomery St., Ste. 2000
San Francisco, CA 94111-6538
Telephone:  (415) 391-0600
Fax:  (415) 395-8095
Ernie.Getto@lw.com
Karl.Lytz@lw.com
Andrea.Hogan@lw.com
Patrick.Ferguson@lw.com

Mary Rose Alexander
IL Bar No. 6205313
CA Bar No. 143899
Margrethe K. Kearney
IL Bar No. 6286559
Latham & Watkins LLP
233 S. Wacker Dr.
Ste. 5800
Chicago, IL 60606
Telephone: (312) 872-7700
Facsimile: (312) 993-9767
Mary.Rose.Alexander@lw.com
Margrethe.Kearney@lw.com