**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | | |
|---|---|---|
| APPLETON PAPERS INC. and NCR CORPORATION, | ) ) ) | No. 08-CV-00016-WCG |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| GEORGE A. WHITING PAPER COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) | |

---

**CERTAIN DEFENDANTS' RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS**

---

Pursuant to Civil L.R. 56.2(b) of the United States District Court for the Eastern District of Wisconsin, the City of Appleton, Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC (collectively, "Georgia-Pacific"), CBC Coating, Inc., Menasha Corporation, Neenah-Menasha Sewerage Commission, P.H. Glatfelter Company, US Paper Mills Corporation, and WTM I Company (collectively, the "Defendants"), responds to NCR Corporation ("NCR") and Appleton Papers Inc. ("API") (collectively, "Plaintiffs") Proposed Findings of Fact ("PPFF") in support of Plaintiffs' Motion for Summary Judgment on Phase I, and sets forth additional undisputed material facts that preclude summary judgment in favor of Plaintiffs.

# RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT[1]

## A.      Parties, Jurisdiction and Venue.

**PPFF 1:**      **API is a Delaware corporation with its principal place of business in Appleton, Wisconsin. Complaint, Case no. 08-CV-16-WCG, at ¶ 7.**

     Response to PPFF 1:

     Admit.

**PPFF 2:**      **NCR is a Maryland corporation with its principal place of business in Dayton, Ohio. Complaint, Case no. 08-CV-16-WCG, at ¶ 8; Complaint, Case no. 08-CV-895-WCG, at ¶ 7.**

     Response to PPFF 2:

     Admit.

**PPFF 3:**      **Defendants are identified in the original and amended complaints filed in Case no. 08-CV-16-WCG and Case no. 08-CV-895-WCG.**

     Response to PPFF 3:

     Admit.

**PPFF 4:**      **This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. §913(b), and 28 U.S.C. § 1331 (federal question). Complaint, Case no. 08-CV-16-WCG, at ¶ 5; Complaint, Case no. 08-CV-895-WCG, at ¶ 5.**

     Response to PPFF 4:

     Admit.

---

[1]      The evidence supporting Defendants' Responses to Plaintiffs' Proposed Findings of Fact includes: the evidence submitted by Plaintiffs attached to the Declaration of Ronald R. Ragatz ("Ragatz. Decl.") (Doc. # 579), the evidence submitted by Defendants attached to the Declaration of Patrick F. Ferguson ("PJF Decl.") (Doc. # 575, 582 and 583) in support of our Motion for Summary Judgment, filed on Aug. 28, 2009, and additional evidence not previously submitted attached to either the Declaration of Andrea M. Hogan ("AMH Decl.") or the Declaration of Jayni E. Foley ("JEF Decl.") submitted herewith. The JEF Decl. includes primarily documents produced by Plaintiffs after the discovery cut-off from the files from Wiggins-Teape's Butler's Court facility, a production which apparently is still ongoing. New documents from Butler's Court were produced as recently as September 29, 2009. Evidence not previously submitted to this Court is noted in **bold**.

**PPFF 5:** Venue is proper in this District pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 913(b), and 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims, including the alleged releases of hazardous substances, occurred in this District and the Lower Fox River is located entirely within this District. Additionally, Defendants conducted business or operations within this District at times relevant to the events described in the Plaintiffs' Complaints. Complaint, Case no. 08-CV-16-WCG, at ¶ 6; Complaint, Case no. 08-CV-895-WCG, at ¶ 6.

Response to PPFF 5:

Admit.

### B. Carbonless Paper.

**PPFF 6:** NCR invented carbonless paper in 1953. Declaration of Ronald R. Ragatz ("Ragatz Dec.") at ¶ 2, Ex. A (Plaintiff NCR Corporation's December 19, 2008 Responses to Defendant P.H. Glatfelter Company's First Set of Interrogatories ("Interrogatory Response") No. 1).

Response to PPFF 6:

Deny. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Plaintiff NCR Corporation's December 19, 2008 Responses to Defendant P.H. Glatfelter Company's First Set of Interrogatories No. 1 states "NCR states that it used an emulsion containing Aroclor 1242 in the manufacture of NCR Paper brand carbonless copy paper beginning in 1953/54 and ending in April 1971." The evidentiary material does not state when carbonless paper was invented.

**PPFF 7:** In its simplest form, carbonless paper involved two sheets of paper, a top sheet with coating on the back and a bottom sheet with coating on the front. *Id.* at ¶ 3, Ex. B (Deposition of Jerome Bodmer ("Bodmer Dep.") at 17-18); *Id.* at ¶ 4, Ex. C (Deposition of Dale Schumaker ("Schumaker Dep.") at 20).

Response to PPFF 7:

Admit.

**PPFF 8:** The top sheet was coated with an emulsion consisting of microscopic gelatin capsules containing dye dissolved in a solvent. *Id.* at ¶ 3, Ex. B (Bodmer Dep. at 20-21); *Id.* at ¶ 5, Ex. D (Deposition of Ronald Jezerc ("Jezerc Dep.") at 34); *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 75).

Response to PPFF 8:

Admit.

3

**PPFF 9:** **The original solvent in the microcapsules was a formulation of polychlorinated biphenyl ("PCB") sold by Monsanto as Aroclor 1242.** *Id.* **at ¶ 3, Ex. B (Bodmer Dep. at 30);** *Id.* **at ¶ 5, Ex. D (Jezerc Dep. at 34, 56).**

     Response to PPFF 9:

     <u>Admit</u>. However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. The deposition testimony of Jerome Bodmer at page 30 states:

     Q:     Do you know today who the manufacturer of the Aroclor was back in the 1960s?

     A:     I just - - I don't remember. Recollection, might have been Monsanto. I'm not sure.

Ragatz Decl. Ex. B [Mar. 16, 2009 J. Bodmer Depo Excerpts] at 30.

     This deposition testimony does not confirm that the "original solvent in the microcapsules was a formulation of polychlorinated biphenyl ("PCB") sold by Monsanto . . ."

**PPFF 10:** **Impact on the front of the top sheet (e.g., by typewriter key or pen) would rupture the capsules on the back of that sheet and release the dye that reacted with the coating on the front of the bottom sheet, thereby creating a copy of whatever was typed or written.** *Id.* **at ¶ 3, Ex. B (Bodmer Dep. at 20-21);** *Id.* **at ¶ 6, Ex. E (Deposition of William Goetz ("Goetz Dep.") at 103, 157).**

     Response to PPFF 10:

     <u>Admit</u>.

        C.     <u>Production Of Carbonless Paper During The Time PCBs Were Used.</u>

**PPFF 11:** **Commercial production and sale of carbonless paper began in 1954.** *Id.* **at ¶ 2, Ex. A (Interrogatory Response No. 1).**

     Response to PPFF 11:

     <u>Admit</u>.

**PPFF 12:** **NCR manufactured the emulsion.** *Id.* **at ¶ 6, Ex. E (Goetz Dep. at 40).**

     Response to PPFF 12:

     <u>Admit</u>.

**PPFF 13:** **NCR contracted with certain companies to apply the emulsion and other coatings to the paper.** *Id.* (Goetz Dep. at 38, 290-91); *Id.* at ¶ 7, Ex. F (Deposition of Floyd Strelow ("Strelow Dep.") at 116-117); *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 124).

Response to PPFF 13:

Admit.

**PPFF 14:** **One such company was Appleton Coated Paper Company ("ACPC"), a specialty paper coater based in Appleton, Wisconsin.** *Id.* at ¶ 6, Ex. E (Goetz Dep. at 38).

Response to PPFF 14:

Admit.

**PPFF 15:** **NCR sold the emulsion to ACPC and ACPC sold the coated paper back to NCR.** *Id.* (Goetz Dep. at 38, 79); *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 109).

Response to PPFF 15:

Admit. However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. None of the cited materials support that "ACPC sold the coated paper back to NCR."

**PPFF 16:** **NCR marketed and sold the finished carbonless paper to its customers.** *Id.* at ¶ 6, Ex. E (Goetz Dep. at 294).

Response to PPFF 16:

Admit.

**PPFF 17:** **The use of PCBs in carbonless paper ended in the spring of 1971.** *Id.* at ¶ 2, Ex. A (Interrogatory Response No. 1); *Id.* at ¶ 9, Ex. H (NCR-FOX 0162136-0162137).

Response to PPFF 17:

Deny. PPFF 17 is vague and requires greater specificity. Per Ragatz Decl. Exs. A (Interrogatory Response No. 1) and H (NCR-FOX 0162136-0162137) cited by Plaintiffs, NCR stopped using PCBs in CCP in April 1971. However, WT stopped using PCBs in CCP almost a year earlier, in July 1970. ***See* AMH Decl. Ex. 1 [Report on Apr. 28, 1970 Conversation with WT] (WT stating that the UK Ministry of Technology approved the step taken by WT to decide to make the switch from Aroclor to an alternative solvent); Ex. 2 [Monsanto Performance Review 1970 Objectives] (stating that Aroclor 1242 had been replaced in NCR paper coating in the UK by July 1970).**

**D.** **ACPC Corporate History.**

5

**PPFF 18:** **ACPC was incorporated in 1907 and remained a separate corporate entity throughout the time that PCBs were used in carbonless paper.** *Id.* **at ¶ 10, Ex. I (NCR-FOX 0090101-113).**

Response to PPFF 18:

Deny. In PPFF 17, Plaintiffs state "The use of PCBs in carbonless paper ended in the spring of 1971." In PPFF 22, Plaintiffs state "On or about September 30, 1970, The National Cash Register Company acquired Appleton Coated Paper Company, making it a wholly owned subsidiary." Therefore, between September 30, 1970 and the spring of 1971, when PCBs were still used in carbonless copy paper, NCR owned ACPC.

**PPFF 19:** **Through most of that time, NCR had no ownership interest in ACPC.** *Id.* **(NCR-FOX 0090101-13).**

Response to PPFF 19:

Admit.

**PPFF 20:** **NCR and ACPC simply had a contractual business relationship.** *Id.* **at ¶ 6, Ex. E (Goetz Dep. at 38).**

Response to PPFF 20:

Deny. PPFF 20 is vague because it does not provide a time period during which "NCR and ACPC simply had a contractual business relationship." Per PPFF 22, "On or about September 30, 1970, The National Cash Register Company acquired Appleton Coated Paper Company, making it a wholly owned subsidiary." Thus, after September 30, 1970, NCR and ACPC did not simply have a contractual business relationship — instead, NCR owned ACPC after September 30, 1970.

Additionally, there were intensive technical exchanges and a close working relationship between NCR, ACPC, Mead Corporation ("Mead"), and Wiggins-Teape ("WT"). ***See generally*** **Declaration of Jayni E. Foley ("JEF Decl."), Ex. 1, which is a compilation of all communications and meetings between NCR, ACPC, WT, Mead and other companies during the time frame between 1953 through 1971.**

E.          NCR Corporate History.

**PPFF 21:** **In September 1969, The National Cash Register Company acquired Combined Paper Mills, Inc., which became its wholly-owned subsidiary.** *Id.* **at ¶ 10, Ex. I (NCR-FOX 0090101-113).**

Response to PPFF 21:

Admit. However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Ragatz Decl., Ex. I, NCR-FOX 0090101-113 states "1969 . . . The National Cash Register

6

Company acquired Combined Paper Mills, Inc." [NCR-FOX-0090102], "Combined Paper Mills, Inc., acquired by the National Cash Register Company," [NCR-FOX-0090111], and "NCR Corporation acquired Combined Paper Mills in 1969," [NCR-FOX-0090112]. The evidentiary material cited does not state that the acquisition occurred in September, and instead only refers to 1969 generally.

**PPFF 22:** **On or about September 30, 1970, The National Cash Register Company acquired Appleton Coated Paper Company, making it a wholly owned subsidiary.** *Id.* **(NCR-FOX 0090101-13).**

Response to PPFF 22:

Admit.

**PPFF 23:** **On or about June 21, 1971, The National Cash Register Company created Appleton Papers, Inc. as a subsidiary by merging ACPC and Combined Paper Mills, Inc.** *Id.* **(NCR-FOX 0090101-13).**

Response to PPFF 23:

Admit.

**PPFF 24:** **Appleton Papers, Inc. was a wholly-owned subsidiary of The National Cash Register Company.** *Id.* **(NCR-FOX 0090101-13).**

Response to PPFF 25:

Admit.

**PPFF 25:** **Effective as of January 1, 1973, Appleton Papers, Inc. merged into The National Cash Register Company, and became known as the Appleton Papers Division of The National Cash Register Company.** *Id.* **(NCR-FOX 0090101-13).**

Response to PPFF 25:

Admit.

**PPFF 26:** **On or about May 10, 1974, The National Cash Register Company changed its name to NCR Corporation ("NCR"), a Maryland corporation, which is one of the Plaintiffs in this action.** *Id.* **(NCR-FOX 0090101-13).**

Response to PPFF 26:

Admit. However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Ragatz Decl. Ex I, NCR-FOX 0090101-13, states that on April 17, 1964 "The National Cash Register changed its name to NCR Corporation." NCR-FOX 0090101-13 does not refer to this event occurring "On or about May 10, 1974."

7

## F. API Corporate History.

**PPFF 27:** In June 1978, NCR sold the assets of the Appleton Papers Division to Lentheric Inc. *Id.* (NCR-FOX 0090101-113).

Response to PPFF 27:

Admit.

**PPFF 28:** Lentheric Inc. had no prior ownership affiliation with NCR or any prior interest in any of the Appleton Paper Divisions assets. *Id.* at ¶ 10, Ex. I (NCR-FOX 0090101-113).

Response to PPFF 28:

Admit.

**PPFF 29:** On or about June 30, 1978, Lentheric Inc. changed its name to Appleton Papers Inc. ("API"), which is one of the Plaintiffs in this action. *Id.* (NCR-FOX 0090101-113).

Response to PPFF 29:

Admit.

**PPFF 30:** API is a different corporation than Appleton Papers, Inc. *Id.* (NCR-FOX 0090101-113).

Response to PPFF 30:

Admit.

## G. 106 Order.

**PPFF 31:** In November 2007, the government issued a unilateral administrative order pursuant to CERCLA § 106 ("106 Order") to NCR and API, as well as six other recipients who are Defendants in this action. *Id.* at ¶ 11, Ex. J (106 Order).

Response to PPFF 31:

Admit.

**PPFF 32:** The 106 Order states that NCR is liable as a successor to at least two corporate predecessors. *Id.* (106 Order, ¶ 7a.i).

Response to PPFF 32:

Admit.

SF\720485.10

**PPFF 33:**       **The 106 Order likewise states that API is liable under CERCLA because it is a "successor" to companies that disposed of hazardous substances.** *Id.* **(106 Order, ¶ 7a.ii).**

      Response to PPFF 33:

      <u>Deny</u>. PPFF 33 is vague and incomplete. The Section 106 Order at ¶ 7a.ii states:

> Appleton Papers Inc. ("API") is a party that is liable for payment of response costs and performance of response activities at the Site because API is: (1) a successor to one or more corporate predecessors that, at the time of disposal of hazardous substances, owned and/or operated a facility at which such hazardous substances were disposed of, and from which there has been a release of hazardous substances to the Site; and (2) a successor to one or more corporate predecessors that by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances at a facility owned or operated by another party or entity and from which there has been a release of hazardous substances to the Site.

