# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | | |
|---|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 08-CV-16-WCG |
| | ) | |
| GEORGE A. WHITING PAPER COMPANY,<br>ET AL., | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| NCR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 08-CV-0895-WCG |
| | ) | |
| KIMBERLY-CLARK CORPORATION,<br>ET AL., | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSES TO CERTAIN DEFENDANTS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs NCR Corporation and Appleton Papers Inc., through their Attorneys, for their Responses to Certain Defendants' [Proposed] Findings of Fact and Conclusions of Law [Docket No. 587], state as follows:

## [PROPOSED] FINDINGS OF FACT

### I. BACKGROUND ON THE PARTIES

1.    Plaintiffs NCR Corporation ("NCR") and Appleton Papers Inc. ("API") seek contribution from Defendants under CERCLA Section 113(f)(1) for response costs and/or natural resource damages associated with polychlorinated biphenyl ("PCB") contamination in the Lower Fox River. Doc. #265 [Seventh Amended Complaint].

**RESPONSE:**       Undisputed.

2.    Defendants and Counterclaimants who are parties to the Motion for Summary Judgment for which these [Proposed] Findings of Fact are filed include: the City of Appleton, Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James

Corporation, and Georgia-Pacific LLC (collectively, "Georgia-Pacific"), CBC Coating, Inc., Menasha Corporation, Neenah-Menasha Sewerage Commission, P.H. Glatfelter Company, US Paper Mills Corporations, and WTM I Company.

> **RESPONSE:**         Undisputed.

3.      The City of Appleton is a Wisconsin municipal corporation organized under the laws of the State of Wisconsin, with its principal place of business located in Appleton, Wisconsin.  Doc. #258 [Defendant City of Appleton's Answer To Sixth Amended Complaint, filed September 26, 2008].

> **RESPONSE:**         Undisputed.

4.      Defendant Georgia-Pacific Consumer Products LP is a Delaware limited partnership with its principal place of business in Atlanta, Georgia and was formerly known as Fort James Operating Company.  Doc. #310 [Defendants Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC's Amended Answer, Affirmative Defenses and Counterclaim to Plaintiffs' Seventh Amended Complaint, filed October 17, 2008].

> **RESPONSE:**         Undisputed.

5.      Defendant Georgia-Pacific LLC is a Delaware limited liability corporation with its principal place of business in Atlanta, Georgia.  *Id.*

> **RESPONSE:**         Undisputed.

6.      Defendant Fort James Corporation is a Virginia corporation with its principal place of business in Atlanta, Georgia.  *Id.*

> **RESPONSE:**         Undisputed.

7.      Defendant CBC Coating, Inc. is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin.  Doc. #327 [Defendant CBC Coating, Inc.'s Amended Answer, Affirmative Defenses and Counterclaim to Plaintiffs' Seventh Amended Complaint, filed October 24, 2008].

> **RESPONSE:**         Undisputed.

8.      Defendant Menasha Corporation is a Wisconsin corporation with its principal place of business in Neenah, Wisconsin.  Doc. #293 [Defendant Menasha Corporation's Answer to Seventh Amended Complaint and Counterclaims, filed October 13, 2008].

> **RESPONSE:**         Undisputed.

9.      Defendant Neenah-Menasha Sewerage Commission ("Neenah-Menasha SC") operates a publicly owned treatment works.  Doc. #261 [Defendant Neenah-Menasha Sewerage

Commission's Answer and Affirmative Defenses to Plaintiffs' Six Amended Complaint, filed September 29, 2008].

**RESPONSE:**     Undisputed.

10.     Defendant P.H. Glatfelter Company is a Pennsylvania corporation with its principal place of business in York, Pennsylvania.  Doc. #298 [Defendant P.H. Glatfelter Company's Answer, Affirmative Defenses, and Counterclaim to Plaintiffs' Seventh Amended Complaint, filed October 15, 2008].

**RESPONSE:**     Undisputed.

11.     Defendant U.S. Paper Mills Corp. is a Wisconsin corporation with its principal place of business in De Pere, Wisconsin.  Doc. #283 [Defendant U.S. Paper Mill Corp.'s Answer To Seventh Amended Complaint, Affirmative Defenses and Counterclaim, filed October 6, 2008].

**RESPONSE:**     Undisputed.

12.     Defendant WTM I Company is a Delaware corporation with its principal place of business in Las Vegas, Nevada.  Doc. #300 [Answer and Counterclaims of WTM I Company To The Seventh Amended Complaint, filed October 16, 2008].

**RESPONSE:**     Undisputed.

## II.     BACKGROUND ON THE CORPORATE HISTORY OF NCR CORPORATION AND APPLETON PAPERS, INC.

13.     In 1884, NCR was founded in Ohio.  Declaration of Patrick J. Ferguson In Support of Certain Defendant's Motion For Summary Judgment Regarding Defendant's Knowledge ("PJF Decl."), Ex. 3 [http://www.ncr.com/about_ncr/company_overview/history.jsp].

**RESPONSE:**     Undisputed.

14.     In 1889 the Combined Locks Paper Company was founded at Combined Locks, Wisconsin.  *Id.*, Ex. 4 [Appleton Papers Chronology].

**RESPONSE:**     Undisputed.

15.     In 1966, the Combined Locks Paper Company changed its name to Combined Paper Mills, Inc. ("CPM").  *Id.*

**RESPONSE:**     Undisputed.

16.     In 1969, NCR acquired CPM.  *Id.*

**RESPONSE:**     Undisputed.

3

17.     In 1907, ACPC was founded in Appleton, Wisconsin.  *Id*.

    **RESPONSE:**          Undisputed.

18.     In 1970, NCR acquired Appleton Coated Paper Company ("ACPC") as a wholly-owned subsidiary of NCR.  *Id.*

    **RESPONSE:**          Undisputed.

19.     On June 21, 1971, NCR merged its two subsidiaries, Combined Paper Mills, Inc. and Appleton Coated Paper Company, to create Appleton Papers, Inc., a subsidiary of NCR.  *Id.*

    **RESPONSE:**          Undisputed.

20.     On January 1, 1973 Appleton Papers, Inc. merged with NCR and changed from a subsidiary of NCR to a division of NCR.  *Id.*

    **RESPONSE:**          Undisputed.

## III.   OVERVIEW OF THE DEVELOPMENT AND MANUFACTURE OF PCBS AND NCR PAPER

21.     Monsanto Chemical Company ("Monsanto") manufactured a PCB called Aroclor 1242.  PJF Decl., Ex. 2 [NCR's Responses To Georgia-Pacific's First Set Of Interrogatories] at 8 and 4-5.

    **RESPONSE:**          Undisputed.

22.     NCR used Aroclor 1242 as a solvent to suspend dyes inside the carbonless copy paper ("CCP") emulsion capsules that it manufactured at plants located in Dayton, Ohio (from approximately 1953 through 1971), Portage, Wisconsin (from approximately 1968 through 1971), and Borehamwood, United Kingdom (from approximately 1957 through 1971).  *Id.*, Ex. 2 [NCR's Responses To Georgia-Pacific's First Set Of Interrogatories] at 4-5, 8.

    **RESPONSE:**          Disputed in part.   The record evidence cited states that

emulsion capsules were manufactured in Borehamwood, United Kingdom from approximately

1957 through 197<u>0</u>, not 197<u>1</u> as recited above.  *Id.*   The remainder of this finding of fact is

undisputed.

23.     Beginning in 1953 or 1954 and ending in 1971, under contract to NCR, Appleton Coated Papers Company ("ACPC") applied this emulsion to preformed paper at a coating facility in Appleton, Wisconsin.  *Id.*, Ex. 2 at 5-6.

    **RESPONSE:**          Undisputed.

4

24.     Beginning in late 1969 and ending in 1971, CCP was also produced at a facility in Combined Locks, Wisconsin that NCR acquired in 1969. *Id.*, Ex. 2 at 5.

**RESPONSE:**          Undisputed.

25.     CCP was also manufactured in the United Kingdom ("UK") from approximately 1955 to 1970 at two facilities operated by Wiggins Teape Ltd ("WT"), NCR's exclusive licensee for CCP production in Europe. *Id.*, Ex. 2 at 6, 8.

**RESPONSE:**          It is undisputed that CCP was manufactured in the UK from approximately 1955 to 1970 at two facilities operated by WT. Nothing in the record evidence cited, however, suports the assertion that WT was NCR's "exclusive licensee for CCP production in Europe" during all or part of the referenced time period. *See* PJF Decl., Ex. 2 at 6, 8.

26.     WT produced CCP at coating plants located in Treforest, England and Nivelles, Belgium from approximately 1956 to 1970. *Id.*

**RESPONSE:**          Undisputed.

27.     ACPC sold the paper that became scrap during the CCP manufacturing process production, called "broke," to brokers, who in turn sold it to recycling mills. Doc. #334 [Plaintiffs Appleton Papers Inc. and NCR Corporation's Answer To Defendant Menasha Corporation's Counterclaim] at 4-6.

**RESPONSE:**          Undisputed.

28.     Printers and converters of business forms sold their production scrap, which contained PCBs from manufacturing forms on NCR Paper, to recycling mills. PJF Decl., Ex. 1 [Record of Decision for Operable Units 1 and 2, Wisconsin DNR and U.S. EPA, December 2002 ("2002 ROD")] at 4; Ex. 6 [August 11, 2009 Revised Expert Opinion of Joseph V. Rodricks] at 25.

**RESPONSE:**          Undisputed.

29.     Post-consumer wastepaper, which contained varying, but very small, amounts of PCBs from NCR Paper, were recycled by recycling mills. *Id.*, Ex. 1 [2002 ROD, at 4]; Ex. 6 [Aug. 11, 2009 Revised Expert Opinion of Joseph V. Rodricks] at 25.

**RESPONSE:**          Disputed in part. It is undisputed that post-consumer wastepaper contained varying amounts of PCBs from NCR Paper and that post-consumer

wastepaper was recycled by recycling mills. It is disputed, however, that post-consumer wastepaper contained "very small" amounts of PCBs. As one example, testing conducted by Fort Howard Corporation in 1985 showed that a sample of a certain grade of recovered paper (File Stock) tested in that year had a PCB concentration of 52,474 parts per billion. Declaration of Kathleen Roach ("Roach Decl."), Ex. 130 [Exhibit 696-S to the Deposition of Donald Schneider].

## IV. NCR CORPORATION'S MANUFACTURING OF CCP AND PLAINTIFFS' KNOWLEDGE REGARDING RECYCLING AND DDT

30. NCR developed patentable technologies ranging from cash registers to encapsulation processes. *Id.*, Ex. 10 [1963 Annual Report Excerpts] at 2-4, 16-17.

**RESPONSE:** Undisputed.

31. NCR first produced No Carbon Required ("NCR") Paper in 1954. *Id.*, Ex. 10 at 16; Ex. 11 [June 30, 2009 H. Schwab Depo. Excerpts at 175:8-189:18].

**RESPONSE:** Undisputed.

32. The NCR Materials Research Department employed 146 scientists between 1951 and 1971. *Id.*

**RESPONSE:** The proposed fact is unsupported by the record evidence cited. *See* PJF Decl., Ex. 10 at 16, and Ex. 11 at 175:8-189:18.

33. The scientists employed by NCR's Materials Research Department all had scientific degrees, and at least 42 of the scientists had advanced scientific degrees. *Id.*

**RESPONSE:** The proposed fact is unsupported by the record evidence cited. *See* PJF Decl., Ex. 10 at 16, and Ex. 11 at 175:8-189:18.

34. The scientists employed by NCR's Materials Research Department also experimented with microencapsulation in other applications using a wide variety of chemicals other than PCBs. *Id.*, Ex. 12 [Aug. 12, 2009 J. Herbig Depo. Excerpts at 28:20-30:15].

