IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

APPLETON PAPERS INC. and
NCR CORPORATION,

    Plaintiffs,

    v.                                   No. 08-CV-16-WCG

GEORGE A. WHITING PAPER COMPANY, et al.,

    Defendants.

---

NCR CORPORATION,

    Plaintiff,

    v.                                   No. 08-CV-0895-WCG

KIMBERLY-CLARK CORPORATION, et al.,

    Defendants.

---

**PLAINTIFFS' RESPONSE TO CERTAIN DEFENDANTS' PROPOSED
FINDINGS OF FACT REGARDING MOTION FOR SUMMARY JUDGMENT
THAT PLAINTIFFS ARE NOT ENTITLED TO CONTRIBUTION**

---

    Plaintiffs, NCR Corporation ("NCR") and Appleton Papers Inc. ("API"), by their undersigned counsel, pursuant to Civil Local Rule 56.2(b)(1), submit the following response to Certain Defendants' Proposed Findings of Fact In Support of Their Motion For Summary Judgment. Pursuant to Civil Local Rule 56.2(b)(2), additional facts precluding summary judgment are set forth in the simultaneously filed Plaintiffs' Proposed Findings Of Fact in Opposition to Certain Defendants' Motion For Summary Judgment That Plaintiffs Are Not Entitled To Contribution, with supporting evidentiary materials.

    **Proposed Finding No. 1:** The Court has jurisdiction over this case under § 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1331 (federal question).

    **RESPONSE NO. 1:** Undisputed.

**Proposed Finding No. 2:** Venue is proper under § 113(b) of CERCLA, 28 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b).

**RESPONSE NO. 2:** Undisputed.

**Proposed Finding No. 3:** Plaintiff Appleton Papers Inc., is a Delaware corporation with its principal place of business in Appleton, Wisconsin. Plaintiff NCR is a Maryland corporation with its principal place of business in Dayton, Ohio. Appleton Papers Inc., and NCR are collectively referred to as "Plaintiffs."

**RESPONSE NO. 3:** Undisputed.

**Proposed Finding No. 4:** Defendants U.S. Paper, CBC, Menasha Corporation, and WTMI Company (collectively the "Recycling Mills"), are, were, or are successors to, paper recycling mills located adjacent to the Lower Fox River.

**RESPONSE NO. 4:** Undisputed.

**Proposed Finding No. 5:** Defendants Neenah Menasha Sewerage Commission (Menasha, Wisconsin) and the City of Appleton (Appleton, Wisconsin) (collectively the "POTWs"), operate wastewater treatment facilities. The "Recycling Mills" and the "POTWs" are collectively referred to as "defendants" unless identified individually.

**RESPONSE NO. 5:** Undisputed.

**Proposed Finding No. 6:** Plaintiffs applied an emulsion containing polychlorinated biphenyls ("PCBs") onto their carbonless copy paper ("NCR Paper") from the mid-1950s until mid-1971 ("The Production Period") when the Plaintiffs switched from a PCB based emulsion to MIPB. MIPB stands for Mono-isopropyl biphenyl, the chemical solvent that the Plaintiffs used to replace PCBs. MIPB, unlike PCBs, does not contain chlorine. Aroclor 1242 is the trade name for the PCBs used by Plaintiffs in the production of their NCR Paper.

**RESPONSE NO. 6:** Disputed as to form and content. This proposed finding of fact violates Eastern District Local Rule 56.2 in that it wholly fails to limit the proposed finding "as far as practicable to a single factual proposition."

Further, throughout their proposed findings of fact, Defendants' erroneously attribute actions to API and NCR, rather than their predecessor, ACPC, by collectively describing "Plaintiffs" alleged actions in various proposed findings. Therefore, clarification is required. Plaintiffs, NCR and API, did not apply an emulsion containing

