IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN, GREEN BAY DIVISION

APPLETON PAPERS INC. and
NCR CORPORATION,

Plaintiffs,

v.

GEORGE A. WHITING PAPER
COMPANY, et al.,

Defendant.

Case No. 08-CV-16-WCG

NCR CORPORATION,

Plaintiff,

v.

KIMBERLY-CLARK
CORPORATION, et al.,

Defendant.

Case No. 08-CV-0895-WCG

## CERTAIN DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT IN OPPOSITION TO CERTAIN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants U.S. Paper Mills Corporation ("U.S. Paper"), CBC Coating, Inc. ("CBC"), Menasha Corporation, the City of Appleton and the Neenah Menasha Sewerage Commission submit the following responses to Plaintiffs' Proposed Findings of Fact in Opposition to Certain Defendants' Motion for Summary Judgment (Doc. 656). Pursuant to Civil Local Rule 56.2, each statement is supported by appropriate citation to the Record.

1.      The National Cash Register Company ("NCR") invented NCR brand carbonless copy paper ("CCP") in 1953. Declaration of Dennis P. Birke in Opposition to Certain Defendants' Motion For Summary Judgment that Plaintiffs Are Not Entitled To Contribution ("Birke Decl."), Ex. 49 at 45:11-15, 120:24-25, 121:1-2, 225:22-25 [Deposition of Michael Stevens F. Stevens, Ph.D. ("Stevens Dep.")]; Ex. 1 at 4 [Plaintiff

NCR Corporation's Responses to Defendant P.H. Glatfelter Company's First Set of Interrogatories, dated December 19, 2008 ("NCR Responses/Glatfelter Interrogatories")].

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Plaintiff NCR Corporation's December 19, 2008 Responses to Defendant P.H. Glatfelter Company's First Set of Interrogatories No. 1 states "NCR states that it used an emulsion containing Aroclor 1242 in the manufacture of NCR Paper brand carbonless copy paper beginning in 1953/54 and ending in April 1971." The evidentiary material does not state when carbonless paper was invented.

2. In its simplest form, CCP involves two sheets of paper, a top sheet with coating on the back (called the "coated back" or "CB" sheet) and a bottom sheet with coating on the front (called the "coated front" or "CF" sheet). *Id.*, Ex. 2 at 17:9 through 18:12 [Deposition of Jerome Bodmer ("Bodmer Dep.")]; Ex. 3 at 20:8-24 [Deposition of Dale Schumaker ("Schumaker Dep.")].

**RESPONSE:**

Undisputed and immaterial.

3. The backside of the top (coated back) sheet was coated with an emulsion consisting of microscopic gelatin capsules containing dye dissolved in a solvent. *Id.*, Ex. 2 at 20:18 through 21:22 [Bodmer Dep.]; Ex. 4 at 34:10-24 [Deposition of Ronald Jezerc, Volume 1 ("Jezerc Dep.")]; Ex. 50 at 24:13 through 25:13, 42:13 through 43:10 [Deposition of Bruce Brockett ("Brockett Dep.")]; Ex. 3 at 75:5 through 76:9 [Schumaker Dep.].

2

**RESPONSE:**

Undisputed and immaterial.

4.      Pressure applied to the face of the coated back sheet (such as by pen or typewriter key) would rupture the microcapsules, releasing the dye, which would react with a special clay coating on the coated front sheet to form an image identical to the image on the coated back sheet.  Expert Report of William Moore, dated June 5, 2009 ("Moore Report") at 8; Expert Report of Harri Kytomaa, Ph.D., P.E., dated August 7, 2009 ("Kytomaa Report") at 3.  The Moore Report and the Kytomaa Report are Exhibits 14 and 15, respectively, to the Declaration of Kathleen Roach ("Roach Decl."), filed September 30, 2009.

**RESPONSE:**

Undisputed and immaterial.

5.      The original solvent in the microcapsules was a formulation of particular type of polychlorinated biphenyl ("PCB") sold by Monsanto as Aroclor 1242.  *Id.*, Ex. 51 at 36:3 through 37:3 [Deposition of Alan Kresch, Ph.D. ("Kresch Dep.)]; Ex. 4 at 56:15 through 16:2, 75:22 through 76:2 [Jezerc Dep.].

**RESPONSE:**

Undisputed.

6.      Monsanto manufactured a number of different PCB formulations [*Id.*, Ex. 10 (MONSFOX00002456-57], but Aroclor 1242 was the only one ever used in making CCP.  *Id.*, Ex. 12 (NCR-FOX0162136-37]

3

**RESPONSE:**

Undisputed and immaterial. However, see response to PPFF 13 infra to the effect that Aroclor 1242 is a mixture, including other Aroclors.

7. Commercial production and sale of CCP began in 1954. *Id.*, Ex. 1 at 4 [NCR Response/Glatfelter Interrogatories]; Ex. 49 at 120:24-25 [Stevens Dep.].

**RESPONSE:**

Undisputed and immaterial.

8. NCR manufactured the emulsion used in CCP at a NCR-owned facilities in Dayton, Ohio and, starting in 1968, in Portage, Wisconsin. *Id.*, Ex. 52 at 4-5 [Plaintiff NCR Corporation's Responses to Defendant Georgia-Pacific Consumer Products LP's (f/k/a Fort James Operating Company), Fort James Corporation's and Georgia-Pacific LLC's First Set of Interrogatories, dated January 27, 2009 ("NCR Responses/GP Interrogatories)]; Ex. 6 at 40:14-22 [Deposition of William Goetz ("Goetz Dep.")].

**RESPONSE:**

Undisputed and immaterial.

9. NCR sold the emulsion to certain companies, such as Appleton Coated Paper Company ("ACPC"), a specialty paper coater based in Appleton, Wisconsin. *Id.*, Ex. 52 at 5-6 [NCR Responses/GP Interrogatories]; Ex. 7 at 116:16 through 117:14 [Deposition of Floyd Strelow ("Strelow Dep.")]; Ex. 5 at 123:19 through 124:14 [Jezerc Dep.]; Ex. 6 at 38:9-24 [Goetz Dep.].

**RESPONSE:**

Undisputed and immaterial.

4

10.     ACPC applied the emulsion and other coatings to paper it purchased. ACPC sold the coated paper back to NCR. *Id.*, Ex. 6 at 38:9-24, 77:3 through 78:22 [Goetz Dep.].

**RESPONSE:**

Undisputed and immaterial.

11.     NCR marketed and sold the finished CCP to its customers. *Id.* at 78:1-22.

**RESPONSE:**

Undisputed and immaterial.

12.     ACPC first learned of concerns about some PCBs in mid-1969. Declaration of Ronald Jezerc, dated September 30, 2009 ("Jezerc Decl."), ¶ 2 (filed herewith).

**RESPONSE:**

Disputed and immaterial. PPFF 12 is vague and overbroad, particularly with respect to the word "concerns." For example, in his deposition testimony, at page 57, Ronald Jezerc specifically testifies as follows:

Q:     When you started working at Appleton in 1964, when you first came to Appleton, did you know that the NCR emulsion with which you were working contained PCBs?

A:     Somewhere in there I must have found out, but ---

Q:     Right. I'm trying to determine when, in fact, you figured that out, if you recall.

A:     Maybe when I read the patent.

Q:     Okay. Do you recall reading the patent?

5

A:    I don't know.

Q:    Okay.

A:    I really don't know.  I --

Q:    That's fine.  That's fine.  So at some point it sounds like you did have an understanding that the NCR emulsion contained PCBs; is that correct?

A:    Yes.

Q:    Okay.  But you can't remember if it was in 1964, 1965, 1966, but sometime between 1964 and 1971, you learned that information; is that right?

A:    '69 I would -- I had to have known before that time.

Ronald R. Ragatz August 28, 2009 Decl. ("Ragatz Decl.") (Doc. # 579) Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpt] at 57.

Mr. Jezerc continues on to testify on page 74, regarding the determination to eliminate the use of PCBs in NCR emulsion:

Q:    -- okay?  All right.  Do you recall when it was determined that PCBs should be phased out of the emulsion?

A:    Well, I've done a lot of thinking about this, and I'm not sure how I answered this type of question the first time around, but sometime in '69, people became concerned that articles were being written about the power industry and their leaky transformers, which contained PC- - - Aroclor as the coolant.  So the supplier, rightfully so, decided sometime in '69 that Aroclor was going to be discontinued as a sales item and they were no longer going to manufacture it.

Ragatz Decl. (Doc. # 579) Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpt] at 74.

6

Further, Mr. Jezerc previously testified that he became aware in the late 1960s of various publications describing the environmental aspects and the persistence of PCBs. Andrea M. Hogan September 30, 2009 Declaration ("AMH Decl.") (Doc. # 667) Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpt] at 60. Mr. Jezerc also testified that the concerns raised in these articles related to the bioaccumulation and biopersistence of PCBs in the environment and in animals. *Id*. at 60-61. An additional concern, according to Mr. Jezerc, was whether PCBs impacted the food chain. *Id*. at 60-61. Mr. Jezerc also recalled a meeting with his supervisor, Tom Busch, in 1969 to discuss replacing Aroclor due to several environmental studies that he read which discussed the harmful environmental effects of PCBs. AMH Decl. (Doc. # 667) Ex. 21 [2006 Jezerc Depo.] at 51-52; Ex. 4 [April 20, 2009 Jezerc Depo.] at 74, 77, 171-172; Ex. 24 [Sept. 30, 1970 ACPC Quarterly Report] (stating that the change in the NCR emulsion from PCBs (Aroclor) to MIPB was made "to satisfy environmental preservation regulations.")

The ACPC Plant Manger at the time, Lawrence Casey, also testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." AMH Decl. (Doc. # 667) Ex. 11 [Nov. 10, 2006 L. Casey Depo. Excerpt] at 39-41. Similarly, ACPC Assistant Solvent Manager Dale Schumaker learned of PCB concerns from ACPC Vice President Tom Busch, and Schumaker discussed the decision to change the Aroclor emulsion with Busch. AMH Decl. (Doc. # 667) Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269.

To summarize Messrs. Jezerc, Casey and Schumaker's testimony, ACPC knew *specifically* of environmental and health concerns about PCBs used in the NCR emulsion

and the production of CCP by 1969, at the latest. ACPC knew of the scientific studies

regarding the persistence of PCBs in the environment by the late 1960s. Thus, Plaintiffs'

statement that "ACPC first learned of concerns about some PCBs in mid 1969," is vague

and overbroad.

13.     ACPC did not believe that the concerns raised about PCBs applied to

Aroclor 1242. Jezerc Decl., ¶ 2.

**RESPONSE:**

Disputed and immaterial. Aroclor 1242, like all other Aroclors, was a mixture of

different chlorine compounds, such that it overlapped with Aroclors with higher chlorine

percentages, such as Aroclor 1248 and 1254. AMH Decl. (Doc. # 667) Ex. 14 [Aroclor

Chart]; Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts] at 14-16 ("Aroclor 1242 was

homed in on a trichlor or three-chlorine homologue, but in point of fact, it did contain all

the homologues up to and including the hexachlor and the six chlorine ones. Now,

altogether, in any of the Aroclors there were about 200 different components of different

chlorine levels, including not only the level of chlorine, but also the different

arrangement of the chlorine atoms around the molecule.")

8

AMH Decl. (Doc. # 667) Ex. 14 Aroclor Chart:



Further, ACPC's Plant Manger Lawrence Casey, testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." AMH Decl. (Doc. # 667) Ex. 11 [Apr. 20, 2009 L. Casey Depo. Excerpt] at 39-41. Mr. Busch stated that his "research people" discovered the issue with PCBs. *Id.* Additionally, Michael Stevens, a former ACPC chemist, testified at page 43 of the following:

Q:     What was your understanding as to why National Cash Register wanted to replace or get rid of Aroclor?

