**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | | |
|---|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION, | ) | No. 08-CV-00016-WCG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE A. WHITING PAPER<br>COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CERTAIN DEFENDANTS' RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF
FACT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO CERTAIN DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL
SUMMARY JUDGMENT**

Pursuant to Civil L.R. 56.2(c) of the United States District Court for the Eastern District

of Wisconsin, the City of Appleton, Georgia-Pacific Consumer Products LP (f/k/a Fort James

Operating Company), Fort James Corporation, and Georgia-Pacific LLC (collectively, "Georgia-

Pacific"), CBC Coating, Inc., Menasha Corporation, Neenah-Menasha Sewerage Commission,

P.H. Glatfelter Company, US Paper Mills Corporation, and WTM I Company (collectively, the

"Defendants"), responds to NCR Corporation ("NCR") and Appleton Papers Inc. ("API")

(collectively, "Plaintiffs") Proposed Findings of Fact ("PPFF") in support of Plaintiffs'

Opposition to Certain Defendants' Motion for Summary Judgment, or In the Alternative, Partial

Summary Judgment.

The evidence supporting Defendants' Responses to Plaintiffs' Proposed Findings of Fact in Support of Plaintiffs' Opposition includes: the evidence submitted by Plaintiffs attached to the Declaration of Kathleen L. Roach ("Roach Decl.") (Doc. # 660), the evidence submitted by Defendants attached to the Declaration of Patrick F. Ferguson ("PJF Decl.") (Doc. # 587) in support of Defendants' Motion for Summary Judgment, filed on Aug. 28, 2009, and additional evidence attached to either the Declaration of Andrea M. Hogan ("AMH Decl.") or the Declaration of Jayni E. Foley ("JEF Decl.") in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment (Doc. # 667 and 680, respectively). The JEF Decl. includes primarily documents produced by Plaintiffs after the discovery cut-off from the files from Wiggins-Teape's Butler's Court facility, which were produced as recently as September 29, 2009. Defendants are still in the process of reviewing this sizable production, which contains numerous new relevant documents. Additional evidence from this production is attached to the Supplemental Declaration of Jayni Foley ("Supp. JEF Decl.") filed concurrently herewith. Evidence not previously submitted to this Court is noted in **bold**.

## RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT

Because of the volume of proposed findings of fact set forth by Plaintiffs, before responding to each specific proposed finding of fact, Defendants have summarized why the alleged facts, by topic area, do not preclude summary judgment in Defendants favor:

I. **BACKGROUND INFORMATION ON, AND EARLY TESTING OF, PCBS [NOS. 1-13].**

There is no material dispute of fact as to the background information and early testing of PCBs that would preclude summary judgment here. While tests were conducted on PCBs as early as the 1930s, by the mid-1950s NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. Moreover, it is undisputed that by 1967, NCR knew that PCBs persisted in the environment, and by 1969 at the latest, NCR knew that Aroclor 1242 presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to PCBs persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

2

## II.  THE DEVELOPMENT OF CARBONLESS COPY PAPER ("CCP") AND NCR CORPORATION'S TESTING OF AROCLOR 1242 [NOS. 14-27].

The basic process of producing CCP is agreed upon by all parties.  While adverse health effects from Aroclor were found as early as the 1950s, it is undisputed that by 1967, NCR knew that PCBs persisted in the environment, and by 1969 at the latest, NCR knew that Aroclor 1242 presented a risk to the environment.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

## III.  THE PROCESS OF MAKING AND SELLING CCP [NOS. 28-33].

There are no material issues of fact as to the process of making and selling CCP.  In the United States, NCR produced PCB-containing emulsion for CCP and sold the emulsion to licensees and contractors (including Appleton Coated Paper Company).  The licensees and contractors used the PCB-containing emulsion to create and apply a coating onto the CCP, and sold the finished CCP back to NCR.

## IV.  THE PUBLICATION OF SILENT SPRING DEALING WITH DDT [NOS. 34-40].

There are no material issues of fact as to the publication of *Silent Spring* and DDT that would preclude summary judgment here.  The first part of Rachel Carson's *Silent Spring* was published in the *New Yorker* in 1962.  PCBs and DDT have "general similarities in structure and properties," including similarities in "environmental persistence, and two high-dose effects (on skin and liver)," but they are not identical.  *See* Roach Decl. Ex. 22 [Aug. 7, 2009 Report of E. Anderson at 40].  In any event, Plaintiffs concede that Swedish scientist Soren Jensen's 1966 article suggested that PCBs persisted in the environment, and that Jensen's findings were given to NCR by Monsanto.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50.

## V.  THE PUBLICATION OF THE JENSEN REPORT AND RESPONSES FROM MONSANTO AND NCR [NOS. 41-79].

Plaintiffs apparently seek to create a disputed fact regarding knowledge of the environmental risks of PCBs and Aroclor 1242 prior to the early 1970s; however, no material dispute exists.  Plaintiffs' proposed findings on this topic are immaterial and do not preclude summary judgment for Defendants because:

- As early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success.  They were looking for improvements in **toxicity**, odour and cost.") (emphasis added).

- Plaintiffs concede that Soren Jensen's 1966 article suggested that PCBs persisted in the environment, and that Jensen's findings were provided by Monsanto to NCR.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50.

3

- It is undisputed that Dr. Vodden testified that in 1969 he informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications, such as NCR's. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

- In 1969, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers, AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes], and further explained that what was thought to be Aroclors 1254 and 1260 found in the environment could actually be the more chlorinated constituents of the Aroclor 1242 mixture that remained after the degradation of the less chlorinated isomers in Aroclor 1242. **Supp. JEF Decl. Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

Despite this knowledge, ACPC, and then NCR (after its acquisition of ACPC) continued to send PCB-laden broke to the some of the Defendants for recycling into 1971. *See* PJF Decl., Ex. 45 [January 28, 2009 F. Heinritz Depo. at 96:14-25]; **Supp. JEF Decl. Ex. 20 [January 28, 2009 F. Heinritz Depo. at 97:1-14].**

## VI.     MONSANTO ANNOUNCES THAT IT WILL STOP SELLING AROCLOR 1242 [NOS. 80-100].

Similar to Section V, here Plaintiffs seek to create a disputed fact as to Plaintiffs' knowledge regarding the environmental risk of PCBs by setting forth various actions Monsanto took in terminating Aroclor 1242 and its communications on that topic, including alleged communications that use of Aroclor 1242 would not result in environmental harm.  There is no material dispute of fact, however, because as described *supra* Section V, communications between Monsanto and Plaintiffs establish that Plaintiffs knew of the environmental risk of PCBs by 1967 through the Jensen report, and this knowledge was reconfirmed by Monsanto by 1969.

## VII.    NCR AND MONSANTO DEVELOP AND IMPLEMENT MIPB AS A REPLACEMENT SOLVENT FOR AROCLOR 1242 [NOS. 101-124].

There are no material issues of fact as to NCR and Monsanto's development of MIPB as a replacement solvent for Aroclor 1242 use in the United States.  It is undisputed that by the mid-1960s, NCR was considering a replacement for Aroclor 1242 for both business and toxicity reasons, and met with Monsanto representatives several times to discuss a replacement for Aroclor 1242.  *See* Roach Decl. Ex. 65 [Dec. 15, 1965 NCR Progress Report (NCR-FOX-0445928)]; Ex. 66 [Jan. 1966 Progress Report (NCR-FOX-0318306)]; AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19.  After renewed and widespread publicity in 1969 concerning PCBs in birds and mammals off the English coast (the Irish Sea Bird Incident and the Cornish Seal Incident), Dr. Vodden of Monsanto met with NCR's Martin Kelly in 1969 and explained that Aroclor 1242 was going to be removed from sales to open applications such as NCR's, which could result in releases of PCBs to the environment.  Dr. Vodden explained that the Aroclor 1242 mixture contained PCB isomers that were persistent and that could bioaccumulate, and that

4

would remain in the environment even after less chlorinated constituents in 1242 had degraded. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Therefore, even if "1242" itself might not be observed in the environment, releases of 1242 had undoubtedly contributed significantly to the levels of PCBs that were being observed.

## VIII.   GOVERNMENT STATEMENTS, ACTIONS AND INQUIRIES REGARDING PCBS [NOS. 125-150].

Plaintiffs seek (but fail) to create a disputed fact as to both Plaintiffs' and Defendants' knowledge regarding the environmental risks of PCBs by citing various statements and actions by the government and other non-parties to this litigation. These alleged facts are immaterial and do not preclude summary judgment, because when the government or other parties began to investigate and/or regulate PCBs does not equate to the time period when any party to this litigation knew of, or should have known of, the environmental risks of PCBs. Further, government investigations would have begun much earlier had Plaintiffs not concealed what they knew about PCBs.

## IX.   PUBLIC DISCLOSURES OF FACT OF PCBS IN CCP [NOS. 151-156].

Plaintiffs set forth a number of facts regarding alleged disclosures by NCR of the PCB content of CCP which are immaterial and do not preclude summary judgment because Plaintiffs never provide evidence of disclosure by NCR to Defendants. Additionally, Plaintiffs set forth facts regarding the alleged lack of contamination incidents for trucks used to ship both hazardous and non-hazardous materials that are immaterial and ignore that this practice did result in milk contamination.

## X.   WIGGINS TEAPE TESTING REGARDING BROKE RECYCLING [NOS. 157-167].

Plaintiffs' proposed findings regarding WT's testing of broke recycling are immaterial and do not preclude summary judgment for Defendants, because the recent production of Butler's Court documents demonstrates beyond any question that WT, NCR, and ACPC had a longstanding, technical collaboration, evidenced by numerous meetings, visits to each other's facilities, and letters they exchanged between 1953 and 1971. *See* JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]. Moreover, Plaintiffs admit that "it is undisputed that the results of this program revealed the presence of PCBs in broke, paper products made from recycled broke, and the wastewater generated during the recycling process." *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 45.

## XI.   CCP IN POST-CONSUMER GRADES OF RECOVERED FIBER [NOS. 168-180].

Plaintiffs set forth a series of facts about the content of post consumer waste recycled by Defendants, in particular after the production of CCP containing PCBs ended. Many of these facts are undisputed, but are immaterial given that it is undisputed that discharges to the Fox River after mid-1971 were dramatically lower (only 2% of the total volume of PCBs discharged to the River, according to government estimates) than prior to mid-1971, and Plaintiffs have offered no evidence that such discharges after mid-1971 were not minimal. *See* Defendants' Reply to Plaintiffs' Response to Defendants' Proposed Findings of Fact at ¶¶ 118-119; **Supp.**

JEF Decl. Ex. 15 [Wisconsin Department of Natural Resources, "Technical Memorandum 2d" (hereinafter "WDNR Tech Memo 2d")] at 21 [APIFOX00000001-48].

## XII.   ACTIONS AND STATEMENTS OF PAPER TRADE ORGANIZATIONS AND DEFENDANTS REGARDING PCBS [NOS. 181-373].

Plaintiffs devote almost 200 paragraphs to various allegations regarding Defendants' knowledge regarding the PCB content of CCP, actions taken by Defendants in recycling CCP and post-consumer waste paper, Defendants' discharges of effluent containing PCBs, and Defendants' wastewater treatment practices before they had any knowledge of PCBs. These alleged facts are immaterial because: (1) Defendants' continued recycling was endorsed by the government because it resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling; and (2) It is undisputed that discharges to the Fox River after mid-1971 were dramatically lower than prior to mid-1971, and Plaintiffs have offered no evidence that such discharges after mid-1971 were not minimal.

## XIII.   STATUTES AND REGULATIONS REGARDING THE USE AND RECYCLING OF PCBS OR PCB-CONTAINING PRODUCTS [NOS. 374-390].

Plaintiffs make various allegations regarding EPA's authorization of paper recycling, effluent discharge limits and Defendants' compliance with these limits. These alleged facts are immaterial and do not preclude summary judgment because it is undisputed that EPA did, in fact, authorize the recycling of CCP because it determined that permitting such recycling would not present an "unreasonable risk of injury to health or the environment." Moreover, Defendants' recycling resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

Responses to each of Plaintiffs' specific Proposed Findings of Fact are set forth below.

# I.    BACKGROUND INFORMATION ON, AND EARLY TESTING OF, PCBS.

**PPFF 1:  Monsanto was the sole U.S. producer of Aroclors. Roach Decl., Ex. 1 [July 17, 1975 WDNR Progress Report (NCR-FOX-0162508)].**

Response to PPFF 1:

Undisputed.

**PPFF 2:  Aroclors are a series of chlorinated hydrocarbons.  Roach Decl., Ex. 2 [Monsanto Salesmen's Manual (MONSFOX00092612), at 1].**

Response to PPFF 2:

Undisputed.

**PPFF 3:  Each Aroclor had a specific percentage of chlorination and generally was named based on that percentage (for instance, Aroclor 1242 received its name because it contained 42 percent chlorine, and Aroclor 1254 received its name because it contained 54 percent chlorine).  Roach Decl., Ex. 2 [Monsanto Salesman's Manual (MONSFOX00092612), at 1].**

Response to PPFF 3:

It is undisputed that the "*approximate* chlorine content is indicated by the last two figures of the Aroclor number."  Roach Decl. Ex. 2 [Monsanto Salesman's Manual at 1] (emphasis added).

Aroclor 1242, like all other Aroclors, was a mixture of different chlorine compounds, such that it overlapped with Aroclors with higher chlorine percentages, such as Aroclor 1248 and 1254.  AMH Decl. Ex. 14 [Aroclor Chart]; Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts] at 14-16 ("Aroclor 1242 was homed in on a trichlor or three-chlorine homologue, but in point of fact, it did contain all the homologues up to and including the hexachlor and the six chlorine ones. Now, altogether, in any of the Aroclors there were about 200 different components of different chlorine levels, including not only the level of chlorine, but also the different arrangement of the chlorine atoms around the molecule.")

**AMH Decl. Ex. 14 Aroclor Chart:**



**PPFF 4: Aroclors were used in a wide variety of industrial and commercial applications, including paints, inks, varnishes, waxes, lacquers, lubricants, hydraulic fluids, rubber, thermostats, textiles, and coatings in swimming pools and water tanks. Roach Decl., Ex. 2 [Monsanto Salesmen's Manual (MONSFOX00092612), at 20-40].**

Response to PPFF 4:

Undisputed.

**PPFF 5: Prior to 1966, no studies were conducted on the effects of Aroclor in the environment.**

Response to PPFF 5:

Unsupported, incorrect, and immaterial. Affirmative evidence shows that several studies were conducted on the effects of Aroclor in the environment prior to 1966. For example, the expert report of Joseph Rodricks states that as early as the 1950s "based on both publicly *available scientific knowledge* and *private testing results*, NCR knew, or should have known, that PCBs were: (a) toxic to animals and people; (b) stable and persistent in the environment; (c) highly soluble in fatty materials such as milk; and (d) not soluble in water. The latter three characteristics should have given rise to a suspicion by NCR that PCBs could bioaccumulate in the food chain." Declaration of Patrick J. Ferguson in Support of Certain Defendants' Motion for Summary Judgment, Or Alternatively, Partial Summary Judgment (hereinafter "PJF Decl.") Ex. 6 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 56 (emphasis added).

The expert report of Joseph Rodricks describes several studies published prior to 1966 which tested the effects of Aroclor in the environment:

• The 1944 Miller study, "Pathologic Changes in Animals Exposed to a Commercial Chlorinated Diphenyl" reported effects on animals exposed to Aroclor 1242.

• The Rodricks report further states: "By the mid 1960s there was ample scientific reason for NCR to believe that nonoccupational exposures to PCBs, as might occur through the food chain, could pose a risk of harm to human health."

• "Some of the first PCB toxicity testing programs on birds were reported in 1962 by Dr. E.L. McCune and colleagues at the University of Missouri, who observed toxicity associated with the paint used on laboratory chicken cages; the paint contained Aroclor 1242. . . . .McCune et al. found that 'the major toxic agent is the chlorinated biphenyl.'"

• "In 1965, Flick et al. reported pathological changes occurring in chicks ingesting PCBs at various dietary levels. Pathological changes included discoloration of the pancreas, enlarged hemorrhagic kidney, enlarged adrenal, dermatitis, and defeathering."

• "Analytical methods capable of identifying PCBs in tissue samples became available in 1966, when Jensen identified PCBs in 200 pike (Esox lucius), fish spawn, a white-tailed eagle (Haliaeetus albicilla), and humans from Sweden using gas chromatography—mass spectroscopy (GC-MS) techniques. Jensen described PCBs as 'related to and as poisonous as DDT,' and stated that PCBs may enter the body through skin, inhalation, or by ingestion."

Declaration of Andrea M. Hogan in Support of Certain Defendants' Opposition to Plaintiffs' Motion for Summary Judgment on Phase I (hereinafter "AMH Decl.") Ex. 25 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 29-33.

In any event, PPFF 5 is immaterial because as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 6: Limited health effects studies were performed on PCBs in the 1930s and 1940s, which studies often included chlorinated biphenyls and napthalenes. Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at 12, n.17].**

Response to PPFF 6:

Unsupported and immaterial.  It is undisputed that health effects studies were performed on PCBs in the 1930s and 1940s, which often included chlorinated biphenyls and napthalenes.  *See* AMH Decl. Ex. 25 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 29-33.  However, PPFF 6 inaccurately describes the health effects studies during the 1930s and 1940s as "limited," when in fact there were numerous studies on the health effects of chlorinated biphenyls during that period.  The expert report of Joseph Rodricks describes several:

> • "Jones JW and Alden HS. 1936. An acneform dermatergosis. Arch. Dermatol. Syphilol. 33(6):1022-1034. (JDGFOX00000726-38)"

> • "Drinker CK, Warren MF, and Bennett GA. 1937. The problem of possible systemic effects from certain chlorinated hydrocarbons. J. Ind. Hyg. Toxicol. 19(7):283-311. (JDGFOX00000739-67)"

> •"Bennett GA, Drinker CK, and Warren MF. 1938. Morphological changes in the livers of rats resulting from exposure to certain chlorinated hydrocarbons. J. Ind. Hyg. Toxicol. 20(2):97-123. (JDGFOX00000768-94)"

> • "Miller JW. 1944. Pathologic changes in animals exposed to a commercial chlorinated diphenyl. Publ. Health Rep. 59(33):1085-1093. (JDGFOX00000852-62)"

AMH Decl. Ex. 25 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 29.

Further, the alleged fact is immaterial.  As early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19.  And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967.  Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 7:  Some of the studies performed on PCBs in the 1930s and 1940s identified chloracne and liver effects during certain work place exposure routes and certain exposure levels, however the results were not definitive for PCBs because the exact compound or set of compounds was not accurately determined.  Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams at 12, n.17].**

Response to PPFF 7:

Inaccurate and immaterial.  PPFF 7 is inaccurate.  Several studies on the health effects of chlorinated biphenyls in the 1930s and 1940s identified chloracne and liver effects specifically due to PCBs.  *See* AMH Decl. Ex. 25 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 29-33 (citing several 1937 reports on PCB health effects).

In any event, PPFF 7 is immaterial because as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex.

16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50; PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas]. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 8: These early studies of PCBs were summarized in September 1972 as follows: "Although there were sporadic reports during the 1930s and 1940s in the industrial medical literature of toxic effects of PCBs and of mixtures containing PCBs, they were not generally regarded either as hazardous chemicals or as potential environmental contaminants." Roach Decl., Ex. 4 [Panel on Hazardous Trace Substances (NIEHS), "PCBs – Environmental Impact," Environmental Research, September 1972 (NCR-FOX-0578310)].**

Response to PPFF 8:

Unsupported and immaterial. PPFF 8 is overbroad and incomplete. PPFF 8 makes a statement regarding how PCBs were "generally regarded" that is contradicted by other evidence.

The expert report of Joseph Rodricks states the toxicity of Aroclors was repeatedly demonstrated by the 1930s and 1940s:

Shortly after the commercialization of PCBs in 1930, reports began to appear in the scientific literature of cases of poisoning of workers involved in PCB manufacture and use. . . . By the 1940s, more skin and liver problems had been observed in electricians and factory workers exposed to products that contained PCBs. *Journal articles described the toxicity of "Arochlors" as having "been repeatedly demonstrated*, both from the standpoint of their absorption from the inspired air as well as from their effect in producing a serious and disfiguring dermatitis when allowed to remain in contact with the skin."

AMH Decl. Ex. 25 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 30 (emphasis added).

In any event, the alleged fact is immaterial. Butler's Court documents indicate that NCR began looking for replacements to Aroclor 1242 in the 1950s because of concerns about Aroclor's toxicity. JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in **toxicity**, odour and cost.") (emphasis added); AMH Decl. Ex. 16 [7/29/54 NCR Letter]. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 9: Monsanto sales manuals, internal memoranda and letters to customers prior to 1971 all stated that Aroclors did not represent industrial toxicological problems at ordinary temperatures. Roach Decl., Ex. 5 [November 30, 1950 Letter from Monsanto to American Smelting & Refining Co. (NCR-FOX-0575146)]; Ex. 6 [April 10, 1962 Letter from Monsanto to St. Clair Shores Fire Department (NCR-FOX-0575354)]; Ex. 7 [May 6, 1964 Letter from Monsanto to Raytheon Company (NCR-FOX-0575378)]; Ex. 8 [May 19, 1969 Letter from Monsanto to PPG Industries (NCR-FOX-0575886)]; Ex. 9 [July 23, 1969 Letter from Monsanto to New Jersey Department of Conservation and Economic Development (NCR-FOX-0575899)].**

Response to PPFF 9:

Unsupported, incorrect, and immaterial. PPFF 9 is unsupported and contradicted by affirmative evidence.

As an initial matter, PPFF 9 is unsupported by Roach Declaration, Exhibits 5 and 6. These letters do not refer to "Aroclor" at all. Instead, they refer to Pydraul AC or Pydraul A-200, stating that the "toxicity of this material is of a very low order." The letters also state that the compound made the animals "sick and lethargic," and "there was evidence of upper respiratory infection present for 36 hours." Roach Decl., Ex. 6.

Second, PPFF 9 is incorrect because several Monsanto internal memoranda, letters, and meeting notes prior to 1971 indicated toxicological problems due to Aroclors at ordinary temperatures.

For example, in April 1970, Monsanto revised its warning labels for Aroclor 1242 to specifically warn of environmental risks, PJF Decl. Ex. 43 [April 1970 Monsanto Warning Labels], and these labels were sent to NCR. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts at 84-90]. Monsanto also sent a letter to all of its customers, including NCR, in June 1970, stating that it was discontinuing the sale of PCBs for use in plasticizer applications (including the Aroclor used in CCP) because of worldwide concern over environmental contamination. PJF Decl. Ex. 44 [June 1970 Monsanto Letter, marked and authenticated as Exhibit 601 at April 30, 2009 T. Clark Depo. (Ex. 82) at 173:21-174:25].

Moreover, Monsanto records from prior to 1970 also state that Aroclors present toxicological problems.

- Roach Declaration Exhibit 8 is a letter from Elmer Wheeler at Monsanto to Dr. A. Goldberg at PPG Industries describing two publications "which relate to the *toxicity* and safe usage of our Aroclors." Ex. 8 [May 19, 1969 Letter from Monsanto to PPG Industries (NCR-FOX-0575886)] (emphasis added). The Monsanto letter states: "The discussion of 'toxicity' is factual to the extent that there can be skin effects and *systemic effect evidenced in the liver*." *Id*. (emphasis added).

- In late 1969, Dr. H.A. Vodden of Monsanto's research department arranged a meeting with Martin Kelly of NCR's Borehamwood CCP emulsion production

facility. AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 26-29]. During this 1969 meeting, Dr. Vodden explained to Martin Kelly that Aroclor 1242 had constituents that were persistent and would bioaccumulate, that its degradation residues resulting from Aroclor 1242 releases would pose those problems, that the production of NCR Paper resulted in open and uncontrolled releases of Aroclor 1242, and that because of these environmental concerns, Monsanto was going to stop selling it for use in the production of NCR Paper. AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 26-29].

- In December 1969 and January 1970, Monsanto tested the effluent from NCR's facilities in the US and UK, and found "quite high" levels of Aroclor 1242. PJF Decl. Ex. 37 [1969 Monsanto Aroclor Water Samples]; Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; Ex. 39 [Aug. 19, 2009 E. Tucker Depo. at 39:18-41:20].

Therefore, Monsanto internal memoranda and letters to customers prior to 1971 did state that Aroclors presented toxicological problems at ordinary temperatures.

Further, PPFF 9 is immaterial because it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 10: Monsanto's recommendations regarding work place exposure to Aroclor included: (1) at elevated temperatures, removal of vapors from the workplace using local exhaust ventilation; and (2) avoiding prolonged breathing of Aroclor vapors or mists and direct skin contact (due to risk of irritation, not possible toxicity). Roach Decl., Ex. 5 [November 30, 1950 Letter from Monsanto to American Smelting & Refining Co. (NCR-FOX-0575146)]; Ex. 7 [May 6, 1964 Letter from Monsanto to Raytheon Company (NCR-FOX-0575378)]; Ex. 8 [May 19, 1969 Letter from Monsanto to PPG Industries (NCR-FOX-0575886)]; Ex. 9 [July 23, 1969 Letter from Monsanto to New Jersey Department of Conservation and Economic Development (NCR-FOX-0575899)].**

Response to PPFF 10:

Incorrect and immaterial. The proposed finding of fact is incorrect because Monsanto recommended avoiding prolonged contact with Aroclor due to toxicity concerns, not just skin irritation.

Roach Declaration Exhibit 8 is a letter from Elmer Wheeler at Monsanto describing two publications "which relate to the *toxicity* and safe usage of our Aroclors." Ex. 8 [May 19, 1969 Letter from Monsanto to PPG Industries (NCR-FOX-0575886)] (emphasis added). The letter states: "The discussion of 'toxicity' is factual to the extent that there can be skin effects and *systemic effect evidenced in the liver*." *Id*. (emphasis added).

Roach Declaration Exhibit 7 likewise states that Monsanto's New York office requested information "relative to the *toxicity* and safe handling of Aroclor," including Aroclor 1242. Ex. 7 [May 6, 1964 Letter from Monsanto to Raytheon Company (NCR-FOX-0575378)] (emphasis added). The May 6, 1964 letter evaluated the "acute toxicity problem," and recommended limiting exposure to Aroclor in order to "eliminate the *hazard* of skin absorbtion." Roach Decl. Ex. 7 (emphasis added). Roach Declaration Exhibit 9 also reviews testing done on "chronic toxicity." *Id.*, Ex. 9 [July 23, 1969 Letter from Monsanto to New Jersey Department of Conservation and Economic Development (NCR-FOX-0575899)].

Further, PPFF 10 is immaterial because it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 11: However, Monsanto repeatedly stated there was no hazard concern from occasional short-term skin exposure to Aroclors or Aroclor vapors. *See, e.g.*, Roach Decl., Ex. 7 Ex. [May 6, 1964 Letter from Monsanto to Raytheon Company (NCR-FOX-0575378)]; Ex. 8 [May 19, 1969 Letter from Monsanto to PPG Industries (NCR-FOX-0575886)].**

Response to PPFF 11:

<u>Incorrect and immaterial</u>. PPFF 11 is incorrect and incomplete because it omits significant information showing Monsanto's knowledge of the known hazard from Aroclors. For example, a May 19, 1969 Monsanto letter states: "The discussion of 'toxicity' is factual to the extent that there can be skin effects and *systemic effect evidenced in the liver*." *Id.* (emphasis added). Roach Decl. Ex. 8 [May 19, 1969 Letter from Monsanto to PPG Industries (NCR-FOX-0575886)] (emphasis added).

In any event, PPFF 11 is immaterial because as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 12: Monsanto arranged for testing on the acute toxicity of PCBs and determined that they were not acutely toxic. Roach Decl., Ex. 10 [November 10, 1953 Certificate of Analysis from Scientific Associates (MONSFOX00061898)]; Ex. 11 [December 11, 1953 Certificate of Analysis from Scientific Associates (NCR-FOX-0575151)].**

Response to PPFF 12:

Unsupported, incorrect, and immaterial. PPFF 12 is unsupported and incorrect because these test results do not show that PCBs are not "acutely toxic." Instead, these letters report test results showing that rats dosed with Aroclor developed lethargy, diarrhea, and "the liver was dull red with a greenish hue while the spleen was abnormally dark." Roach Decl. Ex. 11 [December 11, 1953 Certificate of Analysis from Scientific Associates (NCR-FOX-0575151)] at 3. Further, "the intestinal track was irritated with mucus present in several instances." Ex. 10 [November 10, 1953 Certificate of Analysis from Scientific Associates (MONSFOX00061898)].

Second, Monsanto had other tests done which showed Aroclor toxicity. *See, e.g.,* Roach Decl. Ex. 8 [May 19, 1969 Letter from Monsanto to PPG Industries (NCR-FOX-0575886)]; AMH Decl. Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 26-29]; PJF Decl. Ex. 37 [1969 Monsanto Aroclor Water Samples]; *Id.* Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; *Id.* Ex. 39 [Aug. 19, 2009 E. Tucker Depo. at 39:18-41:20].

In any event, PPFF 12 is immaterial because as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 13: Monsanto visited CCP manufacturing facilities in 1953 and 1954 and understood the manufacturing process for CCP and NCR's use of Aroclor 1242. Roach Decl., Ex. 12 [Dec. 7, 1953 NCR Impact Printing Report (NCR-FOX-325163)]; Ex. 13 [Apr. 28, 1954 Mead Research Laboratories Report (MONSFOX00000300)].**

Response to PPFF 13:

Undisputed. However, Roach Decl., Ex. 12 [Dec. 7, 1953 NCR Impact Printing Report (NCR-FOX-325163)] does not support PPFF 13. This document states only that Monsanto visited Mead Corporation to run tests on "Aroclor and Formaldehyde vapor concentrations." It does not state that Monsanto "understood the manufacturing process for CCP and NCR's use of Aroclor 1242," as PPFF 13 claims, nor does it contain information supporting that statement.

## II. THE DEVELOPMENT OF CARBONLESS COPY PAPER ("CCP") AND NCR CORPORATION'S TESTING OF AROCLOR 1242.

**PPFF 14: In the mid-1950s, NCR Corporation ("NCR") developed a paper system – the CCP brand of carbonless copy paper ("CCP") – that could make multiple copies without the use of carbon paper. Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 8].**

Response to PPFF 14:

Undisputed.

**PPFF 15:  CCP consisted in its simplest form of two overlain sheets, each with a special coating.  Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 8].**

Response to PPFF 15:

Undisputed.

**PPFF 16:  The top sheet, called "Coated Back," was coated on its backside with a thin layer of microscopic capsules, which capsules contained colorless ink, oils, and a transfer solvent.  Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 8]; Ex. 15 [Aug. 7, 2009 Report of H. Kytomaa at 3].**

Response to PPFF 16:

Undisputed.

**PPFF 17:  The bottom sheet, called "Coated Front," was coated on its face with a special clay or resin and contained no solvent. Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore, at 8]; Ex. 15 [Aug. 7, 2009 Report of H. Kytomaa at 3].**

Response to PPFF 17:

Undisputed.

**PPFF 18:  Pressure applied to the face of the Coated Back sheet (such as by pen, printer or typewriter key) would rupture the microscopic capsules, transferring the solvent to the Coated Front sheet below, where it would react with the special clay or resin on the Coated Front sheet to form an image identical to the image printed or written on the Coated Back sheet.  Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 8]; Ex. 15 [Aug. 7, 2009 Report of H. Kytomaa at 3].**

Response to PPFF 18:

Undisputed.

**PPFF 19:  A solvent was required to hold the ink in suspension inside the microcapsules.  Roach Decl., Ex. 16 [P. Phillips Dep. at 69:2-14]; Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 12].**

Response to PPFF 19:

Undisputed.

**PPFF 20:  Aroclor 1242 was the only type of PCB ever used in CCP. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 12].**

Response to PPFF 20:

It is undisputed that the PCB Aroclor 1242 was used in CCP, including NCR's CCP. *See id.* However, the PPFF is not supported by the evidentiary material cited in support of this proposed finding of fact. The expert report of Marcia Williams does not state that Aroclor 1242 was the *only* type of PCB ever used in CCP. Further, PPFF 21 describes how NCR tested virtually all of the PCB Aroclors manufactured by Monsanto for use in CCP.

**PPFF 21: NCR's Research Group tested many kinds of materials for potential solvents, including virtually all of the PCB Aroclors manufactured by Monsanto. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 38].**

Response to PPFF 21:

Undisputed.

**PPFF 22: Monsanto and NCR engaged in testing of Aroclor 1242 to determine if it would be safe to use in the emulsion for CCP from a health and workplace safety perspective. Roach Decl., Ex. 12 [Dec. 7, 1953 Impact Printing Report (NCR-FOX-0325163)]; Ex. 17 [June 4, 2009 Report of M. Williams, at 38].**

Response to PPFF 22:

Undisputed.

**PPFF 23: After workplace air levels were tested and found to be below the recommended 8-hour workplace standard, Monsanto informed NCR that, "Aroclor does not have cumulative effects and does not cause liver damage. They [Monsanto] do not believe that there is an industrial hazard caused by our use of Aroclor or Formaldehyde under normal conditions." Roach Decl., Ex. 12 [Dec. 7, 1953 Impact Printing Report (NCR-FOX-0325163)].**

Response to PPFF 23:

Unsupported and immaterial. PPFF 23 is unsupported and inadmissible because it is based on a hearsay statement. The NCR report describes a statement allegedly made by a Monsanto employee after a visit to Mead Corporation. This is a hearsay statement that is not admissible for the truth of the matter asserted. *See* Fed. R. Evid. 802.

Moreover, PPFF 23 is immaterial because as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 24:  NCR also contracted with Hill Top Research Institute, Inc., an independent laboratory, for toxicology testing and allergenic studies on PCB-containing CCP.**  *See, e.g.*, Roach Decl., Ex. 18 [Oct. 10, 1955 Hill Top Research Report to NCR (APIFOX00032939)]; Ex. 19 [Aug. 8, 1958 Hill Top Research Report to NCR (JDGFOX00001319)]; Ex. 20 [Nov. 12, 1958 Hill Top Research Report to NCR (JDGFOX00001333)].

Response to PPFF 24:

Undisputed.

**PPFF 25:  A November 1958 study performed by Hill Top Research Institute Inc. concluded, "No chronic or cumulative toxic effects would be expected to occur in humans handling the NCR paper forms daily."  Roach Decl., Ex. 21 [Nov. 12, 1958 Hill Top Research Report to NCR (NCR-FOX-477426) at 6].**

Response to PPFF 25:

Overbroad and immaterial.  PPFF 25 is overbroad because results of the November 1958 study found the livers of rabbits dosed with NCR emulsion coating to be "granular and vocuolated," to contain "cysts," and to be "necrosed."  Roach Decl. Ex. 21 at 3, 5.

PPFF 25 is also immaterial because as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] at 18-19 ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success.  They were looking for improvements in **toxicity**, odour and cost.").  And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967.  Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 26:  Plaintiffs' expert Elizabeth Anderson concluded that, prior to 1971: "[T]he extent of testing shows that NCR was being conscientious by trying to fully understand the potential hazards associated with its products, including CCP and its various components such as Aroclor 1242."  Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson at 15].**

Response to PPFF 26:

Incorrect and immaterial.  PPFF 26 is immaterial because Plaintiffs have produced a significant volume of documents from the Wiggins-Teape's ("WT") Butler's Court facility after the discovery cut-off and after the report of Elizabeth Anderson was issued.  These documents reveal an ongoing technical exchange over the course of almost two decades between NCR, WT and ACPC coinciding in part with WT's own testing of the risks of recycling broke, along with substantial knowledge of NCR and ACPC regarding the toxicity of CCP and NCR broke, the

effect of recycling broke and the persistence and bioaccumulation of PCBs (including Aroclor 1242 in the environment). *See generally* JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]. Because Elizabeth Anderson's report does not consider this evidence, PPFF 26's evidentiary support lacks foundation.

Moreover, PPFF 26 is incorrect because Plaintiffs knew or should have known by 1965 that recycling broke resulted in the discharge of PCBs to waterbodies, and thus should have done something to stop this much sooner. The Butler's Court documents evidence more than <u>20</u> in-person technical meetings between NCR, WT, and ACPC in 1964-66 (some days-long) in which all aspects of CCP production, including broke recycling, were discussed, at the same time that WT was conducting a major investigation of broke recycling and the fate of PCBs in that procedure. ***See* JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; Supp. JEF Decl. Ex. 10 [BCFOX00057271] [September 14, 1965 WT research report]; Supp. JEF Decl. Ex. 7 [GPFOX00030219] [March 24, 1965 Letter from BAT to WT].**

And having received and read Soren Jensen's findings in February of 1967, there can be no dispute that NCR at that time ***knew*** that the use of PCBs created an environmental ***risk.*** PJF Decl., Ex. 21 [*New Scientist* Article]; Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas, attaching study].

**PPFF 27: Plaintiffs' expert Marcia Williams has opined, "in the 1950s when NCR decided to utilize Aroclor 1242 as a solvent for its CCP emulsion, neither regulations nor knowledge would suggest any concern with the use of PCBs in this application." Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams, at p. 39].**

Response to PPFF 27:

<u>Vague and immaterial</u>. PPFF 27 is immaterial because Plaintiffs have produced a significant volume of documents from the Wiggins-Teape's ("WT") Butler's Court facility after the discovery cut-off and after the report of Marcia Williams was issued. These documents reveal a comprehensive, ongoing technical exchange that took place over the course of almost two decades between NCR, WT and ACPC coinciding in part with WT's own testing of the risks of recycling broke, along with substantial knowledge of NCR and ACPC regarding the toxicity of CCP and NCR broke, the effect of recycling broke and the persistence and bioaccumulation of PCBs (including Aroclor 1242 in the environment). *See generally* JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]. Because Marcia Williams' report does not consider this evidence, PPFF 27's evidentiary support lacks foundation.

Moreover, PPFF 27 is immaterial when compared with NCR's own decision to begin looking for replacements to Aroclor 1242 in the 1950s because of concerns about Aroclor's toxicity. JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in **toxicity**, odour and cost.") (emphasis added).

Finally, PPFF 27 is also immaterial because it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor

presented a risk to the environment and that Monsanto would be terminating all Aroclor sales. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

## III.    THE PROCESS OF MAKING AND SELLING CCP.

**PPFF 28:  From the time it was first commercially sold throughout the 1970s, CCP was used primarily in multi-page forms used in offices and businesses. Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 8].**

Response to PPFF 28:

Undisputed.

**PPFF 29:  In the United States, emulsion for CCP was produced by NCR and sold to licensees, which made the coating, applied the coating on paper, and sold finished CCP back to NCR.  Roach Decl., Ex. 15 [Aug. 7, 2009 Report of H. Kytomaa, at 3].**

Response to PPFF 29:

Undisputed.

**PPFF 30:  Appleton Coated Paper Company ("ACPC") sold emulsion-containing paper trimmings ("broke") generated during the production of CCP to brokers, who then sold the broke to paper recycling mills.  Roach Decl., Ex. 23 [F. Heinritz Dep. 20:15-20, 28:18-21].**

Response to PPFF 30:

Undisputed.

**PPFF 31:  In Europe, NCR licensed Wiggins-Teape to produce CCP at two facilities in England and one in Belgium.  Def. Prop. Findings of Fact at ¶¶ 25, 26.**

Response to PPFF 31:

Undisputed.

**PPFF 32:  Wiggins-Teape was licensed to (and did in fact) sell CCP.  Roach Decl., Ex. 24 [Sep. 18, 2009 G. Vichare Dep. at 87:17-21].**

Response to PPFF 32:

Undisputed.

**PPFF 33:  ACPC was not licensed to sell CCP.  Roach Decl., Ex. 24 [Sep. 18, 2009 G. Vichare Dep. at 87:17-21].**

Response to PPFF 33:

Undisputed.

## IV.    THE PUBLICATION OF SILENT SPRING DEALING WITH DDT.

**PPFF 34:  The first part of Rachel Carson's *Silent Spring* was published in the *New Yorker* in 1962.  *See* PJF Decl. at Ex. 13 [*Silent Spring* Excerpt].**

Response to PPFF 34:

Undisputed.

**PPFF 35:  *Silent Spring* focused on pesticides that were applied directly and intentionally into the ground, plants and water bodies to kill pests.  Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at 47].**

Response to PPFF 35:

Undisputed.

**PPFF 36:  The chemical properties of DDT and Aroclor 1242 do not suggest that these two chemicals would have similar toxicities or environmental effects.  Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson at 39-46]; Ex. 25 [J. Herbig Dep. at 244:11-14].**

Response to PPFF 36:

Incorrect and immaterial.  The expert report of E. Anderson states that PCBs and DDT have "general similarities in structure and properties," including similarities in "environmental persistence, and two high-dose effects (on skin and liver)."  Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson] at 40.

Further, the deposition testimony of Joseph Rodricks states that PCBs and DDT share the characteristics of being fat soluble and resistant to degradation.  *See* [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 148 -149 (not appended by Plaintiffs as Exhibit 29).

The alleged fact is in any event immaterial and does not preclude summary judgment.  As early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19.  And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967.  Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 37:  While pesticides had chemical similarities to PCBs, they also had chemical similarities to hundreds – and possibly thousands – of other chemicals in use.  Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at 47].**

Response to PPFF 37:

Immaterial.  The alleged fact is immaterial and does not preclude summary judgment.  It is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967.  Further confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due PCBs' persistence and tendency to bioaccumulate.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 38:  There are differences between DDT and Aroclor 1242 – both in terms of the manner in which they were used and the adverse effects they cause – and so there is no reason to believe that they would act similarly in the environment.  Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson at 39-46]; Ex. 26 [H. Vodden Dep. at 113:6-13]; Ex. 25 [J. Herbig Dep. at 244:11-14].**

Response to PPFF 38:

Incorrect and immaterial.  The expert report of E. Anderson states that PCBs and DDT have "general similarities in structure and properties," including similarities in "environmental persistence, and two high-dose effects (on skin and liver)."  Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson] at 40.  Therefore, there is "reason to believe that they would act similarly in the environment," contrary to PPFF 38.

Further, the deposition testimony of Joseph Rodricks states that PCBs and DDT share the characteristics of being fat soluble and resistant to degradation.  *See* [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 148 -149 (not appended by Plaintiffs as Exhibit 29).

PPFF 38 is in any event immaterial.  As early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19.  And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967.  Further confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 39:  John Stutz testified that any connection between DDT and PCB was "speculation" on his part and that this "speculation" did not even come to his mind until the time he was "looking for a replacement for Aroclor" (which he testified was in the late 1960s).  Roach Decl., Ex. 27 [J. Stutz June 18, 2009 Dep. at 71:24-72:7, 82:3-84:6].**

Response to PPFF 39:

Incorrect and immaterial.  John Stutz testified that he thought "environmental concerns might have a role in" the replacement of Aroclor, and that "Aroclor would perform similarly to DDT."  Roach Decl., Ex. 27 [J. Stutz June 18, 2009 Depo. at 82].  Stutz also testified that he

discussed these concerns about Aroclor biopersistence with colleagues at NCR in the last 1960s. *Id*. at 83-84.

PPFF 38 is in any event immaterial. It is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 40: NCR only experimented with encapsulating DDT for at most "a couple days," and this was done by a research group that had absolutely no involvement with CCP. Roach Decl., Ex. 25 [J. Herbig Dep. at 26:21-27:17; 243:13-244:14].**

Response to PPFF 40:

Unsupported and immaterial. Herbig never states that microencapsulation of DDT took "at most" a couple of days. Instead, he states: "it could have been a couple days." Roach Decl., Ex. 25 J. Herbig Depo. at 243.

In any event, PPFF 40 is immaterial because it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

## V. THE PUBLICATION OF THE JENSEN REPORT AND RESPONSES FROM MONSANTO AND NCR.

**PPFF 41: In 1966, Swedish scientist Soren Jensen presented findings suggesting for the first time that some PCBs persisted in the environment. Roach Decl., Ex. 28 [Dec. 15, 1966 New Scientist Article (MONSFOX00003427)].**

Response to PPFF 41:

Inaccurate. The Jensen article reported the widespread prevalence of PCBs generally, and did not specify specific types of PCBs. Further, while the December 15, 1966 *New Scientist* article describes the findings that PCBs persist in the environment, the article does not state that this suggestion was made "for the first time."

The alleged fact in any event does not preclude summary judgment. Plaintiffs concede that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Further confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 42:  Prior to the publication of Jensen article, no one made any connection between DDT and PCB.  Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson at 39-46]; Ex. 29 [J. Rodricks Dep. at 148:12 – 149:19].**

Response to PPFF 42:

Unsupported and inaccurate.  Exhibit 22, the August 7, 2009 Report of Elizabeth Anderson describes the field of Structure/Activity Relationships ("SAR") and Plaintiffs' expert concludes that based on her current analysis using SAR, "the structures of [PCBs and DDT] are not considered equivalent."  Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson at 39-46] at 43.  Elizabeth Anderson's Report continues to discuss, in her view, the differences in toxicity between PCBs and DDT.  However, the report never states that "no one made *any connection* between DDT and PCB."  Further, the deposition testimony of Joseph Rodricks states:

Q:      At that point in time, let's take 1960, was it generally recognized that PCB and DDT shared those same chemical properties you mention in your report; fat solubility, ability to magnify – biomagnify?

A:      Generally recognized?

Q:      Yeah.

A:      There had not been the kind of public investigation of PCBs that went on with DDT.  DDT was in very widespread use.  The material - - I think Monsanto probably understood that it would be a stable fat soluble substance – that's in their material - - resistant to degradation, in the early '60s, maybe even before that time, at Monsanto.  And that's in some of their public materials.

But you don't have the same body of knowledge that you have with DDT.  Not at all.

**Supp. JEF Decl. Ex. 18 [August 20, 2009 J. Rodricks Dep. at 148]**.  Therefore, Dr. Rodricks does state that Monsanto likely knew in the early 1960s that PCBs and DDT shared the characteristics of being fat soluble and resistant to degradation.

The alleged fact in any does not preclude summary judgment.  Plaintiffs concede that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967.  Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 43:  In 1967, Monsanto forwarded to NCR a copy of a rendition of a lecture on PCBs given by Jensen.  PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas, attaching copy of lecture (GNCR0000013), also (JDGFOX00000037)].**

Response to PPFF 43:

Underdisputed.  However, while the document transmitted by Monsanto to NCR is a copy of a lecture given by Soren Jensen, it is also referred to in the cover letter from Monsanto as "the original paper of Dr. Jensen in Sweden."  PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas].

**PPFF 44:  Defendants' expert, Joseph Rodricks, testified that, prior to 1967, there was no knowledge of risk that PCBs could bioaccumulate.  Roach Decl., Ex. 29 [J. Rodricks Dep. at 23:3-24:21].**

Response to PPFF 44:

Inaccurate and immaterial.  PPFF 44 mischaracterizes Dr. Rodrick's testimony, which is that the characteristics of PCBs "should have given rise to a suspicion that PCBs could accumulate in the food chain."  *Id*. at 23:21-23.  In addition, Dr. Rodrick's Expert Report states:

> In the 1950s, based on publicly available scientific knowledge and private testing results, NCR knew or should have known that PCBs were: (a) toxic to animals and people; (b) stable and persistent in the environment; (c) highly soluble in fatty materials such as milk; and (d) not soluble in water.  The latter three characteristics should have given rise to a suspicion by NCR that PCBs could bioaccumulate in the food chain.

**Supp. JEF Decl. Ex. 19 [August 11, 2009 J. Rodricks Expert Report at 8].**

Additionally, Rodricks also testified at page 154 that:

Q:      Then is there any reason for NCR to have assumed, prior to 1967, that PCB would accumulate in the environment given what was known about DDT?

(Objection omitted)

A:      I think I did answer that.  I think it should have been a suspicion.  I don't think it rises to the level of an identifiable risk, but at least it should have been – they should have had some suspicion that there would be some release into water bodies from the recycling or from their own operations.

**Supp. JEF Decl. Ex. 19 [August 20, 2009 J. Rodricks Dep. at 154].**

The alleged fact is in any event immaterial and does not preclude summary judgment.  Plaintiffs concede that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967.  Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 45: It is well-recognized by the scientific community that a single, uncorroborated scientific study is not a basis on which to draw final conclusions. Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson at 31].**

Response to PPFF 45:

Unsupported and immaterial. Exhibit 22, Elizabeth Anderson's Expert Report states that "A single scientific report is useful for the generation of hypotheses and may lead to further research, but is not sufficient to make decisions and changes regarding an established process." *Id.* at 31. Elizabeth Anderson's Expert Report does not speak to what is "well-recognized by the scientific community."

The alleged fact is in any event immaterial and does not preclude summary judgment. There was not "one single, uncorroborated scientific study" finding that PCBs were persistent and widespread in the environment — instead "[b]etween 1967 and 1969, researchers around the world confirmed Jensen's findings that PCBs were widespread in nature and posed a clear risk to the environment and public health." **Supp. JEF Decl. Ex. 19 [J. Rodricks Expert Report at 8]**. For instance, Dr. Rodricks highlighted two 1968 studies that confirmed Jensen's findings: Risebrough's 1968 article, "[PCBs] in the Global Ecosystem" PJF Decl., Ex. 25, and Holmes, Simmon, and Tatton's 1968 article, "Chlorinated Hydrocarbons in British Wildlife." PJF Decl., Ex. 6 [J. Rodricks Expert Report at 42-43].

**PPFF 46: In 1967, NCR began to investigate Jensen's findings and sought additional information from Monsanto. Roach Decl., Ex. 30 [February 10, 1967 Monsanto Memorandum (MONSFOX00097886)].**

Response to PPFF 46:

Unsupported and immaterial. Exhibit 30, a February 10, 1967 Monsanto Memorandum, states that "We have been receiving quite a few communications from our customers, but the most critical one is NCR, who are very much involved with their carbonless copy paper." The memorandum also states "We feel our customers, especially NCR, may ask use for some sort of data concerning the safety of these residues in humans." Thus, the memorandum supports that NCR sought information from Monsanto, but not that "[i]n 1967, NCR began to investigate Jensen's findings."

The alleged fact is in any event immaterial and does not preclude summary judgment. Plaintiffs concede that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 47: In connection with providing a copy of that lecture, Monsanto stated its belief that the analytical issues as to the compound identified by Jensen were still uncertain. PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas, attaching copy of lecture (JDGFOX00000037)]; Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams at p. 24].**

Response to PPFF 47:

Incorrect and immaterial. PPFF 47 mischaracterizes the contents of the February 27, 1967 letter from R. Emmet Kelly of Monsanto to Dr. M. J. Thomas of NCR. The letter states: "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from small doses. Whether or not this is at all relevant to small quantities existing in human fat is, of course, an entirely different question." PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas].

Further, Plaintiffs mischaracterize Monsanto's opinion of the scientific studies on PCBs in the environment. After Monsanto received the Jensen study in 1967, Monsanto's Dr. Tucker validated the work "from an analytical chemistry viewpoint" and "[his] conclusion was – is that what Soren Jensen and Gunther Widmark did at their institute was done in a valid way and that the information that they produced was real." PJF Decl. Ex. 39 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 12:5-14:7].

And after renewed and widespread publicity in 1969 concerning PCBs in birds and mammals off the English coast (the Irish Sea Bird Incident and the Cornish Seal Incident), Dr. Vodden of Monsanto met with NCR's Martin Kelly that year and explained that components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

Moreover, the recent Butlers Court production establishes that as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in **toxicity**, odour and cost.") (emphasis added).

Plaintiffs also knew by 1967 that Aroclor was persistent in the environment and bioaccumulated— information that was confirmed by Monsanto in 1969. Yet, ACPC, and then NCR (after its acquisition of ACPC) continued to send PCB-laden broke to some of the Defendants for recycling until 1971. *See See* PJF Decl., Ex. 45 [January 28, 2009 F. Heinritz Depo. at 96:14-25]; **Supp. JEF Decl. Ex. 20 [January 28, 2009 F. Heinritz Depo. at 97:1-14].** In fact, in March 1969, when Monsanto provided a *San Francisco Chronicle* article summarizing a study finding PCB contamination in the San Francisco Bay Area to NCR, NCR stated that it would "take no action unless a second article appeared specifically naming their paper as the source of pollution." PJF Decl., Ex. 28 [Apr. 18, 1969 Monsanto Memo].

**PPFF 48: Monsanto also questioned whether the PCBs found in the environment by Jensen were Aroclors or some other type of PCB and whether the levels found in the environment were significant from a toxicological standpoint. PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas, attaching copy of lecture (JDGFOX00000037)]; Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams at p. 24].**

Response to PPFF 48:

Unsupported and immaterial.  PPFF 48 mischaracterizes the contents of the February 27, 1967 letter from R. Emmet Kelly of Monsanto to Dr. M. J. Thomas of NCR as described in Defendants' Response to PPFF 47.

And in 1969, Dr. Vodden of Monsanto met with NCR's Martin Kelly and explained that components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications.   *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

Further, Plaintiffs mischaracterize Monsanto's opinion of the scientific studies on PCBs in the environment.  After Monsanto received the Jensen study in 1967, Monsanto's Dr. Tucker validated the work "from an analytical chemistry viewpoint" and "[his] conclusion was – is that what Soren Jensen and Gunther Widmark did at their institute was done in a valid way and that the information that they produced was real."   PJF Decl. Ex. 39 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 12:5-14:7].

The alleged fact is in any event immaterial and does not preclude summary judgment, for the reasons in Defendants' Response to PPFF 47.

**PPFF 49:  Monsanto informed NCR that it would investigate Jensen's procedures and findings. In following up with Monsanto in a March 1967 letter, NCR wrote, "Your conclusions and plan of approach to define more precisely the identification of the particular chlorinated compounds would be most appreciated."  Roach Decl., Ex. 31 [Mar. 10, 1967 Letter from M.J. Thomas (PHGNCR-2007078)].**

Response to PPFF 49:

Undisputed.

**PPFF 50:  As late as March, 1969, Monsanto was still wondering whether the "PCBs" found by Jensen and in later California studies were actually PCBs, or were rather some other compounds, which, as a result of "the metabolism of other materials in the marine environment," only appeared to be PCBs.  Roach, Decl., Ex. 32 [Mar. 3, 1969 Monsanto Memorandum, attaching Press Release (MONSFOX00097467) at 3 of press release, stating "This raises the question of whether the substances identified in the Swedish work, and now in California, are actually PCBs – or whether they are compounds which, due to the metabolism of other materials in the marine environment, appear to be PCBs."].**

Response to PPFF 50:

Incomplete and immaterial.  Monsanto's statement is attached to a memorandum that acknowledges that Monsanto was conducting ongoing research on PCBs, and that the statement referred to in PPFF 50 was "probably the full extent of our statements until we are able to make definitive conclusions from our own research programs."  Roach Decl., Ex. 32 [Mar. 3, 1969 Monsanto Memorandum, attaching Press Release (MONSFOX00097467).

28

Further, Plaintiffs completely mischaracterize Monsanto's opinion of the scientific studies on PCBs in the environment. After Monsanto received the Jensen study in 1967, Monsanto's Dr. Tucker validated the work "from an analytical chemistry viewpoint" and "[his] conclusion was – is that what Soren Jensen and Gunther Widmark did at their institute was done in a valid way and that the information that they produced was real." PJF Decl. Ex. 39 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 12:5-14:7].

In 1969, Dr. Vodden was put in charge of the "environmental aspects" of Monsanto's Aroclor program, which had "been highlighted by the recent paper of Jensen in Sweden which indicated that polychlorinated biphenyls were accumulating in wildlife." PJF Decl., Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 18:1-19]. Vodden also described the 1969 publicity related to the PCB-linked death of sea birds in the Irish Sea as "one of the number of incidents that were occurring around that time, which tended to emphasize the results that Jensen had found in Sweden, the fact that PCBs were being found in wildlife." *Id.* at 19:1-18. Dr. Vodden met with NCR's Martin Kelly in 1969 and explained that components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

The alleged fact is in any event immaterial and does not preclude summary judgment. As early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50.

Also, Exhibit 32 is not a press release as Plaintiffs describe but instead is a "statement," and there is no evidence that it was publicly released. There is also no evidence that any party to this litigation had access to and/or read this statement.

**PPFF 51: Prior to the early 1970s, the existence of limited data suggesting that PCBs could result in adverse chronic health effects during certain workplace exposure situations did not equate to knowledge that the compound would be an environmental contaminant. Roach Decl., Ex. 33 [Oct. 1970 Gustafson Article, "PCBs – Prevalent and Persistent" (NCR-FOX-0576274)].**

Response to PPFF 51:

<u>Unsupported and immaterial</u>. Exhibit 33, the October 1970 Gustafson Article "PCBs – Prevalent and Persistent" does not support PPFF 51. Instead, the article refers to the discovery of PCBs in the environment in Sweden in 1966 and in the US in 1967 and concludes that "a wide variety of samples containing PCBs" makes them "truly ubiquitous." *Id.* at 1.

The alleged fact is in any event immaterial and does not preclude summary judgment. In the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT

29

"Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 52: Chemical users and the government routinely rely upon chemical manufacturers for information regarding potential risks to workers and the environment associated with the manufacturers' products. Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at 29].**

Response to PPFF 52:

Immaterial. The alleged fact is immaterial and does not preclude summary judgment. In the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 53: Monsanto, as the manufacturer of all PCBs sold in the United States, was in the best position to evaluate any scientific evidence relating to PCBs. *See* Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at 29-30].**

Response to PPFF 53:

Unsupported and immaterial. Exhibit 3, the Expert Report of Marcia Williams states that "[b]ecause of Monsanto's knowledge, they were uniquely positioned to provide tailored health and environmental effects information to NCR on PCBs as that information evolved in the late 1960s and early 1970s." Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at 30]. It does not state that Monsanto was "in the *best* position to evaluate *any* scientific evidence relating to PCBs," but simply says that Monsanto was uniquely positioned to share information regarding PCBs with NCR.

The alleged fact is in any event immaterial to Phase I, which addresses which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Therefore, Monsanto's knowledge as a non-party is not the issue; rather it is NCR and ACPC's knowledge, whether from Monsanto or other sources, which is material. NCR and ACPC's knowledge is laid out in detail in Doc. # 657, Certain Defendants' Responses to Plaintiffs' Proposed Findings of Fact and Additional Undisputed Facts That Preclude Summary Judgment in Favor of Plaintiffs, including specifically Additional

Undisputed Fact Nos. 1 – 98. *See also* Defendants' Response to PPFF 47 regarding Plaintiffs' knowledge.

**PPFF 54: It is reasonable for a purchaser of a chemical to rely on statements made by the manufacturer regarding its potential adverse effects. Roach Decl., Ex. 29 [J. Rodricks Dep. at 27:19-28:1].**

Response to PPFF 54:

Not a fact. PPFF 54 sets forth a conclusion of law regarding the reasonableness of Plaintiffs' actions and is not the proper subject of a Proposed Finding of Fact.

**PPFF 55: As late as 1969, Monsanto informed numerous governmental entities that it would not expect to find PCBs in the environment in a widespread manner. Roach Decl., Ex. 34 [March 24, 1969 Letter from Monsanto to Los Angeles County Air Pollution Control District (NCR-FOX-0575881)]; Ex. 35 [March 27, 1969 Letter from Monsanto to State of California Resources Agency (NCR-FOX-0575882)]; Ex. 36 [May 26, 1969 Monsanto Memorandum (NCR-FOX-0575888) (recounting conversation with representative of National Air Pollution Control Administration]; Ex. 37 [July 23, 1969 Monsanto Letter to New Jersey Department of Conservation and Economic Development (NCR-FOX-0575899)].**

Response to PPFF 55:

Unsupported and immaterial and/or inadmissible. PPFF 55 is unsupported by the following cited evidence:

- Exhibit 34 (March 24, 1969 Letter from Monsanto to Los Angeles County Air Pollution Control District) states that Monsanto doesn't understand the "origin of materials reported in the recent newspaper articles on the West Coast."

- Exhibit 35 (March 27, 1969 Letter from Monsanto to State of California Resources Agency (NCR-FOX-0575882) describes Monsanto's toxicity studies on fish, the characteristics and uses of PCBs, chronic inhalation studies and solubility of PCBs, and does not address PPFF 55.

- Exhibit 36 (May 26, 1969 Monsanto Memorandum) is inadmissible hearsay as it is a description by the author of a letter, Elmer P. Wheeler, about the position that a Mr. Bob Day would convey to Washington on Monsanto's behalf.

Exhibit 37 (July 23, 1969 Monsanto Letter to New Jersey Department of Conservation and Economic Development) does state that "we are unable at this time to conceive of how the PCB's can become widespread in the environment." This alleged fact is in any event immaterial and does not preclude summary judgment. It does not contradict Jensen's findings that PCBs were, in fact, persistent and widespread in the environment, and there is no evidence this statement was made to any party to this litigation. Moreover, it is undisputed that Dr. Vodden of Monsanto met with NCR's Martin Kelly and explained that components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of

Aroclor to all open and uncontrolled applications.   *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

**PPFF 56:  In 1969, Monsanto said it was still performing research on PCBs and customer uses of PCBs in an effort to understand the mechanisms that would result in the widespread environmental presence of PCBs.  *Id.***

Response to PPFF 56:

Incomplete and Immaterial.  The alleged fact is immaterial to Phase I, which addresses which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.

Moreover, whether or not there was still additional research being performed, this PPFF does not preclude summary judgment.  In the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19.  And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967.  Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor 1242 sales due to its persistence and tendency to bioaccumulate.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

There is also no evidence that Monsanto's statement was made to any party to this litigation.

**PPFF 57:  In a July 23, 1969 letter to the New Jersey Department of Conservation and Economic Development, Monsanto stated, "We are unable at this time to conceive of how the PCBs can become wide spread in the environment.  It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."  Roach Decl., Ex. 37 [July 23, 1969 Monsanto Letter to New Jersey Department of Conservation and Economic Development (NCR-FOX-0575899)].**

Response to PPFF 57:

Incomplete and Immaterial.  The alleged fact is immaterial to Phase I, which addresses which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  The statement in PPFF 57 simply states that Monsanto was certain PCBs were not distributed or broadcast in the same manner that pesticides were (applied to fields, crops, etc).  The statement has nothing to do with PCBs in NCR's CCP in Wisconsin.  There is also no evidence that this statement was made to any party to this litigation.

Moreover, PPFF 57 is immaterial because it is undisputed that Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor 1242 sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 58: In the same July 23, 1969 letter, Monsanto stated, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic." *Id*.**

Response to PPFF 58:

Immaterial. This letter from Monsanto was sent to the New Jersey Department of Conservation and Economic Development and there is no evidence that the letter was sent to any party to this litigation.

Moreover, the recent Butlers Court production establishes that as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in **toxicity**, odour and cost.") (emphasis added).

**PPFF 59: Soren Jensen similarly wrote in 1969: "Little is known about the toxicity of PCB in the levels found by us." Roach Decl., Ex. 38 [Oct. 18, 1969 Article (MONSFOX00083166)].**

Response to PPFF 59:

Immaterial. As with PPFF 58, there is no evidence that this study was provided to or read by any party to this litigation. In any event, Plaintiffs concede that Soren Jensen's 1966 article demonstrated that PCBs persisted in the environment, and that Jensen's findings were provided to NCR by Monsanto. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50. Additionally, the recent Butlers Court production establishes that as early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in toxicity, odour and cost."). Yet, ACPC, and then NCR (after its acquisition of ACPC) continued to send PCB-laden broke to some of the Defendants for recycling well into 1971. *See* PJF Decl., Ex. 45 [January 28, 2009 F. Heinritz Depo. at 96:14-25]; **Supp. JEF Decl. Ex. 20 [January 28, 2009 F. Heinritz Depo. at 97:1-14].**

**PPFF 60: Two Wisconsin researchers reported in 1970 that "[t]he toxicity and sublethal effects of the chlorinated biphenyls to biological systems has not been thoroughly examined" and that further investigations are needed before "control measures can be considered." Roach Decl., Ex. 39 [Veith & Lee, April 1970 Report, "A Review of Chlorinated Biphenyl Contamination in Natural Waters," (NCR-FOX-0616228) at p. 3].**

Response to PPFF 60:

Immaterial.  There is no evidence that any party actually received and read this article. Moreover, that further investigations regarding PCBs should be conducted does not contradict Plaintiffs' knowledge regarding the toxicity of PCBs, their persistence and bioaccumulation and adverse environmental effects.  *See* Defendants' Response to PPFF 47 and 59.

**PPFF 61:  Additional studies published regarding PCBs between 1967 and 1972 either did not identify the types of PCBs being found in the environment or did not indicate that Aroclor 1242 was being found.  Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 25]; Ex. 40 [1976 Fort Howard PCB Report (Ex. 114 to the Deposition of D. DeMeuse), at 15 (stating "Enclosed as a reference section to this report are many articles detailing PCBs in various wildlife forms. In all cases, however, the PCB's detected are not Aroclor 1242, but rather the higher chlorinated compounds.")].**

Response to PPFF 61:

Unsupported and immaterial.  Exhibit 17, the June 4, 2009 Report of Marcia Williams does not state that studies did not indicate that Aroclor 1242 was found, but instead states that "[p]ublicly available information on the presence of Aroclor 1242 in fish, birds, humans, or sediments *was not widely discussed or confirmed* as of May 1972 when the federal government issued a detailed report on PCBs in the environment."  *Id.* at 25 (emphasis added).

The alleged fact is in any event immaterial and does not preclude summary judgment.  It is undisputed that Dr. Vodden of Monsanto met with NCR's Martin Kelly and explained that components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

Dr. Vodden also explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers, AMH Decl. Ex. 26 [8/2609 C. Paton Depo. Excerpts] at 59:4-13; PJF Decl. Ex. 40 [12/19/69 minutes] ("1242 contains many PCB's . . . principally tri – some mono-, di-, tetra- and penta"); Ex. 36 [8/2509 H. Vodden Depo. Excerpts at 21:4-23:8], and that while no "Aroclor 1242" was found in the environment, its five and six chlorine ring constituents would remain after the 4 chlorine ring components had degraded, and that 1242 therefore could be and probably was a major source of the PCB contamination found in nature.  *See* PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254); **Supp. JEF Decl. Ex. 13 [August 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13];** PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher isomers of PCBs that would occur after the degradation").

As Dr. Vodden testified, 1242 was not being found in the environment precisely because after its less chlorinated constituents degraded, its remaining isomers (or homologues) resembled the higher chlorinated Aroclors:

Q:      Did degradation occur for all Aroclors?

34

A:      To some extent, although mostly in the lower chlorinated species.

Q:      How about Aroclor 1242?

A:      With Aroclor 1242, it became very clear from the work which we did at Ruabon that the lower chlorinated components would degrade very significantly, but the higher ones, above about four chlorines, say the fives and the sixes, would not degrade too very significantly with the micro-organisms that we were using. But, again, one has to look at the different sequence of events when it occurs through enzyme degradation in a particular animal, bird, or whatever. But we did find that all the lower chlorinated species, up to the tetrachlor PCB, did degrade almost completely in a relatively short time span.

                . . . .

        Indeed, if you do this, you find that you end up with a product which looks very much like Aroclor 1254, which was the product that people were claiming that they had found in the environment. **So this work seemed to indicate there was a pattern here that although Aroclor 1254 could be the source of contamination, there was no question that Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher isomers of PCBs that would occur after the degradation.**

Q:      And is that one of the conclusions that you reached, that **1242 was, in fact, a substance that had been released into the environment, that what was being observed from environmental samples were its residues**?

A:      Right, **yes**.

PJF Decl., Ex. 36 [Aug. 25, 2009 H. Vodden Depo. Excerpts at 21:4-23:8] (emphasis added).

**PPFF 62:  Those studies published regarding PCBs between 1967 and 1972, that specifically identified the type of PCB being found did not identify Aroclor 1242, but instead identified only the higher-chlorinated Aroclors.  Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 25]; Ex. 40 [1976 Fort Howard PCB Report (Ex. 114 to the Deposition of D. DeMeuse), at 15 (stating "Enclosed as a reference section to this report are many articles detailing PCBs in various wildlife forms. In all cases, however, the PCB's detected are not Aroclor 1242, but rather the higher chlorinated compounds.")].**

Response to PPFF 62:

Unsupported and immaterial.  *See* response to PPFF 61.

**PPFF 63:  No study that was published prior to 1972 ever found that Aroclor 1242 persisted in the environment, or otherwise suggested that Aroclor 1242 entered the food chain from discharges or otherwise posed risk of environmental harm.  Roach Decl., Ex. 29 [J. Rodricks Dep. at 152:7-15].**

Response to PPFF 63:

Unsupported and immaterial.  Dr. Rodricks' testimony at page 152 is:

Q:      Okay.  Was – prior to 1972, was there information, sufficient information to conclude that Aroclor 1242 would persist in the environment?

A:      Well, I - - you have to understand the state of knowledge and I think I've said this before.  What you knew was from the published literature that PCBs persist in the environment and accumulate.  We didn't have a lot of data on which specific congeners tend to accumulate.

**Supp. JEF Decl. Ex. 19 [August 20, 2009 J. Rodricks Dep. at 152].**  Dr. Rodricks did not testify that no study prior to 1972 ever found that Aroclor 1242 persisted in the environment.

Also, see response to PPFF 61 for an explanation of why the alleged fact is in any event immaterial.

**PPFF 64:  Monsanto had a business interest in not sharing all available information with NCR, as Monsanto documents and witnesses made clear that Monsanto would have lost business if NCR had stopped using PCBs in its emulsion before Monsanto was able to develop a satisfactory substitute.  PJF Decl., Ex. 26 [March 12, 1969 Monsanto Memorandum (PHGNCR-2007044) discussing the potential business impact of adverse publicity regarding Aroclors, and specifically referring to a potential shift of customers away from using PCBs as being the worst thing that could happen]; Roach Decl., Ex. 26 [H. Vodden Dep. at 89:19-90:2]; Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at p. 28].**

Response to PPFF 64:

Incorrect, unsupported and immaterial.  PJF Declaration Exhibit 26, the March 12, 1969 Monsanto Memorandum, states that the adverse publicity regarding Aroclors "may have little impact" or "may be very damaging, particularly if customers decide to play it safe and formulate around Aroclors."  The memorandum goes on to describe that NCR had a research program to evaluate Aroclor 1242 replacements and that Monsanto supplied NCR various blends for evaluation "not to aggressively affect a change but to keep NCR busy evaluating our products instead of the competition."  Roach Declaration Exhibit 26, Herbert Vodden's testimony does not address sharing information with NCR, but instead addresses sharing information with Monsanto's competitors.  On this topic, Vodden concludes that "I'm not sure we were particularly worried about our competitors finding out."  Roach Decl., Ex. 26 [H. Vodden Dep. at 90:3-5].  Exhibit 3, the August 6, 2009 Rebuttal Report of Marcia Williams states "Monsanto managed its public communications and its communications with key customers so that Monsanto would not lose customers prior to the availability of Monsanto product substitutes."  Thus, none of this evidence says anything about when and why Monsanto would share information with NCR.

36

Moreover, none of this evidence specifically addresses what Monsanto shared with Plaintiffs and/or what Plaintiffs knew, and for that reason the alleged fact is immaterial. In fact, Monsanto and NCR had a very close, open relationship regarding PCBs, evidenced by the fact that Monsanto sent a copy of Jensen's findings to NCR in February 1967. PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas]. There is no evidence that Monsanto shared such information with its *other* customers, but made an exception for NCR. PJF Decl., Ex. 26 [March 12, 1969 Monsanto Memo] at 1-2, 9. While Monsanto told NCR about the scientific studies because "Monsanto enjoy[ed] a strong position in this industry which [was] dominated by NCR." Monsanto determined to contact NCR regarding "adverse publicity," stating that "[i]t is recommended that with the exception of NCR, we do not bring this publicity to the attention of our Aroclor customers." PJF Decl. Ex. 26 [March 12, 1969 Monsanto Memo] at 1-2, 9; AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts at 25-28] ("we [Monsanto] did everything we could to keep [NCR] informed [about scientific information concerning PCBs].").

**PPFF 65: Internal Monsanto memoranda also make clear that NCR was seeking a replacement for Aroclor 1242 in order to reduce costs and odors associated with it, and that Monsanto was trying to delay this process by providing potential replacements that it did not believe would effect a change in NCR's use of PCB-containing emulsion. PJF Decl., Ex. 26 [March 12, 1969 Monsanto Memorandum (PHGNCR-2007044) stating "NCR have a research program to evaluate NCR replacements mainly because they want a non-propriety product, product with lower odor and lower cost… A year ago, we began to supply Aroclor/HB-40, Aroclor/IGM blends for evaluation by NCR not to aggressively affect a change but to keep NCR busy evaluating our products instead of the competition"].**

Response to PPFF 65:

Incomplete and Immaterial. PPFF 65 is incomplete because by 1969, Monsanto was already taking action to stop its sales and use of Aroclor 1242. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. The memorandum also states, "The adverse publicity on Aroclors . . . may be very damaging, particular if customers decide to play it safe and formulate around Aroclors."

Moreover, NCR had been seeking an alternative to Aroclor since the mid-1950s based not only on odor and cost, but also *toxicity*. *See* AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in **toxicity**, odour and cost.") (emphasis added).

In any event, it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, as NCR received the Jensen report in February 1967. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales due to its persistence and tendency to bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 66:  As late as January 1970, Monsanto was delivering its first shipment of a higher chlorinated Aroclor (Aroclor 1248) to a new customer, Champion Paper.  Roach Decl., Ex. 41 [Feb. 9, 1970 Monsanto Memorandum (MONSFOX00098824)].**

Response to PPFF 66:

Undisputed but immaterial.  Monsanto's actions taken with respect to a non-party to this litigation and a contaminant, Aroclor 1248, not an issue in this litigation, are immaterial.

**PPFF 67:  Champion Paper asked questions and had "doubts" about using Aroclor 1248, but Monsanto representatives discussed those doubts with Champion, including issues of pollution, and put Champion "more at ease about using" Aroclor 1248.  Roach Decl., Ex. 41 [Feb. 9, 1970 Monsanto Memorandum (MONSFOX00098824)].**

Response to PPFF 67:

Undisputed but immaterial.  There is no evidence that any party to this litigation was aware of these statements.  Further, Monsanto's actions taken with respect to a non-party to this litigation and a contaminant, Aroclor 1248, not an issue in this litigation, are immaterial.

**PPFF 68:  W.B. Papageorge was the Monsanto employee responsible for PCBs, particularly issues regarding the environmental aspects of PCBs, in the United States, while H.A. Vodden was one of the people responsible for such issues in Europe.  Roach Decl., Ex. 26 [H.A. Vodden Dep. at 87:22-88:2]; Ex. 42 [Oct. 30, 1969 Monsanto Memorandum (Ex. 947 to Vodden Dep.)].**

Response to PPFF 68:

Undisputed.

**PPFF 69:  In a December 15, 1970 letter, Mr. Papageorge (of Monsanto-U.S.) wrote to Dr. Vodden (of Monsanto-U.K.) and requested that Dr. Vodden make efforts to delay the publication of a study – by scientists with the British government – naming CCP as a source of Aroclor 1242, because Mr. Papageorge was concerned that "the resulting widespread knowledge that Aroclor 1242 is involved in significant quantities in this paper application will seriously affect our situation with NCR-U.S."  Roach Decl., Ex. 43 [Dec. 15, 1970 Letter (PHGNCR-2001014)].**

Response to PPFF 69:

Undisputed but immaterial.  There is no evidence that this memorandum or its contents were communicated to any party to this litigation.  Additionally, Exhibit 43, the December 15, 1970 Monsanto Letter, does not state that the study was by scientists in the British government, but instead simply refers to "Messers. Bailey and Bunyan" with no mention of their affiliation.

*See* response to PPFF 61 for further discussion of why this fact is immaterial.

**PPFF 70: In December 1969, Monsanto communicated to NCR: "No [Aroclor] 1242 [had been] found in any environmental samples" and "none found to date in environment – we think it degrades." Roach Decl., Ex. 44 [Dec. 16, 1969 Monsanto/NCR Meeting Notes (GPFOX00030900)].**

Response to PPFF 70:

Incomplete and immaterial. The alleged fact is incomplete. In the same December 1969 meeting and in separate meetings in the UK, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers, AMH Decl. Ex. 26 [8/2609 C. Paton Depo. Excerpts] at 59:4-13; PJF Decl. Ex. 40 [12/19/69 minutes] ("1242 contains many PCB's . . . principally tri – some mono-, di-, tetra- and penta"); Ex. 36 [8/2509 H. Vodden Depo. Excerpts at 21:4-23:8], and that while no "Aroclor 1242" was found in the environment, its five and six chlorine ring constituents would remain after the 4 chlorine ring components had degraded, and that 1242 therefore could be and probably was a major source of the PCB contamination found in nature. *See* PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254); **Supp. JEF Decl. Ex. 13 [August 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13**]; PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher isomers of PCBs that would occur after the degradation"). Dr. Vodden told Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

In any event, PPFF 70 is immaterial and does not preclude summary judgment. As early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19. And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50; PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas]. Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 71: Monsanto had neither determined that Aroclor 1242 was an environmental contaminant, nor that it was going to stop selling Aroclor 1242, before at least January of 1970. Roach Decl., Ex. 45 [Jan. 26, 1970 Monsanto Memo (Ex. 949 to H. Vodden Dep.) stating: "*If* in the long run, NCR paper is considered to be a pollution source," NCR "must find an alternative to Aroclor which could be introduced if the Aroclor system were deemed unacceptable," and referring to this possible switch to an Aroclor alternative as a "contingency plan."].**

Response to PPFF 71:

<u>Incorrect</u>.  In 1969, Dr. Vodden of Monsanto specifically told Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

Further, Exhibit 45, the January 26, 1970 Monsanto Memorandum does not state that Monsanto had not determined *Aroclor 1242* was an environmental contaminant, but only discusses whether *NCR paper* will be considered a pollution source "in the long run."  It also does not address Monsanto's internal sales plans for Aroclor 1242.

In any event, PPFF 71 is immaterial and does not preclude summary judgment.  As early as the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19.  And it is undisputed that by the mid-1960s, NCR knew that PCBs such as Aroclor presented a risk to the environment, because NCR received the Jensen report in February 1967.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50; PJF Decl., Ex. 24 [Feb. 27, 1967 Letter from Kelly to Thomas].  Confirming this knowledge, Monsanto told NCR in 1969 that Aroclor presented a risk to the environment and that Monsanto would be terminating all Aroclor sales.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 72:  Sometime prior to February 19, 1970, NCR told Monsanto that Monsanto should inform the British government that CCP utilized PCBs in its emulsion.  Roach Decl., Ex. 46 [February 19, 1970 Monsanto Memorandum (Ex. 951 to H. Vodden Dep.) stating that NCR and Wiggins Teape "agreed that [Monsanto] should identify the N.C.R. paper application for Aroclor at [Monsanto's] next meeting with the Ministry of Agriculture as a constructive and positive step."].**

Response to PPFF 72:

<u>Undisputed</u>.  However, PPFF 72 is incomplete and mischaracterizes the events leading up to Monsanto informing the British government that CCP utilized PCB in its emulsion as it omits that it is undisputed that NCR originally asked Monsanto not to identify NCR paper as a "major outlet" because NCR wanted to make sure its "housekeeping" was in order first.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 82.

**PPFF 73:  A letter that Monsanto sent to all customers in February of 1970 clearly informed customers that "PCBs with a chlorine content of less than 54% [which includes Aroclor 1242] have not been found in the environment and appear to present no potential problem to the environment."  Roach Decl., Ex. 47 [February 1970 Monsanto Customer Letter (Ex. 962 to H. Vodden Dep.)].**

Response to PPFF 73:

<u>Inaccurate and incomplete</u>.  The alleged fact is inaccurate because Monsanto took several actions in 1970 to alert its customers to the environmental concerns regarding Aroclor 1242:

- In June 1970, Monsanto sent a letter to Monsanto's customers, including NCR, stating that it was discontinuing the sale of PCBs for use in plasticizer applications (including the Aroclor used in CCP) because of worldwide concern over environmental contamination. PJF Decl. Ex. 44 [June 1970 Monsanto Letter, marked and authenticated as Exhibit 601 at April 30, 2009 T. Clark Depo. (Ex. 82) at 173:21-174:25].

- In April 1970, Monsanto revised its warning labels for Aroclor 1242 that specifically warned of environmental risks, PJF Decl. Ex. 43 [April 1970 Monsanto Warning Labels], and these labels were sent to NCR. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts at 84-90].

- Additionally, in March 1970, Monsanto issued a technical bulletin warning of "environmental hazards" of Aroclor 1242, including that the PCBs contained in Aroclor 1242 "may be harmful to certain forms of animal life." AMH Decl. Ex. 30 [Monsanto Technical Bulletin – Aroclor Plasticizer] at 13].

Further, after renewed and widespread publicity in 1969 concerning PCBs in birds and mammals off the English coast (the Irish Sea Bird Incident and the Cornish Seal Incident), Dr. Vodden of Monsanto met with NCR's Martin Kelly that year and explained that Aroclor 1242 was going to be removed from sales to open applications such as NCR's, which could result in releases of PCBs to the environment. Dr. Vodden explained that the Aroclor 1242 mixture contained PCB isomers that were persistent and that could bioaccumulate, and that would remain in the environment even after less chlorinated constituents in 1242 had degraded. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Therefore, even if "1242" itself might not be observed in the environment, releases of 1242 had undoubtedly contributed significantly to the levels of PCBs that were being observed. Dr. Vodden stated that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications due to concerns of biopersistence. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50, 66.

**PPFF 74: In April 1970, Monsanto issued a press release stating, "Monsanto's PCB program was initially directed at proper identification of chlorinated hydrocarbons appearing in the environment. This research, confirmed by others,** *found only the higher chlorinated materials*. **At the same time, Monsanto undertook animal feeding studies which show PCB** *is not a highly toxic material*.**" Roach Decl., Ex. 48 [Apr. 10, 1970 Monsanto Press Release (GPFOX00055242)].**

Response to PPFF 74:

Undisputed but incomplete and immaterial. *See* Defendants' Response to PPFF 61 and 73.

**PPFF 75: In May 1970, Monsanto stated that PCBs found in the environment in Europe were higher chlorinated PCBs. Roach Decl., Ex. 48 [April 10, 1970 Monsanto Press Release (GPFOX00055242)].**

Response to PPFF 75:

Unsupported and immaterial. Exhibit 48, the April 10, 1970 Monsanto Press Release, does not specifically address PCBs found in Europe. The alleged fact is also inaccurate and immaterial for the reasons discussed in Defendants' response to PPFF 61 and 73.

**PPFF 76: In October 1971, Dr. Vodden was finding that "the significant isomers in Aroclor 1242 also degrade completely," and that he expected his research to show that the "residues from Aroclor 1242 do not accumulate significantly." Roach Decl., Ex. 49 [October 6, 1971 Memorandum from H. Vodden (Ex. 968 to Vodden Dep.)].**

Response to PPFF 76:

Unsupported and immaterial. Plaintiffs mischaracterize Exhibit 49, the October 6, 1971 Memorandum from Herbert Vodden. The memorandum discusses two studies, and concludes "[a]pparently then there are *two completely opposite indications* of the degradability of these two products [including Aroclor 1242]" (emphasis added). Moreover, Dr. Vodden did not state that he "expected" his research to show that "residues from Aroclor 1242 do not accumulate significantly." Rather, he said the research "may" show this. *Id.*

Further, Dr. Vodden of Monsanto explained to NCR in 1969 that the Aroclor 1242 mixture contained PCB isomers that were persistent and that could bioaccumulate, and that would remain in the environment even after less chlorinated constituents in 1242 had degraded. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Therefore, even if "1242" itself might not be observed in the environment, releases of 1242 had undoubtedly contributed significantly to the levels of PCBs that were being observed. Dr. Vodden specifically stated that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications due to concerns of persistence in the environment. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50, 66.

The alleged fact is immaterial for the reasons discussed in Defendants' response to PPFF 61 and 73.

**PPFF 77: Defendants' expert Joseph Rodricks concluded that no published study reported that Aroclor 1242 was bioaccumulating before 1971. Roach Decl., Ex. 29 [J. Rodricks Dep. at 32:13-17].**

Response to PPFF 77:

Unsupported and immaterial. Plaintiffs mischaracterize the testimony of Dr. Rodricks. Dr. Rodricks testimony on page 32 is:

Q:     Were there any published reports, publicly available reports, or Aroclor 1242 being present in the water or the sediment or the fish *of the Fox River* prior to 1971?

A:     Not that I know of, no.

Roach Decl., Ex. 29 [J. Rodricks Dep. at 32:13-17] (emphasis added). Therefore, Dr. Rodricks' testimony addresses studies specifically relating to the Fox River, and does not support PPFF 77.

The alleged fact is immaterial for the reasons discussed in Defendants' response to PPFF 61 and 73-74.

**PPFF 78: NCR did not have the technical capability to test for PCBs until at least 1971, and the evidence demonstrates that NCR's attempts to perform its own PCB testing in 1971 were unsuccessful. Roach Decl., Ex. 50 [Dec. 22, 1971 Letter from Mead to Monsanto (MONSFOX00000330) (stating, "I understand from Dr. Taylor of NCR that after several attempts by their analytical department to measure PCB concentrations in some effluent samples they decided that their zero tests were invalid and, therefore, have submitted to your laboratories for analysis.")]; Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at 21, n.52].**

Response to PPFF 78:

Unsupported and immaterial. In Exhibit 3, the August 6, 2009 Rebuttal Report of Marcia Williams, Ms. Williams opines that "NCR had no capability to analytically measure PCBs in environmental samples prior to 1971 and NCR relied upon Monsanto for PCB analysis of environmental samples." *Id*. at 21, n. 52. Ms. Williams then relies on Roach Decl., Exhibit 50 [Dec. 22, 1971 Letter from Mead to Monsanto] as Plaintiffs do in PPFF 78. However, the December 22, 1971 letter from Mead to Monsanto states only that NCR's "zero tests" were invalid, and not that all of NCR's tests to measure PCBs in their effluent samples were invalid.

The alleged fact is in any event immaterial and does not preclude summary judgment as Plaintiffs' knowledge regarding the toxicity, persistence and accumulation of PCBs in the environment was not contingent on its own PCB testing. There is no dispute that WT, NCR's licensee, worked with British American Tobacco and Monsanto in 1965 to analytically measure PCBs. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 42-45. Further, in December 1969, NCR sent effluent samples to Monsanto, and Monsanto found PCB levels as high as 1,063 parts per million in such samples. *See* PJF Decl., Ex. 37 [1969 Monsanto Aroclor Water Samples].

**PPFF 79: Plaintiffs' expert Williams has opined: "While information on the environmental presence of PCBs grew considerably between late 1966 and May 1971, the information available to NCR during this timeframe did not indicate that [Aroclor 1242] was an environmental contaminant." Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams, at 39].**

Response to PPFF 79:

Immaterial. Williams' June 2009 report did not consider Dr. Vodden's September 2009 testimony that he informed NCR about the environmental impact of Aroclor 1242. Nor did Williams consider the overwhelming amount of evidence in the recent Butler's Court documents that show extensive communication and meetings between NCR, WT, ACPC, and others related to environmental discharges caused by recycling NCR paper. *See* JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR].

## VI. MONSANTO ANNOUNCES THAT IT WILL STOP SELLING AROCLOR 1242.

**PPFF 80:  Prior to Monsanto announcing that it was going to stop selling all PCBs, NCR became concerned that Monsanto would stop supplying Aroclor 1242 at some point. Roach Decl., Ex. 51 [Sep. 30, 2009 R. Jezerc Declaration].**

Response to PPFF 80:

Immaterial.  The alleged fact is immaterial and does not preclude summary judgment. That Aroclor 1242 was persistent and would bioaccumulate and that Monsanto was going to terminate sales was told to NCR in 1969, before Monsanto's general announcement to its customers in 1970.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.  That NCR was concerned about Monsanto terminating its sales of Aroclor 1242 prior to Monsanto's public announcement is unsurprising given that NCR had prior knowledge of this.

**PPFF 81:  In June 1970, Monsanto sent a letter to certain customers stating that it would stop supplying most of its Aroclors, including Aroclor 1242, for modifier and plasticizer applications effective August 30, 1970.  Roach Decl., Ex. 52 [June 1970 Letter (NCR-FOX-0517895)].**

Response to PPFF 81:

Unsupported in part.  While Exhibit 52 is a letter from Monsanto to its customers, it states that Monsanto has "come to a decision to discontinue the sale of PCB-containing products for modifier and plasticizer applications effective August 30, 1970."  The letter is clear that this includes Aroclor 1242, but does not specify that it encompasses "most of its Aroclors."

**PPFF 82:  The June 1970 letter did not specify that Aroclor 1242 had been found in the environment.  *Id.***

Response to PPFF 82:

Undisputed but immaterial.  Exhibit 52, the June 1970 letter from Monsanto to its customers references an earlier letter "notifying [customers] of the allegations that certain polychlorinated biphenyls (PCBs) had been found in the environment and were contaminants." The letter further states "[i]n review of these allegations . . . we have come to a decision to discontinue the sale of PCB-containing products for modifier and plasticizer applications effective August 30, 1970."

The alleged fact is immaterial and does not preclude summary judgment.  It is undisputed that Dr. Vodden told Mr. Kelly of NCR during a 1969 meeting that the components of Aroclor 1242 were persistent and would bioaccumulate and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.  Dr. Vodden of Monsanto explained that the Aroclor 1242 mixture contained PCB isomers that were persistent and that could bioaccumulate, and that would remain in the environment even after less chlorinated constituents in 1242 had degraded.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66; AMH Decl. Ex. 26 [8/2609 C. Paton Depo. Excerpts] at 59:4-13; PJF Decl. Ex. 40 [12/19/69 minutes] ("1242 contains many PCB's . . . principally tri – some

44

mono-, di-, tetra- and penta"); Ex. 36 [8/2509 H. Vodden Depo. Excerpts at 21:4-23:8]. Therefore, even if "1242" itself might not observed in the environment, its five and six chlorine ring constituents would remain after the 4 chlorine ring components had degraded, and that Aroclor 1242 had undoubtedly contributed significantly to the levels of PCBs being observed in nature.  *See* PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254); **Supp. JEF Decl. Ex. 13 [August 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13]**; PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher isomers of PCBs that would occur after the degradation").

**PPFF 83:  Monsanto did not recall its PCB products, but instead affirmatively told customers to use their existing materials before changing to replacements.  Roach Decl., Ex. 53 [Feb. 16, 1970 Monsanto Memorandum (NCR-FOX-0576082)].**

Response to PPFF 83:

Unsupported and immaterial.  Exhibit 53, the February 16, 1970 Monsanto Memorandum is an internal memorandum that follows up on a letter sent to transformer customers and relates solely to Aroclor 1254 and 1260.  Moreover, the letter does not state that Monsanto "affirmatively told customers to use their existing materials before changing to replacements," but instead says "[w]e want to avoid a situation where a customer wants to return a fluid."

The alleged fact is immaterial in any event and does not preclude summary judgment, because it relates to PCBs in materials sold to transformer customers, and not Aroclor 1242 as used in CCP.

**PPFF 84:  Unlike NCR, many Monsanto customers increased their purchases of Aroclor products before the August 30, 1970 phase-out deadline.  Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams, at 44-45].**

Response to PPFF 84:

Unsupported and immaterial.  Exhibit 3, the August 6, 2009 Rebuttal Report of Marcia Williams states that "many of [Monsanto's] customers had ordered extra amounts of the Aroclor materials prior to the August 30 phase-out deadline."  The Rebuttal Report does not state that NCR did not also increase its purchase of Aroclor products prior to the August 30, 1970 phase-out deadline.

Moreover, despite knowing that Aroclor presented risks of environmental harm by the mid-1960s, NCR nonetheless purchased increasing amounts of PCBs from Monsanto for use in the manufacture of CCP — from 0.6 million pounds in 1957, to 4.4 million pounds in 1967, 5.8 million pounds in 1968, 6.3 million pounds in 1969, and 6.6 million pounds in 1970.  PJF Decl. Ex. 30 [Jan. 19, 1976 NCR Letter]; *see also* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50.

The alleged fact is immaterial in any event and does not preclude summary judgment, because it describes the behavior of non-parties to the litigation.

**PPFF 85: Monsanto continued to sell its existing stock of Aroclor 1242 and related chlorinated products until mid-1972. Roach Decl., Ex. 54 [Jan. 31, 1972 Monsanto Letter to Pydraul customers (NCR-FOX-0576743)].**

Response to PPFF 85:

Unsupported and immaterial. Exhibit 54, the January 31, 1972 Monsanto Letter to Pydraul customers, discusses Pydraul products and states that Monsanto has "decided to stop using polychlorinated terphenyls as a component in our fluids." It does not include any discussion of Aroclor 1242, nor polychlorinated *bi*phenyls, or PCBs.

The alleged fact is immaterial in any event and does not preclude summary judgment, because it is undisputed that Monsanto notified its customers that it would stop supplying Aroclor 1242 for modifier and plasticizer applications, effective August 30, 1970, as described in PPFF 81, and Defendants' Response to PPFF 81.

**PPFF 86: Monsanto sold Aroclor 1242 for electrical uses until 1977. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 39-40, n.100].**

Response to PPFF 86:

Immaterial. Whether or not Monsanto sold Aroclor 1242 for applications such as electrical uses is immaterial and irrelevant to this litigation, which solely involves the use of PCBs in NCR emulsion and CCP.

**PPFF 87: In October 1970, the U.S. Department of Agriculture announced a cancellation of PCBs used in pesticides, but allowed for a six-month transition period to allow customers to use existing supplies. Roach Decl., Ex. 55 [Oct. 29, 1970 USDA Notice 70-25 (MONSFOX00095569)].**

Response to PPFF 87:

Immaterial. The U.S. Department of Agriculture's actions taken with respect to PCBs in pesticides are immaterial and irrelevant to this litigation, which solely involves the use of PCBs in NCR emulsion and CCP, and does not involve pesticides.

**PPFF 88: NCR voluntarily stopped using Aroclor 1242 in the production of CCP by April 1971. Roach Decl., Ex. 56 [Dec. 7, 1972 Letter from Monsanto to NYDEC (GPFOX00049252)].**

Response to PPFF 88:

Unsupported. Exhibit 56, the December 7, 1972 Letter from Monsanto to the New York State Department of Environmental Conservation does not address whether NCR's actions in terminating its use of Aroclor 1242 were voluntary. In fact, as PPFF 81 states, Monsanto notified its customers that it would stop supplying Aroclor 1242 in August of 1970, and thus NCR stopped using Aroclor 1242 in the production of CCP because a supply of Aroclor 1242 was no longer available; this was not a voluntarily action as Plaintiffs suggest.

46

**PPFF 89:  In 1971, Wiggins Teape stated "There was no evidence that we were doing anything detrimental.  There is still no certainty that we were, but as soon as we became aware of doubts, we took immediate action," and the decision to seek a replacement was made "in view of the possible but unascertainable hazard to the environment in the long term."  Roach Decl., Ex. 57 [Nov. 9, 1971 Wiggins Teape Memorandum (MONSFOX00000606)].**

Response to PPFF 89:

Undisputed but immaterial.  Additional text from Exhibit 57, the November 9, 1971 Wiggins Teape Memorandum, puts the statement in PPFF 89 in context.  The memorandum states: "Increasingly frequent suggestions have been made in recent years that certain polychlorinated biphenyls ("PCB's") might constitute an environmental hazard. . . . Wiggins Teape, recognizing at any early date that these suggestions might prove to be justified, mounted a major research effort and, having identified a satisfactory substitute material, have not since July 1970 used any PCB material in their manufacture of NCR Paper."  Moreover, the November 9, 1971 Wiggins Teape Memorandum describes *WT's actions* to replace Aroclor 1242 in CCP and *not* NCR's action.  Notably, while NCR finally stopped using Aroclor 1242 in April/May 1971, WT stopped using it almost a year earlier.  AMH Decl. Ex. 1 [Report on Apr.  28, 1970 Conversation with WT] (WT stating that the UK Ministry of Technology approved the step taken by WT to decide to make the switch from Aroclor to an alternative solvent); Ex. 2 [Monsanto Performance Review 1970 Objectives (stating that Aroclor 1242 had been replaced in NCR paper coating in the UK by July 1970).

The alleged fact is immaterial in any event and does not preclude summary judgment, because there is undisputed evidence that relates specifically to Plaintiffs' knowledge regarding Aroclor 1242.  The recent Butlers Court production establishes that as early as the mid-1950s, NCR itself began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success.  They were looking for improvements in **toxicity**, odour and cost.") (emphasis added).  Plaintiffs also concede that Soren Jensen's 1966 article demonstrated that PCBs persisted in the environment, and that Jensen's findings were communicated to NCR in February 1967 by Monsanto.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50.  Further confirming this knowledge, in 1969, Dr. Vodden told  Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications due to biopersistence.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

**PPFF 90:  Wiggins Teape was able to replace Aroclor 1242 for its products in the U.K. and Europe months before NCR was able to do so in the United States as a result of differences in the raw materials used in the CCP product overseas.  Roach Decl., Ex. 58 [Gordon Taylor Dep. at 104:17-105:15]; Ex. 26 [H. Vodden Dep. at 88:22-89:18].**

Response to PPFF 90:

Unsupported in part and immaterial.  Gordon Taylor's deposition testimony at 104:17-105:15 does not support PPFF 90 and instead states that Mr. Taylor's was having difficulty segregating his knowledge into specific time periods in response to a question asking during his deposition.  It does not in any way address PPFF 90.  The deposition testimony of Herbert Vodden states that "technological difficulties" caused delays in the U.S. in NCR's replacement of Aroclor 1242 and that HB-40 was not an acceptable solvent for "the system used by NCR in America."

The alleged fact is immaterial in any event and does not preclude summary judgment.  The recent Butlers Court production establishes that as early as the mid-1950s, NCR itself began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."  AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success.  They were looking for improvements in **toxicity**, odour and cost.") (emphasis added).  Thus, whether NCR was delayed in 1970 from finding a replacement for CCP due to "technological difficulties" is immaterial, given that NCR knew of Aroclor 1242's toxicity and was seeking an alternative in the mid-1950s.

**PPFF 91:  After Monsanto stopped selling PCBs, some U.S. companies found alternative sources through imports of PCBs from foreign manufacturers.  Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams at 45, n.130]; Ex. 59 [Feb. 25, 1976 Versar report, "PCBs in the U.S. – Industrial Use and Environmental Distribution" (GPFOX00023719)].**

Response to PPFF 91:

Irrelevant.  The alleged fact is immaterial and does not preclude summary judgment.  PPFF 91 relates to the actions taken by foreign manufacturers and other companies that are not parties to this litigation.

**PPFF 92:  After performing testing at NCR and Wiggins Teape locations in the United Kingdom, Monsanto sent letters to U.S. customers stating that Aroclor 1242 had not been found in environmental samples and that environmental samples appeared to be limited to higher chlorinated Aroclors.  Roach Decl., Ex. 60 [Jan. 13, 1970 Monsanto Memorandum (MONSFOX00056852)]; Ex. 17 [June 4, 2009 Report of M. Williams at 40, n.101].**

Response to PPFF 92:

Unsupported, misleading, and immaterial.  PPFF 92 does not include as evidence any such letters sent to U.S. customers stating that Aroclor 1242 had not been found in environmental samples and that environmental samples appeared to be limited to higher chlorinated Aroclors.  Moreover, Exhibit 60, the January 13, 1970 Monsanto Memorandum states that "the contamination levels in the surface water drain and the brook confirmed that considerable amounts of PCB had been discharged" and that the "mud in the brook was heavily contaminated."

Further, Monsanto specifically reported analytic results obtained from NCR's UK and US operations, including ACPC, showing high concentrations of PCB releases in discharges and the surrounding environment. *See* PJF Decl., Ex. 37 [1969 Monsanto Aroclor Water Samples]; Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; Ex. 39 [Aug. 19,2009 E. Tucker, Depo. at 39:18-41:20]. Vodden also said that Monsanto reported the UK results to NCR and WT. PJF Decl. Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 34:17-35:9, 49:12-50:3]. Therefore, PPFF 92 is misleading and/or incorrect in ignoring these results and disclosures.

The alleged fact is immaterial in any event and does not preclude summary judgment. It is undisputed that Dr. Vodden testified that he had already, during a 1969 meeting, informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate and that Monsanto was going to terminate its sales of Aroclor. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Moreover, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. **Supp. JEF Decl. Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

**PPFF 93: Monsanto sent a letter to one of its PCB customers, FMC Corporation, in May 1970 after testing at the NCR/affiliate facilities in the United States, stating that Aroclor 1242 was not an environmental contaminant. Roach Decl., Ex. 61 [May 19, 1970 Monsanto Letter to FMC (NCR-FOX-0576152)].**

Response to PPFF 93:

Immaterial and misleading. There is no evidence that the May 19, 1970 letter that was sent from Monsanto to FMC was provided to or read by any Defendant. Additionally, the May 19, 1970 Monsanto Letter to FMC states that Aroclor 1242 "has not been indited as an environmental contaminant" not that "Aroclor 1242 was not an environmental contaminant."

Further, Monsanto specifically reported analytic results obtained from NCR's UK and US operations, including ACPC, showing high concentrations of PCB releases in discharges and the surrounding environment. *See* PJF Decl., Ex. 37 [1969 Monsanto Aroclor Water Samples]; Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; Ex. 39 [Aug. 19,2009 E. Tucker, Depo. at 39:18-41:20]. Vodden also said that Monsanto reported the UK results to NCR and WT. PJF Decl. Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 34:17-35:9, 49:12-50:3]. Therefore, PPFF 93 is misleading and/or incorrect in ignoring these results and disclosures.

**PPFF 94: There is no indication that Monsanto communicated to NCR any time before May 1971 that NCR's use of Aroclor 1242 as a component in the emulsion it sold for the manufacture of carbonless paper would cause Aroclor 1242 to accumulate in the environment or that such use, or the recycling of carbonless paper resulting from such use, could result in environmental harm. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 40, n.101].**

Response to PPFF 94:

Immaterial and misleading.  Williams' June 2009 report did not consider Dr. Vodden's September 2009 testimony that he informed NCR about the environmental impact of Aroclor 1242.  Nor did Williams consider the overwhelming amount of evidence in the recent Butler's Court documents that show extensive communication and meetings between NCR, WT, ACPC, and others related to environmental discharges caused by recycling NCR paper.  *See* JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR].

Further, Monsanto specifically reported analytic results obtained from NCR's UK and US operations, including ACPC, showing high concentrations of PCB releases in discharges and the surrounding environment.  *See* PJF Decl., Ex. 37 [1969 Monsanto Aroclor Water Samples]; Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; Ex. 39 [Aug. 19,2009 E. Tucker, Depo. at 39:18-41:20].  Vodden also said that Monsanto reported the UK results to NCR and WT.  PJF Decl. Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 34:17-35:9, 49:12-50:3].  Therefore, PPFF 91 is misleading and/or incorrect in ignoring these results and disclosures.

**PPFF 95:  There is no indication that Monsanto communicated to NCR at any time before May 1971 that NCR's use of Aroclor 1242 caused Aroclor 1242 to accumulate in the environment or that NCR's use of Aroclor 1242 could result in environmental harm. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams, at 40].**

Response to PPFF 95:

Immaterial and misleading  *See* Defendants' Response to PPFF 94.

Monsanto specifically reported analytic results obtained from NCR's UK and US operations, including ACPC, showing high concentrations of PCB releases in discharges and the surrounding environment.  *See* PJF Decl., Ex. 37 [1969 Monsanto Aroclor Water Samples]; Ex. 38 [Monsanto Aroclor Environmental Contamination Status 1970]; Ex. 39 [Aug. 19,2009 E. Tucker, Depo. at 39:18-41:20].  Vodden also said that Monsanto reported the UK results to NCR and WT.  PJF Decl. Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 34:17-35:9, 49:12-50:3].  Therefore, PPFF 91 is misleading and/or incorrect in ignoring these results and disclosures.

**PPFF 96:  In a July 14, 1972 communication to FDA, Monsanto stated "that many PCBs are biodegradable, particularly the monochloro, dichloro and trichloro, with evidence that some of the tetrachloro and pentachloro also degrade."  Roach Decl., Ex. 62 [July 14, 1972 Monsanto Letter (MONSFOX00095580)].**

Response to PPFF 96:

Incomplete and immaterial.  The July 14, 1972 Monsanto letter to the Department of Health, Education and Welfare also states that "early evidence indicated that, like DDT, PCBs did not readily biodegrade in the environment."

The alleged fact is immaterial in any event and does not preclude summary judgment.  It is undisputed that in a 1969 meeting,  Dr. Vodden told Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

Moreover, in 1969 Monsanto also explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers, AMH Decl. Ex. 26 [8/2609 C. Paton Depo. Excerpts] at 59:4-13; PJF Decl. Ex. 40 [12/19/69 minutes] ("1242 contains many PCB's . . . principally tri – some mono-, di-, tetra- and penta"); Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8], and that its five and six chlorine ring constituents would remain after the 4 chlorine ring components had degraded, and that 1242 therefore could be and probably was a major source of the PCB contamination found in nature.  *See* PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254]; **Supp. JEF Decl. Ex. 13 [August 19, 2009 E. Tucker Depo. Excerpts at 66:22-67:13]**; PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher homologues of PCBs that would occur after the degradation").

Also, there is no evidence that any party to this litigation was provided or read the July 14, 1972 Monsanto letter to the Department of Health, Education and Welfare.

**PPFF 97:  In July 1972, the American Paper Institute reported to the federal Department of Health, Education, and Welfare that, "Aroclor 1242 – the PCB found in recycled paper board – is the least chlorinated form of PCB found in the environment….[T]here is no evidence to indicate that Aroclor 1242 either persists or accumulates in the environment."  Roach Decl., Ex. 63 [July 17, 1972 American Paper Institute Comments (NCR-FOX-0577479)].**

Response to PPFF 97:

Undisputed and immaterial.  *See* Defendants' Response to PPFF 96.

**PPFF 98:  On August 28th and 29th, 1975, the WDNR held hearings with respect to PCBs.  Roach Decl., Ex. 64 [August 28/29, 1975 WDNR Hearing Transcript (NCR-FOX-0096936)].**

Response to PPFF 98:

Undisputed.

**PPFF 99:  Mr. Papageorge of Monsanto testified before the WDNR, that "if we could just turn the clock back and only use let's say 1221, a 1232 and even a 1242 and no others, we probably wouldn't be sitting in this room today. I just don't think a problem would have developed."  Roach Decl., Ex. 64 [August 28/29, 1975 WDNR Hearing Transcript (NCR-FOX-0096936) at 26].**

Response to PPFF 99:

Undisputed and immaterial.  It is undisputed that Mr. Papageorge testified to this effect. However, in 1969 Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers, AMH Decl. Ex. 26 [8/2609 C. Paton Depo. Excerpts] at 59:4-13; PJF Decl. Ex. 40 [12/19/69 minutes] ("1242 contains many PCB's . . . principally tri – some mono-, di-, tetra- and penta"); Ex. 36 [8/2509 H. Vodden Depo. Excerpts at 21:4-23:8], and that while

no "Aroclor 1242" was found in the environment, its five and six chlorine ring constituents would remain after the 4 chlorine ring components had degraded, and that 1242 therefore could be and probably was a major source of the PCB contamination found in nature. *See* PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254); **Supp. JEF Decl. Ex. 13 [8/19/09 E. Tucker Depo. Excerpt at 66:22-67:13]**; PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher homologues of PCBs that would occur after the degradation").As Mr. Papageorge testifies in Exhibit 64, the August 28/29, 1975 WDNR Hearing Transcript, on page 26, Aroclors 1254 and 1260 were found in the environment.

**PPFF 100: Plaintiffs' expert Anderson has opined: "Even in 1972, after NCR had stopped the use of Aroclor 1242 in CCP, the manner by which PCBs reached the environment and the potential impacts of Aroclor 1242 on the environment were far from certain. The weight-of-evidence attesting to the adverse effects of Aroclor 1242 on the environment did not warrant action until after the decision to replace Aroclor 1242 had already been made and the substitution was completed." Roach Decl., Ex. 22 [August 7, 2009 Report of E. Anderson at 1-2].**

Response to PPFF 100:

Incorrect and immaterial.

The manner in which PCBs reached the environment was a matter specifically discussed by NCR and Monsanto. Monsanto undertook analytic sampling and reported waste water discharges directly to NCR, making it aware of the discharges from its operations and of PCB presence in the surrounding environment. The WT "mass balance" graph indicates huge releases from NCR's coating operations, which Vodden stated were reported to NCR in a joint meeting. PJF Decl., Ex. 42 [February 19, 1970 Minutes]; Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 45:22-46:23].

In any event, the alleged fact is immaterial and does not preclude summary judgment. There is undisputed evidence that relates specifically to Plaintiffs' knowledge regarding Aroclor 1242. *See* Defendants' Response to PPFF 47 and 61.

## VII.  NCR AND MONSANTO DEVELOP AND IMPLEMENT MIPB AS A REPLACEMENT SOLVENT FOR AROCLOR 1242.

**PPFF 101: NCR first considered a replacement for Aroclor 1242 in the mid-1960s for various business reasons, including a desire to replace the clay component on the coated front sheets for better performance, and a concern about relying on a single solvent and a single solvent supplier. Roach Decl., Ex. 65 [Dec. 15, 1965 NCR Progress Report (NCR-FOX-0445928)]; Ex. 66 [Jan. 1966 Progress Report (NCR-FOX-0318306)].**

Response to PPFF 101:

Incorrect and immaterial. NCR "first considered a replacement for Aroclor 1242" much earlier than the mid-1960s. In 1954, NCR was looking to replace Aroclor in CCP, in part

because Aroclor was "very toxic." AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]; JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in **toxicity**, odour and cost.") (emphasis added).

Further, in 1965, NCR and WT discussed replacement of Aroclor as a means to facilitate recycling. JEF Decl. Ex. 117 [Report on 12/13-15/65 WT Visit to NCR] at BCFOX00048821-2 (NCR studying HB-40 as an Aroclor replacement because it is "more easily removable in a repulping operation").

Moreover, the fact that NCR was considering a replacement for Aroclor for both business and toxicity reasons does not preclude summary judgment here. It is undisputed that during a 1965 meeting, Dr. Vodden of Monsanto informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications, including NCR's. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Yet, ACPC, and then NCR (after its acquisition of ACPC) *continued* to send PCB-laden broke to some of the Defendants for recycling until 1971. *See* PJF Decl., Ex. 45 [January 28, 2009 F. Heinritz Depo. at 96:14-25]; **Supp. JEF Decl. Ex. 20 [January 28, 2009 F. Heinritz Depo. at 97:1-14].**

**PPFF 102: In March 1969, NCR and Monsanto discussed NCR's ongoing efforts to find a substitute for Aroclor 1242. An internal Monsanto document reported, "NCR are always anxious to find replacements for Aroclor 1242 to get a lower cost, second source of supply, and lower odor." Roach Decl., Ex. 67 [April 18, 1969 Monsanto Memorandum (MONSFOX00080385) at 2].**

Response to PPFF 102:

Incomplete and immaterial. It is undisputed that NCR and Monsanto discussed NCR's ongoing efforts to find a substitute for Aroclor 1242 in 1969.

However, PPFF 102 is incomplete and immaterial because additional evidence shows that NCR and Monsanto had knowledge of the toxicity and environmental threat posed by Aroclor 1242 potentially as early as 1954, and certainly by 1967. *See* AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; Ex. 17 [Feb. 13, 1970 WT "Sleeping Tiger" Memo]. Plaintiffs concede that Soren Jensen's 1966 article demonstrated to them in 1967 that PCBs persisted in the environment, and it is undisputed that Dr. Vodden testified that he informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications, including NCR's. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 103: In December 1969, NCR and Monsanto met to discuss possible substitutes for Aroclor 1242, including monoisopropyl biphenyl ("MIPB"), the replacement candidate NCR ultimately chose to replace Aroclor 1242 the next year. Roach Decl., Ex. 44 [Dec. 16, 1969 Monsanto/NCR Meeting Notes (GPFOX00030900)].**

Response to PPFF 103:

Undisputed but immaterial. The alleged fact is immaterial and does not preclude summary judgment. It is undisputed that Dr. Vodden testified that during a 1969 meeting that he informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor due to biopersistence. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Moreover, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. **Supp. JEF Decl. Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13];** PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher homologues of PCBs that would occur after the degradation").

**PPFF 104:  Monsanto did not inform NCR at the meetings in March 1969 or December 1969 that there was any immediate need to find a replacement solvent for Aroclor 1242. Roach Decl., Ex. 44 [Dec. 16, 1969 Monsanto/NCR Meeting Notes (GPFOX00030900)]; Ex. 67 [April 18, 1969 Monsanto Memorandum Describing March 1969 Meeting (MONSFOX00080385)].**

Response to PPFF 104:

Overbroad, incorrect, and immaterial. Roach Declaration Exhibit 67 in fact states that:

> The meeting [with NCR] began by referring to previous publicity on Aroclors being identified in birds (Jensen & Widmark's worker[sic] of two-three years ago). . . . We presented the SFO Chronicle article and gave Monsanto's position on the article. NCR said it seemed provocative. . . . We then got down to a discussion of the technical needs of the dye solvent. There are two needs: (1) Aroclor 1242 replacement in existing production. . . .

Roach Decl. Ex. 67 [April 18, 1969 Monsanto Memorandum Describing March 1969 Meeting (MONSFOX00080385) at 1-2]. Therefore, the immediate need to replace Aroclor 1242 was already apparent by 1969.

Further, in separate meetings in the UK, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers, AMH Decl. Ex. 26 [8/2609 C. Paton Depo. Excerpts] at 59:4-13; PJF Decl. Ex. 40 [12/19/69 minutes] ("1242 contains many PCB's . . . principally tri – some mono-, di-, tetra- and penta"); Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8], and that "Aroclor 1242's five and six chlorine ring constituents would remain after the 4 chlorine ring components had degraded," and that 1242 therefore could be and probably was a major source of the PCB contamination found in nature. *See* PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254); **Supp. JEF Decl. Ex. 13 [8/19/09 E. Tucker Depo. Excerpt at 66:22-67:13];** PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination

due to the residues of the higher homologues of PCBs that would occur after the degradation"). Vodden stated during a 1969 meeting with NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor due to its biopersistence. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

In any event, PPFF 104 is immaterial it is undisputed that NCR and Monsanto had knowledge of the toxicity and environmental threat posed by Aroclor 1242 by 1967. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 105:  Monsanto representatives similarly testified that they did not recall any timeline for the replacement of Aroclor being set in those meetings.  Roach Decl., Ex. 68 [C. Paton Dep. at 141:14-142:6].**

Response to PPFF 105:

Incomplete and immaterial.  PPFF 105 is incomplete because Paton testified that, in regard to the replacement of Aroclor 1242, Monsanto and NCR were "trying to . . . move towards that as quickly as we could."  Roach Decl., Ex. 68 [C. Paton Dep. at 141:14-142:6].

In any event, PPFF 105 is immaterial because it is undisputed that NCR and Monsanto had knowledge of the toxicity and environmental threat posed by Aroclor 1242 by 1969 at the very latest, yet continued to sell PCB-laden broke to some of the Defendants and others through mid-1971. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66; *See* PJF Decl., Ex. 45 [January 28, 2009 F. Heinritz Depo. at 96:14-25]; **Supp. JEF Decl. Ex. 20 [January 28, 2009 F. Heinritz Depo. at 97:1-14].**

**PPFF 106:  In addition to wanting to replace Aroclor 1242 for business reasons, NCR also became concerned about the continued availability of the product as well as negative publicity surrounding PCBs in general.  Roach Decl., Ex. 51 [Sep. 30, 2009 R. Jezerc Declaration].**

Response to PPFF 106:

Inadmissible and immaterial.

The September 30, 2009 Declaration of Ronald Jezerc is inadmissible evidence.  It is "well-settled" that a party "cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition" in order to "defeat a defendant's motion for summary judgment."  *See Ferguson v. Medical College of Wisconsin*, 471 F. Supp. 2d 901 (E.D. Wis. 2007) (citing *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994); *Sirvidas v. Commonwealth Edison Co*., 60 F.3d 375, 379 (7th Cir. 1995); *Russell v. Acme-Evans Co*., 51 F.3d 64, 67-68 (7th Cir. 1995).  Here, Plaintiffs submit as evidence as declaration of Ronald Jezerc who was deposed in this litigation on April 20, 2009. While not relevant to this proposed finding of fact, the Declaration of Ronald Jezerc conflicts with his earlier deposition testimony.  For example, Mr. Jezerc testified that:

Q:      Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB.  From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs?

(Objection omitted)

A:      I don't have any idea whether there were other reasons.

Q:      Okay. But **environmental concerns was the reason that you understood at the time they were being phased out; is that correct**?

(Objection omitted)

A:      **Yes**.

AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 171-72 (emphasis added).

In contrast, the September 30, 2009 declaration of Ronald Jezerc states "[t]hrough the time that the changeover was completed, I continued to believe that Aroclor 1242 posed no environmental danger."  This manufactured conflict created by the September 30, 2009 declaration of Ronald Jezerc cannot create a material issue of fact to defeat a motion for summary judgment.  *See Ferguson v. Medical College of Wisconsin*, 471 F. Supp. 2d 901 (E.D. Wis. 2007)

In any event, it is undisputed that by 1969, NCR and Monsanto were concerned about potential toxic and environmental threat posed by Aroclor, and Monsanto told NCR that it would cease all Aroclor sales.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 107:  During these meetings in 1969, Monsanto and NCR discussed the publicity about potential risks associated with higher chlorinated PCBs.  Roach Decl., Ex. 44 [Dec. 16, 1969 Monsanto/NCR Meeting Notes (GPFOX00030900)]; Ex. 67 [April 18, 1969 Monsanto Memorandum Describing March 1969 Meeting (MONSFOX00080385)].**

Response to PPFF 107:

Undisputed.  It is undisputed that in 1969, NCR and Monsanto discussed the publicity about potential risks associated with PCBs, and specifically discussed replacing Aroclor 1242. *See* Roach Decl. Ex. 67 [April 18, 1969 Monsanto Memorandum Describing March 1969 Meeting (MONSFOX00080385)] at 1-2.  Further, Plaintiffs admit that they took steps to reduce negative publicity and protect their economic position.  For example, NCR asked Monsanto not reveal to NCR paper as a "major outlet" for PCBs in Monsanto's meeting with the UK Ministry. Pls.' Response to PFOF at ¶ 82.

**PPFF 108:  Even with these assurances from Monsanto in late 1969 and early 1970, NCR continued with its effort to find a replacement for Aroclor 1242.  Roach Decl., Ex. 69 [Mar. 6, 1970 Monsanto Memorandum (MONSFOX00099559) (noting that the "NCR people, both in the U.S. and U.K. have been looking for a substitute for Aroclor 1242 for several reasons.  The PCB threat has accelerated this desire to convert.")].**

Response to PPFF 108:

Incomplete, incorrect, and immaterial. PPFF 108 is misleading. It is undisputed that Dr. Vodden of Monsanto informed Martin Kelly of NCR in 1969 that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto would be terminating its sales of Aroclor. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

Further, Monsanto's customer bulletins, warnings and letters from March, April and June of 1970 respectively, did dsicuss and/or warn of, environmental risks of Aroclor 1242. *See* AMH Decl. Ex. 30 [Monsanto Technical Bulletin – Aroclor Plasticizer] at 13 (warning of "environmental hazards" of Aroclor 1242 and stating that the PCBs in Aroclor 1242 "may be harmful to certain forms of animal life"); PJF Decl. Ex. 43 [4/70 Monsanto Warning Labels] (specifically warning of environmental risks of Aroclor 1242); PJF Decl. Ex. 44 [6/70 Monsanto Letter] (stating that it was discontinuing the use of Aroclor 1242 (among other Aroclors) because of worldwide concern over environmental contamination).

In any event, any alleged "assurances from Monsanto in late 1969 and early 1970" are immaterial because it is undisputed that by 1967, NCR was concerned about potential toxic and environmental threats posed by PCBs, and by 1969, NCR was concerned about Aroclor in its CCP and *knew* that Monsanto was terminating its sale of Aroclor to all open and uncontrolled applications, including NCR's. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 109: NCR investigated numerous potential replacements and potential suppliers other than Monsanto during its effort to find a substitute for Aroclor 1242. Roach Decl., Ex. 58 [Gordon Taylor Dep. at 103:9-104:11]; Ex. 17 [June 4, 2009 Report of M. Williams at 43].**

Response to PPFF 109:

Undisputed but unsupported. While undisputed, Roach Declaration Exhibit 58 [Gordon Taylor deposition at 103:9-104:11] does not support this alleged fact.

**PPFF 110: MIPB was not in regular production when NCR began to consider it as a replacement for Aroclor 1242. Roach Decl., Ex. 68 [C. Paton Dep. at 140:19-142:6]; Ex. 26 [H. Vodden Dep. at 88:22-89:16]; Ex. 17 [June 4, 2009 Report of M. Williams at 46].**

Response to PPFF 110:

Undisputed.

**PPFF 111: NCR was not able to obtain from Monsanto a sufficient amount of MIPB for testing until sometime in 1970. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 46, n.124].**

Response to PPFF 111:

Undisputed.

**PPFF 112:  Monsanto performed toxicity and biodegradation testing on MIPB, while NCR tested safety and performance characteristics of CCP with MIPB.  Roach Decl., Ex. 70 [Dec. 15, 1970 Monsanto Letter to NCR (NCR-FOX-0517914)]; Ex. 71 [May 20, 1970 NCR Special Products Division Brief (NCR-FOX-332210)].**

Response to PPFF 112:

Undisputed.

**PPFF 113:  NCR accelerated its effort to find a replacement for Aroclor 1242 between the first and second quarters of 1970.  Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 45]; Ex. 72 [M. Williams' Interview Notes with G. Taylor (NCR-FOX-0592836)]; Ex. 73 [M. Williams' Interview Notes with J. Taylor (NCR-FOX-0592832)].**

Response to PPFF 113:

Undisputed.

**PPFF 114:  NCR and Monsanto met again in June 1970 to discuss the replacement project.  Roach Decl., Ex. 74 [June 10, 1970 NCR Letter to Monsanto (MONSFOX00000151)].**

Response to PPFF 114:

Undisputed.

**PPFF 115:  At the June 1970 meeting, Monsanto informed NCR that it should move quickly to find a replacement for Aroclor 1242.  Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 45]; Ex. 72 [M. Williams' Interview Notes with G. Taylor (NCR-FOX-0592836)]; Ex. 73 [M. Williams' Interview Notes with J. Taylor (NCR-FOX-0592832)].**

Response to PPFF 115:

Undisputed but incomplete.

In June 1970, WT and NCR UK had completed their conversion from Aroclor 1242 to HB-40.  Roach Decl., Ex. 26 [H. Vodden Dep. at 78:1-15].

**PPFF 116:  Former NCR employees who attended the June 1970 meeting did not recall that Monsanto discussed plans to imminently cease sales of Aroclor 1242 or that Aroclor 1242 was considered an environmental contaminant.  Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 45]; Ex. 72 [M. Williams' Interview Notes with G. Taylor (NCR-FOX-0592836)].**

Response to PPFF 116:

Inaccurate and immaterial.  Roach Declaration Exhibit 72 [M. Williams' Interview Notes with G. Taylor (NCR-FOX-0592836) at 1], states that Gordon Taylor reported that the work in

replacing Aroclor "had been motivated by a general concern about the use of Aroclor, given the publications regarding PCBs in the environment." Taylor further stated that the Monsanto representative "expressed his company's concern about Aroclor and Monsanto's desire that NCR make a concerted effort to cease using Aroclor as soon as possible." *Id.* Therefore NCR and Monsanto discussed both environmental concerns and the urgency of replacing Aroclor at the June 1970 meeting.

Further, Monsanto's June 1970 letter specifically stated that Monsanto was discontinuing the use of Aroclor 1242 (among other Aroclors) because of worldwide concern over environmental contamination. PJF Decl. Ex. 44 [June 1970 Monsanto Letter].

In any event, PPFF 116 is immaterial because it is undisputed that during a 1969 meeting, Dr. Vodden of Monsanto told Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications such as NCR's. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

**PPFF 117: In October 1970 NCR began to replace Aroclor 1242 with MIPB as Monsanto increased its production of MIPB and NCR finished product quality testing. Roach Decl., Ex. 75 [Oct. 27, 1970 NCR Special Products Group Quarterly Activity Report (NCR-FOX-0064071)]; Ex. 76 [June 24, 1970 ACPC Memorandum (NCR-FOX-0523963)].**

Response to PPFF 117:

Undisputed but unsupported. It is unknown whether NCR finished product quality testing in 1970; the documents cited to support PPFF 117 do not state whether product testing was finished in October 1970.

**PPFF 118: Purchases of Aroclor 1242 were minimized once NCR began its accelerated effort to find a replacement. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 47].**

Response to PPFF 118:

Unsupported and immaterial. From 1967 through 1970, NCR purchased increasing amounts of PCBs from Monsanto for use in the manufacture of CCP — from 4.4 million pounds in 1967, 5.8 million pounds in 1968, 6.3 million pounds in 1969, and 6.6 million pounds in 1970. PJF Decl. Ex. 30 [Jan. 19, 1976 NCR Letter].

Therefore, NCR continued to purchase *increasing* amounts of PCBs and Aroclor 1242 even *after* it learned of PCBs persisting in the environment and even *after* NCR had several discussions with Monsanto regarding Aroclor environmental dangers and potential negative publicity from the same. *See id.*; *see also* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

Therefore, it is immaterial that once NCR finally began its replacement effort in the late 1970s, it may have "minimized" purchases of Aroclor 1242. NCR had knowledge of PCBs in its product much earlier, yet for years did nothing.

**PPFF 119: NCR completely ended the use of Aroclor 1242 in CCP by April 1971. Roach Decl., Ex. 56 [Dec. 7, 1972 Monsanto Letter (GPFOX00049252)].**

Response to PPFF 119:

It is undisputed that the replacement of Aroclor 1242 was finished in April or May of 1971.

**PPFF 120: After April 1971, neither NCR nor its licensees used Aroclor 1242 for CCP. Roach Decl., Ex. 56 [Dec. 7, 1972 Monsanto Letter (GPFOX00049252)]; Ex. 57 [Nov. 9, 1971 Wiggins Teape Memorandum (MONSFOX00000606)].**

Response to PPFF 120:

Undisputed.

**PPFF 121: After the phase-out was completed, NCR returned its remaining Aroclor 1242 to Monsanto. Roach Decl., Ex. 77 [1971 Shipping Return Receipt (MONSFOX00000283)].**

Response to PPFF 121:

Undisputed.

**PPFF 122: NCR took action to find a replacement for Aroclor 1242 before Monsanto stopped selling the material to a variety of customers. Roach Decl., Ex. 75 [Oct. 27, 1970 NCR Special Products Group Quarterly Activity Report (NCR-FOX-0064071)]; Ex. 54 [1/31/1972 Monsanto Letter to Pydraul customers (NCR-FOX-0576743)].**

Response to PPFF 122:

Undisputed, but immaterial. It is immaterial that Monsanto may have stopped selling Aroclor to NCR before some other customers, and therefore, NCR may have taken action to replace Aroclor 1242 before other PCB customers. This alleged fact does not go to NCR's own knowledge or fault in polluting the lower Fox River.

Further, Plaintiffs admit that they took steps to reduce negative publicity and to protect their continued use of Aroclor by, for example, asking Monsanto not to reveal NCR paper as a "major outlet" for PCBs during Monsanto's meeting with the UK Ministry. Pls.' Response to PFOF at ¶ 82.

PPFF 122 is also immaterial because it is undisputed that NCR had knowledge of PCBs in its product much earlier, yet for years did nothing to cease sales, even *after* NCR was aware of environmental risks from the PCBs in its paper. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66.

**PPFF 123: Plaintiffs' expert Williams, who began working at EPA at its inception in 1970, concluded, "NCR's actions in this timeframe, and particularly its decision to**

**discontinue its use of Aroclor 1242 even though there was no definitive information suggesting that its continued use risked environmental harm, were reasonable and prudent given the preliminary and evolving information available as of 1971."  Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 2, 13].**

Response to PPFF 123:

Incorrect and immaterial.  PPFF 123 is immaterial because Plaintiffs have produced a significant volume of documents from the Wiggins-Teape's ("WT") Butler's Court facility after the discovery cut-off and after the report of Marcia Williams was issued.  These documents reveal an ongoing technical exchange over the course of almost two decades between NCR, WT and ACPC coinciding in part with WT's own testing of the risks of recycling broke, along with substantial knowledge of NCR and ACPC regarding the toxicity of CCP and NCR broke, the effect of recycling broke and the persistence and bioaccumulation of PCBs (including Aroclor 1242 in the environment).  *See generally* JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR].  Because Marcia Williams' report does not consider this evidence, PPFF 123's evidentiary support lacks foundation.

Further, PPFF 123 is specifically contradicted by other undisputed evidence showing NCR's knowledge and fault in continuing the sale of PCB-containing CCP even *after* NCR had knowledge of the potential environmental dangers from its own CCP:

- In 1965, WT visited NCR.  NCR told WT that NCR has "been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in **toxicity**, odour, and cost."  **Supp. JEF Decl. Ex. 8 [BCFOX00047465 at BCFOX00047467 and BCFOX0004788-89] [Feb 15, 1965 Report on WT visit to NCR]** (emphasis added); *see also* JEF Decl. Ex. 70 [same].

- In February 1967, Monsanto shared scientist Soren Jensen's 1966 article with NCR.  This article demonstrated that PCBs persisted in the environment.  Jensen's study was alarming, finding PCBs "in some 200 pike taken from different parts of Sweden, fish and fish-spawn throughout the country, an eagle which was found dead in Stockholm Archipelago, and in his own his wife's and baby daughter's hair."  PJF Decl., Ex. 21 [*New Scientist* Article].  In addition, "[t]he substance has also been detected in the air over London and Hamburg and also in seals caught off Scotland.  **It can therefore be presumed to be widespread throughout the world.**"  *Id.* (emphasis added); s*ee also* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50.

- During a 1969 meeting, Dr. Vodden of Monsanto told Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications, such as NCR's.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

- Monsanto also explained to NCR that **what was thought to be Aroclors** was a mixture that included higher chlorinated isomers and could actually be **residuals of Aroclor 1242**. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. And Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment **could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. Supp. JEF Decl. Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

- Roach Declaration Exhibit 72 [M. Williams' Interview Notes with G. Taylor (NCR-FOX-0592836) at 1], states that Gordon Taylor reported that the work in replacing Aroclor "had been motivated by a general concern about the use of Aroclor, given the publications regarding PCBs in the environment." It further states that Monsanto representative, "expressed his company's concern about Aroclor and Monsanto's desire that NCR make a concerted effort to cease using Aroclor as soon as possible." *Id.*

In any event, PPFF 116 is immaterial because it is undisputed that by 1967, NCR knew about the potential toxic and environmental threats posed by PCBs, and by 1969, NCR knew that Monsanto was halting sales of Aroclors, including 1242, to open and uncontrolled uses (such as NCR's) because of those concerns. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66. Yet despite this knowledge, NCR continued to sell PCB-laden broke to some of the Defendants and others until April 1971. *See* PJF Decl., Ex. 45 [January 28, 2009 F. Heinritz Depo. at 96:14-25]; **Supp. JEF Decl. Ex. 20 [January 28, 2009 F. Heinritz Depo. at 97:1-14].**

**PPFF 124: Plaintiffs' expert Anderson, who directed EPA's central risk assessment programs beginning in 1975, opined, "It is simply not credible to suggest that a company such as NCR had sufficient knowledge to be concerned about using a substance such as Aroclor 1242 especially in the absence of information about the toxicity of Aroclor 1242 at low environmental levels." Roach Decl., Ex. 22 [Aug. 7, 2009 Report of E. Anderson at 1].**

Response to PPFF 124:

Incorrect and immaterial. PPFF 124 is immaterial because Plaintiffs have produced a significant volume of documents from the Wiggins-Teape's ("WT") Butler's Court facility after the discovery cut-off and after the report of Elizabeth Anderson was issued. These documents reveal an ongoing technical exchange over the course of almost two decades between NCR, WT and ACPC coinciding in part with WT's own testing of the risks of recycling broke, along with substantial knowledge of NCR and ACPC regarding the toxicity of CCP and NCR broke, the effect of recycling broke and the persistence and bioaccumulation of PCBs (including Aroclor 1242 in the environment). *See generally* JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]. Because Elizabeth Anderson's report does not consider this evidence, PPFF 124's evidentiary support lacks foundation.

Also, and like PPFF 123, above, PPFF 124 is contradicted by other undisputed evidence showing NCR's knowledge and fault in continuing the sale of PCB-containing CCP even *after* NCR had knowledge of the potential environmental dangers from its own CCP. *See* Defendants' Response to Plaintiffs' Proposed Finding of Fact Number 123 (and citations therein), above.

**VIII.   GOVERNMENT STATEMENTS, ACTIONS AND INQUIRIES REGARDING PCBS.**

PPFF 125:  In 1957, the U.S. Fish and Wildlife Service performed toxicity testing of some 4,000 chemicals – including four Aroclor compounds – to determine the effect on fish and larval lampreys, which testing found that PCBs were not acutely toxic to the tested species.  Roach Decl., Ex. 78 [July 15, 1967 Monsanto Letter (GPFOX00045446)].

Response to PPFF 125:

Unsupported and immaterial.  Exhibit 78 is actually a July 15, 1969 (not 1967) Monsanto letter.  The letter refers to a March 1957 U.S. Fish & Wildlife Service study of four Aroclor compounds that "showed no effect at 5 ppm in this abbreviated experiment of 24 hours."  This was the specific finding of the study; not that PCBs are "not acutely toxic."

The alleged fact is immaterial in any event and does not preclude summary judgment.  The letter does not specify which four Aroclor compounds were tested, and there is no evidence that any party to this litigation knew of and/or read this study.

PPFF 126:  Government entities and Monsanto began expanded chronic toxicity testing on PCBs by 1970.  Roach Decl., Ex. 79 [July 30, 1971 FDA Letter (NCR-FOX-0576455)].

Response to PPFF 126:

Unsupported and immaterial.  Exhibit 79, the July 30, 1971 FDA Letter, discusses chronic toxicity testing on PCBs, but does not prescribe any time frame to the testing to support Plaintiffs' statement that this testing began by 1970.

The alleged fact is immaterial in any event and does not preclude summary judgment, because there is no evidence that either the letter or the testing referred to in the letter was provided to and/or read by any party to this litigation.

PPFF 127:  Much of this testing was not completed until the early-to-mid-1970s.  Roach Decl., Ex. 79 [July 30, 1971 FDA Letter (NCR-FOX-0576455)].

Response to PPFF 127:

Unsupported and immaterial.  Exhibit 79, the July 30, 1971 FDA Letter, does not state when the testing was completed.

The alleged fact is immaterial in any event and does not preclude summary judgment, for the reasons in Defendants' Response to PPFF 126.

PPFF 128:  In the early 1970s, the United States Food and Drug Administration first began raising concerns about the PCB content of food packaging materials, and the potential for PCBs to migrate from these packaging materials into food products.  Roach

**Decl., Ex. 80 [Foods Analyzed by FDA for PCB]; Ex. 81 ["The Status of PCBs" by L.L. Ramsey (NCR-FOX-0334410)].**

Response to PPFF 128:

Unsupported and immaterial. Exhibit 80, a Memorandum on Foods Analyzed by FDA for PCB, and Exhibit 81, a speech on "The Status of PCBs" by the FDA does not support the statement that concerns regarding PCB content of food packaging materials arose "in the early 1970s." Instead, these documents state that the issue first arose in July 1971, and that the FDA conducted a survey to determine the extent of contamination in the fall of 1971.

The alleged fact is immaterial in any event and does not preclude summary judgment, because there is no evidence that either the memorandum or speech (Exhibits 80 and 81) were provided to and/or read by any party to this litigation.

**PPFF 129: Prior to 1972, government agencies distinguished between Aroclor 1242 and higher-chlorinated PCBs. Roach Decl., Ex. 82 [June 1971 Report "The Use and Disposal of Electrical Insulating Liquids" (MONSFOX00044051)]; Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271), at, *inter alia*, 8, 63, 93-98].**

Response to PPFF 129:

Unsupported in part and immaterial. Exhibit 82, the June 1971 Report "The Use and Disposal of Electrical Insulating Liquids," was written by the National Industrial Pollution Control Council and expressly states on its cover page that the report "does not necessarily represent the views of the Department of Commerce or any other Government Agency." Therefore, Exhibit 82 does not support PPFF 129, which states that "government agencies distinguished between Aroclor 1242 and higher-chlorinated PCBs."

The alleged fact is immaterial in any event and does not preclude summary judgment, because whether Aroclor 1242 was distinguished from other higher-chlorinated PCBs by government agencies is irrelevant to Plaintiffs' knowledge regarding the environmental risks of Aroclor 1242. It is undisputed that Dr. Vodden explained to NCR in 1969 that the Aroclor 1242 mixture contained PCB isomers that were persistent and that could bioaccumulate, and that would remain in the environment even after less chlorinated constituents in 1242 had degraded. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Therefore, NCR knew that even if "1242" itself might not be observed in the environment, releases of 1242 had undoubtedly contributed significantly to the levels of PCBs that were being observed. *Id.*; *see also* AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes].

**PPFF 130: In the early 1970s, scientists recognized that lower-chlorinated Aroclors were being released into the environment, but the evidence available at that time did not suggest the lower-chlorinated Aroclors were accumulating in the environment. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 29-30].**

Response to PPFF 130:

Immaterial.  The alleged fact is immaterial and does not preclude summary judgment, because it is undisputed that Dr. Vodden of Monsanto explained that the Aroclor 1242 mixture contained PCB isomers that were persistent and that could bioaccumulate, and that would remain in the environment even after less chlorinated constituents in 1242 had degraded.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.  Therefore, NCR knew that even if "1242" itself might not observed in the environment, releases of 1242 had undoubtedly contributed significantly to the levels of PCBs that were being observed.  *Id*.  Further, Monsanto informed NCR that it was going to terminate its sales of Aroclor to all open and uncontrolled applications (such as NCR's) due to those concerns.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

**PPFF 131:  PCBs were not regulated by the government until the 1970s.  Roach Decl., Ex. 84 [Apr. 24, 1972 EPA Memorandum "Policy on PCBs" (GPFOX00033019)].**

Response to PPFF 131:

Undisputed but immaterial.  The alleged fact is immaterial and does not preclude summary judgment, because the date that the government or other parties began to investigate and/or regulate PCBs does not equate to the time period when any party to this litigation *knew* of, or *should have known* of, the environmental risks of PCBs.  Indeed, Plaintiffs were well aware of the environmental risks of PCBs before 1972.

Moreover, government agencies would have known about the environmental risks of Plaintiffs' PCBs long before 1972 if only Plaintiffs had informed the government of what they knew about those risks in the mid-1960s.  *See, e.g.* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50, 66.

**PPFF 132:  The United States formed an Interdepartmental Task Force in September 1971 in order to investigate available information on PCBs, evaluate what was known about the chemicals, and identify what additional information was needed.  Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271) at 1].**

Response to PPFF 132:

Undisputed but immaterial.  The alleged fact is immaterial and does not preclude summary judgment, for the reasons in Defendants' Response to PPFF 131.

**PPFF 133:  In April 1972, U.S. EPA developed a risk management strategy for all PCBs in water bodies, announcing, "It is the policy of the EPA that all discharges to the aquatic environment involving PCBs be restricted to the lowest possible level."  Roach Decl., Ex. 84 [Apr. 24, 1972 EPA Letter (GPFOX00033019)].**

Response to PPFF 133:

Undisputed but immaterial.  The alleged fact is immaterial and does not preclude summary judgment, for the reasons in Defendants' Response to PPFF 131.

**PPFF 134:  In April 1972, U.S. EPA set a desired limit in ambient waters for all types of Aroclors at .01 ppb, which was increased in stringency in later years as EPA**

65

gained additional information on the bioaccumulation of PCBs in aquatic environments. **Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271)]; Ex. 84 [Apr. 24, 1972 EPA "Policy on PCBs"]; Ex. 17 [June 4, 2009 Report of M. Williams at 31].**

Response to PPFF 134:

Undisputed but immaterial.  The alleged fact is immaterial and does not preclude summary judgment, for the reasons in Defendants' Response to PPFF 131.

**PPFF 135:  In May 1972, the Interdepartmental Task Force analyzed information relating to the environmental impact of PCBs in Task Force Report.  Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271)].**

Response to PPFF 135:

Undisputed but immaterial.  The alleged fact is immaterial and does not preclude summary judgment, for the reasons in Defendants' Response to PPFF 131.

**PPFF 136:  This 1972 Interdepartmental Task Force Report was well-publicized. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams].**

Response to PPFF 136:

Unsupported and immaterial.  Exhibit 17, the June 4, 2009 Report of Marcia Williams, does not state that the 1972 Interdepartmental Task Force Report was well-publicized.  Further, the alleged fact is immaterial and does not preclude summary judgment, for the reasons set forth in Defendants' Response to PPFF 131.

**PPFF 137:  The Interdepartmental Task Force concluded that significant gaps remained but that:  "The evidence available, however, indicates that PCBs must be viewed as potential problems.  The difficulties of attaining a proper evaluation in any reasonable length of time suggest that the least costly course would be to take all measures possible to prevent their escape into the environment."  Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCRFOX-0563271) at 168].**

Response to PPFF 137:

Undisputed but immaterial.  The alleged fact is immaterial and does not preclude summary judgment because statements made in the Interdepartmental Task Force Report are, at best, advisory, and also for the reasons set forth in Defendants' Response to PPFF 131.

**PPFF 138:  The Interdepartmental Task Force also concluded that "[t]here are currently no toxicological or ecological data available to indicate that the levels of PCBs currently known to be in the environment constitute a threat to human health."  Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271) at 3].**

Response to PPFF 138:

Undisputed but immaterial.  The alleged fact is immaterial and does not preclude summary judgment because statements made in the Interdepartmental Task Force Report are, at best, advisory, and also for the reasons set forth in Defendants' Response to PPFF 131.

**PPFF 139:  The Interdepartmental Task Force determined that all discharges of PCBs to the aquatic environment should be minimized.  Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271) at 168].**

Response to PPFF 139:

Unsupported and immaterial.  The Interdepartmental Task Force Report concludes that "[t]he difficulties of attaining a proper evaluation in any reasonable length of time suggest that the least costly course would be to take all measures possible to prevent their escape into the environment."  This does not support the Plaintiffs' alleged fact that "[t]he Interdepartmental Task Force determined that all discharges of PCBs to the aquatic environment should be minimized."

The alleged fact is immaterial and does not preclude summary judgment because statements made in the Interdepartmental Task Force Report are, at best, advisory, and also for the reasons set forth in Defendants' Response to PPFF 131.

**PPFF 140:  The Interdepartmental Task Force specifically identified paper mills as facilities that had higher PCB levels in their effluent, and recommended that paper mills and other industrial plants take appropriate action to minimize all PCB discharges to water.  Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271)].**

Response to PPFF 140:

Unsupported in part and immaterial.  Exhibit 83, the Interdepartmental Task Force Report, found that effluents from a number of different types of facilities were higher than those in municipal sewage, including: "paper mills, appliance manufacturers, electrical equipment manufacturers, and chemical industries."  *Id*. at 102.  The Interdepartmental Task Force Report then recommended that the electric equipment manufacturing industry, the electric utility industry, and Monsanto's manufacturing and disposal facilities effluents "should be regulated and closely monitored to assure that no more than 0.01 parts per billion results in the receiving water."  *Id*. at 103.  The Interdepartmental Task Force Report does not recommend that paper mills take "appropriate action to minimize all PCB discharges to water."

Further, the alleged fact is immaterial and does not preclude summary judgment because statements made in the Interdepartmental Task Force Report are, at best, advisory, and also for the reasons set forth in Defendants' Response to PPFF 131.

**PPFF 141:  The Interdepartmental Task Force stated the fact "that more scientific information about PCBs is needed is illustrated by the sparsity of knowledge about PCBs in the environment.  Only general statements can be made about how PCBs reach the environment, how they reach target organisms, and how much is present."  Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271) at 14].**

Response to PPFF 141:

Undisputed but incomplete and immaterial. The alleged fact is immaterial and does not preclude summary judgment, because statements made in the Interdepartmental Task Force Report are, at best, advisory, and also for the reasons in Defendants' Response to PPFF 131.

Indeed, government agencies would have known about the environmental risks of Plaintiffs' PCBs long before 1972 if only Plaintiffs had informed the government of what they knew about those risks in the mid-1960s. *See, e.g.* Doc. #659 [Pls.' Response to PFOF] at ¶ 48-50, 66.

**PPFF 142: Bioaccumulation factors for Aroclor 1242 were not available in the May 1972 Interdepartmental Task Force report. Roach Decl., Ex. 83 [1972 Interdepartmental Task Force Report (NCR-FOX-0563271) at 1].**

Response to PPFF 142:

Unsupported and immaterial. PPFF 142 is not supported by page 1 of the 1972 Interdepartmental Task Force Report, which includes no discussion of the bioaccumulation factors of Aroclor 1242. Whether bioaccumulation factors for Aroclor 1242 were made available to the government for its Interdepartmental Task Force report does not bear on the substance or timing of Plaintiffs knowledge regarding the environmental risks of PCBs. It is undisputed that Dr. Vodden testified that he had already, during a 1969 meeting, informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications (including NCR's) due to those concerns. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

Plaintiffs also knew in 1967 that PCBs bioaccumulated, and Plaintiffs' "1242" point is misleading and/or immaterial because Dr. Vodden specifically told NCR about higher chlorine constituents in 1969. Dr. Vodden explained that the Aroclor 1242 mixture contained PCB isomers that were persistent and that could bioaccumulate, and that would remain in the environment even after less chlorinated constituents in 1242 had degraded. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Therefore, NCR knew that even if "1242" itself might not observed in the environment, releases of 1242 had undoubtedly contributed significantly to the levels of PCBs that were being observed. *Id.*

**PPFF 143: In 1973, EPA finalized its proposal to list all PCBs as toxic water pollutants, a precursor for regulating the discharge of all PCBs into water. Roach Decl., Ex. 85 [1973 EPA Water Quality Criteria (NCR-FOX-0578566)].**

Response to PPFF 143:

Unsupported and immaterial. The excerpt of EPA's 1973 Water Quality Criteria provided as Exhibit 85 does not support PPFF 143. The alleged fact is immaterial and does not preclude summary judgment, for the reasons set forth in Defendants' Response to PPFF 131.

**PPFF 144: In 1973, the Food and Drug Administration published the initial human health advisory tolerance for PCBs in fish (5 mg/kg or 5 ppm). Roach Decl., Ex. 86 [A Chronology of Local Toxics Investigations, (NCR-FOX-0017997)].**

Response to PPFF 144:

Undisputed but immaterial. The alleged fact is immaterial and does not preclude summary judgment, for the reasons set forth in Defendants' Response to PPFF 131.

**PPFF 145: Sampling data up until the 1975 timeframe continued to identify the presence of higher-chlorinated PCB Aroclors in most environmental samples. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 35].**

Response to PPFF 145:

Undisputed but immaterial. PPFF 145 is taken out of context as Marcia Williams' report also notes that during the same timeframe EPA determined that Aroclor 1242 was widely present in fish in the United States.

The alleged fact is in any event immaterial and does not preclude summary judgment, because it relates to the knowledge of government officials and not any party to this litigation. It is undisputed that Dr. Vodden testified that during a 1969 meeting he informed NCR that Aroclor 1242 was persistent and would bioaccumulate. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Moreover, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated homologues. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242, and therefore, NCR knew that even if "1242" itself might not observed in the environment, releases of 1242 had undoubtedly contributed significantly to the levels of PCBs that were being observed. *Id.*; *see also* Doc. #659 [Pls.' Response to PFOF] at ¶ 66; **Supp. JEF Decl. Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

**PPFF 146: In the mid-1970s, government agencies and other researchers began to concentrate on the fact that all Aroclors are mixtures of different isomers and congeners. Roach Decl., Ex. 1 [July 17, 1975 WDNR Progress Report (NCR-FOX-0162508)].**

Response to PPFF 146:

Unsupported, incomplete, and immaterial. Exhibit 1, the July 17, 1975 Progress Report of the Wisconsin Department of Natural Resources, simply states that "[e]ach Aroclor produced is actually a multi-component mixture which includes other Aroclors." Exhibit 1 does not indicate the date when WDNR "began to concentrate of [this] fact," nor does it address when other government agencies and researchers began to discuss or knew that Aroclors are a mixture of different isomers and congeners.

The alleged fact is also incomplete because it ignores the fact that the Plaintiffs knew years before the government agencies began focusing on the issue that Aroclor is a mixture that included higher chlorinated isomers. AMH Decl. Ex. 26 [8/2609 C. Paton Depo. Excerpts] at

59:4-13; PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254); PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher isomers of PCBs that would occur after the degradation"). As even Plaintiffs concede, by the time they received Jensen's study in 1967 they understood the potential link between Aroclor and the PCBs found in the environment and were investigating it. *See* Plaintiffs' Proposed Findings of Fact, ¶¶ 43-50. The reason that the government's investigation began almost a decade later than Plaintiffs' investigation is because the Plaintiffs concealed from the government what they knew.

The alleged fact is in any event immaterial and does not preclude summary judgment, because it relates to the knowledge, and timing of that knowledge, of government officials and "other researchers," but not Plaintiffs.

**PPFF 147:  In April 1976, WDNR noted that "Aroclor 1242 is not harmless by any means.  Aroclor 1242 has many of the more highly chlorinated isomers present in Aroclors 1248 and 1254."  Roach Decl., Ex. 1 [July 17, 1975 WDNR Progress Report (NCR-FOX-0162508)].**

Response to PPFF 147:

Unsupported, incomplete, and immaterial.  Exhibit 1, the July 17, 1975 Progress Report of the Wisconsin Department of Natural Resources does not support PPFF 147, and could not, given that the alleged fact refers to a WDNR statement in April of 1976, and Exhibit 1 is dated July 17, 1975.

The alleged fact is also incomplete because it ignores the fact that the Plaintiffs knew years before the government agencies began focusing on the issue that Aroclor is a mixture that included higher chlorinated isomers.  Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers. PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254); PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher isomers of PCBs that would occur after the degradation"); AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes].  Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. **Supp. JEF Decl. Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

As even Plaintiffs concede, by the time they received Jensen's study in 1967 they understood the potential link between Aroclor and the PCBs in the environment and were investigating it.  *See* Plaintiffs' Proposed Findings of Fact, ¶¶ 43-50.  The reason that the government's investigation began almost a decade later than Plaintiffs' investigation is because the Plaintiffs concealed from the government what they knew.

The alleged fact is in any event immaterial and does not preclude summary judgment, because it relates to the knowledge, and timing of that knowledge, of WDNR and not Plaintiffs.

**PPFF 148:  In July 1976, EPA found that data indicated that Aroclors 1016 and 1242 were "widely present in fish in the United States.  This in turn leads to substantial exposure of humans and other fish-eating animals."  Roach Decl., Ex. 87 [July 23, 1976 Federal Register Proposed Rule (GPFOX00009380)].**

Response to PPFF 148:

Undisputed, but incomplete and immaterial.  The alleged fact is immaterial and does not preclude summary judgment, because it relates to the knowledge, and timing of that knowledge, of EPA and not Plaintiffs.  It is undisputed that Dr. Vodden testified that during a 1969 meeting he informed NCR that Aroclor 1242 was persistent and would bioaccumulate.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66.

The alleged fact is also incomplete because it ignores the fact that the Plaintiffs knew years before the government agencies began focusing on the issue that Aroclor is a mixture that included higher chlorinated isomers.  AMH Decl. Ex. 26 [8/2609 C. Paton Depo. Excerpts] at 59:4-13; PJF Decl. Ex. 40 [12/19/69 minutes] (notes of minutes from Monsanto/NCR meeting in which it was discussed that Aroclor 1242 degrades to resemble Aroclor 1254); PJF Decl., Ex. 36 [8/25/09 H. Vodden Depo. Excerpts at 21:4-23:8] (confirming that "Aroclor 1242 could also provide some of this environmental contamination due to the residues of the higher isomers of PCBs that would occur after the degradation").  As even Plaintiffs concede, by the time they received Jensen's study in 1967 they understood the potential link between Aroclor and the PCBs in the environment and were investigating it.  *See* Plaintiffs' Proposed Findings of Fact, ¶¶ 43-50.  The reason that the government's investigation began almost a decade later than Plaintiffs' investigation is because the Plaintiffs concealed from the government what they knew.

**PPFF 149:  The only evidence in the record of NCR receiving governmental inquiries regarding CCP before 1972 is a 1957 inquiry from the New York State Department of Labor, to which NCR fully responded by disclosing the presence of all constituents of CCP (including Aroclor 1242), and providing information on the toxicity tests that had been performed on Aroclor 1242.  Roach Decl., Ex. 88 [Feb. 27, 1957 NCR Memorandum (APIFOX00023870)]; Ex. 89 [March 12, 1957 Letter from NCR to New York State Department of Labor (APIFOX00013515)].**

Response to PPFF 149:

Immaterial.  The alleged fact is immaterial and does not preclude summary judgment.  It is undisputed that between 1969 and 1971, Monsanto received US and UK governmental inquiries about PCB use, and that during this time, NCR and Monsanto had repeated communications and meetings to coordinate how to respond to such inquiries without naming NCR Paper as a source of PCBs.  PJF Decl., Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report, marked and authenticated as Exhibit 950 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 40:10-43:12] ("no mention was made of NCR but it will become increasingly difficult to maintain this position."); Ex. 50 [April 9, 1970 Congressman Ryan Letter].  It is also undisputed that NCR asked Monsanto not to identify NCR paper as a "major outlet" for Aroclor at the meeting between Monsanto and the UK Ministry.  *Id.*, Ex. 41 [Jan. 26, 1970 Minutes] at 1.  NCR wanted to make sure their "housekeeping" was in order first.  *Id.*

71

**PPFF 150:  There is no evidence that NCR ever failed to respond to any governmental inquiries regarding PCBs.**

Response to PPFF 150:

Disputed and immaterial.  There is undisputed evidence that NCR sought to delay the provision of information to government agencies that NCR paper was a major use of Aroclors. *See* Defendants' Response to PPFF 149.  For instance, NCR asked Monsanto not to identify NCR paper as a "major outlet" for Aroclor at the meeting between Monsanto and the UK Ministry. PJF Decl., Ex. 41 [Jan. 26, 1970 Minutes] at 1.  NCR wanted to make sure their "housekeeping" was in order first. *Id.*  Therefore, at its meeting with the UK Ministry of Agriculture on January 27, 1970, Monsanto did not disclose the use of PCBs in NCR Paper. *Id.*, Ex. 49 [Jan. 27, 1970 Ministry/Monsanto Meeting Report] ("No mention was made of NCR but it will become increasingly difficult to maintain this position.").

## IX.    PUBLIC DISCLOSURES OF FACT OF PCBS IN CCP.

**PPFF 151:  NCR disclosed the fact that CCP contained PCBs in patents it filed in the 1950s.  Roach Decl., Ex. 90 [U.S. Patent #2,712,507 (NCR-FOX-0322717)].**

Response to PPFF 151:

Disputed and immaterial.  The alleged fact is immaterial and does not preclude summary judgment, because there is no evidence that Defendants knew of and read any patents filed by NCR.  Further, the patents did not disclose that PCBs were used in CCP, but only that they were one of any number of solvents that could be used.  *See id.*

By contrast, NCR knew from the start that its CCP contained PCBs.  And in the unlikely event ACPC did not know earlier, ACPC undoubtedly knew that ruptured capsules released PCBs by 1963 through its close working relationship and discussions with both NCR and WT, through product specifications that NCR shared with ACPC, through ACPC's own knowledge of CCP, and, if nothing else, from its 1963 meeting with NCR and WT in which PCB releases from broken capsules were specifically discussed.  JEF Decl. Ex. 35 [WT Report on 12/63 visit to ACPC] at BCFOX00038483 and 85-6 (WT discusses with NCR and ACPC how "capsule breakage leads to release of the oil (Arachlor)….").

**PPFF 152:  NCR disclosed the fact that CCP contained PCBs in 1970 to governmental entities.  Roach Decl., Ex. 91 [Apr. 17, 1970 Meeting Minutes (MONSFOX00034522)].**

Response to PPFF 152:

Unsupported and immaterial.  Exhibit 91, the April 17, 1970 Monsanto Meeting Minutes does not support that NCR disclosed that CCP contained PCBs in 1970 to governmental entities, but instead supports that *Monsanto* disclosed that CCP contained PCBs specifically to the UK Ministry of Agriculture, Fisheries and Food.

The alleged fact is immaterial in any event and does not preclude summary judgment, because there is no evidence that NCR disclosed the fact that CCP contained PCBs in 1970 to Defendants. In fact, the April 17, 1970 Monsanto Meeting Minutes specifically state that Monsanto's disclosure to the UK Ministry was made "in confidence." Furthermore, NCR only made this decision to disclose *after* WT decided to disclose. WT believed that: "in their own self interest, they could remain silent no longer about their usage of Aroclor 1242," and scheduled a meeting with the Ministry of Technology on May 24, 1970. PJF Decl., Ex. 53 [Apr. 16, 1970 WT/Monsanto Meeting Report, marked and authenticated as Exhibit 955 at Aug. 25, 2009 H. Vodden Depo. (Rough) (Ex. 36) at 55:11-60:19].

Moreover, NCR was concerned that public disclosure of PCBs in CCP could cause NCR to lose market share to its main CCP competitor, 3M. PJF Decl., Ex. 33 [Apr. 7, 2009 D. McIntosh Depo. Excerpts at 119:1-25]; Ex. 11 [June 30, 2009 H. Schwab Depo. Excerpts at 118:13-24]; Ex. 28 [Apr. 18, 1969 C. Paton Monsanto Memo to File] at 1-2; Ex. 27 [Aug. 26, 2009 C. Paton Depo. (Rough) at 18:4-23:19].

**PPFF 153: An environmental journal article in 1970 disclosed the fact that PCBs were in CCP. Roach Decl., Ex. 33 [October 1970 Gustafson Article "PCBs – Prevalent and Persistent" (NCR-FOX-0576274)].**

Response to PPFF 153:

Undisputed but immaterial. There is no evidence that Defendants knew of or read the October 1970 Article by Carl Gustafson. Further the article states: "We need to know all the uses for the PCBs. . . . These facts should be known if we are to determine how they get into the environment." Therefore, this article could not alert Defendants or others to the possibility that recycled paper could contain PCBs; the article itself states that how PCBs get into the environment is unknown.

Plaintiffs fail to acknowledge that the very reason Defendants did not know that NCR Paper contained PCBs was because Plaintiffs *never* told them. PJF Decl., Ex. 46 [Aug. 26, 2009 L. Golper Depo. Excerpts at 15:22-18:4]. By contract, NCR knew from the start that its CCP contained PCBs. And in the unlikely event ACPC did not know earlier, ACPC undoubtedly knew that ruptured capsules released PCBs by 1963 through its close working relationship and discussions with both NCR and WT, through product specifications that NCR shared with ACPC, through ACPC's own knowledge of CCP, and, if nothing else, from its 1963 meeting with NCR and WT in which PCB releases from broken capsules were specifically discussed. JEF Decl. Ex. 35 [WT Report on 12/63 visit to ACPC] at BCFOX00038483 and 85-6 (WT discusses with NCR and ACPC how "capsule breakage leads to release of the oil (Arachlor)….").

**PPFF 154: The fact that CCP contained PCBs was reported in a number of Wisconsin newspapers in 1971 and 1972. Roach Decl., Ex. 92 [1971-1972 Newspaper Articles (NCR-FOX-0620780)].**

Response to PPFF 154:

<u>Undisputed but immaterial</u>.  There is no evidence that Defendants knew of or read the articles included as Exhibit 92 to the Roach Declaration, and even if Defendants had read such 1971-72 articles, this fact would not preclude summary judgment for the Defendants.

Plaintiffs fail to acknowledge that the very reason Defendants did not know that NCR Paper contained PCBs was because Plaintiffs ***never*** told them. PJF Decl., Ex. 46 [Aug. 26, 2009 L. Golper Depo. Excerpts at 15:22-18:4].  By contrast, NCR knew from the start that its CCP contained PCBs.  And in the unlikely event ACPC did not know earlier, ACPC undoubtedly knew that ruptured capsules released PCBs by 1963 through its close working relationship and discussions with both NCR and WT, through product specifications that NCR shared with ACPC, through ACPC's own knowledge of CCP, and, if nothing else, from its 1963 meeting with NCR and WT in which PCB releases from broken capsules were specifically discussed. JEF Decl. Ex. 35 [WT Report on 12/63 visit to ACPC] at BCFOX00038483 and 85-6 (WT discusses with NCR and ACPC how "capsule breakage leads to release of the oil (Arachlor)….").

**PPFF 155:  It was extremely common until the 1980s for trucking companies to use the same trucks to ship both hazardous and non-hazardous materials (including food products).  Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams at 48-50].**

Response to PPFF 155:

<u>Immaterial</u>.  It is immaterial what the common practice was; NCR's use of milk trucks to ship PCB-containing emulsion resulted in milk contamination.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 91.

Further, whatever the industry practice was, NCR continued it despite knowing that its shipments had in fact contaminated several milk shipments.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 91.

**PPFF 156:  A review of 30 years of this practice by the EPA and DOT in 1987 revealed very few instances of joint-use contamination incidents.  Roach Decl., Ex. 93 [April 1987 EPA Report to Congress "Study of Joint Use Vehicles for Transportation of Hazardous and Nonhazardous Materials" (NCR-FOX-0620421)].**

Response to PPFF 156:

<u>Immaterial and irrelevant</u>.  It is immaterial that EPA/DOT's report revealed few instances of joint-use contamination; NCR's use of milk trucks to ship PCB-containing emulsion resulted in milk contamination.  *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 91.

## X.  <u>WIGGINS TEAPE TESTING REGARDING BROKE RECYCLING.</u>

**PPFF 157:  John Gough, the former Wiggins Teape employee who was responsible for Wiggins Teape's studies regarding the recycling of NCR broke, stated that his concern, and the reason for the broke recycling studies, was to determine how well the recycling process was able to remove dyes from the CCP recycled.  Roach Decl., Ex. 94 [J. Gough Dep. at 25:20-26:12, 98:11-99:2; 115:17-116:2].**

Response to PPFF 157:

Undisputed, but incomplete and immaterial. PPFF 157 is immaterial and does not preclude summary judgment for Defendants. In fact, WT engaged in a comprehensive recycling study in 1964-1966 to determine the best method for removing the PCB-containing ink from NCR broke because WT concerns with PCB toxicity:

> Mr. Gough explained the reason for [WT's] interest in Arochlor; it is present in the emulsion used to coat NCR paper. In the production of NCR paper there is a very large amount of waste which is repulped and used to make other types of papers. **Arochlor, a chlorinated diphenyl, is toxic and so it is necessary to known how much is removed during the repulping process especially if the paper is to be used for food wrapping**.

*See* JEF Decl. Ex. 52 [Notes of Nov. 5, 1964 meeting between BAT and WT regarding Aroclor].

Moreover, Plaintiffs admit that WT recycling studies focused not only on the best ways to remove the inks, but also on whether such PCB-containing inks were being discharged to waterbodies during the recycling process. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 45 ("it is undisputed that the results of this program revealed the presence of PCBs in broke, paper products made from recycled broke, and the wastewater generated during the recycling process."). The Butler's Court documents overwhelmingly indicate that the results of WT's studies were shared with NCR. There were more than 20 in-person technical meetings (some days-long) between NCR, WT, and ACPC during the period of WT's recycling studies in which all aspects of CCP production, including broke recycling, were discussed. *See* **Supp. JEF Decl. Ex 1. [Timeline of WT, NCR, and ACPC Communications];Ex. 8 [Feb 15, 1965 Report on WT visit to NCR] at BCFOX00047483** (NCR and WT discussed: "reuse of paper machine broke containing emulsion and the problem which will arise if emulsion gets into the backwater.").

However, Mr. Gough was a mid-level WT employee during the mid-1960s and did not attend the meetings with NCR, ACPC, and others. As Mr. Gough explained with regards to the testing program: "there was a separate person in my department who was the group's environmental advisor" Roach Decl., Ex. 94. [J. Gough Depo Excerpts at 101:17-23]. The information exchanged between NCR and WT was "controlled by Dr. Rance and his team." *Id*. at 108:16-17; *see* Defendants' Response to PPFF ¶ 161. Therefore, Mr. Gough would not have known what was discussed with NCR at such meetings. Nor was Mr. Gough senior enough to necessarily know all the reasons motivating WT's broke recycling program.

Moreover, the Butler's Court documents evidencing the extensive technical exchange between NCR and WT, which included broke recycling discussions, were not produced by Plaintiffs until starting September 11, 1009, *after* Mr. Gough was deposed. Therefore, Mr. Gough was unable to provided testimony regarding such documents.

**PPFF 158: Mr. Gough stated that he was not concerned with the "fate" of Aroclors in the paper, but that a scientist at British American Tobacco Company ("BAT") who was**

asked to test the removal of dyes suggested that it would be easier to study the removal of Aroclors as a "proxy" or "surrogate" for the dyes (as the dyes were too difficult to test directly). *Id.*

Response to PPFF 158:

Unsupported and immaterial. Plaintiffs mischaracterize Mr. Gough's testimony. Neither the word "fate" nor "surrogate" appear anywhere within the cited testimony. Additionally, PPFF 158 does not suggest that Mr. Gough's concern had any particular time frame, incorrectly suggesting that he and WT were always only concerned with the removal of dyes.

PPFF 158 is immaterial and does not preclude summary judgment for Defendants. *See* Defendants' Response to PPFF 157. Plaintiffs admit that WT recycling studies focused not only on the best ways to remove the inks, but also on whether such PCB-containing inks were being discharged to waterbodies during the recycling process. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 45 ("it is undisputed that the results of this program revealed the presence of PCBs in broke, paper products made from recycled broke, and the wastewater generated during the recycling process.").

**PPFF 159: Mr. Gough stated that this testing was purely an "economic" issue, because Wiggins Teape was contemplating building its own recycling plant, and it wanted to make sure that the recycled products it made did not contain inks, and that it could deink the NCR broke without using so much bleach that the paper fiber was destroyed. Roach Decl., Ex. 94 [J. Gough Dep. at 97:19-98:10].**

Response to PPFF 159:

Undisputed, but immaterial. Mr. Gough did state that WT's PCB testing program was economically-oriented because WT wanted to find a way to de-ink the NCR Paper without destroying the fiber. *Id.*

However, PPFF 159 is immaterial and does not preclude summary judgment for Defendants. *See* Defendants' Response to PPFF 157. Plaintiffs admit that WT recycling studies focused not only on the best ways to remove the inks, but also on whether such PCB-containing inks were being discharged to waterbodies during the recycling process. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 45 ("it is undisputed that the results of this program revealed the presence of PCBs in broke, paper products made from recycled broke, and the wastewater generated during the recycling process."). Mr. Gough also explained that WT knew "about the deinking technology, where you can just float the capsules off or float the ink off, [and] thought maybe they can float the capsules off." Gough's testimony confirms that WT understood that this "floated-off" material, which contained Aroclor 1242, would have to be disposed of.

**PPFF 160: Mr. Gough did not share any of the results of this testing with anyone at NCR or ACPC until a conference in 1972, and he has no knowledge that anyone else ever shared such information with anyone at NCR or Appleton Papers. *Id.* ___. Roach Decl., Ex. 94 [J. Gough Dep. at 29:17-31:4., 105:23-106:16].**

Response to PPFF 160:

<u>Unsupported and immaterial</u>.  Mr. Gough does not state that he "did not share any results" with NCR or ACPC, but rather that, prior to the November 1972 meeting, *he never had any contact with any representatives of the NCR Corporation*.  *Id*. at 105:23-106:16.  When asked whether he knew of anyone else who did pass on the results, Mr. Gough simply stated, "I don't know."  *Id*. at 106:12-16.  This testimony merely confirms that fact that Mr. Gough was a mid-level WT employee who was not involved extensive meetings and correspondence with NCR and ACPC during this time.  ***See* Supp. JEF Decl. Ex 1. [Timeline of WT, NCR, and ACPC Communications]**; *see also* Defendants' Response to PPFF 157.

PPFF 160 does not preclude summary judgment for Defendants.  The Butler's Court documents overwhelmingly indicate that the results of WT's studies were shared with NCR.  There were more than <u>20</u> in-person technical meetings (some days-long) between NCR, WT, and ACPC during the period of WT's recycling studies in which all aspects of CCP production, including broke recycling, were discussed.  ***See* Supp. JEF Decl. Ex 1. [Timeline of WT, NCR, and ACPC Communications]**; *see also* Defendants' Response to PPFF 157.  Mr. Gough did not attend such meetings.  Nor, was Mr. Gough able to review the Butler's Court documents, which were produced *after* his deposition.

**PPFF 161:  Mr. Gough stated that the relationship between Wiggins Teape and NCR was "very carefully controlled" and that "Dr. Rance [of Wiggins Teape] was controlling the amount of information that got to NCR because he was concerned about -- you know, because it was a commercial relationship and licensing renewal, so he very mechanically managed what information went to them."  Roach Decl., Ex. 94 [J. Gough Dep. at 108:8-109:1].**

Response to PPFF 161:

<u>Unsupported and immaterial</u>.  Mr. Gough testified that information between NCR and WT was "controlled by Dr. Rance *and his team*."  *Id*. at 108:16-17.

PPFF 161 does not preclude summary judgment for Defendants because Butler's Court documents demonstrate beyond any question that there existed a longstanding technical collaboration between WT and NCR.  *See* Defendants' Response to PPFF 157.  Dr. Rance's team included both Clive Capps and Ian Hendry who, unlike John Gough, did attend many of the more than 20 in-person technical meetings (some days-long) between NCR, WT, and ACPC during the period of WT's recycling studies in which all aspects of CCP production, including broke recycling, were discussed.  *See* **Supp. JEF Decl. Ex 1. [Timeline of WT, NCR, and ACPC Communications]**; JEF Decl. Ex. 47 [WT Report on Visit to NCR in Nov. 1964] (Dr. Rance, Mr. Capps, and Mr. Hutchinson attending for WT).  Clive Capps wrote numerous reports regarding such visits, which specifically describe broke recycling discussions held between WT and NCR.  *See* **Supp. JEF Decl. Ex. 8 [Feb 15, 1965 Report on WT visit to NCR] at BCFOX00047483** (NCR and WT discussed: "reuse of paper machine broke containing emulsion and the problem which will arise if emulsion gets into the backwater.").

Further, it is documented that ACPC and WT "enjoy[ed] complete freedom with regard to exchanging information."  JEF Decl. Ex. 95 [8/18/65 WT Letter to ACPC].

**PPFF 162:  Former NCR employees have similarly testified that the "technical exchange" of information between Wiggins Teape and NCR was not "open," and was intended only to keep the quality of the product consistent.  The information exchanged was of a technical nature, and Wiggins Teape and NCR were generally "secretive" about their respective research.  Roach Decl., Ex. 95 [Aug. 28, 2009 G. Vichare Dep. at 63:11-64:4]; Ex. 24 [Sep. 18, 2009 G. Vichare Dep. at 101:4-16, 102:16-104:13]; Ex. 96 [H. Schwab Dep. at 35:20-36:11, 88:8-89:11].**

Response to PPFF 162:

Unsupported and immaterial.  Plaintiffs cite to portions of Mr. Schwab's testimony that have absolutely no relationship to WT, the exchange of information between WT and NCR, or NCR's "secretive" nature.  *See* Ex. 96 [H. Schwab Dep. at 35:20-36:11, 88:8-89:11].  Similarly, Plaintiffs mischaracterize the deposition of Mr. Vichare, who merely stated that "I'm not sure how freely everything was done because NCR was, you know, fairly concerned about their technology."  Roach Decl., Ex. 95 [Aug. 28, 2009 G. Vichare Dep. at 63:11-64:4].

Further, this Plaintiffs' assertion is pure fantasy.  The Butler's Court documents clearly evidence two decades of intense collaboration among ACPC, NCR, and WT regarding CCP production, recycling and PCB problems.  During this time, there were at least sixty-five (65) meetings and letters among ACPC and NCR and/or NCR's other licensees.  Many involved broke and recycling.  *See* Def. Resp. to PPFF [Doc. #657] at ¶60. For instance, in a August 18, 1965 letter between  WT's Clive Capps and ACPC's John Reeve, Capps stated "Our liaison is helped enormously by the fact that *we enjoy complete freedom with regarding to exchanging information*."  JEF Decl. Ex. 95 [WT Aug. 18, 1965 letter to ACPC] (emphasis added).  Similarly, Mr. Reeve wrote to Capps on July 30, 1965, explaining that the exchange of information between ACPC and WT concerning NCR paper was so open that: ". . . I think we did end up agreeing that probably either of us could go to work for either company and feel right at home."  JEF Decl. Ex. 96 [ACPC July 30, 1965 letter to WT].

**PPFF 163:  As a result of the research conducted by Wiggins Teape, Wiggins Teape built its own broke recycling plant, hoping to achieve results similar to those achieved in the recycling experiments conducted by Wiggins Teape and BAT.  Roach Decl., Ex. 94 [J. Gough Dep. at 66:1-10, 100:24-101:16].**

Response to PPFF 163:

Unsupported and immaterial.  Plaintiffs did not provide the cited testimony, *Id.* at 66:1-10, that allegedly supports this fact.  *See* Roach Decl., Ex. 94 [J. Gough Dep. at 66:1-10, 100:24-101:16].

PPFF 163 is immaterial and does not preclude summary judgment for Defendants.  *See* Defendants' Response to PPFF ¶157.

**PPFF 164:  The goal of WT's recycling mill was to remove as much of the inks (and, coincidentally, PCBs) from the CCP, and ensure that those inks and Aroclors were discharged either to the river or to sludge and not to the recycled products.  Roach Decl., Ex. 94 [J. Gough Dep. at 73:7-74:1, 97:19-99:3].**

Response to PPFF 164:

Unsupported and immaterial. In the cited testimony, Mr. Gough never stated that the "goal" of WT's program was to "ensure that those inks and Aroclors were discharged either to the river or to sludge." *Id*. Moroever, there was nothing "coincindental" about WT's desire to remove PCBs from NCR broke. In fact, WT engaged in a comprehensive recycling study in 1964-1966 to determine the best method for removing the PCB-containing ink from NCR broke because of WT's concerns with PCB toxicity:

> Mr. Gough explained the reason for [WT's] interest in Arochlor; it is present in the emulsion used to coat NCR paper. In the production of NCR paper there is a very large amount of waste which is repulped and used to make other types of papers. **Arochlor, a chlorinated diphenyl, is toxic and so it is necessary to know how much is removed during the repulping process especially if the paper is to be used for food wrapping**.

*See* JEF Decl. Ex. 52 [Notes of Nov. 5, 1964 meeting between BAT and WT regarding Aroclor].

Moreover, Plaintiffs admit that WT recycling studies focused not only on the best ways to remove the inks, but also on whether such PCB-containing inks were being discharged to waterbodies during the recycling process. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 45 ("it is undisputed that the results of this program revealed the presence of PCBs in broke, paper products made from recycled broke, and the wastewater generated during the recycling process.").

**PPFF 165: Mr. Gough stated that environmental issues were not a part of the work that he was doing. Roach Decl., Ex. 94 [J. Gough Dep. at 101:17-23].**

Response to PPFF 165:

Undisputed, but Immaterial. PPFF 165 does not preclude summary judgment for Defendants because Mr. Gough is not the person who would have been aware of such issues Mr. Gough explained with regard to the testing program that: "there was a separate person in my department who was the group's environmental advisor" *Id*. Gough was a mid-level WT employee at this time and was not part of the discussions WT had with NCR and ACPC concerning WT's discovery of PCBs in the backwater from the recycling of NCR broke. *See* Defendants' Response to PPFF ¶157.

**PPFF 166: Wiggins Teape continued to recycle broke through at least February 1970. Roach Decl., Ex. 97 [March 3, 1970 Monsanto Memo (PHGNCR-2005015), referencing a February 1970 visit to Wiggins Teape and describing Wiggins Teape's sale of broke to an outside broker at that time].**

Response to PPFF 166:

Unsupported and immaterial. The referenced memo states that "Wiggins-Teape were rather vague about the quantity and destination of the off-cuts (Broke)" and makes no reference

to whether or not the sale of broke was ongoing or whether WT had already stopped selling broke. *Id*. at 3.

PPFF 166 is immaterial and does not preclude summary judgment for Defendants. *See* Defendants' Response to PPFF 157.

**PPFF 167: Mr. Gough is a paid consultant for at least one of the Defendants in this matter, and was paid for giving testimony in his fact deposition in this matter. Roach Decl., Ex. 94 [J. Gough Dep. at 78:8-80:13, 87:10-17].**

Response to PPFF 167:

Undisputed.

## XI.  CCP IN POST-CONSUMER GRADES OF RECOVERED FIBER.

**PPFF 168: Broke generated from the manufacture of CCP was one type of Recovered Fiber that could be recycled by paper mills. Roach Decl., Ex. 98 [Suppl. Response of U.S. Paper to Information Request of U.S. Department of Interior (Exhibit 253 to R. Gerbers Dep.)].**

Response to PPFF 168:

Undisputed. Defendants object, however, to Plaintiffs' use of the defined term "Recovered Fiber" without providing any definition. For the purposes of Defendants' responses to Plaintiffs' PPFF, Defendants assume that "Recovered Fiber" refers to wastepaper.

**PPFF 169: CCP Broke generally consisted of any trim or cuttings from the finishing of CCP, as well as any off-specification paper that could not be sold as CCP. Roach Decl., Ex. 99 [D. Christensen Dep. at 21:12-22:9].**

Response to PPFF 169:

Undisputed. However, Plaintiffs' use of the word "trim" in this context is not the same as the trim sold separately by forms manufacturers to the recycling Defendants.

**PPFF 170: Because there was a market demand for it, CCP broke was considered a valuable product and a revenue generating part of Appleton Coated's business. Roach Decl., Ex. 99 [D. Christensen Dep. at 52:25 – 53:8]; Ex. 100 [P.H. Glatfelter Response to Third Section 104(e) Request of the U.S. Department of Interior (NCR-FOX-0236691) at 5 (discussing competition for CCP broke)]; Ex. 101 [F. Strelow Dep. at 114:17-22].**

Response to PPFF 170:

Unsupported in part and immaterial. No evidence cited by Plaintiffs supports that "CCP broke was considered a valuable product." Plaintiffs seek to characterize CCP broke as "a valuable product" for the purposes of arguing that they and their predecessors are not "arrangers" under CERCLA Section 107(a). Whether Plaintiffs are liable as "arrangers" is immaterial to

Phase I, which addresses which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.

**PPFF 171:  The ACPC facility never disposed of CCP broke, and had procedures in place to collect, sort, and bale CCP broke.  Roach Decl., Ex. 99 [D. Christensen Dep. at 21:12-22:9]; Ex. 23 [F. Heinritz Dep. at 96:21-97:14]; Ex. 102 [July 21, 1966 ACPC Memorandum (NCR-FOX-0318041)].**

Response to PPFF 171:

<u>Unsupported in part and immaterial</u>.  On page 97 of Exhibit 23, Fred Heinritz testifies:

Q:      To your knowledge, was any of the NCR broke and trim sent to the Mackville Dump?

A:      I don't know.

**Supp. JEF Decl. Ex. 20 [January 28, 2009 F. Heinritz Dep. at 97:1-2].**  This does not support that "the ACPC facility *never* disposed of CCP broke," and neither do Exhibits 99 and 102.  The alleged fact regarding whether ACPC "disposed of" broke is immaterial in any event and does not preclude summary judgment, for the reasons described in Defendants' Response to PPFF 170.

**PPFF 172:  The ACPC facility sold all of its CCP broke through recycled paper brokers, who then sold and delivered this CCP broke to various paper mills, including some of Defendants' facilities.  Roach Decl., Ex. 99 [D. Christensen Dep. at 31:13-32:3]; Ex. 101 [F. Strelow Dep. at 40:23-41:23]; Ex. 103 [Aug. 7, 2009 Rebuttal Report of W. Moore at 2]; Ex. 23 [F. Heinritz Dep. at 20:15-20].**

Response to PPFF 172:

<u>Undisputed</u>.

**PPFF 173:  CCP broke would have contained Aroclor 1242 prior to April 1971.  Roach Decl., Ex. 104 [July 10, 2009 Report of C. Klass at 11, 13-14].**

Response to PPFF 173:

<u>Undisputed</u>.

**PPFF 174:  Once the phase-out of Aroclor 1242 had been completed by April 1971, any newly generated CCP broke would not have contained any Aroclor 1242.  Roach Decl., Ex. 104 [July 10, 2009 Report of C. Klass at 13].**

Response to PPFF 174:

Unsupported in part.  While Exhibit 104, the July 10, 2009 Report of Charles Klass at 13, states that "[a]fter [April or May 1971], there were no *new* sources of PCBs being introduced into the river" it also states that "Appleton Coated continued to sell broke and trim after spring 1971, and some of this broke and  trim may have contained PCBs."

**PPFF 175:  CCP was also present in certain grades of post-consumer Recovered Fiber.  Roach Decl., Ex. 104 [July 10, 2009 Report of C. Klass at 13-15]; Ex. 14 [June 5, 2009 Report of W. Moore at 9-10].**

Response to PPFF 175:

Undisputed.

**PPFF 176:  Multi-page forms made of CCP were filled out, separated, and distributed in the course of ordinary office and businesses practices, and were often stored in file cabinets and other storage locations.  Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 8-9].**

Response to PPFF 176:

Undisputed.

**PPFF 177:  Much of the multi-page forms made from CCP went through office paper recycling and file recycling/document destruction programs, and found their way into certain grades of post-consumer Recovered Fiber.  Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 8-9].**

Response to PPFF 177:

Unsupported and immaterial.  While Exhibit 14, the June 5, 2009 Report of William Moore does support PPFF 177, the report of Charles Klass states in contrast that the "rate of recycling post-consumer business forms in the United States in the 1960s, 1970s and 1980s was quite low" and that "post-consumer wastepaper would have been recycled at a much lower rate than post-industrial/pre-consumer wastepaper."  Ex. 104 [July 10, 2009 Report of C. Klass at 14-15.  Broke and trim are included in Klass's reference to "post-industrial/pre-consumer wastepaper" while "post-consumer wastepaper" may have included CCP that was used in an office.

Whether much of CCP used in an office was recycled and "found their way into" post-consumer wastepaper is immaterial in any event, and does not preclude summary judgment because Phase I addresses which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  It is also immaterial because Defendants' continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

**PPFF 178: Because old records that were put into storage often were not recycled for many years, certain grades of post-consumer Recovered Fiber contained pre-1971 CCP long after NCR discontinued the use of Aroclor 1242 in the manufacture of new CCP in April 1971. Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 9-11].**

Response to PPFF 178:

Undisputed but immaterial. The alleged fact is immaterial and does not preclude summary judgment, because it is undisputed that discharges to the Fox River after mid-1971 were lower than prior to mid-1971, and Plaintiffs have offered no evidence that such discharges after mid-1971 were not minimal. *See* Defendants' Reply to Plaintiffs' Response to Defendants' Proposed Findings of Fact at ¶¶ 118-119. Further, Defendants' continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

**PPFF 179: There were four grades of post-consumer Recovered Fiber that came primarily from office buildings and would have contained pre-1971 CCP even after 1971: Mixed Paper, Sorted White Ledger, Sorted Colored Ledger, and File Stock. Roach Decl., Ex. Ex. 14 [June 5, 2009 Report of W. Moore at 10].**

Response to PPFF 179:

Undisputed but immaterial. *See* Defendants' Response to PPFF 178.

**PPFF 180: Defendants' recycling mills recycled grades of recovered fiber most likely to contain PCBs. Roach Decl., Ex. 14 [June 5, 2009 Expert Report of W. Moore, at 6-7].**

Response to PPFF 180:

Unsupported and immaterial. PPFF 180 is vague and ambiguous and includes no reference to the amount of such recovered fiber recycled, the time period of the alleged recycling and which specific grades Plaintiffs refer to as "most likely" to contain PCBs. In addition, the evidence cited by Plaintiffs does not state that Riverside (Defendant CBC Coating) used any grades of recovered fiber that would have contained PCBs. *Id.* The alleged fact is immaterial in any event for the reasons in Defendants' Response to PPFF 178.

## XII.  ACTIONS AND STATEMENTS OF PAPER TRADE ORGANIZATIONS AND DEFENDANTS REGARDING PCBS.

### A.  Paper Trade Organizations

**PPFF 181: The Institute of Paper Chemistry stated in the 1970s that issues relating to PCBs in paper products and in paper mill effluents had been recognized by the paper industry since the late 1960s. Roach Decl., Ex. 105 [Institute of Paper Chemistry Report (NCR-FOX-0281317), at 1, stating: "The presence of PCBs in paper products and mill effluents has been recognized since the late 1960s."]; Ex. 106 [July 22, 1977 Institute of**

**Paper Chemistry Report (NCR-FOX-0073460), at 3, stating "Since the late 1960s PCBs have been known to be present in paper products and mill effluents."].**

Response to PPFF 181:

Unsupported and immaterial. PPFF 181 mischaracterizes Exhibits 105, the Institute of Paper Chemistry Report, and 106, the July 22, 1977 Institute of Paper Chemistry Report. These reports state that the presence of PCBs in mill effluent has been recognized since the late 1960s. They do not state that "*issues relating to PCBs in paper products and in paper mill effluents* had been recognized by the paper industry since the late 1960s." Moreover, both reports discuss the dearth of information on PCBs in mill effluents. Roach Decl., Ex. 105 [Institute of Paper Chemistry Report (NCR-FOX-0281317), at 1, stating "apparently nothing has been published on the dispersal of PCBs within the mill system"]; Ex. 106 [July 22, 1977 Institute of Paper Chemistry Report (NCR-FOX-0073460), at 3, stating "during the early phase of this project [a comprehensive literature search] disclosed very little quantitative information of PCBs in mill effluents."].

The alleged fact is immaterial in any event and does not preclude summary judgment. Exhibits 105 and 106 solely refer generally to PCBs in paper mill effluent; they do not support that in the late 1960s PCBs were recognized in Defendants' effluent. Moreover, the alleged fact relates to the actions and knowledge of the government or other non-parties regarding PCBs and PCB contamination, and not the knowledge of any party to this litigation.

**PPFF 182: As a result of concerns raised by the FDA in the early 1970s, the paperboard packaging industry began investigating potential sources of the PCBs being found in food packaging materials. Roach Decl., Ex. 107 [Sept. 15, 1971 BRDA Memo (MENFOX00001640); Ex. 108 [Sept. 28, 1971 BRDA News Release (MENFOX00001723)]; Ex. 109 [Oct. 1, 1971 American Paper Institute Memo (MENFOX00000149)].**

Response to PPFF 182:

Undisputed but immaterial. The alleged fact is immaterial and does not preclude summary judgment, because there is no evidence that Exhibits 107, 108 and 109 were provided to and read by all Defendants.

**PPFF 183: By the end of 1971, the recycling of pre-1971 CCP was identified as the principal source of PCBs in food packaging materials. Roach Decl., Ex. 107 [Sept. 15, 1971 BRDA Memo (MENFOX00001640); Ex. 108 [Sept. 28, 1971 BRDA News Release (MENFOX00001723)]; Ex. 109 [Oct. 1, 1971 American Paper Institute Memo (MENFOX00000149)].**

Response to PPFF 183:

Undisputed but immaterial. However, the cited evidentiary material also refers to other sources of PCBs, such as process water from affected lakes and streams. Ex. 109 [Oct. 1, 1971 American Paper Institute Memo at 2]. The alleged fact is immaterial and does not preclude summary judgment, because there is no evidence that Exhibits 107, 108 and 109 were provided to and read by all Defendants.

84

**PPFF 184:  Beginning in January 1971, the American Paper Institute and other paper industry trade organizations issued a number of bulletins explaining that PCBs had been used in the manufacture of CCP, and that certain grades of recovered paper (such as mixed office waste and ledger grades) were likely sources of PCB-containing CCP.** *See, e.g.*, **Roach Decl., Ex. 110 [Jan. 12, 1971 American Paper Institute Letter (NCR-FOX-0334431)]; Ex. 107 [Sept. 15, 1971 BRDA Memo (MENFOX00001640); Ex. 108 [Sept. 28, 1971 BRDA News Release (MENFOX00001723)]; Ex. 109 [Oct. 1, 1971 American Paper Institute Memo (MENFOX00000149)].**

Response to PPFF 184:

Undisputed but immaterial.  The alleged fact is immaterial and does not preclude summary judgment, as there is no evidence that these bulletins were provided to and read by all Defendants.  Exhibit 110, the January 12, 1971 American Paper Institute Letter, is addressed to "Members Combination Paperboard Division Paperboard Group, American Paper Institute."  There is no evidence that Defendants were members of this group.  Exhibit 107, the September 15, 1971 BRDA Memo, is addressed to the Board of Trustees, Technical Planning Committee, Paper Stock Committee, Boxboard Research & Development Association.  There is also no evidence that Defendants were members of this committee.

**PPFF 185:  Bulletins issued by the American Paper Institute and other paper industry trade organizations in the early 1970s advised recycling mills to "exercise extremely thorough surveillance of incoming paper stock to ensure that PCB type carbonless carbon paper is not included in any bale of . . . mixed office grades that might be used" and to "avoid the use of mixed office waste that might contain NCR papers . . . ." Roach Decl., Ex. 107 [Sept. 15, 1971 BRDA Memo (MENFOX00001640); Ex. 111 [Oct. 11, 1971 American Paper Institute Memo (MENFOX00000154).**

Response to PPFF 185:

Undisputed but immaterial.  *See* Defendants' Response to PPFF 184.  In addition, Exhibit 111, the October 11, 1971 American Paper Institute Memo, is addressed to "Members Paper Stock Conservation Committee, American Paper Institute" and there is no evidence Defendants were members of this group.  Moreover, these bulletins were issued in late 1971 as opposed to Plaintiffs' general time frame of "in the early 1970s."

## B.     Fort Howard Paper Company (Predecessor of the Georgia-Pacific Defendants)

**PPFF 186:  Donald Schneider was the in charge of the Technical Department of Fort Howard from 1969 through 1979.  Roach Decl., Ex. 112 [D. Schneider Dep. at 17:8-25, 20:14-20].**

Response to PPFF 186:

Unsupported.  PPFF mischaracterizes Mr. Schneider's testimony, which was that "in 1969 or so, I became assistant technical director, and then sometime in the early '70s, I became

technical director, and I held that up until about 1979." Roach Decl., Ex. 112 [D. Schneider Dep. at 17:8-11].

**PPFF 187: The Technical Department at Fort Howard was responsible for pollution abatement activities, and Fort Howard's Director of Pollution Abatement, David Pagel, reported to Mr. Schneider. Roach Decl., Ex. 112 [D. Schneider Dep. at 21:3-14].**

Response to PPFF 187:

<u>Unsupported</u>. PPFF mischaracterizes Mr. Schneider's testimony, which was that the Technical Department was "involved with the pollution abatement system." Roach Decl., Ex. 112 [D. Schneider Dep. at 21:4].

Mr. Schneider also testified that he was the Technical Director at Fort Howard "up until about 1979, and I think I became director of research and development. And then in the later '80s, I became vice president of research and development." *Id*. at 17:10-14.

Mr. Schneider testified that Mr. Pagel "worked for me" but did not testify that Mr. Pagel worked for him in his capacity as Director of Pollution Abatement during the time that Mr. Schneider worked in the Technical Department. Roach Decl., Ex. 112 [D. Schneider Dep. at 21:21].

With respect to Mr. Pagel's position, Mr. Schneider testified that:

Q: And when did the position, whether or not it was director of environmental technology or pollution abatement, as you referred to it a little while ago, when did that position emerge?

A: Well, I imagine when he joined the -- when he joined the research department in the early '80s.

Q: Before the '80s, in the '70s, do you know what his title was?

A: No.

**Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 23:25, 24:1-8].**

**PPFF 188: Mr. Schneider stated that he learned that PCBs were contained in CCP at least by the time that Monsanto publicly announced that it was going to cease selling PCBs for use in CCP. Mr. Schneider stated that it was "well known" and "well publicized" in journals that related to the paper industry at the time that Monsanto made the decision to stop selling PCBs for use in CCP. Roach Decl., Ex. 112 [D. Schneider Dep. at 125:23-126:17, 127:11-21].**

Response to PPFF 188:

<u>Unsupported</u>. In this paragraph and in the following paragraphs, Plaintiffs make allegations that mischaracterize Mr. Schneider's testimony and suggest that Mr. Schneider knew

in June of 1970 that NCR Paper contained PCBs. Mr. Schneider's testimony was that he first learned that PCBs were in NCR Paper when he read an article in a journal called Chem 26 which presented the results of an FDA/EPA food basket survey. Roach Decl., Ex. 112 [D. Schneider Dep. at 121:24-124:19]. While Mr. Schneider could not remember the exact date of this article, he testified that "I'm sure it was in '71, '72, in that time frame." *Id.* at 125:5-18. The article Mr. Schneider read was dated December 1971. **Supp. JEF Decl. Ex. 16 [December 1971 Chem 26 Article, MONSFOX00068171].** Mr. Schneider's testimony is clear that he knew no earlier than December 1971 that NCR Paper contained PCBs.

PPFF 188 mischaracterizes Mr. Schneider's testimony, which refers to Monsanto's decision to stop selling PCBs in general, not to Monsanto's "decision to stop selling PCBs for use in CCP." Mr. Schneider testifies that he believes the publicity surrounding Monsanto's decision to stop selling PCBs "would have mentioned that NCR Paper was one of the applications" but not that he actually does remember that being mentioned. Roach Decl., Ex. 112 [D. Schneider Dep. at 125:23 – 126:5; 127:11-21].

**PPFF 189: Former employees of Fort Howard, Bergstrom, Menasha, and U.S. Paper all testified to having read trade and industry publications during their employment with those companies. Roach Decl., Ex. 113 [P. Tallmadge Dep. at 16:17-23]; Ex. 114 [O. Ross Dep. at 16:2-6]; Ex. 115 [D. Pagel Dep. at 28:17-29:20]; Ex. 112 [D. Schneider Dep. at 31:6-15]; Ex. 116 [H. Sattler Dep. at 45:7-13]; Ex. 117 [T. Olson Dep. at 44:2-16].**

Response to PPFF 189:

Undisputed but Immaterial. Mr. Pagel's testimony was that he remembers reading "perhaps cursorily, not religiously," a publication that TAPPI put out, a publication called Pulp and Paper, and occasionally reading Chemicals 26. Roach Decl., Ex. 115 [D. Pagel Dep. at 29:5-23]. PPFF also mischaracterizes Mr. Schneider's testimony, which was that he read TAPPI, Pulp and Paper, the Paper Trade Journal, Chemical Week, and some publications of The Institute of Paper Chemistry. Roach Decl., Ex. 112 [D. Schneider Dep. at 31:6-15]. As to the testimony of Mr. Olson, his reading of the publications was after 1986 and therefore after the relevant time period. With respect to Mr. Sattler's testimony, he does not testify as to any time frame that Menasha was a member of various trade organizations, and further does not state which organizations he received newsletters from, nor that he received them through Menasha. *See* Defendants' Response to PPFF 298-299.

The alleged fact is in any event immaterial and does not preclude summary judgment. Fort Howard had no knowledge of PCBs in NCR Paper until, at the earliest, December of 1971 and Fort Howard had no knowledge that PCBs were in its effluent until, at the earliest, late 1974. *Id.* at 128:7-9, **Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 166:15-16].** Plaintiffs have acknowledged that the recycling mills did not know CCP contained PCBs during the Production Period, which is the only time period relevant to Phase I. U.S. Paper's position is only that it did not know CCP contained PCBs during any relevant time period. **McKinney Decl., ¶ 4 & Attachment 4, Dep. of J. Patterson (March 13, 2009) at 112:18-23; ¶ 6 & Attachment 6, Dep. of D. Hecker (June 10, 2009) at 60:10-11; and ¶ 7 & Attachment 7, Dep. of T. Van Deursen (June 10, 2009) at 77:13-18.**

**PPFF 190:  Mr. Schneider also testified that he learned of a situation where shredded wheat was found to have been contaminated with PCBs as a result of a boxboard mill recycling CCP.  Roach Decl., Ex. 112 [D. Schneider Dep. at 121:13-122:8, 122:10-16].**

Response to PPFF 190:

Undisputed but Immaterial.  As explained in response to PPFF 188, Mr. Schneider learned of a situation involving shredded wheat when he read an article in Chem 26 in December 1971.  Mr. Schneider did not testify that the contamination was related to a boxboard mill.

The alleged fact is in any event immaterial and does not preclude summary judgment, because Fort Howard had no knowledge of PCBs in NCR Paper until, at the earliest, December 1971, and Fort Howard had no knowledge that PCBs were in its effluent until, at the earliest, late 1974.  Roach Decl., Ex. 112 [D. Schneider Dep. at 128:7-9], **Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 166:15-16].**

**PPFF 191:  Mr. Schneider co-authored a report on PCBs in 1976 that placed the timing of these discoveries as sometime in the 1970-71 time frame, and Mr. Schneider stated that he believed that he learned about the connection between PCBs and CCP at that time.  Roach Decl., Ex. 40 [1976 Fort Howard PCB Report (Ex. 114 to the Deposition of D. DeMeuse), at p. 2, stating that the "PCB situation, as it relates to the paper industry, came to light during 1970-71 when the U.S. Food & Drug Administration found PCBs in certain food products and traced this contamination to the recycled fiber used in the manufacture of the food packaging material]; Ex. 112 [D. Schneider Dep. at 145:7-146:9].**

Response to PPFF 191:

Unsupported and Immaterial.  PPFF is vague and ambiguous in that it does not explain what "these discoveries" refers to.  The report that Mr. Schneider co-authored did not mention Shredded Wheat.  Mr. Schneider testified that the reference in the report was to the article he read in December 1971:

Q:   If you look down to the bottom paragraph, it says, "The PCB situation, as it relates to the paper industry, came to light during 1970-'71, when the U.S. Food & Drug Administration found PCBs in certain food products."  Is that what you were discussing before with respect to the shredded wheat?

A:   Yes.  I believe that's specifically the shredded wheat article.

Roach Decl., Ex. 112 [D. Schneider Dep. at 145:7-15].

The alleged fact is in any event immaterial and does not preclude summary judgment, because Fort Howard had no knowledge of PCBs in NCR Paper until, at the earliest, December of 1971, and Fort Howard had no knowledge that PCBs were in its effluent until, at the earliest, late 1974.  *Id.* at 128:7-9, **Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 166:15-16].**

**PPFF 192:  Fort Howard was therefore aware by June 1970 at the latest that CCP contained PCBs.  Roach Decl., Ex. 40 [1976 Fort Howard PCB Report (Ex. 114 to the Deposition of D. DeMeuse), at 2]; Ex. 112 [D. Schneider Dep. at 125:23-126:17, 127:11-21, 145:7-146:9].**

Response to PPFF 192:

Unsupported.  PPFF is completely unsupported, does not follow from previously alleged facts, and grossly mischaracterizes Mr. Schneider's testimony.  *See* responses to PPFFs 188 through 191.

The June 1970 date referred to in PPFF 192 appears to reference the letter supporting PPFF 81.  It is undisputed that this letter was sent by Monsanto "to certain customers stating that it would stop supplying most of its Aroclors, including Aroclor 1242, for *modifier and plasticizer applications* effective August 30, 1970."  PPFF 81, Roach Decl., Ex. 52 [June 1970 Letter (NCR-FOX-0517895)].  There is no evidence that this letter was sent to Fort Howard, or to any other recycling mill.  This letter does not mention carbonless copy paper.  Furthermore, this letter was not shown to Mr. Schneider in his deposition.

**PPFF 193:  At the time he learned of the connection between PCBs and CCP, Mr. Schneider testified that he knew that Fort Howard was recycling CCP.  Roach Decl., Ex. 112 [D. Schneider Dep. at 355:20-356:15].**

Response to PPFF 193:

Immaterial.  The alleged fact is immaterial and does not preclude summary judgment, because Mr. Schneider also testified that when he first learned of the connection between NCR Paper and PCBs in December 1971, Fort Howard processed only a very small amount of NCR Paper and by that time, there were no longer PCBs in NCR Paper.  **Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 357:8-21].**  Fort Howard had no knowledge that PCBs were in its effluent until, at the earliest, late 1974.  **Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 166:15-16].**  The alleged fact is also immaterial because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 194:  Despite this knowledge, Mr. Schneider stated that, other than possibly some informal conversations regarding the shredded wheat incident, he did not discuss the PCB situation with anyone at Fort Howard.  Roach Decl., Ex. 112 [D. Schneider Dep. at 123:12-124:15].**

Response to PPFF 194:

Unsupported and Immaterial.  PPFF mischaracterizes Mr. Schneider's testimony, which was that after he became aware that there was a connection between PCBs and NCR Paper

sometime in the 1970's, he did not mention that to anyone at Fort Howard because "Fort Howard did not process that much NCR paper. NCR paper was very difficult to process in our -- on our equipment." **Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 357:8-21].**

The alleged fact is immaterial and does not preclude summary judgment, because Fort Howard had no knowledge that PCBs were in its effluent until, at the earliest, late 1974. **Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 166:15-16].** The alleged fact is also immaterial because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 195: Mr. Pagel, Fort Howard's Director of Pollution Abatement, testified that Mr. Schneider never mentioned PCBs or their connection to CCP with him prior to 1974. Roach Decl., Ex. 115 [D. Pagel Dep. at 89:7-90:5].**

Response to PPFF 195:

<u>Unsupported and Immaterial</u>. As explained in response to PPFF 187, PPFF 195 mischaracterizes Mr. Schneider's testimony, which was that prior to 1974, Mr. Pagel was not Fort Howard's Director of Pollution Abatement. With respect to Mr. Pagel's position, Mr. Schneider testified that:

Q   And when did the position, whether or not it was director of environmental technology or pollution abatement, as you referred to it a little while ago, when did that position emerge?

A   Well, I imagine when he joined the -- when he joined the research department in the early '80s.

Q   Before the '80s, in the '70s, do you know what his title was?

A   No.

Roach Decl., Ex. 112 [D. Schneider Dep. at 23:25, 24:1-8].

PPFF 195 also mischaracterizes Mr. Pagel's testimony, which was that prior to DNR informing Fort Howard that it had PCBs in its effluent, Mr. Schneider never "mentioned" PCBs to him. Roach Decl., Ex. 115 [D. Pagel Dep. at 90:2-5].   .

The alleged fact is immaterial and does not preclude summary judgment, because Fort Howard had no knowledge that PCBs were in its effluent until, at the earliest, late 1974. **Supp. JEF Decl. Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 166:15-16].** The alleged fact is also immaterial because by the time Fort Howard learned that PCBs were in its effluent, PCBs

were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 196: Fort Howard did not do anything with respect to PCBs until 1974, when the WDNR tested Fort Howard's effluent and found PCBs. Roach Decl., Ex. 115 [D. Pagel Dep. at 90:6-91:6]; Ex. 112 [D. Schneider Dep. at 127:23-134:11].**

Response to PPFF 196:

<u>Unsupported and Immaterial</u>. PPFF is vague, ambiguous, and misleading. PPFF mischaracterizes Mr. Pagel's testimony, which was that he first heard the term PCB when WDNR told Fort Howard in late '74 or early '75 that there were PCBs in its effluent. D. Pagel Dep. At 88:7-11. Because Mr. Pagel testified that he did not hear the term "PCB" before late 1974, it is misleading to suggest that Mr. Pagel testified that Fort Howard "did not do anything with respect to PCBs until 1974." See PPFF 196.

PPFF likewise mischaracterizes Mr. Schneider's testimony, which was:

Q   And do you remember whether it was a surprise to you that Fort Howard's effluent would contain PCBs?

A   Yes.

D. Schneider 128:7-9. Because Mr. Schneider testified that he was not aware that PCBs might be contained in Fort Howard's effluent before 1974, it is misleading to suggest that Mr. Pagel testified that Fort Howard "did not do anything with respect to PCBs until 1974." *See* PPFF 196.

The alleged fact is in any event immaterial and does not preclude summary judgment because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 197: The WDNR's testing during that time period determined that Fort Howard had the highest PCB discharges on the Fox River. Roach Decl., Ex. 118 [1976 WDNR PCB Report (GPFOX00000690) at 44, Table 5].**

Response to PPFF 197:

<u>Unsupported and immaterial</u>. PPFF is vague, ambiguous, and mischaracterizes the document cited in support. It is unclear what "that time period" refers to. *See* PPFF 197. The

document cited (GPFOX00000690) refers to 13 test results for Fort Howard, taken between March 4, 1975 and April 21, 1976. The document cited (GPFOX00000690) contains in Table 5 "Estimates of PCB Discharges to Green Bay and Lake Michigan From Industrial and Municipal Effluents." There is no indication that Table 5 contains an exhaustive list of industrial and municipal dischargers to the Fox River, and therefore it is impossible to determine from Table 5 that Fort Howard had "the highest PCB discharges on the Fox River." *See* PPFF 197. Furthermore, Table 5 contains for each listed industrial and municipal discharger a different number of samples taken over different time periods, making comparisons between dischargers based on Table 5 of extremely limited use, and further making it impossible to determine from Table 5 that Fort Howard had "the highest PCB discharges on the Fox River." *See* PPFF 197.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 198: The WDNR estimated in 1976 that Fort Howard was releasing 3.8 pounds of PCBs per day to the Fox River, greater than three times the amount estimated as being discharged by Bergstrom (the second largest estimated discharger to the Fox River), and 17 times the amount the third largest discharger (Fond du Lac WWTP) was estimated to be releasing at that time]. Roach Decl., Ex. 118 [1976 WDNR PCB Report (GPFOX00000690) at 44, Table 5].**

Response to PPFF 198:

Unsupported and Immaterial. PPFF is vague, ambiguous, and mischaracterizes the document cited in support. The document cited (GPFOX00000690) refers to 13 test results for Fort Howard, taken between March 4, 1975 and April 21, 1976. The document cited (GPFOX00000690) contains in Table 5 "Estimates of PCB Discharges to Green Bay and Lake Michigan From Industrial and Municipal Effluents." There is no indication that Table 5 contains an exhaustive list of industrial and municipal dischargers to the Fox River, and therefore it is impossible to determine from the document who the "largest" discharger was. Furthermore, Table 5 contains for each listed industrial and municipal discharger a different number of samples taken over different time periods. Estimates for 1976 were not provided for all of these dischargers, and it is therefore misleading to compare between dischargers. There are two estimates for the Fond du Lac WWTP in Table 5: one for February 27, 1973 and one for May 23, 1975. It is misleading to base the statement that in 1976 Fort Howard discharged "17 times the amount the third largest discharger (Fond du Lac WWTP) was estimated to be releasing at that time" on a document that contains only a 1976 estimate for Fort Howard (based on 13 samples) and a 1975 estimate for Fond du Lac WWTP (based on 2 samples). The same principle holds true for the statement that in 1976 Fort Howard discharged "greater than three times the amount estimated as being discharged by Bergstrom."

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 199: Two of Fort Howard's first steps in connection with the PCB situation were to develop the capability of testing for PCBs in-house, and then to initiate a program of testing its recycled fiber for PCBs. Roach Decl., Ex. 112 [D. Schneider Dep. at 128:10-134:11].**

Response to PPFF 199:

<u>Undisputed but Immaterial</u>. PPFF is vague and ambiguous regarding what "the PCB situation" refers to. However, it is undisputed that in late 1974 and throughout 1975, Fort Howard undertook a comprehensive investigation to determine the source of PCBs in Fort Howard's effluent. As part of that initial investigation and thereafter, Fort Howard undertook a number of activities, including but not limited to developing in-house laboratory expertise regarding the testing of PCBs, including purchasing lab equipment and undertaking training and sampling and PCB analysis of waste paper. *See* Georgia-Pacific's Objections and Responses to Plaintiff NCR Corporation's First Set of Interrogatories and Requests for the Production of Documents, Response to Interrogatory No. 2 (January 5, 2009).

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 200: That testing was conducted on bales of recycled fiber that Fort Howard had in inventory and was waiting to recycle. Roach Decl., Ex. 119 [R. Lemerande Dep. at 65:2-66:17].**

Response to PPFF 200:

<u>Unsupported and Immaterial</u>. PPFF mischaracterizes Mr. Lemerande's testimony, which was that Fort Howard tested both wastepaper already on site and incoming wastepaper:

Q    Okay. What kind of samples were you going to give him?

A    Wastepaper samples.

Q    Okay. From where?

A   From our -- the wastepaper that we had on site.

Q   Incoming wastepaper or in the storage rooms or --

A   Both.

Roach Decl., Ex. 119 [R. Lemerande Dep. at 66:2-8].

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 201:  The testing revealed that Fort Howard still had many bales of pre-1971 paper in inventory, including entire bales of pre-1971 CCP, and bales dating back to 1967. Roach Decl., Ex. 120 [Analysis of Wastepaper Received by Fort Howard in 1975 and 1976, Exhibit B to "List of Exhibits" (Ex. 498 to the R. Geigel Dep.)]**

Response to PPFF 201:

Unsupported and Immaterial.  PPFF is vague, ambiguous, and mischaracterizes the document cited in support.  The document cited states that some of the samples were taken from bales that were received before 1971.  Only four of the samples appear to have been of pre-1971 NCR Paper.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 202:  These older bales, particularly the older bales of CCP, had very large PCB concentrations.  Roach Decl., Ex. 120 [Analysis of Wastepaper Received by Fort Howard in 1975 and 1976, Exhibit B to "List of Exhibits" (Ex. 498 to the R. Geigel Dep.)].**

Response to PPFF 202:

Unsupported and Immaterial.  PPFF is vague, ambiguous, and mischaracterizes the document cited in support.  It is unclear what it means for a bale to have "very large" PCB concentrations.  All the document cited shows is that the four samples that appear to be from pre-1971 NCR Paper have higher PCB content than the other samples taken.

94

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 203: Fort Howard's 1975 testing of bales of recovered fiber revealed concentrations of pre-1971 bales of CCP, with PCB concentrations of 31,900,000 ppb (Sample 5A), 35,600,000 ppb (Sample 33), 10,800,000 ppb (Sample 25), 10,000,000 ppb (Sample 147), and 2,591,400 ppb (Sample 76). Roach Decl., Ex. 120 [Analysis of Wastepaper Received by Fort Howard in 1975 and 1976, Exhibit B to "List of Exhibits" (Ex. 498 to the R. Geigel Dep.)].**

Response to PPFF 203:

Unsupported and Immaterial. PPFF mischaracterizes the document cited in support, which lists PCB content of 31,900,000 ppb for sample 5A, but also states that Sample 5A is a repeat of Sample 5. Sample 5 lists PCB content of 1,613,100 ppb.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 204: Fort Howard's 1975 testing of bales of recovered fiber further revealed PCB concentrations of other grades of recovered fiber with PCB concentrations of 152,900 ppb (Sample 155 – Colored Ledger), 23,050 ppb (Sample 61 – Colored Ledger ), 6,100 ppb (Sample 30 – Newsprint), and 5,550 ppb (Sample 141 – Colored Ledger ).] Roach Decl., Ex. 120 [Analysis of Wastepaper Received by Fort Howard in 1975 and 1976, Exhibit B to "List of Exhibits" (Ex. 498 to the R. Geigel Dep.)].**

Response to PPFF 204:

Unsupported and Immaterial. PPFF mischaracterizes the document cited in support, which contains information on samples from over a dozen different grades of paper. The results for each of these grades is highly variable. In addition to the samples referenced above, some samples of colored ledger listed PCB content of 409 ppb (Sample 49) and 265 ppb (Sample 107) and some samples of newsprint listed 181 ppb (Sample 122) and 96 ppb (Sample 123).

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this

minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 205: After conducting this sampling, Fort Howard recycled all of the bales of recovered fiber from which the tested samples were taken; it did not take any of these bales out of inventory. Roach Decl., Ex. 121 [J. Powell Dep. at 138:7-22]; Ex. 119 [R. Lemerande Dep. at 76:8-77:2]; Ex. 122 [J. Herb Dep. at 31:5-16]; Ex. 123 [W. Martens Dep. at 118:15-24]; Ex. 124 [W. Charles Dep. at 142:3-9]; Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 12, stating "Fort Howard Paper Company feels that fluctuations in the in the PCB content of the effluent is directly attributable to the type of wastepaper processed. This is especially true for the October 22, 1975, sample and the December 19, 1975, sample as both of these samples were collected during periods in which large quantities of older wastepapers (pre-1974) were being processed in our system."].**

Response to PPFF 205:

<u>Unsupported and Immaterial</u>. PPFF mischaracterizes the testimony of J. Powell which was that, after conducting the sampling, Fort Howard did not discontinue its normal recycling practices. Roach Decl., Ex. 121 [J. Powell Dep. at 138:7-22].

PPFF is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 206: The March 5, 1976 "Report on Polychlorinated Biphenyls," stated that, while a good deal of experimental work had been done by that point regarding PCBs, the results of those studies "have been reported for the most part as PCBs and not as a specific Aroclor." Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 14].**

Response to PPFF 206:

<u>Unsupported and Immaterial</u>. PPFF mischaracterizes the document cited in support, which states: "A considerable amount of experimental work has been done in an attempt to determine the PCB content in fish, especially in the Great Lakes area. However, they have been reported for the most part as PCBs and not as a specific Aroclor." Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 14].

PPFF is in any event immaterial and does not preclude summary judgment, because, unlike NCR, who learned about the properties of Aroclor 1242 from Monsanto and learned that Aroclor 1242 contained higher chlorinated isomers, persisted in the environment and bioaccumulated, Fort Howard did not know this information, from Monsanto, or other sources. It is undisputed that Dr. Vodden testified that during a 1969 meeting that he informed Martin

Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. See Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Moreover, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. **[Supp. JEF Decl.] Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

**PPFF 207: Fort Howard's 1976 PCB Report further stated that it enclosed as a reference section many articles detailing PCBs in various wildlife forms, and that "in all cases…the PCB's detected are not Aroclor 1242, but rather the higher chlorinated compounds." Roach Decl., Ex. 40 [1976 Fort Howard PCB Report (Ex. 114 to D. DeMeuse Dep), at 15 (emphasis added)].**

Response to PPFF 207:

Undisputed but Immaterial. Fort Howard does not dispute that the document cited, Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 14], contains the portion quoted in PPFF.

PPFF is in any event immaterial and does not preclude summary judgment, because, unlike NCR, who learned about the properties of Aroclor 1242 from Monsanto and learned that Aroclor 1242 contained higher chlorinated isomers, persisted in the environment and bioaccumulated, Fort Howard did not know this information, from Monsanto, or other sources. It is undisputed that Dr. Vodden testified that during a 1969 meeting that he informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. See Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Moreover, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. **[Supp. JEF Decl.] Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

**PPFF 208: The report cites statements made by Mr. Kleinert of the WDNR during the public hearings on PCBs that, although the WDNR lumped all Aroclors together and dealt with them generically, the WDNR was able to identify which Aroclors were being found at the time, stating: "The principal Aroclor that we're finding in fish is 1254. In lower Green Bay, the principal Aroclor we're finding is 1248." Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 15].**

Response to PPFF 208:

Unsupported and Immaterial. Fort Howard does not dispute that the document cited, Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 15],

contains the portion quoted in PPFF. However, this quotation does not support the proposition that WDNR "lumped all Aroclors together and dealt with them generically." *See* PPFF 208.

The alleged fact is in any event immaterial and does not preclude summary judgment, because it relates to the knowledge, and timing of that knowledge, of WDNR and not Plaintiffs or Defendants. Regarding Plaintiffs' knowledge, it is undisputed that Dr. Vodden testified that during a 1969 meeting that he informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Moreover, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. **[Supp. JEF Decl.] Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].** Defendants did not have these or similar communications with Monsanto or NCR, and were not told that Aroclor 1242 was persistent in the environment, bioaccumulated and was a mixture that included higher chlorinated isomers.

**PPFF 209: The report also states that "[b]io-degradation represents a mechanism for removing PCBs from the environment," and that "Aroclor 1242 is similar to [Aroclor] 1016," a compound that was found to biodegrade almost entirely. Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 15-17].**

Response to PPFF 209:

<u>Unsupported and Immaterial</u>. PPFF mischaracterizes the document cited in support. The statement that "[b]io-degredation represents a mechanism for removing PCBs from the environment" is a direct quote from a paper entitled "Characterization of Polychlorinated Biphenyls" by James P. Mieure of Monsanto Company. Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 15]. Further summarizing Dr. Mieure's paper, the report states that "[t]he significant difference between Aroclor 1242 and Aroclor 1016 is the lower pentachlorinated biphenyl content of the aroclor 1016." *Id*. at 16. Nothing in the cited pages of the report, 15 through 17, supports the statement that Aroclor 1016 was "a compound that was found to biodegrade almost entirely." *See* PPFF 209.

PPFF is in any event immaterial and does not preclude summary judgment, because, unlike NCR, who learned about the properties of Aroclor 1242 from Monsanto and learned that Aroclor 1242 contained higher chlorinated isomers, persisted in the environment and bioaccumulated, Fort Howard did not know this information, from Monsanto, or other sources. It is undisputed that Dr. Vodden testified that during a 1969 meeting that he informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Moreover, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the

environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. **[Supp. JEF Decl.] Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

**PPFF 210:  The report also cites as support statements from William Papageorge during the August 1975 WDNR hearings on PCBs.  Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 17].**

Response to PPFF 210:

Unsupported and Immaterial.  PPFF is vague, ambiguous, and mischaracterizes the document cited in support.  It is unclear what statements PPFF claims the report cites Papageorge in support of.  The document states that "We believe that the most significant mechanism by which PCBs are removed from effluent is by their absorption on the insoluble solid materials normally removed by effective primary and secondary treatment systems.  This is in accord with the findings of Monsanto Company as discussed by Mr. William Papageorge at the August, 1975, Wisconsin DNR hearings." Roach Decl., Ex. 40 [1976 Fort Howard Report on PCBs (Ex. 114 to D. DeMeuse Dep), at 17].

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 211:  Fort Howard tested its recovered fiber on a yearly basis from 1975 until at least 1994.  Roach Decl., Ex. 125 [R. Everson Dep. at 99:22-100:4]; Ex. 126 [Feb. 21, 1995 Fort Howard PCB Report to WDNR (Ex. 542-M to W. Charles Dep.), at Table 2 (p. 5), showing 17 years (1978-1994) of testing Fort Howard recovered fiber for PCBs].**

Response to PPFF 211:

Undisputed but Immaterial.  From 1975 until at least 1994 Fort Howard periodically sampled incoming wastepaper.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 212:  Fort Howard never made a single change to the recovered fiber that it purchased as a result of this testing.  Roach Decl., Ex. 121 [J. Powell Dep. at 46:5-47:19]; Ex. 124 [W. Charles Dep. at 91:14-25]; Ex. 112 [D. Schneider Dep. at 160:1-161:16, 259:12-19]; Ex. 115 [D. Pagel Dep. at 223:16-224:8]; Ex. 127 [D. DeMeuse Dep. at 66:10-13].**

Response to PPFF 212:

Undisputed but Immaterial. Over the years, the concentration of PCBs typically found in waste paper decreased. As a result of these declining concentrations of PCBs in wastepaper and improvements to its wastewater treatment plant, Fort Howard never exceeded PCB discharge standard in the WPDES permit issued to it. Furthermore, the estimated amount of PCBs discharged from Fort Howard after NCR ceased producing NCR Paper with PCBs in 1971 is extremely low in comparison to the far higher estimated levels of PCB discharges that occurred when NCR was still producing NCR Paper with a PCB emulsion.

The alleged fact is in any event immaterial and does not preclude summary judgment because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 213: The results of this testing, and even the fact of the testing itself, was kept a secret from Fort Howard employees, purportedly on the advice of attorneys. Roach Decl., Ex. 128 [March 25, 1975 Letter from WARF Institute to R. Krueger, outside counsel to Fort Howard (Ex. 696-L to D. Schneider Dep.), attaching PCB analyses, stating "No one at Fort Howard has been contacted by us concerning these results."]; Ex. 112 [D. Schneider Dep. at 193:9-195:20, 223:19-224:21, 364:1-23, explaining that Fort Howard's attorneys sought to keep PCB testing information from being shared with anyone aside from Mr. Schneider, Mr. Everson, who actually performed the testing, and a Fort Howard attorney; and further stating that he was not certain whether this information would have been shared with anyone outside of that circle at any point in the 1970s].**

Response to PPFF 213:

Unsupported and Immaterial. PPFF is vague and ambiguous and mischaracterizes the cited document and deposition testimony. While the cited document, Roach Decl., Ex. 128 [March 25, 1975 Letter from WARF Institute to R. Krueger (Ex. 696-L to D. Schneider Dep.), is correctly quoted, this quotation does not state that the testing results were being "kept a secret from Fort Howard employees." *See* PPFF 213. The alleged fact mischaracterizes Mr. Schneider's testimony, which was that he did not know the details of the interaction and discussions between Fort Howard and its attorneys. Moreover, while the early results of paper testing were not widely distributed, later results were.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 214: The employees responsible for purchasing Fort Howard's recovered fiber confirmed that they were never made aware of the results of Fort Howard's PCB testing, and some of those individuals did not even know that such testing had ever been conducted by Fort Howard. Roach Decl., Ex. 123 [W. Martens Dep. at 23:9-24:6, 94:19-95:14, 110:9-111:20]; Ex. 129 [R. Geigel Dep. at 13:12-14:23, 97:3-24]; Ex. 124 [W. Charles Dep. at 15:5-18, 131:15-23].**

Response to PPFF 214:

Unsupported and Immaterial. PPFF is vague and misleading, and should be clarified to refer to the testimony of the three employees responsible for purchasing who were deposed in this litigation.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 215: Fort Howard did not consult with the employees responsible for purchasing Fort Howard's recovered fiber to determine if it was feasible to avoid grades high in PCBs. Roach Decl., Ex. 124 [W. Charles Dep. at 135:15-23]; Ex. 123 [W. Martens Dep. at 136:2-9]; Ex. 129 [R. Geigel Dep. at 166:17-167:25].**

Response to PPFF 215:

Unsupported and Immaterial. PPFF is vague and misleading, and should be clarified to refer to the testimony of the three employees responsible for purchasing that were deposed in this litigation. Furthermore, the testimony of Mr. Martens and Mr. Geigel referenced in PPFF 215 was that they could not remember anyone asking if Fort Howard could "afford to stop using [or buying] certain grades of recovered fiber." Roach Decl., Ex. 123 [W. Martens Dep. at 136:2-9]; Ex. 129 [R. Geigel Dep. at 166:17-167:25]. Mr. Charles' testimony referenced in PPFF 215 related to a different question and was that:

Q   Do you remember at any point being asked by anyone at Fort Howard whether it would be economically possible or feasible for Fort Howard to go through the recovered fiber that it purchased and try to segregate out PCB-containing materials?

A   No.

Roach Decl., Ex. 124 [W. Charles Dep. at 135:15-21].

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this

minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 216: This testing revealed grades of recovered fiber that routinely tested as having higher PCB concentrations. *See, e.g.*, Roach Decl., Ex. 126 [Feb. 21, 1995 Fort Howard PCB Report to WDNR (Ex. 542-M to W. Charles Dep.), at Table 2 (p. 5), showing that the Unprinted Poly, Office Fiber and Mixed Paper grades had an average PCB concentration over 17 years of testing (from 1978-1994) approximately 3½ times higher than the average of all other grades tested over that period[1]; Ex. 130 [1985 Waste Paper PCB Analysis, Exhibit 696-S to the D. Schneider Dep.]; Ex. 131 [Aug. 12, 1986 Memo Attaching Waste Paper Analysis, Exhibit 696-T to the D. Schneider Dep.].**

Response to PPFF 216:

Unsupported and Immaterial. PPFF is vague, ambiguous, and mischaracterizes the document cited in support. The testing cited in Ex. 542-M to W. Charles Dep. at Table 2, p. 5 does not "reveal[] grades of recovered fiber that routinely tested as having higher PCB concentrations." *See* PPFF 216. In fact, the data for the three grades cited in PPFF demonstrates just the opposite. Unprinted Poly shows that some samples tested as low as 10 ppb, that there was only one sample for Office Fiber, and that Mixed Paper grades tested as low as 87 ppb. Therefore, none of these grades "routinely" showed "higher" PCB concentrations. Fort Howard, however, does not dispute that NCR Paper had contaminated all types of paper and that most grades Fort Howard tested revealed the presents of PCBs.

The alleged fact is in any event immaterial and does not preclude summary judgment, because the difference noted in the alleged fact amounts to approximately ***two or three hundred parts per billion of PCBs***. This is in contrast to the PCB content of NCR Paper during the production period, which Plaintiffs do not dispute was recorded to be as high as **35,600,000 parts per billion**. *See* PPFF 203. The alleged fact is also immaterial because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 217: Fort Howard repeatedly informed the WDNR and other agencies that its testing revealed no connection between PCB concentration and grade of paper. *See, e.g.*, Roach Decl., Ex. 132 [Jan. 29, 1985 Letter from Fort Howard to Wisconsin Bureau of Wastewater Management (Ex. 143 to D. DeMeuse Dep., stating "there is no particular wastepaper grade that uniformly contributes more than others to the contamination of wastepaper with PCBs"]; Ex. 133 [Jan. 27, 1989 Letter from Fort Howard to WDNR (GPFOX00094652), stating "For example, the permit language requires a study of**

---

[1] The results for File Stock shown on this chart have been excluded from the average, due to the fact that these numbers were not accurately reported, as described *infra* at ¶ 217.

**alternate wastepaper sources. Fort Howard has been testing the level of PCBs in wastepaper samples for ten (10) years. No significant correlation between the grade of wastepaper and PCB levels is indicated in this data."]; Ex. 134 [Dec. 27, 1989 PCB Report from Fort Howard to WDNR (Ex. 115 to D. DeMeuse Dep.) at 3 "This data [regarding testing of recovered fiber grades at Table 3, which information omitted any reference to File Stock (see below), and itself showed certain grades that had notably higher PCB concentrations than other grades] leads to the conclusion that all wastepaper grades contain small and on average relatively uniform amounts of PCBs. Therefore, switching to alternate sources of supply cannot accomplish the required wastewater PCB reductions."].**

Response to PPFF 217:

<u>Unsupported and Immaterial</u>. The alleged fact mischaracterizes Fort Howard's statements which, as noted above, stated that there was no "particular wastepaper grade that *uniformly* contributes more than others to the contamination of wastepaper with PCBs" and that Fort Howard's data indicated "no *significant* correlation between the grade of wastepaper and PCB levels." See PPFF 217. The data presented in the December 27, 1989 PCB report did not show that certain grades of paper had "notably higher PCB concentrations than other grades." In fact, the largest difference in average PCB content between paper grades was 356 ppb (Plastics Windowed Envelopes at 387 ppb and News at 31 ppb). Other documents demonstrate that Fort Howard provided this information to the government to illustrate the fact that "virtually all grades of wastepaper contain PCBs in small amounts thus eliminating the option of switching to 'PCB free' grades." Roach Decl., Ex. 126 [Feb. 21, 1995 Fort Howard PCB Report to WDNR, Exhibit 542-M to the W. Charles Dep., at 3].

The alleged fact is in any event immaterial and does not preclude summary judgment, because the most "notable" difference between grades amounts to 356 ppb - and as Table 3 demonstrates, the standard deviation of the test results confirms that there is no statistically significant difference between the averages of these two grades. This is in contrast to the PCB content of NCR Paper during the production period, which Plaintiffs do not dispute was recorded to be as high as ***35,600,000 parts per billion***. *See* PPFF 203. The alleged fact is also immaterial because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 218: Starting in approximately 1972 or 1973, Fort Howard actually increased its purchasing of those grades of recycled fiber likely to contain higher PCB concentrations. Roach Decl., Ex. 135 [Fort Howard May 3, 1996 Responses to Rule 104(e) Requests from the Department of the Interior (NCR-FOX-0206804), stating "Starting in the 1970's, changes in the availability of wastepaper required that Fort Howard use more mixed papers, and particularly more office papers of lower grades. This change increased the likelihood that Fort Howard would inadvertently receive wastepaper that included NCR grade from old office files and similar document archives throughout the United States."]; Ex. 129 [R. Geigel Dep. at 165:2-166:13, testifying that Fort Howard began buying lower**

**grade office papers in response to increases in the price for recovered fiber beginning in approximately 1972 or 1973].**

Response to PPFF 218:

Unsupported and Immaterial.  Fort Howard does not dispute that the document cited is accurately quoted.  However, PPFF mischaracterizes Mr. Geigel's testimony, which was that there were shortages in the other grades of wastepaper.  Roach Decl., Ex. 129 [R. Geigel Dep. at 165:12-19].

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 219:  One of the least expensive grades of recovered fiber that contained one of the highest PCB concentrations was a grade called "File Stock."  Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 10-11]; Ex. 124 [W. Charles Dep. at 61:25-62:16].**

Response to PPFF 219:

Unsupported and Immaterial.  PPFF mischaracterizes Mr. Charles's testimony, which was that file stock was on the "lower end of the scale" in terms of the pricing of grades, but the questioner himself recognized that "prices change over time."  Roach Decl., Ex. 124 [W. Charles Dep. at 61:25-62:16].

Expert Charles Klass explained in his expert report that "[c]arbonless copy paper would have been recycled as a component of sorted office waste, mixed office waste, or "file stock." Bales of this material would have contained primarily sheets of paper that did not contain PCBs and a few sheets that did. Recycling these bales would not cause a high concentration of PCBs to be sent to the wastewater of the recycling mill at any one time."  **[Supp. JEF Decl.] Ex. 36 [July 2009 Expert Report of C. Klass at 15].**

The alleged fact is in any event immaterial and does not preclude summary judgment, because Plaintiffs' attempt to define the grade "File Stock" as a foundation for PPFFs 222 through 224.  PPFFs 222 through 224 are unsupported as discussed in Defendants' Response to PPFFs 222 through 224, and, therefore, Plaintiffs' mischaracterization in PPFF 219 is immaterial.  The alleged fact is also immaterial because the definition of the grade "File Stock" is immaterial to the issues in Phase I of this litigation of knowledge and fault of all parties to this litigation.

**PPFF 220:  File Stock was a grade of Recovered Fiber that was generated by businesses or government agencies when they wanted specifically to discard or destroy old business records and files that had been retained in file storage for many years.  Roach**

Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 10]; Ex. 124 [W. Charles Dep. at 56:22-58:5]; Ex. 123 [W. Martens Dep. at 57:11-59:9].

Response to PPFF 220:

Unsupported and Immaterial. PPFF is unsupported by deposition testimony. Mr. Charles testified that "file stock" was not an industry name for the grade of paper, but was rather a Fort Howard grade. **[Supp. JEF Decl.] Ex. 41 [April 21, 2009 W. Charles Depo. Excerpt at 27:23 – 28:5]**. Ken Graves, a Fort Howard Process Engineer, testified that the definition of "file stock" was not related to the age of the paper contained in the grade:

> "The definition -- definition of file stock – and it's true of not only file stock but all grades of wastepaper -- is driven by contaminants present. And there are specific contaminants that we would identify as file stock contaminants, and that could be -- for example, pressure-sensitive adhesives are considered a file stock contaminant. And so paper that would contain that would be graded as file stock. . . . So file stock unto itself is not a finite, unchanging entity. Many different types of paper were graded as file stock because of the contaminants they would have present in them."

**Supp. JEF Decl. Ex. 21 [August 20, 2009 K. Graves Depo. Excerpt at 22:11 – 23:7].**

The alleged fact is in any event immaterial and does not preclude summary judgment, because Plaintiffs attempt to define the grade "File Stock" as a foundation for PPFFs 222 through 224. PPFFs 222 through 224 are unsupported as discussed in Defendants' Response to PPFFs 222 through 224, and, therefore, Plaintiffs' mischaracterization in PPFF 220 is immaterial. The alleged fact is also immaterial because the definition of the grade "File Stock" is immaterial to the issues in Phase I of this litigation of knowledge and fault of all parties to this litigation.

**PPFF 221: Continuing well into the 1980s, this grade was the most likely to contain pre-1971 CCP and have the highest PCB levels of any grade of Recovered Fiber, as, by definition, all of the paper contained in that grade was over a certain age. Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 11].** *Cf. id.* **at Ex. 40 [1976 Fort Howard PCB Report (Ex. 114 to the Deposition of D. DeMeuse), concluding "We are cognizant, also, of the fact that there is a tremendous depository especially in business and government files, of paper containing a high concentration of PCBs."].**

Response to PPFF 221:

Unsupported and Immaterial. As explained in response to PPFF 220, the definition of File Stock is inaccurate, and therefore the premise of PPFF 221 is incorrect.

The alleged fact is in any event immaterial and does not preclude summary judgment, because Plaintiffs attempt to define the grade "File Stock" as a foundation for PPFFs 222 through 224. PPFFs 222 through 224 are unsupported as discussed in Defendants' Response to PPFFs 222 through 224, and, therefore, Plaintiffs' mischaracterization in PPFF 221 is immaterial. The alleged fact is also immaterial because the definition of the grade "File Stock"

is immaterial to the issues in Phase I of this litigation of knowledge and fault of all parties to this litigation.

**PPFF 222: Fort Howard was the first mill in the Fox River Valley to use File Stock beginning in the 1970s, and was the only mill to continue using sizeable amounts of File Stock into the mid-1980s. Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 11-12].**

Response to PPFF 222:

Unsupported and Immaterial. PPFF relies solely upon the expert report of Plaintiffs' expert Moore, which report mischaracterizes documents in the record. Furthermore, Mr. Charles testified that "file stock" was not an industry name for the grade of paper, but was rather a Fort Howard grade. **[Supp. JEF Decl.] Ex. 41[April 21, 2009 W. Charles Depo. Excerpt at 27:23 – 28:5]**. Therefore, the comparison between Fort Howard and other mills contained in the alleged fact is misleading and inaccurate.

The alleged fact is also immaterial because the definition of the grade "File Stock" is immaterial to the issues in Phase I of this litigation of knowledge and fault of all parties to this litigation. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16]**.

**PPFF 223: Fort Howard increased its use of File Stock from less than one ton per day in 1974 to more than 160 tons per day in 1989, with File Stock representing more than 14 percent of Fort Howard's total fiber usage by 1989. Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 13]; Ex. 136 [Fort Howard recovered paper receipts and consumption from August 1974 to August 1975 (GPFOX00138790 – GPFOX00138818)]; Ex.137 [Fort Howard 1989 Pulp Processing Report (GPFOX00139142)].**

Response to PPFF 223:

Unsupported and Immaterial. PPFF is vague, ambiguous, misleading and mischaracterizes the documents cited in support, which show that Fort Howard received File Stock on only three occasions before April of 1977. The documents cited in support also demonstrate that Fort Howard's use of the File Stock grade varied between 1974 and 1989. For example, in 1988, by the apparent method of calculation used by Plaintiffs in PPFF 223, Fort Howard used roughly 82 tons per day of File Stock, which amounted to about 7.5 percent of Fort Howard's total fiber usage.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In

addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 224: Testing in 1985 and 1986 revealed that the PCB concentrations of the File Stock samples tested in those years were the highest of any samples tested and approximately 153 times greater than the average of all other grades tested in 1985, and 31 times greater than the average of all other grades tested in 1986. Roach Decl., Ex. 130 [1985 Waste Paper PCB Analysis, Exhibit 696-S to the D. Schneider Dep.]; Ex. 131 [Aug. 12, 1986 Memo Attaching Waste Paper Analysis, Exhibit 696-T to the D. Schneider Dep.].**

Response to PPFF 224:

Unsupported and Immaterial. PPFF is vague, ambiguous, misleading and mischaracterizes the documents cited in support, which demonstrate that the average PCB content of wastepaper was calculated both with and without single outlier samples of File Stock paper, pursuant to standard statistical methods. **[Supp. JEF Decl.] Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 251:3-22].** Also, the testing results contained other File Stock samples that were not the "highest of any samples tested."

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 225: Two File Stock samples were tested in each of 1985 and 1986, and those samples that tested as having the highest PCB concentrations were omitted from the "average" PCB concentrations provided by Fort Howard to the WDNR. Roach Decl., Ex. 130 [1985 Waste Paper PCB Analysis, Exhibit 696-S to the D. Schneider Dep.]; Ex. 131 [Aug. 12, 1986 Memo Attaching Waste Paper Analysis, Exhibit 696-T to the D. Schneider Dep.]; Ex. 126 [Feb. 21, 1995 Fort Howard PCB Report to WDNR, Exhibit 542-M to the W. Charles Dep., at Tables 1 & 2 (pp. 4-5)]; Ex. 112 [D. Schneider Dep. at 249:22-253:14; 256:15-257:21; 257:25-259:6, discussing Exhibits 696-S and 696-T, as well as the fact that the high File Stock samples from each year were omitted from the numbers provided in Exhibit 542-M to the WDNR, referring to such samples (one of two tested in each year) as "outliers"].**

Response to PPFF 225:

Unsupported and Immaterial. PPFF is vague, ambiguous, misleading and mischaracterizes the documents cited in support, which demonstrate that the average PCB content of wastepaper was calculated both with and without single outlier samples of File Stock paper, pursuant to standard statistical methods. Roach Decl., Ex. 112 [D. Schneider Dep. at 251:3-22]. The outlier, which listed 5,763 ug/kg PCB content, is many orders of magnitude less

than the PCB content of NCR Paper during the production period, which Plaintiffs do not dispute was recorded to be as high as ***35,600,000 parts per billion***.  *See* PPFF 203.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.

**PPFF 226:  In 1984, Fort Howard tested its own finished products for PCBs and discovered that they had an average PCB concentration of 348 ppb; more than 12.5 times the average PCB concentration of the products from Fort Howard competitors that Fort Howard tested that same year.  Roach Decl., Ex. 138 [1984 PCB Wastepaper Study, Ex. 748 to the Deposition of Richard Everson]; Ex. 125 [R. Everson Dep. at 152:18-155:19, discussing Exhibit 748].**

Response to PPFF 226:

Unsupported and Immaterial.  PPFF 226 is vague, ambiguous, misleading and mischaracterizes the document cited in support, which does not contain a calculated "average PCB concentration."  In addition, the document cited, Roach Decl., Ex. 138 [1984 PCB Wastepaper Study, Ex. 748 to the Deposition of Richard Everson], contains at the most five products manufactured by other companies that could be considered remotely competitive with Fort Howard products (Samples 653-57).  Furthermore, the document cited does not state whether Samples 653-57 were made by a recycling mill or by the use of virgin pulp.  Therefore, the comparison is not an accurate "apples to apples" comparison.  **[Supp. JEF Decl.] Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 300:20-301:5]**.  The cited testimony from Mr. Everson does not support PPFF because, as Mr. Everson stated, he could not recall the testing.  Roach Decl., Ex. 125 [R. Everson Dep. at 152:18-155:19].

The alleged fact is in any event immaterial and does not preclude summary judgment because testing of Fort Howard's finished products is not material to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.

**PPFF 227:  Fort Howard never informed any customer of the presence of PCBs in its products and never included any warnings with its products regarding PCBs.  Roach Decl., Ex. 112 [D. Schneider Dep. at 301:12-22]; Ex. 121 [J. Powell Dep. at 108:1-9]; Ex. 115 [D. Pagel Dep. at 184:14-17].**

Response to PPFF 227:

Unsupported and Immaterial. PPFF 227 mischaracterizes the cited testimony, which was that neither Mr. Schneider, Ms. Powell (personally and as corporate designee), nor Mr. Pagel had any knowledge about whether or not Fort Howard warned any customers that its products contained PCBs. Roach Decl., Ex. 112 [D. Schneider Dep. at 301:12-22]; Ex. 121 [J. Powell Dep. at 108:1-9]; Ex. 115 [D. Pagel Dep. at 184:14-17].

The alleged fact is in any event immaterial and does not preclude summary judgment because Fort Howard's communications with its customers regarding finished products is not material to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.

**PPFF 228: Fort Howard was a tissue manufacturer, producing all manner of tissue products. Roach Decl., Ex. 127 [D. DeMeuse Dep. at 19:2-12].**

Response to PPFF 228:

Unsupported and Immaterial. PPFF 228 mischaracterizes the cited testimony, which was that during the time Mr. DeMeuse was at Fort Howard, Fort Howard made "toilet tissue, napkins, towels, wipers, consumer products for -- some for retail and some for the -- what we call the commercial business, you know, selling to hotels and restaurants and those type of things. And that's primarily the products that we made." Roach Decl., Ex. 127 [D. DeMeuse Dep. at 19:7-12].

PPFF is in any event immaterial and does not preclude summary judgment, because the range of products sold by Fort Howard is immaterial to the issues in Phase I of this litigation of knowledge and fault of all parties to this litigation.

**PPFF 229: Until Fort Howard began dumping its sludge at a landfill that it operated, it dumped its sludge in at least two locations: the Ashwaubenon dump and an area known as Hocker's Brickyard. Roach Decl., Ex. 112 [D. Schneider Dep. at 101:12-102:11]; Ex. 121 [J. Powell Dep. at 20:19-21:12]; Ex. 115 [D. Pagel Dep. at 54:7-17].**

Response to PPFF 229:

Unsupported and Immaterial. PPFF 229 mischaracterizes the cited testimony, which was that before it began using the landfill by the airport, Fort Howard sent its sludge to what was then known as the Ashwaubenon dump and to fill the clay pits at Hockers Brick.

The alleged fact is in any event immaterial and does not preclude summary judgment, because when Fort Howard began operating the referenced landfill in 1964, Fort Howard was not recycling NCR Paper. **[Supp. JEF Decl.] Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 84:23-24**].  Moreover, the alleged fact is not material to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs *to a waterbody*, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  No measurable PCBs would have been transported to the LFR in runoff from the landfill.  **[Supp. JEF Decl.] Ex. 42 [July 2009 Expert Report of G. Dawson at 4].**  Moreover, Fort Howard had no knowledge of PCBs in NCR Paper until, at the earliest, December of 1971.  *See* Response to PPFF 188.

**PPFF 230:  The area that was formerly the Ashwaubenon dump is now part of the Ashwaubenon High School.  Roach Decl., Ex. 112 [D. Schneider Dep. at 101:12-102:11]; Ex. 121 [J. Powell Dep. at 20:19-21:12]; Ex. 115 [D. Pagel Dep. at 54:7-17].**

Response to PPFF 230:

Unsupported and Immaterial.   PPFF 230 mischaracterizes the cited testimony, which was that Fort Howard sent its sludge to an area that is now near the Aswaubenon High School.  *Id.*

The alleged fact is in any event immaterial and does not preclude summary judgment, because when Fort Howard began operating the referenced landfill in 1964, Fort Howard was not recycling NCR Paper.  **[Supp. JEF Decl.] Ex. 35 [Aug. 19, 2009 D. Schneider Depo. Excerpt at 84:23-24].**  Moreover, the alleged fact is not material to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs *to a waterbody*, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  No measurable PCBs would have been transported to the Lower Fox River in runoff from the landfill.  **[Supp. JEF Decl.] Ex. 42 [July 2009 Expert Report of G. Dawson at 4].**  Moreover, Fort Howard had no knowledge of PCBs in NCR Paper until, at the earliest, December of 1971.  *See* Response to PPFF 188.

**PPFF 231:  David Pagel, the person charged with overseeing Fort Howard's wastewater treatment system, testified that Fort Howard began experimenting with secondary treatment in 1957, and understood its capabilities several years in advance of actually implementing secondary treatment.  Roach Decl., Ex. 115 [D. Pagel Dep. at 16:3-22, 17:21-19:10].**

Response to PPFF 231:

Unsupported and Immaterial.  PPFF is vague, ambiguous, and misleading.  The PPFF is unclear about the time period in which it applies and unclear as to what is meant by "understood its capabilities".  The cited testimony does not support that Mr. Pagel was "charged with overseeing Fort Howard's wastewater treatment system."  *See* PPFF 231.  PPFF also

mischaracterizes Mr. Pagel's testimony, which was that Fort Howard "perhaps" achieved success with secondary treatment several years before secondary treatment was implemented "[b]ecause [Fort Howard] needed to have the parameters to make the design and so forth. So it was probably several years before that that we were satisfied that we knew what we were doing." Roach Decl., Ex. 115 [D. Pagel Dep. at 19:6-10]. PPFF is vague as to the meaning of "implementing" secondary treatment. The cited testimony supports that Fort Howard began designing a secondary treatment system as soon as it was able to get secondary treatment to work. *Id*. at 18:19-19:10

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. The alleged fact refers to activities that took place long before Fort Howard knew there were PCBs in its effluent.

**PPFF 232: In the late-1960s, the Wisconsin government was advocating that paper mills study the possibility of engaging in joint treatment of their wastewaters with those of the Metropolitan Sewerage District. Roach Decl., Ex. 115 [D. Pagel Dep. at 34:14-37:23]; Ex. 139 [Jan. 9, 1967 Memorandum from D. Pagel (GPFOX00099277)].**

Response to PPFF 232:

Unsupported and Immaterial. PPFF mischaracterizes the document Roach Decl., Ex. 139 [Jan. 9, 1967 Memorandum from D. Pagel (GPFOX00099277)], which states that David Martin discussed with Mr. Pagel a "proposal to study the possibility of joint treatment of our waste with that of the Metropolitan Sewerage District and the other mills in town." *See id*. The document does not state that David Martin had any relationship with the "Wisconsin government." PPFF also mischaracterizes Mr. Pagel's deposition testimony, which does not refer to any government "advocating" that paper mills study joint treatment. **Roach Decl. Ex. 115 [May 29, 2009 D. Pagel Depo. Excerpt at 34:14-37:23].**

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. The alleged fact refers to activities that took place long before Fort Howard knew there were PCBs in its effluent.

**PPFF 233: Mr. Pagel wrote to the President of Fort Howard in January of 1967 regarding this proposal, referring to the "*questionable possibility of success of the project*," but advocating Fort Howard's involvement because of the "*very definite fact that we will buy two-and-a-half years of time during which both federal and state pressure should be off*." Roach Decl., Ex. 139 [Jan. 9, 1967 Memorandum from D. Pagel (GPFOX00099277)].**

Response to PPFF 233:

Unsupported and Immaterial.  PPFF mischaracterizes the document, which does not advocate Fort Howard's involvement in joint treatment.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  The alleged fact refers to activities that took place long before Fort Howard knew there were PCBs in its effluent.

**PPFF 234:  Fort Howard delayed implementing secondary treatment until 1973. Roach Decl., Ex. 140 [Aug. 7, 2009 Report of J. Braithwaite at 10-11].**

Response to PPFF 234:

Unsupported and Immaterial.  PPFF is incorrect; Fort Howard implemented secondary treatment in December of 1972.  **[Supp. JEF Decl.] Ex. 43 [May 3, 1996 Fort Howard 104(e) Responses at 12, NCR-FOX-0206804]**.  PPFF relies solely upon the expert report of Plaintiffs' expert Braithwaite, which report mischaracterizes documents in the record.  As explained in the response to PPFF 231, Fort Howard did not delay in implementing secondary treatment, and began designing a secondary treatment system as soon as it was able to get secondary treatment to work.  In his report, wastewater treatment expert Davis Ford states that:

> Fort Howard implemented a highly-rated activated sludge system in 1972. 1972 was a very early date within the pulp and paper industry as well as similar complex industries to take such a major and progressive secondary treatment program.

**[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  The alleged fact refers to activities that took place before Fort Howard knew there were PCBs in its effluent, which was late 1974.  Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 235: When Fort Howard ran a study of chemically assisted clarification in 1984 and 1985, the memo documenting the results reported that a "similar 12 day full scale experiment was conducted in Muscogee during 1979 during which significant reductions in TSS and PCB's were noted." Roach Decl., Ex. 141 [July 19, 1985 Fort Howard Memorandum (NCR-FOX-0110605)].**

Response to PPFF 235:

Undisputed but Immaterial. PPFF mischaracterizes the document, which refers to experiments on "chemically assisted clarification of *secondary* effluent" which began in the Research and Development lab in November of 1984. Roach Decl., Ex. 141 [July 19, 1985 Fort Howard Memorandum (NCR-FOX-0110605)].(emphasis added). Mr. Schneider testified that the experiment conducted in Muskogee required the use of clarifiers, and therefore could not be replicated in the Green Bay Mill until clarifiers could be installed. **[Supp. JEF Decl.] Ex. 35 [May 27 & 28, 2009 D. Schneider Depo. Excerpt at 392:11-394:8];** Roach Decl., Ex. 115 [May 29, 2009 D. Pagel Depo. Excerpt at 309:25-210:5]. A clarifier, which Mr. Schneider testified "is a very expensive item to install, and in the location where it's installed, it required many, many special engineering feats, and so on and so forth," was not installed in Green Bay until the early 1980's. **[Supp. JEF Decl.] Ex. 35 [May 27 & 28, 2009 D. Schneider Depo. Excerpt at 393:8-11], [Supp. JEF Decl.] Ex. 43 [May 3, 1996 Fort Howard 104(e) Responses at 12, NCR-FOX-0206804]**. Fort Howard does not dispute that the cited document contains the quote in PPFF 235.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 236: The memo reporting the results of the 1984 and 1985 experiments similarly noted reductions in PCB's during the last month of the experiment of as much as 73% (with an average reduction of 51%), and a reduction of TSS of as much as 87% (with an average reduction of 69%). Roach Decl., Ex. 141 [July 19, 1985 Fort Howard Memorandum (NCR-FOX-0110605)].**

Response to PPFF 236:

Unsupported and Immaterial. PPFF mischaracterizes the document, which contains a variety of information on results from an experiment on chemically assisted clarification of secondary effluent. Roach Decl., Ex. 141 [July 19, 1985 Fort Howard Memorandum (NCR-FOX-0110605)]. The experiment was conducted over at least six months, and the results in those months varied. *Id*. The document states that the PCB reduction in the last month of the experiment ranged from a low of 21% to a high of 73%. *Id*.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 237:  The President of Fort Howard, Mr. DeMeuse, responded to this memorandum by stating that he considered the results to be "very preliminary in nature," and that Fort Howard needed to consider "the law of diminishing returns" in contemplating further reductions of TSS, BOD and PCB's.  Roach Decl., Ex. 142 [July 30, 1985 Memo from D. DeMeuse (NCR-FOX-0110604)].**

Response to PPFF 237:

Unsupported and Immaterial.  PPFF mischaracterizes the document.  In his deposition testimony, Mr. DeMeuse clarified that these statements referred to the fact that Fort Howard did not yet have sufficient data to completely analyze the experiment, and that the "law of diminishing returns" referred to the marginal effectiveness of additional chemicals.  Mr. DeMeuse testified that:

Q   Okay.  So what -- what did you mean by the law of diminishing returns?  What -- what was that in reference to?

A   It meant that you could, I guess -- how should we say it?  You could pour more resources into it and not get any results.

Q   And right above that it says, "For example, it may well be that chemical additions which achieve a 50 percent removal efficiency of total suspended solids make a lot more sense than chemical additions which achieve a 60 percent removal efficiency," correct?

A   Right.

Q   And that would be a 10 percent increase, correct?

A   A 10 percent efficiency removal, but it might require 500 percent more chemicals --

Q   Okay.

A   -- and we didn't have that data to be able to analyze that.

Q   And why -- why would that be the law of diminishing returns with 500 percent more chemicals?  Because the cost would increase so much?

A   Well, the cost would increase, but does it make any commonsense?

Q   And why would it not make commonsense to add those chemicals?

A   Well, what happens to these chemicals?  You know, you may have created another problem.

**[Supp. JEF Decl.] Ex. 44 [February 20, 2009 D. DeMeuse Depo. Excerpt at 183:1-184:3]**.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 238:  In 1985, Fort Howard's head of Research and Development, Donald Schneider, put together a memorandum comparing the concentration of PCB's in Fort Howard's discharges to the PCB concentrations in the discharges of other area mills in 1983 and 1984.  Fort Howard had the highest PCB concentrations of any of the mills compared in both years, and those concentrations were at least three times greater than the other Fox River mills listed.  Roach Decl., Ex. 143 [Jan. 21, 1985 Memo from D. Schneider (NCR-FOX-0096706)].**

Response to PPFF 238:

<u>Unsupported and Immaterial</u>.  PPFF mischaracterizes the document which was prepared to examine the relationship between PCBs and TSS.  Regarding the data, the memo states "I don't know how significant this data is, however, I am presenting it to you for informational purposes." Roach Decl., Ex. 143 [Jan. 21, 1985 Memo from D. Schneider (NCR-FOX-0096706)].  Mr. Schneider testified that he could not recall the origin of the data used in the memo.  **[Supp. JEF Decl.] Ex. 35 [May 27 & 28, 2009 D. Schneider Depo. Excerpt at 320:11-321:4]**.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 239:  On numerous occasions, Fort Howard threatened that if it were made to comply with additional restrictions on its PCB discharges, the mill would be forced to close.  *See, e.g.*, Roach Decl. Ex. 144 [1976 Fort Howard Statement Before Senate Committee on Natural Resources (GPFOX00009441), at 17-20 (stating that imposing the proposed PCB limitation of 20 ppb would likely force Fort Howard to close, resulting in negative economic and environmental effects for the State)]; Ex. 145 [Jan. 5, 1985 Newspaper Article (Ex. 140 to D. DeMeuse Dep.) (stating "Officials at the Fort Howard Paper Co. said…any state**

**order requiring the company to [meet the proposed regulations] would force the plant to close"].**

Response to PPFF 239:

Unsupported and Immaterial. PPFF mischaracterizes the documents cited in support. The 1976 statement explains that "no technology has been demonstrated on a plantwide scale to be effective in removing PCBs from the wastewater of a recycling mill to the level required by the proposed regulation." Roach Decl. Ex. 144 [1976 Fort Howard Statement Before Senate Committee on Natural Resources (GPFOX00009441), at 17]. Because no technology was available to meet the standard, and Fort Howard did not consider non-compliance with a state limit to be an option, Fort Howard concluded that the limit "could lead to a closing of Fort Howard's recycling and manufacturing facility." *Id*. at 19.

PPFF omits that the proposed regulation addressed in the 1985 article was one that would require Fort Howard to reduce discharge to "no detectable amount" of PCBs in effluent. Roach Decl., Ex. 145 [Jan. 5, 1985 Newspaper Article (Ex. 140 to D. DeMeuse Dep.) As discussed in the response to PPFFs 235 and 236, in 1985 Fort Howard was experimenting with methods for reducing PCBs to non-detectable levels, but had not yet achieved that goal (nor was it required to do so at that time). Because it was "far beyond the capabilities of any facility to remove PCBs entirely," Fort Howard would not be able in 1985 to meet a limit of "no detectable amount" of PCBs, and any regulation requiring that limit could force the mill to close. *Id*.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 240: Throughout the 1970s, Fort Howard continued to argue that implementing more advanced waste treatment systems was not required by the federal or state laws and regulations and such a system would have an undesirable economic impact. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 92]; Ex. 146 [I. Charne opening statement and D. Pagel testimony at 1975 Adjudicatory Hearing (GPFOX00016521), at 3-5, 43-44]; Ex. 147 [D. Pagel Jan. 4, 1977 testimony (NCR-FOX-0163547) (arguing that Fort Howard should not have to improve its treatment performance until EPA finalizes its definitions of best practicable treatment and best available treatment)]; Ex. 148 [April 2, 1979 Letter from WDNR to L. Hermes (NCR-FOX-0000742) explaining the reasons that WDNR was unable to require further PCB reductions at Fort Howard].**

116

Response to PPFF 240:

Unsupported and Immaterial. PPFF mischaracterizes the documents cited in support. In 1976, Fort Howard questioned whether its permit limits were actually based upon "best practicable control technologies," as required under federal law. Roach Decl., Ex. 146 [I. Charne opening statement and D. Pagel testimony at 1975 Adjudicatory Hearing (GPFOX00016521), at 3-5]. Fort Howard did not argue that more advanced waste treatment systems were not required, and in fact Mr. Charne's opening statement made clear that "Fort Howard Paper Company has not been and is not now opposed to pollution control or pollution regulations." Id. at 4. PPFF also mischaracterizes the 1979 Letter from WDNR to L. Hermes, which demonstrates that WDNR acted, on several occasions, beyond its statutory limits. Roach Decl., Ex. 148 [April 2, 1979 Letter from WDNR to L. Hermes (NCR-FOX-0000742)].

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 241: In the 1970s, WDNR described Fort Howard as a "major polluter of the Fox River" that "has taken DNR to court in an attempt to get pollution standards weakened." Roach Decl., Ex. 149 [May 17, 1976 WDNR Letter (NCR-FOX-0570414)]; Ex. 150 [Sept. 16, 1970 WDNR Report (NCR-FOX-0057465)].**

Response to PPFF 241:

Unsupported and Immaterial. PPFF mischaracterizes the documents cited in support and is misleading. PPFF documents one discrete example to extrapolate WDNR's characterization of Fort Howard throughout the 1970's. While Defendants do not dispute that the May 17, 1976 WDNR Letter contains the quotations above, that letter does not embody WDNR's description of Fort Howard over the course of a decade. Defendants cannot discern how the September 16, 1970 WDNR Report could support PPFF.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and

diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 242: In 1979, WDNR detailed steps Fort Howard took to interfere with progress in regulating levels of PCBs in wastewater discharges. Roach Decl., Ex. 151 [Apr. 2, 1979 WDNR Letter (Ex. 128 to D. DeMeuse Dep.)].**

Response to PPFF 242:

Unsupported and Immaterial. The cited letter also states that "Similarly for PCBs, the loadings have been reduced because based on studies conducted by this Department, we have found that the major portions of PCBs are removed in the new treatment systems that the mills have installed these past five years. At Fort Howard the company installed and operates a $4 million secondary-activated sludge type wastewater treatment system." Roach Decl., Ex. 151 [Apr. 2, 1979 WDNR Letter (Ex. 128 to D. DeMeuse Dep.)] The letter does not detail actions Fort Howard took to "interfere with progress" in regulating PCBs, but rather demonstrates that WDNR acted, on several occasions, beyond its statutory limits. Furthermore, the letter makes clear that WDNR objects not to the actions of Fort Howard, but to the decisions and determinations of the Wisconsin courts and legislature.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 243: Fort Howard failed to implement chemically assisted clarification treatment until at least 1990. *See, e.g.*, Roach Decl., Ex. 152 [Feb. 21, 1995 Wastewater Effluent PCB Reduction Program Final Report (GPFOX00019067) at 7].**

Response to PPFF 243:

Unsupported and Immaterial. PPFF mischaracterizes the document cited in support. Fort Howard began to study chemically assisted *secondary* clarification in the Green Bay Mill in 1984, but this method was not successful at reducing PCBs to nondetect. *See* response to PPFF 235. In about 1989, Fort Howard began to experiment with chemically assisted *primary* clarification, which was eventually successful in reducing PCBs to nondetect. *Id.*

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 244: In 1989 the EPA mandated that Fort Howard further reduce the PCB concentration of its discharge. Roach Decl., Ex. 153 [June 30, 1989 Newspaper Article (Ex. 150 to D. DeMeuse Dep.].**

Response to PPFF 244:

Unsupported and Immaterial. PPFF mischaracterizes the document cited in support, which states that the federal government rejected the WDNR's permit for Fort Howard. EPA approved the permit three months later, and the final permit required Fort Howard to reduce PCBs in wastewater by 65% within 4 years. **[Supp. JEF Decl.] Ex. 45 [September 28, 1989 WDNR Press Release (NCR-FOX- 0001714)].** Fort Howard met those requirements.

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 245: In 1993, the USEPA reported that Fort Howard was the only paper company in Wisconsin, and one of only eight dischargers in all of Region V continuing to report discharges of PCBs to Great Lakes receiving waters. Roach Decl., Ex. 154 [1994, USEPA Report on PCBs (GPFOX00013616) at 10].**

Response to PPFF 245:

Unsupported and Immaterial. PPFF mischaracterizes the document cited in support, which states that of the facilities that reported data to EPA under the "Permit Compliance System," eight of those facilities reported discharges in 1993. Fort Howard was the lowest of these dischargers, and reported discharging 0.16 kg of PCBs – ***one one-hundredth*** of the total PCBs discharged by the eight reporting facilities. Roach Decl., Ex. 154 [1994, USEPA Report on PCBs (GPFOX00013616)].

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In

addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 246: Throughout the mid-1970s, the document record indicates that Fort Howard was focused on reducing BOD, TSS, and phosphorous levels and was not specifically focused on reduction of PCB discharge levels. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 91].**

Response to PPFF 246:

Unsupported and Immaterial. PPFF is vague, ambiguous, and unclear as to what time-period is meant by "throughout the mid-1970's." PPFF relies solely upon the expert report of Plaintiffs' expert Williams, which report mischaracterizes documents in the record. As explained in response to PPFF 188, Fort Howard was not aware that PCBs were in its effluent until approximately September of 1974. Before and after that time, Fort Howard reduced PCBs through the reduction of TSS. As Ms. Williams recognizes, "control of suspended solids would result in PCB control." Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 71]; *see also* **[Supp. JEF Decl.] Ex. 46 [February 6, 1981 Letter from WDNR to Fort Howard (NCR-FOX-0000995) "Since various studies have shown that PCB is adsorbed onto suspended solids, the pilot studies shall evaluate the removal of suspended solids . . ."].**

The alleged fact is in any event immaterial and does not preclude summary judgment, because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 247: Throughout the 1970s, Fort Howard discharged levels of PCBs higher than most of the industry and, at various times, discharged levels of BOD and TSS above its permit limits, yet Fort Howard continued to expand its production even though it had not achieved an adequate level of pollutant control. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 92].**

Response to PPFF 247:

Unsupported and Immaterial. PPFF relies solely upon the expert report of Plaintiffs' expert Moore, which report mischaracterizes documents in the record. PPFF is vague and ambiguous as to what is meant by "most of the industry." Neither the alleged fact nor the expert report cite to any documents demonstrating the occasions on which Fort Howard "discharged levels of BOD and TSS above its permit limits." PPFF does not allege that Fort Howard ever exceeded a permit limit for PCBs, because Fort Howard never did.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best

position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 248: In a February 6, 1981 letter, the EPA notified Fort Howard that its discharge continued to show the presence of PCBs and recent bioassays found that the Fort Howard discharge was toxic to aquatic organisms. Roach Decl., Ex. 155 [Feb. 6, 1981 Letter from EPA to Fort Howard (NCR-FOX-0000995)].**

Response to PPFF 248:

Undisputed but Immaterial. PPFF appears to erroneously cite NCR-FOX-0000995 instead of NCR-FOX-0000998.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 249: In the February 6, 1981 letter, the EPA also requested that Fort Howard take immediate actions to address these issues, using Clean Water Act authorities to require Fort Howard to provide extensive information and to submit plans for pilot studies of treatment methods for removing PCB for the mill's effluent. Roach Decl., Ex. 155 [Feb. 6, 1981 Letter from EPA to Fort Howard (NCR-FOX-0000995) (stating "The studies shall be of sufficient scale that the results can be readily applied to treatment of the total effluent from the facility. The goal of the pilot studies shall be to reduce the PCB in the effluent to the lowest level that can be achieved on a consistent basis.")].**

Response to PPFF 249:

Unsupported and Immaterial. PPFF is vague, ambiguous, and unclear as to what "these issues" refers to. The February 6, 1981 letter was an information request under section 308 of the Clean Water Act, asking Fort Howard to monitor certain discharges not already reported

under Discharge Monitoring Reports or in WPDES applications.  Roach Decl., Ex. 155 [Feb. 6, 1981 Letter from EPA to Fort Howard (NCR-FOX-0000995) at Attachment I].

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 250:  The EPA also required Fort Howard, in its February 6, 1981 letter, to evaluate chemical addition and clarification and multimedia filtration at a minimum. Roach Decl., Ex. 155 [Feb. 6, 1981 Letter from EPA to Fort Howard (NCR-FOX-0000995).**

Response to PPFF 250:

Unsupported and Immaterial.  PPFF mischaracterizes the document cited in support, which states that "the pilot studies shall evaluate the removal of suspended solids via at least two methods including (1) chemical addition and clarification, and (2) multimedia filtration. The company may at its discretion evaluate other technology for removing PCB."  Roach Decl., Ex. 155 [Feb. 6, 1981 Letter from EPA to Fort Howard (NCR-FOX-0000995) at Attachment I].  As discussed in response to PPFF 235, Fort Howard installed clarifiers in the early 1980's.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 251:  Fort Howard's actions during the 1970s and into the 1980s increased the risk of additional PCB contamination to the Lower Fox River.  Roach Decl., Ex. 17 [June 4, 2009 Expert Report of M. Williams at 84-95].**

Response to PPFF 251:

Unsupported and Immaterial. PPFF relies solely upon the expert report of Plaintiffs' expert Williams, which report mischaracterizes documents in the record.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 252: Indeed, it was not until at least 1989, when the WDNR and EPA mandated that Fort Howard reduce the PCB concentration of its discharge, that Fort Howard finally implemented chemically assisted clarification, even though it had achieved success with it in experiments conducted at another of its facilities in 1979, and in additional experiments at the Green Bay mill from 1984 through 1989. Roach Decl., Ex. 141 [July 19, 1985 Fort Howard Memorandum (NCR-FOX-0110605)].**

Response to PPFF 252:

Unsupported and Immaterial. PPFF mischaracterizes the document cited in support and relies on an unsupported premise, as explained in response to PPFFs 235 and 243. Fort Howard began to study chemically assisted *secondary* clarification in the Green Bay Mill in 1984, but this method was not successful at reducing PCBs to nondetect. *See* response to PPFF 235. In about 1989, Fort Howard began to experiment with chemically assisted *primary* clarification, which was eventually successful in reducing PCBs to nondetect. *Id*. Chemically assistant secondary clarification was a different technology than the technology experimented with in Muskogee in 1979. Fort Howard worked for decades to reach nondetect, even though it was not required by WDNR. Fort Howard always met permit limits for PCBs.

The alleged fact is in any event immaterial to Phase I and Defendants' Motion for Summary Judgment, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. Defendants' continued recycling was promoted by the government because this minor and diminishing risk was outweighed by the benefits of continued paper recycling. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **[Supp. JEF Decl.] Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

123

C. **Bergstrom Paper Company (Predecessor of P.H. Glatfelter Company)**

**PPFF 253:  In August 1975, Richard Wand, a Vice President of the Bergstrom Paper Company ("Bergstrom"), testified at the WNDR hearings on PCBs:**

> [T]here is no evidence known by us which would suggest that Aroclor 1242 found in our effluent is the same Aroclor found to accumulate in the fatty tissue tissues of fish, fowl, or other wildlife.  Indeed, though it has been documented that Aroclor 1242 was the most plentiful Aroclor produced by Monsanto, few traces of this variety are being found in the environment.
>
> It is apparent from the testimony gathered at these hearings that legitimate questions of concern have been raised about PCB's.  It is also apparent, I think, that we have great gaps in our knowledge about the effect, the degradability, and the economics of eliminating PCB's.  We believe that it would be unconscionable for the Department to promulgate these proposed rules without better documentation, to show that the proposed discharge limitations are necessary; that they are attainable and that they are of sufficient benefit to merit halting recycling in the State of Wisconsin.

**Roach Decl., Ex. 64 [August 28-29, 1975 WDNR Hearing Transcript (NCR-FOX-0096936) at 43-46]; Ex. 156 [R. Wand Resumé (Ex. 756 to R. Wand Dep.)].**

Response to PPFF 253:

Undisputed.

**PPFF 254:  Personnel at Bergstrom learned about PCBs in CCP at least by August 1971.  Roach Decl., Ex. 157 [PHG Responses to NCR Interrogatories (Exhibit 367 to E. Gallaher Dep.) at 7].**

Response to PPFF 254:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 255:  Bergstrom sampled finished paper for the presence of PCBs in 1971 and 1972.  Roach Decl., Ex. 158 [November 18, 1971 Institute of Paper Chemistry Letter and Attachment, Exhibit 329 to K. Maves Dep.]; Roach Decl., Ex. 159 [December 3, 1971 Bergstrom Memo (Exhibit 330 to K. Maves Dep.)]; Roach Decl., Ex. 160 [May 17, 1972 Bergstrom Memo (Exhibit 335 to K. Maves Dep.)].**

Response to PPFF 255:

Undisputed.

**PPFF 256: In 1972, PCBs were detected in Bergstrom finished paper produced more than a year after April 1971. Roach Decl., Ex. 160 [May 17, 1972 Bergstrom Memo (Exhibit 335 to K. Maves Dep.)].**

Response to PPFF 256:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 257: PCBs were detected in all of the finished paper sampled by Bergstrom in 1971 and 1972. Roach Decl., Ex. 158 [November 18, 1971 Institute of Paper Chemistry Letter and Attachment (Exhibit 329 to K. Maves Dep.)]; Roach Decl., Ex. 159 [December 3, 1971 Bergstrom Memo (Exhibit 330 to K. Maves Dep.)]; Roach Decl., Ex. 160 [May 17, 1972 Bergstrom Memo (Exhibit 335 to K. Maves Dep.)].**

Response to PPFF 257:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 258: Bergstrom sampled wastewater effluent for the presence of PCBs beginning in 1973. Roach Decl., Ex. 161 [October 17, 1973 Institute of Paper Chemistry Letter and Attachment (Exhibit 336 to K. Maves Dep.)].**

Response to PPFF 258:

Undisputed.

**PPFF 259: PCBs were detected in wastewater effluent sampled at the Bergstrom mill in 1973. Roach Decl., Ex. 161 [October 17, 1973 Institute of Paper Chemistry Letter and Attachment (Exhibit 336 to K. Maves Dep.)].**

Response to PPFF 259:

Undisputed.

**PPFF 260: Bergstrom sampled recovered fiber for the presence of PCBs in 1975. Roach Decl., Ex. 162 [May 12, 1975 Institute of Paper Chemistry Letter and Attachment (Part of Exhibit 586 to L. Wilhelm Dep.)].**

Response to PPFF 260:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 261: PCBs were detected in recovered fiber sampled at the Bergstrom mill in 1975. Roach Decl., Ex. 162 [May 12, 1975 Institute of Paper Chemistry Letter and Attachment (Part of Exhibit 586 to L. Wilhelm Dep.)].**

Response to PPFF 261:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 262:  Bergstrom made no changes in its papermaking operations in response to learning that PCBs were detected in samples of finished paper, wastewater effluent and recovered fiber.  Roach Decl., Ex. 163 [C. Hess Dep. at 183:24-184:4]; Ex. 114 [O. Ross Dep. at 135:2-5]; Ex. 164 [D. Bergstrom Dep. at 183:21-184:14].**

Response to PPFF 262:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 263:  Cecil Hess, administrative vice president at Bergstrom in the 1970s, testified, "[A]s far as I was concerned, [PCB] was in the waste stream, and the purchasing department was sending it to me, so I deinked it and made paper out of what I got."  Roach Decl., Ex. 163 [C. Hess Dep. at 15:9-19, 106:6-106:9].**

Response to PPFF 263:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 264:  In the 1970s, Bergstrom purchased and recycled a grade of wastepaper called Sorted Colored Ledger.  Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 14].**

Response to PPFF 264:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 265:  Sorted Colored Ledger was a grade of recovered fiber that was collected primarily from offices.  Roach Decl., Ex. 14 [June 5, 2009 Report of W. Moore at 10].**

Response to PPFF 265:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 266:  In approximately 1973, Bergstrom began to recycle recovered fiber from a program that obtained wastepaper from offices.  Roach Decl., Ex. 165 [July 10, 2000 Affidavit of Richard Wand (Exhibit 757 to R. Wand Dep.)].**

Response to PPFF 266:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 267: The Shade office recycling program had 450 customer organizations participating in the desk-top office paper collection program and collected 10,000 tons of office paper in 1976. Roach Decl., Ex. 166 [Fourth Report to Congress: Resource Recovery and Waste Reduction at (NCR-FOX-368195) at 38].**

Response to PPFF 267:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 268: Bergstrom's mill in Neenah was the only mill to recycle recovered fiber collected from the Shade office recycling program. Roach Decl., Ex. 167 [Defendant P.H. Glatfelter Company's Responses and Objections to Defendant United States of America's First Set of Interrogatories and Requests for the Production of Documents to Defendant P.H. Glatfelter Company (Exhibit 1018 to C. Missimer Dep.) at 10].**

Response to PPFF 268:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 269: Bergstrom recycled CCP broke at least throughout the 1960s and 1970s. Roach Decl., Ex. 168 [June 3, 1955 Debit Memo (NCR-FOX-0276909)]; Ex. 100 [P.H. Glatfelter Response to Third Section 104(e) Request of the U.S. Department of Interior (NCR-FOX-0236691) at 5]; Ex. 169 [R. Wand Dep. at 78:1-24].**

Response to PPFF 269:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 270: Bergstrom's fiber procurement manager, Dedric Bergstrom, was not aware of testing of wastepaper for the presence of PCBs during the 1970s. Roach Decl., Ex. 164 [D. Bergstrom Dep. at 19:14-15, 139:18-139:23].**

Response to PPFF 270:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 271: In July 1974, WDNR transmitted to Bergstrom results of PCB testing of wastewater effluent at the Bergstrom mill. Roach Decl., Ex. 170 [July 5, 1974 WDNR Letter and Attachment (Exhibit 519 to O. Ross Dep.)].**

Response to PPFF 271:

Undisputed.

**PPFF 272: In 1974, WDNR effluent sampling at the Bergstrom mill detected a PCB concentration of 18.5 ppb. Roach Decl., Ex. 170 [July 5, 1974 WDNR Letter and Attachment (Exhibit 519 to O. Ross Dep.)].**

Response to PPFF 272:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 273: In 1974, WDNR expressed the following conclusion and recommendation regarding the Bergstrom mill: "The Department feels PCBs at any level in an effluent should [be] eliminated. It appears in this case that the NCR waste paper should be eliminated from the recycle fiber system." Roach Decl., Ex. 170 [July 5, 1974 WDNR Letter and Attachment (Exhibit 519 to O. Ross Dep.)].**

Response to PPFF 273:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 274: Bergstrom sent a letter to WDNR in 1975 that transmitted PCB analyses of fourteen samples of recovered fiber. Roach Decl., Ex. 162 [May 23, 1975 Bergstrom Letter (Part of Exhibit 586 to L. Wilhelm Dep.)].**

Response to PPFF 274:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 275: In May 1975, seven of fourteen samples of recovered fiber at the Bergstrom mill showed detectable amounts of PCB present. Roach Decl., Ex. 162 [May 23, 1975 Bergstrom Letter (Part of Exhibit 586 to L. Wilhelm Dep.)].**

Response to PPFF 275:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 276: In May 1975, Bergstrom informed WDNR that "[t]he seven wastepaper grades which show a detectable amount of PCB present represent approximately 50 percent of the waste which we recycle. These grades represent mostly office waste, forms, NCR, and ledger which we feel could come from old files which would date back to when PCBs were being used in the manufacture of carbonless papers." Roach Decl., Ex. 162 [May 23, 1975 Bergstrom Letter (Part of Exhibit 586 to L. Wilhelm Dep.)].**

Response to PPFF 276:

Undisputed.

**PPFF 277:  Bergstrom sent a letter to WDNR stating:  "If it were necessary for us to eliminate these grades from our recycling process it would impose a serious financial burden on us and would throw this large volume of waste back for other means of disposal such as landfill or incineration."  Roach Decl., Ex. 162 [May 23, 1975 Bergstrom Letter (Part of Exhibit 586 to L. Wilhelm Dep.)].**

Response to PPFF 277:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 278:  PCB discharges in effluent could have been reduced if Bergstrom improved its wastewater treatment system.  Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 79-80]; Roach Decl., Ex. 140 [Aug. 7, 2009 Report of J. Braithwaite at 15-16].**

Response to PPFF 278:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 279:  In 1969, the State of Wisconsin issued a Pollution Abatement Order to Bergstrom which required that the company cooperate in the provision of joint municipal-industrial collection and treatment facilities by December 31, 1972 or construct its own treatment facilities meeting effluent standards and limitations by same date.  Roach Decl., Ex. 171 [November 13, 1974 Findings of Fact, Conclusions of Law and Order (Exhibit 227 to J. Haney Dep.)].**

Response to PPFF 279:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 280:  Construction on the secondary treatment plant at the Bergstrom mill was completed in December 1976.  Roach Decl., Ex. 172 [June 1, 1996 Response of the P.H. Glatfelter Company to the Request for Cooperation in Providing Information of the United States Department of the Interior Concerning the Fox River/Green Bay Site, dated February 22, 1996 (Exhibit 156 to K. Maves Dep.) at 17].**

Response to PPFF 280:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 281:  The secondary treatment system at the Bergstrom mill experienced numerous start-up problems and equipment deficiencies in the mid-to-late-1970s.  Roach Decl., Ex. 172 [June 1, 1996 Response of the P.H. Glatfelter Company to the Request for**

Cooperation in Providing Information of the United States Department of the Interior Concerning the Fox River/Green Bay Site (Exhibit 156 to K. Maves Dep.) at 17]; Ex. 173 [C. Missimer Dep. at 137:1-4].

Response to PPFF 281:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 282: In 1977 and 1983 the State of Wisconsin sued Bergstrom for alleged violations of its wastewater discharge permit. Roach Decl., Ex. 174 [July 7, 1977 State of Wisconsin Complaint (Exhibit 236 to J. Haney Dep.)]; Ex. 175 [1983 Complaint against Bergstrom (NCRFOX-0146651)].**

Response to PPFF 282:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 283: Wisconsin's Assistant Attorney General described Bergstrom as having a "lackadaisical attitude toward environmental protection." Roach Decl., Ex. 176 [Feb. 4, 1981 Wisconsin Department of Justice Letter (NCR-FOX-0123738)].**

Response to PPFF 283:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 284: Bergstrom began to deposit sludge into Arrowhead Park Landfill in 1952. Roach Decl., Ex. 177 [April 1999 Arrowhead Park Landfill Evaluation (Exhibit 871 to S. Shimek Dep.) at p. v].**

Response to PPFF 284:

Undisputed.

**PPFF 285: Arrowhead Park Landfill was built in a portion of Lower Fox River. Roach Decl., Ex. 178 [February 3, 1970 Department of the Army Public Notice (NCR-FOX-0621363)]; Roach Decl., Ex. 177 [April 1999 Arrowhead Park Landfill Evaluation (Exhibit 871 to S. Shimek Dep.) at p. v].**

Response to PPFF 285:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 286:  Arrowhead Park Landfill was used for sludge disposal until 1976. Roach Decl., Ex. 177 [April 1999 Arrowhead Park Landfill Evaluation (Exhibit 871 to S. Shimek Dep.) at p. v].**

Response to PPFF 286:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 287:  In 1973, WDNR ordered Bergstrom to close Arrowhead Park Landfill because it was located within 1,000 feet of a lake.  Roach Decl., Ex. 179 [June 11, 1973 WDNR Letter (Exhibit 515 to O. Ross Dep.)].**

Response to PPFF 287:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 288:  A Glatfelter consultant estimated that 262,802 dry tons of sludge were placed in Arrowhead Park Landfill from 1952 to 1976.  Roach Decl., Ex. 180 [June 5, 2009 Expert Report of W. Shields at 5-1].**

Response to PPFF 288:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 289:  Arrowhead Park Landfill occupied approximately 33 acres.  Roach Decl., Ex. 177 [April 1999 Arrowhead Park Landfill Evaluation (Exhibit 871 to S. Shimek Dep. at p. v].**

Response to PPFF 289:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 290:  Bergstrom officials knew as early as the 1960s that solids from the Arrowhead Park Landfill were released to the Lower Fox River.  Roach Decl., Ex. 181 [Aug. 26, 1960 Bergstrom Memo (Ross Exhibit 512)].**

Response to PPFF 290:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 291:  Bergstrom did not notify WDNR about discharges from Arrowhead Park Landfill.  Roach Decl., Ex. 3 [Aug. 6, 2009 Rebuttal Report of M. Williams at 81].**

Response to PPFF 291:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 292: Bergstrom was aware that recycling pre-1971 (PCB-containing) CCP could result in contamination of sludge with PCBs in 1971. Roach Decl., Ex. 173 [C. Missimer Dep. at 66:7-67:1].**

Response to PPFF 292:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 293: Bergstrom did not make any changes in landfill operations between 1971 and 1976. Roach Decl., Ex. 114 [O. Ross Dep. at 70:3-70:11]; Roach Decl., Ex. 182 [R. Swoboda Dep. at 116:6-10].**

Response to PPFF 293:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 294: A Glatfelter consultant estimated that 2,613 dry tons of PCB-containing sludge were released from Arrowhead Park Landfill to the Lower Fox River between 1971 and 1976. Roach Decl., Ex. 183 [August 7, 2009 Rebuttal Report of W. Shields at 2-5].**

Response to PPFF 294:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 295: Bergstrom "did not take actions that could have reduced the risk of further PCB contamination to the River from the Landfill." Roach Decl., Ex. 180 [June 5, 2009 Report of W. Shields at p. 1-3].**

Response to PPFF 295:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

**PPFF 296: Before the late 1970s, Bergstrom did not take reasonable, prudent and available actions to prevent the risk of further PCB contamination to the Lower Fox River. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 74-84].**

Response to PPFF 296:

Inaccurate, immaterial, incomplete, not supported by the evidence, and/or the evidence is inadmissible.

### D. Menasha Corporation

**PPFF 297: Menasha knew that CCP contained PCBs by January 1971. Roach Decl., Ex. 184 [D. Austin Dep. at 103:1-25]; Ex. 110[Jan. 12, 1971 American Paper Institute Letter (NCRFOX-0334431)].**

Response to PPFF 297:

Unsupported. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. There is no credible evidence that Menasha learned that NCR brand carbonless copy paper contained PCBs before the fall of 1971. However, as a result of its review of existing records from the former John Strange Paper Mill ("JSPM"), documents produced by parties in this case and a review of deposition transcripts, Menasha believes it probably received such knowledge in the fall of 1971 because documents in Menasha's possession obtained from U.S. Paper related to the operation of JSPM from September and October 1971 suggest that in the fall of 1971, Menasha had knowledge of a letter dated January 12, 1971 from the American Paper Institute ("API") to the members of its Combination Paperboard Division, Paperboard Group [NCR-FOX-334431][2] which identified NCR as the cause of all PCBs found in paper stock. A letter from the Boxcard Research & Development Association ("BRDA") dated September 15, 1971 [MENFOX00001640-1645] states: "API issued a bulletin on January 12, 1971, addressed to the Combination Paperboard Division, advising to avoid these materials." At this time, there is no evidence establishing that Menasha ever actually received API's January 12, 1971 letter, but initials on the first page of BRDA's September 15, 1971 letter [MENFOX00001640] indicate that letter was received by JSPM which was in 1971 owned by Menasha. (Menasha Amended and Supplemental Responses to NCR's First Set of Interrogatories and Request for Production of Documents, dated July 22, 2009).

The deposition testimony of David Austin at page 103:12-17 states:

12   A Yeah, I would say they received it. You got the
13   routing on it. I personally don't have any knowledge
14   of it.
15   Q Were you told that Menasha Corporation received this
16   document?
17   A No.

Mr. Austin has no personal knowledge of the document, and his testimony does not establish that Menasha received the January 12, 1971 document.

**PPFF 298: Menasha was a member of the American Paper Institute and the Boxboard Research and Development Association ("BRDA"). Roach Decl., Ex. 116 [H. Sattler Dep. at 28:9-16]; Ex. 184 [D. Austin Dep. at 107:2-5].**

---

[2] This document has been identified as Exhibit 385 at the deposition of Helmuth "Rusty" Sattler and as Exhibit 554-E at the deposition of David Austin.

Response to PPFF 298:

Undisputed but incomplete.  It is undisputed that at various times, Menasha was a member of the American Paper Institute and the Boxboard Research and Development Association ("BRDA").   The proposed finding of fact is incomplete, because while Mr. Sattler and Mr. Austin both testify that Menasha was a member of the American Paper Institute and the BRDA, neither provides any testimony concerning the dates when Menasha was a member of either organization.

**PPFF 299:  Menasha typically received the bulletins sent out by the American Paper Institute and BRDA to member companies.  Roach Decl., Ex. 184 [D. Austin Dep. at 88:2-21]; Ex. 116 [H. Sattler Dep. at 45:7-13].**

Response to PPFF 299:

Unsupported. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The deposition of Helmut Sattler states at 45:3-13:

3  Q Were you personally a member of any trade industry
4  organizations or professional organizations related
5  to the paperboard industry?
6  A No.
7  Q Did you receive any publications or newsletters or
8  news releases from paper trade organizations?
9  A Yes.
10 Q And would you have read those?
11 A I beg your pardon?
12 Q Would you have read those?
13 A Yes.

While Mr. Sattler states he received newsletters from paper trade organizations, he does not state from which organizations, nor that he received them through Menasha.  His testimony does not confirm that Menasha "typically received the bulletins sent out by the American Paper Institute and BRDA."

The deposition of David Austin states at 88:13-21:

13 Q Do you have any recollection of seeing those
14 documents when you were the purchasing agent at the
15 John Strange mill?
16 A I don't recall it.
17 Q Okay. Would you have received those types of
18 bulletins from paper trade industry organizations as
19 the purchasing agent for the John Strange mill?
20 A I would not have received them.

Mr. Austin has no recollection of seeing these documents while he was purchasing agent at the John Strange Mill, and acknowledges he would not have received them. His testimony, therefore, does not confirm that Menasha "typically received the bulletins sent out by the American Paper Institute and BRDA."

**PPFF 300: Menasha received a bulletin from the American Paper Institute dated January 12, 1971 that explained that PCBs had previously been used in the manufacture of CCP, and that recycling mills should "be careful that paper stock to be used in making combination paperboard for food packaging does not include [CCP]." Roach Decl., Ex. 184 [D. Austin Dep. at 103:1-25]; Ex. 110 [Jan. 12, 1971 American Paper Institute Letter (NCR-FOX-0334431)].**

Response to PPFF 300:

Undisputed that Menasha at some point received a bulletin from the American Paper Institute dated January 12, 1971. However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

Mr. Austin's deposition at 103:15-17 states:

15 Q Were you told that Menasha Corporation received this
16 document?
17 A No.

Mr. Austin has no personal knowledge that the bulletin from the American Paper Institute dated January 12, 1971 was received by Menasha.

**PPFF 301: Menasha received a bulletin from the BRDA in September 1971 that advised it to "avoid the use of mixed office waste that might contain NCR papers, or any other material so contaminated, such as ledger grades from multiple forms factories." Roach Decl., Ex. 184 [D. Austin Dep. at 104:1-105:7]; Ex. 107 [Sep. 1971 BRDA Bulletin (MENFOX00001640)].**

Response to PPFF 301:

Undisputed and immaterial. It is undisputed that Menasha received the BRDA bulletin (MENFOX00001640), and believes that it received the bulletin in approximately September 1971.

The alleged fact is immaterial to Phase I, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. The bulletin from the BRDA in September 1971 did not discuss or address the possibility that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental

damage. Further, the alleged fact refers to activities that took place before Menasha knew there were PCBs in its effluent.


**PPFF 302: David Austin was the purchasing agent for Menasha at the John Strange Mill from the late 1950s to approximately 1974. Roach Decl., Ex. 184 [D. Austin Dep. at 78:10-17]; Ex. 185 [D. Austin Affidavit (Exhibit 554C to D. Austin Dep.)].**

Response to PPFF 302:

Undisputed that David Austin was the purchasing agent for Menasha at the John Strange Mill for some period of time. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

David Austin's deposition states at page 78:10-17:

10   Q Okay. And just so that I'm clear, you started
11   purchasing recovered fiber for the mill in the early
12   1960s or thereabouts?
13   A Thereabouts, yes.

Mr. Austin's testimony does not confirm that he that he was the purchasing agent for Menasha at the John Strange Mill from the late 1950s.

Mr. Austin's affidavit (Exhibit 554C) states, in pertinent part:

3. During my term of employment, I had different job responsibilities. In the late 1950's/early 1960's, I assumed responsibility for purchasing the scrap paper used to produce the paperboard, boxboard and tube stock at the mill. I held this position until the late 1960's/early 1970's. My title in that position was Paper Stock Buyer. I held that position in addition to my other responsibilities.

Mr. Austin's affidavit states that he assumed responsibility for purchasing scrap paper in "the late 1950s/early 1960s." The affidavit does not confirm that he was the purchasing agent for Menasha at the John Strange Mill from the late 1950s.

**PPFF 303: Mr. Austin was responsible for all wastepaper purchasing for the John Strange Mill from the late 1950s to approximately 1974. Roach Decl., Ex. 184 [D. Austin Dep. at 59:25-60:4; Ex. 185 [D. Austin Affidavit (Exhibit 554C to D. Austin Dep.)].**

Response to PPFF 303:

Undisputed that David Austin was involved in the purchase of wastepaper as furnish for the John Strange Mill for a period of time. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The deposition testimony of David Austin at page 78:10-13 states:

    10  Q Okay. And just so that I'm clear, you started
    11  purchasing recovered fiber for the mill in the early
    12  1960s or thereabouts?
    13  A Thereabouts, yes.

Mr. Austin's testimony does not confirm that he that he was the purchasing agent for Menasha at the John Strange Mill from the late 1950s.

**PPFF 304:  Mr. Austin testified in a prior deposition and affidavit that Menasha knew about PCBs in CCP as early as the 1950s or 1960s, and that he was instructed not to purchase any grades of recovered fiber containing CCP because it might contain PCBs. Roach Decl., Ex. 185 [D. Austin Affidavit (Exhibit 554C to D. Austin Dep.)]; Ex. 186 [Dec. 23, 1992 D. Austin Dep. (MENFOX00004384) at p. 14].**

Response to PPFF 304:

Undisputed but incomplete.   NCR omits that it is well aware that this prior testimony was erroneous.  Mr. Austin repudiated this inaccurate testimony after he saw documents for the first time that indicate the paper industry was not aware of PCBs in NCR brand carbonless copy paper until NCR made the paper industry aware in 1971, at the earliest.  **Supp. JEF Decl. Ex. 47 [April 22, 2009 Deposition of David Austin at 87: 11 -  88: 23; 97: 3-9; and,  100: 11 -  101: 1].**  These documents had never been seen by Mr. Austin until 2009, when they were obtained by Menasha from U.S. Paper.  *Id*. Ex. 48 at 88:16.

Further, API and NCR themselves have for at least ten years believed Mr. Austin's 1992 testimony was in error.  According to a statement of NCR and API made in 1999, "Mr. Austin testified that his superiors warned him in the *1950s and 1960s* that NCR Paper® contained PCBs and should be avoided.  This testimony is not believable as no one – including NCR or the federal or state governments – was aware at the time of any environmental problem associated with PCBs or their presence in NCR Paper®.  Mr. Austin would have had to have been prescient to be aware of problems associated with PCBs as early as the 1950s or 1960s**."  Supp. JEF Decl. Ex. 48 [Comments of Appleton Papers, Inc. and NCR Corporation on the January 15, 1999 Revision of Technical Memorandum 2D, dated February 10, 1999 [NCR-FOX-0551330-551343] at page 3 [NCR-FOX-0551337]]** (emphasis in original).

**PPFF 305:  Menasha knew that the recycling of CCP would result in the discharge of PCBs to a waterbody no later than October 1971.  Roach Decl., Ex. 184 [D. Austin Dep. at 100:11 – 101:1].**

Response to PPFF 305:

Unsupported and out of context.  The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact, and is presented out of context.

The deposition testimony of David Austin at 100:21 – 101:1 states:

21 Q And is it your testimony today that Menasha
22 Corporation became aware of those issues relating to
23 PCBs in NCR paper based on bulletins it received from
24 the American Paper Institute and the Boxboard
25 Research & Development Association?

1A  Yes.

Mr. Austin's  testimony  demonstrates that  Menasha's awareness of the issues relating to PCBs in NCR Paper was based on the information contained in bulletins it received from the American Paper Institute and the Boxboard Research & Development Association, both of which are dated in 1971.  A review of bulletins  from the American Paper Institute and the Boxboard Research and Development Association makes clear that the "issues relating to PCBs in NCR paper" did not include any discussion of the discharge of PCB to a waterbody.   The January 21, 1971 memo from the American Paper Institute noted that they had been "advised by a member company that the vehicle for dye material in carbonless copy paper is a severe contaminant of paper stock and can migrate from combination paperboard to food products."  Roach Decl. Ex. 110 [NCR-FOX-334431].  The September 15, 1971 memorandum from the Boxboard Research & Development Association ("BRDA") noted that "API is processing a proposal from Hazelton Laboratories which is designed to determine PCB levels in all types of paper and paperboard used in packaging as well as tests measuring the transfer to foods."  **Supp. JEF Decl. Ex 59 [MENFOX00001819].**  The Technical Summary attached to the September 15, 1971 BRDA memorandum similarly noted that "[t]he basic concern of the combination paperboard industry lies in the possible contamination of paperboard from NCR papers either directly or indirectly." **Supp. JEF Decl. Ex 59 [MENFOX00001821].**   The September 28, 1971 memorandum from the BRDA states, in pertinent part, that "our industry associations have research programs to develop better tests to measure levels of PCB, determine levels of PCB in all types of packaging materials, and transfer of PCB from packaging materials to food or vice versa."  Roach Decl. Ex. 108 [Sept. 28, 1971 BRDA News Release (MENFOX00001723)].  None of the bulletins discuss or mention the potential discharge of PCBs to a waterbody as a result of the recycling of NCR-brand carbonless copy paper, nor the PCB contamination in the Fox River  These memorandum, do not support or confirm that "Menasha knew that the recycling of CCP would result in the discharge of PCBs to a waterbody no later than October 1971."

 **PPFF 306: By the late 1960s or early 1970s, Menasha was aware that there was PCB contamination of the Fox River.  Roach Decl., Ex. 184 [D. Austin Dep. at 100:11 – 101:1].**

Response to PPFF 306:

Unsupported and out of context.  The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The deposition testimony of David Austin at 100:21 – 101:1 states:

21 Q And is it your testimony today that Menasha
22 Corporation became aware of those issues relating to

23　PCBs in NCR paper based on bulletins it received from
24　the American Paper Institute and the Boxboard
25　Research & Development Association?

1　A Yes.

Mr. Austin's testimony  demonstrates that  Menasha's awareness of the issues relating to PCBs in NCR Paper was based on the information contained in the bulletins it received from the American Paper Institute and the Boxboard Research & Development Association, both of which are dated in 1971.  A review of bulletins from the American Paper Institute and the Boxboard Research and Development Association makes clear that the "issues relating to PCBs in NCR paper" did not include any discussion of the discharge of PCB to a waterbody.   The January 21, 1971 memo from the American Paper Institute noted that they had been "advised by a member company that the vehicle for dye material in carbonless copy paper is a severe contaminant of paper stock and can migrate from combination paperboard to food products."  Roach Decl. Ex. 110 [NCR-FOX-334431].  The September 15, 1971 memorandum from the Boxboard Research & Development Association ("BRDA") noted that "API is processing a proposal from Hazelton Laboratories which is designed to determine PCB levels in all types of paper and paperboard used in packaging as well as tests measuring the transfer to foods."  **Supp. JEF Decl. Ex 59 [MENFOX00001819].** The Technical Summary attached to the September 15, 1971 BRDA memorandum similarly noted that "[t]he basic concern of the combination paperboard industry lies in the possible contamination of paperboard from NCR papers either directly or indirectly."  **Supp. JEF Decl. Ex 59 [MENFOX00001821].**   The September 28, 1971 memorandum from the BRDA states , in pertinent part, that "our industry associations have research programs to develop better tests to measure levels of PCB, determine levels of PCB in all types of packaging materials, and determine transfer of PCB from packaging materials to food or vice versa." Roach Decl. Ex. 108 [Sept. 28, 1971 BRDA News Release (MENFOX00001723)].  None of the bulletins discuss or mention the potential discharge of PCBs to a waterbody as a result of the recycling of NCR-brand carbonless copy paper, nor the PCB contamination in the Fox River. The evidence cited does not confirm that "[b]y the late 1960s or early 1970s, Menasha was aware that there was PCB contamination of the Fox River."

**PPFF 307:  Based on bulletins Menasha received from the API and BRDA between January and October 1971, Menasha became aware that the PCBs in the Fox River were coming from the recycling of CCP.  Roach Decl., Ex. 184 [D. Austin Dep. at 100:11 – 101:1].**

Response to PPFF 307:

Unsupported and out of context.  The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The deposition testimony of David Austin at 100:21 – 101:1 states:

21　Q And is it your testimony today that Menasha
22　Corporation became aware of those issues relating to

23  PCBs in NCR paper based on bulletins it received from
24  the American Paper Institute and the Boxboard
25  Research & Development Association?

1  A  Yes.

   The bulletins relating to PCBs in NCR paper from the American Paper Institute and the Boxboard Research and Development Association  did not include any discussion of the discharge of PCB to a waterbody, let alone the Fox River.   The January 21, 1971 memo from the American Paper Institute noted that they had been "advised by a member company that the vehicle for dye material in carbonless copy paper is a severe contaminant of paper stock and can migrate from combination paperboard to food products."  Roach Decl. Ex. 110 [NCR-FOX-334431].  The September 15, 1971 memorandum from the Boxboard Research & Development Association ("BRDA") noted that "API is processing a proposal from Hazelton Laboratories which is designed to determine PCB levels in all types of paper and paperboard used in packaging as well as tests measuring the transfer to foods."  **Supp. JEF Decl. Ex 59 [MENFOX00001819].**  The Technical Summary attached to the September 15, 1971 BRDA memorandum similarly noted that "[t]he basic concern of the combination paperboard industry lies in the possible contamination of paperboard from NCR papers either directly or indirectly."  **Supp. JEF Decl. Ex 59 [MENFOX00001821].**  The September 28, 1971 memorandum from the BRDA  states, in pertinent part, that "our industry associations have research programs to develop better tests to measure levels of PCB, determine levels of PCB in all types of packaging materials, and determine transfer of PCB from packaging materials to food or vice versa."  Roach Decl. Ex. 108 [Sept. 28, 1971 BRDA News Release (MENFOX00001723)].  None of the bulletins discuss or mention the potential discharge of PCBs to a waterbody as a result of the recycling of NCR-brand carbonless copy paper, nor the PCB contamination in the Fox River.  The evidence cited does not confirm that "[b]y the late 1960s or early 1970s, Menasha was aware that there was PCB contamination of the Fox River."

   **PPFF 308:   Menasha knew no later than September 1971 that certain grades of Recovered Fiber were most likely to contain CCP manufactured using PCBs.  Roach Decl., Ex.  184  [D. Austin  Dep.  at  104:1-105:7];  Ex.  107  [Sep.  1971  BRDA  Bulletin (MENFOX00001640)].**

   Response to PPFF 308:

   Unsupported and vague.  The proposed finding of fact is vague as it fails to define  what constitutes "certain grades of Recovered Fiber."   The proposed finding of fact is also defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.  Exhibit 107 states that "by continuing to avoid the use of mixed office waste *that might contain NCR paper*, or other material so contaminated, such as ledger grades from multiple form factories, you could expect satisfactorily low levels of PCB in your boxboard." [MENFOX00001641] (emphasis added).  The evidence cited  refers to general types of recycled paper "that might contain NCR paper,", but does not reference specific grades of recovered fiber that were  " most likely to contain CCP manufactured using PCBs."  The PPFF does not confirm that "Menasha knew no later than September 1971 that certain grades of Recovered Fiber were most likely to contain CCP manufactured using PCBs."

140

**PPFF 309:    Menasha received a "Technical Summary" from the BRDA in September 1971 that explained that a direct source of PCBs in recycled paperboard was the use of office waste containing CCP.  Roach Decl., Ex. 184 [D. Austin Dep. at 104:1-105:7]; Ex. 107 [Sep. 1971 BRDA Technical Summary (MENFOX00001640)].**

Response to PPFF 309:

Undisputed but immaterial.  The Technical Summary attached to the September 15, 1971 BRDA memorandum stated that "[t]he basic concern of the combination paperboard industry lies in the possible contamination of paperboard from NCR papers either directly or indirectly." **Supp. JEF Decl. Ex 59 [MENFOX00001821].**  The Technical Summary does not discuss or mention the potential discharge of PCBs to a waterbody as a result of the recycling of NCR-brand carbonless copy paper, nor the PCB contamination in the Fox River.  Therefore, the alleged fact is immaterial to Phase I, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.

**PPFF 310:    In July 1972, W. Allen Schenck spoke to "[a]n official of Appleton Coated" who stated "'off the record' that old PCB containing NCR paper could turn up in office waste for 3-5 years."  Roach Decl., Ex. 187 [June 6, 1972 Menasha Memorandum (MENFOX00003590)].**

Response to PPFF 310:

Undisputed but incomplete.  This fact is incomplete because NCR omits that in addition to speaking to "an official of Appleton Coated", (which at that time was NCR's Appleton Paper Division), Allen Schenck, the mill manager at JSPM, in July 1972 called Monsanto, the manufacturer of Aroclor 1242, the PCB used by NCR in NCR brand carbonless copy paper, in an effort to obtain information to assess the risks associated with PCBs.   (MENFOX00003590).  Monsanto's representative, W.B. Papageorge, and Mr. Schenck discussed when various end uses of PCBs stopped, including the use of PCBs in inks, paints, adhesives, plasticizers, lubricants, hydraulic fluid, heat transfer fluid, chlorinated terphenyls and NCR brand carbonless copy paper.  Mr. Papageorge told Mr. Schenck that:  "Monsanto will be publishing the results of a two year animal feeding study in 60-90 days.  This study was of the type designed for FDA food use approval.  Mr. Papageorge said the results 'are not alarming' in Monsanto's judgment.  There are three Aroclors 1242, 1254 and 1260 depending on degree of chlorine substitution.  Number 1242 used in NCR paper seemed a little less toxic in these studies."  (MENFOX00003590).

The telephone calls to Monsanto and NCR's Appleton Paper Division were some of the measures Menasha undertook to assess the risks associated with PCBs in NCR brand carbonless copy paper.

**PPFF 311:  Menasha continued purchasing and recycling Mixed Paper, which it knew came from offices and was likely to contain pre-1971 CCP, throughout the 1970s. Roach Decl., Ex. 184 [D. Austin Dep. at 66:1-68:18, 113:3-15]; Ex. 188 [Aug. 28/29, 1975**

**WDNR Hearing Transcript (NCR-FOX-0281394)]; Ex. 189 [June 25, 1976 Versar Letter (MENFOX00001940)].**

Response to PPFF 311:

Unsupported, immaterial, and inadmissible in part. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The deposition testimony of David Austin at 67:11-14 states:

11  Q So, if I understand your prior testimony correctly,
12  the John Strange mill purchased mixed paper grades
13  from wastepaper packers; is that correct?
14  A Yes.

The deposition testimony of David Austin at 113:3-15 states:

3  Q And you said just now that the mill didn't purchase
4  recovered fiber from NCR or Appleton Coated, correct?
5  A To the best of my knowledge, correct, yes.
6  Q And so it wasn't a major shift in the purchasing of
7  recovered fiber at the mill; is that --
8  A At the mill, no.
9  Q And so you continued purchasing the four major grades
10  that we discussed earlier, old corrugated, mixed
11  paper, kraft cuttings, and newspapers?
12  A Yes.
13  Q And you continued purchasing those from the same
14  brokers?
15  A Sure.

The testimony confirms that Menasha continued to purchase certain grades of recovered fiber, but does not confirm that Menasha "continued purchasing and recycling Mixed Paper, *which it knew* came from offices and *was likely to contain pre-1971 CCP*." (emphasis added).

Exhibit 189, the June 25, 1976 "Versar Letter," (MENFOX00001940-45) has not been authenticated and is inadmissible as hearsay. It is not known who filled in the information on this form or whether the person had the authority to respond on Menasha's behalf, and the accuracy of the sources of the information cannot be verified,. Menasha does not agree that the document is authentic or otherwise admissible as evidence, and NCR has failed to establish the document's admissibility .

Even if the Versar Letter is otherwise admissible, it does not confirm the facts cited. The Versar Letter purports to identify various "Input Raw Materials" used by the former John Strange Paper Mill. The response to question #6, "Input Raw Materials," lists "waste paper," which contained subcategories of Newsprint, Corrugated, Printing and Writing, Tissue, and Mixed." (at MENFOX00001941). In response to question #7, "What data are available for the

142

PCB contents of these inputs?", the response is "None." (at MENFOX00001942). The Versar Letter, even if admissible, does not confirm that Menasha "continued purchasing and recycling Mixed Paper, *which it knew* came from offices and *was likely to contain pre-1971 CCP*." (emphasis added).

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

**PPFF 312: Mr. Austin testified that the mixed paper recycled at the John Strange Mill was collected from offices and businesses. Roach Decl., Ex. 184 [D. Austin Dep. at 66:1-68:18].**

Response to PPFF 312:

Undisputed.

**PPFF 313: Mr. Austin testified that, even after learning about PCBs in CCP, there "wasn't a major shift in the purchasing of Recovered Fiber at the [John Strange] mill," and that "the mill continued purchasing the four major grades [of Recovered Fiber]," including mixed paper, from the same brokers. Roach Decl., Ex. 184 [D. Austin Dep. at 113:3-15].**

Response to PPFF 313:

Undisputed.

**PPFF 314: Allen Schenck was the vice president of technical and environmental for Menasha in August 1975. Roach Decl., Ex. 188 [Aug. 28/29, 1975 WDNR Hearing Transcript (NCRFOX-0281394)].**

Response to PPFF 314:

Undisputed.

**PPFF 315: Mr. Schenck made a statement to the WDNR in August 1975 regarding PCB related issues at the John Strange Mill. He stated that the mill used approximately 25,000 tons of mixed paper a year (or about 30 percent of its furnish). Roach Decl., Ex. 188 [Aug. 28/29, 1975 WDNR Hearing Transcript (NCR-FOX-0281394)].**

Response to PPFF 315:

Undisputed in part and unsupported in part. It is undisputed that Mr. Schenck made a statement to the WDNR in August 1975 that John Strange Mill used "approximately 25,000 tons of mixed paper a year." However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

Mr. Schenck's statement to the WDNR stated, in pertinent part, that "[t]he present grades of recycled fibers used are 50,000 tons of old corrugated, 25,000 tons of mixed paper, 8,000 tons of new." (at NCR-FOX-0281460). The statement does not mention what percent of JSPM's furnish any of these particular grades comprise. Therefore, the statement does not confirm that 25,000 tons of mixed paper represented "about 30 percent of its furnish."

**PPFF 316:  In June 1976, Versar Inc. was generating a model on "polychlorinated biphenyls in the pulp and paper industry."  In a questionnaire sent to the John Strange Mill for this model, Menasha responded that 30 percent of its input raw materials were mixed papers.  Roach Decl., Ex. 189 [June 25, 1976 Versar Letter (MENFOX00001940)].**

Response to PPFF 316:

 Inadmissible and immaterial.  The proposed finding of fact is defective under L.R. 56.2(a) because  the evidentiary material cited is inadmissible as hearsay and does not  support this proposed finding of fact.

Exhibit 189, the June 25, 1976 "Versar Letter," (MENFOX00001940-45) has not been authenticated and is inadmissible as hearsay.  It is not known who filled in the information on this form or whether the person had the authority to respond on Menasha's behalf,  and the accuracy of the sources of the information cannot be verified.  Menasha does not agree that the document is authentic or otherwise admissible as evidence, and NCR has failed to establish  the document's admissibility.

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

**PPFF 317:  Menasha also responded to the Versar questionnaire in June 1976 that the input raw materials used at the John Strange Mill had not been subject to change in composition in the past, and that the input streams were not monitored for PCB content. Roach Decl., Ex. 189 [June 25, 1976 Versar Letter (MENFOX00001940)].**

Response to PPFF 317:

Unsupported, inadmissible, and immaterial.  The proposed finding of fact is defective under L.R. 56.2(a) because  the evidentiary material cited is inadmissible as hearsay and does not support this proposed finding of fact.

Exhibit 189, the June 25, 1976 "Versar Letter," (MENFOX00001940-45) has not been authenticated and is inadmissible as hearsay.  It is not known who filled in the information on this form or whether the person had the authority to respond on Menasha's behalf,  and the accuracy of the sources of the information cannot be verified.  Menasha does not agree that the document is authentic or otherwise admissible as evidence, and NCR has failed to establish  the document's admissibility.

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

**PPFF 318: Menasha did not meaningfully inspect or screen incoming Recovered Fiber for CCP. Roach Decl., Ex. 104 [July 10, 2009 Report of C. Klass at 17-20 ("[n]o feasible mechanism . . . in the 1970s or 1980s to remove PCB-containing NCR-brand carbonless copy paper from post-consumer wastepaper grades.")].**

Response to PPFF 318:

 Incomplete, out of context, and immaterial.  The proposed finding of fact is incomplete and immaterial.

Mr. Klass's opinion is cited out of context by NCR.  Mr. Klass' statement at page 17 of his report that "[t]here was no practical way in the 1970s and 1980s to sort PCB-containing carbonless paper from post-consumer wastepaper grades" applied to the sorters of paper, not to recycling mills such as Menasha.  Further, NCR omits that Mr. Klass expressly noted the applicable industry standards that applied to recycling mills such as JSPM upon receipt of bales of recycled paper.  Specifically:

> [t]he industry standards for the purchase and sale of wastepaper placed obligations on both sellers (brokers) and buyers (recycling mills). Brokers were obligated to use their best efforts to ensure that the bales of paper sold contained only the grades of paper purported to be contained in the bales. Buyers had to have procedures in place to prevent and/or minimize the introduction of foreign materials from entering its production process. Bales were to be visually inspected upon arrival at the mill. If anyone noticed any foreign materials the bale was put aside and it was typically returned to the supplier or regraded. The remaining bales were then weighed, inspected, and sent to the storage area or to the pulpers or beaters. Before mill employees added these bales to the pulpers and beaters, the bales were typically broken open and an additional visual inspection was conducted to determine whether there were foreign materials within the bale. If there were visible foreign materials they were removed.

Roach Decl., Ex. 104 [July 10, 2009 Report of C. Klass at 19].  NCR's own expert, William Moore, acknowledged these types of inspections were wholly consistent with existing industry practice relating to the purchase and sale of recycled paper.  **Supp. JEF Dec. Ex. 33 [August 21, 2009 Deposition of William Moore at 96:10-13, 109:15-24, 110:16-20, 118:2-11].**

NCR also omits relevant deposition testimony.  The deposition testimony of David Austin states at 124:24 – 126:5:

24 Q Now, if I'm understanding this correctly, there were
25 basically three inspections at the mill, first, the
1 Towmotor operators would visually inspect the bales
2 of recovered fiber, correct?
3 A Yes.

8 Q And then the bales were inspected when they were
9 weighed and sent to the storage area, correct?
10 A While we still had a weighmaster, yes.

2 Q Okay. Then when the recovered fiber was added to the
3 beaters and pulpers, there was a final visual
4 inspection, correct?
5 A That is correct.

**Supp. JEF Decl. Ex. 47 [April 22, 2009 D. Austin Deposition at 124:24-126:5].**

The evidence establishes that there were at least two to three inspections of the bales for CCP and other contaminants prior to the recovered fiber being used at the JSPM. The exterior of the bales was inspected upon delivery. The exterior of the bales was inspected again prior to storage in JSPM's warehouse, and a final inspection was conducted by breaking the bale open just prior to introduction into the production process. At each stage, bales containing visible amounts of NCR brand carbonless copy paper were rejected and returned to the paper broker that originally delivered the paper. JSPM implemented the appropriate, industry accepted practices to inspect and screen for CCP containing PCBs.

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

**PPFF 319: Roger Ackerman was the purchasing manager for the John Strange Mill from 1976 to 1983. Roach Decl., Ex. 190 [R. Ackerman Dep. at 12:4-14:10, 27:2-10].**

Response to PPFF 319:

Undisputed in part, unsupported in part. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The deposition testimony of Roger Ackerman at 12:4 – 16 states:

4 Q Now, you said that you started working at the John
5 Strange mill in 1976?
6 A September of 1976.
7 Q Why did you leave the Ford Motor Company to go work
8 for the John Strange mill?
9 A That was about the time when the auto industry was
10 starting to look a little lacking in future because

146

11  of the oil -- various oil crises and so forth.
12  Q How long were you at -- strike that. For how long
13  did you work at Menasha Corporation?
14  A 21 years.
15  Q What year did you retire?
16  A 1997, August of '97.

**Supp. JEF Decl. Ex. 40 [2009 Deposition of R. Ackerman at 12:4-16].**

The deposition testimony of Roger Ackerman at 27:2-10 states:

2   Q So were there any changes in your job
3   responsibilities between the time that you were at
4   the John Strange mill versus when you moved up to
5   Neenah?
6   A The -- my title remained the same throughout my time
7   at Menasha Corporation. The job change was that I no
8   longer had any responsibility for purchasing for the
9   John Strange mill, because it was no longer part of
10  Menasha Corporation.

The deposition testimony cited does not confirm that Mr. Ackerman was the purchasing manager at JSPM from 1976 to 1983.

**PPFF 320:  Mr. Ackerman was not instructed about PCBs, PCBs in CCP, or screening incoming Recovered Fiber for CCP.  Roach Decl., Ex. 190 [R. Ackerman Dep. at 83:14 – 85:12].**

Response to PPFF 320:

Undisputed in part, incomplete, and immaterial.  It is undisputed that Mr. Ackerman testified he was not instructed regarding screening incoming recovered fiber for CCP.

As to the remainder of the proposed finding of fact, the phrase "instructed about PCBs, PCBs in CCP" is vague and incomplete, and therefore does not support or confirm that Mr. Ackerman was not instructed "about PCBs, PCBs in CCP."

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

**PPFF 321:  Mr. Austin testified that CCP was visually indistinct, and that it was impossible to tell whether a given sheet of paper was CCP just by looking at it.  Roach Decl., Ex. 184 [D. Austin Dep. at 79:24-80:10].**

Response to PPFF 321:

Unsupported. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

The deposition testimony of David Austin at 79:24-80:10 states:

24  Q Now, if I understand your prior testimony just now,
25   you were familiar with NCR paper -- or you knew what

1   NCR paper was when you were a purchasing agent in the
2   1960s and '70s, correct?
3   A I knew it was a white grade of paper.
4   Q But you couldn't identify a sheet of NCR paper just
5   by looking at it; is that right?
6   A I was not that familiar with it, no.
7   Q That's what you meant when you said, "Right now if
8   you laid a sheet of paper here, I couldn't tell you
9   what it was," end quote, correct?
10  A Yes.

The cited testimony does not confirm that as a general matter "CCP was visually indistinct, and that it was impossible to tell whether a given sheet of paper was CCP just by looking at it."

**PPFF 322: In his statement to the WDNR in August 1975, Allen Schenck said that there was "no practical method to select PCB free paper in bale form." Roach Decl., Ex. 188 [Aug. 28/29, 1975 WDNR Hearing Transcript (NCR-FOX-0281394)].**

Response to PPFF 322:

Undisputed.

**PPFF 323: Menasha did not make any efforts to eliminate PCBs from its finished product or the Recovered Fiber it recycled. Roach Decl., Ex. 191 [Sep. 11, 1973 Menasha Memorandum (MENFOX00000347)]; Ex. 192 [Nov. 22, 1977 Menasha PCB Test Program Document (MENFOX00001903)]; Ex. 193 [Dec. 20, 1977 Menasha Letter (MENFOX00001904)].**

Response to PPFF 323:

Unsupported and immaterial. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

As set forth in response to PPFF 318, JSPM conducted at least two to three inspections of the bales for CCP and other contaminants prior to the recovered fiber being used at the JSPM. The exterior of the bales was inspected upon delivery. The exterior of the bales was inspected again prior to storage in JSPM's warehouse, and a final inspection was conducted by breaking the bale open just prior to introduction into the production process. At each stage, bales

containing visible amounts of NCR brand carbonless copy paper were rejected and returned to the paper broker that originally delivered the paper. JSPM implemented the appropriate, industry accepted practices to inspect and screen for CCP containing PCBs. **Supp. JEF Decl. Ex. 33 [August 21, 2009 Deposition of William Moore at 96:10-13, 109:15-24, 110:16-20, 118:2-11].**

The September 11, 1973 Menasha Memorandum (MENFOX00000347) discusses a procedure for the processing of incoming purchase orders. The only reference to PCBs in the memorandum is: "Under no circumstances can we refer to PCB or food packaging; customers should merely be asked to state exact end use on purchase orders." This memorandum does not discuss or pertain to "any efforts to eliminate PCBs from its finished product or from the Recovered Fiber it recycled."

The November 22, 1977 Menasha PCB Test Program Document (MENFOX00001903) pertains to a PCB testing program implemented by Menasha in 1977. Paragraph III, "Acceptance and Rejection," notes that paperboard which "analyzes under 10 parts/million PCB will be released for shipment. Paperboard testing over 10 parts/million PCB will be held and diverted to other end uses not requiring PCB compliance." This program was designed to prevent PCB above acceptable limits from being used in food grade packaging. Contrary to NCR's assertion, it does demonstrate "efforts to eliminate PCBs from its finished product or from the Recovered Fiber it recycled."

The December 20, 1977 Menasha Letter (MENFOX00001904) was sent to one of Menasha's customers, Crown Cork & Seal Company. It states the Menasha "can supply separator stock manufactured from 100% recycled fibres with PCB tests in compliance with FDA regulations not exceeding 10 parts/million as aroclor 1242." Contrary to NCR's assertion, it does demonstrate "efforts to eliminate PCBs from its finished product or from the Recovered Fiber it recycled."

None of the documents cited confirm "Menasha did not make any efforts to eliminate PCBs from its finished product or from the Recovered Fiber it recycled."

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling. Moreover, by the time Menasha learned that PCBs were in its effluent, NCR Paper no longer contained PCBs.

**PPFF 324: Throughout the 1970s, Menasha was concerned primarily with ensuring that paperboard used for food packaging purposes had PCB levels below 10 ppm, not with eliminating PCBs from the product altogether. Roach Decl., Ex. 191 [Sep. 11, 1973 Menasha Memorandum (MENFOX00000347)]; Ex. 192 [Nov. 22, 1977 Menasha PCB Test Program Document (MENFOX00001903)]; Ex. 193 [Dec. 20, 1977 Menasha Letter (MENFOX00001904)].**

Response to PPFF 324:

Unsupported, vague, and immaterial. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Further, the use of the phrase "concerned primarily with" is vague and incomplete.

The September 11, 1973 Menasha Memorandum (MENFOX00000347) discusses a procedure for the processing of incoming purchase orders. This memorandum does not confirm that Menasha was "concerned primarily with ensuring that paperboard used for food packaging purposes had PCB levels below 10 ppm, not with eliminating PCBs from the product altogether."

The November 22, 1977 Menasha PCB Test Program Document (MENFOX00001903) pertains to a PCB testing program implemented by Menasha in 1977. This memorandum demonstrates Menasha's commitment to meeting the then applicable regulatory standards for PCB content in food packaging paperboard. This memorandum does not confirm that Menasha was "concerned primarily with ensuring that paperboard used for food packaging purposes had PCB levels below 10 ppm, not with eliminating PCBs from the product altogether."

The December 20, 1977 Menasha Letter (MENFOX00001904) was sent to one of Menasha's customers, Crown Cork & Seal Company. This memorandum demonstrates Menasha's commitment to meeting applicable regulatory standards for PCB content in food packaging paperboard. This document does not confirm that Menasha was "concerned primarily with ensuring that paperboard used for food packaging purposes had PCB levels below 10 ppm, not with eliminating PCBs from the product altogether."

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling. Moreover, by the time Menasha learned that PCBs were in its effluent, NCR Paper no longer contained PCBs.

**PPFF 325: Even into the late 1970s, PCBs were still present in paperboard manufactured at the John Strange Mill at levels above 10 ppm. Menasha's policy was that "[p]aperboard which analyzes under 10 parts/million PCB will be released for shipment. Paperboard testing over 10 parts/million PCB will be held and diverted to other end uses not requiring PCB compliance." Roach Decl., Ex. 191 [Sep. 11, 1973 Menasha Memorandum (MENFOX00000347)]; Ex. 192 [Nov. 22, 1977 Menasha PCB Test Program Document (MENFOX00001903)]; Ex. 193 [Dec. 20, 1977 Menasha Letter (MENFOX00001904)]; Ex. 188 [Aug. 28/29, 1975 WDNR Hearing Transcript (NCR-FOX-0281394)].**

Response to PPFF 325:

Unsupported, vague, and immaterial. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Further, the use of the term "policy" is vague and incomplete.

The September 11, 1973 Menasha Memorandum (MENFOX00000347) discusses a procedure for the processing of incoming purchase orders. This memorandum does not set forth

any specific testing results regarding the alleged PCB content in any Menasha product in the late 1970s, and therefore, does not confirm that "even in the late 1970s, PCBs were still present in paperboard manufactured at the John Strange Mill at levels above 10 ppm." Further, the memorandum does not discuss, let alone confirm, any policy on Menasha's behalf regarding PCBs.

The November 22, 1977 Menasha PCB Test Program Document (MENFOX00001903) pertains to a PCB testing program implemented by Menasha in 1977. It does not set forth any specific testing results confirming any alleged PCB content in any Menasha product in the late 1970s, and therefore, does not confirm that "even in the late 1970s, PCBs were still present in paperboard manufactured at the John Strange Mill at levels above 10 ppm." Further, the memorandum does not discuss let alone confirm any policy on Menasha's behalf regarding PCBs.

The December 20, 1977 Menasha Letter (MENFOX00001904) was sent to one of Menasha's customers, Crown Cork & Seal Company. It does not set forth any specific testing results confirming any alleged PCB content in any Menasha product in the late 1970s, and therefore, does not confirm that "even in the late 1970s, PCBs were still present in paperboard manufactured at the John Strange Mill at levels above 10 ppm." Further, the memorandum does not discuss let alone confirm any policy on Menasha's behalf regarding PCBs.

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling. Moreover, by the time Menasha learned that PCBs were in its effluent, NCR Paper no longer contained PCBs.

**PPFF 326: Even after learning that recycling CCP would result in PCBs in mill effluent, Menasha continued discharging certain process and waste waters directly into the Fox River. Roach Decl., Ex. 194 [Aug. 10, 1971 Marathon Letter to Menasha (NCR-FOX-0248734)]; Ex. 195 [July 28, 1972 Menasha Letter to Neenah-Menasha Sewerage Commission (NCR-FOX-0248617)].**

Response to PPFF 326:

Unsupported and immaterial. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

Exhibit 195, the July 28, 1972 Menasha letter to Neenah-Menasha Sewerage Commission states, in pertinent part, that:

"The flow to the sewerage plant was not decreased by transferring flow to the river. For many years the effluent waters at Strange have been segregated as follows:

"(a) water from the process has gone to the Sewerage Plant,

(b) Felt washing water and cooling water has gone directly to the river" (at NCR-FOX-0248617)."

1972 was prior to the time that Menasha believes it was aware that recycling CCP would result in PCBs in mill effluent. The letter merely confirms that Menasha discharged felt washing water and cooling water to the river, process waters were sent to the Sewerage Plant. There is no evidence that the felt washing water and cooling water contained PCBs. **Supp. JEF Decl. Ex. 39 [August 28, 2009 Deposition of James Braithwaite at 219:2-17]**. Therefore, the referenced exhibit does not confirm that **"**even after learning that recycling CCP would result in PCBs in mill effluent, Menasha continued discharging certain process and waste waters directly into the Fox River."

The PPFF is in any event immaterial and does not preclude summary judgment, because Menasha's continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling. Moreover, by the time Menasha learned that PCBs were in its effluent, NCR Paper no longer contained PCBs.

**PPFF 327: In 1971, the John Strange Mill had approximately 22 unmonitored outfalls that discharged directly into the Fox River. Roach Decl., Ex. 194 [Aug. 10, 1971 Marathon Letter to Menasha (NCR-FOX-0248734)].**

Response to PPFF 327:

Unsupported. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

Exhibit 194, the August 10, 1971 Marathon Engineering letter to Menasha, states, in pertinent part:

"A survey report of Mr. Erdman recommended combining the present 22 outfalls into a total of 4."

The letter makes no reference to whether these outfalls were monitored or not, and as a result, the letter does not confirm that "[i]n 1971, the John Strange Mill had approximately 22 unmonitored outfalls that discharged directly into the Fox River." *See id.*

**PPFF 328: In 1972, the John Strange Mill was still discharging approximately 1,324,000 gallons per day felt washing water (which contained approximately 2,824 pounds of suspended solids) directly to the Fox River. Roach Decl., Ex. 195 [July 28, 1972 Menasha Letter to Neenah-Menasha Sewerage Commission (NCR-FOX-0248617)].**

Response to PPFF 328:

Undisputed.

**PPFF 329: After 1971, Menasha did not take reasonable, prudent or available steps to decrease the risk of further PCB contamination to the Lower Fox River. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 105 - 112].**

Response to PPFF 329:

Unsupported and immaterial. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.

Plaintiffs have failed to cite any specific fact in support of this contention. Rather, they cite solely to a portion of the expert report of one of Plaintiff's experts, Marcia Williams. However, Ms. Williams fails to cite to specific evidence to support the proposed finding of fact, and instead attempts to support this fact through the absence of evidence. For example, Ms. Williams states that "the data record is limited regarding the timing of actions to identify non-feedstock sources of PCB," (page 108) and that "there is no evidence in the document record that the John Strange Mill made any significant adjustments to its raw materials wastepaper mix.," (page 108). The absence of information does not mean that actions were not taken. Ms. Williams report provides no affirmative evidence to support or confirm that "[a]fter 1971, Menasha did not take reasonable, prudent or available steps to decrease the risk of further PCB contamination to the Lower Fox River."

Omitted by NCR and Ms. Williams are the various actions that Menasha did take to decrease the risk of further PCB contamination. As an initial matter, as early as 1947, the JSPM was utilizing primary treatment technology of its process wastewater, in the form of Dorr-Oliver fiber recovery units to separate and recover paper fiber from its process outflows before entering the Lower Fox River or the Neenah-Menasha Sewerage Commission POTW. Fibers recovered from the wastewater stream were then directed back into the JSPM papermaking process. **Supp. JEF Decl. Ex. 60 [May 6, 2009 Deposition of David Sugden, Vol. 1, at 64:3-15].** The use of fiber-recovery units continued throughout the relevant time period.

In 1972, the mill manager at JSPM, Allan Schenck, called both Monsanto, the manufacturer of Aroclor 1242, the PCB used by NCR in NCR brand carbonless copy paper, and NCR's own Appleton Paper Division to assess the risks associated with PCBs. Roach Decl. Ex. [MENFOX00003590]. Between November 19th and 21st of 1975, Jim Schedgick, Menasha's Technical Director, attended a conference in Chicago, IL hosted by the U.S. EPA regarding PCBs. There, EPA discussed the sources of environmental PCBs and options the was is considering in regulating PCBs. **Supp. JEF Decl. Ex. 52 [November 24, 1975 Menasha Corporation Memorandum re: EPA conference on PCBs ] [MENFOX00000395-96].** Menasha joined paper industry efforts to address NCR's PCBs in recycled paper resulting from NCR's use of Aroclor 1242 in NCR brand carbonless copy paper. *See* for example: **Supp. JEF Decl. Ex. 49 [March 20, 1972 BRDA Memorandum re: Joint Meeting - PCB] [MENFOX00000166]; Ex. 50 [May 19, 1972 National Association of Secondary Material Industries memorandum] [MENFOX00000226]; Ex. 51 [August 14, 1973 Mensasha Memorandum] [MENFOX00000343-344]; Ex. 53 [BRDA Memorandum re: Meeting of the Chemical & Coating Committee] [MENFOX00001705-1710]; Ex. 54 [July 2, 1973 API Memorandum ] [MENFOX00001796]; Ex. 55 [July 5, 1972 BRDA Memorandum]**

**[MENFOX00001869-1880]**; Ex. 56 **[November 14, 1973 BRDA Memorandum]
MENFOX00002389]**; Ex. 57 **[March 1, 1976 Bergstrom Memorandum] [NCR-FOX-
0161368]**; Roach Decl., Ex. 191 **[Sep. 11, 1973 Menasha Memorandum
(MENFOX00000347]** (This is not intended to be an exhaustive list and other such documents
may be found in documents produced by the parties, including Menasha). Menasha continuously
operated and then upgraded its waste water treatment system, including: the addition of a
clarifier, plant effluent filters, save-alls, collection tanks, aqua purge showers, felt showers and
Milton Roy chemical pumps and pressure filtration screens. Menasha also the increased
recycling of already recovered fiber within the JSPM, reduced and then eliminated the outfalls to
the Lower Fox River from JSPM, and always was evaluating means to achieve the overall
reduction and/or elimination of plant effluent.

     As set forth in response to PPFF 318, JSPM conducted at least two to three inspections of
the bales for CCP and other contaminants prior to the recovered fiber being used at the JSPM.
The exterior of the bales was inspected upon delivery. The exterior of the bales was inspected
again prior to storage in JSPM's warehouse, and a final inspection was conducted by breaking
the bale open just prior to introduction into the production process. At each stage, bales
containing visible amounts of NCR brand carbonless copy paper were rejected and returned to
the paper broker that originally delivered the paper. JSPM implemented the appropriate,
industry accepted practices to inspect and screen for CCP containing PCBs. **Supp. JEF Decl.
Ex. 33 [August 21, 2009 Deposition Transcript of William Moore at 96:10-13, 109:15-24,
110:16-20, 118:2-11].**

     PPFF 329 is also immaterial because the undisputed evidence shows that by 1967, NCR
knew that PCBs persisted in the environment, and by 1969 at the latest, NCR knew that Aroclor
1242 presented a risk to the environment and that Monsanto would be terminating all Aroclor
sales. *See* Doc. #659 [Pls.' Response to PFOF] at ¶¶ 48-50, 66. In addition, it is undisputed that
discharges to the Fox River after mid-1971 were much lower than prior to mid-1971, and
Plaintiffs have offered no evidence that such discharges after mid-1971 were not minimal. *See*
Defendants' Reply to Plaintiffs' Response to Defendants' Proposed Findings of Fact at ¶¶ 118-
119.

### E.    U.S. Paper Mills Corp.

     **PPFF 330: By 1971, it was generally known within the paperboard packaging
industry that PCBs were previously used in the manufacture of CCP. Roach Decl., Ex. 108
[September 28, 1971 News Release from BRDA (MENFOX00001723)].**

     Response to PPFF 330:

     <u>Disputed, unsupported, and immaterial</u>. This proposed fact is immaterial to the summary
judgment motions filed by Certain Defendants in general because it relates to the Post-
Production Period. The proposed facts in this paragraph are further immaterial as to U.S. Paper
in particular because there is no evidence that U.S. Paper was a member of the BRDA or the
paperboard packaging industry. **Declaration of Stephen F. McKinney ("McKinney Decl."),
filed on October 19, 2009, ¶ 5 & Attachment 5, Dep. of T. Olson (May 12, 2009) at 45:11-
12; and ¶ 4 & Attachment 4, Dep. of J. Patterson (March 13, 2009) at 104:21 – 105:1.** This

proposed fact is also immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants. See Response to PPFF 339 below. U.S. Paper was and is today, a small paper company that made paper for the cores of toilet and paper towel roles. U.S. Paper did not produce paper used in food packaging. U.S. Paper made core stock and liners, not packaging. Steven Bogart Declaration ("Bogart Decl."), filed August 28, 2009, (Doc. # 555) ¶ 30 & Attach. 30, Dep. of J. Patterson, (Mar. 13, 2009) at 34:17-22, 125:4-11, 126:13-15; *id.* at ¶ 31 & Attach. 31, Dep. of T. Olson, (May 12, 2009) at 35:4-14. There is no evidence in the record that U.S. Paper ever knew that Plaintiffs' NCR Paper contained PCBs until the 1990s. *Id.* at ¶ 33 & Attach. 33, Dep. of D. Hecker, (June 10, 2009) at 59:25-60:23; *id.* at ¶ 34 & Attach. 34, Dep. of T. Van Deurzen, (Mar. 12, 2009) at 76:18-77:21; *id.* at ¶ 30 & Attach. 30, Dep. of J. Patterson, (Mar. 13, 2009) at 28:12-13, 101:25-102:3, 107:8-14; *id.* at ¶ 32 & Attach. 32, Dep. of R. Gerbers, (Mar. 11, 2009) at 8:14-9:12, 23:10-24:5, 80:9-14; *id.* at ¶ 31 & Attach. 31, Dep. of T. Olson, (May 12, 2009) at 36:11-21, 40:2-13.

**PPFF 331: U.S. Paper was a member of the paperboard industry, and manufactured paperboard products. Roach Decl., Ex. 196 [J. Patterson Dep. at 43:12-18, 106:21 – 107:4].**

Response to PPFF 331:

Disputed, unsupported, and immaterial. These proposed facts are immaterial to the summary judgment motions filed by Certain Defendants because they relate to the Post-Production Period. While it is undisputed that U.S. Paper manufactured paperboard for toilet paper cores and some liners to separate stacked cans, there is no evidence that U.S. Paper held any membership in any association specific to the paperboard industry including the BRDA. **McKinney Decl., ¶ 4 & Attachment 4, Dep. of J. Patterson (March 13, 2009) at 34:19-22, 42:2-15; and ¶ 5 & Attachment 5, Dep. of T. Olson (May 12, 2009) at 44:17-45:12.**

**PPFF 332: U.S. Paper claims that it "never" learned that CCP contained PCBs. USP Motion for Summary Judgment (Dkt. #551) pp. 6-7.**

Response to PPFF 332:

Disputed, unsupported, and immaterial. This proposed fact is immaterial to the summary judgment motions filed by Certain Defendants because they relate to the Post-Production Period. They are also immaterial as to US Paper in particular. Plaintiffs have acknowledged that the recycling mills did not know CCP contained PCBs during the Production Period, which is the only time period relevant to Phase I. U.S. Paper's position is only that it did not know CCP contained PCBs during any relevant time period. **McKinney Decl., ¶ 4 & Attachment 4, Dep. of J. Patterson (March 13, 2009) at 112:18-23; ¶ 6 & Attachment 6, Dep. of D. Hecker (June 10, 2009) at 60:10-11; and ¶ 7 & Attachment 7, Dep. of T. Van Deursen (June 10, 2009) at 77:13-18.**

**PPFF 333: Richard Keyser, a former employee at the De Pere Mill, testified that he learned about PCB contamination of the Fox River in the 1970s. Roach Decl., Ex. 197 [R. Keyser Dep. at 95:14 – 96:16].**

Response to PPFF 333:

Disputed, unsupported and immaterial. This proposed fact is immaterial to the summary judgment motions filed by Certain Defendants because it occurred, primarily, after the Production Period. While it is undisputed that Mr. Keyser heard about PCBs in the Fox River, Mr. Keyser testified that he could not remember when he heard about it, whether it was early or late in the 1970s, and that he did not know where the PCBs came from, that he did not hear about a connection between PCBs and recycling, and that he did not mention any information about PCBs to any one at U.S. Paper. **McKinney Decl., ¶ 8, Dep. of R. Keyser (April 13, 2009) at 96:17 – 97:9**. This proposed fact is also immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants. See Response to PPFF 339 below.

**PPFF 334: For at least some period of time in the late 1960s to early 1970s, the De Pere Mill specifically purchased CCP broke to use in the manufacture of its white paper. Roach Decl., Ex. 98 [February 8, 2007 Supplemental Response of U.S. Paper Mills Corp. to Information Request of United States Department of the Interior, Fish and Wildlife Service of 1996 (Exhibit 253 to R. Gerbers Deposition), pp. 2-6].**

Response to PPFF 334:

Undisputed. It is undisputed that U.S. Paper likely purchased NCR carbonless copy paper broke as furnish from Appleton Coated Paper Company ("ACPC") for some period of time in the late 1960s to early 1970s to make its white core stock.

**PPFF 335: A former employee at the mill recalled up to 30 to 40 bales of CCP broke being delivered to the mill per week. Roach Decl., Ex. 98 [February 8, 2007 Supplemental Response of U.S. Paper Mills Corp. to Information Request of United States Department of the Interior, Fish and Wildlife Service of 1996 (Exhibit 253 to R. Gerbers Deposition), p. 3], Ex. 198 [T. Van Deurzen Dep. at 47:13 – 49:2].**

Response to PPFF 335:

Disputed, unsupported and immaterial. This proposed fact is immaterial to the summary judgment motions filed by the Certain Defendants because the records cited clearly state that source of this proposed fact, Thomas Van Deurzen, was not employed at U.S. Paper until November 1971. This was after Plaintiffs ceased using PCBs in its CCP when there would no longer have been PCBs in CCP broke. Any CCP broke observed by Van Deurzen did not have PCBs in it and cannot be relevant to Phase I. Therefore, the inference of this proposed fact that USP received 30 to 40 bales per week of CCP broke in the late 1960s and before November 1971 is unsupported by the cited evidentiary record. Roach Decl., Ex. 98 at p.3; Deposition of Thomas Van Deurzen at 10:18-20. This proposed fact is also immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants. See Response to PPFF 339 below.

**PPFF 336: James Patterson was assistant superintendent and superintendent of the De Pere Mill in the 1970s. In those positions, Mr. Patterson was involved with the**

purchased of Recovered Fiber used at the De Pere Mill.  Roach Decl., Ex. 196 [J. Patterson Dep. at 45:23 – 46:1].

Response to PPFF 336:

Undisputed, but immaterial.  This proposed fact is immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants.  See Response to PPFF 339 below.  This proposed fact is also immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**PPFF 337:  Mixed Paper was one of the four major grades of Recovered Fiber recycled at the De Pere Mill.  Roach Decl., Ex. 196 [J. Patterson Dep. at 43:24–45:11]; Ex. 117 [T. Olson Dep. at 27:3–28:1].**

Response to PPFF 337:

Undisputed.  U.S. Paper defines Mixed Paper as a mix of any kind of water paper, including, but not limited to, newspapers and office waste.  **McKinney Decl., ¶ 4 & Attachment 4, Dep. of J. Patterson (March 13, 2009) at 40:5-12.**

**PPFF 338:  U.S. Paper recycled Mixed Paper at the De Pere Mill throughout the 1970s and 1980s.  Roach Decl., Ex. 199 [1971-1972 Grades of Paper Stock and Rag Used by U.S. and Canadian Mills (NCR-FOX-0600711)]; Ex. 200 [1984 Recovered Paper Usage (USPFOX00000670)]; Ex. 201 [B. Merline Dep. at 43:1-11, 85:11–87:2].**

Response to PPFF 338:

Undisputed, but immaterial. See Response to PPFF 337 above.  This proposed fact is immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants.  See Response to PPFF 339 below.  This proposed fact is also immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**PPFF 339:  U.S. Paper never stopped recycling Mixed Paper at the De Pere Mill because of PCBs in CCP.  Roach Decl., Ex. 199 [1971-1972 Grades of Paper Stock and Rag Used by U.S. and Canadian Mills (NCR-FOX-0600711)]; Ex. 200 [1984 Recovered Paper Usage (USPFOX00000670)]; Ex. 201 [B. Merline Dep. at 43:1-11, 85:11–87:2].**

Response to PPFF 339:

Disputed, unsupported and immaterial.  U.S. Paper had no reason to believe its Mixed Paper had CCP in it or that any CCP in the bales contained PCBs during any time relevant to Phase I.  Moreover, beginning in 1974 consultant-initiated tests showed non-detect for PCBs.  Therefore, US Paper had no reason to believe it was necessary to take any action due to PCBs.  When in 1973 the DNR required industries to file an annual report on effluent discharge quality called the NR 101 Report, U.S. Paper retained as consultants Robert E. Lee & Associates (USPFOX00000198), Inc and Foth & Van Dyke (USPFOX00000066) concerning compliance

with NR 101. **McKinney Decl., ¶ 1 & Attachment 1 (USPFOX00000198);** Timothy Davis Declaration ("Davis Decl.") filed August 26, 2009, (Doc. # 558) Ex. A (USPFOX00000066).  In the analytical report from Foth & Van Dyke in 1974, U.S. Paper's effluent was analyzed for PCBs (USPFOX00000068) and found to contain less than 0.0001 mg/l (no detect).  *Id.* (USPFOX00000068).  The tests which U.S. Paper's consultant performed beginning in 1974 gave U.S. Paper no reason to believe that PCBs were in their processes or effluent.  When in 1974 the DNR required industries to file an annual report on effluent discharge quality called the NR 101 Report, U.S. Paper retained their consultants Robert E. Lee & Associates (USPFOX00000198), Inc and Foth & Van Dyke (USPFOX00000066) to assist U.S. Paper in its compliance with that regulation by testing its effluent.  *Id.* (USPFOX00000066).  Among other parameters, the consultants analyzed the effluent for PCBs.  In the analytical report from Foth & Van Dyke in 1974, U.S. Paper's effluent was analyzed for PCBs (USPFOX00000068) and found to contain less than 0.0001 mg/l (no detect).  *Id.* (USPFOX00000068).  In the early 1990s the DNR transferred hard copies of the NR101 reports to a computer database.  The WDNR NR101 records show a non-detect for PCBs at U.S. Paper's DePere Mill in 1978 (USPFOX00000057) and 1979 (USPFOX00000058).  John Van Lieshout Declaration ("Van Lieshout Decl.") filed August 26, 2009 (Doc. # 559) Ex. A.  This proposed fact is also immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**PPFF 340:  U.S. Paper did not meaningfully inspect or screen incoming Recovered Fiber for CCP.  Roach Decl., Ex. 104 [July 10, 2009 Report of C. Klass at 17-20 ("[n]o feasible mechanism . . . in the 1970s or 1980s to remove PCB-containing NCR-brand carbonless copy paper from post-consumer wastepaper grades.")]; Ex. 196 [J. Patterson Dep. at 60:18–63:2; 64:3-14].**

Response to PPFF 340:

Disputed, unsupported and immaterial.  Richard Gerbers testified that he did attempt to screen incoming recovered fiber for CCP and other paper which might turn its product a color.  **McKinney Decl., ¶ 9 & Attachment 9, Dep. of R. Gerbers (March 11, 2009) at 34:24 – 35:1, 35:18-22, 37:3-9**.  While it is undisputed that it was not practical to inspect all bales for carbonless copy paper, that is immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants.  See Response to PPFF 339 above.  This proposed fact is also immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**PPFF 341:  Only one witness, Richard Gerbers, recalls a "blender test" being used to determine whether a given bale contained CCP.  Roach Decl., Ex. 202 [R. Gerbers Dep. at 42:21–46:11].**

Response to PPFF 341:

Undisputed, but immaterial.  While it is undisputed that it was not practical to inspect all bales for carbonless copy paper, that is immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of

contaminants.  See Response to PPFF 339 above.  Richard Gerbers did not begin his employment with U.S. Paper until November of 1971. Bogart Decl. (Doc. # 555) ¶ 32 & Attach. 32, Dep. of R. Gerbers, (Mar. 11, 2009) at 9:8-12.  Accordingly, this proposed fact is immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**PPFF 342:  Mr. Gerbers never performed the test himself, and testified that the test was rarely performed.  Roach Decl., Ex. 202 [R. Gerbers Dep. at 46:10-11].**

Response to PPFF 342:

<u>Undisputed, but immaterial</u>.  While it is undisputed that it was not practical to inspect all bales for carbonless copy paper, that is immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants.  See Response to PPFF 339 above.  This proposed fact is immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**PPFF 343:  Mr. Patterson, who supervised Mr. Gerbers' direct supervisor, and who actually recalled performing the "blender test," testified that the test was never used to test for CCP, and that it was used only to test for recovered fiber that had "wet strength." Roach Decl., Ex. 202 [R. Gerbers Dep. at 10:7-10; 103:15-18]. Ex. 196 [J. Patterson Dep. at 60:18–63:2; 64:3-14].**

Response to PPFF 343:

<u>Disputed, in part, and immaterial</u>. Although it is undisputed that Mr. Patterson was Mr. Gerber's supervisor's supervisor, Mr. Patterson did not testify that the test was never used to test for CCP in furnish, but merely that he was not aware that it was also used for that purpose. **McKinney Decl., ¶ 4 & Attachment 4, Dep. of J. Patterson (March 13, 2009) at 62:25 – 63:2**.  While it is undisputed that it was not practical to inspect all bales for carbonless copy paper, that is immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants.  See Response to PPFF 339 above.  This proposed fact is immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**PPFF 344:  Prior to 1971, the only wastewater treatment used at the De Pere Mill were two settling lagoons that discharged directly to the Lower Fox River.  Roach Decl., Ex. 140 [August 7, 2009 Report of J. Braithwaite at 22-23].**

Response to PPFF 344:

<u>Disputed, unsupported, immaterial</u>.  In addition to two settling lagoons used to settle out solids before treated wastewater was discharged over the ground and vegetation to the river, there were various pieces of equipment that removed fiber from the wastewater, including save-alls and side-hill screens.  By 1945 U.S. Paper had installed and was operating a lagoon to treat wastewater. **McKinney Decl., ¶ 4 & Attachment 4, Dep.of J. Patterson (March 13, 2009) at 9:17-21 and 87:5-24**.  Sometime prior to 1955 U.S. Paper added a second lagoon. **McKinney**

**Decl., ¶ 2 & Attachment 2 (GLTFOX00001352).** In the 1957 report by the Committee on Water Pollution (NCR-FOX 407807), at page 34, the Committee ordered that U.S. Paper "continue to operate the lagooning facilities in an effective manner to maintain pollutional discharge to the Fox River at a minimum." **McKinney Decl., ¶ 3 & Attachment 3 (NCR-FOX407807).** In September 1963 Carl Blabaum, Assistant Director of the Committee on Water Pollution provided U.S. Paper with a specification for a V-notch weir for flow monitoring on their lagoon (US21_029409). The weir was installed by November 1963 because the Committee on Water Pollution measured U.S. Paper discharge flow during the samples collected November 4 through 8, 1963. During the period from 1963 through 1967 U.S. Paper lowered the percent fiber discharged normalized to production by approximately 88% while decreasing the volume of wastewater discharged by 88%. U.S. Paper accomplished this by installing wedgewire screens at various points in their production process and efficiently operating their lagoon system. **McKinney Decl., ¶¶ 1, 2 and 3 & Attachments 1, 2 and 3 (NCR-FOX502664; GLTFOX00001362; USPFOX00000090 and 148).** U.S. Paper reduced both water usage and fiber loss by installing a 100 mesh sidehill screen (GLTFOX00001362), two sidehill washers (USPFOX00000146), a sidehill saveall screen (USPFOX00000089), a North saveall (USPFOX00000089), a settling tank (USPFOX00000080), and a filter system (USPFOX00000075) at critical points in the hydropulping and fourdrinier board making process. **McKinney Decl., ¶¶ 1, 2 and 3 & Attachments 1, 2 and 3 (GLTFOX00001362; USPFOX00000075, 80, 89 and 146); ¶ 10 & Attachment 10, Dep. of M. Merline (April 23, 2009) Merline at 52:4-21; ¶ 4 & Attachment 4, Dep. of J. Patterson (March 13, 2009) at 124:18-24; and ¶ 8 & Attachment 8, Dep. of R. Keyser (April 13, 2009) at 35:23 – 36:11, 88:18-24, and 112:23-25.** Each piece of equipment had the effect of recovering paper fiber for beneficial reuse in the Fourdrinier paperboard machine and cleaning process water for reuse rather than discharge to the lagoons. Reducing the paper fiber loading and hydraulic loading to the lagoons resulted in the lagoons operating more efficiently and reduced the paper fiber discharged to the LFR. The installation of these recovery systems allowed U.S. Paper to reduce its discharge by 85%. The settling tank and filter installed in 1971 improved U.S. Paper's wastewater quality in their discharge to the De Pere POTW. The Department of Resource Development evaluated the paper mills along the LFR in terms of environmental performance in 1966 and 1967. **McKinney Decl., ¶ 1 & Attachment 1 (USPFOX00000151, 154, 167 and 170**). In 1966 board mills along the LFR averaged 0.57% fiber loss per ton of production and 5,395 gallons of water discharged per ton of production. In October 1966 U.S. Paper averaged 0.23% fiber loss per ton of production and 4,644 gallons of water discharged per ton of production, below the average for comparable board mills in the area. In 1967 board mills along the LFR averaged 0.65% fiber loss per ton of production and 4,573 gallons of water discharged per ton of production. During that same period U.S. Paper averaged 0.35% fiber loss per ton of production and 1,957 gallons of water discharged per ton of production, well below the average for comparable board mills in the area. In July 1970 U. S. Paper requested permission to discharge to the De Pere POTW from the DNR and the City of De Pere. The DNR acknowledged U.S. Paper's request as in compliance with Order No. 4B-68-11a-42A 9. **McKinney Decl., ¶ 1 & Attachment 1 (USPFOX00000083).** U.S. Paper's consultant Robert E. Lee & Associates then submitted plans and specifications for the sewer connections. J.H. Lenz, De Pere City Engineer approved those plans and specifications on July 30, 1970. **McKinney Decl., ¶ 1 & Attachment 1 (USPFOX00000196).** These plans and specifications were also submitted to the DNR with request for approval. **McKinney Decl., ¶ 1 & Attachment 1**

**(USPFOX00000197).** The DNR approved the plans and specifications as submitted (USPFOX00000076). The sewer connection was initially made in August of 1970. **McKinney Decl., ¶ 1 & Attachment 1 (USPFOX00000074).**

**PPFF 345: Prior to 1971, there were instances where the settling lagoons would erode to the point where wastewater would be discharged without treatment directly to the Lower Fox River. Roach Decl., Ex. 203 [July 25, 1955 Letter from Wisconsin Board of Health (GLTFOX00001352)].**

Response to PPFF 345:

Disputed, unsupported and immaterial. This fact is immaterial as there is no evidence that US Paper recycled CCP in 1955, the date on the record evidence cited by Plaintiffs. It is disputed because the record evidence cited does not support the factual assertion that there were more than one instance of erosion to the settling lagoons. There was one instance in 1955 when one of the waste water lagoons, to which wastewater was diverted while the main lagoon was being cleaned, had a breach in it. According to the record evidence cited by Plaintiffs for this proposed finding, the discharge lasted only a matter of days.

**PPFF 346: Even after 1971, when the De Pere Mill connected to the De Pere POTW, U.S. Paper on occasion diverted wastewater to lagoons that were known to overflow directly into the Lower Fox River. K. Roach Decl., Ex. 201 [Merline Dep. at 65:17–66:19]; Ex. 98 [Suppl. Response of U.S. Paper to Information Request of U.S. Department of Interior, Gerbers Exhibit 253, p. 3].**

Response to PPFF 346:

Disputed, in part, and immaterial. The record cited does not support more than that on a few occasions, in emergency situations when the basement of the mill was flooded in the 1970s. On these few occasions, wastewater was diverted to a lagoon, but not with an amount sufficient to overflow the lagoon and discharge to the lower Fox River. **McKinney Decl., ¶ 10 & Attachment 10, Dep. of B. Merline (April 23, 2009) at 65:18 – 66:7, 67:7-20, 70:9-11, 72:22-24; McKinney Decl. , ¶ 8 & Attachment 8, Dep of R. Keyser (April 13, 2009) at 118:1-10.** The Rule governing lagoon construction, operation and closure (NR213) was not promulgated until July 1984. U.S. Paper stopped using their lagoon in 1971 when they connected to the De Pere POTW, except for a few temporary diversions during upset conditions. There is no record of sludge residuals being released from the lagoons. The control authorities were informed in 1970 that U.S. Paper intended to abandon its lagoons and discharge to the De Pere POTW in accordance with Order No. 4B-68-11a-42A 9. The WDNR acknowledged full compliance with Order No. 4B-68-11a-42A 9 and complimented U.S. Paper on their cooperation in 1972. **McKinney Decl., ¶ 2 & Attachment 2 (GLTFOX00001369).** If the DNR had required additional lagoon closure activities they would have mentioned it in their correspondence with U.S. Paper. In terms of filling in their lagoons, U.S. Paper was in conformance with industrial practices and applicable environmental laws of the time. Given the distance of the former lagoons from the river and the nature of PCB adsorption to paper fibers, even if U.S. Paper had left some sludge in the lagoons there is no basis to conclude it would have leached out and discharged to the LFR. **McKinney Decl., ¶ 7 & Attachment 7, Dep. of T. Van Deurzen (June**

**10, 2009) at 87:17-19, 88:19-89-11; ¶ 9 & Attachment 9, Dep. of R. Gerbers (March 11, 2009) at 108:1-5**.  This proposed fact is immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants.  See Response to PPFF 339 above.  This proposed fact is also immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**PPFF 347:  U.S. Paper's continued use of its settling lagoons after it hooked up to the De Pere POTW in 1971 was not reasonable or prudent behavior.  K. Roach Decl., Ex. 204 [R. Fulk Dep. at 120:12–121:5].**

Response to PPFF 347:

<u>Disputed and immaterial</u>.  See Response to PPFF 346 above.  Such emergency diversions do not constitute continued use of the lagoons.

**PPFF 348:  U.S. Paper was not permitted to discharge wastewater from its lagoons.**

Response to PPFF 348:

<u>Disputed, in part, and immaterial</u>.  U.S. Paper did not discharge wastewater from its lagoons after connecting to the De Pere wastewater system in the August of 1970.  Prior to that time, U.S. Paper's De Pere Mill was subject to regular inspection by agency authorities and was encouraged to continue to operate the lagoons in an effective manner; but no permit was required at that time.  U.S. Paper was never required to obtain a permit because it did not discharge to the Fox River when permitting regulations were established.  See Responses to PPFF 344 and 346 above.

**PPFF 349:  During the 1970s, U.S. Paper did not take reasonable, prudent or available actions to lower the risk of further PCB contamination to the Lower Fox River.  Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 112 - 118].**

Response to PPFF 349:

<u>Disputed and immaterial</u>.  U.S. Paper first connected to the DePere POTW in August of 1970, then finally connected in early 1971, after making some alterations. **McKinney Decl., ¶ 1 & Attachment 1 (USPFOX00000074).**  According to one of Plaintiffs' experts, James Braithwaite, connection to a POTW allowed an industry to wash it hands with respect to "responsibility for wasterwater." **McKinney Decl., ¶ 11 & Attachment 11, Dep. of J. Braithwaite (Sept. 3, 2009) at 129:15 – 130:13**.  See Responses to PPFF 344 and 366 above.  This proposed fact is immaterial as to U.S. Paper because by 1974 U.S. Paper's effluent was registering non-detect for PCBs in consultant-initiated lab tests for a range of contaminants.  See Response to PPFF 339 above.  This proposed fact is also immaterial to the summary judgment motions filed by Certain Defendants in general because it relates to the Post-Production Period.

**F.** **Riverside Paper Company (Predecessor of CBC Coating, Inc.)**

**PPFF 350: The Riverside Paper Company (Riverside) knew by March 1972 that PCBs had been used in the manufacture of CCP. Roach Decl., Ex. 205 [March 13, 1972 Pioneer Paper Stock Letter (CBCFOX00003773)].**

Response to PPFF 350:

Unsupported. The proposed finding of fact is not supported by the evidence. The Plaintiffs cite a March 13, 1972 letter from Pioneer Paper Stock that was found in Riverside's files. The letter does not indicate when Riverside Paper Corporation received the March 1972 letter, which was not addressed to Riverside directly but rather a now-deceased former Riverside employee's name is handwritten on the side of a copy of the letter that was found in Riverside's files. Roach Decl., Ex. 205 [March 13, 1972 Pioneer Paper Stock Letter]; **Supp. JEF Decl. Ex. 31 [April 16, 2009 G. Holzknecht Depo. at 164:14-165:18].** The only former Riverside employee who recalls having seen the letter, George Holzknecht, Jr., does not recall when he saw it other than it was sometime prior to 2000; he does not recall seeing it in March 1972 and Riverside was not a Paper Stock Supplier of Pioneer Paper stock, which was the group to whom the letter was addressed. **Supp. JEF Decl. Ex. 31 [April 16, 2009 G. Holzknecht Depo. at 163:23-166:24].**

**PPFF 351: Riverside knew by March 1972 that "large stocks of old type PCB contaminated carbonless carbon paper exist throughout the country." Roach Decl., Ex. 205 [March 13, 1972 Pioneer Paper Stock Letter (CBCFOX00003773)].**

Response to PPFF 351:

Unsupported. See response to PPFF 350 above. Further, Mr. Holzknecht testified that he was not aware in March 1972 that "large stocks of old type PCB contaminated carbonless carbon paper exist throughout the country" and he did not know whether anyone at Riverside would have known that. **Supp. JEF Decl. Ex. 31 [April 16, 2009 G. Holzknecht Depo. at 166].**

**PPFF 352: In the 1970s, Riverside recycled white and colored ledgers. Roach Decl., Ex. 206 [April 1, 1998 CBC Memorandum (Ex. 510-D to G. Holzknecht, Jr. Depo.)]; Ex. 207 [G. Holzknecht Jr. Depo. at 111:8 – 112:7]; Ex. 208 [May 8, 1974 Riverside Memorandum (CBCFOX00005693)].**

Response to PPFF 352:

Undisputed.

**PPFF 353: Riverside purchased the Sorted Colored Ledger and Sorted White Ledger grades of recovered fiber from brokers. Roach Decl., Ex. 209 [L. Golper Depo. at 44:3-9, 61:8-19].**

Response to PPFF 353:

Unsupported and incomplete.  The proposed finding of fact is not supported by the evidence and is incomplete.  See response to PPFF 352 above.  In addition, Plaintiffs' only citation for the proposition that Riverside purchased any "sorted" ledger grades is the deposition testimony of broker Leo Golper, who testified that he recalls he sold "sorted" ledger grade to Riverside, although he did not recall when.  Roach Decl., Ex. 209 [L. Golper Depo. at 61:8-19].  It is unclear from Mr. Golper's testimony, however, whether his definition of "sorted" ledger grades is the same as Plaintiffs' expert's definition of Sorted Ledger Grades.  **Supp. JEF Decl. Ex. 32 [August 26, 2009 L. Golper Depo. at 45:5-22, 73:2-25, 79:3-9]**; **Supp. JEF Decl. Ex. 33 [August 21, 2009 W. Moore Depo. at 44:3-19]**.

**PPFF 354:  Between 1960 and December 1972, Riverside discharged all of its wastewater directly to the Lower Fox River with no treatment.  Roach Decl., Ex. 210 [R. Farnum Dep. at 72:16 – 73:4].**

Response to PPFF 354:

Unsupported.  The proposed finding of fact is not supported by the evidence.  Riverside Paper Corporation utilized a recirculation and save-all system for treatment of wastes before discharge to the Fox River as early as 1957.  Ex. 15 to Decl. of Dennis P. Birke at NCR-FOX-0230593 [1957 Order].

**PPFF 355:  In December 1972, Riverside began sending some of its wastewater to the City of Appleton Publicly-Owned Treatment Works for treatment.  Roach Decl., Ex. 211 [Dec. 26, 1972 Letter from City of Appleton to Riverside (NCR-FOX-0004352)].**

Response to PPFF 355:

Undisputed.

**PPFF 356:  Even after Riverside began sending some of its wastewater to the City of Appleton publicly-owned treatment works for treatment, Riverside continued discharging some untreated wastewater directly to the Lower Fox River.  Roach Decl., Ex. 207 [G. Holzknecht, Jr. Dep. at 189:2-5].**

Response to PPFF 356:

Undisputed.  However, the proposed finding of fact is immaterial without evidence that Riverside's discharge to the Lower Fox River contained any PCBs.  Further, Riverside's WDNR wastewater discharge permit allowed for Riverside's continued discharge to the Lower Fox River.  **Supp. JEF Decl. Ex. 34 [March 22, 1974 Riverside Paper Corporation WPDES Permit (NCR-FOX-0055599 at 0055606)]**

**PPFF 357:  Riverside first detected Aroclor 1242 in its wastewater in 1974.  Roach Decl., Ex. 212 [March 22, 1996 PCB Synopsis (Ex. 510-L G. Holzknecht, Jr. Dep.)]; Ex. 207 [G. Holzknecht, Jr. Dep. at 155:25 – 156:19].**

Response to PPFF 357:

164

Undisputed. Riverside first detected Aroclor 1242 in its wastewater in December 1974. Roach Decl., Ex. 212 [March 22, 1996 PCB Synopsis]; Roach Decl., Ex. 207 [G. Holzknecht, Jr. Depo. at 156:9-19].

**PPFF 358: Despite detecting PCBs in its wastewater in 1974, Riverside never tested its incoming recovered fiber for PCB-content. Roach Decl., Ex. 212 [March 22, 1996 PCB Synopsis (Ex. 510-L to G. Holzknecht, Jr. Dep.)]; Ex. 207 [G. Holzknecht, Jr. Dep. at 33:18-25, 155:25 – 156:19].**

Response to PPFF 358:

Undisputed. However, after December 1974, Riverside did not detect Aroclor 1242 in its wastewater again until 1979. Roach Decl., Ex. 212 [March 22, 1996 PCB Synopsis].

**PPFF 359: Riverside took no action to screen or limit the amount of PCB-containing CCP it took in. Roach Decl., Ex. 207 [G. Holzknecht, Jr. Dep. at 173:20-23]; Ex. 210 [R. Farnum Dep. at 111:4-15].**

Response to PPFF 359:

Undisputed. However, the PPFF is misleading because the evidence cited by the Plaintiffs does not support that Riverside ever took in any PCB-containing CCP. The two former CBC employees whose depositions are referenced were not asked whether Riverside took any action to screen or limit the amount of PCB-containing CCP Riverside took in, rather they were asked the broad question of whether Riverside ever changed any of its procedures or operations because of concerns about PCBs. Roach Decl., Ex. 207 [G. Holzknecht, Jr. Dep. at 173:20-23]; Ex. 210 [R. Farnum Dep. at 111:4-15].

**PPFF 360: During the 1970s, Riverside did not take reasonable, prudent or available steps to minimize the risk of further PCB contamination to the Lower Fox River. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 100 - 105].**

Response to PPFF 360:

Unsupported. Riverside took reasonable, prudent or available steps to ensure it was minimizing its release of PCBs to the Lower Fox River. **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of Davis Ford at 230].**

### G. Wisconsin Tissue Mills, Inc. (Predecessor of the WTM I Company)

**PPFF 361: WTM contends it did not know about PCBs in CCP until 1975. Roach Decl., Ex. 213 [WTM's Responses to NCR's First Set of Interrogatories at 5].**

Response to PPFF 361:

Undisputed.

**PPFF 362: Wisconsin Tissue Mills, Inc. ("WTM") stated in 1975 that it knew that "many grades of waste paper have PCB's in them" due to CCP made prior to 1971 being included in recovered fiber streams. Roach Decl., Ex. 214 [Aug. 25, 1975 WTM Letter (WTMFOX00008907)].**

Response to PPFF 362:

Unsupported as phrased. The August 25, 1975 memo which is cited as the source for PPFF 362 actually reads as follows: "…many grades of wastepaper have PCBs in them…. PCBs are from NCR carbonless paper made prior to five years ago and are found in many of the wastepaper streams." In other words, PCBs, not CCP made prior to 1971, were present in many of the wastepaper streams.

**PPFF 363: WTM first began recycling CCP as early as 1956. Roach Decl., Ex. 215 [1996 WTM I 104(e) responses (NCR-FOX-479011)].**

Response to PPFF 363:

Undisputed.

**PPFF 364: Between 1956 and 1978, the primary grades of recovered fiber used by WTM were Sorted Colored Ledger and Sorted White Ledger. Roach Decl., Ex. 215 [1996 WTM I 104(e) responses (NCR-FOX-479011)].**

Response to PPFF 364:

Unsupported. WTM's 1996 104(e) response which Plaintiffs cite as the source for PPFF 364 actually reads as follows:

> The raw material for the paper produced by Wisconsin Tissue during the relevant time period consisted of wastepaper, virgin pulp and pulp substitutes. The wastepaper process during this time period was almost entirely pre-consumer paper and consisted primarily of manifold colored ledger, sorted colored ledger, white manifold and white ledger…. On occasion, Wisconsin Tissue processed high grade, uncoated post-consumer waste such as shredded tax returns from the IRS and envelopes used for church donations.

Roach Decl., Ex. 215 [WTM I 104(e) Responses, Response 10 (NCR-FOX-479019)]

**PPFF 365: WTM purchased Sorted Colored Ledger from brokers. Roach Decl., Ex. 209 [L. Golper Dep. at 44:10-12].**

Response to PPFF 365:

Unsupported as phrased. WTM does not understand how Plaintiffs define the phrase "Sorted Colored Ledger." Therefore, PPFF 365 is vague and unclear. WTM admits that Leo

Golper testified that he sold sorted colored ledger to Wisconsin Tissue Mills. WTM also incorporates by reference its response to PPFF 364.

**PPFF 366: WTM was recycling office waste as early as 1963, and continued to do so through at least 1975. Roach Decl., Ex. 216 [D. Conger Dep. at 32:2-3]; Ex. 217 [Sept. 1975 WTM Letter to Brokers, Exhibit 636 to D. Conger Deposition].**

Response to PPFF 366:

Unsupported as phrased. Admits that D. Conger testified at deposition that he remembered office waste being used in 1963. He also testified that he recalled that WTM started to use office waste when it put in the No. 2 paper machine. **Supp. JEF Decl. Ex. 22 [May 11, 2009 D. Conger Dep. at 31:23-32:1]** In fact, the No. 2 paper machine was not installed until 1964. Roach. Decl., Ex. 215 [1996 WTM I 104(e) responses, Response 10, (NCR-FOX-479020). He further recalled WTM discontinuing the use of office waste at some point. Roach Decl., Ex. 216 [D. Conger Dep. at 32:4-8]. Further, WTM admits that it advised its secondary fiber suppliers in 1975 to "discontinue sending us any waste paper containing office waste." Roach Decl., Ex. 217 [D. Conger Dep. Ex. 636]. Neither reference cited by Plaintiffs reflect that WTM recycled office waste continuously from 1963 through at least 1975.

**PPFF 367: WTM began purchasing File Stock in the 1980s. Roach Decl., Ex. 218 [W. New Dep. at 110:23 – 111:5]; Ex. 219 [1984 WTM Cost & Tonnage report (NCR-FOX-0286568)].**

Response to PPFF 367:

Unsupported as phrased. WTM does not understand how Plaintiffs define the phrase "File Stock." Therefore, PPFF 367 is vague and unclear. Admit that W. New testified at deposition that at some point in the 1980s WTM began using file stock and that Dep. Ex. 219 reflects that in October 1984 WTM purchased a small amount of "sorted file stock."

In any event, PPFF 367 is immaterial. There is no evidence that PCBs were discharged to the Fox River by the WTM facility as a result of its recycling "sorted file stock." WTM's Discharge Monitoring Reports submitted to WDNR in the 1980s routinely reflected PCBs at "non-detect." *See, e.g.*, **Supp. JEF Decl. Ex. 23 [NCR-FOX-0285795]; Ex. 24 [NCR-FOX-0288592]; Ex. 25 [NCR-FOX-0288541] [1983, 1984, and 1985 WTM Discharge Monitoring Reports].**

**PPFF 368: In January 1976 WTM tested four grades of incoming recovered fiber and found PCBs in each grade tested. Roach Decl., Ex. 220 [Feb. 12, 1976 PCB Data (WTMFOX00009882)]; Ex. 216 [D. Conger Dep. at 98:9 – 99:21].**

Response to PPFF 368:

Undisputed.

**PPFF 369:  WTM found PCBs in each grade of recovered fiber tested in January 1976.  Roach Decl., Ex. 220 [Feb. 12, 1976 PCB Data (WTMFOX00009882)]; Ex. 216 [D. Conger Dep. at 98:9 – 99:21, 148:13-20]; Ex. 218 [W. New Dep. at 146:21-147:12].**

Response to PPFF 369:

Undisputed.

**PPFF 370:  WTM did not stop purchasing any of the grades of recovered fiber tested in 1976.  Roach Decl., Ex. 216 [D. Conger Dep. at 98:9 – 99:21, 148:13-20]; Ex. 218 [W. New Dep. at 146:21-147:12].**

Response to PPFF 370:

Undisputed.  PPFF 370 is, however, immaterial.  There is no evidence of any material discharge of PCBs to the Fox River as a result of WTM's recycling of any of the four grades tested in 1976.  In fact, the 1976 testing results demonstrated that WTM's wastewater treatment plant was effectively removing PCBs before the discharge of effluent to the river.  Roach Decl., Ex. 220 [Feb. 12, 1976 PCB Data (WTMFOX00009882)]

**PPFF 371:  Prior to 1973, when it installed its own wastewater treatment plant, WTM sent its wastewater to the Neenah-Menasha Sewerage Commission with no pretreatment.  Roach Decl., Ex. 216 [D. Conger Dep. at 55:18 – 56:10].**

Response to PPFF 371:

Unsupported as phrased.  The material cited by Plaintiffs in PPFF 371 does not support this assertion.  Admit that in 1973 WTM's own wastewater treatment plant went into service, and that prior to its installation, and in fact for another approximate 3 years after its installation, WTM discharged its wastewater to the Neenah-Menasha Sewerage Commission ("NMSC").  Deny that prior to 1973 WTM's discharges to the NMSC had no pretreatment; the WTM facility used Save-alls and/or Side-hill washers.  Roach Decl., Ex. 216 [D. Conger Dep. at 56:12-18].  **Supp. JEF Decl. Ex. 22 [May 11, 2009 D. Conger Dep. 28:1-29:7; 62:11-65:1]; Supp. JEF Decl. Ex. 26 [May 28, 2009 W. New Dep. 105:12-19].**

**PPFF 372:  Prior to 1973, when it installed its own wastewater treatment plant, WTM knew that the Neenah-Menasha Sewerage Commission was "not capable of handling effluent."  Roach Decl., Ex. 218 [W. New Dep. at 53:12-16].**

Response to PPFF 372:

Unsupported as phrased.  Admit that the cited deposition testimony is accurately quoted, but Plaintiffs' isolation of this phrase fails to include and recognize the appropriate context.  Obviously, the NMSC was capable of handling effluent -- that was its purpose.  (*See, e.g.,* Roach Decl. Ex. 215 [1996 WTM I 104(e) Responses, Response 15, NCR-FOX-479031] "[T]he Neenah-Menasha sewage treatment plant provided primary treatment during all of the relevant time period and secondary treatment beginning in 1967.")  What the witness was describing was his impression that at times the NMSC facility could not always process the loadings to it, and

168

that its current size in 1973 might not be adequate to accommodate the future growth of WTM under the circumstances.  Roach Decl., Ex. 218 [W. New Dep. 53:12-24].

**PPFF 373:  Prior to 1973, WTM would occasionally receive calls from the Neenah-Menasha Sewerage Commission saying "their operation was somehow either compromised or out of control and that [WTM] had to shut off flow to the Neenah-Menasha Sewerage Commission."  Roach Decl., Ex. 218 [W. New Dep. at 54:3-7, 55:14-18].**

Response to PPFF 373:

Undisputed in part.  Bill New testified that prior to 1973 WTM received such calls as described from "time to time."  Roach Decl., Ex. 218 [W. New Dep. at 54:3-7].

## XIII.  STATUTES AND REGULATIONS REGARDING THE USE AND RECYCLING OF PCBS OR PCB-CONTAINING PRODUCTS.

**PPFF 374:  The Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 et seq., enacted in 1976, directed EPA to prohibit manufacturing, processing, distribution in commerce, and use of PCBs, after 1978 or 1979 (depending upon activity) unless EPA approved specific use authorizations or exemptions.  Roach Decl., Ex. 221 [Aug. 24, 2009 Supplemental Rebuttal Report of M. Williams at 2].**

Response to PPFF 374:

Undisputed.  However, Plaintiffs' citation to the Supplemental Rebuttal Report of Marcia Williams as to the direction to EPA included in TSCA is improper.  *See* 15 U.S.C. § 6205(e) for prohibitions against manufacturing, processing, distribution in commerce, and use of PCBs.

**PPFF 375:  In 1979, a use authorization for PCB-containing carbonless copy paper was approved pursuant to TSCA, but the authorization prohibited the manufacturing, processing and distribution of PCBs in commerce unless EPA had issued a specific use authorization.  Roach Decl., Ex. 222 [May 31, 1979 Rule, 44 Federal Register 31514 (MONSFOX00008510)].**

Response to PPFF 375:

Unsupported in part.  The May 31, 1979 EPA final rule published in 44 Fed. Reg. 31514 authorized the use of existing CCP containing PCBs.  Roach Decl., Ex. 222 [May 31, 1979 Rule, 44 Federal Register 31,514, at 31,535].  However, it is not the use authorization, but TSCA itself, that prohibits the manufacturing, processing and distribution in commerce of PCBs in commerce unless EPA grants an authorization or exemption.  *See* 15 U.S.C. § 6205(e)(2)-(3).

**PPFF 376:  In 1979, the American Paper Institute petitioned the EPA for a class exemption to permit the recycling of PCB-containing paper.  Roach Decl., Ex. 221 [Aug. 24, 2009 Supplemental Rebuttal Report of M. Williams at 2].**

Response to PPFF 376:

<u>Unsupported and inadmissible</u>. In support of PPFF 376 Plaintiffs cite only Exhibit 221, the Supplemental Rebuttal Report of Marcia Williams which states that the American Paper Institute ("API") filed a class exemption petition for recycling wastepaper containing PCBs. The proper evidentiary support for PPFF 376 is the actual petition filed by API, and not Ms. Williams's characterization of the petition.

**PPFF 377: EPA did not authorize the recycling of paper containing PCBs until 1984, when it acted on the American Paper Institute's petition for a specific use authorization, and also imposed a discharge limit of 3 ppb. Roach Decl., Ex. 223 [July 10, 1984 Rule, 49 Federal Register 28172 (GPFOX00102564)]; Ex. 221 [Aug. 24, 2009, Supplemental Rebuttal Report of M. Williams at 3].**

Response to PPFF 377:

<u>Immaterial</u>. The United States' expert witness in this case, Jay Brigham, opined that: "[w]hen EPA did promulgate PCB rules in 1979, recycled paper was exempt from the rules, so as not to undermine recycling efforts." PJF Decl. Ex. 78 [Brigham Expert Report] at 2; Ex. 79 [Aug. 21, 2009 J. Brigham Depo. Excerpts] at 74:3-4 ("by 1979, when the rules are issued, there is an exemption for recycling"). The United States also confirmed that the 1979 use authorization allowed for the continuation of CCP recycling activity in its September 30, 2009 Response Brief. *See* Doc. #649 at 9-10 (referring to the 1979 rule and stating that "[w]ith regard to PCBs contained in remaining CCP, EPA determined that the continuation of recycling activity 'does not present an unreasonable risk' of injury to human health or the environment.").

The alleged fact is immaterial in any event and does not preclude summary judgment. Whether the recycling of paper containing PCBs was authorized by EPA in 1979, or whether it was authorized in 1984 (and permitted until 1984 by EPA's pronouncement that any activity underway before July 1, 1979 could continue so long as the relevant petition was properly filed, *see* 48 Fed. Reg. at 55,090), EPA was aware of and analyzed the risk of recycling paper containing CCP and determined that permitting such recycling yielded environmental benefits and would not present an "unreasonable risk of injury to health or the environment." Roach Decl., Ex. 223 [July 10, 1984 Rule, 49 Federal Register 28,172 at 28,180]; Roach Decl., Ex. 224 [June 27, 1988 Rule, 53 Federal Register 24,206 at 24,215].

**PPFF 378: Throughout the 1970s and 1980s, a number of Defendants routinely exceeded the 3 ppb PCB discharge limit set by EPA. K. Roach Decl., Ex. 226 [Summary of Department Hearings to Consider Effluent Standards for PCBs Held on August 28-29, 1975 (NCR-FOX-475447) at NCR-FOX-475448)]; Ex. 227 [NR 101 Summary Report (NCR-FOX-0328207)].**

Response to PPFF 378:

<u>Unsupported and immaterial</u>. PPFF 378 is unsupported by the documents cited in support, which do not support the existence of a 3 ppb PCB discharge limit set by EPA. To the contrary, the summary of the 1975 hearings discusses a proposed limit of 5 ppb by the State of Wisconsin, which was never applied by Wisconsin to paper recyclers. The cited documents contain limited information on discrete testing for certain of the Defendants, as well as annual

summary data for some of the Defendants. As a result, neither of these documents support the statement that "a number of Defendants routinely exceeded" any particular level of PCB discharge. Moreover, the summary contained in NCR-FOX-475447 is inadmissible under Fed. R. Evid. 802 because it is hearsay.

The alleged fact is in any event immaterial and does not preclude summary judgment because Defendants' continued recycling was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.

**PPFF 379: In 1988, EPA limited PCB discharges from recyclers to either 3 ppb or an equivalent mass discharge amount, in part because EPA recognized that most local governments were imposing limits stricter than 3 ppb. Roach Decl., Ex. 224 [June 27, 1988 Rule, 53 Federal Register 24206 (NCR-FOX-0574353)]; Ex. 225 [July 8, 1987 Proposed Rule, 52 Federal Register 25838 (NCR-FOX-0574330)]; Ex. 221 [Aug. 24, 2009, Supplemental Rebuttal Report of M. Williams at 4].**

Response to PPFF 379:

Unsupported and immaterial. The action taken by EPA in 1988 was to retain the limit for PCB discharges to 3 ppb and to add the option of complying with a mass-based limit and was due not to stricter local requirements, but because of "the present status of some state NPDES permits and the foreseeable delays in implementing state revisions of water quality standards." Roach Decl., Ex. 224 [June 27, 1988 Rule, 53 Fed. Reg. 24,206 at 24,209].

The alleged fact is immaterial in any event and does not preclude summary judgment, as EPA's motivation in retaining a 3 ppb limit or an equivalent mass discharge for PCBs is unrelated to Phase I, which addresses which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. Moreover, Defendants' continued recycling of PCB-containing wastepaper was promoted by the government because its minor and diminishing risk was outweighed by the benefits of continued paper recycling.

**PPFF 380: In considering whether to allow recycling of paper containing PCBs, the government sought to promote recycling and limit PCB releases to waterbodies, "EPA looked for solutions *that maximized both goals* to the extent practicable. EPA did not see this as a trade-off since neither goal eclipsed the other." Roach Decl., Ex. 221 [Aug. 24, 2009, Supplemental Rebuttal Report of M. Williams at 1].**

Response to PPFF 380:

Undisputed but immaterial. As Ms. Williams' report notes EPA "saw its role as a dual role – to encourage recycling and to protect public health and the environment." It is undisputed and immaterial to Phase I that EPA sought to protect public health and the environment and to limit PCB releases. What is material is that when faced with these two goals, EPA permitted the recycling of paper containing PCBs and acknowledged that "[r]ecycling old products yields both environmental and economic benefits since that practice conserves natural resources, reduced

energy use and reduces solid waste generation."  Roach Decl., Ex. 224 [June 27, 1988 Rule, 53 Fed. Reg. 24,206, 24,215.

**PPFF 381:  During state hearings held in 1975 to consider prohibiting the discharge of PCBs in effluent or limiting PCB discharges to 5 ppb, WDNR official Stanton Kleinert stated that most pulp and paper mills which recycle papers are discharging less than 5 ppb PCBs.  K. Roach Decl., Ex. 226 [Summary of Department Hearings to Consider Effluent Standards for PCBs Held on August 28-29, 1975 (NCR-FOX-475447) at NCR-FOX-475448)].**

Response to PPFF 381:

Unsupported in part and immaterial.  Exhibit 226, the Summary of Department Hearings to Consider Effluent Standards for PCBs Held on August 28-29, 1975, does state that "most pulp and paper mills which recycle papers are discharging less than 5 ppb PCBs," but there is no indication that the statement was made during the hearings by WDNR official Stanton Kleinert; instead it simply appears that Mr. Kleinert prepared the written summary of the hearing.

The alleged fact is immaterial in any event and does not preclude summary judgment, because whether most recycling mills discharged less than 5 ppb in 1975 is unrelated to Phase I, which concerns the knowledge of the parties to this litigation.  Moreover, Defendants' continued recycling of PCB-containing wastepaper was promoted by the government because its minor and diminishing risk was outweighed by the benefits of continued paper recycling.

**PPFF 382:  In 1975, WDNR official Stanton Kleinert noted that PCB discharges from Bergstrom and Fort Howard were "exceeding 5 ppb in most samples."  K. Roach Decl., Ex. 226 [Summary of Department Hearings to Consider Effluent Standards for PCBs Held on August 28-29, 1975 (NCR-FOX-475447) at NCR-FOX-475448)].**

Response to PPFF 382:

Unsupported and immaterial.  PPFF 382 mischaracterizes the document cited in support (NCR-FOX-475447).  The test results contained in Table 1 of the document consists only of results from WDNR's testing program.  The highest number of test results presented for any Defendant is for Bergstrom, and only eight test dates are provided.  Based on these limited results, it is misleading to suggest out of context that either of the Defendants were exceeding any particular level of discharges "in most samples."

The alleged fact is in any event immaterial and does not preclude summary judgment because by the time Fort Howard and Bergstrom learned that PCBs were in their effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Moreover, Defendants' continued recycling of PCB-containing wastepaper was promoted by the government because its minor and diminishing risk was outweighed by the benefits of continued paper recycling.

**PPFF 383:  In 1975, WDNR praised a recycling mill, the Sterling Mill of the Brown Paper for having PCB levels well below 5 ppb, despite using 100 percent recycled fiber, and noted its "outstanding wastewater treatment system with exceptional solids removal."  K.**

**Roach Decl., Ex. 226 [Summary of Department Hearings to Consider Effluent Standards for PCBs Held on August 28-29, 1975 (NCR-FOX-475447) at NCR-FOX-475448)].**

Response to PPFF 383:

Undisputed but immaterial.  The wastewater treatment system of Sterling Mill of the Brown Paper, a non-party to this litigation, is immaterial and does not preclude summary judgment, as it is unrelated to this litigation.

**PPFF 384:  Most defendants, including Bergstrom, had inadequate wastewater treatment to control the discharge of PCBs to the Lower Fox River.  Roach Decl., Ex. 140 [Aug. 7, 2009 Report of J. Braithwaite at 6, 15-20].**

Response to PPFF 384:

Unsupported and immaterial.  PPFF 384 relies solely upon the expert report of Plaintiffs' expert Braithwaite, which report mischaracterizes documents in the record.  In his report, Defendants' wastewater treatment expert Davis Ford states that:

> Before 1972, each Mill employed wastewater treatment methods that were reasonable and appropriate for the pulp and paper industry at that time. While each of the Mills was at a different stage of developing its wastewater treatment system prior to 1972, each of the Mills was within the standard of care for the industry at that time.

The alleged fact is in any event immaterial because the report of Mr. Braithwaite addresses the Defendants' actions before they had knowledge, and is therefore immaterial to Phase I, which addresses the issues in this Court's CMO of which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  The alleged fact is also immaterial because by the time Defendants learned that PCBs were in their effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  Moreover, Defendants' continued recycling of PCB-containing wastepaper was promoted by the government because its minor and diminishing risk was outweighed by the benefits of continued paper recycling.

**PPFF 385:  There is no evidence that NCR recycled any PCB-containing CCP broke.**

Response to PPFF 385:

Undisputed in part.  PPFF 385 is undisputed in that Defendants do not dispute that NCR was not a recycling mill and did not recycle its own wastepaper.  However, after its acquisition of ACPC in 1970, NCR sold broke for recycling through 1971.  *See* Defendants' Reply to Plaintiffs' Response to Defendants' Proposed Findings of Fact at ¶ 74.

**PPFF 386: Fort Howard's actions after 1972 contributed additional PCBs to the Lower Fox River at a time when governmental entities were trying to reduce all new loadings of PCBs to the river. Roach Decl., Ex. 17 [June 4, 2009 Report of M. Williams at 85].**

Response to PPFF 386:

Unsupported and immaterial. PPFF 386 relies solely upon the expert report of Plaintiffs' expert Braithwaite, which report mischaracterizes documents in the record. In his report, wastewater treatment expert Davis Ford states that: "Fort Howard employed reasonable and appropriate wastewater treatment methods from the 1950s through the 1980s. Fort Howard's wastewater treatment practices were consistent with industrial practices for the time." **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

The alleged fact is in any event immaterial and does not preclude summary judgment because Defendants' continued recycling of PCB-containing wastepaper was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling. It is also immaterial to Phase I, which addresses which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper. The alleged fact is also immaterial because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper. In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time. **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

PPFF 387: Neenah Menasha Sewerage Commission delayed bringing its treatment system into compliance with state standards and this delay allowed untold millions of pounds of PCB containing suspended solids to be discharged into the Fox River. Roach Decl., Ex. 140 [Aug. 7, 2009 Report of J. Braithwaite at 28].

Response to PPFF 387:

Unsupported. To the extent that there were any delays by Neenah Menasha Sewerage Commission ("NMSC"), these delays were beyond the control of NMSC. **Supp. JEF Decl. Ex. 28 [November 28, 1972 letter from Robert Bues to EPA] [NMSC-FOX-000178-185]; Ex. 29 [July 2009 Expert Report of D. Ford at 29].** James Braithwaite's estimate of discharges to the Fox River of "untold millions of pounds of PCB containing suspended solids" is unsupported and misleading. Braithwaite offers no support for this proposition in his report or deposition. First, the United States estimates that only approximately 700,000 pounds of PCBs were discharged to the entire Lower Fox River. **Supp. JEF Decl. Ex. 15 [WDNR Technical Memorandum 2d at 1][NMSC_FOX_007988-8115].** Second, suspended solids and PCBs do not correlate on a 1:1 basis; instead 1 pound of secondary suspended solids is equal to .000045 pounds of PCBs. **Supp. JEF Decl. Ex. 30 [Aug. 18, 2009 D. Ford Dep. 198:20-199:7].** Lastly, up to 98% of PCBs settle out in pretreatment or primary treatment and are not discharged to the

River.  **Supp. JEF Decl. Ex. 30 [Aug. 18, 2009 D. Ford Dep. 163:15-24]; Ex. 29 [July 2009 Expert Report of D. Ford at 6.]**

**PPFF 388:  Even as late as 1985, when it was still discharging "40-50 lbs. [of PCBs] per year" into the Fox River, Fort Howard publicly maintained that, "[a] closer examination of the PCB issue leads one to conclude that they are not as dangerous as some people believe."  Roach Decl., Ex. 251 [Closing Remarks by D. DeMeuse (GPFOX00016084), at p. 7].**

Response to PPFF 388:

Unsupported and immaterial.  PPFF mischaracterizes the document cited in support (GPFOX00016084), which states that "***according to the DNR***, Fort Howard has an ***estimated*** PCB discharge of between 40-50 lbs. per year." *Id.* (emphasis added).  The quote above is taken out of context, and in its entirety reads: "I don't intend to defend PCB's, nor will I attempt to persuade you that PCB's are simply benign.  However, a closer examination of the PCB issue leads one to conclude that they are not as dangerous as some people believe." *Id.*

The alleged fact is in any event immaterial and does not preclude summary judgment because Defendants' continued recycling of PCB-containing wastepaper was promoted by the government and resulted in only minor and diminishing risks that were outweighed by the benefits of continued paper recycling.  It is also immaterial to Phase I, which addresses which party "knew, or should have known, that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage" and which party was "in the best position to know about possible [PCB] contamination" resulting from the recycling of NCR-brand carbonless copy paper.  The alleged fact is also immaterial because by the time Fort Howard learned that PCBs were in its effluent, PCBs were no longer being added to NCR Paper and were only present in minor and diminishing amounts in post-consumer paper.  In addition, Fort Howard employed reasonable and appropriate wastewater treatment systems at this time.  **Supp. JEF Decl. Ex. 29 [July 2009 Expert Report of D. Ford at 16].**

**PPFF 389:  At a WDNR hearing on PCBs, the Wisconsin Paper Council, a paper trade organization to which several Defendants belonged, testified:**

> **Aroclor 1242 used in the manufacture of carbonless copy paper has significantly different structural constituent characteristics, whereby its stability and persistence are less and its degradability appears to be significantly higher than its comparatively more highly chlorinated Aroclor relatives . . . . [B]ased on studies reviewed by us, it is not Aroclor 1242, the carbonless paper Aroclor, which has commonly been found in large concentrations in commercial fish.**

**Roach Decl., Ex. 64 [August 28-29, 1975 WDNR Hearing Transcript (NCR-FOX-0096936)].**

Response to PPFF 389:

Underlined in part and immaterial. That the statement in PPFF 389 was made by the Wisconsin Paper Council at a WDNR hearing is undisputed; however, Exhibit 64, the August 28-29, 1975 WDNR Hearing Transcript does not support that several Defendants belonged to the Wisconsin Paper Council. The alleged fact is immaterial in any event and does not preclude summary judgment, because it is undisputed that Dr. Vodden testified that during a 1969 meeting that he informed Martin Kelly of NCR that the components of Aroclor 1242 were persistent and would bioaccumulate, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. *See* Doc. #659 [Pls.' Response to PFOF] at ¶ 66. Moreover, Monsanto explained to NCR that Aroclor 1242 was a mixture that included higher chlorinated isomers. AMH Decl. Ex. 26 [Aug. 26, 2009 C. Paton Depo. Excerpts] at 59:4-13; Ex. 27 [P.K. Maier's Meeting Notes]. Monsanto further explained to NCR that Aroclors 1254 and 1260 found in the environment could actually be Aroclor 1242 due to the degradation process of Aroclor 1242. **[Supp. JEF Decl.] Ex. 13 [Aug. 19, 2009 E. Tucker Depo. Excerpt at 66:22-67:13].**

**PPFF 390: In April 1972, an article in Environmental Health Perspectives acknowledged that there continued to be significant gaps in knowledge concerning PCBs and the environment: "Evaluation of the long-term effects of the accumulation of PCBs and of the change in use patterns and production will require the development of environmental transport models more sophisticated than those currently in use, together with the requisite data." Roach Decl., Ex. 252 [April 1972 Article in Environmental Health Perspectives (NCR-FOX-372820), at p. 34].**

Response to PPFF 390:

Immaterial. *See* Defendants' Response to PPFF 389.

Dated: October 19, 2009                                    Respectfully Submitted,

                                                           ____/s/ Karl S. Lytz_____
                                                           Karl S. Lytz
                                                           Ernest J. Getto
                                                           CA Bar No. 55662
                                                           Karl S. Lytz
                                                           CA Bar No. 110895
                                                           Andrea M. Hogan
                                                           CA Bar No. 238209
                                                           Patrick J. Ferguson
                                                           CA Bar No. 252778
                                                           Jayni E. Foley
                                                           CA Bar No. 258261
                                                           Latham & Watkins LLP
                                                           505 Montgomery St., Ste. 2000
                                                           San Francisco, CA 94111-6538
                                                           Telephone: (415) 391-0600
                                                           Fax: (415) 395-8095

Ernie.Getto@lw.com
Karl.Lytz@lw.com
Andrea.Hogan@lw.com
Patrick.Ferguson@lw.com
Jayni.Foley@lw.com

Mary Rose Alexander
IL Bar No. 6205313
CA Bar No. 143899
Margrethe K. Kearney
IL Bar No. 6286559
Latham & Watkins LLP
233 S. Wacker Dr.
Ste. 5800
Chicago, IL 60606
Telephone: (312) 872-7700
Facsimile: (312) 993-9767
Mary.Rose.Alexander@lw.com
Margrethe.Kearney@lw.com