      Thus, the Section 106 Order states that API is liable both because it is a successor to companies that disposed of hazardous substances from facilities they owned and/or operated, and is a successor to companies that arranged for the disposal or treatment of hazardous substances.

**PPFF 34:**       **The 106 Order identifies the two corporate predecessors, ACPC and Combined Papers Mills, Inc. and their corporate history.** *Id.* **(106 Order, ¶ 7a.iv. and v).**

      Response to PPFF 34:

      <u>Deny</u>. PPFF 34 does not provide a complete description of the corporate predecessors of Plaintiffs. ACPC, Combined Paper Mills, Inc. and Appleton Papers, Inc. were all predecessors to NCR. ACPC, Combined Paper Mills, Inc., Appleton Papers, Inc. and NCR were all predecessors to API. *See* Ragatz Decl., Ex. I [106 Order, ¶ 7]; PJF Decl., Ex. 3 [http://www.ncr.com/about_ncr/company_overview /history.jsp]; Ex. 4 [Appleton Papers Chronology].

**PPFF 35:**       **The government does not state any basis for concluding that NCR is liable under CERCLA except as successor to ACPC and Combined Paper Mills, Inc.** *Id.* **at ¶ 11, Ex. J (106 Order, ¶ 7a.i).**

      Response to PPFF 35:

      <u>Admit</u>.

**PPFF 36:**       **API is alleged to have liability solely as a "successor."** *Id.* **(106 Order, ¶ 7a.ii).**

      Response to PPFF 36:

9

<u>Deny</u>. API is not alleged to have liability solely as a "successor." The counterclaims of many of the Defendants allege API's liability as a current owner of the Appleton Facility. *See* Doc. #310 [Georgia-Pacific's Answer, Affirmative Defenses and Counterclaims to Plaintiffs' Seventh Amended Complaint] at ¶ 38; *see also* Doc. #298 [P.H. Glatfelter Company's Answer, Affirmative Defenses and Counterclaims to Plaintiffs' Seventh Amended Complaint] at ¶ 14.

**PPFF 37:    API did no business until 1978, seven years after the use of PCBs in carbonless copy had ceased. *Id.* at ¶ 10, Ex. I (NCR-FOX 0090101-113).**

Response to PPFF 37:

<u>Admit</u>.

**PPFF 38:    Combined Paper Mills, Inc. conducted trial runs of CB coating on a limited basis for a short period of time when PCBs were used in making carbonless paper. *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 44).**

Response to PPFF 38:

<u>Deny</u>. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Dale Schumaker's deposition testimony at page 44 states:

Q:    Do you have any knowledge, prior to 1971, as to whether the CB Coating with the NCR emulsion was being applied at Combined Locks?

A:    They were attempting to do it in the later, I don't know, '69, '70 time frame. I'm not sure where the exact dates fall together because Combined Locks was purchased by NCR, and I don't know if the coating attempt came before that or after that. I know they had a coater there. They were extremely unsuccessful with what they were trying to do.

Ragatz Decl., Ex. C [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 44. Mr. Schumaker's testimony does not state that any trial runs of CB coating conducted by Combined Paper Mills, Inc. were conducted "on a limited basis for a short period of time."

### H.    ACPC Personnel.

**PPFF 39:    Jerome Bodmer was an ACPC chemist. *Id.* at ¶ 3, Ex. B (Bodmer Dep. at 16).**

Response to PPFF 39:

<u>Deny</u>. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Jerome Bodmer's deposition testimony at page 16 states:

Q:    And during your entire time at Appleton Papers, regardless of how your title changed, basically you did tests or experiments or measurements concerning coatings that Appleton Coated Paper put on paper. Is that a fair summary?

SF\720485.10

A:       Yes.

Ragatz Decl. Ex. B [Mar. 16, 2009 J. Bodmer Depo Excerpts] at 16.

The testimony discusses Jerome Bodmer's job responsibilities, but does not state that he was a chemist at ACPC.

**PPFF 40:       Dale Schumaker was ACPC's coatings manager.** *Id.* **at ¶ 4, Ex. C (Schumaker Dep. at 17-18).**

Response to PPFF 40:

Admit.  However, PPFF 40 is vague and incomplete because it provides no time period for which Dale Schumaker was ACPC's coatings manager.  Dale Schumaker was also the plant manager at ACPC from 1971 through 1979, and served in various other positions thereafter. **AMH Decl. Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 256-57.**

**PPFF 41:       Ron Jezerc was ACPC's research manager.** *Id.* **at ¶ 5, Ex. D (Jezerc Dep. at 15).**

Response to PPFF 41:

Admit.  However, PPFF 41 is vague and incomplete because it provides no time period for which Ron Jezerc was ACPC's research manager.

**PPFF 42:       William Goetz was an ACPC chemist.** *Id.* **at ¶ 6, Ex. E (Goetz Dep. at 26).**

Response to PPFF 42:

Admit.  However, PPFF 42 is vague and incomplete because it provides no time period for which William Goetz was an ACPC chemist.

**PPFF 43:       Floyd Strelow was ACPC's purchasing manager.** *Id.* **at ¶ 7, Ex. F (Strelow Dep. at 10-11).**

Response to PPFF 43:

Admit.  However, PPFF 43 is vague and incomplete because it provides no time period for which Floyd Strelow was ACPC's purchasing manager.

**PPFF 44:       Donald Christensen was an ACPC employee in the purchasing department.** *Id.* **at ¶ 8, Ex. G (Deposition of Donald Christensen ("Christensen Dep.") at 8).**

Response to PPFF 44:

Admit.  However, PPFF 44 is vague and incomplete because it provides no time period for which Donald Christensen was an ACPC employee in the purchasing department.

**I.       <u>Role Of ACPC.</u>**

**PPFF 45:      ACPC purchased the emulsion manufactured by NCR and it applied the coatings to the paper.** *Id.* **at ¶ 6, Ex. E (Goetz Dep. at 38-40);** *Id.* **at ¶ 5, Ex. D (Jezerc Dep. at 92).**

        Response to PPFF 45:

        <u>Deny</u>.  It is not clear whether ACPC purchased the emulsion directly from NCR or whether NCR provided the emulsion under some other form of accounting or contractual relationship.  Ragatz Decl. Ex. E (Goetz Dep. at 78) ("We'd buy the materials as specified by NCR").

**PPFF 46:      NCR marketed and sold the finished product to its customers.** *Id.* **at ¶ 6, Ex. E (Goetz Dep. at 294);** *Id.* **at ¶ 4, Ex. C (Schumaker Dep. at 203-04).**

        Response to PPFF 46:

        <u>Admit</u>.  However, PPFF 46 is incomplete.  Although ACPC operated as a contract coater, NCR had different arrangements with other companies, including a license arrangement in which Wiggins Teape marketed and sold the finished product.  PJF Decl. Ex. 2 [NCR's Responses to GP's First Set of Interrogatories at ¶ 4].  Similar license arrangements may have existed with other companies in Japan and Canada.  *Id.*

**PPFF 47:      ACPC never manufactured the emulsion for carbonless paper when it contained PCBs.** *Id.* **at ¶ 6, Ex. E (Goetz Dep. at 38-40).**

        Response to PPFF 47:

        <u>Admit</u>.

**PPFF 48:      ACPC did not control the chemical composition of the emulsion.** *Id.* **at ¶ 5, Ex. D (Jezerc Dep. at 93).**

        Response to PPFF 48:

        <u>Deny</u>.  The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.  The deposition testimony of Ronald Jezerc on page 93 states:

        Q:      And what were some of the issues in terms of handling that presented themselves?

        A:      The capsules did not disintegrate in our coaters.  They could handle in our color preparation.  We were a facilitator.  We were not a decision maker.  NCR was the one who made the capsules.  They had to make a decision on whether it handled all right.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 93.

        The testimony is in the context of a discussion regarding experimental trials on compounds to replace PCBs in CCP.  *Id.* at 92.  The deposition testimony states that ACPC was

12

not a decision maker in the context of these experimental trials, but does not directly support the statement that "ACPC did not control the chemical composition of the emulsion."

Moreover, there was a longstanding technical collaboration between ACPC and NCR, and the degree to which ACPC influenced the chemical composition of the emulsion is not known. *See* **JEF Decl., Ex. 1, [Chart: Communications Among ACPC, WT, And NCR].**

**PPFF 49:      NCR controlled the capsule technology and did not want ACPC to learn how to make capsules.** *Id.* **(Jezerc Dep. at 93, 108-09);** *Id.* **at ¶ 4, Ex. C (Schumaker Dep. at 43, 242).**

Response to PPFF 49:

Admit.

**PPFF 50:      ACPC did not know very much about the capsules because that was all controlled by NCR.** *Id.* **at ¶ 4, Ex. C (Schumaker Dep. at 31, 43, 74, 242).**

Response to PPFF 50:

Deny.  PPFF 50 is incorrect and incomplete because it omits significant information shared between NCR and ACPC, including that:

- There was a longstanding technical collaboration between ACPC and NCR, evidenced by the many meetings, visits to facilities and letters exchanged between 1953 and 1971.  *See* **JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR].**

- Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP**.  *See generally* JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; AMH Decl. Ex. 4  [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212; Ex. 12  [Jan. 28, 2009 F. Heinritz Depo. Excerpts] at 45-49, 118-119; Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79; JEF Decl. Ex. 178 [May 10, 1968 Letter from T. Busch, ACPC to H.V. Lauer, NCR].**

- By 1958, ACPC knew that the recycling broke caused the CCP capsules to rupture, discharging their contents.  **JEF Decl. Ex. 12  [Jan. 7, 1958 WT Letter to NCR & Attachment].**

- By 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper.  **JEF Decl. Ex. 35  [WT Report on December 2-4, 1963 visit to ACPC] at 5-6 (Representatives from WT discussed Aroclor release from CCP capsules with John Reeve and Tom Busch of ACPC).**

- ACPC gained information from NCR regarding the constituents of CCP by working with NCR to test constituents of NCR emulsion.  **JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT and NCR]; AMH Decl. Ex. 5  [July 24, 1967 ACPC Memo]; Ex. 6 [Sept. 28, 1967 ACPC Memo].**

13

- ACPC gained information from NCR regarding the constituents of CCP by working directly with NCR in its development of patents for paper processes. **AMH Decl. Ex. 8 [Sept. 15, 1967 ACPC Memo]; Ex. 9 [Patent No. 3,311,499].**

- ACPC learned that Aroclor 1242 was a constituent of NCR emulsion based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR. **AMH Decl. Ex. 15 [Process Specification 2036.93]; Ex. 7 [May 19, 1967 ACPC Memo].**

- ACPC had internal meetings in 1969 about replacing Aroclor in NCR emulsion due to the adverse environmental effects of PCBs. **AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpts] at 52, 60; Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269; Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77.**

**PPFF 51:       The role of ACPC was to apply the coating so that the product performed in a way that was acceptable to NCR and its customers.** *Id.* **at ¶ 5, Ex. D (Jezerc Dep. at 30-31);** *Id.* **at ¶ 4, Ex. C (Schumaker Dep. at 32).**

Response to PPFF 51:

Deny. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. The deposition testimony of Dale Schumaker on page 32 states:

Q:       Do you remember, prior to 1970 --

A:       Uh, huh.

Q:       -- when you learned that there were PCBs in NCR emulsion?

A:       No idea. In fact, I wouldn't know what they were at that point in time, except for the fact that I do have some chemistry background. But that wasn't our concern.

Q:       Your concern was coating; is that right?

A:       Our concern was to take the emulsion, make it into a satisfactory coating, put it on the paper, make a satisfactory product and not spend too much money doing it. That's an oversimplification.

Ragatz Decl. Ex. C [Aug. 19, 2009 D. Schumaker Depo. Excerpt] at 32.

The deposition testimony of Ronald Jezerc simply describes the process of applying coating to carbonless copy paper. Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 30-31. While the deposition testimony supports that ACPC's concern was to make "satisfactory coating" and "satisfactory product," the testimony does not expressly state that ACPC's role "was to apply the coating so that the product performed in a way that was acceptable to NCR and its customers."

ACPC also had other roles with respect to CCP and NCR's emulsion. As PPFF 56 states "ACPC did trial runs using emulsion with the replacement solvents in order to determine whether the new emulsion could be effectively applied to the paper in a way that would produce acceptable performance by the finished carbonless paper." *Id.* (Jezerc Dep. at 77-78). Therefore, ACPC's role was not only to apply the coating. Furthermore, ACPC arranged for the disposal of PCB-containing broke through brokers. Doc. #334 [Plaintiffs Appleton Papers Inc. and NCR Corporation's Answer To Defendant Menasha Corporation's Counterclaim] at 4-6.

**PPFF 52: ACPC treated the emulsion as a very valuable product.** *Id.* **at ¶ 5, Ex. D (Jezerc Dep. at 32, 189).**

Response to PPFF 52:

Admit.

## J.     ACPC's Knowledge And Actions.

**PPFF 53: ACPC first learned of generalized concerns about PCBs in mid to late 1969.** *Id.* **(Jezerc Dep. at 58, 74).**

Response to PPFF 53:

Deny. PPFF 53 is vague and overbroad, particularly with respect to the phrase "generalized concerns." For example, in his deposition testimony, at page 57, Ronald Jezerc specifically testifies as follows:

Q:     When you started working at Appleton in 1964, when you first came to Appleton, did you know that the NCR emulsion with which you were working contained PCBs?

A:     Somewhere in there I must have found out, but ---

Q:     Right. I'm trying to determine when, in fact, you figured that out, if you recall.

A:     Maybe when I read the patent.

Q:     Okay. Do you recall reading the patent?

A:     I don't know.

Q:     Okay.

A:     I really don't know. I --

Q:     That's fine. That's fine. So at some point it sounds like you did have an understanding that the NCR emulsion contained PCBs; is that correct?

A:     Yes.

15

Q:    Okay. But you can't remember if it was in 1964, 1965, 1966, but sometime between 1964 and 1971, you learned that information; is that right?

A:    '69 I would -- I had to have known before that time.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpt] at 57.

Mr. Jezerc continues on to testify on page 74, regarding the determination to eliminate the use of PCBs in NCR emulsion:

Q:    -- okay? All right. Do you recall when it was determined that PCBs should be phased out of the emulsion?

A:    Well, I've done a lot of thinking about this, and I'm not sure how I answered this type of question the first time around, but sometime in '69, people became concerned that articles were being written about the power industry and their leaky transformers, which contained PC- -- Aroclor as the coolant. So the supplier, rightfully so, decided sometime in '69 that Aroclor was going to be discontinued as a sales item and they were no longer going to manufacture it.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpt] at 74.