**RESPONSE:** The proposed fact is unsupported by the record evidence cited. Nothing in the record evidence cited supports the assertion that the referenced

6

experimentation was performed by scientists in the Materials Research Department.  *See* PJF Decl., Ex. 12 at 28:20-30:15.

35.    The first part of Rachel Carson's *Silent Spring* was published in the *New Yorker* in 1962 and brought public attention to the widespread use and harmful ecological effects of DDT.  *Id.*, Ex. 13 [*Silent Spring* Excerpt].

**RESPONSE:**        Undisputed that the first part of Rachel Carson's *Silent Spring* was published in the *New Yorker* in 1962.  The record evidence cited does not support the "fact" that this publication "brought public attention to the widespread use and harmful ecological effects of DDT."

36.    ACPC knew from the time it began manufacturing CCP that broke would be recycled.  *Id.*, Ex. 14 [Mar. 3, 2009 A. Kresch Deno.  Excerpts at 80:20-81:20]; Ex. 15 [March 25, 2009 D. Christenson Depo. Excerpts at 47:5-49:19].

**RESPONSE:**        The proposed fact is unsupported by the record evidence cited.  *See* PJF Decl., Exs. 14 and 15 at 47:5-49:19.

37.    NCR knew that broke from the manufacturing of CCP would be recycled by the mid-1960s at the latest.  *Id.*

**RESPONSE:**        The proposed fact is unsupported by the record evidence cited.  *See* PJF Decl., Exs. 14 and 15 at 47:5-49:19.  Nothing in the record demonstrates that NCR knew at any point before it ceased using PCBs in the production of CCP that broke from the manufacturing of CCP would be recycled.

38.    NCR also knew that CCP capsules would also rupture when subjected to the pressure, heat, and pH conditions that occur in the recycling process.  *Id.*, Ex. 12 [Aug. 12, 2009 J. Herbig Depo. Excerpts at 237:13-241:21]; Ex. 16 [June 16, 2009 G. Taylor Depo. Excerpts at 65:19-67;16, 224:3-228:22]; Ex 11 [June 30, 2009 H. Schwab Depo. Excerpts at 143:14-145:24]; Ex. 17 [Apr. 24, 2009 W. Goetz Depo. Excerpts at 102:6-105:5, 156:19-157:19; 226:11-232:13; 257:24-258:6]; Ex 18 [Herbig Encapsulation Article, marked and authenticated as Exhibit 868-J during Aug. 12, 2009 J. Herbig Depo. (Ex. 12) at 173:7-12]; Ex. 19 [Goetz Paper on NCR Pressure Sensitive Copy Paper Excerpts, marked and authenticated as Exhibit 560 during Apr. 24, 2009 W. Goetz Depo, (17) at 82:12-84:22].

**RESPONSE:** Disputed. First, this "fact" is wholly unsupported by the record evidence cited by Defendants. None of the deponents listed were asked any questions regarding NCR's past knowledge (to support the statement that "NCR *knew*") as to whether capsules would break under certain conditions, nor were they asked anything about whether capsules would rupture during recycling. *See* PJF Decl., Ex. 12 at 237:13-241:21; Ex. 16 at 65:19-67;16, 224:3-228:22; Ex 11 at 143:14-145:24; Ex. 17 at 102:6-105:5, 156:19-157:19; 226:11-232:13; 257:24-258:6; Ex 18; and Ex. 19. The deponents were merely asked in the cited pages for their present opinions as to whether certain conditions might cause capsule breakage. *Id.* With respect to pressure, certain of the witnesses (and articles) cited stated that the capsules were designed to break when more than 35 pounds per square inch of pressure was applied to the paper, but no evidence cited by Defendants suggests that the recycling process would have applied this level of pressure (and no questions regarding the pressure applied by recycling was asked of any of these witnesses in the cited pages). *Id.* With respect to heat, in response to questioning as to whether temperatures of 180-200 degress Fahrenheit would rupture the capsules, James Herbig testified that he did not know (PJF Decl., Ex. 12 at 239:7-240:4), Gerald Taylor said that he "guess[ed]" that it might "somewhat increase the permeability" of the capsule (*Id.*, Ex. 16 at 227:4-20); and Helmut Schwab stated that it was possible. *Id.*, Ex. 11 at 144:14-15. With respect to the effects of pH, Mr. Taylor testified that he "would expect at extremes it would have an effect" (*Id.*, Ex. 16 at 227:4-20); and Mr. Herbig stated that he would expect the pH of certain acids would have "an effect" on the "chances" of the capsule breaking. *Id.*, Ex. 12 at 241:11-21. None of the articles cited provide anything additional.

Secondly, NCR employees who were the most knowledgeable about these issues, stated that the capsules would likely withstand heats in excess of 400 degrees Fahrenheit (or short of

Case 2:08-cv-00016-WCG   Filed 09/30/09   Page 8 of 45   Document 659

setting the paper on fire), would not be affected by the acidity or alkilinity of the chemicals used

in the recycling system, and would not likely be reptured by the pressure applied in the

recycling process.  Roach Decl., Ex. 27 [July 1, 2009 Stutz Dep. at 262:24-265:3]; Ex. 236 [R.

Sandberg Dep. at 90:1-91:17, 108:1-109:5].

39.    NCR studied both DDT and PCBs for encapsulation purposes.  *Id.*, Ex. 12
[Aug. 12, 2009 J. Herbig Depo. Excerpts at 28:20-30:15]; Ex. 20 [June 18, 2009 J. Stutz Depo.
Excerpts at 81:3-83:19].

**RESPONSE:**          It is undisputed that NCR studied PCBs for encapsulation

purposes, but neither Mr. Herbig nor Mr. Stutz testifies that NCR actually studied DDT for

encapsulation purposes in the cited testimony.  *See* PJF Decl., Ex. 12 at 28:20-30:15 and Ex. 20

at 81:3-83:19.

## V.    RELATIONSHIP BETWEEN NCR, WT AND MONSANTO, PLAINTIFFS' KNOWLEDGE REGARDING PCBS, AND PLAINTIFFS' FAILURE TO INFORM DEFENDANTS

40.    In 1964, NCR began an in-depth technical exchange program with its European
licensee, WT, that continued well into the 1970's.  *C.f.* PJF Decl., Ex. 71 [November 1964 NCR
Progress Report]; Ex. 72 [February 1965 NCR Progress Report].  This type of report was kept in
the ordinary course of NCR's business.  *C.f. Id.*, Ex. 83 [February 12, 2009 P. Phillips Depo.
Excerpt at 54:9-55:23 (Feb. 1961 Progress Report authenticated and marked as Exhibit 27)].

**RESPONSE:**          Disputed, and unsupported by the record evidence.  The

lack of support for this "undisputed" fact can be seen from the very fact that that Defendants list

the purportedly supporting evidence following a "*C.f.*" citation.  It is undisputed that NCR and

WT engaged in a technical exchange program, which program apparently began in 1964, but the

"depth" of those technical exchanges are disputed.  *See* Pls. PFF, ¶¶ 161-62.  It is also clear

from the very face of the evidence cited – reports from 1961, 1964 and 1965 – that Defendants

have no basis for their statement that this technical exchange program "continued well into the

1970's."  Nothing in the record supports that assertion.

9

41.     In the latter part of 1964, WT became interested in recycling its own broke. *Id.*, Ex. 68 [Nov. 5, 1964 C. Ayers' Letter].

**RESPONSE:**          Undisputed.

42.     In 1965, WT's Butler's Court research group began an extensive broke recycling testing program. *Id.* Ex. 68 [Nov. 5, 1964 C. Ayers' Letter]; Ex. 69 [Apr. 23, 1965 WT Letter].

**RESPONSE:**          It is undisputed that, in 1965, WT's Butler's Court research group began a broke recycling testing program. Whether or not that program was "extensive," however, is not a "fact" appropriate for a proposed finding of fact, nor is it supported by the record evidence cited. *See* PJF Decl., Exs. 68 & 69.

43.     WT's broke recycling testing program had laboratory support from British American Tobacco Ltd., WT's then part owner. *Id.*, Ex. 68 [Nov. 5, 1964 C. Ayers' Letter]; Ex. 69 [Apr. 23, 1965 WT Letter].

**RESPONSE:**          It is undisputed that WT's broke recycling testing program had laboratory support from British American Tobacco Ltd. ("BAT"). Nothing cited by Defendants supports the "fact" that BAT was WT's "part owner" in 1965. *See* PJF Decl., Exs. 68 & 69.

44.     WT's broke recycling testing program had input from Monsanto on analytic techniques. *Id*.

**RESPONSE:**          Undisputed.

45.     The results of this program revealed the presence of PCBs in all media sampled, including the broke itself, paper products made from recycled broke, and the wastewater generated during the recycling process. *Id.*, Ex. 70 [Oct. 5, 1964 WT Letter].

**RESPONSE:**          It is undisputed that the results of this program revealed the presence of PCBs in broke, paper products made from recycled broke, and the wastewater generated during the recycling process.

46.     There is no evidence that NCR conducted any investigation of the fate of its PCB-containing paper.

**RESPONSE:** Disputed in part. It is undisputed that NCR never conducted recycling experiments prior to 1972 like those conducted by WT. It is disputed that NCR otherwise never investigated the fate of CCP. *See, e.g.,* Roach Decl., Ex. 237 [Nov. 1962 NCR Research Progress Report (NCR-FOX-318198) at 2]; Ex. 238 [Feb. 1966 Research Division Progress Report (NCR-FOX-318325) at 14].

47. In 1965, NCR asked Monsanto for toxicity information on Aroclor 1242 and 1254, *id.*, Ex. 74 [Dec. 30, 1965 letter,], and began searching for a replacement for PCBs. *Id.*, Ex. 73 [Nov. 1965 Progress Report]; Ex. 72 [Feb. 1965 Progress Report].

**RESPONSE:** Disputed in part. It is undisputed that, in 1965, NCR asked Monsanto for toxicity information with respect to Aroclor 1242, but it is disputed that NCR asked Monsanto for any such information with respect to Aroclor 1254, and nothing in the record evidence cited (which references *only* Aroclor 1242) supports that statement. *See* PJF Decl., Exs. 72 & 73. It is also undisputed that NCR was searching for a replacement for Aroclor in or around the mid-1960s, but the implication that this search had anything to do with the toxicity of Aroclor 1242 is disputed and finds no support in the record. *See, e.g.*, Roach Decl., Ex. 16 [P. Phillips Dep. at 78:3-10, 142:2-143:10, 206:3-16 (stating that NCR began looking at replacements for Aroclor after his work on switching from clay-based CF to phenolic resin CF (which began in the early 1960s), "because that's the work that told us that we needed an improved solvent over Aroclor because of the -- the Aroclor was a -- not a good functioning solvent for resin CF.").

48. On December 15, 1966, a Swedish scientist, Soren Jensen, reported findings of widespread evidence of PCBs in the environment in the publication, *New Scientist. Id.*, Ex. 21 [New Scientist Article].

**RESPONSE:** It is undisputed that Soren Jensen, a Swedish scientist, reported findings of PCBs in the environment in the December 15, 1966 edition of *New Scientist.* Whether or not such evidence – which was confined to samples taken of fish, an

eagle, and three humans, all located in Sweden – was "widespread" is neither supported by the record (*see* PJF Decl., Ex. 21), nor is it a "fact" appropriate for a proposed statement of fact.

49.     Jensen's findings demonstrated that PCBs were widely dispersed and persistent in the environment, having been found in fish, eagles, egg shells, and human hair. *Id.*, Ex. 21 [*New Scientist* Article]; Ex. 22 [May 24, 1967 *Medical Tribune* Article].

**RESPONSE:**          As above, it is undisputed that Soren Jensen, a Swedish scientist, reported findings of PCBs in the environment in the December 15, 1966 edition of *New Scientist.*  Whether or not such evidence – which was confined to samples taken of fish, an eagle, and three humans, all located in Sweden – showed that PCBs were "widely dispersed" is neither supported by the record (*see* PJF Decl., Ex. 21), nor is it a "fact" appropriate for a proposed statement of fact.