2

polychlorinated biphenyls ("PCBs") to manufacture NCR Brand carbonless copy paper ("CCP") from the mid-1950s until mid-1971 ("The Production Period"). API had no connection to CCP prior to its purchase of the assets of NCR's Appleton Papers Division on June 30, 1978. Declaration of Megan A. Senatori in Response to Defendants' Proposed Findings of Fact Regarding Certain Defendants' Motion for Summary Judgment that Plaintiffs are not Entitled to Contribution ("Senatori Decl."), Ex. 1 at NCR Fox 0090103, NCR Fox 0090110 [API Corporate History Chronology]. NCR manufactured an emulsion containing a particular form of PCBs, called Aroclor 1242, during the Production Period. Declaration of Dennis P. Birke in Opposition to Certain Defendants' Motion For Summary Judgment that Plaintiffs Are Not Entitled To Contribution ("Birke Decl."), Ex. 52 at 4-5 [Plaintiff NCR Corporation's Responses to Defendant Georgia-Pacific Consumer Products LP's (f/k/a Fort James Operating Company), Fort James Corporation's and Georgia-Pacific LLC's First Set of Interrogatories, dated January 27, 2009 ("NCR Responses/GP Interrogatories)]; Ex. 6 at 40:14-22 [Deposition of William Goetz ("Goetz Dep.")], Ex. 12 (NCR-FOX0162136-37]. NCR then sold the emulsion to Appleton Coated Paper Company ("ACPC"). Birke Decl, Ex. 52 at 5-6 [NCR Responses/GP Interrogatories]; Ex. 7 at 116:16 through 117:14 [Deposition of Floyd Strelow ("Strelow Dep.")]; Ex. 5 at 123:19 through 124:14 [Jezerc Dep.]; Ex. 6 at 38:9-24 [Goetz Dep.]. ACPC applied the emulsion onto a base paper to manufacture CCP, which was then purchased by NCR. Birke Decl., Ex. 6 at 38:9-24, 77:3 through 78:22 [Goetz Dep]. ACPC did not manufacture paper. Rather, its operations were limited to coating paper manufactured elsewhere. Birke Decl., Ex. 58 at p. NCR-FOX 0191612 [API's 104(e) Responses Dated September 9, 1998]. The change

3

over in the emulsion started in 1970 and, by mid-1971, NCR had discontinued use of PCBs in the emulsion and, instead, used Mono-isopropyl biphenyl ("MIPB") in the emulsion. Declaration of Ronald Jezerc at ¶ 5. It is undisputed that MIPB, unlike Aroclor 1242, does not contain chlorine.

Accordingly, NCR and API are liable solely as successors to ACPC – not for their own actions or inactions. *See* Plaintiffs' Brief In Support Of Motion for Summary Judgment On Phase I at 9-13. Accordingly, Defendants' reference to the actions or inactions of "Plaintiffs" throughout their proposed findings of fact as a basis for summary judgment is incorrect both factually and as a matter of law.

**Proposed Finding No. 7:** In 1976 the US EPA Administrator set effluent standards for discharges of PCBs at 1 microgram per liter (1µg/l), finding that:

> The term polychlorinated biphenyls refers to a family of organic chemicals which have been produced and marketed in this country for approximately 45 years. These organic chemicals are synthetically made and consist of a number of chlorinated biphenyl isomers. They are highly stable compounds and are used primarily as dielectric and heat transfer fluids, though they have other uses as well. PCBs have been conclusively demonstrated to produce lethal and sublethal toxic effects and low dose levels upon a wide range of fish, mammals, and other wildlife, and have also demonstrated adverse health effects to humans. Moreover, they are highly mobile and persistent in the environment, and bioaccumulate greatly in tissue.

**RESPONSE NO. 7:** Disputed in part. The record evidence cited by Defendants fails to support the factual position that in 1976 the US EPA "set effluent standards for discharges of PCBs at 1 microgram per liter (1µg/l)." The record evidence cited by Defendants is only a "Proposed Toxic Pollutant Effluent Standards for Polychlorinated Biphenyls" and the text in that document (at page 30468) states only that the standards were being "proposed" – rather than, as Defendants assert – being "set."

**Proposed Finding No. 8:** PCBs have been banned from production in the United States since January 1, 1979 and distribution of PCBs in the United States has been banned since July 2, 1979.

4

**RESPONSE NO. 8:** Undisputed.

**Proposed Finding No. 9:** Remediation of the PCB pollution of the Lower Fox River has been estimated to cost $700 million in future response costs alone.

**RESPONSE NO. 9:** Plaintiffs do not dispute that estimates for future response costs alone are at least $700 million.

**Proposed Finding No. 10:** Plaintiffs' production of NCR Paper created waste paper ("broke" and "trim") which Plaintiffs sold through brokers throughout the Production Period for the express purpose of recycling.