A:     I asked Lee Yurkowitz that question. I said, you've been telling me that Aroclor is the finest carbonless paper solvent ever used. Why are you trying something else? Particularly since it wasn't quite as good a solvent, as it turned out, as Aroclor was.

And he said it was his understanding that the basic research group, one of their duties was to cull the university literature on arcane subjects that might have some impact

9

on our business, and there was a term used in some of those relative to Aroclor. The term was "biopersistent." And I said, what does that mean? And he said, it means it sticks around in the environment. . . .

AMH Decl. (Doc. # 667) Ex. 23 [Mar. 13, 2009 M. Stevens Depo. Excerpts] at 43.

14. In 1970, ACPC learned that NCR had decided to replace Aroclor 1242 as a solvent in the CCP emulsion. Jezerc Decl., ¶ 3.

**RESPONSE:**

Undisputed and immaterial.

15. ACPC understood that the reasons for NCR's decision to replace Aroclor 1242 included concerns about whether Monsanto would continue to make Aroclor 1242 and negative publicity about PCBs in general. Jezerc Decl., ¶ 3.

**RESPONSE:**

Disputed and immaterial. The September 30, 2009 Declaration of Ronald Jezerc is inadmissible evidence. It is "well-settled" that a party "cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition" in order to "defeat a defendant's motion for summary judgment." *See Ferguson v. Medical College of Wisconsin*, 471 F. Supp. 2d 901 (E.D. Wis. 2007) (citing *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994); *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 379 (7th Cir. 1995); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995). Here, Plaintiffs submit as evidence as declaration of Ronald Jezerc who was deposed in this litigation on April 20, 2009.

While not relevant to this proposed finding of fact, the Declaration of Ronald Jezerc conflicts with his earlier deposition testimony. For example, Mr. Jezerc testified that:

Q:      Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB. From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs?

(Objection omitted)

A:      I don't have any idea whether there were other reasons.

Q:      Okay. But environmental concerns was the reason that you understood at the time they were being phased out; is that correct?

(Objection omitted)

A:      Yes.

AMH Decl. (Doc. # 667) Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 171-72.

 In contrast, the September 30, 2009 declaration of Ronald Jezerc states "[t]hrough the time that the changeover was completed, I continued to believe that Aroclor 1242 posed no environmental danger." This manufactured conflict created by the September 30, 2009 declaration of Ronald Jezerc cannot create a material issue of fact to defeat a motion for summary judgment. *See Ferguson v. Medical College of Wisconsin*, 471 F. Supp. 2d 901 (E.D. Wis. 2007)

In any event, it is undisputed that by 1969, NCR and Monsanto were concerned about potential toxic and environmental threat posed by Aroclor, and Monsato told NCR that it would cease all Aroclor sales. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

16.     NCR worked with Monsanto to find potential replacement solvents. Birke Decl. Ex. 53 at 137:5-11, 138:16 through 142:6 [Deposition of Cumming Paton, Ph.D. ("Paton Dep.")]; Jezerc Decl. ¶ 4.

**RESPONSE:**

Undisputed and immaterial.

17.     ACPC did trial runs using emulsion with the replacement solvent in order to determine whether the new emulsion could be effectively applied to the paper in a way that would produce acceptable performance by the finished carbonless paper.  Birke Decl. Ex. 4 at 74:10 through 75:21 [Jezerc Dep.].

**RESPONSE:**

Undisputed and immaterial.

18.     A workable replacement solvent was identified and the changeover to a solvent that contained no PCBs was begun in 1970 and completed in the first half of 1971.  Jezerc Decl. ¶ 5.

**RESPONSE:**

Disputed in part; undisputed in part and immaterial.  It is undisputed that PCBs were no longer used in the production of CCP beginning in the first half of 1971. However, Wiggins Teape ("WT") stopped using PCBs in CCP in the UK a year earlier, in July 1970.  AMH Decl. (Doc. # 667) Ex. 1 [Report on Apr.  28, 1970 Conversation with WT] (WT stating that the UK Ministry of Technology approved the step taken by WT to decide to make the switch from Aroclor to an alternative solvent); Ex. 2 [Monsanto Performance Review 1970 Objectives (stating that Aroclor 1242 had been replaced in NCR paper coating in the UK by July 1970).

19.    Through the time that the changeover was completed, ACPC continued to believe that Aroclor 1242 posed no environmental danger.  *Id.* ¶ 6.

**RESPONSE:**

Disputed and immaterial.  The Declaration of Ronald Jezerc conflicts with his earlier deposition testimony.  For example, Mr. Jezerc testified that:

Q:    Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB.  From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs?

(Objection omitted)

A:    I don't have any idea whether there were other reasons.

Q:    Okay. But environmental concerns was the reason that you understood at the time they were being phased out; is that correct?

(Objection omitted)

A:    Yes.

AMH Decl. (Doc. # 667) Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 171-72.

In contrast, the September 30, 2009 declaration of Ronald Jezerc states "[t]hrough the time that the changeover was completed, I continued to believe that Aroclor 1242 posed no environmental danger."  This manufactured conflict created by the September 30, 2009 declaration of Ronald Jezerc cannot create a material issue of fact to defeat a motion for summary judgment.  *See Ferguson v. Medical College of Wisconsin*, 471 F. Supp. 2d 901 (E.D. Wis. 2007)

In any event, it is undisputed that by 1969, ACPC, NCR and Monsanto were concerned about potential toxic and environmental threat posed by Aroclor, and Monsato

told NCR that it would cease all Aroclor sales.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

20.     During the period that Aroclor 1242 was used in the NCR emulsion, ACPC did not know that Aroclor 1242 was being released to the Lower Fox River or any other water body as a result of the recycling of carbonless paper.  *Id.* ¶ 7; Birke Decl. Ex. 5 at 195:24 through 196:25, 197:1-4 [Jezerc Dep.]; *Id.*, Ex. 9 at 63:25 through 65:5 [Deposition of Donald Christensen ("Christensen Dep.")]; *Id.*, Ex. 7 at 99:17 through 100:4 [Strelow Dep.].

**RESPONSE:**

Disputed and immaterial.  ACPC was aware that recycling NCR-brand carbonless paper would result in the discharge of PCBs to any water body.

*First*, ACPC's knowledge must be placed in the context of its longstanding technical collaboration between ACPC and NCR, evidenced by the many meetings, visits to facilities and letters exchanged between 1953 and 1971.  *See* Jayni E. Foley September 30, 2009 Declaration ("JEF Decl.") (Doc. # 678), Ex. 1, listing all communications and meetings between NCR, ACPC, WT and other licensees, for which evidence has been produced, during the time frame between 1953 through 1971 [Chart:  Communications Among ACPC, WT, And NCR].  Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP.  *See generally* JEF Decl. (Doc. # 678), Ex. 1 [Chart:  Communications Among ACPC, WT, And NCR]; AMH Decl. (Doc. # 667) Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212; JEF Decl. (Doc. # 678) Ex. 178 [May 10, 1968 Letter from T. Busch, ACPC to H.V. Lauer, NCR]; AMH Decl. (Doc. # 667) Ex. 12 [Jan. 28, 2009 F. Heinritz Depo. Excerpts] at 45-49, 118-119;

Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79. Over the next two decades, NCR, ACPC, and WT held more than sixty-five (65) in-person technical meetings, on a wide range of topics related to CCP, including NCR broke, recycling, and Aroclor content. See JEF Decl. (Doc. # 678) Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; Ex. 12 [January 7, 1958 NCR Letter] (stating that NCR has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company," and that ACPC and Mead "sell it to other paper making firms who re-use it").

During this long technical collaboration, WT conducted a new and intensive program to test Aroclor concentrations in the broke recycling process in order to determine how to best reuse NCR broke, based on WT's understanding that Aroclor made the NCR broke potentially "toxic." JEF Decl. (Doc. # 678) Ex. 52 [Nov. 5, 1964 Notes of meeting between BAT and WT regarding Aroclor] ("Aroclor, a chlorinated diphenyl, is toxic"); Ex. 70 [Apr. 1, 1965 Memo on WT visit to NCR] at 18-19; see also AMH Decl. (Doc. # 667) Ex. 62 [March 16, 1965 WT Letter re: Aroclor testing] [Gough Depo. Ex. 1010-I]. The results of WT's testing established that recycling CB and CFB broke (*i.e.*, PCB-containing broke) would result in the discharge of PCB-laden wastewater. JEF Decl. (Doc. # 678) Ex. 89 [Aug 4, 1965 letter from BAT to WT] [Gough Depo. Ex. 1010-P]; Ex. 111 [Nov. 25, 1965 BAT to WT letter] [Gough Depo. Ex. 1010-T].

*Second*, as early as 1958, ACPC knew recycling the broke from CCP caused the capsules to rupture, discharging their contents. A letter from WT to NCR in January 1958 states that WT has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated

Paper Company.  It is my understanding that neither mill reprocesses their own NCR Paper waste but that they sell it to other paper making firms who re-use it in fairly high grade papers."  JEF Decl. (Doc. # 678) Ex. 12 [January 7, 1958 NCR Memo & Attachments].  There is also correspondence from 1965 from WT to ACPC regarding repulping NCR broke.  JEF Decl. (Doc. # 678) Ex. 79 [May 19, 1965 ACPC Letter].

*Third*, by 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper.  During a visit by WT to ACPC, the two companies discussed the issue of the release of Aroclor due to capsule breakage in a certain application of CCP, "CB Cheque Papers."  JEF Decl. (Doc. # 678) Ex. 35 [WT Report on December 2-4, 1963 visit to ACPC] at 5-6 ("This capsule breakage leads to release of the oil (Arachlor)").

Additionally, Ronald Jezerc's deposition testimony at page 74 states:

Q:      --okay? All right. Do you recall when it was determined that PCBs should be phased out of the emulsion?

A:      Well, I've done a lot of thinking about this, and I'm not sure how I answered this type of question the first time around, but sometime in '69, people became concerned that articles were being written about the power industry and their leaky transformers, which contained PC - - -Aroclor as the coolant.  So the supplier, rightfully so, decided sometime in '69 that Aroclor was no longer going to be discontinued as a sales item and they were no longer going to manufacture it.

Ragatz Decl. (Doc. # 579) Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 74.

Further, ACPC gained information from NCR regarding the constituents of CCP:

- By working with NCR to test constituents of NCR emulsion.  JEF Decl. (Doc. # 678) Ex. 1 [Chart:  Communications Among ACPC, WT and NCR]; AMH Decl.

(Doc. # 667) Ex. 5 [July 24, 1967 ACPC Memo]; Ex. 6 [Sept. 28, 1967 ACPC Memo].

- By working directly with NCR in its development of patents for paper processes. AMH Decl. (Doc. # 667) Ex. 8 [Sept. 15, 1967 ACPC Memo]; Ex. 9 [Patent No. 3,311,499].

and,

- Based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR. AMH Decl. (Doc. # 667) Ex. 15 [Process Specification 2036.93]; Ex. 7 [May 19, 1967 ACPC Memo].

*Fourth*, ACPC knew that PCBs raised environmental concerns and caused environmental harm. Ronald Jezerc's deposition testimony at page 77-80, 171-72, and 282 states:

Q:     Okay. Do you remember the time frame that you first either heard or read about problems with PCBs?

A:     It had to be in mid-'69.

*         *         *

Q:     Okay. When you were apprised or learned of problems with PCBs, what did you understand the problem to be?

A:     That it sat around and didn't break up.

Q:     Okay. Would this be an issue relating to biodegradability.

A:     Yeah.

*         *         *

17

Q:      Okay.  And so it was only after it had been released into the environment that you understood a concern to be posed by PCBs at this time?

A:      I think that's what it was.