Further, Mr. Jezerc previously testified that he became aware in the late 1960s of various publications describing the environmental aspects and the persistence of PCBs. **AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpt] at 60.** Mr. Jezerc also testified that the concerns raised in these articles related to the bioaccumulation and biopersistence of PCBs in the environment and in animals. *Id*. at 60-61. An additional concern, according to Mr. Jezerc, was whether PCBs impacted the food chain. *Id*. at 60-61. Mr. Jezerc also recalled a meeting with his supervisor, Tom Busch, in 1969 to discuss replacing Aroclor due to several environmental studies that he read which discussed the harmful environmental effects of PCBs. **AMH Decl. Ex. 21 [2006 Jezerc Depo.] at 51-52; Ex. 4 [April 20, 2009 Jezerc Depo.] at 74, 77, 171-172; Ex. 24 [Sept. 30, 1970 ACPC Quarterly Report] (stating that the change in the NCR emulsion from PCBs (Aroclor) to MIPB was made "to satisfy environmental preservation regulations.")**

The ACPC Plant Manger at the time, Lawrence Casey, also testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." **AMH Decl. Ex. 11 [Nov. 10, 2006 L. Casey Depo. Excerpt] at 39-41.** Similarly, ACPC Assistant Solvent Manager Dale Schumaker learned of PCB concerns from ACPC Vice President Tom Busch, and Schumaker discussed the decision to change the Aroclor emulsion with Busch**. AMH Decl. Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269.**

To summarize Messrs. Jezerc, Casey and Schumaker's testimony, ACPC knew *specifically* of environmental and health concerns about PCBs used in the NCR emulsion and the production of CCP by 1969, at the latest. ACPC knew of the scientific studies regarding the persistence of PCBs in the environment by the late 1960s. Thus, Plaintiffs' statement that "ACPC first learned of generalized concerns about PCBs in mid to late 1969," is vague and overbroad.

**PPFF 54:** **Upon learning of concerns related to PCBs, ACPC promptly began cooperating with NCR in efforts to identify a replacement solvent.** *Id.* **at ¶ 5, Ex. D (Jezerc Dep. at 188).**

Response to PPFF 54:

Deny. The proposed finding of fact is vague as to what constitutes "concerns related to PCBs," and does not indicate whether this phrase refers to concerns regarding potential toxicity to humans, including workplace exposures, concerns about toxicity to wildlife, concerns about environmental persistence and the propensity to bioaccumulate, or none, all, or a subset of these concerns.

The proposed finding of fact is also defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. The deposition testimony of Ronald Jezerc on page 188 states:

Q:      So when you were involved in finding or perfecting the coating and the whole phasing out of PCBs in the coating, were you thinking that this was not a worthwhile thing to do, that there was no  --

A:      Oh, no.

Q:       -- reason to do it?

A:      No, no.  By that time it was 1970 and – or '69, and it was pointed out to me by executives that we would replace that, period.

Q:      And you never - -or did you ever ask about the need to do that?

A:      No.  I was a good follower.

Q:      Good soldier?

A:      Right.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 188.

Mr. Jerzec's testimony thus described how he was a "good follower" and did not ask questions about the need to find a replacement for PCBs in the emulsion for carbonless copy paper. This deposition testimony does not support the statement that "Upon learning of concerns related to PCBs, ACPC promptly began cooperating with NCR in efforts to identify a replacement solvent."

**PPFF 55:** **NCR worked with Monsanto to find potential replacement solvents.** *Id.* **(Jezerc Dep. at 87-88).**

Response to PPFF 55:

Admit.

**PPFF 56:     ACPC did trial runs using emulsion with the replacement solvents in order to determine whether the new emulsion could be effectively applied to the paper in a way that would produce acceptable performance by the finished carbonless paper.** *Id.* **(Jezerc Dep. at 77-78).**

Response to PPFF 56:

Admit.

**PPFF 57:     ACPC did not believe that the attention raised about PCBs applied to Aroclor 1242.** *Id.* **at ¶¶ 13-14, Ex. L (MONSFOX00002456-457), Ex. M (NCR-FOX 0592823).**

Response to PPFF 57:

Deny. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

Exhibit L, MONSFOX00002456-457, is a letter from Monsanto to "Sirs." It is not addressed to ACPC, and there is no evidence that ACPC ever received it. Further, the letter states "As your supplier of Aroclor 1254 and 1260 and formulated products containing 1254, we wish to alert you to the potential problem of environmental contamination as referred to in the newspaper and magazine articles." The letter also states "We realize that you have marketed or may now market transformers and other electrical equipment containing dielectric fluids which include Aroclor 1254 and 1260." The letter is directed to purchasers of Aroclor 1254 and 1260 and companies that market transformers and electric equipment, a universe that does not include ACPC. There is no evidence nor support for the proposition that this letter was sent to ACPC, nor that any information contained in the letter written by Monsanto can be imputed to ACPC.

Exhibit M, NCR-FOX 0592823, are the notes of Plaintiffs' expert Marcia Williams on an interview with Ronald Jezerc on January 5, 2005. Ms. Williams notes state:

> When asked what it was that made total substitution necessary, Mr. Jezerc again emphasized the increased attention to PCBs by the press and the increasing public attention on PCBs as a potential environmental concern.[1] At the close of our interview, Mr. Jezerc reiterated that the replacement project became full blown because the "rumblings were increasing." He explained that at that time Aroclor was a great product; it had not caused the company any manufacturing problems, serious customer complaints, or employee issues or concerns.[2]

Footnote 1 states: "Mr. Jezerc mentioned as one of the motivations for replacing Aroclor, a "ruling" by a judge that mono-, di-, and tri- were all polychlorinated biphenyls. He explained that ACPC did not understand the basis for the ruling since Monsanto had represented to them that the Aroclor 1242 was not a polychlorinated biphenyl (because 1242 was not a poly-). However, based on this public 'ruling' ACPC understood that the government, and the general

public, was sending a message about PCBs. We note that we have not been able to find any confirmation of a 'ruling' or something along similar lines that occurred around this time."

Footnote 2 states: "Mr. Jezerc also noted that Monsanto had assured ACPC that Aroclor 1242 was 'mono or di-' and therefore not a polychlorinated biphenyl. Because of this, ACPC did not believe that the attention raised about Aroclor bioaccumulation applied to them."

When read as a whole, Ms. Williams' notes indicate that while Mr. Jezerc stated that "Monsanto had assured ACPC that Aroclor 1242 was 'mono or di-' and therefore not a polychlorinated biphenyl" he also told Ms. Williams that a motivating factor for replacing Aroclor 1242 in NCR's emulsion was "a 'ruling' by a judge that mono-, di-, and tri- were all polychlorinated biphenyls." Therefore, the cited evidentiary material does not support that "ACPC did not believe that the attention raised about PCBs applied to Aroclor 1242."

Additionally, Ms. Williams notes of Mr. Jezerc's statements are inadmissible hearsay in violation of Fed. R. Evid. 802, and thus also violate L.R. 56(a)(2).

Moreover, Aroclor 1242, like all other Aroclors, was a mixture of different chlorine compounds, such that it overlapped with Aroclors with higher chlorine percentages, such as Aroclor 1248 and 1254. **AMH Decl. Ex. 14 [Aroclor Chart]; Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts] at 14-16** ("Arcolor 1242 was homed in on a trichlor or three-chlorine homologue, but in point of fact, it did contain all the homologues up to and including the hexachlor and the six chlorine ones. Now, altogether, in any of the Aroclors there were about 200 different components of different chlorine levels, including not only the level of chlorine, but also the different arrangement of the chlorine atoms around the molecule.")

**AMH Decl. Ex. 14 Aroclor Chart:**



Further, ACPC's Plant Manger Lawrence Casey, testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." **AMH Decl. Ex. 11**

**[Apr. 20, 2009 L. Casey Depo. Excerpt] at 39-41.** Mr. Busch stated that his "research people" discovered the issue with PCBs. *Id.* Additionally, Michael Stevens, a former ACPC chemist, testified at page 43 of the following:

> Q:     What was your understanding as to why National Cash Register wanted to replace or get rid of Aroclor?
>
> A:     I asked Lee Yurkowitz that question. I said, you've been telling me that Aroclor is the finest carbonless paper solvent ever used. Why are you trying something else? Particularly since it wasn't quite as good a solvent, as it turned out, as Aroclor was.
>
> And he said it was his understanding that the basic research group, one of their duties was to cull the university literature on arcane subjects that might have some impact on our business, and there was a term used in some of those relative to Aroclor. The term was "biopersistent." And I said, what does that mean? And he said, it means it sticks around in the environment. . . .

**AMH Decl. Ex. 23 [Mar. 13, 2009 M. Stevens Depo. Excerpts] at 43.**

**PPFF 58:     At that point, NCR was already looking for a replacement solvent. *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 88).**

Response to PPFF 58:

<u>Deny</u>. PPFF 58 is vague and ambiguous. It is not clear what time frame "At that point," refers to. The deposition testimony of Ronald Jezerc at page 88 states:

> Q:     Okay. All right. You spoke of replacing PCBs in the NCR emulsion. What was the compound, if you know that eventually replaced PCBs in the NCR emulsion?
>
> A:     I knew at the time.
>
> Q:     Okay. Was it - -does MIPB ring a bell?
>
> A:     I believe that is the – yes.
>
> Q:     All right. And how were you involved, if at all, in replacing PCBs with MIPB?
>
> A:     How was I involved?
>
> Q:     Yeah. Yes.
>
> A:     Running trials in cooperation with NCR.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 88.

Mr. Jezerc's testimony does not state when NCR began to look for a replacement solvent, and it is not clear what time frame "At that point" refers to.

SF\720485.10

Moreover, other evidence indicates that NCR began looking for replacements to Aroclor 1242 in the 1950s because of concerns about Aroclor's toxicity, odor and cost. **JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in toxicity, odour and cost.")**

**PPFF 59:      The transition to a replacement solvent was made in approximately the spring of 1971.** *Id.* **at ¶ 9, Ex. H (NCR-FOX 0162136-137).**

Response to PPFF 59:

Deny. WT stopped using PCBs in CCP in the UK a year earlier, in July 1970. **AMH Decl. Ex. 1 [Report on Apr. 28, 1970 Conversation with WT] (WT stating that the UK Ministry of Technology approved the step taken by WT to decide to make the switch from Aroclor to an alternative solvent); Ex. 2 [Monsanto Performance Review 1970 Objectives] (stating that Aroclor 1242 had been replaced in NCR paper coating in the UK by July 1970).**

**PPFF 60:      There is no evidence that ACPC was aware that recycling NCR-brand carbonless paper would result in the discharge of PCBs to any water body.** *Id.* **at ¶ 5, Ex. D (Jezerc Dep. at 82, 187, 195);** *Id.* **at ¶ 8, Ex. G (Christensen Dep. at 64-65);** *Id.* **at ¶ 7, Ex. F (Strelow Dep. at 66, 99-100);** *Id.* **at ¶ 4, Ex. C (Schumaker Dep. at 193);** *Id.* **at ¶ 3, Ex. B (Bodmer Dep. at 37-38).**

Response to PPFF 60:

Deny. ACPC "was aware that recycling NCR-brand carbonless paper would result in the discharge of PCBs to any water body."

*First*, ACPC's knowledge must be placed in the context of its longstanding technical collaboration between ACPC and NCR, evidenced by the many meetings, visits to facilities and letters exchanged between 1953 and 1971. *See* **JEF Decl., Ex. 1, listing all communications and meetings between NCR, ACPC, WT and other licensees, for which evidence has been produced, during the time frame between 1953 through 1971 [Chart: Communications Among ACPC, WT, And NCR].** Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP. *See generally* **JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; AMH Decl. Ex. 4  [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212; JEF Decl. Ex. 178 [May 10, 1968 Letter from T. Busch, ACPC to H.V. Lauer, NCR]; Ex. 12 [Jan. 28, 2009 F. Heinritz Depo. Excerpts] at 45-49, 118-119; Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79.** Over the next two decades, NCR, ACPC, and WT held more than sixty-five (65) in-person technical meetings, on a wide range of topics related to CCP, including NCR broke, recycling, and Aroclor content. **See JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; Ex. 12 [January 7, 1958 NCR Letter] (stating that NCR has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company," and that ACPC and Mead "sell it to other paper making firms who re-use it").**

During this long technical collaboration, WT conducted a new and intensive program to test Aroclor concentrations in the broke recycling process in order to determine how to best re-use NCR broke, based on WT's understanding that Aroclor made the NCR broke potentially "toxic." **JEF Decl. Ex. 52 [Nov. 5, 1964 Notes of meeting between BAT and WT regarding Aroclor] ("Aroclor, a chlorinated diphenyl, is toxic"); Ex. 70 [Apr. 1, 1965 Memo on WT visit to NCR] at 18-19; see also AMH Decl. Ex. 62 [March 16, 1965 WT Letter re: Aroclor testing] [Gough Depo. Ex. 1010-I].** The results of WT's testing established that recycling CB and CFB broke (*i.e.*, PCB-containing broke) would result in the discharge of PCB-laden wastewater. **JEF Decl. Ex. 89 [Aug 4, 1965 letter from BAT to WT] [Gough Depo. Ex. 1010-P]; Ex. 111 [Nov. 25, 1965 BAT to WT letter] [Gough Depo. Ex. 1010-T].**

*Second*, as early as 1958, ACPC knew recycling the broke from CCP caused the capsules to rupture, discharging their contents. A letter from WT to NCR in January 1958 states that WT has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company. It is my understanding that neither mill reprocesses their own NCR Paper waste but that they sell it to other paper making firms who re-use it in fairly high grade papers." **JEF Decl. Ex. 12 [January 7, 1958 NCR Memo & Attachments].** There is also correspondence from 1965 from WT to ACPC regarding repulping NCR broke. **JEF Decl. Ex. 79 [May 19, 1965 ACPC Letter].**

*Third*, by 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper. During a visit by WT to ACPC, the two companies discussed the issue of the release of Aroclor due to capsule breakage in a certain application of CCP, "CB Cheque Papers." **JEF Decl. Ex. 35 [WT Report on December 2-4, 1963 visit to ACPC] at 5-6 ("This capsule breakage leads to release of the oil (Arachlor)").**

Additionally, Ronald Jezerc's deposition testimony at page 74 states:

Q:      --okay? All right. Do you recall when it was determined that PCBs should be phased out of the emulsion?

A:      Well, I've done a lot of thinking about this, and I'm not sure how I answered this type of question the first time around, but sometime in '69, people became concerned that articles were being written about the power industry and their leaky transformers, which contained PC - - -Aroclor as the coolant. So the supplier, rightfully so, decided sometime in '69 that Aroclor was no longer going to be discontinued as a sales item and they were no longer going to manufacture it.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 74.

 Further, ACPC gained information from NCR regarding the constituents of CCP:

- By working with NCR to test constituents of NCR emulsion. **JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT and NCR]; AMH Decl. Ex. 5 [July 24, 1967 ACPC Memo]; Ex. 6 [Sept. 28, 1967 ACPC Memo].**

- By working directly with NCR in its development of patents for paper processes. **AMH Decl. Ex. 8 [Sept. 15, 1967 ACPC Memo]; Ex. 9 [Patent No. 3,311,499].**

22

and,

- Based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR. **AMH Decl. Ex. 15 [Process Specification 2036.93]; Ex. 7 [May 19, 1967 ACPC Memo].**

*Fourth*, ACPC knew that PCBs raised environmental concerns and caused environmental harm. Ronald Jezerc's deposition testimony at page 77-80, 171-72, and 282 states:

Q:      Okay. Do you remember the time frame that you first either heard or read about problems with PCBs?

A:      It had to be in mid-'69.

*        *        *

Q:      Okay. When you were apprised or learned of problems with PCBs, what did you understand the problem to be?

A:      That it sat around and didn't break up.