50.     In February 1967, at NCR's request, Dr. Emmet Kelly at Monsanto forwarded copies of Jensen's report to Mr. D. Wood and Mr. M.J. Thomas, both NCR employees. *Id.*, Ex. 23 [Feb. 10, 1967 Letter from Kelly to Wood]; Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas (letter and attached Jensen report marked and authenticated as Exhibits 468 and 469 during April 8, 2009 E. McKinney Depo. (Ex. 34) at 91:13-95:17)]; Ex. 39 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 12:5-14:24].

**RESPONSE:**          Disputed in part.  It is undisputed that on February 27, 1967, Dr. Emmet Kelly at Monsanto forwarded a copy of a rendition of a lecture given by Jensen to Mr. M.J. Thomas of NCR.  The record evidence cited by Defendants, however, does not support the fact that NCR requested that Monsanto send this document.  Nor does it suggest that Mr. D. Wood received a copy of it from Dr. Kelly, or that Mr. Wood was even an NCR employee. *See* PJF Decl., Exs. 23, 24 & 39.

51.     Between 1967 and 1969, several scientific studies on PCBs were completed and published in the UK and US popular and scientific press. *Id.*, Ex. 6 [Aug. 11, 2009 Revised Expert Opinion of Joseph V. Rodricks at 42-43]; *c.f.* Ex. 25 [Dec. 14, 1968 Publication "[PCBs] in the Global Ecosystem" Excerpt].

**RESPONSE:**          Undisputed.

52.    These studies confirmed Jensen's 1966 findings.  *C.f. Id.*, Ex. 25 [Dec. 14, 1968 Publication "[PCBs] in the Global Ecosystem" Excerpt]

**RESPONSE:**    This statement is unsupported by the record evidence cited, a fact clearly evidenced by Defendants use, again, of only a "*C.f.*" citation, clearly inadequate to support a finding of fact.  *See* PJF Decl., Ex. 25.

53.    While Monsanto did not share these scientific studies with its other Aroclor customers, it told NCR about the scientific studies because "Monsanto enjoy[ed] a strong position in this industry which [was] dominated by NCR."  NCR determined to contact NCR regarding "adverse publicity" and stating that "[i]t is recommended that with the exception of NCR, we do not bring this publicity to the attention of our Aroclor customers."  *Id.*, Ex. 26 [March 12, 1969 Monsanto Memo] at 1-2, 9; Ex. 26 [Mar. 12, 1969 Monsanto Memo] at 1 (In 1969, Monsanto stated in an internal memorandum entitled "Future Plans for Aroclor Plasticizers" that "the adverse publicity" associated with these studies "may be very damaging."); Ex. 27 [Aug. 26, 2009 C. Paton Depo. Excerpts (Rough) at 21:13-22:8] ("we [Monsanto] did everything we could to keep [NCR] informed [about scientific information concerning PCBs].").

**RESPONSE:**    Disputed.  It is undisputed that Defendants accurately cite from the referenced memo, but this "fact" implies that certain ("these") scientific studies were shared with NCR by Monsanto without any support.  Indeed, the record evidence cited refers to bringing "publicity" to NCR's attention, not any "scientific studies."  *See* PJF Decl., Exs. 26 & 27 at 21:13-22:8.  Further, Defendants' statement that "NCR determined to contact NCR" is apparently a typo.

54.    On March 27, 1969, Monsanto visited NCR's home office in Dayton.  *Id.*, Ex. 28 [Apr. 18, 1969 Monsanto Memo, marked and authenticated as Exhibit 971-C during Aug. 26, 2009 C. Paton Depo. (Rough) (Ex. 27) at 18:4-23:19].  Mr. Haier, Mr. Wilde and Mr. Paton attended this meeting on behalf of Monsanto and Mr. Lauer, Mr. Thacker and Mr. Fitzpatrick attended on behalf of NCR.  *Id.*

**RESPONSE:**    Undisputed, other than to state that the individual listed as "Mr. Haier" appears to have actually been a Mr. Maier.

55.    During this March 27, 1969 meeting Monsanto and NCR discussed PCB contamination and a recent *San Francisco Chronicle* article regarding PCB pollution in San Francisco Bay.  *Id.*, Ex. 28 [Apr. 18, 1969 Monsanto Memo].  During this same meeting, NCR's representative, Howard Lauer, stated that "NCR would take no action unless a second article

appeared specifically naming their paper as the source of pollution." *Id.* at 1-2; Ex. 27 [C. Paton Depo. (Rough) at 57:10-58:4].

>        **RESPONSE:**        It is undisputed that during a March 27, 1969 meeting Monsanto and NCR discussed PCB contamination and a recent *San Francisco Chronicle* article regarding PCB pollution in San Francisco Bay. It is also undisputed that Defendants accurately quote from the cited memorandum as its recitation of Mr. Lauer's statement, but fail to give the proper context for that statement. The memorandum states that "NCR said [the *San Francisco Chronicle* article] seemed provocative and some jumping to conclusions was apparent. They agreed that nothing would be gained by Monsanto's entering into a public controversy with the reporter on some of his statements...Lauer said that NCR would take no action unless a second article appeared specifically naming their paper as a source of pollution."

56.        In a subsequent April 28, 1969 telephone conversation with Mr. Paton of Monsanto, NCR's Gordon Taylor called the same article "just another in the series of articles on the toxicity of PCBs," and also said that "there was always the possibility that the second shoe would drop." *Id.*, Ex. 29 [Apr. 29, 1969 Taylor/Paton Phone Memo, marked and authenticated as Exhibit 971-F during Aug. 26, 2009 C. Paton Depo. (Rough) (Ex. 27) at 34:22-38:17].

>        **RESPONSE:**        It is undisputed that Defendants accurately cite from an April 29, 1969 Memorandum, written by Mr. Paton, relaying what he remembers Mr. Taylor telling him.

57.        Each year between 1954 and 1970, NCR purchased increasing amounts of PCBs from Monsanto for use in the manufacture of CCP — from 0.6 million pounds in 1957 to 6.6 million pounds in 1970. *Id.*, Ex. 30 [Jan. 19, 1976 NCR Letter].

>        **RESPONSE:**        Undisputed.

58.        After the date of the Jensen report, NCR increased its consumption of Aroclor from 4.4 million pounds (1967), to 5.8 million pounds (1968), to 6.3 million pounds (1969), to 6.6 million pounds in 1970. *Id.*

>        **RESPONSE:**        Undisputed.

14

59. NCR produced millions of pounds of CCP at the Appleton coating plant — with production increasing from 0.2 million pounds in 1954 to 11.8 million pounds in 1970. *Id.*, Ex. 31 [US Production NCR Paper Capsules 1954-1972].

> **RESPONSE:** Disputed. NCR did not produce *any* CCP between 1954 and 1970. NCR produced *emulsion for CCP*, and ACPC produced CCP. The document cited by Defendants reflects the production of *emulsion*, which did range between 0.2 million pounds in 1954 and 11.8 million pounds in 1970. *See* PJF Decl., Ex. 31.

60. After the date of the Jensen report, NCR increased its production from 7.8 million pounds (1967), to 10.3 million pounds (1968), to 11.3 million pounds (1969), to 11.8 million pounds in 1970. *Id.*

> **RESPONSE:** It is undisputed that NCR produced the quantities of *emulsion* stated in this proposed fact.

61. Around the late 1960's and 1970, CCP was one of NCR's most lucrative products. *Id.*, Ex. 32 [Apr. 2, 2009 C. Rench Depo. Excerpts at 131:17-21] (NCR's Vice President of Research and Development, Carl Rench, described CCP as one of [NCR's] cash cows").

> **RESPONSE:** Undisputed.

62. Between 1970 and 1972, certain of NCR's other product lines failed (cash registers and computing systems). *id.*, Ex. 32 [Apr. 2, 2009 C. Rench Depo. Excerpts at 189:2-190:2]; Ex. 34 [Apr, 8, 2009 E. McKinney Depo. Excerpts at 151:23-153:20].

> **RESPONSE:** Disputed. First, nothing cited by Defendants in any way supports the proposition that any of NCR's other product lines "failed." The most either witness testified to was that certain products were not profitable at that time and that NCR's "expectations on the market share was not working out properly." *See* PJF Decl., Ex. 32 at 189:2-190:2.

63. In 1969, NCR was concerned that public disclosure of PCBs in CCP could cause NCR to lose market share to its main CCP competitor, 3M. *Id.*, Ex. 33 [Apr. 7, 2009 D. McIntosh Depo. Excerpts at 119:1-25]; Ex. 11 [June 30, 2009 H. Schwab Depo. Excerpts at 118:13-24]; Ex. 28 [Apr. 18, 1969 C. Paton Monsanto Memo to File] at 1-2; Ex. 27 [Aug. 26, 2009 C. Paton Depo. (Rough) at 18:4-23:19].

**RESPONSE:**          Disputed, and unsupported by the record evidence cited.

Defendants cite several deposition transcripts for the basic proposition that 3M was a competitor of NCR's in the CCP market. They then cite a memo, written by a *Monsanto* employee regarding the article in the *San Francisco Chronicle*, stating that "[s]uch an article could play into the hands of 3-M's action paper." *See* PJF Decl., Ex. 28. This belief is not attributed to anyone at NCR. Internal Monsanto documents from the same time period make clear that Monsanto was concerned about 3-M taking over market share from NCR. *See* PJF Decl., Ex. 26 [March 12, 1969 Monsanto Memo] at 1-2.

64.     On October 31, 1969, Dr. H.A. Vodden of Monsanto's research department in Ruabon, South Wales, was made responsible for the environmental aspects of PCB contamination in the United Kingdom, including on-going studies of the potential biodegradation of Aroclor 1242, the investigation of PCB releases at Monsanto's Newport, UK PCB production facility, and information regarding PCB disposal by Monsanto's major Aroclor customers in the UK. *Id.*, Ex. 35 [Oct. 30, 1969 Monsanto Memo]; Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 18:11-19; 20:10-15; 23:11-15].

**RESPONSE:**          Undisputed, other than to state that the memo referenced by

Defendants is dated October 3<u>0</u>, 1969, not October 3<u>1</u>, 1969.

65.     In late 1969, Dr. Vodden arranged a meeting with Martin Kelly of NCR's Borehamwood CCP emulsion production facility. *Id.*, Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 26:8-20].

**RESPONSE:**          It is undisputed that Dr. Vodden testified: "as far as I can remember, I met him then." Dr. Vodden's memory regarding the timing of other events, however, does call his memory into question. *See* Response to Def. Prop. Finding of Fact No. 66 *infra*.

66.     During this 1969 meeting, Dr. Vodden explained to Martin Kelly that Aroclor 1242 had constituents that were persistent and would bioaccumulate, that even though Aroclor 1242 was not detected in the environment, its degradation residues resulting from Aroclor 1242 releases would pose those problems, that the production of NCR Paper resulted in open and uncontrolled releases of Aroclor 1242, and that because of these environmental concerns, Monsanto was going to stop selling it for use in the production of NCR Paper. *Id.*, Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 27:24-28:5].

**RESPONSE:** Disputed. It is undisputed that Dr. Vodden testified that he informed Martin Kelly of NCR that components of Aroclor 1242 were persistent and would bioaccumulate, that Aroclor 1242 had not been found in the environment to that point, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. However, the documentary evidence from the same time period suggests that such statements were not made by anyone at Monsanto to anyone at NCR during any meeting in 1969, or any other meeting in the early 1970s. For example, an internal Monsanto memorandum summarizing a meeting between Monsanto, NCR and WT in January of 1970, states that "*If* in the long run, NCR paper is considered to be a pollution source," NCR "must find an alternative to Aroclor which could be introduced *if* the Aroclor system were deemed unacceptable," and referred to this possible switch to an Aroclor alternative as a "contingency plan." Roach Decl., Ex. 45 [Jan. 26, 1970 Monsanto Memo (Ex. 949 to Vodden Dep.)]. This evidence flatly contradicts Dr. Vodden's testimony that he had already informed NCR that Aroclor 1242 was an environmental contaminant and that Monsanto was going to stop selling Aroclor 1242 for paper applications.