**RESPONSE NO. 10:** Disputed in part. As set forth above, neither NCR nor API produced CCP during the Production Period, and neither NCR nor API sold broke during the Production Period. *See* Response to Proposed Finding No. 6 above. Instead, ACPC coated the CCP. *Id.* It is undisputed that ACPC's production of CCP generated "broke" and "trim" which ACPC sold through brokers. *Id.* The ACPC facility never disposed of CCP broke, and had procedures in place to collect, sort, and bale CCP broke. Declaration of Kathleen L. Roach ("Roach Decl."), Ex. 99 [D. Christensen Dep. at 21:12-22:9]; Ex. 23 [F. Heinritz Dep. at 96:21-97:14]; Ex. 102 [July 21, 1966 ACPC Memorandum (NCR-FOX-0318041)]. The ACPC facility sold all of its CCP broke through recycled paper brokers, who then sold and delivered this CCP broke to various paper mills, including some of Defendants' facilities. Roach Decl., Ex. 99 [D. Christensen Dep. at 31:13-32:3]; Ex. 101 [F. Strelow Dep. at 40:23-41:23]; Ex. 103 [Aug. 7, 2009 Rebuttal Report of W. Moore at 2]; Ex. 23 [F. Heinritz Dep. at 20:15-20]. However, the record evidence cited does not support the factual assertion that ACPC sold the broke for the "express purpose of recycling." ACPC's purpose of selling the broke was to generate revenue. Senatori Dec., Ex. 2, p. 53 [Deposition of Don Christensen ("Christensen Dep."), testifying that ACPC's sale of broke was "a revenue-generating part of the business."]; Roach Decl.,

5

Ex. 99 [D. Christensen Dep. at 52:25 – 53:8]; Ex. 100 [P.H. Glatfelter Response to Third Section 104(e) Request of the U.S. Department of Interior (NCR-FOX-0236691) at 5 (discussing competition for CCP broke)]; Ex. 101 [F. Strelow Dep. at 114:17-22].

**Proposed Finding No. 11:** Some recyclers recycled the Plaintiffs' broke, trim, and NCR Paper forms, all made from NCR Paper, to recover the wood fibers in the paper. The PCBs were of no use to the recyclers.

**RESPONSE NO. 11:** Disputed in part. As stated above, neither NCR nor API generated broke or trim from CCP during the Production Period. *See* Response to Proposed Finding No. 6 above. It is undisputed that: (1) some recyclers recycled broke and trim generated by ACPC during the production of CCP, as well as CCP forms, to recover the wood fibers in the paper; and (2) the PCBs contained in CCP were of no use to the recyclers.

**Proposed Finding No. 12:** PCBs entered the Fox River directly from Plaintiffs own manufacturing activities and from recycling the waste paper (broke and trim), and from recycling the NCR Paper forms discarded by consumers and diverted for recycling rather than for burial at landfills.

**RESPONSE NO. 12:** Disputed in part. The record evidence cited by Defendants fails to support the proposition asserted in Proposed Finding No. 12. Moreover, as stated above, API had no connection to CCP prior to its purchase of the assets of NCR's Appleton Papers Division on June 30, 1978. *See* Response To Proposed Finding No. 6 above. Rather, NCR and API are successors to ACPC which owned facilities in Appleton. *Id.* Moreover, ACPC never directly discharged to the Fox River, but rather, discharged to the City of Appleton POTW. Senatori Decl., Ex. 3, at p. 69 [Goetz Dep.]; Birke Decl, Ex. 57 at p. NCR-Fox0078283 [API's 104(e) Responses Dated May 6, 1996]. Finally, ACPC did not manufacture paper. Rather, its operations

were limited to coating paper manufactured elsewhere. Birke Decl., Ex. 58 at p. NCR-FOX 0191612 [API's 104(e) Responses Dated September 9, 1998].

**Proposed Finding No. 13:** There is no evidence in the record that the Plaintiffs ever told the Defendants during the Production Period that their NCR Paper and the waste paper created during the production of NCR Paper contained PCBs.

**RESPONSE NO. 13:** Disputed in part. It is undisputed that there is no evidence in the record that Plaintiffs ever directly told the Defendants during the Production Period that CCP and the broke created during the production of CCP contained PCBs. Plaintiff API did not exist during the period. Plaintiff NCR had no relationship with Defendants during the period. However, certain Defendants were, in fact, aware during the Production Period that CCP contained PCBs. For example, Ford Howard was aware by June 1970 at the latest that CCP contained PCBs. Roach Decl., Ex. 40 [1976 Fort Howard PCB Report (Ex. 114 to the Deposition of D. DeMeuse), at p. 2], Ex. 112 [D. Schneider Dep. at 125:23-126:17, 127:11-21, 145:7-146:9]. Likewise, David Austin, the purchasing agent for Menasha Corporation, confirmed in a sworn affidavit that he was instructed in the late-1950's or early-1960s that CCP might contain PCBs. Roach Decl., Ex. 185 [Feb. 29, 1999 Affidavit of David Austin (Ex. 554-C to Austin Dep.)].