*      *      *

Q:      Okay.  We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB.  From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs?

(Objection omitted)

A:      I don't have any idea whether there were other reasons.

Q:      Okay.  But environmental concerns was the reason that you understood at the time they were being phased out; is that correct?

(Objection omitted)

A:      Yes.

*      *      *

Q:      Did he [Mr. Busch] agree with you that something had to be done about PCBs in '68/'69?

(Objection omitted)

A:      Yes.

AMH Decl. (Doc. # 667) Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 282.

Further, Mr. Jezerc previously testified that he became aware of various publications describing the environmental aspects of PCBs in the late 1960s and

18

discussing the persistence of PCBs. AMH Decl. (Doc. # 667) Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpt] at 60. Mr. Jezerc also testified that the concerns raised in these articles related to the bioaccumulation and biopersistence of PCBs in the environment and in animals. *Id*. at 60-61. An additional concern, according to Mr. Jezerc, was whether PCBs impacted the food chain. *Id*. at 60-61.

The ACPC Plant Manger at the time, Lawrence Casey, also testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." AMH Decl. (Doc. # 667) Ex. 11 [Apr. 20, 2009 L. Casey Depo. Excerpt] at 39-41. Similarly, ACPC Assistant Solvent Manager Dale Schumaker learned of PCB concerns from ACPC Vice President Tom Busch, and Schumaker discussed the decision to change the Aroclor emulsion with Busch. AMH Decl. (Doc. # 667) Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269.

*Fifth*, ACPC was aware of environmental concerns regarding discharge containing PCBs entering the River. Ronald Jezerc's deposition testimony at page 73 states:

Q: Okay. At the time of this letter, I guess it is 1968, or memo, was there a concern about having the wash-up water go to the river? You mentioned it didn't have to go to the river. Just money?

A: That was our main concern.

Q: Okay. So it wasn't – environmental concerns were not an issue here?

A: I don't think that they came in until '69. You want to talk about that? I thought that's what we were going to talk about today.

Ragatz Decl. (Doc. # 579) Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 73.

In sum, ACPC knew that recycling broke from CCP ruptures the capsules, it knew that CCP and broke contained PCBs, it knew that PCBs raised environmental concerns and caused environmental harm, and it was concerned about the discharge of PCBs entering the River.

Further, based on the extensive meetings and consultations regarding broke recycling that occurred among NCR, WT, ACPC and Mead during the period of 1957 through 1964, and based specifically on the analytic work and extensive technical consultations regarding broke recycling that occurred during 1965, as detailed in JEF Decl. (Doc. # 678) Ex. 1, ACPC in fact knew in 1965 at the latest that the recycling of broke would result in the release of PCBs into the environment.

AMH Decl. (Doc. # 667) Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 282.

21.     Defendant U.S. Paper Mills Corporation ("U.S. Paper") discharged wastewater from its DePere paper mill to the Lower Fox River during the time PCBs were used in CCP.  Birke Decl., Ex. 32.

**RESPONSE:**

Disputed and immaterial.  U.S. Paper completed its connection to the De Pere POTW in March 1971.  *See* Steven P. Bogart October 19, 2009 Declaration ("S. Bogart Decl.") ¶ 14 & Attach. 14 (USPFOX0000074-75, 80)

22.     Defendant Menasha Corporation ("Menasha") is successor to John Strange Paper Mills, which discharged wastewater to the Lower Fox River during the time PCBs were used in CCP.  *Id.*, Ex. 36.

20

**RESPONSE:**

Unsupported and not a fact. To the extent PPFF 22 sets forth that Menasha "is a successor to John Strange Mill," this is a conclusion of law and is not the proper subject of a Proposed Finding of Fact. Menasha acknowledges that its relationship to the Lower Fox River Site is as a result of its former ownership of JSPM, which it sold to U.S. Paper in 1983.

The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Exhibit 36, the August 10, 1971 letter from Marathon Engineering, Inc., to John Strange Paper Mill, does not anywhere reference the discharge of "wastewater to the Lower Fox River during the time PCBs were used in CCP," and as a result does not confirm that John Strange Mills "discharged wastewater to the Lower Fox River during the time PCBs were used in CCP.

23. Defendant CBC Coating, Inc. is successor to Riverside Paper corporation, which discharged wastewater to the river. *Id.*, Ex. 39 at 72:20 through 73:4 [Deposition of Randall Farnum ("Farnum Dep.")].

**RESPONSE:**

Undisputed and immaterial.

24. Defendant Neenah Menasha Sewerage District collected wastewater from the Neenah and Menasha area and discharged it to the Lower Fox River during the time PCBs were used in CCP. *Id.*, Ex. 34 at GPFOX00008654 [Report on an Investigation of the Pollution in the Lower Fox River and Green Bay Made During 1966 and 1967, dated January 4, 1968, GPFOX00008651-697].

**RESPONSE:**

Undisputed and immaterial.

25.     Defendant City of Appleton collected wastewater from the Appleton area that it discharged to the Lower Fox River during the time PCBs were used in CCP.  *Id.*, Ex. 15 at NCR-FOX-0230571.

**RESPONSE:**

Undisputed and immaterial.  The proposed finding of fact is objectionable insofar as it states that the City "collected wastewater from the Appleton area"  because the City had a sewer and wastewater treatment system beginning in about 1937 to which certain dischargers of wastewater in the Appleton area discharged their wastewater to be sent to the City's treatment plant prior to discharge to the Lower Fox River.  The City did not "collect" the wastewater except through its sewer system  and only certain dischargers  in the Appleton area sent their wastewater to the City's sewer and wastewater treatment facility.

The City of Appleton attempted to treat all of the wastewater it received through its primary system, starting in 1937, and primary and secondary treatment starting in 1964.  It did not simply discharge the wastes sent to it to the Lower Fox River.  S. Bogart Decl. ¶ 21 & Attach. 21 (COA-FOX-00013114).

26.     The wastewater discharges of each moving Defendant included PCBs.  *Id.*, Ex.54 at 6, 21, 22, 25, 28 [Expert Report of James Braithwaite, P.E., BCEE ("Braithwaite Report"), dated August 7, 2009.

**RESPONSE:**

Disputed and immaterial. Plaintiffs' statement is vague as to the time period

referenced. Further, the cited pages of Mr. Braithwaite's report do not support the

proposition asserted. In addition, it is undisputed that certain recycling mills, like U.S.

Paper, never had a positive test for PCBs in its effluent. *See* Certain Defendants

Proposed Statement of Facts in Support of Their Motion for Summary Judgment No. 27,

(Doc. # 554).

27.     Defendant Georgia Pacific Consumer Products is successor to Ford

Howard Paper Company, which discharged its wastewater to the Lower Fox River during

the time PCBs were used in CCP. *Id.*, Ex. 40 at GPFOX00008872 [Report on a

Wastewater Survey at Fort Howard Paper Company Green Bay, Wisconsin, October 10

through 12, 1966, Inclusive].

**RESPONSE:**

Undisputed and immaterial.

28.     Defendant P.H. Glatfelter Corp. is successor to Bergstrom Paper

Company, which discharged its wastewater to the Lower Fox River during the time

PCBs were used in CCP. *Id.*, Ex. 46 [Order of the Committee on Water Pollution and

State Board of Health, dated March 25, 1959.

**RESPONSE:**

Undisputed and immaterial.

29.     Those companies' wastewater discharges included PCBs. *Id.*, Ex. 54 at

10, 16, 18 and 19 [Braithwaite Report].

**RESPONSE:**

_Disputed and immaterial._ It is unclear who "those companies" are. Further there is no indication as to what time frame Plaintiffs are referring. For example, beginning from its first test in 1974, U.S. Paper never had a positive test for PCBs in its effluent. _See_ Certain Defendants Proposed Statement of Facts in Support of Their Motion for Summary Judgment Nos. 24-27, (Doc. # 554).

30. The recycling paper mill Defendants put CCP through a re-pulping and de-inking process which stripped the inks and coatings from the paper and Defendants then flushed these materials into their wastewater and into the Lower Fox River. Expert Report of Marcia W. Williams, dated June 4, 2009 ("Williams Report") at 61-63, Roach Decl., Ex. 17.

**RESPONSE:**

_Disputed and immaterial._ Plaintiffs' statement does not refer to a particular period of time. The recycling mills all connected to sewage treatment facilities at some point. Specifically U.S. Paper connected to the De Pere POTW in 1971. _See_ S. Bogart Decl. ¶ 14 & Attach. 14 (USPFOX0000074-75, 80). Further, not all recycling mills utilized a de-inking process. _See id._ at ¶ 7 & Attach. 7. (Apr. 23, 2009 B. Merline Depo. Excerpts) at 51:22-24.

31. When ACPC sold carbonless broke, the coating containing PCBs was intact on the paper. _Id._ at 61-62.

**RESPONSE:**

_Disputed and immaterial._ See deposition testimony of ACPC employee Donald Christensen:

14 Q:   If a roll was mishandled and it caused damage, you

15 know, rupturing the capsules and causing the ink to

16 release within the roll, what was done with that

17 roll?

18 A:   It would -- it would probably have been disposed

19 of.

20 Q:   How would you have disposed of that?

21 A:   Selling it as broke.

S. Bogart Decl. ¶ 6 & Attach. 6 (Mar. 29, 2009 D. Christensen Depo. Excerpts) at

24:14-21.

32.     In that form, it posed no threat to the environment.  *Id.* at 61-63.

**RESPONSE:**

<u>Disputed and immaterial</u>.  ACPC sold broke knowing it would be recycled.  *See*

Certain Defendants Proposed Statement of Facts in Support of Their Motion for

Summary Judgment No. 10, (Doc. 554).  Both NCR and ACPC knew that recycling CCP

broke could result in  PCB discharge to the Lower Fox River.  *See* Response to No. 20.

Further, this statement defies logic as the EPA has stated:

> PCBs have been conclusively demonstrated to produce lethal and
> sublethal toxic effects and low dose levels upon a wide range of fish,
> mammals, and other wildlife, and have also demonstrated adverse health
> effects to humans.  Moreover, they are highly mobile and persistent in the
> environment, and bioaccumulate greatly in tissue.

*See* Steven P. Bogart August 28, 2009 Declaration (Doc. # 555) ¶ 5 & Attach. 5, 41 Fed.

Reg. 30467, 30468 (July 23, 1976).

33.     The recycling paper mill Defendants put carbonless paper through a re-pulping and/or a variety of different de-inking process which stripped the inks and coatings from the paper and Defendants then flushed them into their wastewater and into the river.  *Id.*

**RESPONSE:**

Disputed and immaterial.  Plaintiffs' statement does not refer to a particular period of time.  The recycling mills all connected to sewage treatment facilities at some point. Specifically U.S. Paper connected to the De Pere POTW in 1971.  *See* S. Bogart Decl. ¶ 14 & Attach. 14 (USPFOX0000074-75, 80).  Further, not all recycling mills utilized a de-inking process.  *See id.* at ¶ 7 & Attach. 7. (Apr. 23, 2009 B. Merline Depo. Excerpts) at 51:22-24.

34.     A memorandum to T.W. Busch from L. Schleicher, dated October 24, 1975, contains the following statement:

> The Brief made a strong and correct plea that the recycling companies are the innocent victims of circumstance created by carbonless manufactures which are still a part of the paper industry.  Though it is undeniable that we did use PCB there was no evidence at that time that their use would create a future pollution problem.   I think they should have stated these facts in the Brief and also should have pointed out that these same manufactures replaced the PCB's when there was only very limited information, and they did it voluntarily.

Birke Decl.  Ex. 55 [Memorandum].

**RESPONSE:**

Undisputed.  The quote is an accurate reproduction of the document referenced.