Q:      Okay. Would this be an issue relating to biodegradability.

A:      Yeah.

*        *        *

Q:      Okay. And so it was only after it had been released into the environment that you understood a concern to be posed by PCBs at this time?

A:      I think that's what it was.

*        *        *

Q:      Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB. From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs?

(Objection omitted)

A:      I don't have any idea whether there were other reasons.

Q:      Okay. But environmental concerns was the reason that you understood at the time they were being phased out; is that correct?

(Objection omitted)

A:      Yes.

23

*    *    *

Q:    Did he [Mr. Busch] agree with you that something had to be done about PCBs in '68/'69?

(Objection omitted)

A:    Yes.

**AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 282.**

Further, Mr. Jezerc previously testified that he became aware of various publications describing the environmental aspects of PCBs in the late 1960s and discussing the persistence of PCBs. **AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpt] at 60.** Mr. Jezerc also testified that the concerns raised in these articles related to the bioaccumulation and biopersistence of PCBs in the environment and in animals. *Id*. at 60-61. An additional concern, according to Mr. Jezerc, was whether PCBs impacted the food chain. *Id*. at 60-61.

The ACPC Plant Manger at the time, Lawrence Casey, also testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." **AMH Decl. Ex. 11 [Apr. 20, 2009 L. Casey Depo. Excerpt] at 39-41.** Similarly, ACPC Assistant Solvent Manager Dale Schumaker learned of PCB concerns from ACPC Vice President Tom Busch, and Schumaker discussed the decision to change the Aroclor emulsion with Busch. **AMH Decl. Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269.**

*Fifth*, ACPC was aware of environmental concerns regarding discharge containing PCBs entering the River. Ronald Jezerc's deposition testimony at page 73 states:

Q:    Okay. At the time of this letter, I guess it is 1968, or memo, was there a concern about having the wash-up water go to the river? You mentioned it didn't have to go to the river. Just money?

A:    That was our main concern.

Q:    Okay. So it wasn't – environmental concerns were not an issue here?

A:    I don't think that they came in until '69. You want to talk about that? I thought that's what we were going to talk about today.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 73.

In sum, ACPC knew that recycling broke from CCP ruptures the capsules, it knew that CCP and broke contained PCBs, it knew that PCBs raised environmental concerns and caused environmental harm, and it was concerned about the discharge of PCBs entering the River.

Further, based on the extensive meetings and consultations regarding broke recycling that occurred among NCR, WT, ACPC and Mead during the period of 1957 through 1964, and based

24

specifically on the analytic work and extensive technical consultations regarding broke recycling that occurred during 1965, as detailed in JEF Decl. Exhibit 1, ACPC in fact knew in 1965 at the latest that the recycling of broke would result in the release of PCBs into the environment.

**AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 282.**

      **PPFF 61:     Defendants' PCB expert testified that the chronic effects of PCBs in the environment were not known until 1973 or 1974.** *Id.* **at ¶ 12, Ex. K (Deposition of Joseph V. Rodricks ("Rodricks Dep.") at 65-66).**

      Response to PPFF 61:

      <u>Deny</u>.  PPFF 61 is taken out of context and is incomplete.  The deposition testimony of Joseph Rodricks at page 66 states:

      Q:     There's a sentence at the beginning of that second section that's Roman numeral II, "Toxicological Aspects," and the sentence says - - it reads, "Compared to the chlorinated hydrocarbon pesticides, definitive aspects of acute, subacute and chronic toxicity still remain rather poorly known."

      A:     Uh-huh. Yes, and that's true at the time, sure.

      Q:     That was true at the time, that the definitive aspects of chronic toxicity of PCBs were poorly known at that time?

      A:     They didn't become –the first reports were on 1242 and reproductive effects in the early '70s, and then chronic effects didn't become clear until '73 or 4.

      Q:     Okay.

      A.     So, I never claimed that they were,  These are -- the studies reported were studies of relatively short-term duration showing the systemic effects, and that was clearly a signal of toxicity.

      Q:     So chronic effects weren't known at that time of PCBs?

      A:     No, not that I - - I've never seen that in the literature.  Whether Monsanto had something unpublished, I don't know.

Ragatz Decl. Ex. K [Aug. 20, 2009 J. Rodricks Depo. Excerpt] at 66.

      On page 68, the deposition testimony continues on to state:

      Q:     That it – if I understand you, what you're saying is that the understanding of whether this broad exposure has toxicological implications was poorly known at that time?

                         \*        \*        \*

A.    I would say that it raises – they raise questions about what were, in the early '70s, becoming issues of greater concern, like the formation of tumors in animals or humans, or the effects on reproduction or development process.  They were becoming available at that time, animal test systems, that were giving more definitive clues on that.

So what they're saying is that given the widespread exposure we know is occurring, we need to know a lot more about those kinds of effects given this widespread and chronic exposure that's going on in human – in human populations.

Ragatz Decl. Ex. K [Aug. 20, 2009 J. Rodricks Depo. Excerpt] at 68-69.

The expert report of Joseph Rodricks puts the above deposition testimony into context as it details all the scientific studies of PCBs occurring from the 1930s on:

- "Shortly after the commercialization of PCBs in 1930, reports began to appear in the scientific literature of cases of poisoning of workers involved in PCB manufacture and use.  Soon thereafter, studies were initiated on animals regarding the effects of PCBs administered by inhalation, ingestion, and subcutaneous injection.  These studies documented severe skin lesions in workers (chloracne), and significant liver damage in workers and animals."

- "By the 1940s, more skin and liver problems had been observed in electricians and factory workers exposed to products that contained PCBs.  Journal articles described the toxicity of 'Aroclors' as having 'been repeatedly demonstrated, both from the standpoint of their absorption from the inspired air as well as from their effect in producing a serious and disfiguring dermatitis when allowed to remain in contact with the skin.'"

- "These and other early studies published in the open scientific literature prior to NCR's development of CCP provided a clear indication that PCBs, including the particular PCB mixture selected by NCR for this use, Aroclor 1242, was a potentially hazardous substance, and that care needed to be taken to prevent exposure of humans, animals, or environmental media."

- "By the mid 1960s there was ample scientific reason for NCR to believe that non-occupational exposures to PCBs, as might occur through the food chain, could pose a risk of harm to human health."

- "Some of the first PCB toxicity testing programs on birds were reported in 1962 by Dr. E.L. McCune and colleagues at the University of Missouri, who observed toxicity associated with the paint used on laboratory chicken cages; the paint contained Aroclor 1242. . . . .McCune et al. found that 'the major toxic agent is the chlorinated biphenyl.'"

- "In 1965, Flick et al. reported pathological changes occurring in chicks ingesting PCBs at various dietary levels.  Pathological changes included discoloration of the

26

pancreas, enlarged hemorrhagic kidney, enlarged adrenal, dermatitis, and de-feathering."

- "Analytical methods capable of identifying PCBs in tissue samples became available in 1966, when Jensen identified PCBs in 200 pike (Esox lucius), fish spawn, a white-tailed eagle (Haliaeetus albicilla), and humans from Sweden using gas chromatography—mass spectroscopy (GC-MS) techniques. Jensen described PCBs as 'related to and as poisonous as DDT,' and stated that PCBs may enter the body through skin, inhalation, or by ingestion."

- "Shortly thereafter, UK government chemists, Dr. D.C. Holmes and colleagues reported PCBs in the liver of a European kestrel (Falco tinnunculus) and Dr. Widmark of the University of Stockholm (Sweden) detected PCBs in fish, seabirds, conifer needles, and human fat."

- "Dr. R.W. Risebrough of the University of California ("UC") at Berkeley and colleagues from UC Berkeley, UC Davis, Cornell University and the San Diego Natural History Museum presented chromatographic data showing PCBs in Arctic peregrines, California birds, and fish and seabirds from the Pacific Ocean."

- "In 1969, Dr. Joseph Street and colleagues at Utah State University, who presented at the national meeting of the American Chemistry Society, and reported that higher-level chlorinated PCBs induced enzyme activity at a potency exceeding DDT and hypothesized that, if toxicological effects are related to enzyme induction, then PCBs could confound pesticide-related effects and add to toxicity."

**AMH Decl. Ex. 25 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 30-33.** PPFF 61 is therefore, out of out of context and is incomplete. It does not include that Mr. Rodricks testified "that given the widespread exposure we know is occurring, we need to know a lot more about those kinds of effects given this widespread and chronic exposure that's going on in human – in human populations," and does not include any reference to the multitude of PCBs studies and reports from the 1930s on that discuss toxicity and exposure issues related to PCBs.

Moreover, PPFF 61 ignores that scientific studies regarding the bioaccumulation of PCBs were publicly available well before 1973 or 1974. Mr. Rodricks' expert report states that as early as the 1950s "based on both publicly available scientific knowledge and private testing results, NCR knew, or should have known, that PCBs were: (a) toxic to animals and people; (b) stable and persistent in the environment; (c) highly soluble in fatty materials such as milk; and (d) not soluble in water. The latter three characteristics should have given rise to a suspicion by NCR that PCBs could bioaccumulate in the food chain." PJF Decl. Ex. 6 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 56. Mr. Rodricks also identifies studies in the 1960s finding that "PCBs were widely dispersed and persistent in the environment," and that PCBs were found in "fish spawn, pike, and a sea eagle that lives on fish." Id. at 42 (citing to Soren Jensen's 1966 study; a 1977 study by Holmes; and a 1968 study by Risebrough).

SF\720485.10

In addition, by the late 1960s ACPC itself was aware of environmental concerns about PCBs documented in published scientific studies. ACPC's Manager of Research, Ron Jezerc, has testified that he and others in his department became aware of the environmental aspects of PCBs from reading articles in journals in the late 1960s. **AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpts] at 52, 60.** By the late 1960s, ACPC was concerned about the persistence of the material in the environment and they were aware of a concern about wildlife and the potential that Aroclor might impact the food chain. **AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpts] at 60-61.**

**PPFF 62:     Defendant's PCB expert simply assumed without any basis that ACPC had the same knowledge as NCR.** *Id.* at ¶ 12, Ex. K (Rodricks Dep. at 231-33).

Response to PPFF 62:

Deny. Defendants attempted for many months to gain access to documents that are highly relevant to this litigation, and relate to ACPC's knowledge, at such locations as the former Wiggins Teape Research & Development laboratory in Butler's Court, UK. Defendants attempted to obtain these documents directly through NCR and API, but were stymied at every turn. *See* Doc. #421 [Apr. 14, 2009 Motion to Compel Appleton Coated LLC]; Doc. #421 [Apr. 14, 2009 Motion to Compel Appleton Coated LLC]. On January 29, 2009, Georgia-Pacific subpoenaed third-party Appleton Coated LLC ("ACC") for relevant documents in its "possession, custody, or control," and then was forced to file a motion to compel on April 14, 2009. *See* Doc. #421. Georgia-Pacific also moved to compel API on April 14, 2009 to produce these same documents. *See* Doc. #424 [Apr. 17, 2009 Motion to Compel Appleton Papers Inc.].

This court granted Georgia-Pacific's motions to compel on July 31, 2009, and ordered ACC and API to "to search for and produce any documents in the possession of AWA or Arjowiggins SAS that are responsive to Georgia-Pacific's subpoenas." *See* Doc. #507 [July 31, 2009 Order] at 7. Despite this Order, on September 4, 2009, Georgia-Pacific was forced to file a Local Rule 7.4 Expedited Motion to Compel API and ACC to produce the documents, as no documents had been produced. As of September 14, 2009 Georgia-Pacific began receiving responsive documents, and the productions have continued to date (the latest production occurring on Sept. 29, 2009). Notably, however, it was only after several subpoenas and motions to compel that responsive documents were produced to Defendants. Moreover, the production was made after the discovery cut-off date.

Defendants have been prejudiced by this delay in production by Plaintiff API and ACC. The production contains significant evidence regarding ACPC's knowledge, as reflected in Defendants' Opposition to Plaintiffs' Motion to Compel and its responses herein to Plaintiffs' Proposed Findings of Fact. As laid out in detail in Exhibit 1 to the Declaration of Jayni E. Foley, there are *at least* thirty meetings and or communications with ACPC by NCR and/or NCR licensees relevant to ACPC's knowledge including:

| 7/23/1953 | NCR visit to ACPC: NCR visits ACPC to observe and discuss impact paper coating | **JEF Decl. Ex. 2 [July 23, 1953 NCR report on a visit to ACPC]** |
|---|---|---|

| | | |
|---|---|---|
| 11/12/1956 | WT Visit to ACPC: WT visited ACPC and discussed all of WT's current problems on NCR manufacture and testing. Discussed coating machine, finishing, and emulsion preparation. | **JEF Decl. Ex. 4 [WT Notes on Visit to ACPC, Nov. 12, 1956]** |
| 2/3/1957 | WT Visit to NCR and ACPC: WT visited US coating mills and obtained information regarding high speed coating machines that WT was considering purchasing, and other coating developments. | **JEF Decl. Ex. 7 [WT Notes on Visit to US Coating Mills from Feb. 3-16, 1957].** |
| 9/30/1957 | WT Visit to ACPC: WT visit to ACPC included a tour of the plant and NCR production and discussion of: emulsion preparation, coating, finishing and testing. WT notes that "as far as sorting is concerned, most of the broke taken out at this stage seems due to creases, pipes, bar-marks (from conveyor in tunnel drier) and other mechanical faults." | **JEF Decl. Ex. 9 [WT Notes on Visit to ACPC on Sept. 30, 1957]** |
| 1/7/1958 | NCR Letter to WT: "We have discussed the problem of re-use of waste paper containing NCR and CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company. It is my understanding that neither mill reprocess their own NCR Paper waste but that they sell it to other paper making firms who re-use it in fairly high grade papers." | **JEF Decl. Ex. 12 [January 7, 1958 NCR letter]** |
| 03/1958 | WT Visit to NCR, ACPC and Mead: WT visited NCR and discussed the commercial aspects of WT's production of NCR Paper, NCR's testing of an alternative emulsion which failed due to technical issues, and NCR's research and development efforts. At Mead, Mead showed WT its coating plant and discussed "openly all aspects." At ACPC, WT and ACPC discussed self contained paper, the properties of base paper, and technical issues with paper production and emulsion. NCR also provided detailed responses on technical questions posed by WT ranging from emulsion properties to various production problems. | **JEF Decl. Ex. 17 [WT Summary Report on US Visit in March 1958]; Ex. 18 [WT Notes on Visit to Mead on March 17, 1958]; Ex. 19 [WT Notes on Visits to Dayton, Appleton and Chillicothe in March 1958]** |
| 3/31/1959 | WT Visit to NCR, ACPC, Combined Locks and Mead: The purpose of WT's visit to NCR, Combined Locks and Mead was to observe and discuss: NCR reel orders, the production of machine coated CF paper, to study NCR costs and possible price reductions and to become familiar with the technical aspects of NCR paper production. NCR provided to WT the figures for emulsion consumption and broke at the US Mills. | **JEF Decl. Ex. 21 [WT Notes on Visit to NCR, ACPC and Mead on March 31 through April 16, 1959]** |