Dr. Vodden also testified that his group's work on looking at the environment effects of Aroclor 1242, which did not start until sometime after October 30, 1969, may not have postulated that higher chlorinated homologues present in Aroclor 1242 were persistent in the environment until the middle of 1970, and admitted that he would not have (indeed, could not have) communicated this information to anyone at NCR until that time. Roach Decl., Ex. 26 [H. Vodden Dep. at 77:23-78:11]. In a letter that Monsanto sent to customers the following month, February 1970, Monsanto clearly informed all customers that "PCBs with a chlorine content of less than 54% have not been found in the environment and appear to present no potential

17

problem to the environment." Roach Decl., Ex. 47 [February 1970 Monsanto Customer Letter (Ex. 962 to Vodden Dep.)]. It is therefore apparent that Dr. Vodden's timeline of events, 40 years after the fact, is confused, and contradicted by the documentary evidence as to what Monsanto was telling its customers at the time.

67.    In early January 1970, Monsanto told NCR that recycling NCR Paper broke could also create environmental problems. *Id.*, Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts (Rough) at 32:18-33:13].

**RESPONSE:**        Disputed. The record evidence cited by Defendants does not support the proposed finding of fact. Dr. Vodden expressly testified, in the very pages cited by Defendants, "I wouldn't say I remembered the exactly the timings of these events." *See* PJF Decl., Ex. 36 at 32:18-33:13. He further testified only that January 1970 was when the issue of recycling broke had first been raised, but the document that Defendants introduced with Dr. Vodden in the referenced pages makes clear that on January 13, 1970, the recycling of NCR broke was merely described as a "line of enquiry to be investigated further." Roach Decl., Ex. 239 [January 13, 1970 Monsanto Memorandum (Ex. 948 to Vodden Dep.) at 2]. No reference is made in the document or Dr. Vodden's testimony to discussing this issue with NCR *at all*, much less telling NCR that "recycling NCR broke could also create environmental problems." *Id.*, *see also* PJF Decl., Ex. 36 at 32:18-33:13.

68.    In December 1969 and January 1970, Monsanto tested the effluent from NCR's facilities in the US and UK. *Id.*, Ex. 37 [1969 Monsanto Aroclor Water Samples]; Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; Ex. 39 [Aug. 19, 2009 E. Tucker Depo. at 39:18-41:20]. Effluent samples from an NCR facility had "quite high" levels of Aroclor 1242, and the mud in the stream taking the surface water drainage contained 150 ppb PCBs. *Id.*, Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970].

**RESPONSE:**        Undisputed.

69.    Between December 1969 and February 1970, NCR, Monsanto and WT held several high-level meetings. *Id.*, Ex. 40 [December 19, 1969 minutes, marked and authenticated using different Bates version as Exhibit 971-L during Aug. 26, 2009 C. Paton Depo. (Rough) (Ex. 27) at 50:1 8-57:9]; Ex. 41 [Jan. 26, 1970 Meeting Minutes]; Ex. 42 [February 19, 1970

Meeting Minutes, marked and authenticated as Exhibits 949 and 951 at Aug. 25, 2009
H. Vodden Depo. (Rough) (Ex. 36) at 35:12-40:9; 43:15-50:3].

      **RESPONSE:**      Disputed in part. Nothing in the cited evidence supports

the conclusion that these were "high level" meetings. PJF Decl., Exs. 40, 41, and 42. The

remainder of this Proposed Finding of Fact is undisputed.

      70.    During these meetings, the following subjects were discussed: (a) effluent testing
results from NCR's facilities in the US and UK; (b) effluent testing results from WT's UK and
Belgium facilities; (c) PCB contamination of US and UK waterbodies; (d) appropriate responses
to governmental investigations regarding the source of PCB contamination; and (e) replacement
of PCBs in CCP with another solvent. *Id.*, Ex. 40 [December 19, 1969 minutes]; Ex. 41 [Jan. 26,
1970 Minutes.]; Ex. 42 [February 19, 1970 Minutes]; Ex. 36 [Aug. 25, 2009 H. Vodden Depo.
Excerpts (Rough) at 35:12-40:9; 43:15-50:3]; Ex. 27 [C. Paton Depo. (Rough) at 50:18-57:9].

      **RESPONSE:**      Disputed. These subjects were not all discussed at the

meetings held in the U.S. in 1969 and in the U.K. in 1970. Only certain of these subjects were

discussed at the different meetings. *See* PJF Decl., Exs. 27, 36, 40, 41, 42.

      71.    There is no evidence that the Defendants knew anything about any of the topics
discussed during the meetings between NCR, Monsanto and WT between December 1969 and
February 1970.

      **RESPONSE:**      Disputed. There is, in fact, evidence that Defendants knew,

or at the very least should have known, about the PCB contamination of US waterbodies before

February 1970. Roach Decl., Ex. 105 [Institute of Paper Chemistry Report (NCR-FOX-

0281317), at 1, stating: "The presence of PCBs in paper products and mill effluents has been

recognized since the late 1960s."]; Ex. 106 [July 22, 1977 Institute of Paper Chemistry Report

(NCR-FOX-0073460), at 3, stating "Since the late 1960s PCBs have been known to be present

in paper products and mill effluents."].

      72.    In June 1970, Monsanto sent a letter to Monsanto's customers, including NCR,
stating that it was discontinuing the sale of PCBs for use in plasticizer applications (including the
Aroclor used in CCP) because of worldwide concern over environmental contamination. *Id.*,
Ex. 43 [Monsanto Customer Warning]; Ex. 44 [June 1970 Monsanto Letter, marked and
authenticated as Exhibit 601 at April 30, 2009 T. Clark Depo. (Ex. 82) at 173:21-174:25].

**RESPONSE:** It is undisputed that the June 1970 letter stated that Monsanto was going to discontinue the sale of PCB-containing products for modifier and plasticizer applications effective August 30, 1970, but it is disputed that this letter made any reference at all to "worldwide concern over environmental contamination." *See* PJF Decl., Ex. 44. It is also undisputed that, contrary to its statements in this letter, Monsanto continued to sell its existing stock of Aroclor 1242 and related chlorinated products until mid-1972 Pls. PFF, ¶ 85.

73. The information regarding discontinuing the sale of PCBs for use in plasticizer applications because of worldwide concern over environmental contamination was not communicated to the Defendants. *Id.*, Ex. 45 [Jan. 28, 2009 F. Heinritz Depo. Excerpts at 94:9-96:4]; *Id.*, Ex. 15 [Mar. 25, 2009 D. Christensen Depo. Excerpts at 72:2-73:15].

**RESPONSE:** The proposed fact is unsupported by the record evidence cited. Defendants have cited to two former NCR or ACPC employees who stated that *they* never informed any Defendant about discontinuing the sale of PCBs in plasticizer applications, but this testimony hardly supports the conclusion that this information was never communicated to any Defendant. Indeed, Donald Schneider, Technical Director at Fort Howard, expressly testified that he learned of Monsanto's decision to discontinue the sale of PCBs in plasticizer applications – and specifically for use in CCP – around the time it was announced, referring to that announcement as "well known" and "well publicized" in journals that related to the paper industry at the time. Roach Decl., Ex. 112 [D. Schneider Dep. at 125:23-126:17, 127:11-21]. Furthermore, as above, the June 1970 letter from Monsanto did not make any reference to "worldwide concern over environmental contamination." *See* PJF Decl., Ex. 44.

74. NCR continued to sell broke for recycling until mid-1971. *Id.*, Ex. 45 [Jan. 28, 2009 F. Heinritz Depo. Excerpts at 96:14-96:23].

**RESPONSE:** Disputed. First, NCR did not sell broke. *See, e.g.,* Roach Decl., Ex. 99 [D. Christensen Dep. at 29:11-30:4]; Ex. 229 [D. Hultgren Mar. 18, 2009 Dep. at

117:11-15]; Ex. 23 [F. Heinritz Dep. at 20:15-23]. Second, the record evidence cited does not

support the proposed finding of fact. The testimony of Mr. F. Heinritz cited by Defendants

merely discusses the fact that Appleton Papers (not NCR) sold broke at some undefined point in

time, but does not reference whether Appleton Papers continued to sell that broke "until mid-

1971." *See* PJF Decl., Ex. 45 at 96:14-23.

75.    The broker who sold broke to Defendants was never told by NCR that the broke
may have been coated with PCB emulsion, or was coated with anything harmful to the
environment. *Id.*, Ex. 46 [Aug. 26, 2009 L. Golper Depo. Excerpts at 15:22-18:4].

**RESPONSE:**        It is undisputed that Mr. Golper testified as Defendants

describe during his deposition. It is disputed that Mr. Golper was "the" broker who sold broke

to Defendants, as Defendants worked with numerous brokers. *See, e.g.,* Roach Decl., Ex. 240

[Georgia Pacific Defendants' Responses to NCR Corporations First Set of Interrogatories and

Requests for the Production of Documents ("NCR's First Discovery Requests"), at response to

Interrogatory No. 10], Ex. 241 [U.S. Paper Company's Responses to NCR's First Discovery

Requests at response to Interrogatory No. 10]; Ex. 213 [WTM I Company's Responses to

NCR's First Discovery Requests at response to Interrogatory No. 10]; Ex. 242 [P.H. Glatfelter

Company's Responses to NCR's First Discovery Requests at response to Interrogatory No. 10].

76.    Before 1971, NCR used approximately 30 million pounds of PCBs to make CCP.
*Id.*, Ex. 1 [2002 ROD] at 4.

**RESPONSE:**        Disputed. The record evidence cited by Defendants states

that, before 1971, approximately 30 million pounds of PCB-containing *emulsion* (not 30 million

pounds of *PCBs*) were used in the production of CCP. *See* PJF Decl., Ex. 1 at 4. Furthermore,

NCR did not "make CCP," it sold emulsion to paper coating companies such as ACPC and they

manufactured the CCP. *See* Roach Decl., Ex. 15 [Aug. 7, 2009 Expert Report of Harri

Kytömaa, at 3-4].

## VI. PLAINTIFFS' FAILURE TO INFORM GOVERNMENT AGENCIES REGARDING PCBS IN NCR PAPER AND TOXICITY OF PCBS

77.    Between 1969 and 1971, NCR and Monsanto received US and UK governmental inquiries about PCB use.  PJH Decl., Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report, marked and authenticated as Exhibit 950 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 40:10-43:12]; Ex. 50 [April 9, 1970 Congressman Ryan Letter].

    **RESPONSE:**        Disputed in part.  It is undisputed that *Monsanto* received

US and UK governmental inquiries regarding PCB use between 1969 and 1971, but the record

evidence cited by Defendants does not support the proposed fact that *NCR* received any US or

UK governmental inquiries regarding PCB use over that period.  *See* PJF Decl., Exs. 49 & 50.

It is, rather, an undisputed fact that NCR did *not* receive any governmental inquiries over this

period.  *See* Pls. PFF, ¶ 149.

78.    On January 27, 1970, Monsanto met with the UK Ministry of Agriculture.  *Id.*, Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report]; Ex. 36 [Aug. 25, 2009 H. Vodden Depo. (Rough) at 40:10-43:12].

    **RESPONSE:**        Undisputed.

79.    Attendees for Monsanto included Mr. Cameron and Mr. Vodden, and for the UK Ministry, Mr. Portman and Mr. Wood.  *Id.*

    **RESPONSE:**        Undisputed.

80.    The UK Ministry of Agriculture was investigating the sources of recently discovered PCB contamination in the Irish Sea and Severn Estuary, *id.*, Ex. 51 [1969 Irish Sea Article], and in food products—cashew nuts packaged in recycled cardboard made from NCR broke.  *Id.*, Ex. 52 [May 30, 1970 *Chemical Industry* Article; October 28, 1971 *Science News* Article].