Moreover, regardless of what Defendants may have been told by Plaintiffs, Plaintiffs' expert, Marcia Williams, has opined that "[b]etween the fall of 1970 and January 1971, all secondary paper mills should have known that CCP contained PCBs." Roach Decl., Ex. 17, at p. 53-58 [Williams Report]. Ms. Williams further opined that "Even if one assumes that the subset of knowledgeable paper companies did not share the information regarding the presence of PCBs in CCP with other paper companies, such information was widely known by fall 1970." Roach Decl., Ex. 17, at p. 55 [Williams Report]. For example, the Institute of Paper Chemistry stated in the 1970s that issues

7

relating to PCBs in paper products and in paper mill effluents had been recognized by the paper industry since the late 1960s. Roach Decl, Ex. 105, at 1 [Institute of Paper Chemistry Report (NCR-FOX-0281317), stating: "The presence of PCBs in paper products and mill effluents has been recognized since the late 1960s."]; Ex. 106, at 3 [July 22, 1977 Institute of Paper Chemistry Report (NCR-FOX-0073460), stating "Since the late 1960s PCBs have been known to be present in paper products and mill effluents."].

Accordingly, regardless of what Plaintiffs told Defendants, there is a genuine dispute of material fact relating to what Defendants actually knew, or should have known, regarding the presence of PCBs in CCP during the Production Period.

**Proposed Finding No. 14:** In 1972, an internal memorandum received by Carl Rench, NCR's Corporate Vice President of Research and Development stated that:

- "In the late 1960's accumulative evidence began to show that PCB's may have adverse effects on certain forms of animal life. The same properties that contributed to their usefulness were indited (sic) as contributing to the possible hazardous effects. The resistance to breakdown—such as thermal and biodegradation—was shown to lead to accumulations in the environment. These accumulations (in relation to PCB solvent properties) found their way into animal life as a result of PCB solubility in fatty tissue. The aquatic and fowl forms of life are particularly affected. Domesticated animals (and subsequently human beings) are contaminated through accident or such things as paints containing PCBs."

- "NCR paper was a potential hazard during the production, during the printing and direct handling by the customer and finally through being used in recycled stock for food packaging. The biological effects of PCB's are not completely defined and are still being investigated. The materials can be lethally toxic to aquatic forms of life."

- "The accumulation in bird and mammal liver and fatty tissues represents a danger to human beings from transfer through consumption of animal products."

**RESPONSE NO. 14:** Disputed in part. It is undisputed that the proposed finding includes excerpted quotes from a 1972 NCR memo. However, the paragraphs cited in the

8

proposed finding are incomplete, re-ordered from the order of presentation in the original document, and, further, the quotations above do not properly indicate with ellipses where Defendants have omitted sentences or phrases from the original text.

**Proposed Finding No. 15:** NCR's corporate designee has testified as follows concerning NCR's lack of notification of the presence of PCBs in its NCR Paper:

9 Q: What area would have

10 been tasked with the responsibility for communicating

11 the risk of PCBs in NCR products to downstream users

12 of that product? This would be licensees, broke

13 dealers, customers, paper mills and the like. Was

14 there anybody who was tasked with that

15 responsibility?

16 A: Not that I'm aware of. I'm not aware of a document

17 or information that tells us there was a specific

18 person.

19 Q: Was there an area where that responsibility lay?

20 A: Same answer. I'm not aware.

21 Q: Same question with respect to municipal wastewater

22 treatment facilities.

23 MR. WESTERFIELD: I'll object. That's

24 outside the scope of the notice. If you know.

25 THE WITNESS: Same answer would apply.

Page 177

1 BY MR. HANSEN:

2 Q: Do you know of anyone within NCR that we could go to

3 and ask and find out that in fact such communications

4 occurred, people -- that NCR did, in fact, warn

5 people downstream of these risks?

6 A: No, I don't know of anyone in the company that could

7 be asked that question. I mean --

8 Q: Past or present. Still living.

9 A: You know, I would, again, just simply ask the people

10 that I've identified here so far.