35.    The Lower Fox River had major pollution problems that got progressively worse through the 1950s to early 1970s due to wastewater from municipal and industrial dischargers, including Defendants:

> All of this and industrialization contributed to major pollution problems. From the 1920s through the 1970s pollution reports recorded fish kills, periodic lack of oxygen in the water, and the increasing predominance of only those organisms able to tolerate highly polluted conditions. . . . [I]t was recognized that 9 municipal and 15 industrial discharges had a profound negative impact resulting in dramatic drops in dissolved oxygen levels that occurred regularly in the River and lower Bay in the early 1970s.

> More than anything else these low dissolved oxygen levels severely limited the number and diversity of aquatic organisms in the River and Bay restricting aquatic life to the few organisms adapted to live in heavily polluted water.  Other aquatic life was unable to survive and widespread fish kills resulted.

> From the 1930s to 1970s dissolved oxygen conditions grew worse and the biochemical oxygen demand discharged to the River steadily increased due to paper industry growth and to a lesser extent population growth.

*Id.*, Ex. 13 at 15 (GPFOX000891150 [Lower Green Bay Remedial Action Plan, February 1988, GPFOX00089079-410].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial.  The quote is an accurate reproduction of the document referenced.  Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

36.    Studies in the 1950s, 1960s and early 1970s found levels of oxygen "below that necessary for the survival of many species of fish."  Industrial pollution and municipal sewage treatment discharges were identified as "major contributors to the

area's water quality problems." *Id.*, Ex. 14 at 2 (APIFOX00037378) [Lower Green Bay Remedial Action Plan — First Annual Progress Report, September 7, 1989, APIFOX00037368-427].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

37.  In 1957, the Wisconsin Committee on Water Pollution and State Board of Health found that "polluting substances are being discharged to the Lower Fox River . . . creating conditions hazardous to public health and adversely affecting aquatic life." *Id.*, Ex. 15 at NCR-FOX-0230557 [Findings, Conclusions and Order, dated October 10, 1957, NCR-FOX-0230557-608 ("1957 Order")].

**RESPONSE:**

Undisputed and immaterial. The quote is an accurate reproduction of the document referenced. The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

38.  The findings included the following:

Testimony relative to sources of pollution shows that the Lower Fox River and tributaries receive the discharge of partially treated sewage from municipalities and partially treated industrial wastes from industries. Untreated wastes from municipalities and industries are discharged in certain instances.

*Id.* at NCR-FOX-0230561

In all, the municipal and other sewage treatment plants contribute 13.308 tons, and industrial wastes contribute 121.262 tons for a total of 134.57 tons of biochemical oxygen demand discharged to the Fox River and its tributaries.

From the testimony, it appears that a pollutional load of this magnitude is excessive, adversely affects aquatic life, and cannot be satisfactorily assimilated in the stretch of stream from Neenah-Menasha to Green Bay and that it further contributes to the polluted condition of Green Bay as evidenced by high biochemical oxygen demand, lowered dissolved oxygen, and absence of clean water biological organisms. It appears that a minimum overall reduction of 70-75% from raw waste load is needed to gain improved conditions in the receiving waters.

*Id.* at NCR-FOX-0230568.

**RESPONSE:**

     Undisputed and immaterial. The quote is an accurate reproduction of the

document referenced. The facts themselves are immaterial and irrelevant to Certain

Defendants' Motion for Summary Judgment.

     39.    A 1972 eyewitness account by two EPA officials paints a vivid picture of

the effects of the pollution:

On May 24, 1972 Louis J. Breimhurst and Walter L. Redmon of the EPA observed floating debris, dead fish, extensive growths of filamentous bacteria and sludge deposits, along with bubbles and the strong odor of hydrogen sulfide gas from decomposing organic deposits at the junction of the Fox River and Green Bay. The waters at this point had a turbid gray appearance from suspended organic materials. Pieces of the bottom's sludge mat were breaking loose and floating to the surface due to gas production within these deposits.

*Id.*, Ex. 16 at 17-18 (NCR-FOX-0155544-45) [Report for Informal Hearing on Alleged

Violations of Federal-State Water Quality Standards for Green Bay, United States

Environmental Protection Agency, November 28, 1972, NCR-FOX- 0155527-664 ("1972

EPA Report")].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

40. A follow-up EPA inspection on June 2, 1972, reported similar observations of the river and the following in Green Bay itself:

> At its mouth, the Fox River was a cloudy gray color. Large numbers of fine white fibers and gas bubbles from decomposition of sediments were visible. A few dead fish (carp, suckers, and alewives) were present. . . . At a point about 300 yards offshore and 2.5 miles east of the mouth of the Fox River conditions did not appear much improved from those found at the river mouth. Large mats of floating filamentous algae and scum, as well as larger numbers of dead fish, many gas bubbles, and a few clumps of floating sludge were observed in that area.

*Id.* at 18-19 (NCR-FOX-0155545-46).

**RESPONSE:**

Undisputed and immaterial. The quote is an accurate reproduction of the document referenced. The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

41. The inspection concluded that discharges of suspended solids by entities that are Defendants in this action materially contributed to these conditions. *Id.* at 19 (NCR-FOX-0155546).

**RESPONSE:**

Disputed and immaterial. The phrase "these conditions" is vague. Further, Plaintiffs mischaracterize the document which speaks for itself. Most of the moving

parties are not named in the document. In addition, the facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

42. Defendants were keenly aware of the pollution problem. The Institute of Paper Chemistry (based in Appleton, Wisconsin) prepared a series of reports on the effects of pollution in the Lower Fox River and distributed the reports to a group that included a number of Defendants in this case. For instance, such reports were done in:

- 1956 (*Id.*, Ex. 17 (NCR-FOX-0532525-601)),
- 1958 (*Id.*, Ex. 18 (NCR-FOX-0532731-835)),
- 1960 (*Id.*, Ex. 19 (NCR-FOX-0171314-442))
- 1962 (*Id.*, Ex. 20 (NCR-FOX-0171443-594)),
- 1965 (*Id.*, Ex. 21 (NCR-FOX-0171595-750)), and
- 1968 (*Id.*, Ex. 22 (NCR-FOX-0171751-880)).

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The reports listed were completed on or around the dates stated. Plaintiffs' characterization of the reports is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

43. Those reports documented the polluted condition of the river and tracked its deterioration. *See, e.g.*, *Id.*, Ex. 19 at 121-124; Ex. 21 at 149-151; Ex. 22 at 119-125.

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The reports dealt with pollution concerns regarding total suspended solids, and not PCBs. *See, e.g.*, *Id.*, Ex. 19 at 121-124; Ex. 21 at 149-151; Ex. 22 at 119-125. Plaintiffs' characterization of the reports is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts

31

themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

44.     A 1973 EPA report recognized that:  "Gross water pollution has existed in the Lower Fox River and Green Bay, Wisconsin for a number of years."  *Id.*, Ex. 23 at 1 (GPFOX00002043) [Water Quality Model of the Lower Fox River, Wisconsin, United States Environmental Protection Agency, August 1973, GPFOX00002035-2104].

**RESPONSE:**

Undisputed and immaterial.  The quote is an accurate reproduction of the document referenced.  The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

45.     The low dissolved oxygen levels were created by the continuous discharge of organic waste material from municipal and industrial sources for many years.  *Id.* at 16 (GPFOX00002058).  When that material decomposed in the river, it depleted the oxygen in the water:

> The continuous discharge of settleable waste material from municipal and industrial sources for many years has resulted in the formation of sludge banks throughout the river.  The bottom conditions in the river vary from rather thick deposits of sludge to relatively shallow deposits of decaying organic material from natural resources such as dead algae. The surface layer of sludge, in direct contact with the water, undergoes aerobic decomposition, during which dissolved oxygen resources are depleted from the overlying water.

*Id.* at 16 (GPFOX00002058).

**RESPONSE:**

Disputed in part; undisputed in part and immaterial.  The quote is an accurate reproduction of the document referenced.  Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary

material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

46.    This waste material is called "suspended solids" or "total suspended solids" or "TSS." Biochemical oxygen demand ("BOD") is a "measure of the amount of oxygen used by [such] fermentable organic matter in undergoing decomposition." *Id.*, Ex. 34 at 46 (GPFOX00008696 [Report on an Investigation of the Pollution in the Lower Fox River and Green Bay Made During 1966 and 1967, Wisconsin Department of Natural Resources, January 4, 1968, GPFOX00008651-97.

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

47.    As explained by Plaintiffs' expert James Braithwaite, knowledge of the importance of reducing suspended solids in wastewater discharges existed as early as the 1930s and regulatory efforts to reduce suspended solids date back to at least the 1940s:

> In my opinion, knowledge of the importance in reducing TSS in wastewater discharges existed as far back as the 1930's, and regulatory efforts to reduce suspended solids in municipal and industrial discharges date back to at least the early 1940's.

*Id.*, Ex. 54 at 4 [Braithwaite Report].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is

not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

48.     The State of Wisconsin began trying to achieve significant reductions in municipal industrial discharges of suspended solids in the 1940s:

> The State of Wisconsin began trying to achieve significant reductions in municipal and industrial discharges of suspended solids in the 1940's due to gross pollution, objectionable conditions, and aquatic toxicity in the Fox River and Green Bay as a result of the discharges of domestic sewage solids and waste fiber solids from paper mills in the Lower Fox Valley. These solids were not only objectionable aesthetically and toxic to aquatic organisms, but also contained PCBs and a variety of other chemicals. These efforts by the State, and later by the USEPA, were met by highly varying degrees of cooperation and responsiveness by the cities and industries discharging to the Fox River.

*Id.* at 7.

**RESPONSE:**

<u>Undisputed and immaterial</u>. The quote is an accurate reproduction of the document referenced. The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

49.     The discharge of PCBs would have been effectively controlled by diligent efforts to reduce discharges of suspended solids:

> As a useful surrogate for this lack of knowledge on PCBs in the early years of its use, it is my opinion that knowledge of the control of total suspended solids (TSS), which in turn would have controlled PCBs, was readily available. It is my further opinion that such TSS control, if diligently implemented by those discharging directly to the river, would have effectively and substantially reduced the discharge of PCBs to the Site.

*Id.* at 4.

**RESPONSE:**

Disputed in part; undisputed in part. It is undisputed that TSS control could have reduced the discharge of PCBs to the river. However, Mr. Braithwaite's opinion that TSS control was a "useful surrogate" for the lack of knowledge of PCBs is not supported by the evidence in this case. In fact, the page cited by Plaintiffs does not contain any factual citation to the record and instead only contains Mr. Braithwaite's opinion. *See* Birke Decl. Ex. 54 at 4.

50.    The relationship between PCBs and suspended solids in wastewater has been confirmed by the government. In 1975, Frank Early of the EPA testified that "most of the PCBs discharged from wastepaper mills are adsorbed on fibers and other particulate matter and that mill wastewater treatment systems which effectively remove particulate matter should also remove PCBs." *Id.*, Ex. 24 at 3 (GPFOX00009242) [Summary of Department Hearings to Consider Effluent Standards for PCBs, Held on August 28-29 1975, GPFOX00009240-50].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

51.    In a subsequent report, EPA concluded:

It is apparent that final effluent PCB discharges are related to final effluent TSS discharges.