SF\720485.10

| 11/1960 | WT Visit to ACPC, Mead and NCR: WT visited ACPC, Mead and NCR to discuss technical matters and to look into their finishing methods. WT also evaluates current machinery used by ACPC. ACPC proposed that WT entered into an agreement on "Reciprocity of Research" with ACPC. WT concludes that broke percentages at ACPC and Mead on reel orders may be comparable to WT, and that WT will need to continue to reduce their sheet broke. | **JEF Decl. Ex. 24 [WT Technical Notes on ACPC, NCR and Mead Visits in Nov. 1960]** |
|---|---|---|
| 5/15/1961 | WT Visit to ACPC: WT visited ACPC and discussed various topics including: new coater at ACPC, mill capacity, and other technical issues associated with coating. | **JEF Decl. Ex. 25 [May 29, 1961 WT Notes on Visit to ACPC]** |
| 6/26/1962 | WT visit to ACPC: States that a "full discussion" occurred on NCR Paper and notes the "free and open exchange of information" that took place. | **JEF Decl. Ex. 26 [June 26, 1962 WT Memo on Visit to ACPC]** |
| 10/30/1962 | ACPC Visit to WT: ACPC finished WT's Treforest facility and discussions included: raw materials, mix formulations, emulsion use, and other technical topics. WT notes that for ACPC "the only emulsion lost is in the broke." | **JEF Decl. Ex. 27 [WT Notes on ACPC Visit to WT on Oct. 30, 1962]** |
| 12/2/1963 | WT Visit to ACPC: The purpose of WT's visit to ACPC was to discuss "in detail the up-to-date information" on the coating of NCR paper." Topics included: NCR paper manufacturing by Mitsubishi, emulsion usage, issues with CB check paper (including the capsule breakage and release of Aroclor), various equipment issues, coating weight control and other technical issues. WT notes that it would seem NCR is "only too willing to accept any new raw materials providing it will cheapen the product" which was not the impression NCR had given WT when WT had suggested alternative formulations. WT's visit notes also include Appleton's prices for broke disposal. | **JEF Decl. Ex. 35 [WT Report on ACPC Visit on Dec. 2-4, 1963]; Ex. 32 [Nov. 1963 NCR Paper and Supply Products Technical Services Progress Report]** |
| 8/5/1964 | WT Visit to ACPC: WT visited ACPC to see ACPC's NCR operation and to discuss electrographic paper. Regarding NCR Paper, they discussed: supply of CF, various application methods of CB, a tandem CF-CB machine, and variations in coating weight. | **JEF Decl. Ex. 41 [WT Report on Visit to ACPC on Aug. 5, 1964]** |

| | | |
|---|---|---|
| 09/1964 | ACPC Visit to WT: ACPC visits WT's Treforest facility. | **JEF Decl. Ex. 39 [1964 WT Treforest Annual Report]** |
| 10/13/1964 | WT Visit to ACPC: WT viewed ACPC's production and coating of NCR Paper. | **JEF Decl. Ex. 45 [WT Oct. 13, 1964 Visit to ACPC Notes]** |
| 11/1964 | WT Visit to NCR, Mead, ACPC and Combined Locks: Research personnel at WT visit NCR in Dayton. Spent "considerable time" discussing technical and license matters. Purpose of the visit was to establish a stronger technical liaison, and establish a regular exchange of information. Discussions included: various mills producing NCR paper, new capsules under development and other technical topics. NCR discussed with WT a new technique of encapsulation, self contained paper emulsion containing Aroclor, and testing of active coat weight of NCR paper specifically referring to Aroclor with 42% weight of chlorine. NCR also told WT about its NCR paper developments that are not yet patented. WT's visit notes contain an analysis of chlorine count of WT v. Mead and ACPC. WT tours Mead and notes various technical and production issues, including related to Mead's inefficiency. WT tours Combined Locks and discussed their CF production, sales, and experimental work. WT tours ACPC and discussed coating methodology and self contained paper. | **JEF Decl. Ex. 47 [WT Report on Visit to NCR in Nov. 1964]; Ex. 48 [WT Report on Visit to NCR in Nov. 1964]; Ex. 49 [WT Notes on Technical Discussions During NCR Visit in Nov. 1964]; Ex. 50 [Oct. 1964 NCR Paper and Supply Products Technical Services Progress Report]; Ex. 51 [Nov. 1964 NCR Paper and Supply Products Technical Services Progress Report]** |
| 2/15/1965 | WT Visit to ACPC: WT observes extensive ACPC operations in Appleton from February 15, 1965 to February 19, 1965. Observations include those on coating: "Coaters are theoretically similar" and retentions are "quite separate from broke losses." WT reports that Appleton retains 100% of its emulsion, but this is separate from broke loss. | **JEF Decl. Ex. 59 [Feb. 15, 1965 Report on WT Visit to ACPC in Appleton]** |
| 4/16/1965 | WT Visit to ACPC: Meeting primarily to discuss lithe plates, as WT has been approached to make the Ensink plate. NCR business matters are also discussed. | **JEF Decl. Ex. 69 [April 1965 report on WT visit to ACPC]** |
| 5/19/1965 | Visit to ACPC primarily to study ACPC's new coating machine. The report states: "many previous visits have been made by Wiggins Teape personnel, and there are very | **JEF Decl. Ex. 77 [May 19, 1965 report on WT visit** |

| | | |
|---|---|---|
| | few stones unturned." It also describes the "trim allowance on their [ACPC] cutters" as 3/4 inch and 3/8 inch. | **ACPC]; Ex. 78 [May 19, 1965 report on WT visit ACPC]** |
| 5/19/1965 | ACPC Letter to WT: "NCR Broke Repulping" - ACPC sales of NCR broke to recyclers on the Fox and Kalamazoo Rivers | **JEF Decl. Ex. 79 [May 19, 1965 ACPC letter to WT]** |
| 8/18/1965 | WT Letter to ACPC: "I agree wholeheartedly with you that it is very much to our mutual benefit to keep in touch, in detail, on the various NCR developments. Our liaison is helped enormously by the fact that we enjoy complete freedom with regard to exchanging information." | **JEF Decl. Ex. 95 [Aug 18, 1965 WT letter to ACPC]** |
| 8/26/1965 | ACPC Letter to WT: "I think we did end up agreeing that probably either of use could go to work for either company and feel right at home." | **JEF Decl. Ex. 96 [Aug 26, 1965 ACPC letter to WT]** |
| 11/2/1965 | WT Visit to NCR, ACPC, and Nekoosa Edwards: WT Visit to NCR, ACPC, and Nekoosa Edwards: Visit in New York with WT, NCR, and ACPC on November 3 and 4, 1965. Discussions centered on phenolic CF development. Appleton is doing trials and it getting ready to make their own CF. Lots of information sharing on phenolic CF and testing. | **JEF Decl. Ex. 107 [Nov. 2, 1965 report on WT visit to NCR, ACPC, and Nekoosa Edwards]** |
| 12/15/1965 | WT Visit to NCR, ACPC, and Mead: WT spent two weeks visiting Dayton, Nekoosa, ACPC, Mead, Minerals and Chemicals, and Union Processing regarding NCR Paper. "A significant amount of time" was spent with WT, both in Dayton and at the mills. WT and NCR had detailed discussions of various technical exchange. Appleton has about 58% of NCR sales. | **JEF Decl. Ex. 114 [Report on Dec. 15, 1965 WT visit to NCR, ACPC and Mead]; Ex. 116 [Report on Dec. 15, 1965 WT visit to NCR, ACPC and Mead]; Ex. 117 [Report on Dec. 15, 1965 WT visit to NCR, ACPC and Mead]; Ex. 118 [Dec. 1965 NCR Paper and Supply Products Technical Services Progress Report]** |

32

| | | |
|---|---|---|
| 05/1966 | WT Visits to Mead and ACPC: Purpose of visit was to look at how mills in the US produce base paper for NCR coating. Topics reviewed included: stock preparation, paper making, coating operations, and finishing. Mills use of broke is discussed. WT toured plants. During Mead visit discussed broke. Base paper is made with 30% broke (uncoated) and Mead sells the CF broke at $60/ton. | **JEF Decl. Ex. 134 [May 1966 WT Summary of Visits to NCR Producing Mills]; Ex. 135 [May 1966 WT Summary of Visit to Mead]; Ex. 136 [May 1966 WT report on visit to ACPC]** |
| 5/21/1966 | WT Visits to Combined Locks, ACPC, Mead and Nekoosa Edwards: WT visited Combined Locks to have a general look at operations and to discuss base paper and CF coating operations. WT visited Mead's facility in Chillicothe, Ohio, and discussed various technical issues, including paper stock preparation, coating machines, and sales figures. WT visited ACPC, and discussed purchase of a tandem coater, emulsion, a research agreement between ACPC and NCR. WT visited Nekoosa Edwards, and discuss various technical issues. | **JEF Decl. Ex. 139 [WT Report on Visit to Combined Locks, May 23, 1966]; Ex. 140 [WT Report on Visit to Mead, June 1966]; Ex. 141 [WT Summary of Visit to US, June 1966]** |
| 10/1966 | WT Visit to ACPC: WT visited ACPC for two days and discussed many technical topics, including issues related to emulsion, packaging, trim removal, machinery, coating and finishing. | **JEF Decl. Ex. 154 [Oct. 28, 1976 WT Draft Notes on ACPC Visit]** |
| 04/01/1967 | WT Visit to ACPC: "A.E. Burroughs (with E.S. Brazington) to Appleton Coated Paper Company, Appleton, Wisconsin on technical liaison visit" | **JEF Decl. Ex. 160 [April 1967 WT report on visit to ACPC]** |
| 7/20/1967 | ACPC Visit to WT: ACPC visited WT and discussed "a wide range of topics" related to NCR Paper, including: base paper that is coated, work with an OTM capsule, development of lightweight CFB, coating "second grade" paper, and various other technical and production issues. Patents using shared information, gained through the information WT and ACPC have shared on process developments, was also discussed. | **JEF Decl. Ex. 162 [1967 ACPC Visit to WT]** |

33

| | | |
|---|---|---|
| 9/25/1967 | WT Visit to ACPC: Purpose of the visit was to evaluate the performance of the three-roll coating head and Cleveland crane. ACPC told WT that a complete wash up of the system occurs every 12 hours, and the color is pumped to a buffer tank, and the system is washed off with water to the drain. ACPC claimed an overall broke level of 3% (meaning the difference in weight between all raw materials going in and coating paper going out). | **JEF Decl. Ex. 165 [Oct. 8, 1967 Notes on Visit to ACPC]** |
| 10/1967 | WT Visit to ACPC: Purpose of visit was to obtain detailed information of the three-role applicator used for NCR CF coating, and also obtain information about the use of a Cleveland crane. | **JEF Decl. Ex. 166 [WT Notes on Visit to ACPC on Oct. 8, 1967]; Ex. 160 [Oct. 1967 WT report on visit to ACPC]** |
| 3/25/1968 | WT Visit to ACPC: WT visited ACPC for a routine visit to exchange ideas on NCR paper development and see CFB tandem coater. WT was well received and met almost the entire board of directors. WT states that ACPC is growing more dependent on NCR paper, which WT estimates is 2/3rd of ACPC's profit. WT circulated a draft process development agreement to ACPC. | **JEF Decl. Ex. 175 [WT Report on Visit to ACPC on Mar. 25, 1968]** |
| 5/1/1968 | WT Visit to Mead and ACPC | **JEF Decl. Ex. 177 [May 1968 WT trip report]** |
| 5/10/1968 | NCR visit to ACPC: Sandberg visited ACPC facility to discuss deviations from NCR specifications | **JEF Decl. Ex. 178 [May 10, 1968 letter re NCR visit to ACPC]** |
| 5/27/1968 | WT, NCR Visit to ACPC: Purpose of the visit was to have a general exchange of ideas, practices and machinery in the manufacture of NCR Paper, and to discuss a "tandem" coater. ACPC's consideration of the use of broke in place of Solka Floc was discussed, including that ACPC does not believe repulping will cause blueing. | **JEF Decl. Ex. 179 [June 1968 WT Report on Visit to ACPC];** |
| 12/1/1968 | WT Visit to ACPC: WT visited ACPC as part of regular technical liaison visits to occur at 3-month intervals. WT and ACPC observed a production run at Appleton and discussed various technical topics, including certain testing performed by WT. | **JEF Decl. Ex. 182 [WT Visit Report on Dec. 13-18, 1968 Visit to ACPC]** |

34

| 6/2/1969 | WT Visit to ACPC: The purpose of WT's visit to ACPC was to determine the efficiency of ACPC's production of NCR Paper and identify any major differences in production. Topics discussed included: ordering process, stock holding, raw materials, production efficiency. WT and ACPC also discussed broke levels at ACPC. | **JEF Decl. Ex. 187 [WT Visit Report on June 2-6, 1969 Visit to ACPC]** |
|---|---|---|

Had Plaintiff API and ACC timely produced the subpoenaed documents, relevant information regarding ACPC's knowledge would have been available to Mr. Rodricks for use in his expert report and deposition. It is Plaintiffs' dilatory tactics that prevented Mr. Rodricks from reviewing evidence as to ACPC's knowledge and opining on such evidence.

**PPFF 63:      There is no evidence that ACPC knew, or should have known, during the time that PCBs were used in carbonless paper that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a water body, thereby risking environmental damage. *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 82, 187, 195); *Id.* at ¶ 8, Ex. G (Christensen Dep. at 64-65); *Id.* at ¶ 7, Ex. F (Strelow Dep. at 66, 99-100); *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 193); *Id.* at ¶ 3, Ex. B (Bodmer Dep. at 37-38); *Id.* at ¶ 12, Ex. K (Rodricks Dep. at 65-66).**

Response to PPFF 63:

Deny. ACPC "knew, or should have known, during the time that PCBs were used in carbonless paper that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a water body, thereby risking environmental damage."

*First*, ACPC's knowledge must be placed in the context of its longstanding technical collaboration between ACPC and NCR, evidenced by the many meetings, visits to facilities and letters exchanged between 1953 and 1971. *See* **JEF Decl., Ex. 1, listing all communications and meetings between NCR, ACPC, WT and other licensees, for which evidence has been produced, during the time frame between 1953 through 1971 [Chart: Communications Among ACPC, WT, And NCR].** Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP. *See generally* **JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; AMH Decl. Ex. 4  [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212; JEF Decl. Ex. 178 [May 10, 1968 Letter from T. Busch, ACPC to H.V. Lauer, NCR]; Ex. 12 [Jan. 28, 2009 F. Heinritz Depo. Excerpts] at 45-49, 118-119; Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79.** Over the next two decades, NCR, ACPC, and WT held more than sixty-five (65) in-person technical meetings, on a wide range of topics related to CCP, including NCR broke, recycling, and Aroclor content. **See JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; JEF Decl. Ex. 12 [January 7, 1958 NCR Letter] (stating that NCR has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company," and that ACPC and Mead "sell it to other paper making firms who re-use it").**

35

During this long technical collaboration, WT conducted a new and intensive program to test Aroclor concentrations in the broke recycling process in order to determine how to best re-use NCR broke, based on WT's understanding that Aroclor made the NCR broke potentially "toxic." **JEF Decl. Ex. 52 [Nov. 5, 1964 Notes of meeting between BAT and WT regarding Aroclor] ("Aroclor, a chlorinated diphenyl, is toxic"); Ex. 70 [Apr. 1, 1965 Memo on WT visit to NCR] at 18-19; see also AMH Decl. Ex. 62 [March 16, 1965 WT Letter re: Aroclor testing] [Gough Depo. Ex. 1010-I].** The results of WT's testing established that recycling CB and CFB broke (*i.e.*, PCB-containing broke) would result in the discharge of PCB-laden wastewater. **JEF Decl. Ex. 89 [Aug 4, 1965 letter from BAT to WT] [Gough Depo. Ex. 1010-P]; Ex. 111 [Nov. 25, 1965 BAT to WT letter] [Gough Depo. Ex. 1010-T].**

*Second*, as early as 1958, ACPC knew recycling the broke from CCP caused the capsules to rupture, discharging their contents. A letter from WT to NCR in January 1958 states that WT has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company. It is my understanding that neither mill reprocesses their own NCR Paper waste but that they sell it to other paper making firms who re-use it in fairly high grade papers." **JEF Decl. Ex. 12 [January 7, 1958 NCR Memo & Attachments].** There is also correspondence from 1965 from WT to ACPC regarding repulping NCR broke. **JEF Decl. Ex. 79 [May 19, 1965 ACPC Letter].**

*Third*, by 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper. During a visit by WT to ACPC, the two companies discussed the issue of the release of Aroclor due to capsule breakage in a certain application of CCP, "CB Cheque Papers." **JEF Decl. Ex. 35 [WT Report on December 2-4, 1963 visit to ACPC] at 5-6 ("This capsule breakage leads to release of the oil (Arachlor)").**

Additionally, Ronald Jezerc's deposition testimony at page 74 states:

Q:      --okay? All right. Do you recall when it was determined that PCBs should be phased out of the emulsion?