    **RESPONSE:**        The record evidence does not support the proposed fact.

Defendants have cited articles describing certain incidents, but have not cited anything stating

that the "UK Ministry of Agriculture was investigating" those incidents at the time of the

January 27, 1970 meeting.  *See* PJF Decl., Exs. 51 & 52.

81.     On January 26, 1970, Monsanto met with NCR in advance of Monsanto's meeting with the UK Ministry of Agriculture. *Id.*, Ex. 41 [Jan. 26, 1970 Minutes]; Ex. 36 [Aug. 25, 2009 H. Vodden Depo. (Rough) at 35:12-40:9].

**RESPONSE:**         It is undisputed that Monsanto met with NCR on January 26, 1970. It is also undisputed that Dr. Vodden stated that it was "coincidental that the two meetings occurred one day after the other," and they were likely scheduled as such so that he could make only one trip to London. *See* PJF Decl., Ex. 36 at 41:3-11.

82.     NCR asked Monsanto not to identify NCR paper as a "major outlet" for Aroclor at the meeting between Monsanto and the UK Ministry. *Id.*, Ex. 41 [Jan. 26, 1970 Minutes] at 1. NCR wanted to make sure their "housekeeping" was in order first. *Id.*

**RESPONSE:**         Undisputed. Plaintiffs state, however, that in a meeting among NCR, Monsanto and WT shortly thereafter, on February 19, 1970, both NCR and WT "agreed that [Monsanto] should identify the N.C.R. paper application for Aroclor at [Monsanto's] next meeting with the Ministry of Agriculture as a constructive and positive step." Roach Decl., Ex. 243 [Feb. 19, 1970 Monsanto Memorandum (PHGNCR-2001875)].

83.     At its meeting with the UK Ministry of Agriculture on January 27, 1970, Monsanto did not disclose the use of PCBs in NCR Paper. *Id.*, Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report] ("No mention was made of NCR but it will become increasingly difficult to maintain this position.").

**RESPONSE:**         Undisputed. *But see supra* at Resp. to Def. Prop. Finding of Fact No. 82.

84.     In April 1970, WT decided "that, in their own self interest, they could remain silent no longer about their usage of Aroclor 1242." *Id.* Ex. 53 [Apr. 16, 1970 WT/Monsanto Meeting Report, marked and authenticated as Exhibit 955 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 55:11-60:19].

**RESPONSE:**         Undisputed.

85.     In April 1970, after WT's disclosure, Monsanto disclosed the presence of PCBs in NCR Paper to the British Government in confidence. *Id.*, Ex. 53 [Apr. 16, 1970 WT/Monsanto Meeting Report] at 1; Ex. 54 [Apr. 17, 1970 UK Ministry/Monsanto Meeting Report, marked and authenticated as Exhibit 956 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 60:20-63:2].

**RESPONSE:** Disputed in part. It is undisputed that, on April 17, 1970, Monsanto disclosed the presence of PCBs in NCR Paper to the British Government in confidence. It is disputed that Monsanto made this disclosure "*after* WT's disclosure" as the April 16, 1970 memorandum cited by Defendants makes clear that discussions with WT and NCR "enabled [Monsanto] to make [its] disclosure to the Ministry of Agriculture *prior to* Wiggins Teape approaching the Ministry of Technology." PJF Decl., Ex. 53 at 1 (emphasis added).

86. At about the same time, in April 1970, United States Congressman William Ryan began investigating PCB contamination in the US and contacted Monsanto for information. *Id.*, Ex. 50 [April 9, 1970 Congressman Ryan Letter].

**RESPONSE:** Undisputed.

87. Congressman William Ryan specifically asked Monsanto to release to the public a list of all uses of Aroclor. *Id.*

**RESPONSE:** Undisputed.

88. On April 10, 1970, in response to Congressman Ryan's inquiries, Monsanto issued a press release about PCBs. *Id.*, Ex. 55 [Apr. 10, 1970 Monsanto Press Release].

**RESPONSE:** Undisputed.

89. The April 10, 1970 press release does not list NCR Paper. *Id.*

**RESPONSE:** Undisputed. Plaintiffs also state that this press release provides that Monsanto's research "confirmed by others, found only the higher chlorinated materials" in the environment, and further research "show[ed] PCB is not a highly toxic material." *See* PJF Decl., Ex. 55.

90. NCR was generally secretive about the contents of its products. *Id.*, Ex. 58 [Aug. 19, 2009 D. Schumaker Depo. Excerpts at 43:20-24] (PCBs in CCP was "a deep, dark secret and it was protected by NCR with their lifeblood. And that's an understatement."); Ex. 59 [Mar. 13, 2009 M. Stevens Depo. Excerpts at 44:24-45:15] ("We didn't like to give out our sources of solvents, dyes, or methodology to anyone. . . .[NCR] sure as hell weren't publicizing it. It was a very confidential system."); Ex. 12 [Aug. 12, 2009 J. Herbig Depo. Excerpts at

74:19-75:17] (fundamental research group "too proud" to give information regarding CCP to capsular research department).

> **RESPONSE:** Disputed, and unsupported by the record evidence cited. It is undisputed that NCR was generally protective about certain aspects of its proprietary products, but nothing cited by Defendants supports a finding that it was secretive about "the contents" of its products. The testimony from M. Stevens states that NCR did not give out the "sources" of its solvents, dyes or methodology (PJF Decl., Ex. at 44:24-45:15); the testimony cited from J. Herbig similarly says nothing of "the contents" of NCR products. *Id*., Ex. 12 at 74:19-75:17. The testimony cited from D. Schumaker omits the relevant language that Mr. Schumaker was referring to the secrecy of the "capsule manufacturing deal" and *not* as Defendants erroneous state, the presence of "PCBs in CCP." *Id.*, Ex. 58 at 43:18:23

91.     NCR shipped its PCB-containing emulsion in milk trucks and contaminated milk as a result. *Id.*, Ex. 60 [Milk Truck Hauling PCB Emulsion]; Ex. 61 [July 23, 1970 NCR Memo].

> **RESPONSE:** It is undisputed that NCR shipped its PCB-containing emulsion in trucks used at other times, after cleaning, to carry milk, and that a *single* reported instance of milk contamination resulted.

92.     In April 1970, Monsanto revised its warning labels for Aroclor 1242 that specifically warned of environmental risks, *id.*, Ex. 43 [April 1970 Monsanto Warning Labels], and these labels were sent to NCR. *Id.*, Ex. 27 [Aug. 26, 2009 C. Paton Depo. (Rough) at 81:10-84:5].

> **RESPONSE:** Disputed in part. It is undisputed that, at some point, Monsanto revised its warning labels for Aroclor 1242, but nothing cited by Defendants in any way supports the proposed fact that this amendment occurred in April 1970. Nor do Defendants support their statement that "these labels were sent to NCR." *See* PJF Decl., Exs. 43 & 27 at 81:10-84:5. Indeed, the testimony of Mr. Paton, cited by Defendants, reflects only that Mr.

Paton "think[s]" NCR received its shipments of Aroclor by tank car, and that there would likely

have been someplace on the tank car to insert these warnings.  PJF Decl., Ex. 27 at 82:5-10.

## VII.    CONTAMINATION OF THE FOX RIVER WITH PCBS FROM 1954 UNTIL MID-1971 (THE "PRODUCTION PERIOD")

**RESPONSE:**  Plaintiffs dispute the vague definition of "Production Period" as

ending in "mid-1971."  NCR had fully phased out the use of PCBs in its production of CCP

emulsion by April 1971.  Pls. PFF, ¶ 88.

93.    Discharges of PCBs to the Lower Fox River during the Production Period resulted
from both the production and recycling of CCP made with NCR's PCB-containing coating
emulsions.  PJH Decl., Ex. 1 [2002 ROD] at 4.

**RESPONSE:**           Undisputed.

94.    EPA and WDNR estimated that during the Production Period hundreds of
thousands of pounds of these PCBs were released into the Fox River.  *Id.*, Ex. 1 [2002 ROD] at
4.

**RESPONSE:**           Undisputed.

95.    EPA and WDNR also estimated that the vast majority of total PCBs released to
the Lower Fox River were discharged before PCB use was stopped in 1971.  *Id.* (estimating that
98% of PCBs released into the Lower Fox River had been released by 1971).

**RESPONSE:**           It is undisputed that this proposed fact accurately reflects

the "estimates" of the EPA and WDNR.  It is disputed – even by counsel for Defendants – that

these estimates are accurate.  Roach Decl., Ex. 229 [D. Hultgren Dep. at 33:15-34:16], Ex. 244

[June 11, 1998 Letter from D. Mandelbaum to Department of Justice (NCR-FOX-365834)

(stating, with respect to post-1971 discharges, "Had the [Defendant] Mills shifted out of post-

consumer wastepaper in their furnish, PCB discharges would have been materially lower.")].

96.    During the Production Period, NCR/API released PCBs through effluent
discharges from its emulsion production facility at Portage and its coating operations in Appleton
and Combined Locks.  *Id.*, Ex. 5 [Dec. 12, 1969 Tucker Letter]; Ex. 2 [NCR's Interrogatory
Responses] at 5-6.

**RESPONSE:** Disputed. It is disputed that any such entity as NCR/API existed during the Production Period. It is undisputed that, during the Production Period, the emulsion production facility at Portage, Wisconsin, discharged wastewater that contained Aroclor 1242 to a publicly-owned treatment works, which then discharged to the Upper Fox River. However, there is *no* evidence that any PCBs released from the Portage facility, which is located on the *Upper* Fox River, ever migrated to the *Lower* Fox River. Roach Decl., Ex. 104 [July 10, 2009 Expert Report of C. Klass at 8-9]. Indeed, Defendants' expert Charles Klass is the only one of Defendants' experts to opine on this subject, and he expressly stated: "I have no opinion as to whether a portion of the PCBs that were discharged into the Upper Fox River ultimately made their way into the Lower Fox River." *Id.*

97. PCBs were also released during the Production Period through the recycling of several forms of NCR Paper. *Id.*, Ex. 1 [2002 ROD] at 4.

**RESPONSE:** Undisputed.

98. By WDNR estimates, more PCBs were released into the Fox River in 1970 than in any other year. *Id*., Ex. 47 [WDNR Tech Memo 2d] at Figure-9.

**RESPONSE:** Disputed. The evidence that Defendants cite in support of this proposed fact clearly shows that the WDNR estimated that more PCBs were released into the Fox River in *1969* than in any other year. *See* PJF Decl., Ex. 47 at Figure-9.

**VIII. DEFENDANTS' KNOWLEDGE REGARDING PCBS IN NCR PAPER**

99. The earliest document identified by NCR that NCR claims a Defendant may have seen which stated that NCR Paper contained PCBs is a January 12, 1971 letter from a paper industry group (the American Paper Institute) to members of its Combination Paperboard Subgroup. PJF Decl., Ex. 62 [NCR's Responses To P.H. Glatfelter's First Set Of Interrogatories] at 5; Ex. 63 [Jan. 12, 1971 Letter from American Paper Institute] at 22. There is no evidence that any of the Defendants were members of this Subgroup or received this letter when it was sent.

**RESPONSE:** Disputed. As just one example, the Technical Director at Fort Howard (predecessor to the GP Defendants) testified that he learned of Monsanto's

decision to stop its sales of PCBs to the paper industry, including for use in CCP, from reading paper trade journals around the time that Monsanto made that announcement – which was in June 1970. Roach Decl. Ex. 112 [D. Schneider Dep. at 125:23-126:17, 127:11-21]; Ex. 245 [June 1970 Monsanto Press Release regarding ceasing sales of PCBs for plasticizer applications (Ex. 601 to T. Clark Dep.].