11 Q: In the records that you looked at to prepare for this

12 deposition or any other records you've looked at,

13 have you seen any such notifications?

14 A: I don't recall seeing any, no.

**RESPONSE NO. 15:** Undisputed that the above properly quotes portions of the testimony of NCR's corporate designee. However, Plaintiffs dispute Defendants' characterization of the above-quoted testimony as showing "NCR's lack of notification of the presence of PCBs in its NCR Paper." The quoted testimony confirms only that the deponent testified that he did not know if a specific person was tasked with preparing notifications and, further, that he did not personally recall seeing any notifications.

**Proposed Finding No. 16:** The record contains no evidence that any of the Defendants discovered that NCR Paper contained PCBs until, at the very earliest, August 1971.

**RESPONSE NO. 16:** Disputed. *See* Response to Proposed Finding No. 13 above.

**Proposed Finding No. 17:** Throughout the 1970s Plaintiffs continued to tell the public and the Defendants that its NCR Paper forms were safe:

10

> The paper industry does not directly use PCBs in manufacture. Although Aroclor 1242 was formerly used as a dye solvent in NCR Paper, its use was minute in comparison with other PCB applications outside the paper industry.
>
> 'We'd like to emphasize that we stopped using PCBs in our NCR Paper manufacture in April 1971 . . . . During the past five years, we introduced no PCB in our finished paper; thus our waste Trim and wastewaters of our microcapsule manufacturing plants would reflect this change.'
>
> Regarding pre 1971 NCR Paper already in office files . . . 'No scientific evidence exists for fearing this paper to be a hazard.'

**RESPONSE NO. 17:** Disputed in part. The above includes excerpted quotes from a February 1976 NCR memo to the Wisconsin Department of Natural Resources. However, the quotation above is not an accurate quotation from the document. The above quotation is incomplete, the order of paragraphs has been changed from the order of the text in the original document, and, further, the above quotations do not properly indicate with ellipses where Defendants have omitted text from the original. Further, Defendants have not cited to any evidence of record to show that the document quoted above was provided to them. Finally, Plaintiff, API did not exist as of the date of the document in 1976, and, accordingly, API did not make any public representations in 1976. *See* Response to Proposed Finding No. 6 above.

**Proposed Finding No. 18:** In January 1976, Walter Spearin, NCR Appleton Papers Division's Vice President of Environmental Control informed James S. Haney, Bergstrom Paper Company's Public Affairs Director that "Aroclor 1242, the only PCB used in NCR carbonless paper, is readily biodegradable . . . ."

**RESPONSE NO. 18:** Undisputed that the above is a partial quotation from a January 1976 letter from Walter E. Spearin to James S. Haney.

**Proposed Finding No. 19:** The Neenah-Menasha Sewerage Commission did not discover PCBs in its effluent until 1972 through WDNR sampling. WDNR denied Neenah-Menasha Sewerage Commission's requests for further PCB testing because of the insignificant amounts indicated by previous sampling.

11

**RESPONSE NO. 19:** Disputed in part. The record evidence cited by Defendants for the proposition that "WDNR denied Neenah Menasha Sewerage Commission's requests for further PCB testing because of the insignificant amounts indicated by previous sampling" confirms that there is a disputed issue of fact as to whether the WDNR had concluded that PCBs in effluent from Neenah Menasha Sewerage Commission were "insignificant." The cited document (NMSC Fox 000599-600) confirms that the "Milwaukee Sentinel" and a U.S. EPA conference had quoted Stanton Kleinert, the surveillance chief of the WDNR, as stating that "a large part of the PCB's getting into Lake Michigan comes from the discharges of municipal sewerage treatment plants at Sheboygan, Neenah-Menasha and Milwaukee." Neenah-Menasha, therefore, concluded that there was a "contradiction" between the WDNR's earlier statements that PCBs in effluent from Neenah-Menasha Sewerage Commission were "insignificant" and WDNR's subsequent statements about the large volume of PCB discharges from Neenah-Menasha Sewerage Commission. The document cited by Defendants, therefore, confirms the existence of a genuinely disputed material fact.

**Proposed Finding No. 20:** Neenah Menasha Sewerage Commission was never told that PCBs were used to make carbonless copy paper or that the Plaintiffs were recycling their waste NCR Paper.