35

*Id.*, Ex. 25 at 35 (GPFOX00074725) [Development Document for Proposed Effluent Limitations Guidelines and Standards for Control of Polychlorinated Biphenyls in the Deink Subcategory of the Pulp, Paper and Paperboard Point Source Category, October 1982, GPFOX00074684-768].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial.  The quote is an accurate reproduction of the document referenced.  Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

52.     EPA defined the relationship through a formula that confirmed a direct correlation between the volume of suspended solids and the amount of PCBs in wastewater.  *Id.*

**RESPONSE:**

Disputed and immaterial.  The Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

53.     EPA also confirmed that PCBs adsorb to sludge with organic solids: "It is well known that biological sludges exhibit a strong affinity for PCBs . . ." *Id.*, Ex. 26 at 33 (GPFOX00005189) [Pulp Involvement in the Pulp and Paper Industry, February 25, 1977, GPFOX00005119-241].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

54. The historical failure of certain Defendants to control their discharges of suspended solids (both long before and well after problems with PCBs were known) is the primary reason that the river and bay are now contaminated with PCBs:

> In my opinion, the reason that the river and bay sediments are now contaminated with PCBs is due primarily to the fact that certain of the Defendant Mills and the NMSC during the relevant period failed to adequately control their suspended solids discharges in accordance with repeated State of Wisconsin requests and/or orders that began in the 1940's. This failure is evident from: first, the multiple notices of violations from the State and the USEPA; second, the periodic river studies conducted by the state beginning in the 1950's that showed sludge beds consisting of paper mill fibers in the river downstream of Defendant Mill outfalls; and third, the historical aerial photographs that show Defendant Mills turning the river and Little Lake Butte de Morts (LLBdM) white with "white water" from the paper mill manufacturing activities. Had these solids been properly controlled at the time, the PCB problem in the Lower Fox River would be far less than it is now.

*Id.*, Ex. 54 at 6 [Braithwaite Report].

**RESPONSE:**

Disputed and immaterial. The opinion of Mr. Braithwaite is not supported by the evidence in this case. The "primary reason that the river and bay are now contaminated with PCBs" is that Plaintiffs chose to use an environmental toxin on their CCP and sold waste created during the manufacture of CCP to the recycling mill Defendants. It is undisputed that Plaintiffs never told the defendants that CCP contained PCBs or of the

dangers of recycling CCP.  *See* Certain Defendants Proposed Statement of Facts in

Support of Their Motion for Summary Judgment Nos. 6, 10-13, (Doc. # 554).

55.     Mr. Braithwaite's opinions also are strongly supported by another of

Plaintiffs' experts, Marcia Williams.  [Williams Report, Roach Decl. Ex. 17 at 58- 60].

**RESPONSE:**

<u>Disputed and Immaterial.</u>  The Plaintiffs' characterization of the document is not

accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary

material cited in support of this proposed finding of fact.

56.     U.S. Paper discharged excessive suspended solids from its DePere mill for

many years, including the years that PCBs were used in carbonless paper (1954-71).  By

1941, the State Board of Health was already urging U.S. Paper to reduce such discharges:

> [L]arge amounts of paper fiber and sludge, together with sanitary
> sewage are being discharged onto the bank of the river. . . . In order to
> reduce pollution of the Fox River it is requested that the U.S. Paper
> Mills Corporation provide treatment for its sanitary sewage industrial
> waste…

Birke Decl., Ex. 27 at GLTFOX00001324-25 [Letter from Wisconsin State Board of

Health, dated March 24, 1941].

**RESPONSE:**

<u>Disputed in part; undisputed in part and immaterial.</u>  The quote is an accurate

reproduction of the document referenced.  Plaintiffs' characterization of the document is

not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary

material cited in support of this proposed finding of fact.  The facts themselves are also

immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

57.     The State Board of Health wrote again on December 12, 1941, urging U.S.

Paper to reduce the discharges of suspended solids from its De Pere paper mill:

Waste water from the manufacturing process is discharged directly to the Fox river. . . . The analyses obtained from the U.S. Paper Mills show that this waste is definitely polluting the Fox River and that the formation of sludge banks of decomposing fiber could be eliminated by the proper treatment of this waste before its discharge to the river. . . . It is therefore recommended that in order to prevent the continued discharge of this amount of suspended solids and to reduce the pollutional effect of the waste, satisfactory treatment be provided immediately.

*Id.*, Ex. 28 at NCR-FOX-0004692-93 [Letter from Wisconsin State Board of Health, dated December 12, 1941].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial.  The quote is an accurate reproduction of the document referenced.  Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

58.    A July 25, 1955 letter from the State Board of Health states:

The dike on the north lagoon was eroded to the point where there was no detention period in the lagoon and therefore the waste was being discharged directly to the Fox River without treatment for several days during sludge removal operations.

*Id.*, Ex. 29 at GLTFOX00001352 [Letter from Wisconsin State Board of Health, dated July 25, 1955].

**RESPONSE:**

Undisputed and immaterial.  The quote is an accurate reproduction of the document referenced.  The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

59. On March 4, 1966, Theodore Wisniewski, Director of Water Pollution Control for the State of Wisconsin, wrote to the State Sanitary Engineer regarding a survey of U.S. Paper Mills' discharges, stating:

> The survey shows that a total of 8200 pounds of suspended solids . . . are discharged daily to the river in 439,490 gallons of wastewater . . . On the basis of these survey results, it is recommended that U.S. Paper Mills Corporation improve its effluent handling facilities to markedly reduce the discharge of suspended solids and B.O.D. to the Fox River.

*Id.*, Ex. 30 at GLTFOX00001361 [Letter from the State of Wisconsin Committee on Water Pollution, dated March 4, 1966, GLTFOX00001360-62].

**RESPONSE:**

Undisputed and immaterial. The quote is an accurate reproduction of the document referenced. The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

60. The State recommended that the U.S. Paper Mills' discharge of 2.1 pounds of suspended solids per 1,000 gallons of wastewater be more than cut in half:

> [I]t is recommended that U.S. Paper Mills Corporation further improve its effluent handling facilities to reduce the discharge of total suspended solids to less than one pound per 1,000 gallons while maintaining a fiber loss of less than 1% of production.

*Id.*, Ex. 31 at 2 (USPFOX00000147) [Wisconsin Department of Resource Development, Report on a Wastewater Survey at U.S. Paper Mills Corporation, dated March 6, 1967. USPFOX00000146-148].

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary

material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

61.     However, by 1967, the DePere mill was discharging 5.07 pounds of suspended solids per 1,000 gallons. *Id.*, Ex. 32 at USPFOX000089 [Wisconsin Department of Natural Resources, Report on a Wastewater Survey at U.S. Paper Mills Corporation, dated April 2, 1968, USPFOX000088-90]. The DNR "recommended that the company provide, as soon as possible, the highest practical degree of treatment for its pollutional effluent." *Id.*

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

62.     On February 16, 1970, the Army Corp. of Engineers again wrote to U.S. Paper Mills stating:

> You are hereby ordered to cease immediately any further dumping of fill and debris into the river or on top of the existing illegal fill. You are further requested to take action in removing the fill and debris which has been allowed to escape into the channel.

*Id.*, Ex. 33 at CBCFOX00001013 [Letter from L.S. Kreger, U.S. Army Corp of Engineers, dated February 16, 1970, CBCFOX00001012-14].

**RESPONSE:**

Undisputed and immaterial. The quote is an accurate reproduction of the document referenced. The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

63. Aerial photographs taken in 1961 and 1969 show a discoloration of the river indicating the release of solids from the U.S. Paper's plant. *Id.*, Ex. 54 at 25 [Braithwaite Report].

**RESPONSE:**

Disputed and Immaterial. The Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

64. [Omitted]

65. Defendant Neenah Menasha Sewer District ("District") also discharged excessive levels of suspended solids to the Lower Fox River during the time that PCBs were used in carbonless paper (1954-71). In 1957, the Committee on Water Pollution and State Board of Health found that the District was bypassing its treatment facilities and sending untreated sewage directly to the river about 25 percent of the time:

> 1. That the Cities of Neenah and Menasha, through the medium of the Neenah-Menasha Sewerage Commission, operate a joint treatment plant of the primary type which receives the sewage from both municipalities along with a considerable amount of industrial wastes.
>
> 2. That said treatment plant is at times overloaded with suspended solids, making necessary the by-passing of untreated sewage about 25% of the time due to limited capacity of sludge handling facilities.

*Id.*, Ex. 15 at NCR-FOX-0230569 [1957 Order].

42

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under Civil L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.

Exhibit 15, the 1957 Order, does not characterize Neenah-Menasha Sewerage Commission's discharges of suspended solids as "excessive"; it states that the treatment plant was "at times" overloaded with suspended solids making bypassing necessary. The Order also recognized that "[t]he construction of additional sludge handling facilities is now in progress."

The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

66.    The Board and Committee ordered the District to provide adequate sewage systems by the end of 1961. *Id.*

**RESPONSE:**

Disputed and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under Civil L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.

In Exhibit 15, the Board and Committee ordered Neenah-Menasha Sewerage Commission to "take such action *as may be necessary* to provide adequate sewerage systems and additional sewage treatment plant improvements . . . ." (emphasis added). The improvements were to be completed by December 31, 1961.

The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

67.     The District expanded its waste treatment plant in 1964, but the expanded facility was "quickly overloaded:"

> The Neenah-Menasha Sewerage Commission was established to provide wastewater treatment for the cities of Neenah and Menasha and industries in the municipal area.  The existing waste treatment plant, expanded in 1964, was designed to provide a primary treatment capacity of 26 MGD [million gallons per day] and activated sludge secondary treatment for 18 MGD.  This facility was quickly overloaded, due to groundwater infiltration to the Neenah and Menasha sewer systems and higher than projected industrial waste loadings.  The result was extensive bypassing of wastes including extremely high quantities of suspended solids which were not being properly handled at the sewage treatment plant.

*Id.*, Ex. 16 at 5 (NCR-FOX-0155532) [1972 EPA Report].

**RESPONSE:**

<u>Disputed in part; undisputed in part and immaterial.</u>  The quote is an accurate reproduction of the document referenced.  Plaintiffs' characterization of the document is not accurate and is deficient under Civil L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

68.     On May 14, 1968, the Cities of Neenah and Menasha and the Neenah-Menasha Sewage Commission were ordered to eliminate clear water from the sanitary sewers in order to avoid bypasses.  *Id.* at NCR-FOX-0155580-81.

**RESPONSE:**

<u>Disputed and immaterial.</u>  Plaintiffs' characterization of the document is not accurate and is deficient under Civil L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.

Exhibit 16, the May 14, 1968 Order from the WDNR, makes no mention of bypassing. The Order states that an excess of clear water infiltration resulted in "periodic overloading" of the treatment facilities, which "reduce[d] the efficiency of the total waste treatment . . . ."

The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

69. On March 5, 1970, the DNR ordered the same parties to place facilities in operation by September 30, 1972 to provide a minimum of 90 percent suspended solids removal. *Id.* at NCR-FOX-0155579.

**RESPONSE:**

Undisputed and immaterial. The quote is an accurate reproduction of the document referenced. The facts themselves are immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

70. However, by November 1972, EPA reported that "there is little evidence of action toward compliance." *Id.* at NCR-FOX-0155540.

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under Civil L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.

The quote the Plaintiffs use from the EPA 1972 Report relates to the elimination of clear water infiltration, not the reduction of suspended solids. The Report explains that progress on eliminating clear water from the sanitary sewers of Neenah and Menasha was due to "long-term, and continuing disagreement on plant design, sizing, and construction

45

scheduling, as well as cost allocations to municipalities and industries to be served by the expanded facilities . . . ." At the time of the report, "[p]lans and specifications [had] been submitted to the Wisconsin DNR for review and approval."

The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

71. EPA concluded that:

> Discharges by the cited entities have resulted in continuing degradation of Green Bay and in violations of the Federal-State water quality standards.

*Id.* at 0155555.

**RESPONSE:**

Disputed in part; undisputed in part and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document is not accurate and is deficient under Civil L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.

The quote the Plaintiffs use relates to a number of entities. No evidence exists that discharges from the Neenah-Menasha POTW resulted in continuing degradation of Green Bay or in violations of the Federal-State water quality standards.