A:      Well, I've done a lot of thinking about this, and I'm not sure how I answered this type of question the first time around, but sometime in '69, people became concerned that articles were being written about the power industry and their leaky transformers, which contained PC - - -Aroclor as the coolant. So the supplier, rightfully so, decided sometime in '69 that Aroclor was no longer going to be discontinued as a sales item and they were no longer going to manufacture it.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 74.

Further, ACPC gained information from NCR regarding the constituents of CCP:

- By working with NCR to test constituents of NCR emulsion. **JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT and NCR]; AMH Decl. Ex. 5 [July 24, 1967 ACPC Memo]; Ex. 6 [Sept. 28, 1967 ACPC Memo].**

- By working directly with NCR in its development of patents for paper processes. **AMH Decl. Ex. 8 [Sept. 15, 1967 ACPC Memo]; Ex. 9 [Patent No. 3,311,499].**

36

and,

- Based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR. **AMH Decl. Ex. 15 [Process Specification 2036.93]; Ex. 7 [May 19, 1967 ACPC Memo].**

*Fourth*, ACPC knew that PCBs raised environmental concerns and caused environmental harm. Ronald Jezerc's deposition testimony at page 77-80, 171-72, and 282 states:

Q:    Okay.  Do you remember the time frame that you first either heard or read about problems with PCBs?

A:    It had to be in mid-'69.

*        *        *

Q:    Okay.  When you were apprised or learned of problems with PCBs, what did you understand the problem to be?

A:    That it sat around and didn't break up.

Q:    Okay.  Would this be an issue relating to biodegradability.

A:    Yeah.

*        *        *

Q:    Okay.  And so it was only after it had been released into the environment that you understood a concern to be posed by PCBs at this time?

A:    I think that's what it was.

*        *        *

Q:    Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB.  From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs?

(Objection omitted)

A:    I don't have any idea whether there were other reasons.

Q:    Okay. But environmental concerns was the reason that you understood at the time they were being phased out; is that correct?

(Objection omitted)

A:    Yes.

37

*    *    *

Q:      Did he [Mr. Busch] agree with you that something had to be done about PCBs in '68/'69?

(Objection omitted)

A:      Yes.

**AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 282.**

Further, Mr. Jezerc previously testified that he became aware of various publications describing the environmental aspects of PCBs in the late 1960s and discussing the persistence of PCBs. **AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpt] at 60.** Mr. Jezerc also testified that the concerns raised in these articles related to the bioaccumulation and biopersistence of PCBs in the environment and in animals. *Id*. **at 60-61.** An additional concern, according to Mr. Jezerc, was whether PCBs impacted the food chain. *Id*. **at 60-61.**

The ACPC Plant Manger at the time, Lawrence Casey, also testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." **AMH Decl. Ex. 11 [Apr. 20, 2009 L. Casey Depo. Excerpt] at 39-41.** Similarly, ACPC Assistant Solvent Manager Dale Schumaker learned of PCB concerns from ACPC Vice President Tom Busch, and Schumaker discussed the decision to change the Aroclor emulsion with Busch. **AMH Decl. Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269.**

*Fifth*, ACPC was aware of environmental concerns regarding discharge containing PCBs entering the River. Ronald Jezerc's deposition testimony at page 73 states:

Q:      Okay. At the time of this letter, I guess it is 1968, or memo, was there a concern about having the wash-up water go to the river? You mentioned it didn't have to go to the river. Just money?

A:      That was our main concern.

Q:      Okay. So it wasn't – environmental concerns were not an issue here?

A:      I don't think that they came in until '69. You want to talk about that? I thought that's what we were going to talk about today.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 73.

In sum, ACPC knew that recycling broke from CCP ruptures the capsules, it knew that CCP and broke contained PCBs, it knew that PCBs raised environmental concerns and caused environmental harm, and it was concerned about the discharge of PCBs entering the River.

Further, based on the extensive meetings and consultations regarding broke recycling that occurred among NCR, WT, ACPC and Mead during the period of 1957 through 1964, and based

38

specifically on the analytic work and extensive technical consultations regarding broke recycling that occurred during 1965, as detailed in JEF Decl. Exhibit 1, ACPC in fact knew in 1965 at the latest that the recycling of broke would result in the release of PCBs into the environment.

## ADDITIONAL UNDISPUTED MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS

Many of these undisputed material facts below were cited to and provided by Defendants in support of their Motion for Summary Judgment or Alternatively, Partial Summary Judgment ("Defendants' Motion for Summary Judgment") filed on August 28, 2009.  Doc. # 551, 553, 554. The evidence supporting Defendants' Motion for Summary Judgment is attached to the Declaration of Patrick F. Ferguson ("PJF Decl.") (Doc. # 575, 582 and 583) and is not resubmitted concurrently.  Additional evidence supporting these material facts that was not previously submitted is noted in **bold** and is attached to either the Declaration of Andrea M. Hogan ("AMH Decl."), or the Declaration of Jayni E. Foley ("JEF Decl.") submitted herewith. The JEF Decl. includes primarily documents produced by Plaintiffs after the discovery cut-off from the files from Wiggins-Teape's Butler's Court facility, a production which apparently is still ongoing.

### A.        NCR's Knowledge And Actions.

1.        In the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  **AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19.**

2.        In the mid-1950s, NCR also communicated to certain of its licensees that Aroclor was potentially toxic.  **AMH Decl. Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo].**

3.        By 1958, NCR knew that NCR broke and wastepaper was being resold to recyclers.  **JEF Decl. Ex. 12 [Jan. 7, 1958 WT Letter to NCR]; Ex. 14 [Jan. 27, 1958 NCR Letter to WT]**.

**4.**        By 1958, NCR also had discussions with ACPC, WT, Mead Corporation ("Mead"), and others regarding recycling of NCR broke.  **JEF Decl. Ex. 12  [Jan. 7, 1958 WT Letter to NCR]; Ex. 1 [Chart: Communications Among ACPC, WT and NCR].**

39

5.      By 1958, NCR also knew that the recycling of CCP caused the CCP capsules to burst and their contents to be dispersed.  **JEF Decl. Ex. 12  [Jan. 7, 1958 WT Letter to NCR, attached Bulletin No. 37].**

**6.**      In April 1965, NCR, ACPC and WT discussed the best means to recycle PCB containing broke.  **JEF Decl. Ex. 70 [Apr. 1, 1965 Memo on WT Visit to NCR] at iii ("best method is to absorb oil onto clay and wash out the latter"); JEF Decl. Ex. 12 [Jan. 7, 1958 WT Letter to NCR].**

7.      The first part of Rachel Carson's Silent Spring was published in the New Yorker in 1962 and brought public attention to the widespread use and harmful ecological effects of DDT.  PJF Decl. Ex. 13 [Silent Spring Excerpt].

8.      NCR was aware of the close similarities between DDT and PCBs.  **AMH Decl. Ex. 31 [Dec. 31, 1969 WT Letter to NCR]** ("Equally you will be aware that Aroclor as used in making NCR Paper has close chemical affinities with DDT").

9.      NCR studied both DDT and PCBs for encapsulation purposes.  PJF Decl. Ex. 12 [Aug. 12, 2009 J. Herbig Depo. Excerpts at 28:20-30:15]; Ex. 20 [June 18, 2009 J. Stutz Depo. Excerpts at 81:3-83:19].

10.      On December 15, 1966, a Swedish scientist, Soren Jensen, reported findings of widespread evidence of PCBs in the environment in the publication, *New Scientist*.  PJF Decl. Ex. 21 [*New Scientist* Article].

11.     Jensen's findings demonstrated that PCBs were widely dispersed and persistent in the environment, having been found in fish, eagles, egg shells, and human hair.  PJF Decl. Ex. 21 [*New Scientist* Article]; Ex. 22 [May 24, 1967 *Medical Tribune Article*].

12.     In February 1967, at NCR's request, Dr. Emmet Kelly at Monsanto forwarded copies of Jensen's report to Mr. D. Wood and Mr. M.J. Thomas, both NCR employees.  PJF Decl. Ex. 23 [Feb. 10, 1967 Letter from Kelly to Wood]; Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas (letter and attached Jensen report marked and authenticated as Exhibits 468 and 469 during April 8, 2009 E. McKinney Depo. (Ex. 34) at 91:13-95:17)]; Ex. 39 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 12:5-14:24].

13.     Between 1967 and 1969, several scientific studies on PCBs were completed and published in the UK and US popular and scientific press.  PJF Decl. Ex. 6 [Aug. 11, 2009 Revised Expert Opinion of Joseph V. Rodricks at 42-43]; c.f. Ex. 25 [Dec. 14, 1968 Publication "[PCBs] in the Global Ecosystem" Excerpt]; **AMH Decl. Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memorandum] at 2-5**.

14.     These studies confirmed Jensen's 1966 findings.  *C.f.* PJF Decl. Ex. 25 [Dec. 14, 1968 Publication "[PCBs] in the Global Ecosystem" Excerpt].

15.     While Monsanto did not share these scientific studies with its other Aroclor customers, it told NCR about the scientific studies because "Monsanto enjoy[ed] a strong position in this industry which [was] dominated by NCR."  NCR determined to contact NCR regarding "adverse publicity" and stating that "[i]t is recommended that with the exception of NCR, we do not bring this publicity to the attention of our Aroclor customers."  PJF Decl. Ex. 26 [March 12, 1969 Monsanto Memo] at 1-2, 9; Ex. 26 [Mar. 12, 1969 Monsanto Memo] at 1 (In 1969, Monsanto

41

stated in an internal memorandum entitled "Future Plans for Aroclor Plasticizers" that "the adverse publicity" associated with these studies "may be very damaging."); **AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts at 25-28] ("we [Monsanto] did everything we could to keep [NCR] informed [about scientific information concerning PCBs].").**

**16.** In 1969 Monsanto explained the properties of Aroclor 1242 to NCR, including that Aroclor 1242 was mixture that included higher chlorinated isomers. **AMH Decl. Ex. 27 [P.K. Maier's Dec. 16, 1969 Meeting Notes]; Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13.**

17. On March 27, 1969, Monsanto visited NCR's home office in Dayton. PJF Decl. Ex. 28 [Apr. 18, 1969 Monsanto Memo, marked and authenticated as Exhibit 971-C during Aug. 26, 2009 C. Paton Depo. (**AMH Decl. Ex. 26**) at 24-29]. Mr. Haier, Mr. Wilde and Mr. Paton attended this meeting on behalf of Monsanto and Mr. Lauer, Mr. Thacker and Mr. Fitzpatrick attended on behalf of NCR. *Id.*

18. During this March 27, 1969 meeting Monsanto and NCR discussed PCB contamination and a recent San Francisco Chronicle article regarding PCB pollution in San Francisco Bay. PJF Decl. Ex. 28 [Apr. 18, 1969 Monsanto Memo]. During this same meeting, NCR's representative, Howard Lauer, stated that "NCR would take no action unless a second article appeared specifically naming their paper as the source of pollution." *Id.* at 1-2; **AMH Decl. Ex. 26 [C. Paton Depo. Excerpts at 63-64].**

19. In a subsequent April 28, 1969 telephone conversation with Mr. Paton of Monsanto, NCR's Gordon Taylor called the same article "just another in the series of articles on the toxicity of PCBs," and also said that "there was always the possibility that the second shoe would drop."

42

*Id.*, Ex. 29 [Apr. 29, 1969 Taylor/Paton Phone Memo, marked and authenticated as Exhibit 971-F during Aug. 26, 2009 C. Paton Depo. Excerpts (**AMH Decl. Ex. 26**) at 41-45].

20.    On October 31, 1969, Dr. H.A. Vodden of Monsanto's research department in Ruabon, South Wales, was made responsible for the environmental aspects of PCB contamination in the United Kingdom, including on-going studies of the potential biodegradation of Aroclor 1242, the investigation of PCB releases at Monsanto's Newport, UK PCB production facility, and information regarding PCB disposal by Monsanto's major Aroclor customers in the UK.  PJF Decl. Ex. 35 [Oct. 30, 1969 Monsanto Memo]; **AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 20-29].**

21.    In late 1969, Dr. Vodden arranged a meeting with Martin Kelly of NCR's Borehamwood CCP emulsion production facility.  **AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 26-29].**

22.    During this 1969 meeting, Dr. Vodden explained to Martin Kelly that Aroclor 1242 had constituents that were persistent and would bioaccumulate, that even though Aroclor 1242 was not detected in the environment, its degradation residues resulting from Aroclor 1242 releases would pose those problems, that the production of NCR Paper resulted in open and uncontrolled releases of Aroclor 1242, and that because of these environmental concerns, Monsanto was going to stop selling it for use in the production of NCR Paper.  **AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 26-29].**

23.    In December 1969 and January 1970, Monsanto tested the effluent from NCR's facilities in the US and UK.  PJF Decl. Ex. 37 [1969 Monsanto Aroclor Water Samples]; Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; Ex. 39 [Aug. 19, 2009 E. Tucker

Depo. at 39:18-41:20]. Effluent samples from an NCR facility had "quite high" levels of Aroclor 1242, and the mud in the stream taking the surface water drainage contained 150 ppm PCBs. PJF Decl. Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970].

24.     Between December 1969 and February 1970, NCR, Monsanto and WT held numerous high-level meetings. PJF Decl. Ex. 40 [December 19, 1969 minutes, marked and authenticated using different Bates version as Exhibit 971-L during Aug. 26, 2009 C. Paton Depo. Excerpts (**AMH Decl. Ex. 26**) at 57-67]; Ex. 41 [Jan. 26, 1970 Meeting Minutes]; Ex. 42 [February 16, 1970 Meeting Minutes, marked and authenticated as Exhibits 949 and 951 at Aug. 25, 2009 H. Vodden Depo. (**AMH Decl. Ex. 22**) at 35-40; 43-50].