100. The earliest time that any Defendant can confirm it was made aware that NCR Paper contained PCBs was in August 1971 when Bergstrom Paper Company (Defendant Glatfelter) was told by the American Paper Institute that NCR Paper contained PCBs. *Id.*, Ex. 64 [Glatfelter's Responses To NCR's First Set of Interrogatories] at 7.

**RESPONSE:** Disputed. Fort Howard had earlier knowledge of the presence of PCBs in CCP. *See supra* at Resp. to Def. Prop. Finding of Fact No. 99. Additionally, David Austin, the purchasing agent for Defendant Menasha Corporation, signed a sworn affidavit in 1999 that he was given the instruction in the late-1950s or early-1960s not to purchase NCR Paper as a recovered fiber source because it might contain PCBs. Roach Decl., Ex. 185 [Feb. 29, 1999 Affidavit of David Austin (Ex. 554-C to Austin Dep.)].

101. The year 1971 is the earliest time that any Defendant likely learned of the presence of PCBs in NCR Paper. *Id.*, Ex. 65 [Aug. 26, 2009 M. Williams Depo. Excerpts at 92:18-93:9].

**RESPONSE:** Disputed. *See supra* at Resp. to Def. Prop. Finding of Fact Nos. 99 & 100.

102. Numerous NCR employees confirmed that NCR did not disclose the presence of PCBs in its paper until 1971. *Id.*, Ex. 66 [M. Williams' Interview Notes] (stating that NCR's John Stutz stated that "customers wouldn't have known that CCP had previously contained Aroclor until much later and after the replacement had been completed [in 1971]," *id.* at 5, NCR's Bob Sandberg explained that knowledge that CCP contained PCBs "would not have been well known until the time that PCBs became a public focus and by that time, NCR had ceased its use of PCBs," *id.* at 17, and NCR's Jerry Taylor "did not think it was widely known among brokers and customers that NCR used Aroclor in its CCP," *id.* at 20).

**RESPONSE:** It is undisputed that three former NCR employees stated that they did not believe NCR disclosed the presence of PCBs in its paper to customers until 1971.

103.    The *Los Angeles Times* published an article stating that NCR Paper contained PCBs in the latter half of 1971, when the FDA announced that it had traced shredded wheat PCB contamination to a recycling mill that had used NCR broke. *Id.*, Ex. 56 [Sept. 1971 Congressional Record, Ryan Statement]; Ex. 57 [Sept. 1971 Article Re: PCBs in Foods].

**RESPONSE:** Undisputed.

104.    In 1975, NCR acknowledged that the recycling companies were the innocent victims of circumstances created by carbonless copy paper manufacturers. *Id.*, Ex. 67 [Oct. 24, 1975 NCR Memo] (NCR acknowledges that "the recycling companies are the innocent victims of circumstances created by carbonless manufacturers which are still a part of the paper industry.").

**RESPONSE:** Disputed in part. It is undisputed that *an NCR representative* in October 1975, stated that *he believed* the claim made by the recycling companies in a brief prepared by the Wisconsin Paper Council that they were innocent victims was "correct," but he listed that claim by the recycling companies as one of his criticisms of the brief. *See* PJF Decl., Ex. 67. He went on to write that, while "it is undeniable that we did use PCB *there was no evidence at that time that their use would create a future pollution problem. I think they should have stated these facts in the Brief and also should have pointed out that these same manufacturers replaced the PCB's when there was only limited information, and they did it voluntarily*." *Id.* (emphasis added).

## IX.    DEFENDANTS' RECYCLING OF WASTEPAPER AFTER MID-1971 (THE "POST PRODUCTION PERIOD")

105.    In 1976, the Wisconsin legislature passed a law prohibiting the manufacturing and purchasing for use of PCBs within the state. PJF Decl., Ex. 75 [1975 Wisconsin Assembly Bill 1342].

**RESPONSE:** It is undisputed that Assembly Bill 1342 prohibited the manufacture and purchasing for use of PCBs in Wisconsin, however the law provided for

exemptions for uses in certain circumstances. *See* PJF Decl., Ex. 75 [1975 Wisconsin Assembly Bill 1342].

106.    Assembly Bill 1342 expressly exempted the recycling of paper containing PCBs from its prohibition. *Id.* Specifically, the prohibition did *not* apply to "any product containing PCBs" if "the product is wastepaper, pulp, or other paper products or materials, in which case such product may be purchased for use within this state in the manufacture of recycled paper products." *Id.*

**RESPONSE:**          Undisputed.

107.    Assembly Bill 1342 also required WDNR to adopt rules governing the disposal of PCBs and PCB-containing products, which again exempted "the manufacture or sale of recycled paper products to which PCBs have not been intentionally added during or after manufacture for any of the uses set forth in sub. (1) (c)." *Id.* (sub. (1) (c) exempts paper products).

**RESPONSE:**          Disputed in part. While it is undisputed that Assembly Bill 1342 required WDNR to adopt rules governing the disposal of PCBs and PCB-containing products which exempted "the manufacture or sale of recycled paper products to which PCBs have not been intentionally added during or after manufacture for any of the uses set forth in sub (1)(c)," that provision of Assembly 1342 also provided that "[n]othing in this section shall exempt any person from applicable disposal or discharge limitations required or authorized under other sections of the statutes." *See* PJF Decl., Ex. 75 [1975 Wisconsin Assembly Bill 1342].

108.    Wisconsin set effluent limitations for discharges containing PCBs to abate any risks from the continued recycling of post-consumer waste paper. PJF Decl., Ex. 76 [Wisconsin Natural Resources Board draft PCB effluent limits]; Ex. 77 [Wisconsin Natural Resources Board revised draft PCB effluent limits]; Wis. Adm. Code NR 212.01 (effective Oct. 1, 1981).

**RESPONSE:**          The proposed fact is unsupported by the record evidence cited. *See* PJF Decl., Exs. 77 and Wis. Adm. Code NR 212.01 (effective October 1, 1981). In July 1976, the WDNR attempted to propose effluent standards for PCBs, however the "Department was challenged on its proposed effluent standards for PCBs by Fort Howard and the Wisconsin Paper Council." Roach Decl., Ex. 151 [Apr. 2, 1979 WDNR Letter (Ex. 128 to

D. DeMeuse Dep.)]. Fort Howard later successfully obtained a ruling that WDNR "could not establish *any* effluent limitations which are more stringent than those established" by EPA. *Id.* Moreover Defendants do not cite any record evidence to support the proposition, that the goal of any limitations was to "abate any risks from the continued recycling of post-consumer waste paper." *See* PJF Decl., Exs. 76 & 77, and Wis. Adm. Code NR 212.01.

109.    In 1972, EPA recognized that while some paper companies may have relatively high PCB residues from recycled paper, those would diminish since PCBs were no longer being used in carbonless carbon paper. Declaration of Andrea Hogan in Support of Certain Defendant's Request for Judicial Notice ("AMH Decl.), Ex. 3 [Feb. 4, 1972 EPA Memo] at 3.

**RESPONSE:**        Disputed. First, the EPA document referenced does not state that PCB levels in recycled paper "would" diminish (as cited), but rather states that those levels "should" diminish as a result of the fact that PCBs were no longer being used in the carbonless copy paper. *See* AMH Decl., Ex. 3 at 3. Plaintiffs further state that, due to the actions of certain Defendants, PCB levels in certain mill effluents did not diminish as expected. For example, as a result of its purchasing increasing volumes of lower-grade papers (more likely to contain pre-1971 CCP), the PCB concentrations of the recycled paper recycled by Fort Howard actually *rose* in the mid-1980s to levels higher than any year after 1974. Roach Decl., Ex. 247 [Feb. 21, 1995 Fort Howard Memo (NCR-FOX-0111540) at Table 1].

110.    In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), which includes certain prohibitions against the manufacturing, processing, distribution in commerce or use of PCBs. 15 U.S.C. §§ 2605(e)(2)-(3).

**RESPONSE:**        Undisputed.

111.    In 1979, EPA adopted a rule that included an exception to TSCA's PCB prohibition allowing for the continued use of carbonless copy paper. EPA, *Final Rule, Polychlorinated Biphenyls (PCB) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions*, 44 Fed. Reg. 31,514 (May 31, 1979); *see also* PJF Decl., Ex. 78 [Brigham Expert Report] at 2; Ex. 79 [Aug. 21, 2009 J. Brigham Depo. Excerpts at 74:3-4; 74:16-25; 75:1-2; 98:5-11] (U.S. expert analyzing the 1979 use authorization and opining that it exempted recycling paper from TSCA); Ex. 80 [1984 American Paper Institute Letter] (American Paper

Institute stating its position that by reason of the 1979 use authorization, no other exception for paper recycling was needed).

               **RESPONSE:**         It is undisputed that this rule permitted the continued *use* of PCB-containing carbonless copy paper, however the rule did not permit the *recycling* of PCB-containing paper. Roach Decl., Ex. 221 [Aug. 24, 2009 Supplemental Rebuttal Report of M. Williams at 2].

     112. The 1979 EPA use authorization for the continued use of carbonless copy paper concluded that such use did not present an unreasonable risk. 44 Fed. Reg. at 31,535.

               **RESPONSE:**         It is undisputed that EPA determined that continued use of PCB-containing carbonless copy paper did not present an unreasonable risk, however EPA at this time did not permit the recycling of PCB-containing paper. Roach Decl., Ex. 221 [Aug. 24, 2009 Supplemental Rebuttal Report of M. Williams at 2].

     113. In 1984, EPA adopted an express exemption for "recycled PCBs." EPA, *Final Rule, Toxic Substances Control Act; Polychlorinated Biphenyls (PCB5) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions; Exclusions, Exemptions and Use Authorizations*, 49 Fed. Reg. 28,172, 28,175 (July 10, 1984).

               **RESPONSE:** Undisputed. Plaintiffs further state that the regulation provided that it "will permit the manufacture, processing, distribution in commerce, and use of inadvertently generated and recycled PCBs *under limited circumstances,*" including limits of 3 ppb on PCB concentrations discharged from manufacturing sites. 49 Fed. Reg. 28,172 (emphasis added). Fort Howard and the American Paper Institute challenged the 3 ppb level contained in the July 10, 1984 rule on the basis that such a level could not be consistently met and that mass, rather than concentration, would be more appropriate. Roach Decl., Ex. 221 [Aug. 24, 2009 Supplemental Rebuttal Report of M. Williams at 4]. In 1988, EPA completed a rulemaking that allowed recyclers to use either a 3 ppb PCB volume limit or an equivalent mass

discharge limit. 53 *Federal Register* 24206 (June 27, 1988). EPA determined at that time that most localities were restricting paper mill PCB effluent discharges to more stringent levels. *Id.*

114. In 1984, EPA concluded that the exemption for "recycled PCBs" did not present an unreasonable risk of injury to health or the environment. 49 Fed. Reg. at 28,180; *see also* 52 Fed. Reg. 25,838, 25, 839 (July 8, 1987).

> **RESPONSE:** Undisputed. Plaintiffs further state that EPA's findings were premised on the fact that the regulation limited to 3 ppb PCB concentrations discharged from manufacturing sites. 49 Fed. Reg. 28,172. *See* Response to Def. Prop. Finding of Fact No. 113 *infra*.

115. In the 1970's EPA implemented programs to promote recycling based on its many environmental benefits. AMH Decl., Ex. 1 [1975 EPA Recycling Pamphlet]; *Id.*, Ex. 2 [1977 EPA Fourth Report to Congress] at 38-39; *cf.* PJF Decl., Ex. 81 [Aug. 24, 2009 M. Williams Supp. Rebuttal Expert Report] ("EPA saw its role as duel [sic]– to encourage recycling and to protect public health and the environment").

> **RESPONSE:** Undisputed. Plaintiffs' further state that EPA also implemented programs to limit PCB releases to waterbodies. Roach Decl., Ex. 221 [Aug. 24, 2009 Supplemental Rebuttal Report of M. Williams]. Plaintiffs note that Ms. Williams's report observed "dual" role for EPA, not a "duel" role as cited by Defendants.