**RESPONSE NO. 20:** Disputed. NCR, API, and ACPC were not recyclers. *See* Response To Proposed Finding No. 6 above. Therefore, to the extent that the proposed finding suggests that Plaintiffs were recyclers, the finding is disputed. Further, regardless of what Neenah-Menasha Sewerage Commission claims to have been "told" about the use of PCBs in CCP, there is sufficient evidence to show that they should have known about the use of PCBs. There were numerous newspaper articles published in local papers between September 1971 and August 1972 expressly discussing PCBs in paper,

12

including in carbonless duplicating paper. Senatori Dec., Ex. 4 [Newspaper articles]. Moreover, Neenah Menasha Sewerage Commission's discharges of PCBs were directly discussed in various publicly available governmental documents. Senatori Dec., Ex. 5, at p. API-GF1071236 [WDNR report entitled "The PCB Problem in Wisconsin]; Ex. 6 at pp. API-GF107041-42, API-GF107053, API-GF107059, API-GF107062 [WDNR report prepared for the US EPA entitled "Investigation of Chlorinated and Nonchlorinated Compounds in the Lower Fox River Watershed"]. These publicly available documents create a genuine dispute of material fact regarding what Neenah Menasha Sewerage Commission should have known regarding PCBs.

Finally, Plaintiffs have requested, but have not yet been provided by Neenah-Menasha Sewerage Commission, several boxes of documents that may contain documents refuting this proposed finding of fact. Fed. R. Civ. P. 56(f).

**Proposed Finding No. 21:** The City of Appleton did not discover PCBs in its influent or effluent or that Plaintiffs NCR Paper contained PCBs until after the Production Period.

**RESPONSE NO. 21:** Disputed in part. As set forth above, the term "Plaintiffs NCR Paper" is incorrect. Plaintiff API did not exist during the Production Period. *See* Response to Proposed Finding No. 6 above. Moreover, regardless of what City of Appleton may have discovered in its influent or effluent, there was sufficient public information available to show that the City of Appleton should have known about the presence of PCBs in CCP. *See* Response to Proposed Finding No. 20 above; Senatori Dec., Ex. 6 at pp. API-GF107044-45, API-GF107053, API-GF107059, API-GF107062 [WDNR report entitled "Investigation of Chlorinated and Nonchlorinated Compounds in the Lower Fox River Watershed"].

13

**Proposed Finding No. 22:** U.S. Paper was and is today, a small paper company that made paper for the cores of toilet and paper towel rolls. U.S. Paper did not produce paper used in food packaging.

**RESPONSE NO. 22:** Disputed in part. U.S. Paper indeed produced paper used in food packaging, specifically, rounds for cans that were sold to American Can Company. Senatori Dec., Ex. 7, at pp. 44-45, 118 [Deposition of Richard Keyser].

**Proposed Finding No. 23:** There is no evidence in the record that Plaintiffs ever informed U.S. Paper that the NCR Paper, broke, and trim made by Plaintiffs contained PCBs.

**RESPONSE NO. 23:** Disputed in part. As stated above, ACPC, not NCR or API, made CCP broke or trim. *See* Response to Proposed Finding No. 6 above. Rather, ACPC made CCP broke and trim. *Id.*

**Proposed Finding No. 24:** There is no evidence in the record that U.S. Paper ever knew that Plaintiffs' NCR Paper contained PCBs until the 1990s.

**RESPONSE NO. 24:** Disputed. *See* Response to Proposed Finding No. 13 above.

**Proposed Finding No. 25:** In 1973 the Wisconsin DNR began requiring all paper recyclers to test their waste water.

**RESPONSE NO. 25:** Undisputed that in 1973 WDNR began requiring paper recyclers to test their wastewater discharges for PCBs pursuant to NR 101.

**Proposed Finding No. 26:** U.S. Paper did not have a laboratory or other facility to test NCR Paper or its effluent so U.S. Paper retained Foth and Van Dyke and Associates to conduct the testing required by the DNR.

**RESPONSE NO. 26:** Disputed in part. It is undisputed that U.S. Paper did not have a laboratory or other facility to test CCP or its effluent. It is also undisputed that U.S. Paper would sometimes conduct blender testing. However, Jim Patterson of U.S. Paper testified that this testing was solely to test for wet strength paper—not required testing by the DNR. Senatori Decl, Ex. 8, at pp. 60-63 [Deposition of Jim Patterson].