The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

72. The City of Appleton also discharged suspended solids pollution during the 1954-71 timeframe. In their 1957 Findings, the Board of Health and Committee on Water Pollution found that the City of Appleton was contributing to river pollution and creating a public health hazard by sending untreated sewage directly to the river:

1.      That the City of Appleton provides a primary plant, equipped for chemical treatment for the processing of sewage and industrial wastes tributary to the municipal sewers.

2.      That a substantial part of the sewer system is of the combined type and that during thaws and rainstorms, excessive amounts of surface waters enter the sewer system, making necessary the by-passing of untreated sewage, creating a hazard to public health.

*Id.*, Ex. 15 at NCR-FOX-0230571 [1957 Order].

**RESPONSE:**

Disputed and Immaterial.  The proposed finding is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The proposed finding contains an accurate reproduction of certain language in the cited document, but mischaracterizes the import of the document as a whole.

On information and belief, orders similar to the City of Appleton were issued to all known direct dischargers to the Lower Fox River in 1957.

The City of Appleton legally discharged suspended solids to the Fox River during the period in question, but the characterization of that discharge as "pollution" is vague and overbroad since the City had primary treatment during the entire period in question and secondary treatment starting in 1964.  S. Bogart Decl. ¶ 21 & Attach. 21 (COA-FOX-00013114).

The document cited does not state the City of Appleton was contributing to river pollution or that it was creating a public health hazard by sending untreated sewage directly to the river except under limited circumstances during times of thaw or rainstorms where the sewage treatment plant might not always be able to handle the total amount of water due to infiltration of the surface water into the sewer system.  S. Bogart

47

Decl. ¶ 17 & Attach. 17 (NCR-FOX-0230571). This Order was part of a general effort to improve the water quality of the Lower Fox River and was not unique to the City of Appleton. Dischargers such as Appleton Coated Paper Company and NCR were not subject to the orders since they discharged through a publicly owned treatment plant, but the fact that they were not direct dischargers does not mean that their wastewater did not contribute to the water quality problems addressed in the 1957 orders. S. Bogart Decl. ¶ 16 & Attach. 16 (Deposition of Dale Schumaker, August 19, 2009, p. 296, l. 11-17):

Q. And I think in your prior deposition you said that once the effluent went to the Appleton treatment plant, you just assumed it was taken care of; is that a fair paraphrase of what you said?

A. That's a good phrase, yes.

Q. Okay. And what made you assume that, sir?

A. I don't know. Out of sight out of mind perhaps.

73. The City was ordered to construct adequate treatment facilities by the end of 1961. *Id.*

**RESPONSE:**

Disputed and Immaterial. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary materials cited in support of this proposed finding of fact.

The proposed finding contains language that accurately reproduces part of the document cited, but mischaracterizes the import of the document as a whole.

The 1957 order does not order the City to construct adequate treatment, but states it should "construct adequate additional treatment facilities in accordance with approved

plans not later than December 31, 1961." The difference in wording is significant as the City had substantial treatment capacity recognized in the Order as a primary plant, equipped for chemical treatment for the processing of sewage and industrial wastes tributary to the municipal sewers. The Order, interpreted in context, was concerned with controlling inflow of snow melt and stormwater to the sewer system so that the capacity of the treatment system would not be exceeded in times of high inflow. The City did make substantial efforts to separate its combined sewer system and achieved major progress in this regard . S. Bogart Decl. ¶ 22 & Attach. 22 (COA-FOX-00004890): "By 1965, 90% of the project was constructed and presently there are no known combined sanitary and storm sewers in the Appleton sewer system."

74. However, a 1966 study of the City of Appleton's waste treatment plant found that the raw wastes were "substantially greater than the plant was designed to handle and it appears that additional treatment capacity is necessary to provide effective secondary treatment for all wastes." *Id.*, Ex. 34 at 5 ¶ 15 (GPFOX00008655) [Report on an Investigation of the Pollution in the Lower Fox River and Green Bay Made During 1966 and 1967, January 4, 1968, GPFOX00008651-697].

**RESPONSE:**

Disputed and Immaterial. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The proposed finding contains language that accurately reproduces a portion of the language from the cited source, but mischaracterizes the import of the document as a whole.

The study referenced in the proposed finding of fact was done of the entire Lower Fox River and Green Bay and was designed to assess the impact of BOD (biological oxygen demand) loadings from the Lower Fox River and its tributaries to Green Bay. S. Bogart Decl. ¶ 19 & Attach. 19 (GPFOX008670): "During 1965, the Wisconsin Committee on Water Pollution initiated this study to evaluate the water quality of Green Bay and the effect of waste sources discharging to the Bay." As part of the study, the Committee did a survey of various dischargers to the Lower Fox River, the main tributary to Green Bay. *Id.* (GPFOX00008653-00008660). This survey did not involve any testing of effluent discharged or study of dischargers, but was merely a compilation of discharge sources beginning at Lake Winnebago north to the mouth at Green Bay. *Id.* (GPFOX00008653). The characterization of the study as a "study of the City of Appleton's waste treatment plant" is not only misleading, it is wrong. There is only one paragraph in the entire 47 page report which substantively deals with the Appleton Wastewater Treatment Plant. *Id.* (GPFOX00008655, para. 15). This paragraph deals with only one twenty-four hour period and indicates that while secondary treatment is sometimes bypassed, the raw wastes get primary treatment. This conclusion is consistent with the report of NCR's consultant, RMT: "The principal differences between RMT's analysis and the WDNR's is that RMT concluded that wastewater discharged from the Appleton POTW received at least primary treatment. The only bypassing that occurred at the Appleton POTW was after primary treatment. This was a permitted operational

practice, implemented to obtain the best achievable performance of the biological secondary treatment system." *Id.* at ¶ 15 & Attach. 15 (NCR-FOX-498850).

75.     Further, the City still found "it necessary to bypass some raw wastes during periods of storm water runoff." *Id.*

**RESPONSE:**

Disputed and Immaterial.  NCR's consultant, RMT, found no bypassing of primary treatment at the Appleton Wastewater Treatment Plant.  S. Bogart Decl. ¶ 15 & Attach. 15 (NCR-FOX-498850).  *See* response to PPFF No. 74.

76.     These problems had still not been resolved several years later and the DNR issued the City of Appleton an order on March 5, 1970 directing the City to put a system in place to adequately treat all wastes and reduce suspended solids by 90 percent. *Id.*, Ex. 35 at 2 [Wisconsin Department of Natural Resources Findings of Fact, Conclusions of Law, and Order, dated March 5, 1970, NCR-FOX- 0570834-35].

**RESPONSE:**

Disputed and immaterial.  This proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of the proposed finding of fact.

The proposed finding contains an accurate reproduction of certain language in the 1970 Order, but mischaracterizes the import of the complete document.

This proposed finding is objectionable as it is vague as to the meaning of "these problems had still not been resolved."

The 1970 Order referenced in the finding was, like the 1957 orders, issued to all direct dischargers on the Fox River.  S. Bogart Decl. ¶ 20 & Attach. 20

(WTMFOX00003362-00003385). The Order, read in its entirety and in context, documents significant progress by the City of Appleton since the issuance of prior order to improve its wastewater treatment system. The Order also demonstrates that the City was cooperating with the regulatory authorities and other local governments to improve the quality of its effluent. The regulators found, in regard to the City: "The proposed schedule by the City is reasonable and proper and will serve an adequate basis upon which to proceed with design and construction of adequate treatment works." *Id.* at ¶ 18 & Attach. 18 (NCR-FOX-0570834). The Order did tell the City to place in operation by September 30, 1972, facilities to adequately treat all wastes and waters tributary to its sanitary sewer system. It ordered a minimum of 90 percent removal of the BOD and suspended solids load, and a minimum of 85 percent annual average removal of the total phosphorus tributary to the treatment plant.

After the issuance of the 1970 Order to the City and other direct dischargers, the Congress passed the Clean Water Act, 33 U.S.C. §1251 *et seq.* (1972). This new federal law created qualitative standards for effluent discharges for the first time and dramatically changed in the legal framework for regulation of wastewater discharges throughout the United States. The impact of this legislation must be considered in assessing any actions of the City of Appleton in regard to its wastewater treatment plant after its enactment.

77. Menasha's predecessor, John Strange Paper Company, also contributed to the contamination in the Lower Fox River. Although the company sent some of its wastes to the Neenah Menasha Sewage Commission sewerage system, it still had 22

outfalls that discharged directly into the Lower Fox River in August 1971. *Id.*, Ex. 36 at 1 [Marathon Engineering Inc. Letter, dated August 10, 1971, NCR-FOX-0248734-35].

**RESPONSE:**

Disputed, unsupported, vague, not a fact, and immaterial. To the extent that the John Strange Paper Company is referred to as "Menasha's predecessor," this is a conclusion of law and is not the proper subject of a Proposed Finding of Fact.

The phrase "contributed to the contamination in the Lower Fox River" is vague as it does not define what "contamination" is, and therefore is vague and incomplete.

The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

Exhibit 36, the August 10, 1971 Marathon Engineering letter to Menasha, states, in pertinent part:

"A survey report of Mr. Erdman recommended combining the present 22 outfalls into a total of 4."

The letter does not confirm that any process waste was discharged from any of the outfalls that discharged to the Lower Fox River.

78.     In 1969, the company discharged 2,435 pounds per day of solids to the river through those outfalls. *Id.*, Ex. 37 at 2 (NCR-FOX-0248618) [Menasha Corporation Letter, dated July 29, 1972, NCR-FOX-0248617-619].

**RESPONSE:**

Undisputed and immaterial. However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The use of the phrase "those outfalls" is vague and incomplete. The July 29, 1972 letter does not state which outfalls were used for discharge. As a result, the letter does not confirm that "the company discharged 2,435 pounds per day of solid to the river through those outfalls."

79. Thus, the company "contributed PCBs to the LFR via discharge of dilute wastewater from the mill directly to the Menasha channel until mid-1976 . . ." *Id.*, Ex. 38 at NCR-FOX00527417 [Report Prepared by Geomega, Inc. entitled "An Evaluation of PCB Loading From the John Strange Paper Mill to the Lower Fox River," dated August 4, 2005, NCR-FOX-0527408-490 ("Geomega Report")].

**RESPONSE:**

Undisputed and immaterial. The proposed finding of fact is immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

80. Riverside Paper Corporation, now owned by CBC Coating, Inc., also contributed to contamination of the Lower Fox River during the time that PCBs were used in carbonless paper. For instance, in 1957, the Committee on Water Pollution and State Board of Health found that Riverside discharged wastes to the Fox River and that increases in those wastes were "causing an increase in pollution of the Fox River." *Id.*, Ex. 15 at NCR-FOX-0230593 [1957 Order].

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is not supported by the evidence and is immaterial. Riverside Paper Corporation is not owned by CBC Coating,

Inc., rather, CBC Coating, Inc. is the successor to all relevant liabilities of Riverside

Paper Corporation. (Seventh Amended Complaint, (Doc. # 265) ¶ 29; CBC's Amended

Answer to Seventh Amended Complaint, (Doc. # 327) ¶ 29). Further, Plaintiffs do not

state accurately the Findings of the State Board of Health in 1957, which found: "THE

BOARD AND COMMITTEE FIND: 1. That the Riverside Paper Corporation at

Appleton provides a recirculation and save-all system for treatment of wastes before

discharge to the Fox River. 2. That the biochemical oxygen demand in said discharge has

increased over a period of years, causing an increase in pollution of the Fox River." The

State Board of Health Order did not address PCB contamination. Ex. 15 to Declaration

of Dennis P. Birke at NCR-FOX-0230593 [1957 Order]. The proposed finding of fact

also is immaterial because Riverside did not begin recycling NCR CCP until 1971 or

later. *See* S. Bogart Decl. ¶ 13 & Attach. 13 (CBCFOX0002111-2112).