**25.**     During these meetings, the following subjects were discussed: (a) effluent testing results from NCR's facilities in the US and UK; (b) effluent testing results from WT's UK and Belgium facilities; (c) PCB contamination of US and UK waterbodies; (d) appropriate responses to governmental investigations regarding the source of PCB contamination; and (e) replacement of PCBs in CCP with another solvent. PJF Decl. Ex. 40 [December 19, 1969 minutes]; Ex. 41 [Jan. 26, 1970 Minutes,]; Ex. 42 [February 16, 1970 Minutes]; **AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 35-40; 43-50]; Ex. 26 [C. Paton Depo. Excerpts at 55-74].**

**26.**     NCR cooperated with Monsanto in its investigation of the risks of Aroclor 1242. **AMH Decl. Ex. 28 [Aug. 19, 2009 E. Tucker Depo. Excerpts] at 39:22-40:8; 54:17-19; Ex. 35 [Jan. 5, 1971 Monsanto Letter]; Ex. 29 [Nov. 17, 1969 Monsanto Memo]; Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 50:2-4.**

27.     In 1969, NCR was concerned that public disclosure of PCBs in CCP could cause NCR to lose market share to its main CCP competitor, 3M. PJF Decl. Ex. 33 [Apr. 7, 2009 D. McIntosh

Depo. Excerpts at 119:1-25]; Ex. 11 [June 30, 2009 H. Schwab Depo. Excerpts at 118:13-24]; Ex. 28 [Apr. 18, 1969 C. Paton Monsanto Memo to File] at 1-2; **AMH Decl. Ex. 26** [Aug. 26, 2009 C. Paton Depo. Excerpts at 28-29].

28.     Between 1969 and 1971, NCR and Monsanto received US and UK governmental inquiries about PCB use. PJF Decl. Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report, marked and authenticated as Exhibit 950 at Aug. 25, 2009 H. Vodden Depo. (**AMH Decl. Ex. 22**) at 40-43]; Ex. 50 [April 9, 1970 Congressman Ryan Letter].

29.     On January 27, 1970, Monsanto met with the UK Ministry of Agriculture. PJF Decl. Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report]; **AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. at 40-43]**. Attendees for Monsanto included Mr. Cameron and Mr. Vodden, and for the UK Ministry, Mr. Portman and Mr. Wood. *Id.*

30.     The UK Ministry of Agriculture was investigating the sources of recently discovered PCB contamination in the Irish Sea and Severn Estuary, PJF Decl. Ex. 51 [1969 Irish Sea Article], and in food products—cashew nuts packaged in recycled cardboard made from NCR broke. PJF Decl. Ex. 52 [May 30, 1970 Chemical Industry Article; October 28, 1971 Science News Article].

**31.**     On January 26, 1970, Monsanto met with NCR in advance of Monsanto's meeting with the UK Ministry of Agriculture. PJF Decl. Ex. 41 [Jan. 26, 1970 Minutes]; **AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 35-40].**

45

32.     NCR asked Monsanto not to identify NCR paper as a "major outlet" for Aroclor at the meeting between Monsanto and the UK Ministry.  PJF Decl. Ex. 41 [Jan. 26, 1970 Minutes] at 1. NCR wanted to make sure their "housekeeping" was in order first.  *Id*.

33.     At its meeting with the UK Ministry of Agriculture on January 27, 1970, Monsanto did not disclose the use of PCBs in NCR Paper.  PJF Decl. Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report] ("No mention was made of NCR but it will become increasingly difficult to maintain this position.").

34.     At about the same time, in April 1970, United States Congressman William Ryan began investigating PCB contamination in the US and contacted Monsanto for information.  PJF Decl. Ex. 50 [April 9, 1970 Congressman Ryan Letter].

35.     Congressman William Ryan specifically asked Monsanto to release to the public a list of all uses of Aroclor.  *Id*.

36.     On April 10, 1970, in response to Congressman Ryan's inquiries, Monsanto issued a press release about PCBs.  PJF Decl. Ex. 55 [Apr. 10, 1970 Monsanto Press Release].

37.     The April 10, 1970 press release does not list NCR Paper.  *Id*.

38.     In June 1970, Monsanto sent a letter to Monsanto's customers, including NCR, stating that it was discontinuing the sale of PCBs for use in plasticizer applications (including the Aroclor used in CCP) because of worldwide concern over environmental contamination.  PJF Decl. Ex. 44 [June 1970 Monsanto Letter, marked and authenticated as Exhibit 601 at April 30, 2009 T. Clark Depo. (Ex. 82) at 173:21-174:25].

39.     In April 1970, Monsanto revised its warning labels for Aroclor 1242 that specifically

warned of environmental risks, PJF Decl. Ex. 43 [April 1970 Monsanto Warning Labels], and

these labels were sent to NCR. **AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts at**

**84-90].**

40.     Additionally, Monsanto issued a technical bulletin warning of "environmental hazards"

of Aroclor 1242, including that the PCBs contained in Aroclor 1242 "may be harmful to certain

forms of animal life." **AMH Decl. Ex. 30 [Monsanto Technical Bulletin – Aroclor**

**Plasticizer] at 13].**

41.     Each year between 1954 and 1970, NCR purchased increasing amounts of PCBs from

Monsanto for use in the manufacture of CCP — from 0.6 million pounds in 1957 to 4.4 million

pounds in 1967, 5.8 million pounds in 1968, 6.3 million pounds in 1969, and 6.6 million pounds

in 1970. PJF Decl. Ex. 30 [Jan. 19, 1976 NCR Letter].

42.     NCR produced millions of pounds of CCP at the Appleton coating plant — with

production increasing from 0.2 million pounds in 1954 to 7.8 million pounds in 1967, 10.3

million pounds in 1968, 11.3 million pounds in 1969, and 11.8 million pounds in 1970. PJF

Decl. Ex. 31 [US Production NCR Paper Capsules 1954-1972].

43.     NCR built a new emulsion plant that used PCBs in 1968. PJF Decl. Ex. 31 [US

Production NCR Paper Capsules 1954-1972].

44.     After NCR bought the stock of ACPC in 1970, broke from ACPC continued to be sold to

Defendants even though NCR was fully aware of the significant environmental risks. PJF Decl.

Ex. 4 [Appleton Chronology]; Ex. 31 [US Production NCR Paper Capsules 1954-1972]; **AMH Decl. Ex. 18 [Mar. 25, 2009 D. Christenson Depo. Excerpts] at 125:9-25.**

## B. ACPC's Knowledge And Actions.

45. Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP. *See generally* **JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212; Ex. 12 [Jan. 28, 2009 F. Heinritz Depo. Excerpts] at 45-49, 118-119; Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79; JEF Decl. Ex. 178 [May 10, 1968 Letter from T. Busch, ACPC to H.V. Lauer, NCR].**

46. ACPC knew that the broke it sold for recycling contained emulsion. **JEF Decl. Ex. 27 [WT Notes on Oct. 30, 1962 ACPC Visit] at 2.**

47. By 1958, ACPC knew that the recycling broke caused the CCP capsules to rupture, discharging their contents. **JEF Decl. Ex. 12 [Jan. 7, 1958 WT Letter to NCR & Attachment].**

48. ACPC was also very familiar with the procedures for inventorying, shipping, and billing NCR broke. **AMH Decl. Ex. 20 [Jul. 21, 1966 ACPC Memo re: Broke Inventory, Shipping and Billing Procedure].**

49. NCR, ACPC, and Wiggins Teape ("WT") (NCR's UK licensee) had frequent communications and meetings between the mid-1950s and 1970s concerning CCP manufacture and broke recycling. **JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR].**

48

50.     From 1953 through 1971, NCR, ACPC, and WT shared information regarding recycling and environmental risks, and as early as 1958 had discussed how to best recycle NCR broke. *See generally* **JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; JEF Decl. Ex. 12 [Jan. 7, 1958 NCR Letter to WT]; Ex. 11 [WT Group Research Organization, Annual Report for 1958]; Ex. 79 [May 19, 1965 ACPC Letter].**

51.     ACPC and WT had complete freedom with respect to their exchange of information. **JEF Decl. Ex. 95 [August 18, 1965 WT Letter to ACPC].**

52.     By 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper. **JEF Decl. Ex. 35 [WT Report on December 2-4, 1963 visit to ACPC] at 5-6 (Representatives from WT discussed Aroclor release from CCP capsules with John Reeve and Tom Busch of ACPC).**

53.     ACPC gained information from NCR regarding the constituents of CCP by working with NCR to test constituents of NCR emulsion. **JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT and NCR]; AMH Decl. Ex. 5 [July 24, 1967 ACPC Memo]; Ex. 6 [Sept. 28, 1967 ACPC Memo].**

54.     ACPC gained information from NCR regarding the constituents of CCP by working directly with NCR in its development of patents for paper processes. **AMH Decl. Ex. 8 [Sept. 15, 1967 ACPC Memo]; Ex. 9 [Patent No. 3,311,499].**

55.     Tom Busch, of ACPC, filed numerous patents regarding the NCR paper coating process and wrote an article for the Technical Association of the Pulp and Paper Industry ("TAPPI")

describing paper coating additives.  **AMH Decl. Ex. 9 [Patent No. 3,311,499]; Ex. 10 [Patent No. 3,632,368]; Ex. 19 [Busch Article *Paper Coating Additives*].**

56.     ACPC learned that Aroclor 1242 was a constituent of NCR emulsion based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR.  **AMH Decl. Ex. 15  [Process Specification 2036.93]; Ex. 7 [May 19, 1967 ACPC Memo].**

57.     NCR representatives made multiple visits to ACPC facilities to test processes or discuss chemical specifications.  **JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT and NCR]; AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212**; **Ex. 12 [Jan. 28, 2009 Heinritz Depo. Excerpts] at 45-49, 118-119; Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79.**

58.     ACPC's Manager of Research Ronald Jezerc may have known that NCR emulsion contained PCBs when he read the patent upon starting at ACPC in 1964, and in any event, knew before 1969.  **AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 33-34; 56-57; Ex. 10 [Patent No. 3,632,378].**

59.     By the late 1960s at the latest, ACPC knew of the bioaccumulation and biopersistence of PCBs and was concerned about the adverse environmental effects of PCBs.  **AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpts] at 51-52, 60-61; Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 281-82; Ex. 11 [Nov. 10, 2006 L. Casey Depo. Excerpts] at 39-41; Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269; Ex. 24 [Sept. 30, 1976 ACPC Quarterly Report].**

60.     ACPC had internal meetings in 1969 about replacing Aroclor in NCR emulsion due to the adverse environmental effects of PCBs.  **AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpts] at 52, 60**; Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269; Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77; Ex. 24 [Sept. 30, 1976 ACPC Quarterly Report].

61.     By 1969, ACPC knew that there were environmental concerns associated with discharging wastewater containing NCR emulsion to the River.  **AMH Decl. Ex. 4  [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 72-74**.

62.     ACPC continued to sell broke to Defendants despite this knowledge.  **AMH Decl. Ex. 18 [Mar. 25, 2009 D. Christenson Depo. Excerpts] at 125:9-25;** PJF Decl. Ex. 4 [Appleton Chronology]; Ex. 31 [NCR Report, "US Production NCR Paper Capsules"]**; JEF Decl. Ex. 202 [WT Visit Report on Feb. 17-19, 1971 Visit to NCR] at 9.**

## C.     NCR's Communications With ACPC And Other Licensees And WT's Testing Of Recycled Broke.

63.     During the period from 1953 to 1971, NCR, WT, ACPC, Mead and several others held more than 65 in-person technical meetings (some days-long) to discuss all aspects of NCR paper production, including broke recycling.  *See* **JEF Decl., Ex. 1, which is a compilation of all communications and meetings between NCR, ACPC, WT and other licensees during the time frame between 1953 through 1971, information on which has been produced to**

51

**Defendants [Chart: Communications Among ACPC, WT, And NCR].[2]  Ex. 1 of JEF Decl.**

**is supported by the documents listed as Exhibits 2 through 204 of JEF Decl.**

64.     Significant meetings during which broke and/or broke recycling was discussed occurred

on the following dates and places:

| 65. | 01/1957 | WT Visit to NCR:  WT visited NCR to discuss technical issues regarding NCR Paper, the NCR-WT liaison,  and to discuss research on NCR Paper.  At this meeting NCR set forth the framework under which WT will operate when producing NCR paper.  Major topics discussed included:  machine coating, emulsion coating, making, finishing and testing NCR Paper, end use problems and research and development.  **WT and NCR discussed machine coating and its reduction in broke, and also discussed broke generally, including NCR's estimate of less than 15% broke on all grades.** | **JEF Decl. Ex. 6 [WT Notes on Visit to NCR in Jan. 1957]** |
|---|---|---|---|
| 66. | 7/26/1957 | WT Report on NCR Development meeting:  "**Discussion on Broke and Costs** with Mr. Vincent  - Mr. Vincent reported that Stoneywood are showing 31% Broke on sheets and 15% on reels.  Treforest 20% on sheets and 15% on reels.  Appleton are supposed to be giving is their figures for broke but the meeting agreed that in any case we need a full broke investigation, and Mr. Hendry undertook to put one of Group Research on to it." | **JEF Decl. Ex.  8 [July 26, 1957 WT Report on NCR Development Meeting]** |
| 67. | 9/30/1957 | WT Visit to ACPC:  WT visit to ACPC included a tour of the plant and NCR production and discussion of:  emulsion preparation, coating, finishing and testing.  **WT notes that "as far as sorting is concerned, most of the broke taken out at this stage seems due to creases, pipes, bar-marks (from conveyor in tunnel drier) and other mechanical faults."** | **JEF Decl. Ex. 9 [WT Notes on Visit to ACPC on Sept. 30, 1957]** |
| 68. | 1/1/1958 | WT Group Research Organization, Annual Report for | **JEF Decl. Ex. 11** |

[2]     As described in Defendants' Response to PPFF 62, it was only after months of efforts by Defendants, the July 31, 2009 Order compelling production, and Georgia-Pacific's filing of a subsequent Rule 7.4 Expedited Motion to Compel that many of the documents described in Exhibit 1 to the JEF Decl. were produced.  These documents consistent of documents formerly in the files of WT, from its Butler's Court facility.