116. In the 1970's Congress passed laws that promoted recycling. *See e.g.*, 42 U.S.C. 4331(b) (National Environmental Policy Act) (including the goal of "enhanc[ing] the quality of renewable resources and approach[ing] the maximum attainable recycling of depletable resources").

> **RESPONSE:** It is undisputed that the congressional policy statement in the National Environmental Policy Act ("NEPA") has as one of its goals to "enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources." However, NEPA does not promote recycling per se, rather it is a procedural statute that requires all federal agencies to prepare a detailed statement on potential environmental

impacts of "major Federal actions significantly affecting the quality of the human environment." 42 USC s. 4332(2)(C).

## X.     CONTAMINATION OF THE FOX RIVER WITH PCBS DURING THE POST PRODUCTION PERIOD

117.    The principal source of PCB discharges during the Post Production Period was the recycling of wastepaper that contained CCP produced before mid-1971, PJF Decl., Ex. 7 [PCBs-Issue & Evaluation].

> **RESPONSE:**          It is undisputed that a significant source of Aroclor 1242 discharges during the Post Production Period was the recycling of wastepaper that contained CCP produced before mid-1971.  It is disputed at this time that this source was the principal source, given that discovery into volumetric discharges was outside the scope of Phase I.

118.    During the Post Production Period, PCB discharges were drastically reduced.  *Id.*, Ex. 1 [2002 ROD] at 4; *Id.*, Ex. 8 [July 10, 2009 C. Klass Expert Report at 13, 15]; *Id.*, Ex. 9 [1977 Versar Report] at 4-5.

> **RESPONSE:**          It is undisputed that PCB discharges during the Post Production period were lower than during the Production Period.  Given that discovery into volumetric discharges was outside the scope of Phase I, the remainder of this proposed finding of fact is disputed.

119.    The WDNR estimated that only a minimal amount of PCB discharges occurred after NCR stopped using PCBs in mid-1971.  *Id.*, Ex. 1 [2002 ROD] at 4.

> **RESPONSE:**          It is undisputed that PCB discharges during the Post Production period were lower than during the Production Period.  It is disputed that the amount of PCBs discharged during the latter period was "minimal," and Defendants themselves have argued that these discharges were "material." Roach Decl., Ex. 244 [June 11, 1998 Letter from D. Mandelbaum to Department of Justice (NCR-FOX-365834) (stating, with respect to post-1971 discharges, "Had the [Defendant] Mills shifted out of post-consumer wastepaper in their furnish, PCB discharges would have been materially lower.")].  Given that discovery into

34

volumetric discharges was outside the scope of Phase I, the remainder of this proposed finding

of fact is disputed.

## CONCLUSIONS OF LAW

1.      Section 113(f)(1) of CERCLA provides that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).

**RESPONSE:**          Undisputed.

2.      A court may allocate response costs under CERCLA Section 113(f)(1) on a summary judgment motion where there is no genuine issue of material fact.  *Envtl. Transp. Sys. Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509-10 (7th Cir. 1992) (affirming allocation of 100% of response costs on summary judgment motion to subcontractor trucking company who was entirely responsible).

**RESPONSE:**          It is undisputed that a Court may allocate response costs

under CERCLA Section 113(f)(1) on a summary judgment motion where there is no genuine

issue of material fact, however, such an allocation is inappropriate and premature in this case

because there has been no finding of liability under CERCLA Section 107.  *XDP, Inc. v.*

*Watumull Properties Corp.*, 2004 WL 1103023, at *10 (D. Or. May 14, 2004) (denying

summary judgment motion seeking zero allocation in part due to remaining factual issues

concerning "which parties may be responsible for the clean-up costs"); *Lenox Inc. v. Rueben*

*Smith Rubbish Removal*, 91 F.Supp.2d 743, 748 (D.N.J. 2000) (denying summary judgment

request for zero allocation noting that "it would be difficult to designate each party's equitable

share of the costs before each party's liability was conclusively established.").  Plaintiffs further

state that there are genuine issues of material fact here, precluding summary judgment for

Defendants.

3.      Courts have broad discretion in this equitable allocation, and may consider "several factors, a few factors.  or only one determining factor" in allocating response costs. *Envtl. Transp. Sys.,* 969 F.2d at 509; *see also Town of Munster, Indiana v. Sherwin-Williams Co., Inc.*, 27 F.3d 1268, 1272 (7th Cir. 1994).

35

**RESPONSE:** It is undisputed that courts have discretion in making equitable allocations, and may consider "several factors, a few factors, or only one determining factor, as the district court did in this case, <u>depending on the totality of circumstances presented to the court</u>." *Environmental Transportation Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992) (emphasis added). Plaintiffs further state that because First Phase discovery was limited to certain issues, the parties have been precluded from presenting the court with the "totality of the circumstances" and therefore equitable allocation at this juncture would be premature. *Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 121 F.Supp.2d 248, 257 (W.D.N.Y. 2000)

4. Two factors that courts may consider in allocating response costs under Section 113(f)(1) are knowledge and fault. *See Envtl. Transp. Sys.*, 969 F.2d at 509; Doc. #252 [Scheduling Order] at 4 (stating "that knowledge and fault could constitute the principal bases on which contribution may be allocated").

**RESPONSE:** It is undisputed that courts may consider relative fault in allocating response costs under Section 113(f)(1), *Envtl. Transp. Sys.*, 969 F.2d at 509, and Plaintiffs further state that "the allocation of cleanup costs is a type of decision particularly suited to case-by-case determination. . ." *Id.* Because it was "Congress's intent to allow courts to determine what factors should be considered in their own discretion without requiring a court to consider any particular list of factors," it is also undisputed that courts may consider knowledge in allocating response costs. *Id.* ("[W]e think a court may consider any factors appropriate to balance the equities in the <u>totality of the circumstances</u>.").

5. A court may allocate zero response costs to a party based on the equitable factor of knowledge. *Gopher Oil Co. v. Union Oil Co.*, 955 F.2d 519, 527 (8th Cir. 1992) (affirming allocation of 100% of response costs to party who knew of contamination, and zero response costs to party who "did not have specific knowledge of the contamination"); *Folino v. Hampden Color & Chem. Co.*, 832 F. Supp. 757, 765 (D. Vt. 1993) (precluding recovery of response costs where party had knowledge of and concealed contamination).

**RESPONSE:** Disputed. In *Gopher Oil*, the seller of property was allocated 100% of response costs after a jury trial based on findings that it committed fraud by materially misrepresenting the environmental condition of property to the buyer, because the seller knew there was contamination at the property but affirmatively told the buyer there was no contamination. 955 F.2d at 526. In allocating 100% of response costs to the seller, the court relied upon <u>several</u> factors, including that the seller knew of and was responsible for the contamination; that the buyer did not "materially contribute to the contamination;" and that the contamination caused by seller was extensive and of a toxic nature. *Id*. at 527. Similarly, in *Folino*, the court considered multiple factors in allocating 100% of response costs to a single party, including that both parties distributed hazardous substances at the facility, both parties used poor handling practices, one party's contamination had largely migrated offsite while the party allocated 100% of costs continued to contaminate the facility, and the party allocated 100% of costs continued to use and contaminate the facility after learning the site was contaminated, and did not tell the other party that the site was contaminated. 832 F.Supp. at 764-65.

6. In evaluating the equitable factor of knowledge, a court may find that the party in the better position to know is liable for 100% of response costs. *See Danella Southwest, Inc. v. Southwestern Bell Tele. Co.*, 775 F. Supp. 1227, 1234 (E.D. Mo. 1991) (contractor not required to contribute to response costs where it did not know of and had no reason to suspect contamination).

**RESPONSE:** Disputed. In *Danella*, the court determined that a contractor would not be allocated any share of response costs associated with digging a trench for a phone company in soil contaminated with dioxin based on multiple factors, including: (1) the contractor performed the work it was hired for in a safe manner; (2) there was no reason for the contractor to suspect the soil was contaminated with dioxin; (3) the contractor fulfilled its responsibilities in checking with local utilities for buried lines and pipes before performing its

work; (4) the phone company was responsible for submitting the excavation permit application, which failed to properly show the scope of the excavation into dioxin-contaminated areas; (5) the phone company was periodically notified by EPA of dioxin contaminated areas; and (6) the contractor did not exacerbate the problem after learning of the dioxin contamination. 775 F.Supp. at 1234-35.

7.      A court may allocate zero response costs to a party based on that party's minimal contribution to the contamination. *See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 274 F.3d 1043, 1048 (6th Cir. 2001) (affirming allocation of 100% of costs to party who released "exponentially more" PCBs and zero response costs to the party whose releases were minimal in comparison); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F. 3d 610, 616 (7th Cir. 1998) (affirming allocation of zero response costs to the party whose releases "may have been too inconsequential to affect the cost of cleaning up significantly"); *Gopher Oil Co. v. Union Oil Co.*, 955 F.2d 519, 527 (8th Cir. 1992) (affirming allocation of zero response costs to the party who did not "materially contribute to the contamination").

   **RESPONSE:**          Undisputed that a party found to have contributed "less than one-hundredth of 1%" of the contamination may be allocated zero response costs. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 274 F.3d 1043, 1045 (6th Cir. 2001). Plaintiffs further state that none of the "Certain Defendants" has come close to demonstrating – nor will any be able to demonstrate – such a minimal contribution to the contamination of the Lower Fox River.

8.      A court may consider compliance with law as an equitable factor in allocating response costs. *Environmental Transp. Sys. v. Ensco, Inc.*, 969 F.2d 503, 510 (7th Cir. 1992) ("compliance with industry regulations is an indication of the degree of care a party exercises with respect to hazardous substances").

   **RESPONSE:**          Undisputed. Plaintiffs further state that Defendants have not even alleged that Plaintiffs were ever in violation of any law as a result of their manufacture and sale of NCR paper.

9.      To the extent natural resource damages are subject to contribution under Section 113(f)(1) of CERCLA, equitable factors likewise may be considered to allocate natural resource damages. *Champion Laboratories, Inc. v. Metex Corp.*, 2008 WL 1808309, *6-7 (D. N.J. 2008).

**RESPONSE:** Undisputed.

10. Wisconsin state laws and federal regulations promoted the continued use of CCPs and the continued recycling of post-consumer waste paper containing CCP. PJF Decl., Ex. 75 [1975 Wisconsin Assembly Bill 1342]; EPA, *Final Rule, Polychlorinated Biphenyl's (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions*, 44 Fed. Reg. 31,514 (May 31, 1979); EPA, *Final Rule, Toxic Substances Control Act; Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions; Exclusions, Exemptions and Use Authorizations*, 49 Fed. Reg. 28,172, 28,175 (July 10, 1984).

**RESPONSE:** Disputed. Wisconsin laws and federal regulations allowed

for the continued use of CCPs and recycling of post-consumer CCP, and they also sought to

protect public health and the environment by limiting PCB discharges to water bodies. Roach

Decl., Ex. 221 [Aug. 24, 2009 Supplemental Rebuttal Report of M. Williams]. *See also*

Plaintiffs' Memorandum of Law in Opposition to Certain Defendants' Motion for Summary

Judgment or, Alternatively, Partial Summary Judgment, filed concurrently herewith.

11. There are no genuine issues of material fact that in the Production Period, prior to Plaintiffs having ceased manufacturing carbonless copy paper with PCBs in mid-1971, Plaintiffs "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage."

**RESPONSE:** Disputed. *See* Plaintiff's Memorandum of Law in

Opposition to Certain Defendants' Motion for Summary Judgment or, Alternatively, Partial

Summary Judgment, filed concurrently herewith.

12. There are no genuine issues of material fact that in the Production Period, prior to Plaintiffs having ceased manufacturing carbonless copy paper with PCBs in mid-1971, no Defendant "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage."