14

**Proposed Finding No. 27:** U.S. Paper never had a positive test for PCBs.

**RESPONSE NO. 27:** Disputed. U.S. Paper has indeed had a "positive test for PCBs." For example, U.S. Paper's President and CEO, Thomas Olson, testified in deposition that he was aware that a hot spot of PCBs had been detected in the Fox River adjacent to U.S. Paper's De Pere mill. Senatori Dec., Ex. 11, at pp. 114-15 [Deposition of Thomas L. Olson]. U.S. Paper's own Supplemental Response to information requests of the United States Department of the Interior, Fish and Wildlife Service also confirms U.S. Paper's awareness of positive test results in the hot spot. Senatori Dec., Ex. 10, at p. 2 [U.S. Paper's Supplemental Response]. This same Supplemental Response also confirms U.S. Paper's awareness of a "more recent finding of PCBs in the De Pere plant ash and wastewater lagoon" "as a result of soil testing first undertaken in mid-2006." *Id.* Further, it is undisputed that U.S. Paper, in fact, recycled CCP broke. Senatori Dec., Ex. 11, at p. 57 [Deposition of Tom Van Deurzen confirming that CCP broke came into U.S. Paper by the "truck load."]. Thus, the proposition that U.S. Paper "never" had a "positive test result" is genuinely disputed.

Moreover, regardless of what tests showed, Plaintiffs' expert, Marcia Williams, has opined that U.S. Paper should have known no later than 1971 that PCBs could be present in its wastewater discharges. Roach Dec., Ex. 17, at p. 113 [Williams Report]. Ms. Williams expert report is replete with detailed evidence that U.S. Paper should have known of the presence of PCBs in CCP no later than 1971, but that it failed to act in a reasonable or prudent fashion, including failing to report PCB discharges to the WDNR despite an annual reporting requirement. *Id.*, at p. 117 [Williams Report]; *see also* pp. 112-118. Finally, Ms. Williams opined that U.S. Paper's failure to conduct adequate

15

testing of its effluent "could have contributed to additional PCB harm to the LFR." *Id.*, at pp. 114-15 [Williams Report].

**Proposed Finding No. 28:** In an October 24, 1975 memorandum, Lowell Schleicher, who was the head of NCR's Research Department, stated that "the recycling companies are the innocent victims of circumstance created by carbonless manufactures which are still a part of the paper industry."

**RESPONSE NO. 28:** Disputed in part. It is undisputed that Lowell Schleicher stated in an October 24, 1975 memorandum (NCR-Fox-0536795) his belief that the claim made by the recycling companies in a brief prepared by the Wisconsin Paper Council that they were innocent victims was "correct," but he listed that claim by the recycling companies as one of his criticisms of the brief. However, Mr. Schleicher then states that, while "it is undeniable that we did use PCB there was no evidence at that time that their use would create a future pollution problem. I think they should have stated these facts in the Brief and also should have pointed out that these same manufacturers replaced the PCB's when there was only limited information, and they did it voluntarily." *Id.*

**Proposed Finding No. 29:** Plaintiffs' patents indicate that solvents other than PCBs could have been used in the production of NCR Paper. (Bogart Decl. ¶ 12 & Attach. 12, U.S. Patent No.

**RESPONSE NO. 29:** The record evidence cited by Defendants fails to support this factual proposition.

**Proposed Finding No. 30:** Production of NCR paper rose from 54,000 reams in 1954, to 3,857,000 reams in 1971, and increased yet another 19% in 1972 after the switch from PCB to MIPB.

**RESPONSE NO. 30:** Disputed in part. The record evidence cited by Defendants fails to support the factual proposition that there were 54,000 reams of CCP produced in 1954. Rather, the document Defendants cite for this proposition (NCR-Fox-0549138) states that there were 94,000 reams of CCP produced in 1954.

16

**Proposed Finding No. 31:** During the Production Period Plaintiffs kept their recipe used to make the PCB containing emulsion, including its contents, a closely guarded secret.