     81. The Committee and the Board ordered Riverside to develop plans to

"reduce the quantity of pollutional matter discharged to the Fox River." *Id.*

**RESPONSE:**

     <u>Disputed and Immaterial.</u> The proposed finding of fact is not supported by the

evidence and is immaterial. The language quoted by Plaintiffs omits a relevant portion of

the Order, which states in relevant part: "1. That the Riverside Paper Corporation

conduct a study and develop plans for improvements to the recirculation and save-all

system to reduce the quantity of pollutional matter discharged to the Fox River;" Ex. 15

to Declaration of Dennis P. Birke at NCR-FOX-0230593 [1957 Order]. The proposed

finding of fact also is immaterial because Riverside did not begin recycling NCR CCP

until 1971 or later. *See* S. Bogart Decl. ¶ 13 & Attach. 13 (CBCFOX0002111-2112).

82.     Nonetheless by 1960, Riverside's wastes were still going "directly into the Fox River" without any treatment.  *Id.*, Ex. 39 at 72:20 through 73:4 [Farnum Dep.].

**RESPONSE:**

Disputed and Immaterial.  The proposed finding of fact is not supported by the evidence and is immaterial.  Riverside Paper Corporation utilized a recirculation and save-all system for treatment of wastes before discharge to the Fox River as early as 1957.  Ex. 15 to Declaration of Dennis P. Birke at NCR-FOX-0230593 [1957 Order].  Plaintiff's expert, Marcia Williams, agreed that save-alls can be considered pretreatment for wastewater.  Williams' Depo. p. 242.  The proposed finding of fact also is immaterial because Riverside did not begin recycling NCR CCP until 1971 or later.  *See* S. Bogart Decl. ¶ 13 & Attach. 13 (CBCFOX0002111-2112).

83.     The Fort Howard Paper Company (now Georgia Pacific) had a long history of seriously polluting the Lower Fox River, including during the 1950s and 1960s.  In 1957, the State Board of Health and Committee on Water Pollution found that Fort Howard's "combined discharges has increased over a period of years, causing an increase in pollutional wastes discharged to the Fox River."  *Id.*, Ex. 15 at NCR-FOX-0230602 [1957 Order].

**RESPONSE:**

Unsupported and immaterial.  Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.  The document cited in support of the alleged fact is dated October 10, 1957 and therefore

could not contain information supporting any allegations regarding Fort Howard's activities after October 10, 1957. The document does not contain historical information about Fort Howard's discharges to the Lower Fox River, and therefore does not support the statement that Fort Howard had "a long history of seriously polluting the Lower Fox River." Furthermore, the alleged fact mischaracterizes the document, which contains three findings of fact: (1) that Fort Howard "provides settling lagoons for treatment of de-inking waste before discharge," (2) that Fort Howard "provides a recirculation and save-all system for treatment of paper mill wastes before discharge," and (3) "the *biochemical oxygen demand* of said combined discharges has increased over a period of years, causing an increase in pollutional wastes discharged to the Fox River." *Id*. When fully quoted, and taken in context, the document clearly refers only to increase in biochemical oxygen demand and not to total suspended solids.

The alleged fact is in any event immaterial and does not preclude summary judgment because it is unrelated to Phase I and Defendants' Motion for Summary Judgment, which addresses the issue of whether Plaintiffs' superior knowledge "that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" prohibits Plaintiffs from seeking contribution under CERCLA. Fort Howard was not aware in the 1950s and 1960s that NCR Paper contained PCBs or that the recycling of NCR Paper could result in the discharge of PCBs to a waterbody.

84. The Board and Committee ordered:

That the Fort Howard Paper Company conduct a study and develop plans for reduction of quantity of pollutional matter discharged to the Fox River; report of said study and plans for improvements be submitted

to the Committee on Water Pollution on or before December 31, 1958. .
.

*Id.*

**<u>RESPONSE:</u>**

<u>Unsupported and immaterial</u>.  Plaintiffs' characterization of the document is not

accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary

material cited in support of this proposed finding of fact.  The facts themselves are also

immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.  While

Defendants do not dispute the accuracy of the quotation contained in the alleged fact, the

alleged fact takes the quotation out of context.  As explained in response to PPFF 83, the

document refers to discharges of biochemical oxygen demand and not to total suspended

solids.

The alleged fact is in any event immaterial and does not preclude summary

judgment because it is unrelated to Phase I and Defendants' Motion for Summary

Judgment, which addresses the issue of whether Plaintiffs' superior knowledge "that

recycling NCR-brand carbonless paper would result in the discharge of PCBs to a

waterbody, thereby risking environmental damage" prohibits Plaintiffs from seeking

contribution under CERCLA.  Fort Howard was not aware in the 1950s and 1960s that

NCR Paper contained PCBs or that the recycling of NCR Paper could result in the

discharge of PCBs to a waterbody.  Furthermore, Plaintiffs have not alleged that PCB

discharges are related to levels of biochemical oxygen demand, but rather to total

suspended solids.  Therefore, any dispute over an alleged fact based on the October 10,

1957 document is immaterial to Phase I and Defendants' Motion for Summary Judgment.

85.     Nine years after that order, the State of Wisconsin conducted a wastewater survey of Fort Howard's discharges and found that Fort Howard's lagoons were still releasing 7,400 pounds per day of suspended solids to the Fox River. *Id.*, Ex. 40 at 2 (GPFOX00008873) [Report on a Wastewater Survey at Fort Howard Paper Company, Green Bay, Wisconsin, October 10 through 12, 1966, Inclusive, dated March 6, 1967, GPFOX00008872-73].

**RESPONSE:**

Unsupported and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment. The alleged fact mischaracterizes the document cited in support, and erroneously relates Fort Howard's suspended solids discharges to the October 10, 1957 document quoted in PPFFs 83 and 84. As explained in response to PPFF 83, the document refers to discharges of biochemical oxygen demand and not to total suspended solids. The alleged fact further mischaracterizes the document cited in support, which does not provide information on the level of Fort Howard's suspended solids discharges between 1957 and 1967. Therefore, it is incorrect and misleading to suggest that "Fort Howard's lagoons were ***still releasing*** 7,400 pounds per day of suspended solids to the Fox River" (emphasis added). Furthermore, Fort Howard's settling lagoons achieved in excess of 90 percent removal of solids. *See* S. Bogart Decl. ¶ 10 & Attach. 10 (GPFOX00020330). In fact, the cited document also states that "Total suspended solids from [lagoon effluent] was 1.07 pounds per 1,000 gallons and fiber loss was 0.40% of de-inked pulp production." *See* S. Bogart Decl. ¶ 12 & Attach. 12 (GPFOX00008892). These levels of

discharge are in line with the recommendations made the year before by the Water Resources Division of the State of Wisconsin Department of Resource Management. *See* S. Bogart Decl. ¶ 11 & Attach. 11 (GPFOX00008846 at 2).

The alleged fact is in any event immaterial and does not preclude summary judgment because it is unrelated to Phase I and Defendants' Motion for Summary Judgment, which addresses the issue of whether Plaintiffs' superior knowledge "that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" prohibits Plaintiffs from seeking contribution under CERCLA. Fort Howard was not aware in the 1960s that NCR Paper contained PCBs or that the recycling of NCR Paper could result in the discharge of PCBs to a waterbody.

86.     On March 6, 1967, the State reported and recommended as follows:

This loading of suspended solids and biochemical oxygen demand to the Fox River at Green Bay is a significant factor in the pollution of the river and the bay.

* * *

That the Fort Howard Paper Company, to be in compliance with Order 3-57I-35 issued by the Committee on Water Pollution and State Board of Health, strive for more efficient operation of the waste disposal and recovery facilities.

*Id.*

**RESPONSE:**

Unsupported and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment. While

Defendants do not dispute the accuracy of the quotation contained in the alleged fact, the alleged fact takes the quotation out of context. As presented, the quote implies that the State was singling out Fort Howard as the source of the pollution in the river and the bay. But the full quote makes it clear that Fort Howard was but one of many industrial and municipal dischargers who collectively contributed to pollution: "This loading of suspended solids and biochemical oxygen demand to the Fox River at Green Bay is a significant factor in the pollution of the river and the bay. Only by a substantial reduction in waste strength from *all sources* of water pollution in the city of Green Bay can the Fox River and Green Bay realize any significant improvement." *See* S. Bogart Decl. ¶ 12 & Attach. 12 (GPFOX00008891 at 2 emphasis added).

The alleged fact is in any event immaterial and does not preclude summary judgment because it is unrelated to Phase I and Defendants' Motion for Summary Judgment, which addresses the issue of whether Plaintiffs' superior knowledge "that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" prohibits Plaintiffs from seeking contribution under CERCLA. Fort Howard was not aware in the 1960s that NCR Paper contained PCBs or that the recycling of NCR Paper could result in the discharge of PCBs to a waterbody.

87. In a report dated September 16, 1970, the DNR stated:

Paper mill wastewaters are discharged untreated into the Fox River. The discharge of these inadequately treated wastes has resulted in water pollution of the Fox River and Green Bay.

*Id.*, Ex. 41 at 1 [Report on Examination of Plans and Specifications, Wastewater Treatment Facilities, Fort Howard Paper Company, Green Bay, Wisconsin, dated September 16, 1970, NCR-FOX-0057465-68].

**RESPONSE:**

Unsupported and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment. While Defendants do not dispute the accuracy of the quotation contained in the alleged fact, the alleged fact takes the quotation out of context.

The alleged fact is in any event immaterial and does not preclude summary judgment because it is unrelated to Phase I and Defendants' Motion for Summary Judgment, which addresses the issue of whether Plaintiffs' superior knowledge "that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" prohibits Plaintiffs from seeking contribution under CERCLA. Plaintiffs cite no evidence in the record to indicate that Fort Howard was aware until December 1971, at the earliest, that NCR Paper contained PCBs and until late 1974 at the earliest that the recycling of NCR Paper could result in the discharge of PCBs to a waterbody.

88.    Nonetheless, it was not until 1973, that Fort Howard's secondary treatment systems became fully operational. *Id.*, Ex. 54 at 10 [Braithwaite Report].

**RESPONSE:**

Unsupported and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment. The

alleged fact is vague and ambiguous; it is not clear what is meant by "fully operational." Based on a reasonable reading of that phrase, the alleged fact is incorrect; Fort Howard's secondary treatment was installed and operational in December of 1972. NCR-FOX-0213391. The alleged fact relies solely upon the expert report of Plaintiffs' expert Braithwaite, which report mischaracterizes documents in the record.

The alleged fact is in any event immaterial and does not preclude summary judgment because it is unrelated to Phase I and Defendants' Motion for Summary Judgment, which addresses the issue of whether Plaintiffs' superior knowledge "that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" prohibits Plaintiffs from seeking contribution under CERCLA. Fort Howard was not aware until December 1971, at the earliest, that NCR Paper contained PCBs and until late 1974 at the earliest that the recycling of NCR Paper could result in the discharge of PCBs to a waterbody.

89.     Further, in a 1976 report, the DNR concluded that:

> Fort Howard is a major polluter of the Fox River, discharging 800 pounds of solids into the river every day as well as 4000 pounds of BOD. The company has taken DNR to court in an attempt to get pollution standards weakened.

*Id.*, Ex. 42 at 1 [Letter from DNR to William Rogers, Wisconsin Assembly, dated May 17, 1976 (NCR-FOX-0570414-415)].