52

| | | 1958: "**Re-use of CB and CFB broke. A pulping process was developed for CB and CFB** along the lines suggested by Mead. Work was abandoned when it was shown that there was **no financial advantage over selling the broke at the present price.**" "Visits of Messrs. Lauer and Sandberg. We have had visits from NCR Dayton in connection with the quality of the product, and it is hoped that the result will be a more uniform product and fewer complaints." | **[WT Group Research Organization, Annual Report for 1958]** |
|---|---|---|---|
| 69. | 1/7/1958 | NCR Letter: **Regarding repulping of NCR Paper stating that Sanberg has discussed problem with both ACPC and Mead and they will reply back to WT**. | **JEF Decl. Ex. 12 [January 7, 1958 NCR letter]** |
| 70. | 1/27/1958 | NCR letter to WT: I notice in a letter addressed to you from Bob Sandberg, and dated January, 7th, some information about **re-use of waste paper** - does this mean you have this more or less under control? | **JEF Decl. Ex. 14 [Copy of January 27, 1958 NCR letter]** |
| 71. | 2/21/1958 | WT letter to NCR: "First, **we have received from Mead their reports on the re-use of waste NCR paper**. We do not have a de-inking plant, so we shall proceed with the quaternary ammonium treatment indicated by them. I do not altogether agree with the statement that no trouble is caused with CB on its own, because after it has turned blue by the action of light it is **extremely difficult to remove the blue colour**. As we can not always guarantee to use the broke immediately, **this is quite a serious problem.** However, it does appear that Mead has solved it and we shall follow their instructions." | **JEF Decl. Ex. 16 [Feb. 21, 1958 WT Letter to NCR]** |
| 72. | 3/31/1959 | WT Visit to NCR, ACPC, Combined Locks and Mead: The purpose of WT's visit to NCR, Combined Locks and Mead was to observe and discuss: NCR reel orders, the production of machine coated CF paper, to study NCR costs and possible price reductions and to become familiar with the technical aspects of NCR paper production. **NCR provided to WT the figures for emulsion consumption and broke at the US Mills.** | **JEF Decl. Ex. 21 [WT Notes on Visit to NCR, ACPC and Mead on March 31 through April 16, 1959]** |
| 73. | 11/1/1960 | WT Visit to ACPC, Mead and NCR: WT visited ACPC, Mead and NCR to discuss technical matters and to look into their finishing methods. WT also evaluates current machinery used by ACPC. ACPC proposed that WT entered into an agreement on "Reciprocity of Research" with ACPC. **WT concludes that broke percentages at ACPC and Mead on reel orders may be comparable to WT,** | **JEF Decl. Ex. 24 [WT Technical Notes on ACPC, NCR and Mead Visits in Nov. 1960]** |

SF\720485.10

| | | and that WT will need to continue to reduce their sheet broke. | |
|---|---|---|---|
| 74. | 10/30/1962 | ACPC Visit to WT: ACPC visited WT's Treforest facility and discussions included: raw materials, mix formulations, emulsion use, and other technical topics. **WT notes that for ACPC "the only emulsion lost is in the broke."** | **JEF Decl. Ex. 27 [WT Notes on ACPC Visit to WT on Oct. 30, 1962]** |
| 75. | 11/1963 | WT visits NCR's Dayton facility for a week for "updating." WT tours NCR and Mead's facilities, and NCR asks WT's questions. Topics discussed include: NCR's efforts to develop a next generation paper, NCR's lawsuit against 3M for patent infringement, various trials performed at Nekoosa Edwards, comparison of American and English emulsion. WT visited Mead. **WT notes that Mead sells "all of their NCR waste to a Mill with a deinking plant who they claim are able to re-cover and use as white pulp in this way."** WT was impressed by Mead's "openness in discussion." | **JEF Decl. Ex. 32 [Nov. 1963 NCR Paper and Supply Products Technical Services Progress Report]; Ex. 33 [WT Notes on Visit to Mead on Nov. 29, 1963]; Ex. 34 [WT Notes on Visit to Mead on Nov. 29, 1963]** |
| 76. | 12/2/1963 | WT Visit to ACPC: The purpose of WT's visit to ACPC was to discuss "in detail the up-to-date information" on the coating of NCR paper." Topics included: NCR paper manufacturing by Mitsubishi, emulsion usage, issues with CB check paper **(including the capsule breakage and release of Aroclor)**, various equipment issues, coating weight control and other technical issues. WT notes that it would seem NCR is "only too willing to accept any new raw materials providing it will cheapen the product" which was not the impression NCR had given WT when WT had suggested alternative formulations. **WT's visit notes also include Appleton's prices for broke disposal.** | **JEF Decl. Ex. 35 [WT Report on ACPC Visit on Dec. 2-4, 1963]; Ex. 32 [Nov. 1963 NCR Paper and Supply Products Technical Services Progress Report]** |
| 77. | 10/12/1964 | WT Visit to Combined Locks: WT toured Combined Locks Mill and viewed coating process. **Discussed machine efficiency, including that the on machine coating produced 9% broke and the off machine coating produced 10% broke.** | **JEF Decl. Ex. 44 [WT Oct. 12, 1964 Visit to Combined Locks Notes]** |
| 78. | 11/5/1964 | Notes of meeting between BAT and WT regarding Aroclor: Determinations in paper **- reference to Aroclor being "toxic" and concern that recycled NCR paper should not be used in food packaging materials** | **JEF Decl. Ex. 52 [Nov. 5, 1964 Notes of meeting between BAT and WT regarding Aroclor]** |
| 79. | 1/25/1965 | Letter from J. Gough (WT) to Cora Ayers (BAT) **about "the determination of Aroclor." States that** | **JEF Decl. Ex. 57 [Jan. 25, 1965 Letter** |

54

| | | Monsanto is having a roundtable discussion "between all the interested parties" and Gough will be attending. Gough thinks it may be useful to have the last tests that BAT/Ayers carried out to show at the meeting. Monsanto hopes the meeting will enable them and us (WT) "to get to the bottom of this problem." | from BAT] [Gough Depo. Ex. 1010-G] |
|---|---|---|---|
| 80. | 2/15/1965 | WT Visit to ACPC: WT observes extensive ACPC operations in Appleton from February 15, 1965 to February 19, 1965. Observations include those on coating: "Coaters are theoretically similar" and retentions are "quite separate from broke losses." **WT reports that Appleton retains 100% of its emulsion, but this is separate from broke loss.** | **JEF Decl. Ex. 59 [Feb. 15, 1965 Report on WT Visit to ACPC in Appleton]** |
| 81. | 4/1965 | **WT Visit to NCR: During the NCR-WT visits between 1964-65 the following was discussed: "reuse of paper machine broke containing emulsion and <u>the problem which will arise if emulsion gets into the backwater.</u>" (used recycling process water to be discharged from a plant). During that meeting, NCR advised that the best broke recycling method "was to break the capsules chemically and then adsorb oil/dyestuff mixture onto attapulgus clay which can be removed." Additionally, NCR told WT that <u>NCR has "been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in toxicity, odour, and cost."</u> NCR told WT that it was opposed to using other lighter solvents in the emulsion because that 'might upset the balance of the whole dye system." <u>The memorandum also states that the micro-capsules may be "dissolved, broken by pressure."</u>** | **JEF Decl. Ex. 70 [Feb 15, 1965 Report on WT visit to ACPC in Appleton]; Ex. 72 [Gough Deposition at 56:12-20]** |
| 82. | 5/17/1965 | WT Visit to Mead: Visit arranged by H. Lauer of NCR Dayton. Mead produces NCR paper; reportedly not as efficient as Appleton. **Mead "do not use their NCR broke but sell it to Moraine. . . for about $50 per ton."** | **JEF Decl. Ex. 74 [May 17, 1965 report on WT visit to Mead]; Ex. 75 [May 17, 1965 report on WT visit to Mead]; Ex. 76 [May 1965 Report on Visit to Mead Paper Corporation]** |
| 83. | 12/5/1965 | WT Visit to Mead: Volume of NCR business, NCR coating plant, phenolic F, and broke is discussed. "They do not re-use any of their broke". All broke is | **JEF Decl. Ex. 114 [Dec. 5, 1965 WT report of visit to** |

| | | sold at $50 per ton to Morraine Paper Mills at Dayton. Mead at one time did work on **repulping NCR broke** and found that the CVL dyestuff colour could be destroyed by use of quarternary ammonium compounds. | **Mead]** |
|---|---|---|---|
| 84. | 05/1966 | WT Visits to Mead and ACPC: Purpose of visit was to look at how mills in the US produce base paper for NCR coating. Topics reviewed included: stock preparation, paper making, coating operations, and finishing. **Mills use of broke is discussed**. WT toured plants. During Mead visit discussed broke. Base paper is made with 30% broke (uncoated) and Mead sells the CF broke at $60/ton. | **JEF Decl. Ex. 134 [May 1966 WT Summary of Visits to NCR Producing Mills]; Ex. 135 [May 1966 WT Summary of Visit to Mead]; Ex. 136 [May 1966 WT report on visit to ACPC]** |
| 85. | 9/25/1967 | WT Visit to ACPC: Purpose of the visit was to evaluate the performance of the three-roll coating head and Cleveland crane. ACPC told WT that a complete wash up of the system occurs every 12 hours, and the color is pumped to a buffer tank, and the **system is washed off with water to the drain. ACPC claimed an overall broke level of 3%** (meaning the difference in weight between all raw materials going in and coating paper going out). | **JEF Decl. Ex. 165 [Oct. 8, 1967 Notes on Visit to ACPC]** |
| 86. | 5/27/1968 | WT, NCR Visit to ACPC: Purpose of the visit was to have a general exchange of ideas, practices and machinery in the manufacture of NCR Paper, and to discuss a "tandem" coater. **ACPC's consideration of the use of broke in place of Solka Floc was discussed, including that ACPC does not believe repulping will cause blueing.** | **JEF Decl. Ex. 179 [June 1968 WT Report on Visit to ACPC]** |
| 87. | 6/2/1969 | WT Visit to ACPC: The purpose of WT's visit to ACPC was to determine the efficiency of ACPC's production of NCR Paper and identify any major differences in production. Topics discussed included: ordering process, stock holding, raw materials, production efficiency. **WT and ACPC also discussed broke levels at ACPC.** | **JEF Decl. Ex. 187 [WT Visit Report on June 2-6, 1969 Visit to ACPC]** |

**88.**   In the Fall/winter of 1964, WT began another major effort aimed at developing its own

broke recycling capabilities for NCR paper, including CB and CBF sheets - *i.e.*, those containing

PCB emulsion. **JEF Decl. Ex. 39A [Sept. 17, 1964 Technical Liaison Meeting**

**Ely/Treforest]; Ex. 46 [Oct. 28, 1964 Treforest Technical Report].**

56

89.     Because of WT's knowledge about PCB toxicity and concerns about the potential toxicity of products produced from recycled CB and CFB broke, Mr. John Gough, a fiber specialist at WT, was appointed to design a series of laboratory and large scale trial test runs of recycling options in order to design a system that cost-effectively removed dyes and solvents from waste broke.  **AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19; Ex. 62 [March 16, 1965 WT Letter re: Aroclor testing] [Gough Depo. Ex. 1010-I]; Ex. 52 [Nov. 5, 1964 Notes of BAT/WT Meeting].**

90.     Because WT lacked the laboratory analytic equipment and expertise to conduct the measurements necessary to determine the extent to which dyes and solvents were removed by recycling, WT sought and received the support of British American Tobacco's laboratories for this effort.  **JEF Decl. Ex. 62 [March 16, 1965 WT Letter re: testing samples for Aroclor] [Gough Depo. Ex. 1010-I]; Ex. 58 [February 2, 1965 Letter to WT re: Aroclor determination][Gough Depo. Ex. 1010-H].**

91.     WT consulted with Monsanto and BAT to determine the appropriate analytic techniques for use in this series of experiments and monitored trial testing runs, and together, they decided that analysis of the PCB content in broke was the best means of acquiring the desired information.   **JEF Decl. Ex. 57 [January 1, 1965 WT Letter re: Aroclor determination] [Gough Depo. Ex. 1010-G]; Ex. 62 [March 16, 1965 WT Letter re: testing samples for Aroclor] [Gough Depo. Ex. 1010-I] ("The samples sent for Aroclor testing "represent paper made with and without N.C.R. broke."); Ex. 113 [WT Letter re: samples with broke tested for Aroclor] [Gough Depo. Ex. 1010-U].**

SF\720485.10

92.    Two large scale flotation trial runs were conducted in June and July of 1965.  **JEF Decl. Ex. 91 at pp. 1-6.**

93.    For these broke recycling trial runs by the flotation de-inking process, WT/BAT analyzed the PCB content of broke before it was recycled, the PCB content of the fibers recovered from the process, and the PCB content of  the two waste streams produced from the recycling process - backwater (destined for discharge to a river or treatment plant) and solids removed from a centrifuge process employed during flotation de-inking process.  **JEF Decl. Ex. 91 [WT report "Re-use of N.C.R. Broke - trials on a flotation de-inking plant"]**.

**94.**    As a result of these efforts, the analytic results obtained in August and November 1965 definitively established that the recycling of CB and CFB broke would result in the significant discharge of PCB-laden wastewaters from the flotation de-inking process.  **JEF Decl. Ex. 89 [Aug 4, 1965 letter from BAT to WT] [Gough Depo. Ex. 1010-P]; JEF Decl. Ex. 111 [Nov. 25, 1965 BAT to WT letter] [Gough Depo. Ex. 1010-T].**

**95.**    During this same time period of WT's broke recycling test program, from approximately late 1964 to 1966, over twenty meetings were held between WT, NCR, ACPC, and Mead.  **JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR].**

96.    Also during this same time period, in August 1965, WT wrote ACPC a letter stating "I agree wholeheartedly with you that it is very much to our mutual benefit to keep in touch, in detail, on the various NCR developments.  Our liaison is helped enormously by the fact that we enjoy complete freedom with regard to exchanging information." **JEF Decl. Ex. 95 [Aug 18, 1965 WT letter to ACPC].**

**97.** Around the same time, in April 1965, WT asked whether HB 40, which was an easier substance to remove from the fibers than PCBs, could be substituted for the Aroclor mixture in order to facilitate fiber recovery from CB and CFB broke. NCR denied this request. **JEF Decl. Ex. 70 [Apr. 1, 1965 Memo on WT visit to NCR]** ("The use of a lighter oil in the capsule, to enable the capsules to be 'floated off', was discussed. Dayton are very much against the idea of changing the oil, as they suggest this might upset the balance of the whole dye system. They added that they have been looking for an alternative to Aroclor for the last ten years without success. There were looking for improvements in toxicity, odor and cost.").

**98.** Based generally on the extensive meetings and consultations regarding broke recycling that occurred among NCR, WT, ACPC and Mead during the period of 1957 through 1964, and based specifically on the analytic work and extensive technical consultations regarding broke recycling that occurred around 1965, there can be no doubt that NCR and ACPC in fact knew in 1965 at the latest that the recycling of broke would result in the release of PCBs into the environment. ***See generally* JEF Decl. at Ex. 1, with supporting documentation at Exhibits 2 through 204.**

Dated: September 30, 2009

Respectfully Submitted,

\_\_\_/s/ Karl. S. Lytz\_\_\_\_
Karl S. Lytz

Ernest J. Getto
CA Bar No. 55662
Karl S. Lytz
CA Bar No. 110895
Andrea M. Hogan
CA Bar No. 238209
Patrick J. Ferguson
CA Bar No. 252778

59

Latham & Watkins LLP
505 Montgomery St., Ste. 2000
San Francisco, CA 94111-6538
Telephone:  (415) 391-0600
Fax:  (415) 395-8095
Ernie.Getto@lw.com
Karl.Lytz@lw.com
Andrea.Hogan@lw.com
Patrick.Ferguson@lw.com

Mary Rose Alexander
IL Bar No. 6205313
CA Bar No. 143899
Margrethe K. Kearney
IL Bar No. 6286559
Latham & Watkins LLP
233 S. Wacker Dr.
Ste. 5800
Chicago, IL 60606
Telephone: (312) 872-7700
Facsimile: (312) 993-9767
Mary.Rose.Alexander@lw.com
Margrethe.Kearney@lw.com