**RESPONSE:** Disputed. *See supra* at Resp. to Def. Prop. Finding of Fact

Nos. 99 & 100. *See also* Plaintiff's Memorandum of Law in Opposition to Certain Defendants'

Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, filed concurrently

herewith.

13.     There are no genuine issues of material fact that in the Production Period, prior to Plaintiffs having ceased manufacturing carbonless copy paper with PCBs in mid-1971, Plaintiffs "were in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless paper.

**RESPONSE:**     Disputed.     *See* Plaintiff's Memorandum of Law in Opposition to Certain Defendants' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, filed concurrently herewith.

14.     Defendants should not be allocated any response costs and/or natural resource damages incurred as a result of PCB discharges before June 1971.

**RESPONSE:**     Disputed.     *See* Plaintiff's Memorandum of Law in Opposition to Certain Defendants' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, filed concurrently herewith.

15.     There are no genuine issues of material fact that in the Post Production Period, after Plaintiffs ceased manufacturing carbonless copy paper with PCBs in mid-1971, continued recycling of post-consumer CCP was promoted by both the State of Wisconsin and the EPA and resulted in only minor and diminishing risks that were greatly outweighed by the ecological benefits of continued waste paper recycling.

**RESPONSE:**     Disputed.  Because discovery into volumetric discharges was outside the scope of Phase I, Plaintiffs' dispute Defendants' contention that recycling post-consumer CCP "resulted in only minor and diminishing risks that were greatly outweighed by the ecological benefits of continued waste paper recycling."  Moreover, Plaintiffs dispute Defendants' inference that the State of Wisconsin and EPA encouraged recycling at the expense of the environment.  Roach Decl., Ex. 221 [Aug. 24, 2009 Supplemental Rebuttal Report of M. Williams].  *See also* Plaintiffs' Memorandum of Law in Opposition to Certain Defendants' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, filed concurrently herewith.

16.     Defendants should not be allocated any response costs and/or natural resource damages incurred as a result of PCB discharges after June 1971.

40

**<u>RESPONSE:</u>**    Disputed.    *See* Plaintiff's Memorandum of Law in Opposition to Certain Defendants' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, filed concurrently herewith.


Respectfully submitted,

APPLETON PAPERS INC.                    NCR CORPORATION

/s/ Michael L. Hermes                    /s/ Kathleen L. Roach


Counsel for Appleton Papers Inc.:        Counsel for NCR Corporation:
Michael L. Hermes                        Kathleen L. Roach (Illinois Bar No. 6191432)
HERMES LAW LTD.                          SIDLEY AUSTIN LLP
333 Main Street, Suite 601               One South Dearborn Street
Green Bay, Wisconsin 54301               Chicago, Illinois 60603
(920) 436-9870                           (312) 853-7000
Fax: (920) 436-9871                      Fax: (312) 853-7036

Ronald R. Ragatz                         J. Ric Gass (Wisconsin Bar No. 1011998)
DEWITT ROSS & STEVENS S.C.               GASS WEBER MULLINS LLC
2 E. Mifflin Street, Suite 600           309 North Water Street
Madison, Wisconsin 53703                 Milwaukee, Wisconsin 53202
(608) 255-8891                           (414) 224-7697
Fax: (608) 252-9243                      Fax: (414) 224-6116


September 30, 2009

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2009, I electronically filed **Plaintiffs' Responses to Certain Defendants' [Proposed] Findings of Fact and Conclusions of Law**  using the ECF system, which will send notification of such filing to: Philip Munroe at DiRenzo & Bomier LLC, pmunroe@direnzollc.com; Scott Fleming at Weiss Berzowski Brady LLP, sbf@wbb-law.com; David Mandelbaum at Ballard Spahr Andrews & Ingersoll, LLP, mandelbaum@ballardspahr.com; Marc Davies at Ballard Spahr Andrews & Ingersoll, LLP, davies@ballardspahr.com; Ronald Varnum at Ballard Spahr Andrews & Ingersoll, LLP, varnumr@ballardspahr.com; Sabrina Mizrachi at Ballard Spahr Andrews & Ingersoll, LLP, mizrachis@ballardspahr.com; Monique Mooney at Ballard Spahr Andrews & Ingersoll, LLP, mooney@ballardspahr.com; Caleb Holmes at Ballard Spahr Andrews & Ingersoll, LLP, holmescj@ballardspahr.com; Patrick Zaepfel at Kegel Kelin Almy & Grimm, LLP, zaepfel@kkaglaw.com; Mark Feldmann at Menn Law Firm, Ltd., mark-feldmann@mennlaw.com; Joseph Beisenstein at Menn Law Firm, Ltd., joseph-beisenstein@mennlaw.com; Philip Hunsucker at Hunsucker Goodstein & Nelson PC, phunsucker@hgnlaw.com; David Rabbino at Hunsucker Goodstein & Nelson PC, drabbino@hgnlaw.com; Christopher Dow at Hunsucker Goodstein & Nelson PC, cdow@hgnlaw.com; Allison McAdam at Hunsucker Goodstein & Nelson PC, amcadam@hgnlaw.com; Eric Mroz at Hunsucker Goodstein & Nelson, P.C, mroz@hgnlaw.com; David Edquist at von Briesen & Roper, s.c., dedquist@vonbriesen.com; Christopher Riordan at von Briesen & Roper, s.c., criordan@vonbriesen.com; Patrick Wells at von Briesen & Roper, s.c., pwells@vonbriesen.com; Russell Wilson at Ruder Ware, rwilson@ruderware.com; Linda Benfield at Foley & Lardner LLP, lbenfield@foley.com; Sarah Slack at Foley & Lardner LLP,

sslack@foley.com; Charles Gering at Foley & Lardner LLP, cgering@foley.com; Michelle Gale
at Dykema Gossett PLLC, mgale@dykema.com; Joseph Basta at Dykema Gossett PLLC,
jbasta@dykema.com; Daniel Murray at Johnson & Bell, Ltd., murrayd@jbltd.com; Garrett
Boehm, Jr. at Johnson & Bell, Ltd., boehmg@jbltd.com; Frederick Mueller at Johnson & Bell,
Ltd., muellerf@jbltd.com; John Cermak, Jr. at Baker & Hostetler LLP, jcermak@bakerlaw.com;
Sonja Inglin at Baker & Hostetler LLP, singlin@bakerlaw.com; Timothy Anderson at Remley &
Sensenbrenner, S.C., tanderson@remleylaw.com; Thomas O'Donnell at Calfee Halter &
Griswold LLP, todonnell@calfee.com; William Coughlin at Calfee Halter & Griswold LLP,
wcoughlin@calfee.com; Ted Waskowski at Stafford Rosenbaum LLP,
twaskowski@staffordlaw.com; Richard Yde at Stafford Rosenbaum LLP,
ryde@staffordlaw.com; Meg Vergeront at Stafford Rosenbaum LLP,
mvergeront@staffordlaw.com; Lora L. Zimmer at Hinshaw & Culbertson LLP,
lzimmer@hinshawlaw.com; William Mulligan at Davis & Kuelthau, s.c.,
wmulligan@dkattorneys.com; Kevin Lyons at Davis & Kuelthau, s.c., klyons@dkattorneys.com;
Tara Mathison at Davis & Kuelthau, s.c., tmathison@dkattorneys.com; Elizabeth Miles at Davis
& Kuelthau, s.c., emiles@dkattorneys.com; Thomas Schrimpf at Hinshaw & Culbertson LLP,
tschrimpf@hinshawlaw.com; Paul Kent at Anderson & Kent, S.C., pkent@andersonkent.com;
Waltraud Arts at Anderson & Kent, warts@andersonkent.com; James P. Walsh at the Appleton
City Attorney's Office, jim.walsh@appleton.org; Ian Pitz at Michael Best & Friedrich, LLP,
iapitz@michaelbest.com; Allison Swanson at the City of Green Bay, allisonsw@ci.green-
bay.wi.us; Ted Warpinski at Friebert, Finerty & St. John, S.C., taw@ffsj.com; S. Todd Farris at
Friebert, Finerty & St. John, S.C., stf@ffsj.com; M. Andrew Skwierawski at Friebert, Finerty &
St. John, S.C., mas@ffsj.com; Scott Hansen at Reinhart Boerner Van Deuren s.c.,

shansen@reinhartlaw.com; Steven Bogart at Reinhart Boerner Van Deuren s.c.,

sbogart@reinhartlaw.com; John Van Lieshout at Reinhart Boerner Van Deuren s.c.,

jvanlieshout@reinhartlaw.com; David Frank at Reinhart Boerner Van Deuren s.c.,

dfrank@reinhartlaw.com; Thomas Gottshall at Haynsworth Sinkler Boyd, P.A.,

tgottshall@hsblawfirm.com; Stephen McKinney at Haynsworth Sinkler Boyd, P.A.,

smckinney@hsblawfirm.com; William Harbeck at Quarles & Brady LLP, whh@quarles.com;

David Strifling at Quarles & Brady, LLP, dstrifli@quarles.com; Nancy Peterson at Quarles &

Brady LLP, nkp@quarles.com; Susan Lovern at von Briesen & Roper, s.c.,

slovern@vonbriesen.com; Thomas Armstrong at von Briesen & Roper, s.c.,

tarmstro@vonbriesen.com; Michael P. Carlton at von Briesen & Roper, s.c.,

mcarlton@vonbriesen.com; Kelly Noyes at von Briesen & Roper, s.c., knoyes@vonbriesen.com;

Arthur Foerster at Latham & Watkins LLP, Arthur.Foerster@law.com; Margrethe Kearney at

Latham & Watkins LLP, Margrethe.Kearney@lw.com; Mary Rose Alexander at Latham &

Watkins LLP, Mary.Rose.Alexander@lw.com; Ernest Getto at Latham & Watkins LLP,

Ernie.Getto@lw.com; Karl Lytz at Latham & Watkins LLP, Karl.Lytz@lw.com; Andrea Hogan

at Latham & Watkins LLP, Andrea.Hogan@lw.com; Nathan Fishbach at Whyte Hirschboeck

Dudek S.C., nfishbach@whdlaw.com; Jan Conlin at Robins, Kaplan, Miller & Ciresi L.L.P.,

jmconlin@rkmc.com; Sarah Lindsey at Warner Norcross & Judd LLP, slindsey@wnj.com;

Steven Kohl at Warner Norcross & Judd LLP, skohl@wnj.com; Thomas Andreoli at

Sonnenschein Nath & Rosenthal LLP, tandreoli@sonnenschein.com; Matthew Adams at

Sonnenschein Nath & Rosenthal LLP, madams@sonnenschein.com; Robin Jacobs at Cook &

Franke, S.C., jacobs@cf-law.com; Randall Stone at U.S. Department of Justice,

randall.stone@usdoj.gov; Joshua Levin at U.S. Department of Justice, joshua.levin@usdoj.gov;

Matthew R. Oakes at U.S. Department of Justice, matthew.oakes@usdoj.gov; Perry Rosen at U.S. Department of Justice, perry.rosen@usdoj.gov; Michael Hermes at Hermes Law, Ltd., mlh@hermeslawltd.com; Brandon Evans at Hermes Law, Ltd., bje@hermeslawltd.com; Anthony Steffeck at Hermes Law, Ltd., ajs@hermeslawltd.com; Heidi D. Melzer at Hermes Law, Ltd., hdm@hermeslawltd.com; Dennis Birke at DeWitt Ross & Stevens S.C., db@dewittross.com; Ronald Ragatz at DeWitt Ross & Stevens S.C., rrr@dewittross.com; Megan Senatori at DeWitt Ross & Stevens S.C., ms@dewittross.com; J. Ric Gass at Gass Weber Mullins LLC, gass@gasswebermullins.com David Turek at Gass Weber Mullins LLC, turek@gasswebermullins.com.

NCR CORPORATION

s/ Kathleen L. Roach
By: One of Its Attorneys