**RESPONSE NO. 31:** Disputed in part. Plaintiff, API, had no connection to CCP prior to its purchase of the assets of NCR's Appleton Papers Division on June 30, 1978. *See* Response to Proposed Finding of Fact No. 6 above. It is undisputed that during the Production Period, NCR kept its <u>recipe</u> to make the PCB containing emulsion a closely guarded secret. However, the record evidence cited fails to support the proposition that NCR kept the <u>contents</u> of its emulsion a closely guarded secret. NCR had disclosed the use of PCB in CCP in numerous patents. Roach Decl., Ex. 90 [U.S. Patent #2,712,507 (NCR-FOX-0322717)]. In addition, in response to a 1957 inquiry NCR responded fully by disclosing the presence of ***all*** constituents of CCP and providing information on the toxicity tests that had been performed on Aroclor 1242. Roach Decl., Ex. 88 [Feb. 27, 1957 NCR Memorandum (APIFOX00023870)], Ex. 89 [March 12, 1957 Letter from NCR to New York State Department of Labor (APIFOX00013515)]. Further, in 1970 NCR freely disclosed the contents of CCP to the British government. Roach Decl., Ex. 46 [[February 19, 1970 Monsanto Memorandum (Ex. 951 to H. Vodden Dep.) stating that NCR and Wiggins Teape "agreed that [Monsanto] should identify the N.C.R. paper application for Aroclor at [Monsanto's] next meeting with the Ministry of Agriculture as a constructive and positive step."].

**Proposed Finding No. 32:** Throughout the 1970s the Wisconsin and Federal Governments continued to encourage the recycling of paper despite the fact it could contain trace amounts of PCBs. On or about December 18, 1972, the Government publicly stated that prohibiting all PCB-containing paper in food-packaging material regardless of level of PCB contamination "would also have an adverse impact on recycling programs that would outweigh the beneficial effects, if any, that could be gained by a complete prohibition on the use of salvaged or reclaimed paper that contains low levels of PCBs." As late as May 31, 1979, in prohibiting the manufacture, processing, and distribution of PCBs, the EPA ruled:

> [E]xisting PCB carbonless copy paper may be used indefinitely. . . .There does not appear to be a way to distinguish PCB carbonless copy paper from non-PCB carbonless copy paper except perhaps by dates or other indications on unused inventories. A large portion of the PCB carbonless copy paper that has not been destroyed is probably in files. An enormous undertaking would be required of both business and government to purge existing files of PCB carbonless copy paper. Moreover, the amount of PCB on each sheet of carbonless copy paper is extremely small. In view of these practical considerations and because the potential PCB exposure and risks to human health or the environment are negligible, EPA has concluded that this activity does not present an unreasonable risk and is authorizing the continued use of existing PCB carbonless copy paper.

In 1975, the Wisconsin legislature specifically excepted "wastepaper, pulp or other paper products or materials . . . to be purchased for use within this state in the manufacture of recycled products" from its total ban on the manufacturing or purchase of PCB containing products.

**RESPONSE NO. 32:** Disputed as to form and content. This proposed finding of fact violates Eastern District Local Rule 56.2 in that it wholly fails to limit the proposed finding "as far as practicable to a single factual proposition." Moreover, the record evidence cited fails to support the factual proposition asserted that "Throughout the 1970s the Wisconsin and Federal Governments continued to encourage the recycling of paper despite the fact that it could contain trace amounts of PCBs." It is disputed that recycled paper contained only "trace amounts of PCBs." As one example, testing conducted by Fort Howard Corporation in 1985 showed that a sample of a certain grade of recovered paper (File Stock) tested in that year had a PCB concentration of 52,474 parts per billion. Roach Dec., Ex. 112, [Exhibit 696-S to the Deposition of Donald Schneider].

18

Dated this 30th day of September, 2009.

Respectfully submitted,

| | |
|---|---|
| APPLETON PAPERS INC. | NCR CORPORATION |
| /s/ Megan A. Senatori | /s/ Kathleen L. Roach |
| Counsel for Appleton Papers Inc.: | Counsel for NCR Corporation: |
| DEWITT ROSS & STEVENS S.C. | Kathleen L. Roach |
| 2 E. Mifflin Street, Suite 600 | SIDLEY AUSTIN LLP |
| Madison, Wisconsin 53703 | One South Dearborn Street |
| (608) 255-8891 | Chicago, Illinois 60603 |
| Fax: (608) 252-9243 | (312) 853-7000 |
| | Fax: (312) 853-7036 |
| Michael L. Hermes | |
| HERMES LAW LTD. | |
| 333 Main Street, Suite 601 | J. Ric Gass |
| Green Bay, Wisconsin 54301 | GASS WEBER MULLINS LLC |
| (920) 436-9870 | 309 North Water Street |
| Fax: (920) 436-9871 | Milwaukee, Wisconsin 53202 |
| | (414) 224-7697 |
| | Fax: (414) 224-6116 |
| **COUNSEL FOR APPLETON PAPERS INC.** | **COUNSEL FOR NCR CORPORATION** |