## RESPONSE:

Undisputed but immaterial. Defendants do not dispute the accuracy of the quotation contained in the alleged fact. The alleged fact is in any event immaterial and does not preclude summary judgment because by the time Fort Howard learned that PCBs were in their effluent, PCB's were no longer being added to NCR Paper and were

only present in minor and diminishing amounts in post-consumer paper. Defendants

continued recycling was promoted by the government because this minor and

diminishing risk was outweighed by the benefits of continued paper recycling.

90.     Defendant Glatfelter, as successor to Bergstrom Paper Company, also had

a long history of polluting the Lower Fox River, including during the time PCBs were

used in carbonless paper. For instance, in January 1948, the State found that Bergstrom

was discharging excessive levels of solids from their plant and ordered Bergstrom:

> . . . to minimize to the greatest possible degree silting in of the
> lake…for the preservation of fish and aquatic life and for the protection
> of the public rights in Little Lake Butte des Morts . . .
>
> IT IS THEREFORE ORDERED:
>
> That the Bergstrom Paper Company take such action as may be
> necessary to reduce the concentration of suspended solids in wastes
> discharged to Little Lake Butte des Morts to one pound per 1,000
> gallons or less, on or before June 1, 1949.

*Id.*, Ex. 43 at GLTFOX0005030 [Findings of Fact, Conclusions of Law, and Order of the

State Board of Health, dated June 1, 1948, GLTFOX00005030-032].

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is inaccurate, immaterial,

incomplete, not supported by the evidence, and/or the evidence is inadmissible.

91.     In 1952, Bergstrom installed its first primary treatment tanks, but those

tanks were later found to be undersized. *Id.*, Ex. 44 at GLTFOX00005044 [Bergstrom

Bulletin, October 1967, GLTFOX00005040-047]; Ex. 45 at GLTFOX00005815,

00005819 [Report on Water Use and Waste Disposal at Bergstrom Paper Company,

Neenah, Wisconsin, 1962, GLTFOX00005810-825].

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

92.     In October 1957, the State Board of Health and the Committee on Water Pollution ordered Bergstrom to develop plans for reduction of "pollutional matter discharged to Little Lake Butte de Morts" by the end of 1958. *Id.*, Ex. 15 at NCR-FOX-0230589 [1957 Order].

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

93.     The Committee and Board issued a follow up order on March 25, 1959 for Bergstrom to "substantially reduce the quantity of pollutional solids . . . in the wastes discharged to Little Lake Butte des Morts." *Id.*, Ex. 46 at 2 Order of the Committee on Water Pollution and State Board of Health, dated March 25, 1959, NCR-FOX-0137156-57].

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

94.     In 1962, Bergstrom finally commissioned an internal study, which concluded that the "[t]reatment plant is overloaded" removing only 50 percent of the suspended solids in its wastewater prior to discharge. *Id.*, Ex. 45 at GLTFOX00005815, 19.

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

95.     Bergstrom staff subsequently confirmed the inefficiency of their system in an internal memo dated October 12, 1966:  "Our experience in the Disposal Plant has shown that the amount of settling after two hours is negligible." *Id.*, Ex. 47 at NCR-FOX-0145669 [Bergstrom Memo, dated October 12, 1966].

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

96.     Further, for over 20 years, Bergstrom allowed large amounts of sludges containing PCBs to flow directly into Little Lake Butte de Morts from its landfill:

> Bergstrom/Glatfelter intentionally filled in wetlands contiguous to the lake on land leased from the city with paper mill sludges from its primary settling tanks from 1952 until 1975.  From the available documents, Bergstrom/Glatfelter did not properly construct or maintain the containment dikes surrounding the sludge fill area, or control surface water flow across the landfill, allowing large amounts of entrained paper mill sludges containing PCBs to flow directly into the Lake.

*Id.*, Ex. 54 at 18 [Braithwaite Report].

**RESPONSE:**

Disputed and immaterial. The proposed finding of fact is inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

97.     As Mr. Braithwaite notes, historical aerial photographs graphically depict this contamination. *Id.  See* Ex. 48 [This is a color photograph of the photograph in the Geomega Report (Ex. 38) at Figure 3-1.]

**RESPONSE:**

Disputed and immaterial.  The proposed finding of fact is inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

98.  Defendants' purported lack of knowledge of PCBs at the time they discharged them would not relieve them of culpability because:  "Even prior to the time paper mills knew that PCBs were present in their effluent discharges, they knew that their effluent discharges could be an important source of environmental harms."  [Williams Report, Roach Decl. Ex. 17 at 58].

**RESPONSE:**

Disputed and immaterial.  The proposed finding of fact is not a fact but a legal conclusion.  As a result, it is deficient under L.R. 56.2(a) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The facts themselves are also immaterial and irrelevant to Certain Defendants' Motion for Summary Judgment.

99.  Defendants' own expert, Davis Ford, has opined that even if Defendants had found out about PCBs in CCP prior to 1972, it would have had no effect on the Defendants' wastewater treatment to remove PCBs.  *Id.*, Ex. 56 at 137:28 through 138:12 [Deposition of Davis Ford].

**RESPONSE:**

Disputed.  The proposed finding of fact is a mischaracterization of Mr. Ford's statement.  Mr. Ford testified as follows on the pages cited by Plaintiffs:

**24**     Q -- such knowledge would make a difference as to their
**25**     wastewater treatment practices.
**1**      MS. ALEXANDER: Just for clarification,
**2**      when you're saying, "the time" before, you were

**3**     referring to before '72, right, you're not talking
**4**     about any time?
**5**     MR. HERMES: I'm talking about his opinion
**6**     that says, "Before '72 each mill employed wastewater
**7**     treatment methods that were reasonable and
**8**     appropriate at the time."
**9**     MS. ALEXANDER: Thank you.
**10**    THE WITNESS: Before '72, it would have had
**11**    no impact in my opinion before '72. I don't think
**12**    that's your question.

100.    In fact, Dr. Ford opined that 1979 would have been the first year any

design changes would have been made that dealt with removal of PCBs from effluent.

*Id.* at 138:14-25.

**RESPONSE:**

Disputed.  The proposed finding of fact is a mischaracterization of Mr. Ford's

statement.  Mr. Ford testified as follows on the page cited by Plaintiffs:

**14**    Q My question is, when would it -- in what year
**15**    approximately would it have had an impact?
**16**    A Yeah, I told you that I became aware of PCBs in terms
**17**    of treatment technology about 1980. And I think
**18**    that's a good starting point, because I'm very
**19**    familiar with the evolution of PCBs in the state of
**20**    Wisconsin, which is pretty proactive on PCBs.
**21**    But when it affects a treatment
**22**    system, PCBs in my recollection first appeared on
**23**    NPDES permits or WPDES permits which drive our
**24**    designs and would answer your question, I believe was
**25**    1979.

101.    Defendants only would have taken additional action to control PCB

discharges if required by government regulation.  *Id.* at 155:20-25.

**RESPONSE:**

Disputed.  The proposed finding of fact is a mischaracterization of Mr. Ford's

statement.  Mr. Ford testified as follows on the page cited by Plaintiffs:

**20**    Q Is it your opinion, then, Dr. Ford, that as long as a

**21**    governmental agency was not regulating discharge of
**22**    PCBs, that any discharger of PCBs to the Fox River
**23**    was operating within the standard of care of the
**24**    industry at the time if they were discharging PCBs?
**25**    A I think that's fair.

102.    ACPC did not manufacture paper. Rather, its operations were limited to coating paper manufactured elsewhere. *Id.*, Ex. 58 at NCR-FOX- 0191612 [104(e) Responses dated September 9, 1998, NCR-FOX-191569-620].

**<u>RESPONSE:</u>**

<u>Undisputed and immaterial.</u>  ACPC did not physically manufacture the paper to which it applied NCR's emulsion.

103.    ACPC did not discharge its wastewater to the Lower Fox River. Rather, ACPC's effluent was discharged to the City of Appleton POTW. *Id.*, Ex. 57 at NCR-FOX-0078283 [104(e) Responses dated May 6, 1996, NCR-FOX-0078276-284].

**<u>RESPONSE:</u>**

<u>Disputed and immaterial.</u>  The document cited by ACPC deals only with the time period of 1978 to present. Nothing in the document speaks to ACPC's activities prior to 1978. *Id.*, Ex. 57 at NCR-FOX-0078276 [104(e) Responses dated May 6, 1996, NCR-FOX-0078276-284].

Dated this 19th day of October, 2009.

| **Attorneys for US Paper Mills Corp.** | **Attorneys for CBC Coating, Inc.** |
|---|---|
| s/ <u>Scott W. Hansen</u> | s/ <u>Michael P. Carlton</u> |
| Thomas R. Gottshall | Kelly J. Noyes |
| Stephen F. McKinney | Michael P. Carlton |
| Haynsworth Sinkler Boyd PA | Thomas Armstrong |
| 1201 Main Street, Suite 2200 | Susan E. Lovern |
| P.O. Box 11889 | von Briesen & Roper SC |
| Columbia, SC 29211-1889 | 411 East Wisconsin Avenue, Suite 700 |
| Telephone:  803-779-3080 | Milwaukee, WI 53202-4427 |
| Facsimile:  803-765-1243 | Telephone:  414-276-1122 |

tgottshall@hsblawfirm.com
smckinney@hsblawfirm.com

Scott W. Hansen
Steven P. Bogart
John M. Van Lieshout
David E. Frank
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
P.O. Box. 2965
Milwaukee, WI 53202-
Telephone: 414-298-1000
Facsimile: 414-298-8097
jvanlies@reinhartlaw.com
sbogart@reinhartlaw.com
shansen@reinhartlaw.com
dfrank@reinhartlaw.com

Facsimile: 414-276-6281
knoyes@vonbriesen.com
mcarlton@vonbriesen.com
tarmstro@vonbriesen.com
slovern@vonbriesen.com

**Attorneys for Menasha Corporation**

s/ <u>Philip c. Hunsucker</u>
Allison E. McAdam
Brian L. Zagon
Christopher J. Dow
David Rabbino
Philip C. Hunsucker
Hunsucker Goodstein & Nelson PC
3717 Mt. Diablo Boulevard, Suite 200
Lafayette, CA 94549
Telephone: 925-284-0840
Facsimile: 925-284-0870
amcadam@hgnlaw.com
bzagon@hgnlaw.com
cdow@hgnlaw.com
drabbino@hgnlaw.com
phunsucker@hgnlaw.com

Joseph J. Beisenstein
Mark R. Feldmann
Menn Law Firm Ltd.
2501 E. Enterprise Avenue
P.O. Box 785
Appleton, WI 54912-0785
Telephone: 920-731-6631
Facsimile: 920-734-00981
joseph-beisenstein@mennlaw.com

**Attorneys for Neenah-Menasha Sewerage Commission**

s/ <u>William J. Mulligan</u>
William J. Mulligan
Kevin J. Lyons
James E. Braza
Tara M. Mathison
Elizabeth K.Miles
Davis & Kuelthau SC
111 East Kilbourn Avenue, Suite 1400
Milwaukee, WI 53202-6613
Telephone: 414-225-1402
Facsimile: 414-278-3602
wmulligan@dkattorneys.com
klyons@dkattorneys.com
jbraza@dkattorneys.com
tmathison@dkattorneys.com
emiles@dkattorneys.com

70

mark-feldmann@mennlaw.com

**Attorneys for City of Appleton**

s/ <u>Paul G. Kent</u>
Waltraud A. Arts
Paul G. Kent
Anderson & Kent SC
One North Pinckney Street, Suite 200
Madison, WI 53703-2868
Telephone:  608-246-8500
Facsimile:  608-246-8511
warts@andersonkent.com
kent@andersonkent.com
apotts@andersonkent.com
akim@andersonkent.com

James P. Walsh
Appleton City Attorney
100 North Appleton Street
Appleton, WI 54911
Telephone:  920-832-6423

REINHART\2905063