IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

APPLETON PAPERS INC. and
NCR CORPORATION,

     Plaintiffs,

     v.                             No. 08-CV-16-WCG

GEORGE A. WHITING PAPER COMPANY, et al.,

     Defendants.

---

NCR CORPORATION,

     Plaintiff,

     v.                             No. 08-CV-0895-WCG

KIMBERLY-CLARK CORPORATION, et al.,

     Defendants.

---

**PLAINTIFFS' REPLY TO CERTAIN DEFENDANTS'
RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
PLAINTIFFS' RESPONSE TO CERTAIN DEFENDANTS' PROPOSED
FINDINGS OF FACT REGARDING PLAINTIFFS'  MOTION FOR
SUMMARY JUDGMENT ON PHASE I**

---

     Plaintiffs NCR Corporation ("NCR") and Appleton Papers Inc. ("API"), by their undersigned counsel, pursuant to Civil Local Rule 56.2(b)(1), submit the following reply to Certain Defendants' responses to Plaintiffs' proposed findings of fact and response to Defendants' proposed findings of fact regarding Plaintiffs' motion for summary judgment on Phase I (Doc. #657).

### A.       Parties, Jurisdiction and Venue.

     **PPFF 1:**     API is a Delaware corporation with its principal place of business in Appleton, Wisconsin. Complaint, Case No. 08-CV-16-WCG, at ¶ 7.

     **Defendants' Response to PPFF 1:**     Admit.

1

**Plaintiffs' Reply to PPFF 1:** **Undisputed.**

**PPFF 2:** NCR is a Maryland corporation with its principal place of business in Dayton, Ohio. Complaint, Case No. 08-CV-16-WCG, at ¶ 8; Complaint, Case No. 08-CV-895-WCG, at ¶ 7.

**Defendants' Response to PPFF 2:** Admit.

**Plaintiffs' Reply to PPFF 2:** **Undisputed**.

**PPFF 3:** Defendants are identified in the original and amended complaints filed in Case No. 08-CV-16-WCG and Case No. 08-CV-895-WCG.

**Defendants' Response to PPFF 3:** Admit.

**Plaintiffs' Reply to PPFF 3:** **Undisputed**.

**PPFF 4:** This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. §913(b), and 28 U.S.C. § 1331 (federal question). Complaint, Case No. 08-CV-16-WCG, at ¶ 5; Complaint, Case No. 08-CV-895-WCG, at ¶ 5.

**Defendants' Response to PPFF 4:** Admit.

**Plaintiffs' Reply to PPFF 4:** **Undisputed**.

**PPFF 5:** Venue is proper in this District pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 913(b), and 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims, including the alleged releases of hazardous substances, occurred in this District and the Lower Fox River is located entirely within this District. Additionally, Defendants conducted business or operations within this District at times relevant to the events described in the Plaintiffs' Complaints. Complaint, Case No. 08-CV-16-WCG, at ¶ 6; Complaint, Case No. 08-CV-895-WCG, at ¶ 6.

2

**Defendants' Response to PPFF 5:**    Admit.

**Plaintiffs' Reply to PPFF 5:**    **Undisputed.**

### B.    Carbonless Paper.

**PPFF 6:**    NCR invented carbonless paper in 1953. Declaration of Ronald R. Ragatz ("Ragatz Dec.") at ¶ 2, Ex. A (Plaintiff NCR Corporation's December 19, 2008 Responses to Defendant P.H. Glatfelter Company's First Set of Interrogatories ("Interrogatory Response") No. 1).

**Defendants' Response to PPFF 6:**    Deny. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Plaintiff NCR Corporation's December 19, 2008 Responses to Defendant P.H. Glatfelter Company's First Set of Interrogatories No. 1 states "NCR states that it used an emulsion containing Aroclor 1242 in the manufacture of NCR Paper brand carbonless copy paper beginning in 1953/54 and ending in April 1971." The evidentiary material does not state when carbonless paper was invented.

**Plaintiffs' Reply to PPFF 6:**    **Defendants' response creates no genuine dispute because they have cited no record evidence to refute a finding that NCR invented carbonless copy paper in 1953/54.** Moreover, evidence previously submitted to the Court provides additional evidentiary support for this proposed finding of fact. *See* Declaration of Kathleen L. Roach, Doc. #666, Ex. 14 (June 5, 2008 Report of W. Moore) at 8 ("In the mid-1950s, NCR Corporation developed a carbonless copy paper system called NCR Paper.").

**PPFF 7:**    In its simplest form, carbonless paper involved two sheets of paper, a top sheet with coating on the back and a bottom sheet with coating on the front. Id. at ¶

3

3, Ex. B (Deposition of Jerome Bodmer ("Bodmer Dep.") at 17-18); Id. at ¶ 4, Ex. C (Deposition of Dale Schumaker ("Schumaker Dep.") at 20).

**Defendants' Response to PPFF 7:**     Admit.

**Plaintiffs' Reply to PPFF 7:  Undisputed.**

**PPFF 8:**     The top sheet was coated with an emulsion consisting of microscopic gelatin capsules containing dye dissolved in a solvent. Id. at ¶ 3, Ex. B (Bodmer Dep. at 20-21); Id. at ¶ 5, Ex. D (Deposition of Ronald Jezerc ("Jezerc Dep.") at 34); Id. at ¶ 4, Ex. C (Schumaker Dep. at 75).

**Defendants' Response to PPFF 8:**     Admit.

**Plaintiffs' Reply to PPFF 8:   Undisputed.**

**PPFF 9:**     The original solvent in the microcapsules was a formulation of polychlorinated biphenyl ("PCB") sold by Monsanto as Aroclor 1242. Id. at ¶ 3, Ex. B (Bodmer Dep. at 30); Id. at ¶ 5, Ex. D (Jezerc Dep. at 34, 56).

**Defendants' Response to PPFF 9:**     Admit.  However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. The deposition testimony of Jerome Bodmer at page 30 states:

> Q:     Do you know today who the manufacturer of the Aroclor was back in the 1960s?
>
> A:     I just - - I don't remember. Recollection, might have been Monsanto. I'm not sure.

Ragatz Decl. Ex. B [Mar. 16, 2009 J. Bodmer Depo Excerpts] at 30.

This deposition testimony does not confirm that the "original solvent in the microcapsules was a formulation of polychlorinated biphenyl ("PCB") sold by Monsanto . . ."

**Plaintiffs' Reply to PPFF 9:** **Undisputed.** Defendants have offered equivalent proposed findings in support of one of their summary judgment motions. *See* Certain Defendants [Proposed] Findings of Fact and conclusion of Law (Doc. #587). ¶¶ 21-22 ("[Monsanto] manufactured a PCB called Aroclor 1241 . . . . NCR used Arocolor 1242 as a solvent to suspend dyes inside the carbonless copy paper ("CCP") emulsion capsules . . .")

**PPFF 10:** Impact on the front of the top sheet (e.g., by typewriter key or pen) would rupture the capsules on the back of that sheet and release the dye that reacted with the coating on the front of the bottom sheet, thereby creating a copy of whatever was typed or written. Id. at ¶ 3, Ex. B (Bodmer Dep. at 20-21); Id. at ¶ 6, Ex. E (Deposition of William Goetz ("Goetz Dep.") at 103, 157).

**Defendants' Response to PPFF 10:** Admit.

**Plaintiffs' Reply to PPFF 10:** **Undisputed.**

**C.** **Production Of Carbonless Paper During The Time PCBs Were Used.**

**PPFF 11** Commercial production and sale of carbonless paper began in 1954. Id. at ¶ 2, Ex. A (Interrogatory Response No. 1).

**Defendants' Response to PPFF 11:** Admit.

**Plaintiffs' Reply to PPFF 11:** **Undisputed.**

**PPFF 12:** NCR manufactured the emulsion. Id. at ¶ 6, Ex. E (Goetz Dep. at 40).

**Defendants' Response to PPFF 12:** Admit.

**Plaintiffs' Reply to PPFF 12:** **Undisputed.**

**PPFF 13:** NCR contracted with certain companies to apply the emulsion and other coatings to the paper. Id. (Goetz Dep. at 38, 290-91); Id. at ¶ 7, Ex. F (Deposition of Floyd Strelow ("Strelow Dep.") at 116-117); Id. at ¶ 5, Ex. D (Jezerc Dep. at 124).

**Defendants' Response to PPFF 13:** Admit.

**Plaintiffs' Reply to PPFF 13: Undisputed.**

**PPFF 14:** One such company was Appleton Coated Paper Company ("ACPC"), a specialty paper coater based in Appleton, Wisconsin. Id. at ¶ 6, Ex. E (Goetz Dep. at 38).

**Defendants' Response to PPFF 14:** Admit.

**Plaintiffs' Reply to PPFF 14: Undisputed.**

**PPFF 15:** NCR sold the emulsion to ACPC and ACPC sold the coated paper back to NCR. Id. (Goetz Dep. at 38, 79); Id. at ¶ 5, Ex. D (Jezerc Dep. at 109).

**Defendants' Response to PPFF 15:** Admit. However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. None of the cited materials support that "ACPC sold the coated paper back to NCR."

**Plaintiffs' Reply to PPFF 15: Undisputed.** Plaintiffs contest that the proposed finding of fact is defective under L.R. 56.2(a).

**PPFF 16:** NCR marketed and sold the finished carbonless paper to its customers. Id. at ¶ 6, Ex. E (Goetz Dep. at 294).

**Defendants' Response to PPFF 16:** Admit.

**Plaintiffs' Reply to PPFF 16: Undisputed.**

**PPFF 17:** The use of PCBs in carbonless paper ended in the spring of 1971. *Id.* at ¶ 2, Ex. A (Interrogatory Response No. 1); Id. at ¶ 9, Ex. H (NCR-FOX 0162136-0162137).

**Defendants' Response to PPFF 17:** Deny. PPFF 17 is vague and requires greater specificity. Per Ragatz Decl. Exs. A (Interrogatory Response No. 1) and H (NCR-FOX 0162136-0162137) cited by Plaintiffs, NCR stopped using PCBs in CCP in April 1971. However, WT stopped using PCBs in CCP almost a year earlier, in July 1970. See AMH Decl. Ex. 1 [Report on Apr. 28, 1970 Conversation with WT] (WT stating that the UK Ministry of Technology approved the step taken by WT to decide to make the switch from Aroclor to an alternative solvent); Ex. 2 [Monsanto Performance Review 1970 Objectives] (stating that Aroclor 1242 had been replaced in NCR paper coating in the UK by July 1970).

**Plaintiffs' Reply to PPFF 17:** **Defendants' response creates no genuine dispute because they have cited no record evidence to refute a finding that neither NCR nor ACPC used Aroclor 1242 in carbonless copy paper after April 1971.** Moreover, evidence previously submitted to the Court provides additional evidentiary support for this proposed finding of fact. *See* Declaration of Kathleen L. Roach, Doc. #676, Ex. 56 [Dec. 7, 1972 Monsanto Letter (GPFOX00049252-GPFOX00049258) at 2] ("Replacement of PCBs in the carbonless copy paper application began in the third quarter of 1970 and sales were ended in early 1971.").

The remainder of the response is immaterial to the proposed finding of fact and will therefore not be addressed.

### D. ACPC Corporate History.

**PPFF 18:**     ACPC was incorporated in 1907 and remained a separate corporate entity throughout the time that PCBs were used in carbonless paper. *Id*. at ¶ 10, Ex. I (NCR-FOX 0090101-113).

**Defendants' Response to PPFF 18:**     Deny. In PPFF 17, Plaintiffs state "The use of PCBs in carbonless paper ended in the spring of 1971." In PPFF 22, Plaintiffs state "On or about September 30, 1970, The National Cash Register Company acquired Appleton Coated Paper Company, making it a wholly owned subsidiary." Therefore, between September 30, 1970 and the spring of 1971, when PCBs were still used in carbonless copy paper, NCR owned ACPC.

**Plaintiffs' Reply to PPFF 18:     Defendants' response creates no genuine dispute because they have cited no record evidence disputing a finding that ACPC remained a separate corporate entity from NCR throughout the time that PCBs were used in NCR carbonless copy paper.** That ACPC became a wholly owned subsidiary of the National Cash Register Company on or about September 30, 1970 does not alter that fact.

**PPFF 19:**     Through most of that time, NCR had no ownership interest in ACPC. *Id.* (NCR-FOX 0090101-13).

**Defendants' Response to PPFF 19:**     Admit.

**Plaintiffs' Reply to PPFF 19:     Undisputed.**

**PPFF 20:**     NCR and ACPC simply had a contractual business relationship. *Id.* at ¶ 6, Ex. E (Goetz Dep. at 38).

**Defendants' Response to PPFF 20:** Deny. PPFF 20 is vague because it does not provide a time period during which "NCR and ACPC simply had a contractual business relationship." Per PPFF 22, "On or about September 30, 1970, The National Cash Register Company acquired Appleton Coated Paper Company, making it a wholly owned subsidiary." Thus, after September 30, 1970, NCR and ACPC did not simply have a contractual business relationship — instead, NCR owned ACPC after September 30, 1970.

Additionally, there were intensive technical exchanges and a close working relationship between NCR, ACPC, Mead Corporation ("Mead"), and Wiggins-Teape ("WT"). See generally Declaration of Jayni E. Foley ("JEF Decl."), Ex. 1, which is a compilation of all communications and meetings between NCR, ACPC, WT, Mead and other companies during the time frame between 1953 through 1971.

**Plaintiffs' Reply to PPFF 20: Defendants' response creates no genuine dispute because they have cited no record evidence disputing a finding that ACPC and NCR simply had a contractual business relationship throughout most of the time that PCBs were used in carbonless copy paper.** For example, defendants offer no evidence to indicate that ACPC was a licensee of NCR (as was Wiggins Teape). Further, Defendants' assertion that "there was intensive technical exchanges and a close working relationship between NCR, ACPC, Mead Corporation ("Mead") and Wiggin-Teape ("WT") is not supported by competent evidence. The document cited to support this assertion — Exhibit 1 to the Declaration of Jayni Foley — is an argumentative, one-sided chart prepared by Defendants' attorneys and provides no evidentiary basis for a finding of fact. See Responses 63-87 to Defendants' Proposed Additional Findings of Fact.

### E.    NCR Corporate History.

**PPFF 21:**    In September 1969, The National Cash Register Company acquired Combined Paper Mills, Inc., which became its wholly-owned subsidiary. *Id.* at ¶ 10, Ex. I (NCR-FOX 0090101-113).

**Defendants' Response to PPFF 21:**    Admit.  However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact.    Ragatz Decl., Ex. I, NCR-FOX 0090101-113 states "1969 . . . The National Cash Register Company acquired Combined Paper Mills, Inc." [NCR-FOX-0090102], "Combined Paper Mills, Inc., acquired by the National Cash Register Company," [NCR-FOX-0090111], and "NCR Corporation acquired Combined Paper Mills in 1969," [NCR-FOX-0090112].   The evidentiary material cited does not state that the acquisition occurred in September, and instead only refers to 1969 generally.

**Plaintiffs' Reply to PPFF 21:**    Undisputed.

**PPFF 22:**    On or about September 30, 1970, The National Cash Register Company acquired Appleton Coated Paper Company, making it a wholly owned subsidiary. *Id.* (NCR-FOX 0090101-13).

**Defendants' Response to PPFF 22:**    Admit.

**Plaintiffs' Reply to PPFF 22:    Undisputed.**

**PPFF 23:**    On or about June 21, 1971, The National Cash Register Company created Appleton Papers, Inc. as a subsidiary by merging ACPC and Combined Paper Mills, Inc. *Id.* (NCR-FOX 0090101-13).

**Defendants' Response to PPFF 23:**    Admit.

**Plaintiffs' Reply to PPFF 23:** Undisputed.

**PPFF 24:** Appleton Papers, Inc. was a wholly-owned subsidiary of The National Cash Register Company. *Id*. (NCR-FOX 0090101-13).

**Defendants' Response to PPFF 24:** Admit.

**Plaintiffs' Reply to PPFF 24:** Undisputed.

**PPFF 25:** Effective as of January 1, 1973, Appleton Papers, Inc. merged into The National Cash Register Company, and became known as the Appleton Papers Division of The National Cash Register Company. *Id.* (NCR-FOX 0090101-13).

**Defendants' Response to PPFF 25:** Admit.

**Plaintiffs' Reply to PPFF 25:** Undisputed.

**PPFF 26:** On or about May 10, 1974, The National Cash Register Company changed its name to NCR Corporation ("NCR"), a Maryland corporation, which is one of the Plaintiffs in this action. Id. (NCR-FOX 0090101-13).

**Defendants' Response to PPFF 26:** Admit. However, the proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Ragatz Decl. Ex I, NCR-FOX 0090101-13, states that on April 17, 1964 "The National Cash Register changed its name to NCR Corporation." NCR-FOX 0090101-13 does not refer to this event occurring "On or about May 10, 1974."

**Plaintiffs' Reply to PPFF 26:** Undisputed.

**F. API Corporate History.**

**PPFF 27:** In June 1978, NCR sold the assets of the Appleton Papers Division to Lentheric Inc. *Id*. (NCR-FOX 0090101-113).

**Defendants' Response to PPFF 27:**     Admit.

**Plaintiffs' Reply to PPFF 27:     Undisputed.**

**PPFF 28:**     Lentheric Inc. had no prior ownership affiliation with NCR or any prior interest in any of the Appleton Paper Divisions assets.  *Id.* at ¶ 10, Ex. I (NCR-FOX 0090101-113).

**Defendants' Response to PPFF 28:**     Admit.

**Plaintiffs' Reply to PPFF 28:     Undisputed.**

**PPFF 29:**     On or about June 30, 1978, Lentheric Inc. changed its name to Appleton Papers Inc. ("API"), which is one of the Plaintiffs in this action. *Id.* (NCR-FOX 0090101-113).

**Defendants' Response to PPFF 29:**     Admit.

**Plaintiffs' Reply to PPFF 29:     Undisputed.**

**PPFF 30:**     API is a different corporation than Appleton Papers, Inc. *Id.* (NCR-FOX 0090101-113).

**Defendants' Response to PPFF 30:**     Admit.

**Plaintiffs' Reply to PPFF 30:     Undisputed.**

## G.    106 Order.

**PPFF 31:**    In November 2007, the government issued a unilateral administrative order pursuant to CERCLA § 106 ("106 Order") to NCR and API, as well as six other recipients who are Defendants in this action. Id. at ¶ 11, Ex. J (106 Order).

**Defendants' Response to PPFF 31:**    Admit.

**Plaintiffs' Reply to PPFF 31:    Undisputed.**

**PPFF 32:**    The 106 Order states that NCR is liable as a successor to at least two corporate predecessors. *Id.* (106 Order, ¶ 7a.i).

**Defendants' Response to PPFF 32:**    Admit.

**Plaintiffs' Reply to PPFF 32:    Undisputed.**

**PPFF 33:**    The 106 Order likewise states that API is liable under CERCLA because it is a "successor" to companies that disposed of hazardous substances. Id. (106 Order, ¶ 7a.ii).

**Defendants' Response to PPFF 33:**    Deny. PPFF 33 is vague and incomplete. The Section 106 Order at ¶ 7a.ii states:

> Appleton Papers Inc. ("API") is a party that is liable for payment of response costs and performance of response activities at the Site because API is: (1) a successor to one or more corporate predecessors that, at the time of disposal of hazardous substances, owned and/or operated a facility at which such hazardous substances were disposed of, and from which there has been a release of hazardous substances to the Site; and (2) a successor to one or more corporate predecessors that by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances at a facility owned or operated by another party or entity and from which there has been a release of hazardous substances to the Site.

Thus, the Section 106 Order states that API is liable both because it is a successor to companies that disposed of hazardous substances from facilities they owned and/or

13

operated, and is a successor to companies that arranged for the disposal or treatment of hazardous substances.

**Plaintiffs' Reply to PPFF 33:** **Defendants' response creates no genuine dispute because they have cited no record evidence to refute a finding that the 106 Order states that API is liable under CERCLA because it is a "successor."**

**PPFF 34:** The 106 Order identifies the two corporate predecessors, ACPC and Combined Papers Mills, Inc. and their corporate history. *Id.* (106 Order, ¶ 7a.iv. and v).

**Defendants' Response to PPFF 34:** Deny. PPFF 34 does not provide a complete description of the corporate predecessors of Plaintiffs. ACPC, Combined Paper Mills, Inc. and Appleton Papers, Inc. were all predecessors to NCR. ACPC, Combined Paper Mills, Inc., Appleton Papers, Inc. and NCR were all predecessors to API. See Ragatz Decl., Ex. I [106 Order, ¶ 7]; PJF Decl., Ex. 3 [http://www.ncr.com/about_ncr/company_overview /history.jsp]; Ex. 4 [Appleton Papers Chronology].

**Plaintiffs' Reply to PPFF 34:** **Defendants' response creates no genuine dispute because they have cited no record evidence to refute a finding that the 106 Order identifies ACPC and Combined Papers Mills, Inc. as the two corporate predecessors and sets forth their corporate history.** The remainder of the response is immaterial to this proposed fact and will therefore not be addressed.

**PPFF 35:** The government does not state any basis for concluding that NCR is liable under CERCLA except as successor to ACPC and Combined Paper Mills, Inc. *Id.* at ¶ 11, Ex. J (106 Order, ¶ 7a.i).

**Defendants' Response to PPFF 35:** Admit.

**Plaintiffs' Reply to PPFF 35:** Undisputed.

**PPFF 36:** API is alleged to have liability solely as a "successor." *Id.* (106 Order, ¶ 7a.ii).

**Defendants' Response to PPFF 36:** Deny. API is not alleged to have liability solely as a "successor." The counterclaims of many of the Defendants allege API's liability as a current owner of the Appleton Facility. See Doc. #310 [Georgia-Pacific's Answer, Affirmative Defenses and Counterclaims to Plaintiffs' Seventh Amended Complaint] at ¶ 38; see also Doc. #298 [P.H. Glatfelter Company's Answer, Affirmative Defenses and Counterclaims to Plaintiffs' Seventh Amended Complaint] at ¶ 14.

**Plaintiffs' Reply to PPFF 36:** **Defendants' response creates no genuine dispute because they have cited no record evidence to refute a finding that the 106 Order alleges that API has liability solely as a "successor."** Further, Defendants' references to unsupported allegations in their pleadings are insufficient to create a disputed fact. *See* Rule 56(e)(2) (". . . an opposing party may not rely merely on allegations . . . in its own pleadings.")

**PPFF 37:** API did no business until 1978, seven years after the use of PCBs in carbonless copy had ceased. *Id.* at ¶ 10, Ex. I (NCR-FOX 0090101-113).

**Defendants' Response to PPFF 37:** Admit.

**Plaintiffs' Reply to PPFF 37:** Undisputed.

**PPFF 38:** Combined Paper Mills, Inc. conducted trial runs of CB coating on a limited basis for a short period of time when PCBs were used in making carbonless paper. Id. at ¶ 4, Ex. C (Schumaker Dep. at 44).

**Defendants' Response to PPFF 38:**     Deny.  The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Dale Schumaker's deposition testimony at page 44 states:

> Q:     Do you have any knowledge, prior to 1971, as to whether the CB Coating with the NCR emulsion was being applied at Combined Locks?
>
> A:     They were attempting to do it in the later, I don't know, '69, '70 time frame.  I'm not sure where the exact dates fall together because Combined Locks was purchased by NCR, and I don't know if the coating attempt came before that or after that.  I know they had a coater there. They were extremely unsuccessful with what they were trying to do.

Ragatz Decl., Ex. C [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 44.   Mr. Schumaker's testimony does not state that any trial runs of CB coating conducted by Combined Paper Mills, Inc. were conducted "on a limited basis for a short period of time."

**Plaintiffs' Reply to PPFF 38:**     **Defendants' response creates no genuine disputed fact.**  The cited testimony demonstrates that CB coating containing PCBs was used at the Combined Locks facility for only a brief period ("'69, '70 time frame") and that such usage was on a trial basis ("They were **attempting** to do it . . . [T]hey were extremely unsuccessful with what they were **trying** to do.")  (Emphasis added.)

## H.     ACPC Personnel.

**PPFF 39:**     Jerome Bodmer was an ACPC chemist. *Id*. at ¶ 3, Ex. B (Bodmer Dep. at 16).

**Defendants' Response to PPFF 39:**     Deny.  The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited

in support of this proposed finding of fact. Jerome Bodmer's deposition testimony at page 16 states:

> Q:    And during your entire time at Appleton Papers, regardless of how your title changed, basically you did tests or experiments or measurements concerning coatings that Appleton Coated Paper put on paper. Is that a fair summary?
>
> A:    Yes.

Ragatz Decl. Ex. B [Mar. 16, 2009 J. Bodmer Depo Excerpts] at 16.  The testimony discusses Jerome Bodmer's job responsibilities, but does not state that he was a chemist at ACPC.

**Plaintiffs' Reply to PPFF 39:     Defendants' response creates no genuine dispute as to a material fact because they have cited no record evidence to refute a finding that Mr. Bodmer was an ACPC chemist.**  For purposes of this motion, there is no dispute that Mr. Bodmer, irrespective of his title, "did tests or experiments on measurements concerning coatings that Appleton Coated Paper put on paper."

**PPFF 40:**     Dale Schumaker was ACPC's coatings manager. *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 17-18).

**Defendants' Response to PPFF 40:**     Admit.  However, PPFF 40 is vague and incomplete because it provides no time period for which Dale Schumaker was ACPC's coatings manager.  Dale Schumaker was also the plant manager at ACPC from 1971 through 1979, and served in various other positions thereafter.  AMH Decl. Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 256-57.

**Plaintiffs' Reply to PPFF 40:     Undisputed.**

**PPFF 41:**     Ron Jezerc was ACPC's research manager.  *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 15).

**Defendants' Response to PPFF 41:**   Admit.  However, PPFF 41 is vague and incomplete because it provides no time period for which Ron Jezerc was ACPC's research manager.

 **Plaintiffs' Reply to PPFF 41:**   Undisputed.

**PPFF 42:**   William Goetz was an ACPC chemist.  *Id.* at ¶ 6, Ex. E (Goetz Dep. at 26).

**Defendants' Response to PPFF 42:**   Admit. However, PPFF 42 is vague and incomplete because it provides no time period for which William Goetz was an ACPC chemist.

 **Plaintiffs' Reply to PPFF 42:**   Undisputed.

**PPFF 43:**   Floyd Strelow was ACPC's purchasing manager. *Id.* at ¶ 7, Ex. F (Strelow Dep. at 10-11).

**Defendants' Response to PPFF 43:**    Admit.  However, PPFF 43 is vague and incomplete because it provides no time period for which Floyd Strelow was ACPC's purchasing manager.

 **Plaintiffs' Reply to PPFF 43:**   Undisputed.

**PPFF 44:**   Donald Christensen was an ACPC employee in the purchasing department.  *Id.* at ¶ 8, Ex. G (Deposition of Donald Christensen ("Christensen Dep.") at 8).

**Defendants' Response to PPFF 44:**   Admit.  However, PPFF 44 is vague and incomplete because it provides no time period for which Donald Christensen was an ACPC employee in the purchasing department.

 **Plaintiffs' Reply to PPFF 44:**   Undisputed.

# I.    Role Of ACPC.

**PPFF 45:**    ACPC purchased the emulsion manufactured by NCR and it applied the coatings to the paper. Id. at ¶ 6, Ex. E (Goetz Dep. at 38-40); Id. at ¶ 5, Ex. D (Jezerc Dep. at 92).

**Defendants' Response to PPFF 45:**    Deny.   It is not clear whether ACPC purchased the emulsion directly from NCR or whether NCR provided the emulsion under some other form of accounting or contractual relationship. Ragatz Decl. Ex. E (Goetz Dep. at 78) ("We'd buy the materials as specified by NCR").

**Plaintiffs' Reply to PPFF 45:    Defendants' response creates no genuine dispute because they have cited no record evidence to refute a finding that ACPC purchased the emulsion manufactured by NCR and applied the coating to the paper.**   Plaintiffs' cited record evidence supports the proposed finding of fact.   *See* Ragatz Decl., Ex. E (Goetz Dep.) at 78 ("We would buy the capsule material from NCR.").

**PPFF 46:**    NCR marketed and sold the finished product to its customers. Id. at ¶ 6, Ex. E (Goetz Dep. at 294); *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 203-04).

**Defendants' Response to PPFF 46:**    Admit.  However, PPFF 46 is incomplete. Although ACPC operated as a contract coater, NCR had different arrangements with other companies, including a license arrangement in which Wiggins Teape marketed and sold the finished product. PJF Decl. Ex. 2 [NCR's Responses to GP's First Set of Interrogatories at ¶ 4]. Similar license arrangements may have existed with other companies in Japan and Canada. Id.

**Plaintiffs' Reply to PPFF 46:** **Undisputed.** Defendants' other factual assertions are irrelevant to the proposed finding.

**PPFF 47:** ACPC never manufactured the emulsion for carbonless paper when it contained PCBs. *Id*. at ¶ 6, Ex. E (Goetz Dep. at 38-40).

**Defendants' Response to PPFF 47:** Admit.

**Plaintiffs' Reply to PPFF 47: Undisputed.**

**PPFF 48:** ACPC did not control the chemical composition of the emulsion. *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 93).

**Defendants' Response to PPFF 48:** Deny. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. The deposition testimony of Ronald Jezerc on page 93 states:

> Q: And what were some of the issues in terms of handling that presented themselves?
>
> A: The capsules did not disintegrate in our coaters. They could handle in our color preparation. We were a facilitator. We were not a decision maker. NCR was the one who made the capsules. They had to make a decision on whether it handled all right.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 93.

The testimony is in the context of a discussion regarding experimental trials on compounds to replace PCBs in CCP. Id. at 92. The deposition testimony states that ACPC was not a decision maker in the context of these experimental trials, but does not directly support the statement that "ACPC did not control the chemical composition of the emulsion."

Moreover, there was a longstanding technical collaboration between ACPC and NCR, and the degree to which ACPC influenced the chemical composition of the

emulsion is not known. See JEF Decl., Ex. 1, [Chart: Communications Among ACPC, WT, And NCR].

**Plaintiffs' Reply to PPFF 48:** **Defendants' response creates no genuine dispute because Defendants admit in response to PPFF 49 that NCR controlled the capsule technology and did not want ACPC to learn how to make capsules.**

**PPFF 49:** NCR controlled the capsule technology and did not want ACPC to learn how to make capsules. *Id.* (Jezerc Dep. at 93, 108-09); *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 43, 242).

**Defendants' Response to PPFF 49:** Admit.

**Plaintiffs' Reply to PPFF 49:** Undisputed.

**PPFF 50:** ACPC did not know very much about the capsules because that was all controlled by NCR. *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 31, 43, 74, 242).

**Defendants' Response to PPFF 50:** Deny. PPFF 50 is incorrect and incomplete because it omits significant information shared between NCR and ACPC, including that:

- There was a longstanding technical collaboration between ACPC and NCR, evidenced by the many meetings, visits to facilities and letters exchanged between 1953 and 1971. See JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR].

- Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP. See generally JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212; Ex. 12 [Jan. 28, 2009 F. Heinritz Depo. Excerpts] at 45-49, 118-119; Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79; JEF Decl. Ex. 178 [May 10, 1968 Letter from T. Busch, ACPC to H.V. Lauer, NCR].

- By 1958, ACPC knew that the recycling broke caused the CCP capsules to rupture, discharging their contents. JEF Decl. Ex. 12 [Jan. 7, 1958 WT Letter to NCR & Attachment].

- By 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper. JEF Decl. Ex. 35 [WT Report on December 2-4, 1963 visit to ACPC] at 5-6 (Representatives from WT discussed Aroclor release from CCP capsules with John Reeve and Tom Busch of ACPC).

- ACPC gained information from NCR regarding the constituents of CCP by working with NCR to test constituents of NCR emulsion. JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT and NCR]; AMH Decl. Ex. 5 [July 24, 1967 ACPC Memo]; Ex. 6 [Sept. 28, 1967 ACPC Memo].

- ACPC gained information from NCR regarding the constituents of CCP by working directly with NCR in its development of patents for paper processes. AMH Decl. Ex. 8 [Sept. 15, 1967 ACPC Memo]; Ex. 9 [Patent No. 3,311,499].

- ACPC learned that Aroclor 1242 was a constituent of NCR emulsion based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR. AMH Decl. Ex. 15 [Process Specification 2036.93]; Ex. 7 [May 19, 1967 ACPC Memo].

- ACPC had internal meetings in 1969 about replacing Aroclor in NCR emulsion due to the adverse environmental effects of PCBs. AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpts] at 52, 60; Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269; Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77.

**Plaintiffs' Reply to PPFF 50:** **Defendants' response creates no genuine dispute as to a material fact because they have cited no record evidence to refute a finding that ACPC did not know very much about the capsules because that was all controlled by NCR.** Indeed, Defendants admit in response to PPFF 49 that NCR controlled the capsule technology and did not want ACPC to learn how to make capsules.

Moreover, none of the additional factual propositions asserted by Defendants are supported by the record evidence cited by Defendants. The evidentiary basis for many of Defendants' factual assertions — Exhibit 1 to the Declaration of Jayni Foley — is an argumentative, one-sided chart prepared by Defendants' attorneys and provides no

evidentiary basis for a finding of fact. *See* Responses 63-87 to Defendants' Proposed Additional Findings of Fact.

Defendants assert that "[b]eginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP." It is undisputed that beginning in the 1950's, NCR contracted with ACPC to apply an emulsion to base stock paper to produce NCR Brand carbonless copy paper ("CCP"). It is also undisputed that from 1954 to 1971, the emulsion used in CCP contained Aroclor 1242, a type of PCB. However, the record evidence Defendants cite does not support the conclusion that ACPC "worked closely with NCR to produce PCB-containing CCP." The CCP contained PCB between 1954 and 1971, but that was not the reason for the parties' working relationship. Moreover, it is undisputed that ACPC did not have knowledge in the 1950s that the emulsion even contained PCBs. Defendants do not cite any contrary evidence. In fact, even Defendants do not contend that ACPC knew that the emulsion contained PCBs until 1963. *See e.g.,* Defendants' PFF 52 and the response thereto.

Defendants' assertion that "[b]y 1958, ACPC knew that the recycling broke caused the CCP capsules to rupture, discharging their contents" is not supported by record evidence. The letter upon which this assertion is based simply references that an NCR representative discussed re-use of broke with ACPC, a matter of no consequence to ACPC since, as the letter indicates, ACPC did not re-process the broke but instead sold it "to other paper making firms who re-use it in fairly high grade papers." There is no evidence that ACPC was a party to, or even aware of, the letter.

Defendants' assertion that "[b]y 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper" is not supported by record evidence. The cited document is

an internal WT report describing a visit to ACPC. The author of the report (a WT employee) makes a passing reference to "Arachlor." Foley Decl. Ex. 35 at BCFOX00038486. There is no evidence that any ACPC representative used that term or was familiar with the term. The document demonstrates only that WT was familiar with the term Arachlor as of 1963, an undisputed fact that in not material to Plaintiffs' motion.

Defendants assert that "ACPC gained information from NCR regarding the constituents of CCP by working with NCR to test constituents of NCR emulsion." However, this assertion is not supported by the record evidence cited by Defendants. The documents cited by Defendants as support for this fact describe assistance that ACPC provided to NCR with regard to testing of already-made emulsion and/or other information shared between ACPC and NCR. None of the cited documents discuss the constituents of CCP and none discuss Aroclor 1242.

Defendants' assertion that "ACPC gained information from NCR regarding the constituents of CCP by working directly with NCR in its development of patents for paper processes" is not supported by the record evidence cited by Defendants. The cited documents provide no evidence that ACPC was aware of the constituents of CCP. One patent (Ex. 9) relates to a method of drying paper already coated and the other patent (Ex. 10) relates to a coating technique. Neither patent involved the constituents of CCP.

Defendants' assertion that "ACPC learned that Aroclor 1242 was a constituent of NCR emulsion based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR" is not supported by the record evidence cited by Defendants. Neither of the documents cited by Defendants discusses or even mentions Aroclor 1242 as a constituent of NCR emulsion.

Defendants assert that "ACPC had internal meetings in 1969 about replacing Aroclor in NCR emulsion due to the adverse environmental effects of PCBs." This is a partially disputed, but non-material fact. It is undisputed that ACPC had internal meetings in 1969 about replacing Aroclor in NCR. However, ACPC did not believe that the environmental concerns applied to Aroclor 1242 – the only type of Aroclor ever used in CCP. Declaration of Ronald R. Jezerc ("Jezerc Decl."), (Doc. #674), ¶ 2. Defendants have cited to no record evidence to the contrary.

**PPFF 51:** The role of ACPC was to apply the coating so that the product performed in a way that was acceptable to NCR and its customers. *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 30-31); *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 32).

**Defendants' Response to PPFF 51:** Deny. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. The deposition testimony of Dale Schumaker on page 32 states:

Q:     Do you remember, prior to 1970 --

A:     Uh, huh.

Q:     -- when you learned that there were PCBs in NCR emulsion?

A:     No idea. In fact, I wouldn't know what they were at that point in time, except for the fact that I do have some chemistry background. But that wasn't our concern.

Q:     Your concern was coating; is that right?

A:     Our concern was to take the emulsion, make it into a satisfactory coating, put it on the paper, make a satisfactory product and not spend too much money doing it. That's an oversimplification.

Ragatz Decl. Ex. C [Aug. 19, 2009 D. Schumaker Depo. Excerpt] at 32.

The deposition testimony of Ronald Jezerc simply describes the process of applying coating to carbonless copy paper. Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 30-31. While the deposition testimony supports that ACPC's concern was to make "satisfactory coating" and "satisfactory product," the testimony does not expressly state that ACPC's role "was to apply the coating so that the product performed in a way that was acceptable to NCR and its customers."

ACPC also had other roles with respect to CCP and NCR's emulsion. As PPFF 56 states "ACPC did trial runs using emulsion with the replacement solvents in order to determine whether the new emulsion could be effectively applied to the paper in a way that would produce acceptable performance by the finished carbonless paper." Id. (Jezerc Dep. at 77-78). Therefore, ACPC's role was not only to apply the coating. Furthermore, ACPC arranged for the disposal of PCB-containing broke through brokers. Doc. #334 [Plaintiffs Appleton Papers Inc. and NCR Corporation's Answer To Defendant Menasha Corporation's Counterclaim] at 4-6.

**Plaintiffs' Reply to PPFF 51:** **The response does not create a genuine dispute of material fact.** Defendants admit in response to PPFF 13 and 14 that "NCR contracted with certain companies to apply the emulsion and other coatings to the paper" and that "[o]ne such company was [ACPC.]" That ACPC did trial runs using emulsion with the possible replacement solvents in order to determine whether the new emulsion could be effectively applied to the paper in a way that would produce acceptable performance by the finished carbonless paper does not alter this fact. The proposed finding is also supported by other evidence of record. See Declaration of Ronald R. Jezerc ("Jezerc Decl."), (Doc. #674), ¶4 ("Appleton Coated Paper Company worked with

NCR to make sure the emulsion with the replacement solvent could be effectively applied to paper and achieve the required performance.").

Defendants' assertion that "ACPC arranged for the disposal of PCB-containing broke through brokers" is not supported by any record evidence. In the cited document, Plaintiffs admit that broke "was purchased by others who used the product as the raw material for producing other paper products." Thus, the evidence shows that ACPC sold broke to brokers for re-use. In any event, this assertion is irrelevant to the proposed finding of fact.

**PPFF 52:** ACPC treated the emulsion as a very valuable product. *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 32, 189).

**Defendants' Response to PPFF 52:** Admit.

**Plaintiffs' Reply to PPFF 52: Undisputed.**

### J. ACPC's Knowledge And Actions.

**PPFF 53:** ACPC first learned of generalized concerns about PCBs in mid to late 1969. *Id.* (Jezerc Dep. at 58, 74).

**Defendants' Response to PPFF 53:** Deny. PPFF 53 is vague and overbroad, particularly with respect to the phrase "generalized concerns." For example, in his deposition testimony, at page 57, Ronald Jezerc specifically testifies as follows:

> Q:   When you started working at Appleton in 1964, when you first came to Appleton, did you know that the NCR emulsion with which you were working contained PCBs?
>
> A:   Somewhere in there I must have found out, but ---
>
> Q:   Right. I'm trying to determine when, in fact, you figured that out, if you recall.
>
> A:   Maybe when I read the patent.
>
> Q:   Okay. Do you recall reading the patent?

A:      I don't know.

Q:      Okay.

A:      I really don't know. I --

Q:      That's fine. That's fine. So at some point it sounds like you did have an understanding that the NCR emulsion contained PCBs; is that correct?

A:      Yes.

Q:      Okay. But you can't remember if it was in 1964, 1965, 1966, but sometime between 1964 and 1971, you learned that information; is that right?

A:      '69 I would -- I had to have known before that time.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpt] at 57.

Mr. Jezerc continues on to testify on page 74, regarding the determination to eliminate the use of PCBs in NCR emulsion:

Q:      -- okay? All right. Do you recall when it was determined that PCBs should be phased out of the emulsion?

A:      Well, I've done a lot of thinking about this, and I'm not sure how I answered this type of question the first time around, but sometime in '69, people became concerned that articles were being written about the power industry and their leaky transformers, which contained PC- - - Aroclor as the coolant. So the supplier, rightfully so, decided sometime in '69 that Aroclor was going to be discontinued as a sales item and they were no longer going to manufacture it.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpt] at 74.

Further, Mr. Jezerc previously testified that he became aware in the late 1960s of various publications describing the environmental aspects and the persistence of PCBs. AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpt] at 60. Mr. Jezerc also testified that the concerns raised in these articles related to the bioaccumulation and biopersistence of PCBs in the environment and in animals. Id. at 60-61. An additional concern, according to Mr. Jezerc, was whether PCBs impacted the food chain. Id. at 60-61. Mr. Jezerc also recalled a meeting with his supervisor, Tom Busch, in 1969 to discuss

replacing Aroclor due to several environmental studies that he read which discussed the harmful environmental effects of PCBs. AMH Decl. Ex. 21 [2006 Jezerc Depo.] at 51-52; Ex. 4 [April 20, 2009 Jezerc Depo.] at 74, 77, 171-172; Ex. 24 [Sept. 30, 1970 ACPC Quarterly Report] (stating that the change in the NCR emulsion from PCBs (Aroclor) to MIPB was made "to satisfy environmental preservation regulations.")

The ACPC Plant Manger at the time, Lawrence Casey, also testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." AMH Decl. Ex. 11 [Nov. 10, 2006 L. Casey Depo. Excerpt] at 39-41. Similarly, ACPC Assistant Solvent Manager Dale Schumaker learned of PCB concerns from ACPC Vice President Tom Busch, and Schumaker discussed the decision to change the Aroclor emulsion with Busch. AMH Decl. Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269.

To summarize Messrs. Jezerc, Casey and Schumaker's testimony, ACPC knew specifically of environmental and health concerns about PCBs used in the NCR emulsion and the production of CCP by 1969, at the latest. ACPC knew of the scientific studies regarding the persistence of PCBs in the environment by the late 1960s. Thus, Plaintiffs' statement that "ACPC first learned of generalized concerns about PCBs in mid to late 1969," is vague and overbroad.

**Plaintiffs' Reply to PPFF 53**:      **This response does not create a genuine dispute of material fact.**  It is undisputed that it was not until the late 1960's that ACPC knew about possible environmental effects of some PCBs.  *See* Declaration of Ronald R. Jezerc ("Jezerc Decl."), (Doc. #674), ¶ 2 ("In mid-1969, I first learned of concerns about

possible environmental effects of some polychlorinated biphenyls ('PCBs'). At that time, I understood that those concerns only applied to higher chlorinated Aroclors, such as those used in transformers and did not apply to the PCB formulation used in NCR carbonless paper, Aroclor 1242."). However, ACPC did not believe that these concerns applied to Aroclor 1242 – the only type of Aroclor ever used in CCP. *Id.* Defendants have cited to no record evidence to the contrary.

In fact, Defendants own expert, Joseph Rodricks, testified in his deposition that no published study reported that Aroclor 1242 was bioaccumulating before 1971. Roach Decl., (Doc. # 666), Ex. 29 [J. Rodricks Dep. at 32:13-17]. Further, Defendants' expert, Rodricks, testified that no study published prior to 1972 ever found that Aroclor 1242 persisted in the environment, or otherwise suggested that Aroclor 1242 entered the food chain from discharges or otherwise posed risk of environmental harm. Roach Decl., (Doc. # 666), Ex. 29 [J. Rodricks Dep. at 152:7-15]. Moreover, Defendants have cited to no evidence that ACPC knew of the bioaccumulation and biopersistence of PCBs, or any other environmental or health concerns, prior to 1969.

**PPFF 54:** Upon learning of concerns related to PCBs, ACPC promptly began cooperating with NCR in efforts to identify a replacement solvent. *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 188).

**Defendants' Response to PPFF 54:** Deny. The proposed finding of fact is vague as to what constitutes "concerns related to PCBs," and does not indicate whether this phrase refers to concerns regarding potential toxicity to humans, including workplace exposures, concerns about toxicity to wildlife, concerns about environmental persistence and the propensity to bioaccumulate, or none, all, or a subset of these concerns.

The proposed finding of fact is also defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. The deposition testimony of Ronald Jezerc on page 188 states:

> Q:     So when you were involved in finding or perfecting the coating and the whole phasing out of PCBs in the coating, were you thinking that this was not a worthwhile thing to do, that there was no --
>
> A:     Oh, no.
>
> Q:     -- reason to do it?
>
> A:     No, no. By that time it was 1970 and – or '69, and it was pointed out to me by executives that we would replace that, period.
>
> Q:     And you never - -or did you ever ask about the need to do that?
>
> A:     No. I was a good follower.
>
> Q:     Good soldier?
>
> A:     Right.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 188.

Mr. Jerzec's testimony thus described how he was a "good follower" and did not ask questions about the need to find a replacement for PCBs in the emulsion for carbonless copy paper. This deposition testimony does not support the statement that "Upon learning of concerns related to PCBs, ACPC promptly began cooperating with NCR in efforts to identify a replacement solvent."

**Plaintiffs' Reply to PPFF 54:     Defendants' response creates no genuine dispute of a material fact because they have cited no record evidence that refutes a finding that, upon learning of concerns related to PCBs, ACPC promptly began cooperating with NCR in efforts to identify a replacement solvent.** The proposed finding is also supported by other evidence of record. See Declaration of Ronald R. Jezerc ("Jezerc Decl."), (Doc. #674), ¶4 ("NCR worked with Monsanto to find a

replacement solvent that did not contain PCBs. Appleton Coated Paper Company worked with NCR to make sure the emulsion with the replacement solvent could be effectively applied to paper and achieve the required performance.")

**PPFF 55:** NCR worked with Monsanto to find potential replacement solvents. *Id.* (Jezerc Dep. at 87-88).

**Defendants' Response to PPFF 55:** Admit.

**Plaintiffs' Reply to PPFF 55: Undisputed.**

**PPFF 56:** ACPC did trial runs using emulsion with the replacement solvents in order to determine whether the new emulsion could be effectively applied to the paper in a way that would produce acceptable performance by the finished carbonless paper. Id. (Jezerc Dep. at 77-78).

**Defendants' Response to PPFF 56:** Admit.

**Plaintiffs' Reply to PPFF 56: Undisputed.**

**PPFF 57:** ACPC did not believe that the attention raised about PCBs applied to Aroclor 1242. *Id*. at ¶¶ 13-14, Ex. L (MONSFOX00002456-457), Ex. M (NCR-FOX 0592823).

**Defendants' Response to PPFF 57:** Deny. The proposed finding of fact is defective under L.R. 56.2(a) because it is not supported by the evidentiary material cited in support of this proposed finding of fact. Exhibit L, MONSFOX00002456-457, is a letter from Monsanto to "Sirs." It is not addressed to ACPC, and there is no evidence that ACPC ever received it. Further, the letter states "As your supplier of Aroclor 1254 and 1260 and formulated products containing 1254, we wish to alert you to the potential problem of environmental contamination as referred to in the newspaper and magazine

articles." The letter also states "We realize that you have marketed or may now market transformers and other electrical equipment containing dielectric fluids which include Aroclor 1254 and 1260." The letter is directed to purchasers of Aroclor 1254 and 1260 and companies that market transformers and electric equipment, a universe that does not include ACPC. There is no evidence nor support for the proposition that this letter was sent to ACPC, nor that any information contained in the letter written by Monsanto can be imputed to ACPC.

Exhibit M, NCR-FOX 0592823, are the notes of Plaintiffs' expert Marcia Williams on an interview with Ronald Jezerc on January 5, 2005. Ms. Williams notes state:

> When asked what it was that made total substitution necessary, Mr. Jezerc again emphasized the increased attention to PCBs by the press and the increasing public attention on PCBs as a potential environmental concern.1 At the close of our interview, Mr. Jezerc reiterated that the replacement project became full blown because the "rumblings were increasing." He explained that at that time Aroclor was a great product; it had not caused the company any manufacturing problems, serious customer complaints, or employee issues or concerns.

Footnote 1 states: "Mr. Jezerc mentioned as one of the motivations for replacing Aroclor, a "ruling" by a judge that mono-, di-, and tri- were all polychlorinated biphenyls. He explained that ACPC did not understand the basis for the ruling since Monsanto had represented to them that the Aroclor 1242 was not a polychlorinated biphenyl (because 1242 was not a poly-). However, based on this public 'ruling' ACPC understood that the government, and the general public, was sending a message about PCBs. We note that we have not been able to find any confirmation of a 'ruling' or something along similar lines that occurred around this time."

Footnote 2 states: "Mr. Jezerc also noted that Monsanto had assured ACPC that Aroclor 1242 was 'mono or di-' and therefore not a polychlorinated biphenyl. Because of

33

this, ACPC did not believe that the attention raised about Aroclor bioaccumulation applied to them."

When read as a whole, Ms. Williams' notes indicate that while Mr. Jezerc stated that "Monsanto had assured ACPC that Aroclor 1242 was 'mono or di-' and therefore not a polychlorinated biphenyl" he also told Ms. Williams that a motivating factor for replacing Aroclor 1242 in NCR's emulsion was "a 'ruling' by a judge that mono-, di-, and tri- were all polychlorinated biphenyls." Therefore, the cited evidentiary material does not support that "ACPC did not believe that the attention raised about PCBs applied to Aroclor 1242."

Additionally, Ms. Williams notes of Mr. Jezerc's statements are inadmissible hearsay in violation of Fed. R. Evid. 802, and thus also violate L.R. 56(a)(2).

Moreover, Aroclor 1242, like all other Aroclors, was a mixture of different chlorine compounds, such that it overlapped with Aroclors with higher chlorine percentages, such as Aroclor 1248 and 1254. AMH Decl. Ex. 14 [Aroclor Chart]; Ex. 22 [Aug. 25, 2009 H. Vodden Depo. Excerpts] at 14-16 ("Arcolor 1242 was homed in on a trichlor or three-chlorine homologue, but in point of fact, it did contain all the homologues up to and including the hexachlor and the six chlorine ones. Now, altogether, in any of the Aroclors there were about 200 different components of different chlorine levels, including not only the level of chlorine, but also the different arrangement of the chlorine atoms around the molecule.") AMH Decl. Ex. 14 Aroclor Chart:

Further, ACPC's Plant Manger Lawrence Casey, testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard."

AMH Decl. Ex. 11 [Apr. 20, 2009 L. Casey Depo. Excerpt] at 39-41. Mr. Busch stated

that his "research people" discovered the issue with PCBs. Id. Additionally, Michael

Stevens, a former ACPC chemist, testified at page 43 of the following:

> Q:    What was your understanding as to why National Cash Register wanted
>       to replace or get rid of Aroclor?
>
> A:    I asked Lee Yurkowitz that question. I said, you've been telling me that
>       Aroclor is the finest carbonless paper solvent ever used. Why are you
>       trying something else?

"Particularly since it wasn't quite as good a solvent, as it turned out, as Aroclor

was. And he said it was his understanding that the basic research group, one of their

duties was to cull the university literature on arcane subjects that might have some impact

on our business, and there was a term used in some of those relative to Aroclor. The term

was "biopersistent." And I said, what does that mean? And he said, it means it sticks

around in the environment. . . ." AMH Decl. Ex. 23 [Mar. 13, 2009 M. Stevens Depo.

Excerpts] at 43.

**Plaintiffs' Reply to PPFF 57**:    **Defendants' response creates no genuine

dispute as to a material fact because they have cited no record evidence to refute a

finding that ACPC did not believe that the attention raised about PCBs applied to

Aroclor 1242.** Moreover, evidence previously submitted to the Court provides additional

evidentiary support for this proposed finding of fact. *See* Jezerc Decl., (Doc. #674), ¶ 2

("In mid-1969, I first learned of concerns about possible environmental effects of some

polychlorinated biphenyls ('PCBs'). At that time, I understood that those concerns only

applied to higher chlorinated Aroclors, such as those used in transformers and did not

apply to the PCB formulation used in NCR carbonless paper, Aroclor 1242."").

Defendants have cited to no record evidence to the contrary.

In fact, Defendants own expert, Joseph Rodricks, testified in his deposition that no published study reported that Aroclor 1242 was bioaccumulating before 1971. Roach Decl., (Doc. # 666), Ex. 29 [J. Rodricks Dep. at 32:13-17]. Further, Defendants' expert, Rodricks, testified that no study published prior to 1972 ever found that Aroclor 1242 persisted in the environment, or otherwise suggested that Aroclor 1242 entered the food chain from discharges or otherwise posed risk of environmental harm. Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 152:7-15].

The remainder of the response is immaterial to the proposed finding of fact and will therefore not be addressed.

**PPFF 58:** At that point, NCR was already looking for a replacement solvent. *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 88).

**Defendants' Response to PPFF 58:** Deny. PPFF 58 is vague and ambiguous. It is not clear what time frame "At that point," refers to. The deposition testimony of Ronald Jezerc at page 88 states:

> Q:    Okay. All right. You spoke of replacing PCBs in the NCR emulsion. What was the compound, if you know that eventually replaced PCBs in the NCR emulsion?
>
> A:    I knew at the time.
>
> Q:    Okay. Was it - -does MIPB ring a bell?
>
> A:    I believe that is the – yes.
>
> Q:    All right. And how were you involved, if at all, in replacing PCBs with MIPB?
>
> A:    How was I involved?
>
> Q:    Yeah. Yes.
>
> A:    Running trials in cooperation with NCR.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 88.

Mr. Jezerc's testimony does not state when NCR began to look for a replacement solvent, and it is not clear what time frame "At that point" refers to. Moreover, other evidence indicates that NCR began looking for replacements to Aroclor 1242 in the 1950s because of concerns about Aroclor's toxicity, odor and cost. JEF Decl. Ex. 70 [April 1, 1965 memo on WT visit to NCR] ("[NCR] added that they have been looking for an alternative to Aroclor for the last ten years without success. They were looking for improvements in toxicity, odour and cost.")

**Plaintiffs' Reply to PPFF 58**: **Defendants' response creates no genuine dispute as to a material fact because they have cited no record evidence to refute a finding that, at the time that ACPC learned of concerns related to PCBs, NCR was already looking for a replacement solvent.** In their response, Defendants themselves assert that "NCR began looking for replacements to Aroclor 1242 in the 1950s." Their further assertion that NCR did so "because of concerns about Aroclor's toxicity, odor and cost" is disputed but not material to this proposed finding of fact. As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of Appleton Coated Paper Company ("ACPC"), not the knowledge of NCR. Defendants' assertion relates solely to NCR's knowledge – not ACPC's knowledge – and therefore does not create a genuine dispute of material fact. Therefore, the assertion is immaterial to the proposed finding of fact and will not be further addressed.

**PPFF 59**: The transition to a replacement solvent was made in approximately the spring of 1971. *Id.* at ¶ 9, Ex. H (NCR-FOX 0162136-137).

**Defendants' Response to PPFF 59:**    Deny. WT stopped using PCBs in CCP in the UK a year earlier, in July 1970. AMH Decl. Ex. 1 [Report on Apr. 28, 1970 Conversation with WT] (WT stating that the UK Ministry of Technology approved the step taken by WT to decide to make the switch from Aroclor to an alternative solvent); Ex. 2 [Monsanto Performance Review 1970 Objectives] (stating that Aroclor 1242 had been replaced in NCR paper coating in the UK by July 1970).

**Plaintiffs' Reply to PPFF 59:**    **Defendants' response creates no genuine dispute as to a material fact because they have cited no record evidence to refute a finding that NCR and ACPC made the transition to a replacement solvent in approximately the spring of 1971.**    Indeed, Defendants offered a proposed finding of fact in support of their summary judgment motion stating that "[b]eginning in 1953 or 1954 and *ending in 1971*, under contract to NCR, Appleton Coated Papers Company ("ACPC") applied this emulsion to preformed paper at a coating facility in Appleton, Wisconsin."  Certain Defendants' [Proposed] Findings of Fact and Conclusions of Law, Doc. #587, ¶ 23 (emphasis added).

The fact that Wiggins-Teape may have replaced Aroclor 1242 on a different timeline does not create a disputed fact as to the timing of NCR's replacement. Moreover, evidence previously submitted to the Court provides additional evidentiary support for this proposed finding of fact.  *See* Declaration of Kathleen L. Roach, Doc. #676, Ex. 56 [Dec. 7, 1972 Monsanto Letter (GPFOX00049252-GPFOX00049258) at 2] ("Replacement of PCBs in the carbonless copy paper application began in the third quarter of 1970 and sales were ended in early 1971.").

**PPFF 60:**     There is no evidence that ACPC was aware that recycling NCR-brand carbonless paper would result in the discharge of PCBs to any water body.  *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 82, 187, 195); *Id.* at ¶ 8, Ex. G (Christensen Dep. at 64-65); *Id.* at ¶ 7, Ex. F (Strelow Dep. at 66, 99-100); *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 193); *Id.* at ¶ 3, Ex. B (Bodmer Dep. at 37-38).

**Defendants' Response to PPFF 60:**     Deny.  ACPC "was aware that recycling NCR-brand carbonless paper would result in the discharge of PCBs to any water body."

First, ACPC's knowledge must be placed in the context of its longstanding technical collaboration between ACPC and NCR, evidenced by the many meetings, visits to facilities and letters exchanged between 1953 and 1971. See JEF Decl., Ex. 1, listing all communications and meetings between NCR, ACPC, WT and other licensees, for which evidence has been produced, during the time frame between 1953 through 1971 [Chart: Communications Among ACPC, WT, And NCR]. Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP. See generally JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212; JEF Decl. Ex. 178 [May 10, 1968 Letter from T. Busch, ACPC to H.V. Lauer, NCR]; Ex. 12 [Jan. 28, 2009 F. Heinritz Depo. Excerpts] at 45-49, 118-119; Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79. Over the next two decades, NCR, ACPC, and WT held more than sixty-five (65) in-person technical meetings, on a wide range of topics related to CCP, including NCR broke, recycling, and Aroclor content. See JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; Ex. 12 [January 7, 1958 NCR Letter] (stating that NCR has "discussed the problem of re-use of waste paper containing NCR CB and CFB with

the personnel of both the Mead Corporation and the Appleton Coated Paper Company," and that ACPC and Mead "sell it to other paper making firms who re-use it").

During this long technical collaboration, WT conducted a new and intensive program to test Aroclor concentrations in the broke recycling process in order to determine how to best reuse NCR broke, based on WT's understanding that Aroclor made the NCR broke potentially "toxic." JEF Decl. Ex. 52 [Nov. 5, 1964 Notes of meeting between BAT and WT regarding Aroclor] ("Aroclor, a chlorinated diphenyl, is toxic"); Ex. 70 [Apr. 1, 1965 Memo on WT visit to NCR] at 18-19; see also AMH Decl. Ex. 62 [March 16, 1965 WT Letter re: Aroclor testing] [Gough Depo. Ex. 1010-I]. The results of WT's testing established that recycling CB and CFB broke (i.e., PCB-containing broke) would result in the discharge of PCB-laden wastewater. JEF Decl. Ex. 89 [Aug 4, 1965 letter from BAT to WT] [Gough Depo. Ex. 1010-P]; Ex. 111 [Nov. 25, 1965 BAT to WT letter] [Gough Depo. Ex. 1010-T].

Second, as early as 1958, ACPC knew recycling the broke from CCP caused the capsules to rupture, discharging their contents. A letter from WT to NCR in January 1958 states that WT has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company. It is my understanding that neither mill reprocesses their own NCR Paper waste but that they sell it to other paper making firms who re-use it in fairly high grade papers." JEF Decl. Ex. 12 [January 7, 1958 NCR Memo & Attachments]. There is also correspondence from 1965 from WT to ACPC regarding repulping NCR broke. JEF Decl. Ex. 79 [May 19, 1965 ACPC Letter].

Third, by 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper. During a visit by WT to ACPC, the two companies discussed the issue of the release of Aroclor due to capsule breakage in a certain application of CCP, "CB Cheque Papers." JEF Decl. Ex. 35 [WT Report on December 2-4, 1963 visit to ACPC] at 5-6 ("This capsule breakage leads to release of the oil (Arachlor)").

Additionally, Ronald Jezerc's deposition testimony at page 74 states:

Q:      --okay? All right. Do you recall when it was determined that PCBs should be phased out of the emulsion?

A:      Well, I've done a lot of thinking about this, and I'm not sure how I answered this type of question the first time around, but sometime in '69, people became concerned that articles were being written about the power industry and their leaky transformers, which contained PC - - - Aroclor as the coolant. So the supplier, rightfully so, decided sometime in '69 that Aroclor was no longer going to be discontinued as a sales item and they were no longer going to manufacture it.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 74.

Further, ACPC gained information from NCR regarding the constituents of CCP:

•      By working with NCR to test constituents of NCR emulsion. JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT and NCR]; AMH Decl. Ex. 5 [July 24, 1967 ACPC Memo]; Ex. 6 [Sept. 28, 1967 ACPC Memo].

•      By working directly with NCR in its development of patents for paper processes. AMH Decl. Ex. 8 [Sept. 15, 1967 ACPC Memo]; Ex. 9 [Patent No. 3,311,499] and,

•      Based on product specifications and confidential instructions for handling the PCBcontaining emulsion given to ACPC by NCR. AMH Decl. Ex. 15 [Process Specification 2036.93]; Ex. 7 [May 19, 1967 ACPC Memo].

Fourth, ACPC knew that PCBs raised environmental concerns and caused environmental harm. Ronald Jezerc's deposition testimony at page 77-80, 171-72, and 282 states:

Q:      Okay. Do you remember the time frame that you first either heard or read about problems with PCBs?

A:      It had to be in mid-'69.

* * *

Q:   Okay. When you were apprised or learned of problems with PCBs, what did you understand the problem to be?

A:   That it sat around and didn't break up.

Q:   Okay. Would this be an issue relating to biodegradability.

A:   Yeah.

* * *

Q:   Okay. And so it was only after it had been released into the environment that you understood a concern to be posed by PCBs at this time?

A:   I think that's what it was.

* * *

Q:   Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB. From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs? (Objection omitted).

A:   I don't have any idea whether there were other reasons.

Q:   Okay. But environmental concerns was the reason that you understood at the time they were being phased out; is that correct?  (Objection omitted)

A:   Yes.

* * *

Q:   Did he [Mr. Busch] agree with you that something had to be done about PCBs in '68/'69? (Objection omitted)

A:   Yes.

AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 282.

Further, Mr. Jezerc previously testified that he became aware of various publications describing the environmental aspects of PCBs in the late 1960s and discussing the persistence of PCBs. AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpt] at 60. Mr. Jezerc also testified that the concerns raised in these articles related to the bioaccumulation and biopersistence of PCBs in the environment and in animals. Id. at

60-61. An additional concern, according to Mr. Jezerc, was whether PCBs impacted the food chain. Id. at 60-61.

The ACPC Plant Manger at the time, Lawrence Casey, also testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." AMH Decl. Ex. 11 [Apr. 20, 2009 L. Casey Depo. Excerpt] at 39-41. Similarly, ACPC Assistant Solvent Manager Dale Schumaker learned of PCB concerns from ACPC Vice President Tom Busch, and Schumaker discussed the decision to change the Aroclor emulsion with Busch. AMH Decl. Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269.

Fifth, ACPC was aware of environmental concerns regarding discharge containing PCBs entering the River. Ronald Jezerc's deposition testimony at page 73 states:

> Q:    Okay. At the time of this letter, I guess it is 1968, or memo, was there a concern about having the wash-up water go to the river? You mentioned it didn't have to go to the river.
>
> Just money?
>
> A:    That was our main concern.
>
> Q:    Okay. So it wasn't – environmental concerns were not an issue here?
>
> A:    I don't think that they came in until '69. You want to talk about that? I thought that's what we were going to talk about today.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 73.

In sum, ACPC knew that recycling broke from CCP ruptures the capsules, it knew that CCP and broke contained PCBs, it knew that PCBs raised environmental concerns and caused environmental harm, and it was concerned about the discharge of PCBs entering the River.

43

Further, based on the extensive meetings and consultations regarding broke recycling that occurred among NCR, WT, ACPC and Mead during the period of 1957 through 1964, and based specifically on the analytic work and extensive technical consultations regarding broke recycling that occurred during 1965, as detailed in JEF Decl. Exhibit 1, ACPC in fact knew in 1965 at the latest that the recycling of broke would result in the release of PCBs into the environment. AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 282.

**Plaintiffs' Reply to PPFF 60:** **Defendants' response creates no genuine dispute as to a material fact because they have cited no record evidence that ACPC was aware that recycling NCR-brand carbonless paper would result in the discharge of PCBs to any water body.** Instead, Defendants seek to create a factual dispute by attempting to impute knowledge to ACPC which they contend was possessed by NCR and WT. As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR or WT.

Further, Defendants offer no direct evidence that ACPC gained knowledge its working relationship with NCR or WT that recycling CCP would result in the discharge of PCBs to any water body. Instead, they want the court to infer that the information may have been communicated to ACPC, even though there is no deposition testimony or documentary evidence to support such an inference. However, the factual assertions they offer in an attempt to create such an inference are not supported by a proper evidentiary foundation. *See Serfecz v. Jewel Food Stores, Inc.*, 67 F.3d 591, 602 (7th Cir. 1995) (rejecting attempt to avoid summary judgment on the basis of alleged inferences).

Defendants' response cites repeatedly to Exhibit 1 to the Declaration of Jayni Foley. Exhibit is an argumentative, one-sided chart prepared by Defendants' attorneys and provides no evidentiary basis for a finding of fact. *See* Responses 63-87 to Defendants' Proposed Additional Findings of Fact.

Defendants assert that "Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP." It is undisputed that beginning in the 1950's, ACPC worked with NCR to produce NCR Brand carbonless copy paper ("CCP") by applying an emulsion to base stock paper. It is also undisputed that from 1954 to 1971, the emulsion used in CCP contained Aroclor 1242, a type of PCB. However, the record evidence Defendants cite does not support the conclusion that ACPC "worked closely with NCR to produce PCB-containing CCP." Moreover, it is undisputed that ACPC did not have knowledge in the 1950s that the emulsion even contained PCBs. Defendants do not cite any contrary evidence. In fact, even Defendants do not contend that ACPC knew that the emulsion contained PCBs until 1963. *See e.g.,* Defendants' PFF 52 and response thereto.

Defendants assert that "WT conducted a new and intensive program to test Aroclor concentrations in the broke recycling process in order to determine how to best reuse NCR broke, based on WT's understanding that Aroclor made the NCR broke potentially 'toxic.'" This assertion is disputed but non-material. Defendants have cited no evidence indicating that ACPC received any of the documents upon which they rely. Nor have they produced any evidence demonstrating that WT's activities were communicated to ACPC.

Defendants' assertion that "[b]y 1958, ACPC knew that the recycling broke caused the CCP capsules to rupture, discharging their contents" is not supported by

record evidence. The letter upon which this assertion is based simply references that an NCR representative discussed re-use of broke with ACPC, a matter of no consequence to ACPC since, as the letter indicates, ACPC did not re-process the broke but instead sold it "to other paper making firms who re-use it in fairly high grade papers. There is no evidence that ACPC was a party to, or even aware of, the letter.

Defendants' assertion that "[b]y 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper" is not supported by record evidence. The cited document is an internal WT report describing a visit to ACPC. The author of the report (a WT employee) makes a passing reference to "Arachlor." Foley Decl. Ex. 35 at BCFOX00038486. There is no evidence that any ACPC representative used that term or was familiar with the term. The document demonstrates only that WT was familiar with the term Arachlor as of 1963, an undisputed fact that in not material to Plaintiffs' motion.

Defendants assert that "ACPC gained information from NCR regarding the constituents of CCP by working with NCR to test constituents of NCR emulsion." However, this assertion is not supported by the record evidence cited by Defendants. The documents cited by Defendants as support for this fact describe assistance that ACPC provided to NCR with regard to testing of already-made emulsion and/or other information shared between ACPC and NCR. None of the cited documents discuss the constituents of CCP, and none discuss Aroclor 1242.

Defendants assertion that "ACPC gained information from NCR regarding the constituents of CCP by working directly with NCR in its development of patents for paper processes" is not supported by the record evidence cited by Defendants. The cited documents provide no evidence that ACPC was aware of the constituents of CCP. One

patent (Ex. 9) relates to a method of drying paper already coated and the other patent (Ex. 10) relates to a coating technique. Neither patent involved the constituents of CCP.

Defendants assertion that "ACPC learned that Aroclor 1242 was a constituent of NCR emulsion based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR" is not supported by the record evidence cited by Defendants. Neither of the documents cited by Defendants discusses or even mentions Aroclor 1242 as a constituent of NCR emulsion.

Defendants assert that "ACPC had internal meetings in 1969 about replacing Aroclor in NCR emulsion due to the adverse environmental effects of PCBs." This is a partially disputed, but non-material fact. It is undisputed that ACPC had internal meetings in 1969 about replacing Aroclor in NCR emulsion due to, among other things, adverse environmental effects of PCBs. However, ACPC did not believe that the environmental concerns applied to Aroclor 1242 – the only type of Aroclor ever used in CCP. Declaration of Ronald R. Jezerc ("Jezerc Decl."), (Doc. #674), ¶ 2. Defendants have cited to no record evidence to the contrary.

Defendants assert that "ACPC knew that PCBs raised environmental concerns and caused environmental harm" and that "ACPC was aware of environmental concerns regarding discharge containing PCBs entering the River." It is undisputed that by mid-1969, ACPC knew about possible environmental effects of some PCBs. *See* Declaration of Ronald R. Jezerc ("Jezerc Decl."), (Doc. #674), ¶ 2 ("In mid-1969, I first learned of concerns about possible environmental effects of some polychlorinated biphenyls ('PCBs'). At that time, I understood that those concerns only applied to higher chlorinated Aroclors, such as those used in transformers and did not apply to the PCB

formulation used in NCR carbonless paper, Aroclor 1242."). However, ACPC did not believe that these concerns applied to Aroclor 1242 — the only type of Aroclor ever used in CCP. *Id.* Defendants have cited to no record evidence to the contrary.

In fact, Defendants own expert, Joseph Rodricks, testified in his deposition that no published study reported that Aroclor 1242 was bioaccumulating before 1971. Roach Decl., (Doc. # 666), Ex. 29 [J. Rodricks Dep. at 32:13-17]. Further, Defendants' expert, Rodricks, testified that no study published prior to 1972 ever found that Aroclor 1242 persisted in the environment, or otherwise suggested that Aroclor 1242 entered the food chain from discharges or otherwise posed risk of environmental harm. Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 152:7-15]. Moreover, Defendants have cited to no evidence that ACPC knew of the bioaccumulation and biopersistence of PCBs, or any other environmental or health concerns, prior to 1969.

In summary, Defendants have set forth no evidence that ACPC was aware that recycling NCR-brand carbonless paper would result in the discharge of PCBs to any water body.

**PPFF 61:** Defendants' PCB expert testified that the chronic effects of PCBs in the environment were not known until 1973 or 1974. *Id.* at ¶ 12, Ex. K (Deposition of Joseph V. Rodricks ("Rodricks Dep.") at 65-66).

**Defendants' Response to PPFF 61:** Deny. PPFF 61 is taken out of context and is incomplete. The deposition testimony of Joseph Rodricks at page 66 states:

Q:    There's a sentence at the beginning of that second section that's Roman numeral II, "Toxicological Aspects," and the sentence says - - it reads, "Compared to the chlorinated hydrocarbon pesticides, definitive aspects of acute, subacute and chronic toxicity still remain rather poorly known."

A:    Uh-huh. Yes, and that's true at the time, sure.

Q:      That was true at the time, that the definitive aspects of chronic toxicity of PCBs were poorly known at that time?

A:      They didn't become –the first reports were on 1242 and reproductive effects in the early '70s, and then chronic effects didn't become clear until '73 or 4.

Q:      Okay.

A.      So, I never claimed that they were, These are -- the studies reported were studies of relatively short-term duration showing the systemic effects, and that was clearly a signal of toxicity.

Q:      So chronic effects weren't known at that time of PCBs?

A:      No, not that I - - I've never seen that in the literature. Whether Monsanto had something unpublished, I don't know.

Ragatz Decl. Ex. K [Aug. 20, 2009 J. Rodricks Depo. Excerpt] at 66.

On page 68, the deposition testimony continues on to state:

Q:      That it – if I understand you, what you're saying is that the understanding of whether this broad exposure has toxicological implications was poorly known at that time?

                                        * * *

A.      I would say that it raises – they raise questions about what were, in the early '70s, becoming issues of greater concern, like the formation of tumors in animals or humans, or the effects on reproduction or development process. They were becoming available at that time, animal test systems, that were giving more definitive clues on that.

So what they're saying is that given the widespread exposure we know is occurring, we need to know a lot more about those kinds of effects given this widespread and chronic exposure that's going on in human – in human populations.

Ragatz Decl. Ex. K [Aug. 20, 2009 J. Rodricks Depo. Excerpt] at 68-69.

        The expert report of Joseph Rodricks puts the above deposition testimony into

context as it details all the scientific studies of PCBs occurring from the 1930s on:

        •       "Shortly after the commercialization of PCBs in 1930, reports began to appear in the scientific literature of cases of poisoning of workers involved in PCB manufacture and use. Soon thereafter, studies were initiated on animals regarding the effects of PCBs administered by inhalation, ingestion, and subcutaneous injection. These studies documented severe

skin lesions in workers (chloracne), and significant liver damage in workers and animals."

- "By the 1940s, more skin and liver problems had been observed in electricians and factory workers exposed to products that contained PCBs. Journal articles described the toxicity of 'Aroclors' as having 'been repeatedly demonstrated, both from the standpoint of their absorption from the inspired air as well as from their effect in producing a serious and disfiguring dermatitis when allowed to remain in contact with the skin.'"

- "These and other early studies published in the open scientific literature prior to NCR's development of CCP provided a clear indication that PCBs, including the particular PCB mixture selected by NCR for this use, Aroclor 1242, was a potentially hazardous substance, and that care needed to be taken to prevent exposure of humans, animals, or environmental media."

- "By the mid 1960s there was ample scientific reason for NCR to believe that nonoccupational exposures to PCBs, as might occur through the food chain, could pose a risk of harm to human health."

- "Some of the first PCB toxicity testing programs on birds were reported in 1962 by Dr. E.L. McCune and colleagues at the University of Missouri, who observed toxicity associated with the paint used on laboratory chicken cages; the paint contained Aroclor 1242. . . . .McCune et al. found that 'the major toxic agent is the chlorinated biphenyl.'"

- "In 1965, Flick et al. reported pathological changes occurring in chicks ingesting PCBs at various dietary levels. Pathological changes included discoloration of the pancreas, enlarged hemorrhagic kidney, enlarged adrenal, dermatitis, and defeathering."

- "Analytical methods capable of identifying PCBs in tissue samples became available in 1966, when Jensen identified PCBs in 200 pike (Esox lucius), fish spawn, a white-tailed eagle (Haliaeetus albicilla), and humans from Sweden using gas chromatography—mass spectroscopy (GC-MS) techniques. Jensen described PCBs as 'related to and as poisonous as DDT,' and stated that PCBs may enter the body through skin, inhalation, or by ingestion."

- "Shortly thereafter, UK government chemists, Dr. D.C. Holmes and colleagues reported PCBs in the liver of a European kestrel (Falco tinnunculus) and Dr. Widmark of the University of Stockholm (Sweden) detected PCBs in fish, seabirds, conifer needles, and human fat."

- "Dr. R.W. Risebrough of the University of California ("UC") at Berkeley and colleagues from UC Berkeley, UC Davis, Cornell University and the San Diego Natural History Museum presented chromatographic data

showing PCBs in Arctic peregrines, California birds, and fish and seabirds from the Pacific Ocean."

- • "In 1969, Dr. Joseph Street and colleagues at Utah State University, who presented at the national meeting of the American Chemistry Society, and reported that higher-level chlorinated PCBs induced enzyme activity at a potency exceeding DDT and hypothesized that, if toxicological effects are related to enzyme induction, then PCBs could confound pesticide-related effects and add to toxicity."

AMH Decl. Ex. 25 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 30-33. PPFF 61 is therefore, out of out of context and is incomplete. It does not include that Mr. Rodricks testified "that given the widespread exposure we know is occurring, we need to know a lot more about those kinds of effects given this widespread and chronic exposure that's going on in human – in human populations," and does not include any reference to the multitude of PCBs studies and reports from the 1930s on that discuss toxicity and exposure issues related to PCBs.

Moreover, PPFF 61 ignores that scientific studies regarding the bioaccumulation of PCBs were publicly available well before 1973 or 1974. Mr. Rodricks' expert report states that as early as the 1950s "based on both publicly available scientific knowledge and private testing results, NCR knew, or should have known, that PCBs were: (a) toxic to animals and people; (b) stable and persistent in the environment; (c) highly soluble in fatty materials such as milk; and (d) not soluble in water. The latter three characteristics should have given rise to a suspicion by NCR that PCBs could bioaccumulate in the food chain." PJF Decl. Ex. 6 [Aug. 11, 2009 Revised Expert Report of Joseph Rodricks] at 56. Mr. Rodricks also identifies studies in the 1960s finding that "PCBs were widely dispersed and persistent in the environment," and that PCBs were found in "fish spawn, pike, and a sea eagle that lives on fish." Id. at 42 (citing to Soren Jensen's 1966 study; a 1977 study by Holmes; and a 1968 study by Risebrough).

51

In addition, by the late 1960s ACPC itself was aware of environmental concerns about PCBs documented in published scientific studies. ACPC's Manager of Research, Ron Jezerc, has testified that he and others in his department became aware of the environmental aspects of PCBs from reading articles in journals in the late 1960s. AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpts] at 52, 60. By the late 1960s, ACPC was concerned about the persistence of the material in the environment and they were aware of a concern about wildlife and the potential that Aroclor might impact the food chain. AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpts] at 60-61.

**Plaintiffs' Reply to PPFF 61:** **Defendants' response creates no genuine dispute because they have cited no record evidence to refute a finding that Defendants' PCB expert testified that the chronic effects of PCBs in the environment were not known until 1973 or 1974.** Indeed, there is no dispute that Rodricks testified that "chronic effects didn't become clear until '73 or 4." Ragatz Decl. Ex. K [Aug. 20, 2009 J. Rodricks Depo. Excerpt] at 66. It is also undisputed that ACPC did not believe that the attention raised about PCBs applied to Aroclor 1242. *See* Jezerc Decl., (Doc. #674), ¶ 2 ("In mid-1969, I first learned of concerns about possible environmental effects of some polychlorinated biphenyls ('PCBs'). At that time, I understood that those concerns only applied to higher chlorinated Aroclors, such as those used in transformers and did not apply to the PCB formulation used in NCR carbonless paper, Aroclor 1242."). Defendants have cited to no record evidence to the contrary.

Rodricks testified in his deposition that no published study reported that Aroclor 1242 was bioaccumulating before 1971. Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 32:13-17] and that no study published prior to 1972 ever found that Aroclor 1242

persisted in the environment, or otherwise suggested that Aroclor 1242 entered the food chain from discharges or otherwise posed risk of environmental harm. Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 152:7-15].

The remainder of the response is immaterial to the proposed finding of fact and will therefore not be addressed.

**PPFF 62:** Defendant's PCB expert simply assumed without any basis that ACPC had the same knowledge as NCR *Id.* at ¶ 12, Ex. K (Rodricks Dep. at 231-33).

**Defendants' Response to PPFF 62:** Deny. Defendants attempted for many months to gain access to documents that are highly relevant to this litigation, and relate to ACPC's knowledge, at such locations as the former Wiggins Teape Research & Development laboratory in Butler's Court, UK. Defendants attempted to obtain these documents directly through NCR and API, but were stymied at every turn. See Doc. #421 [Apr. 14, 2009 Motion to Compel Appleton Coated LLC]; Doc. #421 [Apr. 14, 2009 Motion to Compel Appleton Coated LLC]. On January 29, 2009, Georgia-Pacific subpoenaed third-party Appleton Coated LLC ("ACC") for relevant documents in its "possession, custody, or control," and then was forced to file a motion to compel on April 14, 2009. See Doc. #421. Georgia-Pacific also moved to compel API on April 14, 2009 to produce these same documents. See Doc. #424 [Apr. 17, 2009 Motion to Compel Appleton Papers Inc.]. This court granted Georgia-Pacific's motions to compel on July 31, 2009, and ordered ACC and API to "to search for and produce any documents in the possession of AWA or Arjowiggins SAS that are responsive to Georgia-Pacific's subpoenas." See Doc. #507 [July 31, 2009 Order] at 7. Despite this Order, on September 4, 2009, Georgia-Pacific was forced to file a Local Rule 7.4 Expedited Motion to Compel

API and ACC to produce the documents, as no documents had been produced. As of September 14, 2009 Georgia-Pacific began receiving responsive documents, and the productions have continued to date (the latest production occurring on Sept. 29, 2009). Notably, however, it was only after several subpoenas and motions to compel that responsive documents were produced to Defendants. Moreover, the production was made after the discovery cut-off date.

Defendants have been prejudiced by this delay in production by Plaintiff API and ACC. The production contains significant evidence regarding ACPC's knowledge, as reflected in Defendants' Opposition to Plaintiffs' Motion to Compel and its responses herein to Plaintiffs' Proposed Findings of Fact. As laid out in detail in Exhibit 1 to the Declaration of Jayni E. Foley, there are at least thirty meetings and or communications with ACPC by NCR and/or NCR licensees relevant to ACPC's knowledge including:

> 7/23/1953 NCR visit to ACPC: NCR visits ACPC to observe and discuss impact paper coating JEF Decl. Ex. 2 [July 23, 1953 NCR report on a visit to ACPC]

> 11/12/1956 WT Visit to ACPC: WT visited ACPC and discussed all of WT's current problems on NCR manufacture and testing. Discussed coating machine, finishing, and emulsion preparation. JEF Decl. Ex. 4 [WT Notes on Visit to ACPC, Nov. 12, 1956]

> 2/3/1957 WT Visit to NCR and ACPC: WT visited US coating mills and obtained information regarding high speed coating machines that WT was considering purchasing, and other coating developments. JEF Decl. Ex. 7 [WT Notes on Visit to US Coating Mills from Feb. 3-16, 1957].

> 9/30/1957 WT Visit to ACPC: WT visit to ACPC included a tour of the plant and NCR production and discussion of: emulsion preparation, coating, finishing and testing. WT notes that "as far as sorting is concerned, most of the broke taken out at this stage seems due to creases, pipes, bar-marks (from conveyor in tunnel drier) and other mechanical faults." JEF Decl. Ex. 9 [WT Notes on Visit to ACPC on Sept. 30, 1957]

> 1/7/1958 NCR Letter to WT: "We have discussed the problem of reuse of waste paper containing NCR and CB and CFB with the personnel of both

the Mead Corporation and the Appleton Coated Paper Company. It is my understanding that neither mill reprocess their own NCR Paper waste but that they sell it to other paper making firms who re-use it in fairly high grade papers." JEF Decl. Ex. 12 [January 7, 1958 NCR letter]

03/1958 WT Visit to NCR, ACPC and Mead: WT visited NCR and discussed the commercial aspects of WT's production of NCR Paper, NCR's testing of an alternative emulsion which failed due to technical issues, and NCR's research and development efforts. At Mead, Mead showed WT its coating plant and discussed "openly all aspects." At ACPC, WT and ACPC discussed self contained paper, the properties of base paper, and technical issues with paper production and emulsion. NCR also provided detailed responses on technical questions posed by WT ranging from emulsion properties to various production problems. JEF Decl. Ex. 17 [WT Summary Report on US Visit in March 1958]; Ex. 18 [WT Notes on Visit to Mead on March 17, 1958]; Ex. 19 [WT Notes on Visits to Dayton, Appleton and Chillicothe in March 1958]

3/31/1959 WT Visit to NCR, ACPC, Combined Locks and Mead: The purpose of WT's visit to NCR, Combined Locks and Mead was to observe and discuss: NCR reel orders, the production of machine coated CF paper, to study NCR costs and possible price reductions and to become familiar with the technical aspects of NCR paper production. NCR provided to WT the figures for emulsion consumption and broke at the US Mills. JEF Decl. Ex. 21 [WT Notes on Visit to NCR, ACPC and Mead on March 31 through April 16, 1959]

11/1960 WT Visit to ACPC, Mead and NCR: WT visited ACPC, Mead and NCR to discuss technical matters and to look into their finishing methods. WT also evaluates current machinery used by ACPC. ACPC proposed that WT entered into an agreement on "Reciprocity of Research" with ACPC. WT concludes that broke percentages at ACPC and Mead on reel orders may be comparable to WT, and that WT will need to continue to reduce their sheet broke. JEF Decl. Ex. 24 [WT Technical Notes on ACPC, NCR and Mead Visits in Nov. 1960]

5/15/1961 WT Visit to ACPC: WT visited ACPC and discussed various topics including: new coater at ACPC, mill capacity, and other technical issues associated with coating. JEF Decl. Ex. 25 [May 29, 1961 WT Notes on Visit to ACPC]

6/26/1962 WT visit to ACPC: States that a "full discussion" occurred on NCR Paper and notes the "free and open exchange of information" that took place. JEF Decl. Ex. 26 [June 26, 1962 WT Memo on Visit to ACPC]

10/30/1962 ACPC Visit to WT: ACPC finished WT's Treforest facility and discussions included: raw materials, mix formulations, emulsion use,

and other technical topics. WT notes that for ACPC "the only emulsion lost is in the broke." JEF Decl. Ex. 27 [WT Notes on ACPC Visit to WT on Oct. 30, 1962]

12/2/1963 WT Visit to ACPC: The purpose of WT's visit to ACPC was to discuss "in detail the up-to-date information" on the coating of NCR paper." Topics included: NCR paper manufacturing by Mitsubishi, emulsion usage, issues with CB check paper (including the capsule breakage and release of Aroclor), various equipment issues, coating weight control and other technical issues. WT notes that it would seem NCR is "only too willing to accept any new raw materials providing it will cheapen the product" which was not the impression NCR had given WT when WT had suggested alternative formulations. WT's visit notes also include Appleton's prices for broke disposal. JEF Decl. Ex. 35 [WT Report on ACPC Visit on Dec. 2-4, 1963]; Ex. 32 [Nov. 1963 NCR Paper and Supply Products Technical Services Progress Report]

8/5/1964 WT Visit to ACPC: WT visited ACPC to see ACPC's NCR operation and to discuss electrographic paper. Regarding NCR Paper, they discussed: supply of CF, various application methods of CB, a tandem CF-CB machine, and variations in coating weight. JEF Decl. Ex. 41 [WT Report on Visit to ACPC on Aug. 5, 1964]

09/1964 ACPC Visit to WT: ACPC visits WT's Treforest facility. JEF Decl. Ex. 39 [1964 WT Treforest Annual Report]

10/13/1964 WT Visit to ACPC: WT viewed ACPC's production and coating of NCR Paper. JEF Decl. Ex. 45 [WT Oct. 13, 1964 Visit to ACPC Notes]

11/1964 WT Visit to NCR, Mead, ACPC and Combined Locks: Research personnel at WT visit NCR in Dayton. Spent "considerable time" discussing technical and license matters. Purpose of the visit was to establish a stronger technical liaison, and establish a regular exchange of information. Discussions included: various mills producing NCR paper, new capsules under development and other technical topics. NCR discussed with WT a new technique of encapsulation, self contained paper emulsion containing Aroclor, and testing of active coat weight of NCR paper specifically referring to Aroclor with 42% weight of chlorine. NCR also told WT about its NCR paper developments that are not yet patented. WT's visit notes contain an analysis of chlorine count of WT v. Mead and ACPC. WT tours Mead and notes various technical and production issues, including related to Mead's inefficiency. WT tours Combined Locks and discussed their CF production, sales, and experimental work. WT tours ACPC and discussed coating methodology and self contained paper. JEF Decl. Ex. 47 [WT Report on Visit to NCR in Nov. 1964]; Ex. 48 [WT Report on Visit to NCR in Nov. 1964]; Ex. 49 [WT Notes on Technical

Discussions During NCR Visit in Nov. 1964]; Ex. 50 [Oct. 1964 NCR Paper and Supply Products Technical Services Progress Report]; Ex. 51 [Nov. 1964 NCR Paper and Supply Products Technical Services Progress Report]

2/15/1965 WT Visit to ACPC: WT observes extensive ACPC operations in Appleton from February 15, 1965 to February 19, 1965. Observations include those on coating: "Coaters are theoretically similar" and retentions are "quite separate from broke losses." WT reports that Appleton retains 100% of its emulsion, but this is separate from broke loss. JEF Decl. Ex. 59 [Feb. 15, 1965 Report on WT Visit to ACPC in Appleton]

4/16/1965 WT Visit to ACPC: Meeting primarily to discuss lithe plates, as WT has been approached to make the Ensink plate. NCR business matters are also discussed. JEF Decl. Ex. 69 [April 1965 report on WT visit to ACPC]

5/19/1965 Visit to ACPC primarily to study ACPC's new coating machine. The report states: "many previous visits have been made by Wiggins Teape personnel, and there are very. JEF Decl. Ex. 77 [May 19, 1965 report on WT visit few stones unturned." It also describes the "trim allowance on their [ACPC] cutters" as 3/4 inch and 3/8 inch. ACPC]; Ex. 78 [May 19, 1965 report on WT visit ACPC]

5/19/1965 ACPC Letter to WT: "NCR Broke Repulping" – ACPC sales of NCR broke to recyclers on the Fox and Kalamazoo Rivers. JEF Decl. Ex. 79 [May 19, 1965 ACPC letter to WT]

8/18/1965 WT Letter to ACPC: "I agree wholeheartedly with you that it is very much to our mutual benefit to keep in touch, in detail, on the various NCR developments. Our liaison is helped enormously by the fact that we enjoy complete freedom with regard to exchanging information." JEF Decl. Ex. 95 [Aug 18, 1965 WT letter to ACPC]

8/26/1965 ACPC Letter to WT: "I think we did end up agreeing that probably either of use could go to work for either company and feel right at home." JEF Decl. Ex. 96 [Aug 26, 1965 ACPC letter to WT]

11/2/1965 WT Visit to NCR, ACPC, and Nekoosa Edwards: WT Visit to NCR, ACPC, and Nekoosa Edwards: Visit in New York with WT, NCR, and ACPC on November 3 and 4, 1965. Discussions centered on phenolic CF development. Appleton is doing trials and it getting ready to make their own CF. Lots of information sharing on phenolic CF and testing. JEF Decl. Ex. 107 [Nov. 2, 1965 report on WT visit to NCR, ACPC, and Nekoosa Edwards]

12/15/1965 WT Visit to NCR, ACPC, and Mead: WT spent two weeks visiting Dayton, Nekoosa, ACPC, Mead, Minerals and Chemicals, and

Union Processing regarding NCR Paper. "A significant amount of time" was spent with WT, both in Dayton and at the mills. WT and NCR had detailed discussions of various technical exchange. Appleton has about 58% of NCR sales. JEF Decl. Ex. 114 [Report on Dec. 15, 1965 WT visit to NCR, ACPC and Mead]; Ex. 116 [Report on Dec. 15, 1965 WT visit to NCR, ACPC and Mead]; Ex. 117 [Report on Dec. 15, 1965 WT visit to NCR, ACPC and Mead]; Ex. 118 [Dec. 1965 NCR Paper and Supply Products Technical Services Progress Report]

05/1966 WT Visits to Mead and ACPC: Purpose of visit was to look at how mills in the US produce base paper for NCR coating. Topics reviewed included: stock preparation, paper making, coating operations, and finishing. Mills use of broke is discussed. WT toured plants. During Mead visit discussed broke. Base paper is made with 30% broke (uncoated) and Mead sells the CF broke at $60/ton. JEF Decl. Ex. 134 [May 1966 WT Summary of Visits to NCR Producing Mills]; Ex. 135 [May 1966 WT Summary of Visit to Mead]; Ex. 136 [May 1966 WT report on visit to ACPC]

5/21/1966 WT Visits to Combined Locks, ACPC, Mead and Nekoosa Edwards: WT visited Combined Locks to have a general look at operations and to discuss base paper and CF coating operations. WT visited Mead's facility in Chillicothe, Ohio, and discussed various technical issues, including paper stock preparation, coating machines, and sales figures. WT visited ACPC, and discussed purchase of a tandem coater, emulsion, a research agreement between ACPC and NCR. WT visited Nekoosa Edwards, and discuss various technical issues. JEF Decl. Ex. 139 [WT Report on Visit to Combined Locks, May 23, 1966]; Ex. 140 [WT Report on Visit to Mead, June 1966]; Ex. 141 [WT Summary of Visit to US, June 1966]

10/1966 WT Visit to ACPC: WT visited ACPC for two days and discussed many technical topics, including issues related to emulsion, packaging, trim removal, machinery, coating and finishing. JEF Decl. Ex. 154 [Oct. 28, 1976 WT Draft Notes on ACPC Visit]

04/01/1967 WT Visit to ACPC: "A.E. Burroughs (with E.S. Brazington) to Appleton Coated Paper Company, Appleton, Wisconsin on technical liaison visit" JEF Decl. Ex. 160 [April 1967 WT report on visit to ACPC]

7/20/1967 ACPC Visit to WT: ACPC visited WT and discussed "a wide range of topics" related to NCR Paper, including: base paper that is coated, work with an OTM capsule, development of lightweight CFB, coating "second grade" paper, and various other technical and production issues. Patents using shared information, gained through the information WT and ACPC have shared on process developments, was also discussed. JEF Decl. Ex. 162 [1967 ACPC Visit to WT]

9/25/1967 WT Visit to ACPC: Purpose of the visit was to evaluate the performance of the three-roll coating head and Cleveland crane. ACPC told WT that a complete wash up of the system occurs every 12 hours, and the color is pumped to a buffer tank, and the system is washed off with water to the drain. ACPC claimed an overall broke level of 3% (meaning the difference in weight between all raw materials going in and coating paper going out). JEF Decl. Ex. 165 [Oct. 8, 1967 Notes on Visit to ACPC]

10/1967 WT Visit to ACPC: Purpose of visit was to obtain detailed information of the three-role applicator used for NCR CF coating, and also obtain information about the use of a Cleveland crane. JEF Decl. Ex. 166 [WT Notes on Visit to ACPC on Oct. 8, 1967]; Ex. 160 [Oct. 1967 WT report on visit to ACPC]

3/25/1968 WT Visit to ACPC: WT visited ACPC for a routine visit to exchange ideas on NCR paper development and see CFB tandem coater. WT was well received and met almost the entire board of directors. WT states that ACPC is growing more dependent on NCR paper, which WT estimates is 2/3rd of ACPC's profit. WT circulated a draft process development agreement to ACPC. JEF Decl. Ex. 175 [WT Report on Visit to ACPC on Mar. 25, 1968] 5/1/1968 WT Visit to Mead and ACPC JEF Decl. Ex. 177 [May 1968 WT trip report]

5/10/1968 NCR visit to ACPC: Sandberg visited ACPC facility to discuss deviations from NCR specifications JEF Decl. Ex. 178 [May 10, 1968 letter re NCR visit to ACPC]

5/27/1968 WT, NCR Visit to ACPC: Purpose of the visit was to have a general exchange of ideas, practices and machinery in the manufacture of NCR Paper, and to discuss a "tandem" coater. ACPC's consideration of the use of broke in place of Solka Floc was discussed, including that ACPC does not believe repulping will cause blueing. JEF Decl. Ex. 179 [June 1968 WT Report on Visit to ACPC];

12/1/1968 WT Visit to ACPC: WT visited ACPC as part of regular technical liaison visits to occur at 3-month intervals. WT and ACPC observed a production run at Appleton and discussed various technical topics, including certain testing performed by WT. JEF Decl. Ex. 182 [WT Visit Report on Dec. 13-18, 1968 Visit to ACPC]

6/2/1969 WT Visit to ACPC: The purpose of WT's visit to ACPC was to determine the efficiency of ACPC's production of NCR Paper and identify any major differences in production. Topics discussed included: ordering process, stock holding, raw materials, production efficiency. WT and ACPC also discussed broke levels at ACPC. JEF Decl. Ex. 187 [WT Visit Report on June 2-6, 1969 Visit to ACPC] Had Plaintiff API and ACC

timely produced the subpoenaed documents, relevant information regarding ACPC's knowledge would have been available to Mr. Rodricks for use in his expert report and deposition. It is Plaintiffs' dilatory tactics that prevented Mr. Rodricks from reviewing evidence as to ACPC's knowledge and opining on such evidence.

**Plaintiffs' Reply to PPFF 62:** **Defendants' response does not create a genuine dispute as to any material fact.** At his deposition, Dr. Rodricks testified that:

> Well, let me say, as I state upfront in the report, I have treated NCR and the paper company – Appleton as one entity, and I haven't made any separate determination regarding Appleton. So what I've said about NCR I assume applies to Appleton.

Rodricks Dep. at 232. Defendants' response does not address this testimony in any way. Neither in his report nor in his deposition testimony did Dr. Rodricks cite the need for additional information in order to reach a conclusion as to the state of ACPC's knowledge. Instead, he simply opted to treat NCR and ACPC "as one entity." The welter of record citations offered in Defendants' response are irrelevant to this fact and are offered solely as a smokescreen.

**PPFF 63:** There is no evidence that ACPC knew, or should have known, during the time that PCBs were used in carbonless paper that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a water body, thereby risking environmental damage. *Id.* at ¶ 5, Ex. D (Jezerc Dep. at 82, 187, 195); *Id.* at ¶ 8, Ex. G (Christensen Dep. at 64-65); *Id.* at ¶ 7, Ex. F (Strelow Dep. at 66, 99-100); *Id.* at ¶ 4, Ex. C (Schumaker Dep. at 193); *Id.* at ¶ 3, Ex. B (Bodmer Dep. at 37-38); *Id.* at ¶ 12, Ex. K (Rodricks Dep. at 65-66).

**Defendants' Response to PPFF 63:** Deny. ACPC "knew, or should have known, during the time that PCBs were used in carbonless paper that recycling NCR-

brand carbonless paper would result in the discharge of PCBs to a water body, thereby risking environmental damage."

First, ACPC's knowledge must be placed in the context of its longstanding technical collaboration between ACPC and NCR, evidenced by the many meetings, visits to facilities and letters exchanged between 1953 and 1971. See JEF Decl., Ex. 1, listing all communications and meetings between NCR, ACPC, WT and other licensees, for which evidence has been produced, during the time frame between 1953 through 1971 [Chart: Communications Among ACPC, WT, And NCR]. Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP. See generally JEF Decl., Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 38-39; 211-212; JEF Decl. Ex. 178 [May 10, 1968 Letter from T. Busch, ACPC to H.V. Lauer, NCR]; Ex. 12 [Jan. 28, 2009 F. Heinritz Depo. Excerpts] at 45-49, 118-119; Ex. 13 [Apr. 24, 2009 W. Goetz Depo. Excerpts] at 78-79. Over the next two decades, NCR, ACPC, and WT held more than sixty-five (65) in-person technical meetings, on a wide range of topics related to CCP, including NCR broke, recycling, and Aroclor content. See JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR]; JEF Decl. Ex. 12 [January 7, 1958 NCR Letter] (stating that NCR has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company," and that ACPC and Mead "sell it to other paper making firms who re-use it").

During this long technical collaboration, WT conducted a new and intensive program to test Aroclor concentrations in the broke recycling process in order to determine how to best reuse NCR broke, based on WT's understanding that Aroclor

61

made the NCR broke potentially "toxic." JEF Decl. Ex. 52 [Nov. 5, 1964 Notes of meeting between BAT and WT regarding Aroclor] ("Aroclor, a chlorinated diphenyl, is toxic"); Ex. 70 [Apr. 1, 1965 Memo on WT visit to NCR] at 18-19; see also AMH Decl. Ex. 62 [March 16, 1965 WT Letter re: Aroclor testing] [Gough Depo. Ex. 1010-I]. The results of WT's testing established that recycling CB and CFB broke (i.e., PCB-containing broke) would result in the discharge of PCB-laden wastewater. JEF Decl. Ex. 89 [Aug 4, 1965 letter from BAT to WT] [Gough Depo. Ex. 1010-P]; Ex. 111 [Nov. 25, 1965 BAT to WT letter] [Gough Depo. Ex. 1010-T].

Second, as early as 1958, ACPC knew recycling the broke from CCP caused the capsules to rupture, discharging their contents. A letter from WT to NCR in January 1958 states that WT has "discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both the Mead Corporation and the Appleton Coated Paper Company. It is my understanding that neither mill reprocesses their own NCR Paper waste but that they sell it to other paper making firms who re-use it in fairly high grade papers." JEF Decl. Ex. 12 [January 7, 1958 NCR Memo & Attachments]. There is also correspondence from 1965 from WT to ACPC regarding repulping NCR broke. JEF Decl. Ex. 79 [May 19, 1965 ACPC Letter].

Third, by 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper. During a visit by WT to ACPC, the two companies discussed the issue of the release of Aroclor due to capsule breakage in a certain application of CCP, "CB Cheque Papers." JEF Decl. Ex. 35 [WT Report on December 2-4, 1963 visit to ACPC] at 5-6 ("This capsule breakage leads to release of the oil (Arachlor)").

Additionally, Ronald Jezerc's deposition testimony at page 74 states:

Q:      --okay? All right. Do you recall when it was determined that PCBs should be phased out of the emulsion?

A:      Well, I've done a lot of thinking about this, and I'm not sure how I answered this type of question the first time around, but sometime in '69, people became concerned that articles were being written about the power industry and their leaky transformers, which contained PC - - - Aroclor as the coolant. So the supplier, rightfully so, decided sometime in '69 that Aroclor was no longer going to be discontinued as a sales item and they were no longer going to manufacture it.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 74.

Further, ACPC gained information from NCR regarding the constituents of CCP:

• By working with NCR to test constituents of NCR emulsion. JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT and NCR]; AMH Decl. Ex. 5 [July 24, 1967 ACPC Memo]; Ex. 6 [Sept. 28, 1967 ACPC Memo].

• By working directly with NCR in its development of patents for paper processes. AMH Decl. Ex. 8 [Sept. 15, 1967 ACPC Memo]; Ex. 9 [Patent No. 3,311,499]; and

• Based on product specifications and confidential instructions for handling the PCBcontaining emulsion given to ACPC by NCR. AMH Decl. Ex. 15 [Process Specification 2036.93]; Ex. 7 [May 19, 1967 ACPC Memo].

Fourth, ACPC knew that PCBs raised environmental concerns and caused environmental harm. Ronald Jezerc's deposition testimony at page 77-80, 171-72, and 282 states:

Q:      Okay. Do you remember the time frame that you first either heard or read about problems with PCBs?

A:      It had to be in mid-'69.

* * *

Q:      Okay. When you were apprised or learned of problems with PCBs, what did you understand the problem to be?

A:      That it sat around and didn't break up.

Q:      Okay. Would this be an issue relating to biodegradability.

A:      Yeah.

* * *

63

Q:    Okay. And so it was only after it had been released into the environment that you understood a concern to be posed by PCBs at this time?

A:    I think that's what it was.

*  *  *

Q:    Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB. From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs? (Objection omitted)

A:    I don't have any idea whether there were other reasons.

Q:    Okay. But environmental concerns was the reason that you understood at the time they were being phased out; is that correct?  (Objection omitted)

A:    Yes.

*  *  *

Q:    Did he [Mr. Busch] agree with you that something had to be done about PCBs in '68/'69?  (Objection omitted)

A:    Yes.

AMH Decl. Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 77-80, 171-72, and 282.

Further, Mr. Jezerc previously testified that he became aware of various publications describing the environmental aspects of PCBs in the late 1960s and discussing the persistence of PCBs. AMH Decl. Ex. 21 [Dec. 4, 2006 R. Jezerc Depo. Excerpt] at 60. Mr. Jezerc also testified that the concerns raised in these articles related to the bioaccumulation and biopersistence of PCBs in the environment and in animals. Id. at 60-61. An additional concern, according to Mr. Jezerc, was whether PCBs impacted the food chain. Id. at 60-61.

The ACPC Plant Manger at the time, Lawrence Casey, also testified that he first learned about PCBs from Tom Busch of ACPC in the late 1960s, and that Mr. Busch stated that ACPC "had to get rid of the PCBs in the emulsion because of a potential health hazard." AMH Decl. Ex. 11 [Apr. 20, 2009 L. Casey Depo. Excerpt] at 39-41.

Similarly, ACPC Assistant Solvent Manager Dale Schumaker learned of PCB concerns from ACPC Vice President Tom Busch, and Schumaker discussed the decision to change the Aroclor emulsion with Busch. AMH Decl. Ex. 3 [Aug. 19, 2009 D. Schumaker Depo. Excerpts] at 268-269.

Fifth, ACPC was aware of environmental concerns regarding discharge containing PCBs entering the River. Ronald Jezerc's deposition testimony at page 73 states:

> Q:    Okay. At the time of this letter, I guess it is 1968, or memo, was there a concern about having the wash-up water go to the river? You mentioned it didn't have to go to the river.

Just money?

> A:    That was our main concern.

> Q:    Okay. So it wasn't – environmental concerns were not an issue here?

> A:    I don't think that they came in until '69. You want to talk about that? I thought that's what we were going to talk about today.

Ragatz Decl. Ex. D [Apr. 20, 2009 R. Jezerc Depo. Excerpts] at 73.

In sum, ACPC knew that recycling broke from CCP ruptures the capsules, it knew that CCP and broke contained PCBs, it knew that PCBs raised environmental concerns and caused environmental harm, and it was concerned about the discharge of PCBs entering the River.

Further, based on the extensive meetings and consultations regarding broke recycling that occurred among NCR, WT, ACPC and Mead during the period of 1957 through 1964, and based specifically on the analytic work and extensive technical consultations regarding broke recycling that occurred during 1965, as detailed in JEF Decl. Exhibit 1, ACPC in fact knew in 1965 at the latest that the recycling of broke would result in the release of PCBs into the environment.

**Plaintiffs' Reply to PPFF 63:** Defendants' response creates no genuine dispute as to a material fact because they have cited no record evidence that ACPC knew, or should have known, during the time that PCBs were used in carbonless paper that recycling NCR-brand carbonless paper would result in the discharge of PCBs to a water body, thereby risking environmental damage. Instead, Defendants seek to create a factual dispute by attempting to impute knowledge to ACPC which they contend was possessed by NCR and WT. As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR or WT.

Further, Defendants offer no direct evidence that ACPC gained knowledge through its working relationship with NCR or WT such that it knew or should have known that recycling CCP would result in the discharge of PCB to a water body, thereby risking environmental damage. Instead, they want the court to infer that the information might have been communicated to ACPC, even though there is no deposition testimony or documentary evidence to support such an inference. However, the factual assertions they offer in an attempt to create such an inference (which are identical to those offered in their response to PFF 60) are not supported by a proper evidentiary foundation. Plaintiffs incorporate by reference their reply to Defendants' response to PFF 60.

### DEFENDANTS' ADDITIONAL UNDISPUTED MATERIAL FACTS THAT DEFENDANTS CONTEND PRECLUDE SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS

### A. NCR's Knowledge And Actions.

**Proposed Finding No. 1:** In the mid-1950s, NCR began to look for replacements for Aroclor in CCP, in part because Aroclor was "very toxic."

**RESPONSE NO. 1:  This is a disputed, but non-material fact.**  As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of Appleton Coated Paper Company ("ACPC"), not the knowledge of NCR.  Defendants' proposed finding of fact ("PFF") No. 1 relates solely to NCR's knowledge – not ACPC's knowledge.  Accordingly, Defendants' PFF  No. 1 does not create a genuine dispute of material fact.

With respect to NCR, the evidence cited by Defendants does not support the fact asserted.  None of the documents cited by Defendants supports the proposition that in the mid-1950's, NCR starting looking for "replacements for Aroclor in CCP, in part because Aroclor was 'very toxic.'"  To the contrary, Exhibit 16 cited by Defendants concludes that "N.C.R. emulsion is non-toxic" and, further, that "N.C.R. Emulsion paper is non-toxic…"  Declaration of Andrea M. Hogan ("AMH Decl.") (Doc. #667), at APIFOX00039898-899.  Moreover, the memorandum that Defendants attempt to rely upon throughout their proposed findings of fact (AMH Decl. (Doc. #667), Ex. 17) is a Wiggins Teape ("WT") document, not an NCR document, and Defendants have cited to no record evidence that NCR ever received such document or was aware of it prior to its production in September 2009 from documents located at Butler's Court.   In any event, the memorandum confirms that Hilltop Research had conducted an independent investigation and had informed NCR in 1956 that "Tests on animals and humans indicate that NCR paper can be used without danger of irritation, sensitization or acute chronic toxic effects."  *Id.,* at BCFOX00004098.   Thus, there is no evidentiary support for the factual proposition asserted by Defendants in PFF No. 1.

**Proposed Finding No. 2:** In the mid-1950s, NCR also communicated to certain of its licensees that Aroclor was potentially toxic.

**RESPONSE NO. 2: This is a disputed, but non-material fact.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. It is undisputed that ACPC was not a licensee of NCR. Defendants have not shown that ACPC had any knowledge in the mid-1950s that Aroclor was potentially toxic. Accordingly, Defendants' PFF No. 2 does not create a genuine dispute of material fact.

With respect to NCR, the evidence cited by Defendants does not support the fact asserted. AMH Decl. (Doc. # 667), Ex. 17. To the contrary, Exhibit 17 confirms that Hilltop Research had conducted an independent investigation and had informed NCR in 1956 that "Tests on animals and humans indicate that NCR paper can be used without danger of irritation, sensitization or acute chronic toxic effects." *Id.,* at BCFOX00004098. NCR had, in turn, passed those results onto one of its licensees – WT. Thus, there is no evidentiary support for the factual proposition asserted by Defendants in PFF No. 2.

**Proposed Finding No. 3:** By 1958, NCR knew that NCR broke and wastepaper was being resold to recyclers.

**RESPONSE NO. 3: This is an undisputed, but non-material fact.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants have not shown that by 1958, ACPC "knew that NCR broke and wastepaper

was being sold to recyclers."  Accordingly, Defendants' PFF No. 3 does not create a genuine dispute of material fact.

**Proposed Finding No. 4:**     By 1958, NCR also had discussions with ACPC, WT, Mead Corporation ("Mead"), and others regarding recycling of NCR broke.

**RESPONSE NO. 4:**     **This is an disputed, but non-material fact.**  It is undisputed that by 1958, NCR, WT, and ACPC had general discussions regarding recycling of NCR broke.  However, Defendants have produced no evidence of record to show that such discussions had anything to do with PCBs or the release of PCBs to a water body.  Moreover, it is undisputed that ACPC sold broke for papers other than CCP. Accordingly, not all broke contained PCBs during the time that PCBs were used in the emulsion for CCP.  Accordingly, Defendants' PFF No. 4 does not create a genuine dispute of material fact.

Further, the evidentiary basis for No. 4 includes Exhibit 1 to the Declaration of Jayni Foley.  This document is an argumentative, one-sided chart prepared by Defendants' attorneys and provides no evidentiary basis for a finding of fact.  *See* Responses 63-87 to Defendants' Proposed Additional Findings of Fact.

**Proposed Finding No. 5:**     By 1958, NCR also knew that the recycling of CCP caused the CCP capsules to burst and their contents to be dispersed.

**RESPONSE NO. 5:**     **This is a disputed, but non-material fact.**  As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants have produced no evidence of record to show that by 1958 ACPC knew "that the recycling of CCP caused the CCP capsules to burst and their contents to be

dispersed." Accordingly, Defendants' PFF No. 5 does not create a genuine dispute of material fact.

The proposed finding is disputed with regard to NCR's knowledge. NCR employees testified in their depositions that they did not believe that the capsules would break under the pressure of recycling. *See e.g.,* Plaintiffs' Responses to Certain Defendants' [Proposed] Findings of Fact and Conclusions of Law (Doc. # 659), Response to PFF No. 38. Accordingly, there is contrary evidence in the record that could lead to a finding that NCR did not know that the recycling of CCP caused the CCP capsules to burst and their contents to be dispersed.

**Proposed Finding No. 6:** In April 1965, NCR, ACPC and WT discussed the best means to recycle PCB containing broke.

**RESPONSE NO. 6: The evidence cited does not support this proposed fact**. The cited evidentiary materials cited do not support the factual assertion that ACPC was a party to communications involving WT and NCR in April 1965. Nor do the cited documents show that NCR and WT discussed the best means to recycle PCB containing broke. Accordingly, Defendants' PFF No. 6 does not create a genuine dispute of material fact.

**Proposed Finding No. 7:** The first part of Rachel Carson's *Silent Spring* was published in the *New Yorker* in 1962 and brought public attention to the widespread use and harmful ecological effects of DDT.

**RESPONSE NO. 7: This is a partially disputed, but non-material fact**. It is undisputed that the first part of Rachel Carson's *Silent Spring* was published in the *New Yorker* in 1962. However, the record evidence cited does not support the "fact" that

this publication "brought public attention to the widespread use and harmful ecological effects of DDT." Moreover, Defendants have cited no evidence that ACPC had any knowledge about the publication of *Silent Spring* in 1962, or at any other time. Accordingly, Defendants' PFF No. 7 does not create a genuine dispute of material fact.

**Proposed Finding No. 8:** NCR was aware of the close similarities between DDT and PCBs.

**RESPONSE NO. 8: This is a disputed, but non-material fact**. As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants have cited no evidence that ACPC was "aware of the close similarities between DDT and PCBs." Accordingly, Defendants' PFF No. 8 does not create a genuine dispute of material fact.

With regard to NCR's knowledge, the evidentiary material cited by Defendants does not show that NCR was "aware of the close similarities between DDT and PCBs." Defendants cite solely to a 1969 letter from WT to NCR stating <u>WT's</u> awareness and/or opinion that "Aroclor as used in making NCR Paper has close chemical affinities with DDT." Defendants have pointed to no evidence whatsoever to show that NCR believed that DDT and PCBs had close similarities. To the contrary, the evidence of record shows that the chemical properties of DDT and Aroclor 1242 did not have similar toxicities or environmental effects. *See e.g.,* Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law (Doc. #661), PFF Nos. 36-40.

**Proposed Finding No. 9:** NCR studied both DDT and PCBs for encapsulation purposes.

**RESPONSE NO. 9:** **This is a disputed, but non-material fact**.  As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants cite to no evidence of record that ACPC studied DDT and PCBs for encapsulation purposes.  Accordingly, Defendants' PFF No. 9 does not create a genuine dispute of material fact.

With regard to NCR, it is undisputed that NCR studied PCBs for encapsulation purposes.  However, neither Mr. Herbig nor Mr. Stutz testified that NCR actually studied DDT for encapsulation purposes in the cited testimony.  *See* Declaration of Patrick J. Ferguson ("PJF Decl.") (Doc. #575), Ex. 12 at 28:20-30:15 and Ex. 20 at 81:3-83:19. Accordingly, the evidence of record cited does not support the proposed finding with respect to NCR's actions.  Moreover, NCR only experimented with encapsulating DDT for at most "a couple days," and this was done by a research group that had absolutely no involvement with CCP.  See Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law (Doc. #661), PFF No. 40.

**Proposed Finding No. 10:**   On December 15, 1966, a Swedish scientist, Soren Jensen, reported findings of widespread evidence of PCBs in the environment in the publication, New Scientist.

**RESPONSE NO. 10:** **This is a partially disputed, but non-material fact**.  It is undisputed that Soren Jensen, a Swedish scientist, reported findings of PCBs in the environment in the December 15, 1966 edition of *New Scientist.*  However, whether or not such evidence – which was confined to samples taken of fish, an eagle, and three humans, all located in Sweden – was "widespread" is neither supported by the record (*see*

PJF Decl. (Doc. #575), Ex. 21), nor is it a "fact" appropriate for a proposed statement of fact. In any event, Defendants do not claim that ACPC was aware of the Jensen study at the time of its publication in 1966. Accordingly, Defendants' PFF No. 10 does not create a genuine dispute of material fact.

**Proposed Finding No. 11:** Jensen's findings demonstrated that PCBs were widely dispersed and persistent in the environment, having been found in fish, eagles, egg shells, and human hair.

**RESPONSE NO. 11: This is a partially disputed, but non-material fact.** As above, it is undisputed that Soren Jensen, a Swedish scientist, reported findings of PCBs in the environment in the December 15, 1966 edition of *New Scientist.* Whether or not such evidence – which was confined to samples taken of fish, an eagle, and three humans, all located in Sweden – showed that PCBs were "widely dispersed" is neither supported by the record (*see* PJF Decl., (Doc. #575), Ex. 21), nor is it a "fact" appropriate for a proposed statement of fact. In any event, Defendants do not claim that ACPC was aware of the Jensen study at the time of its publication in 1966. Accordingly, Defendants' PFF No. 11 does not create a genuine dispute of material fact

**Proposed Finding No. 12:** In February 1967, at NCR's request, Dr. Emmet Kelly at Monsanto forwarded copies of Jensen's report to Mr. D. Wood and Mr. M.J. Thomas, both NCR employees.

**RESPONSE NO. 12: This is a partially disputed, but non-material fact**. It is undisputed that on February 27, 1967, Dr. Emmet Kelly at Monsanto forwarded a copy of a rendition of a lecture given by Jensen to Mr. M.J. Thomas of NCR. The record evidence cited by Defendants, however, does not support the fact that NCR requested that

Monsanto send this document. Nor does it suggest that Mr. D. Wood received a copy of it from Dr. Kelly, or that Mr. Wood was even an NCR employee. *See* PJF Decl. (Doc. #575), Exs. 23, 24 & 39. In any event, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR, and the proposed fact does not address in any way ACPC's knowledge, nor does it even suggest that ACPC received a copy of the Jensen report in or around February 1967, or at any time. Accordingly, Defendants' PFF No. 12 does not create a genuine dispute of material fact.

**Proposed Finding No. 13:** Between 1967 and 1969, several scientific studies on PCBs were completed and published in the UK and US popular and scientific press.

**RESPONSE NO. 13: Undisputed.**

**Proposed Finding No. 14:** These studies confirmed Jensen's 1966 findings.

**RESPONSE NO. 14: The evidence cited does not support this proposed fact.** This proposed fact is unsupported by the record evidence cited, a fact clearly evidenced by Defendants use, again, of only a "*C.f.*" citation, clearly inadequate to support a finding of fact. *See* PJF Decl. (Doc. #575), Ex. 25.

**Proposed Finding No. 15:** While Monsanto did not share these scientific studies with its other Aroclor customers, it told NCR about the scientific studies because "Monsanto enjoy[ed] a strong position in this industry which [was] dominated by NCR." NCR determined to contact NCR regarding "adverse publicity" and stating that "[i]t is recommended that with the exception of NCR, we do not bring this publicity to the attention of our Aroclor customers."

**RESPONSE NO. 15: This is a disputed, but non-material fact.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the

relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants cite to no evidence of record that NCR or Monsanto shared these scientific studies with ACPC. Accordingly, Defendants' PFF No. 15 does not create a genuine dispute of material fact.

With regard to NCR's knowledge, it is undisputed that Defendants accurately cite from the referenced memo, but this "fact" implies that certain ("these") scientific studies were shared with NCR by Monsanto without any support. Indeed, the record evidence cited refers to bringing "publicity" to NCR's attention, not any "scientific studies." *See* PJF Decl. (Doc. #575), Exs. 26 & 27 at 21:13-22:8. Further, Defendants' statement that "NCR determined to contact NCR" is apparently a typo.

**Proposed Finding No. 16:** In 1969 Monsanto explained the properties of Aroclor 1242 to NCR, including that Aroclor 1242 was a mixture that included higher chlorinated isomers.

**RESPONSE NO. 16:** **This is a disputed, but non-material fact**. As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants cite to no evidence of record that "Monsanto explained the properties of Aroclor 1242" to ACPC. Accordingly, Defendants' PFF No. 16 does not create a genuine dispute of material fact.

With regard to NCR's knowledge, in December 1969, Monsanto communicated to NCR that: "No [Aroclor] 1242 [had been] found in any environmental samples" and "none found to date in environment – we think it degrades." Declaration of Kathleen Roach ("Roach Dec.") (Doc. #666) [Dec. 16, 1969 Monsanto/NCR Meeting Notes

(GPFOX00030900)].  Further, in a February 1970 letter, Monsanto clearly informed all customers that "PCBs with a chlorine content of less than 54% have not been found in the environment and appear to present no potential problem to the environment."  Roach Decl. (Doc. #666), Ex. 47 [February 1970 Monsanto Customer Letter (Ex. 962 to Vodden Dep.)].

**Proposed Finding No. 17:**  On March 27, 1969, Monsanto visited NCR's home office in Dayton.  Mr. Haier, Mr. Wilde and Mr. Paton attended this meeting on behalf of Monsanto and Mr. Lauer, Mr. Thacker and Mr. Fitzpatrick attended on behalf of NCR.

**RESPONSE NO. 17:  Undisputed**.  However, the individual listed as "Mr. Haier" appears to have actually been a Mr. M̲aier.  Moreover, the proposed fact does not relate to ACPC's knowledge in any respect.

**Proposed Finding No. 18:**  During this March 27, 1969 meeting Monsanto and NCR discussed PCB contamination and a recent *San Francisco Chronicle* article regarding PCB pollution in San Francisco Bay.  During this same meeting, NCR's representative, Howard Lauer, stated that "NCR would take no action unless a second article appeared specifically naming their paper as the source of pollution."

**RESPONSE NO. 18:  This is a partially disputed, but non-material fact**. As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR.  Defendants cite to no evidence of record that ACPC was aware of the San Francisco Chronicle article regarding PCB pollution in San Francisco Bay.  Accordingly, Defendants' PFF No. 18 does not create a genuine dispute of material fact.

With respect to NCR's knowledge, it is undisputed that during a March 27, 1969 meeting, Monsanto and NCR discussed PCB contamination and a recent *San Francisco Chronicle* article regarding PCB pollution in San Francisco Bay. The article appeared on February 24, 1969 and is entitled "A Menacing New Pollutant." It was authored by David Perlman, who is listed as a science correspondent. It is undisputed that the article does not mention carbonless paper as a source of PCB pollution, that it does not identify Aroclor 1242 as a concern, and that it repeats the belief that higher-chlorinated formulations have greater toxicity.

It is also undisputed that Defendants accurately quote from the cited memorandum as its recitation of Mr. Lauer's statement, but fail to give the proper context for that statement. The memorandum states that "NCR said [the *San Francisco Chronicle* article] seemed provocative and some jumping to conclusions was apparent. They agreed that nothing would be gained by Monsanto's entering into a public controversy with the reporter on some of his statements…Lauer said that NCR would take no action unless a second article appeared specifically naming their paper as a source of pollution."

**Proposed Finding No. 19:** In a subsequent April 28, 1969 telephone conversation with Mr. Paton of Monsanto, NCR's Gordon Taylor called the same article "just another in the series of articles on the toxicity of PCBs," and also said that "there was always the possibility that the second shoe would drop."

**RESPONSE NO. 19: This is an undisputed, but non-material fact.** It is undisputed that Defendants accurately cite from an April 29, 1969 Memorandum, written

by Mr. Paton, relaying what he remembers Mr. Taylor telling him. However, the proposed fact does not relate to ACPC's knowledge in any respect.

**Proposed Finding No. 20:** On October 31, 1969, Dr. H.A. Vodden of Monsanto's research department in Ruabon, South Wales, was made responsible for the environmental aspects of PCB contamination in the United Kingdom, including on-going studies of the potential biodegradation of Aroclor 1242, the investigation of PCB releases at Monsanto's Newport, UK PCB production facility, and information regarding PCB disposal by Monsanto's major Aroclor customers in the UK.

**RESPONSE NO. 20: This is an undisputed, but non-material fact.** However, the memo referenced by Defendants is dated October 30, 1969, not October 31, 1969. Moreover, the proposed fact does not relate to ACPC's knowledge in any respect.

**Proposed Finding No. 21:** In late 1969, Dr. Vodden arranged a meeting with Martin Kelly of NCR's Borehamwood CCP emulsion production facility.

**RESPONSE NO. 21: This is an undisputed, but non-material fact.** Dr. Vodden testified: "as far as I can remember, I met him then." Dr. Vodden's memory regarding the timing of other events, however, does call his memory into question. *See* Plaintiff's Response to Defendants' Prop. Finding of Fact No. 66 (Doc. #659). Moreover, the proposed fact does not relate to ACPC's knowledge in any respect.

**Proposed Finding No. 22:** During this 1969 meeting, Dr. Vodden explained to Martin Kelly that Aroclor 1242 had constituents that were persistent and would bioaccumulate, that even though Aroclor 1242 was not detected in the environment, its degradation residues resulting from Aroclor 1242 releases would pose those problems, that the production of NCR Paper resulted in open and uncontrolled releases of Aroclor

1242, and that because of these environmental concerns, Monsanto was going to stop selling it for use in the production of NCR Paper.

**RESPONSE NO. 22:** **This is a disputed, but non-material fact**. As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants cite to no evidence of record that ACPC was involved in the 1969 meeting discussed or learned of the information discussed in such meeting. Accordingly, Defendants' PFF No. 22 does not create a genuine dispute of material fact.

With regard to NCR's knowledge, it is undisputed that Dr. Vodden testified that he informed Martin Kelly of NCR that components of Aroclor 1242 were persistent and would bioaccumulate, that Aroclor 1242 had not been found in the environment to that point, and that Monsanto was going to terminate its sales of Aroclor to all open and uncontrolled applications. However, the documentary evidence from the same time period suggests that such statements were not made by anyone at Monsanto to anyone at NCR during any meeting in 1969, or any other meeting in the early 1970s. For example, an internal Monsanto memorandum summarizing a meeting between Monsanto, NCR and WT in January of 1970, states that "*If* in the long run, NCR paper is considered to be a pollution source," NCR "must find an alternative to Aroclor which could be introduced *if* the Aroclor system were deemed unacceptable," and referred to this possible switch to an Aroclor alternative as a "contingency plan." Roach Decl. (Doc. #666), Ex. 45 [Jan. 26, 1970 Monsanto Memo (Ex. 949 to Vodden Dep.)]. This evidence flatly contradicts Dr. Vodden's testimony that he had already informed NCR that Aroclor 1242 was an

environmental contaminant and that Monsanto was going to stop selling Aroclor 1242 for paper applications.

Dr. Vodden also testified that his group's work on looking at the environmental effects of Aroclor 1242, which did not start until sometime after October 30, 1969, may not have postulated that higher chlorinated homologues present in Aroclor 1242 were persistent in the environment until the middle of 1970, and admitted that he would not have (indeed, could not have) communicated this information to anyone at NCR until that time. Roach Decl. (Doc. # 666), Ex. 26 [H. Vodden Dep. at 77:23-78:11]. In a letter that Monsanto sent to customers in February 1970, Monsanto clearly informed all customers that "PCBs with a chlorine content of less than 54% have not been found in the environment and appear to present no potential problem to the environment." Roach Decl. (Doc. #666), Ex. 47 [February 1970 Monsanto Customer Letter (Ex. 962 to Vodden Dep.)]. It is therefore apparent that Dr. Vodden's timeline of events, 40 years after the fact, is confused, and contradicted by the documentary evidence as to what Monsanto was telling its customers at the time.

**Proposed Finding No. 23:** In December 1969 and January 1970, Monsanto tested the effluent from NCR's facilities in the US and UK. Effluent samples from an NCR facility had "quite high" levels of Aroclor 1242, and the mud in the stream taking the surface water drainage contained 150 ppm PCBs.

**RESPONSE NO. 23:** **This is an undisputed, but non-material fact.** The proposed fact does not relate to ACPC, or ACPC's knowledge, in any respect.

**Proposed Finding No. 24:** Between December 1969 and February 1970, NCR, Monsanto and WT held numerous high-level meetings.

**RESPONSE NO. 24:** **This is a disputed in part, but non-material fact**. The word "numerous" is vague and not appropriate for a finding of fact. In addition, nothing in the cited evidence supports the conclusion that these were "high level" meetings. PJF Decl. (Doc. #575), Exs. 40, 41, and 42. The remainder of this Proposed Finding of Fact is undisputed. Moreover, the proposed fact does not relate to ACPC, or ACPC's knowledge, in any respect.

**Proposed Finding No. 25:** During these meetings, the following subjects were discussed: (a) effluent testing results from NCR's facilities in the US and UK; (b) effluent testing results from WT's UK and Belgium facilities; (c) PCB contamination of US and UK water bodies; (d) appropriate responses to governmental investigations regarding the source of PCB contamination; and (e) replacement of PCBs in CCP with another solvent.

**RESPONSE NO. 25:** **This is a disputed, but non-material fact.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants cite to no evidence of record that ACPC was involved in the December 1969 or the February 1970 meetings between NCR, Monsanto, and WT, or that ACPC somehow learned of the information discussed in such meetings. Accordingly, Defendants' PFF No. 25 does not create a genuine dispute of material fact.

With regard to NCR, this fact is disputed because the subjects listed in the proposed finding were not all discussed at the meetings held in the U.S. in 1969 and in the U.K. in 1970. Only certain of these subjects were discussed at the different meetings. *See* PJF Decl. (Doc. #575), Exs. 27, 36, 40, 41, 42.

**Proposed Finding No. 26:** NCR cooperated with Monsanto in its investigation of the risks of Aroclor 1242.

**RESPONSE NO. 26: The record evidence does not support this non-material fact.** Moreover, the proposed fact does not relate to ACPC's knowledge or actions in any respect.

With regard to NCR's actions, the record evidence relates solely to certain test samples that Monsanto was taking, and, while confirming that NCR cooperated in taking those samples, does not discuss anything pertaining to "risks of Aroclor 1242," or in any way suggests that these samples were being taken to investigate any such risks.

**Proposed Finding No. 27:** In 1969, NCR was concerned that public disclosure of PCBs in CCP could cause NCR to lose market share to its main CCP competitor, 3M.

**RESPONSE NO. 27: This is a disputed, but non-material fact.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants cite to no evidence of record that ACPC was concerned about "public disclosure of PCBs in CCP." Accordingly, Defendants' PFF No. 27 does not create a genuine dispute of material fact.

With regard to NCR's knowledge, the proposed fact is disputed and unsupported by the record evidence cited. Defendants cite several deposition transcripts for the basic proposition that 3M was a competitor of NCR's in the CCP market. They then cite a memo, written by a *Monsanto* employee regarding the article in the *San Francisco Chronicle*, stating that "[s]uch an article could play into the hands of 3-M's action paper." *See* PJF Decl. (Doc. #575), Ex. 28. This belief is not attributed to anyone at NCR.

Internal Monsanto documents from the same time period make clear that Monsanto was concerned about 3-M taking over market share from NCR. (*See* PJF Decl. (Doc. #575), Ex. 26 [March 12, 1969 Monsanto Memo] at 1-2, but no documents suggest that <u>NCR</u> was similarly concerned).

**Proposed Finding No. 28:** Between 1969 and 1971, NCR and Monsanto received US and UK governmental inquiries about PCB use.

**RESPONSE NO. 28:** **This is a disputed in part, but non-material fact.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants cite to no evidence of record that "between 1969 and 1971" ACPC received any "US and UK governmental inquiries about PCB use", or, further, that ACPC was aware if NCR and/or Monsanto received governmental inquiries. Accordingly, Defendants' PFF No. 28 does not create a genuine dispute of material fact.

With regard to NCR, this fact is disputed in part. It is undisputed that *Monsanto* received US and UK governmental inquiries regarding PCB use between 1969 and 1971, but the record evidence cited by Defendants does not support the proposed fact that *NCR* received any US or UK governmental inquiries regarding PCB use over that period. *See* PJF Decl. (Doc. #575), Exs. 49 & 50. It is, rather, an undisputed fact that NCR did *not* receive any governmental inquiries over this period. *See* Pls. PFF (Doc. #661), ¶ 149.

**Proposed Finding No. 29:** On January 27, 1970, Monsanto met with the UK Ministry of Agriculture. Attendees for Monsanto included Mr. Cameron and Mr. Vodden, and for the UK Ministry, Mr. Portman and Mr. Wood.

**RESPONSE NO. 29:** **This is an undisputed, but non-material fact**. Defendants have cited to no record evidence that ACPC attended the January 27, 1970 meeting between Monsanto and the UK Ministry of Agriculture, or that ACPC was otherwise aware that such meeting took place.

**Proposed Finding No. 30:** The UK Ministry of Agriculture was investigating the sources of recently discovered PCB contamination in the Irish Sea and Severn Estuary, and in food products—cashew nuts packaged in recycled cardboard made from NCR broke.

**RESPONSE NO. 30:** **The record evidence does not support this non-material fact.** Defendants have cited articles describing certain incidents, but have not cited anything indicating that the "UK Ministry of Agriculture was investigating" those incidents at the time of the January 27, 1970 meeting. *See* PJF Decl. (Doc. #575), Exs. 51 & 52. Moreover, the proposed fact has nothing to do with ACPC's knowledge or actions in any respect.

**Proposed Finding No. 31:** On January 26, 1970, Monsanto met with NCR in advance of Monsanto's meeting with the UK Ministry of Agriculture.

**RESPONSE NO. 31:** **This is an undisputed, but non-material fact**. It is undisputed that Monsanto met with NCR on January 26, 1970. It is also undisputed that Dr. Vodden stated that it was "coincidental that the two meetings occurred one day after the other," and they were likely scheduled as such so that he could make only one trip to London. *See* PJF Decl. (Doc. #575), Ex. 36 at 41:3-11. However, Defendants have cited to no record evidence that ACPC attended the January 26, 1970 meeting between Monsanto and NCR, or that ACPC was otherwise aware of such meeting.

84

**Proposed Finding No. 32:** NCR asked Monsanto not to identify NCR paper as a "major outlet" for Aroclor at the meeting between Monsanto and the UK Ministry. NCR wanted to make sure their "housekeeping" was in order first.

**RESPONSE NO. 32: This is an undisputed, but non-material fact.** Plaintiffs state, however, that in a meeting among NCR, Monsanto and WT shortly thereafter, on February 19, 1970, both NCR and WT "agreed that [Monsanto] should identify the N.C.R. paper application for Aroclor at [Monsanto's] next meeting with the Ministry of Agriculture as a constructive and positive step." Roach Decl. (Doc. #666), Ex. 243 [Feb. 19, 1970 Monsanto Memorandum (PHGNCR-2001875)]. However, the proposed fact does not relate to ACPC's knowledge and/or actions in any respect.

**Proposed Finding No. 33:** At its meeting with the UK Ministry of Agriculture on January 27, 1970, Monsanto did not disclose the use of PCBs in NCR Paper.

**RESPONSE NO. 33: This is an undisputed, but non-material fact.** *See* Plaintiffs' Response No. 32 above. However, the proposed fact does not relate to ACPC's knowledge and/or actions in any respect.

**Proposed Finding No. 34:** At about the same time, in April 1970, United States Congressman William Ryan began investigating PCB contamination in the US and contacted Monsanto for information.

**RESPONSE NO. 34: This is an undisputed, but non-material fact.** The proposed fact does not relate to ACPC's knowledge and/or actions in any respect.

**Proposed Finding No. 35:** Congressman William Ryan specifically asked Monsanto to release to the public a list of all uses of Aroclor.

**RESPONSE NO. 35:** **This is an undisputed, but non-material fact.** The proposed fact does not relate to ACPC's knowledge and/or actions in any respect.

**Proposed Finding No. 36:** On April 10, 1970, in response to Congressman Ryan's inquiries, Monsanto issued a press release about PCBs.

**RESPONSE NO. 36:** **This is an undisputed, but non-material fact.** The proposed fact does not relate to ACPC's knowledge and/or actions in any respect.

**Proposed Finding No. 37:** The April 10, 1970 press release does not list NCR Paper.

**RESPONSE NO. 37:** **This is a partially disputed, but non-material fact**. The proposed fact does not relate to ACPC's knowledge and/or actions in any respect. Plaintiffs also state that this press release provides that Monsanto's research "confirmed by others, found only the higher chlorinated materials" in the environment, and further research "show[ed] PCB is not a highly toxic material." *See* PJF Decl. (Doc. #575), Ex. 55.

**Proposed Finding No. 38:** In June 1970, Monsanto sent a letter to Monsanto's customers, including NCR, stating that it was discontinuing the sale of PCBs for use in plasticizer applications (including the Aroclor used in CCP) because of worldwide concern over environmental contamination.

**RESPONSE NO. 38:** **This is an undisputed, but non-material fact**. Defendants have cited no record evidence that Monsanto sent the June 1970 letter to ACPC, or that ACPC was otherwise aware of the letter.

With respect to NCR, it is undisputed that the June 1970 letter stated that Monsanto was going to discontinue the sale of PCB-containing products for modifier and

plasticizer applications effective August 30, 1970, but it is disputed that this letter made any reference at all to "worldwide concern over environmental contamination." *See* PJF Decl. (Doc. #575), Ex. 44. It is also undisputed that, contrary to its statements in this letter, Monsanto continued to sell its existing stock of Aroclor 1242 and related chlorinated products until mid-1972 Pls. PFF (Doc. #661), ¶ 85

**Proposed Finding No. 39:** In April 1970, Monsanto revised its warning labels for Aroclor 1242 that specifically warned of environmental risks and these labels were sent to NCR.

**RESPONSE NO. 39: This is a disputed in part, but non-material fact.** Defendants cite to no evidence of record that ACPC was aware of warning labels for Aroclor 1242 in April 1970 or at any other time.

It is undisputed that, at some point, Monsanto revised its warning labels for Aroclor 1242, but nothing cited by Defendants in any way supports the proposed fact that this amendment occurred in April 1970. Nor do Defendants support their statement that "these labels were sent to NCR." *See* PJF Decl. (Doc. # 575), Exs. 43 & 27 at 81:10-84:5. Indeed, the testimony of Mr. Paton, cited by Defendants, reflects only that Mr. Paton "think[s]" NCR received its shipments of Aroclor by tank car, and that there would likely have been someplace on the tank car to insert these warnings. PJF Decl. (Doc. #575), Ex. 27 at 82:5-10.

**Proposed Finding No. 40:** Additionally, Monsanto issued a technical bulletin warning of "environmental hazards" of Aroclor 1242, including that the PCBs contained in Aroclor 1242 "may be harmful to certain forms of animal life."

**RESPONSE NO. 40:     This is a disputed in part, but non-material fact.**
Defendants have cited no record evidence that ACPC received the Monsanto technical
bulletin or that ACPC was otherwise aware of such bulletin.

Moreover, Defendants have cited no record evidence that NCR received the
technical bulletin.  Further, Defendants take the statements in the technical bulletin out of
context.  While the technical bulletin does discuss various Aroclors generally, and lists
Aroclor 1242 as containing PCBs, the bulletin also states that  these various Aroclors "all
contain polychlorinated biphenyls (PCB) of various types and in varying amounts."
AMH Decl. (Doc. #667), Ex. 30 (NCR-FOX-0528375).

Further, the bulletin does not, as Defendants contend, state that "Aroclor 1242
'may be harmful to certain forms of animal life.'"   Rather, the complete sentence to
which Defendants are referring states in full that "PCB residues in small amounts have
been found in the environment and some studies have indicated that they may be harmful
to certain forms of animal life."  *Id.*  With regard to Aroclor 1242 – the only type of
Aroclor ever used in CCP – it is undisputed Monsanto had communicated to NCR that:
"No [Aroclor] 1242 [has been] found in any environmental samples" and "none found to
date in environment – we think it degrades."  Roach Decl. (Doc. # 666), Ex. 44 [Dec. 16,
1969 Monsanto/NCR Meeting Notes (GPFOX00030900)].  Moreover, Monsanto sent a
letter to all customers in February of 1970 clearly informing customers that "PCBs with a
chlorine content of less than 54% [which includes Aroclor 1242] have not been found in
the environment and appear to present no potential problem to the environment."  Roach
Decl. (Doc. #666), Ex. 47 [February 1970 Monsanto Customer Letter (Ex. 962 to H.
Vodden Depo.)].

**Proposed Finding No. 41:** Each year between 1954 and 1970, NCR purchased increasing amounts of PCBs from Monsanto for use in the manufacture of CCP — from 0.6 million pounds in 1957 to 4.4 million pounds in 1967, 5.8 million pounds in 1968, 6.3 million pounds in 1969, and 6.6 million pounds in 1970.

**RESPONSE NO. 41:** **This is an undisputed, but non-material fact.** The proposed fact does not relate to ACPC's knowledge and/or actions in any respect.

**Proposed Finding No. 42:** NCR produced millions of pounds of CCP at the Appleton coating plant — with production increasing from 0.2 million pounds in 1954 to 7.8 million pounds in 1967, 10.3 million pounds in 1968, 11.3 million pounds in 1969, and 11.8 million pounds in 1970.

**RESPONSE NO. 42:** **This is a disputed, but non-material fact.** NCR did not produce *any* CCP between 1954 and 1970. NCR produced *emulsion for CCP*, and ACPC produced CCP. The document cited by Defendants reflects the production of *emulsion*, which did range between 0.2 million pounds in 1954 and 11.8 million pounds in 1970. *See* PJF Decl. (Doc. #575), Ex. 31.

**Proposed Finding No. 43:** NCR built a new emulsion plant that used PCBs in 1968.

**RESPONSE NO. 43:** **This is an undisputed, but non-material fact**. The proposed fact does not relate to ACPC's knowledge and/or actions in any respect.

NCR did build a new emulsion plant in Portage in 1968, and the emulsion containing PCBs was produced at the Portage plant. However, the evidence cited by Defendants does not support the asserted fact that the new emulsion plant "used PCBs."

**Proposed Finding No. 44:**    After NCR bought the stock of ACPC in 1970, broke from ACPC continued to be sold to Defendants even though NCR was fully aware of the significant environmental risks.

**RESPONSE NO. 44:**    **This is a disputed, but non-material fact**.  As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants cite to no evidence of record that ACPC "was fully aware of the significant environmental risks" of selling broke.

With regard to NCR's knowledge, none of the record evidence cited by Defendants supports the proposed fact that in 1970, "NCR was fully aware of" "significant environmental risks."  This is a hotly contested fact and is the subject of extensive dispute as set forth in NCR's Responses to Certain Defendants' [Proposed] Findings of Fact and Conclusions of Law (Doc. #659) and NCR's [Proposed] Findings of Fact and Conclusions of Law (Doc. #661).   In fact, Defendants own expert, Joseph Rodricks, testified in his deposition that no published study reported that Aroclor 1242 was bioaccumulating before 1971.  Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 32:13-17].  Further, Defendants' expert, Rodricks, testified that no study published prior to 1972 ever found that Aroclor 1242 persisted in the environment, or otherwise suggested that Aroclor 1242 entered the food chain from discharges or otherwise posed risk of environmental harm.  Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 152:7-15].  Accordingly, Defendants have not shown that NCR was "fully aware" of "significant environmental risks" from Aroclor 1242 in 1970.

## B.    ACPC's Knowledge And Actions.

**Proposed Finding No. 45:** Beginning in the 1950s, ACPC worked closely with NCR to produce PCB-containing CCP.

**RESPONSE NO. 45: This fact is not supported by the record evidence cited by Defendants.** It is undisputed that beginning in the 1950's, ACPC worked with NCR to produce NCR Brand carbonless copy paper ("CCP") by applying an emulsion to base stock paper. It is also undisputed that from 1954 to 1971, the emulsion used in CCP contained Aroclor 1242, a type of PCB. However, the record evidence Defendants cite does not support the conclusion that ACPC "worked closely with NCR to produce PCB-containing CCP." Moreover, it is undisputed that ACPC did not have knowledge in the 1950s that the emulsion even contained PCBs. Defendants do not cite any contrary evidence. In fact, even Defendants do not contend that ACPC knew that the emulsion contained PCBs until 1963. *See e.g.,* Defendants' PFF 52.

**Proposed Finding No. 46:** ACPC knew that the broke it sold for recycling contained emulsion.

**RESPONSE NO. 46: This proposed finding is not supported by the cited record evidence.** As support for this fact, Defendants cite solely to a WT memo describing a visit to the ACPC facility on October 30, 1962. JEF Decl. (Doc. #683), Ex. 27. The statement upon which Defendants' rely — "The only emulsion lost is in the broke" — constitutes an observation of the WT representatives and is not attributed to any ACPC employee. The document does not mention recycling.

**Proposed Finding No. 47:** By 1958, ACPC knew that the recycling broke caused the CCP capsules to rupture, discharging their contents.

**RESPONSE NO. 47:** **The proposed finding is not supported by the cited record evidence.** The document cited states is pertinent part:

> We have discussed the problem of re-use of waste paper containing NCR CB and CFB with the personnel of both Mead Corporation and the Appleton Coated Paper Company. It is my understanding that neither will reprocesses their own NCR Paper waste but that they sell it to other paper making firms who re-use it in fairly high grade papers. The personnel of both mills have promised to write to you directly to give you specific details and their recommendations.

Foley Decl. Ex. 12. Further, there is no evidence ACPC received a copy of the letter or had knowledge of, and agreed with, statements made therein.

**Proposed Finding No. 48:** ACPC was also very familiar with the procedures for inventorying, shipping, and billing NCR broke.

**RESPONSE NO. 48:** **This is a partially disputed, but non-material fact.** It is undisputed that ACPC was familiar with its own internal procedures for inventorying, shipping and billing broke <u>to brokers</u>. However, Defendants have cited no record evidence to support a finding that ACPC was familiar with <u>the brokers'</u> procedures for inventorying, shipping, or billing broke the brokers sold to third parties.

**Proposed Finding No. 49:** NCR, ACPC, and Wiggins Teape ("WT") (NCR's UK licensee) had frequent communications and meetings between the mid-1950s and 1970s concerning CCP manufacture and broke recycling.

**RESPONSE NO. 49: This is a partially disputed, but non-material fact.** Further, the only documentation cited to support this proposed findings — Foley Decl. Ex. 1 — is defective and improper for the reasons stated in Response No. 63. Therefore, this proposed finding is not supported by record evidence. In addition, the documents cited in Ex. 1. show only that there were periodic communications between WT and NCR, between WT and ACPC, and between NCR and ACPC. There were few if any

communications to which all three entities were parties.  Further, there is no evidence that matters discussed in communications between WT and NCR were communicated to ACPC.  These documents further indicate that the communications involved a wide range of topics relating to NCR brand carbonless copy paper, including, in a few instances, the recycling of broke resulting from the manufacture of NCR carbonless copy paper.  However, these communications provide no evidence that ACPC was aware that the recycling of broke would result coatings on the broke being discharged into any water body or that the coatings on broke presented any environmental risk.

**Proposed Finding No. 50:**   From 1953 through 1971, NCR, ACPC, and WT shared information regarding recycling and environmental risks, and as early as 1958 had discussed how to best recycle NCR broke.

**RESPONSE NO. 50:**    **The proposed finding is not supported by the cited record evidence.**  It is undisputed there were discussions between NCR and ACPC, and between ACPC and WT, regarding recycling NCR broke, but the record evidence cited by Defendants provides no support whatsoever for a finding that information was shared regarding "environmental risks" relating to recycling NCR broke from 1953 to 1971. Exhibit 1 is an argumentative, one-sided product prepared by Defendants' attorneys and provides no evidentiary basis for a finding of fact.  Even Exhibit 1, however, provides no support for Defendants' Proposed Finding of Fact, as none of the documents cited therein – including Exhibits 11, 12 and 79 – have anything to do with discussions of environmental risks associated with the recycling of NCR broke. Moreover,  Defendants' own expert, Joseph Rodricks, testified in his deposition that no published study reported that Aroclor 1242 — the type of PCB used in NCR Paper — was  bioaccumulating before

1971.  Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 32:13-17].  Defendants'

expert, Rodricks, further testified that no study published prior to 1972 ever found that

Aroclor 1242 persisted in the environment, or otherwise suggested that Aroclor 1242

entered the food chain from discharges or otherwise posed risk of environmental harm.

Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 152:7-15].    Accordingly,

Defendants have not shown that NCR or ACPC were aware of – let alone discussed –

"environmental risks" relating to recycling NCR broke from 1953 to 1971.

> **Proposed Finding No. 51:**    ACPC and WT had complete freedom with respect
> to their exchange of information.

> **RESPONSE NO. 51:**    **The proposed finding is not supported by the cited**
> **record evidence.**  The cited document consist of a letter prepared by WT and found in
> the files of WT.  There is no evidence that the letter was in fact sent to ACPC by WT or
> that ACPC agreed with anything stated in the letter.  Further, there is record evidence
> demonstrating that that WT and ACPC did *not* exchange information with "complete
> freedom."  To the contrary, the parties had business reasons for limiting the sharing of
> some information.  For example, WT indicated in an internal report that thought that
> "very little information was forthcoming" from ACPC representatives on particular
> subjects and that ACPC was "most unwilling to discuss" these subjects."  *Id.*, Ex. 9 at
> BCFOX00037524.  Another WT report observed:

> > The recent acquisition of Combine Mills by NCR Dayton made APCO [ACPC]
> > very reticent . . . Consequently, we did not have access to all the information
> > necessary to carry out our objectives.  In addition, the discussions were general
> > rather than specific.

> Foley Decl. Ex. 187 at BCFOX00051281.

In addition, while there is some documentary evidence showing that ACPC shared information with WT, there is little evidence indicating that this was reciprocated by WT. For example, Defendants cite no evidence indicating that WT disclosed to ACPC its ongoing research regarding re-use of broke or WT's investigation into alternative to Aroclor 1242.

**Proposed Finding No. 52:**  By 1963 at the latest, ACPC knew that PCBs were a constituent of NCR Paper.

**RESPONSE NO. 52:   The proposed finding is not supported by the cited record evidence.**  The cited document is an internal WT report describing a visit to ACPC.   The author of the report (a WT employee) makes a passing reference to "Arachlor."  Foley Decl. Ex. 35 at BCFOX00038486.   There is no evidence that any ACPC representative used that term or was familiar with the term.   The document demonstrates only that WT was familiar with the term Arachlor as of 1963, an undisputed fact that in not material to Plaintiffs' motion.

**Proposed Finding No. 53:**  ACPC gained information from NCR regarding the constituents of CCP by working with NCR to test constituents of NCR emulsion.

**RESPONSE NO. 53:   This proposed finding is not supported by the record evidence cited by Defendants.**   The evidentiary basis for Defendants' assertions — Exhibit 1 to the Declaration of Jayni Foley — is an argumentative, one-sided chart prepared by Defendants' attorneys and provides no evidentiary basis for a finding of fact. *See* Responses 63-87 to Defendants' Proposed Additional Findings of Fact.  The other documents cited by Defendants as support for this fact describe assistance that ACPC provided to NCR with regard to testing of already made emulsion and/or other

information shared between ACPC and NCR.  None of the cited documents discuss the constituents of CCP, and none discuss Aroclor 1242.

Proposed Finding No. 54:    ACPC gained information from NCR regarding the constituents of CCP by working directly with NCR in its development of patents for paper processes.

**RESPONSE NO. 54:    This proposed finding is not supported by the record evidence cited by Defendants.**    Neither of the patents cited by Defendants relates to constituents of CCP and, accordingly, do not support the proposed fact.  AMH Decl., (Doc. #667), Exs. 9 and 10.[1]  Rather, one patent (Ex. 9) relates to a method of drying paper already coated and the other patent (Ex. 10) relates to a coating technique.

Proposed Finding No. 55:    Tom Busch, of ACPC, filed numerous patents regarding the NCR paper coating process and wrote an article for the Technical Association of the Pulp and Paper Industry ("TAPPI") describing paper coating additives.

**RESPONSE NO. 55:    Undisputed.**

Proposed Finding No. 56:    ACPC learned that Aroclor 1242 was a constituent of NCR emulsion based on product specifications and confidential instructions for handling the PCB-containing emulsion given to ACPC by NCR.

**RESPONSE NO. 56:    This proposed finding is not supported by the record evidence cited by Defendants.**  Neither of the documents cited by Defendants discusses Aroclor 1242 as a constituent of NCR emulsion.  AMH Decl. (Doc. #667), Exs. 7 and 15.  Moreover, neither document cited by Defendants mentions Aroclor 1242 in any respect.

---

[1] Defendants mistakenly cite to Exhibits 8 and 9 but, the patents are Exhibits 9 and 10.

**Proposed Finding No. 57:** NCR representatives made multiple visits to ACPC facilities to test processes or discuss chemical specifications.

**RESPONSE NO. 57: Undisputed in part.** It is undisputed that, commencing in 1953, NCR representatives made multiple visits to ACPC to test processes relating to the coating of base stock with NCR emulsion or to discuss specifications for the manufacture of NCR brand carbonless paper, which specifications sometimes included chemicals.

**Proposed Finding No. 58:** ACPC's Manager of Research Ronald Jezerc may have known that NCR emulsion contained PCBs when he read the patent upon starting at ACPC in 1964, and in any event, knew before 1969.

**RESPONSE NO. 58: This proposed finding is not supported by the record evidence cited by Defendants.** As support for this proposed finding, Defendants cite solely to the deposition testimony of Ronald Jezerc (AMH Decl. (Doc. # 667), Ex. 4, at 33-34; 56-57) and a patent (*id.*, Ex. 10, Patent No. 3,632,378). These documents do not support the facts Defendants have proposed.

With regard to how Mr. Jezerc learned there were PCBs in the emulsion for NCR paper, he initially testified that it may have learned the information from reading the patent, but, then twice stated that he did not know that to be the case and did not recall reading the patent:

> Q.     When you started working at Appleton in 1964, when you first came to Appleton, did you know that the NCR emulsion with which you were working contained PCBs?
>
> A.     Somewhere in there I must have found out, but ---
>
> Q.     Right. I'm trying to determine when, in fact, you figured that out, if you recall.

A.      Maybe when I read the patent.

Q.      Okay.  Do you recall reading the patent?

A.      I don't know.

Q.      Okay.

A.      I really don't know.  I –

AMH Decl. (Doc. # 667), Ex. 4 at 57:2-12  Accordingly, there is no basis for finding of

fact that Mr. Jezerc in fact learned of PCBs by reading a patent, nor is there any basis for

suggesting that he read a particular patent, such as Exhibit 10.

Further, Mr. Jezerc did not testify that he was aware that there were PCBs in the

emulsion in 1964.  Rather, he specifically stated that he could not remember whether he

learned the information, but confirmed only that he would have known before 1969:

> "Q.      That's fine.  That's fine.  So at some point it sounds like you did have an
> understanding that the NCR emulsion contained PCBs; is that correct?
>
> A.      Yes.
>
> Q.      Okay.  But you can't remember if it was in 1964, 1965, 1966, but
> sometime between 1964 and 1971, you learned that information; is that
> right?
>
> A.      '69 I would – I had to have known before that time."

AMH Decl. (Doc. #667), Ex. 4, 57:13-20.  Accordingly, there is also no basis for a

finding of fact that Mr. Jezerc in fact was aware that there were PCBs in the emulsion at

any time earlier than 1969 – as that was the only concrete date he testified to that he knew

he was aware by that date of PCBs in the emulsion.

**Proposed Finding No. 59:**   By the late 1960s at the latest, ACPC knew of the

bioaccumulation and biopersistence of PCBs and was concerned about the adverse

environmental effects of PCBs.

**RESPONSE NO. 59:    This is a disputed, but non-material fact.**  It is undisputed that by the late 1960's, ACPC knew of the bioaccumulation and biopersistence of PCBs.  However, ACPC did not believe that these concerns applied to Aroclor 1242 – the only type of Aroclor ever used in CCP.  Declaration of Ronald R. Jezerc ("Jezerc Decl."), (Doc. # 674), ¶ 2.  Defendants have cited to no record evidence to the contrary.  In fact, Defendants own expert, Joseph Rodricks, testified in his deposition that no published study reported that Aroclor 1242 was bioaccumulating before 1971.  Roach Decl., (Doc. # 666), Ex. 29 [J. Rodricks Dep. at 32:13-17].  Further, Defendants' expert, Rodricks, testified that no study published prior to 1972 ever found that Aroclor 1242 persisted in the environment, or otherwise suggested that Aroclor 1242 entered the food chain from discharges or otherwise posed risk of environmental harm.  Roach Decl., (Doc. #666), Ex. 29 [J. Rodricks Dep. at 152:7-15].  Moreover, Defendants have cited to no evidence that ACPC knew of the bioaccumulation and biopersistence of PCBs prior to 1969.

**Proposed Finding No. 60:**  ACPC had internal meetings in 1969 about replacing Aroclor in NCR emulsion due to the adverse environmental effects of PCBs.

**RESPONSE NO. 60:    This is a partially disputed, but non-material fact.**  It is undisputed that ACPC had internal meetings in 1969 about replacing Aroclor in NCR emulsion.  However, ACPC did not believe that the environmental concerns applied to Aroclor 1242 – the only type of Aroclor ever used in CCP.  Declaration of Ronald R. Jezerc ("Jezerc Decl."), (Doc. # 674), ¶ 2.   Defendants have cited to no record evidence to the contrary.

**Proposed Finding No. 61:**   By 1969, ACPC knew that there were environmental concerns associated with discharging wastewater containing NCR emulsion to the River.

**RESPONSE NO. 61:    This proposed finding is not supported by the record evidence cited by Defendants.**   In the deposition testimony cited by Defendants, ACPC's former manager of research, Ron Jezerc, did not testify that ACPC "knew that there were environmental concerns associated with discharging wastewater containing NCR emulsion to the River."  To the contrary, Mr. Jezerc testified that ACPC did not allow NCR emulsion to be discharged into the sewer because doing so would waste money and, accordingly "we don't put emulsion in the river."  AMH Decl., (Doc. # 667), Ex. 4, at 72-73:

> "Q.    Where did the wash-up water come from?
>
> A.    The coaters after a run, after we clean up the coaters.  We don't put it to the sewer, we hold it and use it as make-up water on this new emulsion.
>
> A.     It's better to use wash-up water for that rather than put it down the sewer and into the river.
>
> Q.    Okay.
>
> A.    It saves us money.
>
> Q.     Right.  Was there – was the reason – well, how does it save you money?
>
> A.    We don't put emulsion in the river.
>
> Q.    Uh huh.  How does that save money?
>
> A.    Because we add it to the coating, we don't have to add new emulsion to the coating."

Moreover, when Mr. Jezerc was asked whether the main concern at that time was environmental concerns relating to discharging wastewater containing NCR emulsion, Mr. Jezerc responded that ACPC's main concern about discharging emulsion was money.

100

*Id.* at 73. Mr. Jezerc testified did not recall any environmental concerns about the emulsion at all until sometime in 1969. *Id.*

Further, Mr. Jezerc confirmed that at the time that he realized that PCBs could pose a potential problem if released into the environment, he believed that the concern was limited to PCBs in transformers:

> "Q. At the time that you realized that PCBs could pose a potential problem if released to the environment [9/30/70 document], were you aware that carbonless copy paper was being recycled?
>
> A. I wasn't. I should have been, but I wasn't.
>
> …Q. So when you realized that there was a potential problem with PCBs being released into the environment, what were the means by which you thought that they could be released?
>
> A. Transformers."

**Proposed Finding No. 62:** ACPC continued to sell broke to Defendants despite this knowledge.

**RESPONSE NO. 62: This proposed finding is not supported by the record evidence cited by Defendants.** First, none of the documents cited by Defendants supports the proposition that ACPC sold "broke to Defendants." It is undisputed that ACPC sold broke to brokers. Second, as set forth in detail in Plaintiffs' Response No. 61 above, Defendants have not offered any evidence to support the factual proposition that ACPC had knowledge that "there were environmental concerns associated with discharging wastewater containing NCR emulsion to the River." To the contrary, ACPC did not believe that the concerns raised about PCBs applied to Aroclor 1242. Jezerc Decl. (Doc. # 674), ¶ 2. Through the time that the changeover was completed, ACPC continued to believe that Aroclor 1242 posed no environmental danger. *Id.,* ¶ 6.

### C. NCR's Communications With ACPC And Other Licensees And WT's Testing Of Recycled Broke.

**Proposed Finding No. 63:** During the period from 1953 to 1971, NCR, WT, ACPC, Mead and several others held more than 65 in-person technical meetings (some days-long) to discuss all aspects of NCR paper production, including broke recycling. See JEF Decl., Ex. 1, which is a compilation of all communications and meetings between NCR, ACPC, WT and other licensees during the time frame between 1953 through 1971, information on which has been produced to Defendants [Chart: Communications Among ACPC, WT, And NCR]. Ex. 1 of JEF Decl. is supported by the documents listed as Exhibits 2 through 204 of JEF Decl.

**RESPONSE NO. 63:** Proposed Finding No. 63 should be stricken as lacking a proper evidentiary foundation. It is based upon a chart (Ex. 1 to the Declaration of Jayni E. Foley), prepared by counsel for Defendants, consisting of their one-sided and argumentative summaries of dozens of underlying documents purporting to reflect communications among a variety of entities. This document is not a proper proposed finding of fact under Civil L.R. 56.2 and provides no evidentiary basis for a finding of fact. The chart is a misleading and argumentative jumble of information which has been selectively aggregated to suit Defendants' purposes. Therefore, Exhibit 1 should be stricken and the Court should reject Defendants' proposed findings of fact that rely upon the exhibit.

Further, the underlying documents do not support a finding that representatives of each of the named parties were in attendance at each of the alleged "65 in-person technical meetings." To the contrary, some of the meetings cited in the chart involved only WT personnel (with no evidence that the matters discussed were communicated to

outside parties). Other meetings involved only representatives of WT and Mead (with no evidence that the matters discussed were communicated to ACPC or NCR). Still other meetings involved only representatives of WT and NCR (with no evidence that the matters discussed were ever communicated to ACPC). Some meetings involved representatives of WT and Combined Locks sat a time when the latter entity had no affiliation with NCR or ACPC.

Further, the Defendants' "color coding" in Exhibit 1 is inaccurate and misleading. For example, according to the chart's color coding, there were "[v]isit[s]/communication[s] involving NCR, ACPC *and* WT" (emphasis added) in March 1958, November 1960, and November 1964 (among other dates). However, examination of the underlying documents demonstrates that WT had *separate* meetings with NCR and ACPC at *separate* locations.

**Proposed Finding No. 64:** Significant meetings during which broke and/or broke recycling was discussed occurred on the following dates and places:

**RESPONSE NO. 64: The proposed finding is not supported by the cited record evidence.** Defendants have simply collected documents that make any mention of broke, without regard to whether the broke in question was generated through the production of CCP (as opposed to broke resulting from uncoated paper) and without regard to whether the CCP-related broke involved "CF broke" (which did not contain an PCBs) or "CB or CFB" broke (which would have contained PCBs between 1954 and 1971. See individual responses below.

| | | | |
|---|---|---|---|
| 65. | 01/1957 | WT Visit to NCR: WT visited NCR to discuss technical issues regarding NCR Paper, the NCR-WT liaison, and to discuss research on NCR Paper. At this meeting NCR set forth the framework under which WT will operate when producing | JEF Decl. Ex. 6 [WT Notes on Visit to NCR in Jan. 1957] |

| | | NCR paper. Major topics discussed included: machine coating, emulsion coating, making, finishing and testing NCR Paper, end use problems and research and development. WT and NCR discussed machine coating and its reduction in broke, and also discussed broke generally, including NCR's estimate of less than 15% broke on all grades. | |
|---|---|---|---|

**RESPONSE NO. 65: Disputed in part; the proposed finding is neither material nor relevant to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. Defendants have not shown how the cited language is either relevant or material to the pending motion. Neither the discussions referenced, nor anything else in the document, addresses the reuse or recycling of broke or the composition of broke. Further, the summary is an incomplete and misleading description of the document upon which it is based. Defendants omit statement in the document which contradict their proposed findings. For example, they fail to mention that the document indicates that the "initiating reason for the visits to the U.S.A. was the very unsatisfactory state of affairs with regard to information" on certain matters and that "N.C.R. Dayton were all worked up at the start of the visit because they thought Wiggins Teape were not willing to co-operate with N.C.R." The document also notes "our troubles over the lack of information." Foley Decl. Ex. 6 at BCFOX00043353..

| 66. | 7/26/1957 | WT Report on NCR Development meeting: "Discussion on Broke and Costs with Mr. Vincent - Mr. Vincent reported that Stoneywood are showing 31% Broke on sheets and 15% on reels. Treforest 20% on sheets and 15% on reels. Appleton are supposed to be giving is [sic] their figures for broke but the meeting agreed that in any case we need a full broke investigation, and | JEF Decl. Ex. 8 [July 26, 1957 WT Report on NCR Development Meeting] |
|---|---|---|---|

| | | Mr. Hendry undertook to put one of Group Research on to it." | |
|---|---|---|---|

**RESPONSE NO. 66:** **Disputed in part, but neither relevant nor material to Plaintiffs' motion.** The proposed finding is defective in that quoted language is vague and ambiguous as to what it meant by "Appleton['s] . . . figures for broke." Nor have Defendants shown how this statement is either relevant or material to the pending motion. Neither the cited language nor any other language in the document addresses the reuse or recycling of broke or the composition of broke. Nor does the document indicate whether the "broke" involved CCP. Further, the document is an internal WT report. There is no indication that the information was provided to anyone outside of WT.

| 67. | 9/30/1957 | WT Visit to ACPC: WT visit to ACPC included a tour of the plant and NCR production and discussion of: emulsion preparation, coating, finishing and testing. WT notes that "as far as sorting is concerned, most of the broke taken out at this stage seems due to creases, pipes, bar-marks (from conveyor in tunnel drier) and other mechanical faults." | JEF Decl. Ex. 9 [WT Notes on Visit to ACPC on Sept. 30, 1957] |
|---|---|---|---|

**RESPONSE NO. 67:** **Disputed in part, but neither relevant nor material to Plaintiffs' motion.** The underlying document makes a bare reference to "broke." Defendants have not shown how the cited language is either relevant or material to the pending motion. Neither the cited language nor any other language in the document addresses the reuse or recycling of broke, the composition of broke or even if the broke contained any PCBs whatsoever. Further, the summary is an incomplete and misleading description of the document upon which it is based. For example, Defendants fail to mention that the document indicates that WT thought that "very little information was forthcoming" from ACPC representatives on particular subjects and that ACPC was

"most unwilling to discuss" these subjects." *Id.*, Ex. 9 at BCFOX00037524.

| 68. | 1/1/1958 | WT Group Research Organization, Annual Report for 1958: "Re-use of CB and CFB broke. A pulping process was developed for CB and CFB along the lines suggested by Mead. Work was abandoned when it was shown that there was no financial advantage over selling the broke at the present price." "Visits of Messrs. Lauer and Sandberg. We have had visits from NCR Dayton in connection with the quality of the product, and it is hoped that the result will be a more uniform product and fewer complaints." | JEF Decl. Ex. 11 [WT Group Research Organization, Annual Report for 1958] |

**RESPONSE NO. 68: Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR or WT. Defendants have not shown ACPC ever had any knowledge of the cited information. Further, the document is an internal WT report. There is no indication that the information was provided to anyone outside of WT. Defendants have not shown how the cited language is either relevant or material to the pending motion.

| 69. | 1/7/1958 | NCR Letter: Regarding repulping of NCR Paper stating that Sandberg has discussed problem with both ACPC and Mead and they will reply back to WT. | JEF Decl. Ex. 12 [January 7, 1958 NCR letter] |

**RESPONSE NO. 69: Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR. The underlying letter simply references that an NCR representative discussed re-use of broke with ACPC, a matter of no consequence to ACPC since, as the letter indicates, ACPC did not re-process the broke but instead sold it "to other paper making firms who re-use it in fairly high grade papers." There is no

106

evidence that ACPC was a party to, or even aware of, the letter.  Further, the summary is an incomplete and misleading description of the document upon which it is based.  For example, the letter states that "[o]ur [NCR's] own experiments in our laboratory indicate that no problem is encountered in re-using CF or CB by itself."  Further, the attachment (a document purportedly prepared by the "Waste Paper Utilization Council") states that "[d]einking mills have reported no trouble with it [NCR broke] except that it does impart a certain amount of blue color."

| 70. | 1/27/1958 | NCR letter to WT: I notice in a letter addressed to you from Bob Sandberg, and dated January, 7th, some information about re-use of waste paper - does this mean you have this more or less under control? | JEF Decl. Ex. 14 [Copy of January 27, 1958 NCR letter] |
|---|---|---|---|

**RESPONSE NO. 70:  Disputed in part, but neither relevant nor material to Plaintiffs' motion.**  As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR or WT.  There is no evidence that ACPC was a party to, or even aware of, the letter.  Further, the summary is an incomplete and misleading description of the document upon which it is based.  The cited text is the last, and presumably least important, of several different matters referenced in the letter.  Further, the letter is vague and ambiguous:  while the letter references re-use of paper and inquires whether "this" is "more or less under control," the letter is unclear what aspect of the re-use of broke "this" refers to.

| 71. | 2/21/1958 | WT letter to NCR: "First, we have received from Mead their reports on the re-use of waste NCR paper.  We do not have a de-inking plant, so we shall proceed with the quaternary ammonium treatment indicated by them.  I do not altogether agree with the statement that no trouble is caused with CB on its own, because after it has turned blue by the action of light it is extremely difficult to remove the blue colour.  As we can not always guarantee to use the broke immediately, this is | JEF Decl. Ex. 16 [Feb. 21, 1958 WT Letter to NCR] |
|---|---|---|---|

| | | quite a serious problem.<br><br>However, it does appear that Mead have solved it and we shall follow their instructions." | |
|---|---|---|---|

**RESPONSE NO. 71: Undisputed, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR or WT. There is no evidence that ACPC was a party to, or even aware of, the letter. Further, Defendants have not shown how the cited language is either relevant or material to the pending motion.

| 72. | 3/31/1959 | WT Visit to NCR, ACPC, Combined Locks and Mead: The purpose of WT's visit to NCR, Combined Locks and Mead was to observe and discuss: NCR reel orders, the production of machine coated CF paper, to study NCR costs and possible price reductions and to become familiar with the technical aspects of NCR paper production. NCR provided to WT the figures for emulsion consumption and broke at the US Mills. | JEF Decl. Ex. 21 [WT Notes on Visit to NCR, ACPC and Mead on March 31 through April 16, 1959] |
|---|---|---|---|

**RESPONSE NO. 72: The cited document does not support this proposed finding and should be disregarded.** JEF Decl. Ex. 21 does not discuss "WT Visit to NCR, ACPC, Combined Locks and Mead." The document references only a visit to WT by a representative of NCR in November 1958 and makes no reference whatsoever to visits occurring in March or April 1959. Further, the document makes no reference to ACPC. As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR or WT.

| 73. | 11/1/1960 | WT Visit to ACPC, Mead and NCR: WT visited ACPC, Mead and NCR to discuss technical matters and to look into their finishing methods. WT also evaluates current machinery used by ACPC. ACPC proposed that WT entered into an agreement on "Reciprocity of Research" with ACPC. WT concludes that broke percentages at ACPC and Mead on reel orders may be | JEF Decl. Ex. 24 [WT Technical Notes on ACPC, NCR and Mead Visits in Nov. 1960] |
|---|---|---|---|

| | | comparable to WT, and that WT will need to continue to reduce their sheet broke. | |
|---|---|---|---|

**RESPONSE NO. 73: Disputed in part but neither relevant nor material to Plaintiffs' motion.** Neither the cited language nor any other language in the document addresses the reuse or recycling of broke or the composition of broke. Instead, the document merely references "broke percentages on reel orders" and WT's efforts to reduce "our sheet broke further." Defendants have not shown how these topics have any relevance to Plaintiffs' motion. Further, these comments were WT's commentary on its own operations in comparison to those of ACPC and Mead. The document provides no evidence that the issue of broke was actually discussed with ACPC. Nor is clear whether the broke referenced in the report was CF broke (containing no PCBs) or CB or CFB broke (which would have contained PCBs as of the date of the document. In addition, the summary is an incomplete and misleading description of the document upon which it is based. For example, Defendants attempt to create the impression that there was a single meeting attended by WT, ACPC, Mead and NCR for the purpose of "discuss[ing] technical matters and to look into their finishing methods." In fact, the document indicates that that WT met separately with representative of ACPC, Mead and NCR and that the quoted language is the author's "object" for his meeting with ACPC. The summary is also misleading in that it references only two selected items from among numerous technical and operational matters discussed with ACPC representatives. Defendants also omit that the document indicates ACPC proposed a "Reciprocity of Research" agreement because ACPC had "many ideas on how NCR paper could be improved," but lacked "sufficiently big research efforts available to carry them out or the

109

facilities . . . to do so."  [BCFOX00037720]

| 74. | 10/30/1962 | ACPC Visit to WT: ACPC visited WT's Treforest facility and discussions included:  raw materials, mix formulations, emulsion use, and other technical topics.  WT notes that for ACPC "the only emulsion lost is in the broke." | JEF Decl. Ex. 27 [WT Notes on ACPC Visit to WT on Oct. 30, 1962] |

**RESPONSE NO. 74:  Undisputed.**  It is notable that, while the document provides a detailed summary of topics discussed, the document makes no mention of the presence of PCBs in NCR emulsion, any concerns regarding use of the emulsion, or the re-use or recycling of broke.

| 75. | 11/1963 | WT visits NCR's Dayton facility for a week for "updating." WT tours NCR and Mead's facilities, and NCR asks WT's questions.  Topics discussed include: NCR's efforts to develop a next generation paper, NCR's lawsuit against 3M for patent infringement, various trials performed at Nekoosa Edwards, comparison of American and English emulsion.  WT visited Mead. WT notes that Mead sells "all of their NCR waste to a Mill with a deinking plant who they claim are able to re-cover and use as white pulp in this way."  WT was impressed by Mead's "openness in discussion." | JEF Decl. Ex. 32 [Nov. 1963 NCR Paper and Supply Products Technical Services Progress Report]; Ex. 33 [WT Notes on Visit to Mead on Nov. 29, 1963]; Ex. 34 [WT Notes on Visit to Mead on Nov. 29, 1963] |

**RESPONSE NO. 75:   Disputed in part, but neither relevant nor material to Plaintiffs' motion.**  As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of NCR, WT or Mead.  These documents purport to report on WT's separate meetings with NCR and Mead.  There is no evidence that ACPC was present at any of the meeting or that the matters discussed at these meeting were communicated to ACPC.  Likewise, there is no evidence that any of the issues discussed between WT and Mead were ever discussed with NCR.

| 76. | 12/2/1963 | WT Visit to ACPC:  The purpose of WT's visit to ACPC was to discuss "in detail the up-to-date information" on the coating of NCR paper."  Topics included:  NCR paper manufacturing by Mitsubishi, | JEF Report on ACPC Visit on Dec. 2-4, 1963]; Ex. 32 [Nov. 1963 NCR |

| | | emulsion usage, issues with CB check paper (including the capsule breakage and release of Aroclor), various equipment issues, coating weight control and other technical issues. WT notes that it would seem NCR is "only too willing to accept any new raw materials providing it will cheapen the product" which was not the impression NCR had given WT when WT had suggested alternative formulations. WT's visit notes also include Appleton's prices for broke disposal. | Paper and Supply Products Technical Services Progress Report] |
|---|---|---|---|

**RESPONSE NO. 76: Undisputed.** It is notable that, while the document provides a detailed summary of topics discussed, these topics did not include the presence of PCBs in NCR emulsion, any concerns regarding use of the emulsion, or the re-use or recycling of broke.

| 77. | 10/12/1964 | WT Visit to Combined Locks: WT toured Combined Locks Mill and viewed coating process. Discussed machine efficiency, including that the on machine coating produced 9% broke and the off machine coating produced 10% broke. | JEF Decl. Ex. 44 [WT Oct. 12, 1964 Visit to Combined Locks Notes] |
|---|---|---|---|

**RESPONSE NO. 77: Undisputed, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of third parties, such as Combined Locks, with whom neither ACPC nor NCR had no corporate affiliation at the time.

| 78. | 11/5/1964 | Notes of meeting between BAT and WT regarding Aroclor: Determinations in paper - reference to Aroclor being "toxic" and concern that recycled NCR paper should not be used in food packaging materials | JEF Decl. Ex. 52 [Nov. 5, 1964 Notes of meeting between BAT and WT regarding Aroclor] |
|---|---|---|---|

**RESPONSE NO. 78: Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of third parties such as WT or BAT. The cited document

purports to summarize a meeting attended by representatives of WT and BAT. There is no evidence that the matters discussed at the meeting were communicated to ACPC or NCR.

| 79. | 1/25/1965 | Letter from J. Gough (WT) to Cora Ayers (BAT) about "the determination of Aroclor." States that Monsanto is having a roundtable discussion "between all the interested parties" and Gough will be attending. Gough thinks it may be useful to have the last tests that BAT/Ayers carried out to show at the meeting. Monsanto hopes the meeting will enable them and us (WT) "to get to the bottom of this problem." | JEF Decl. Ex. 57 [Jan. 25, 1965 Letter from BAT] [Gough Depo. Ex. 1010-G] |
|---|---|---|---|

**RESPONSE NO. 79: Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of third parties such as WT or BAT. The cited document purports summarize a involves a communication between representatives of WT and BAT. There is no evidence that either ACPC or NCR was part of "discussion group" referenced in the underlying document. At his deposition, John Gough, the former WT employee who was responsible for Wiggins Teape's studies regarding the recycling of NCR broke, stated that his concern was to determine how well the recycling process was able to remove dyes from the NCR Paper recycled. Roach Decl., Ex. 94 [J. Gough Dep. at 25:20-26:12, 98:11-99:2; 115:17-116:2]. Mr. Gough stated that he was not concerned with the "fate" of Aroclors in the paper, but that a scientist at British American Tobacco Company ("BAT") who was asked to test the removal of dyes suggested that it would be easier to study the removal of Aroclors as a "proxy" or "surrogate" for the dyes (as the dyes were too difficult to test directly). *Id.* Mr. Gough also stated that this testing was purely an "economic" issue, because Wiggins Teape was contemplating building its own

recycling plant, and it wanted to make sure that the recycled products it made did not

contain inks, and that it could deink the NCR broke without using so much bleach that

the paper fiber was destroyed.  Roach Decl., Ex. 94 [J. Gough Dep. at 97:19-98:10].  Mr.

Gough did not share any of the results of this testing with anyone at NCR or ACPC until

a conference in 1972, and he has no knowledge that anyone else ever shared such

information with anyone at NCR or Appleton Papers.  Roach Decl., Ex. 94 [J. Gough

Dep. at 29:17-31:4. 105:23-106:16].

| 80. | 2/15/1965 | WT Visit to ACPC: WT observes extensive ACPC operations in Appleton from February 15, 1965 to February 19, 1965.  Observations include those on coating: "Coaters are theoretically similar" and retentions are "quite separate from broke losses."  WT reports that Appleton retains 100% of its emulsion, but this is separate from broke loss. | JEF Decl. Ex. 59 [Feb. 15, 1965 Report on WT Visit to ACPC in Appleton] |
|---|---|---|---|

**RESPONSE NO. 80:  Undisputed.**  It is notable that, while the document provides a

detailed summary of topics discussed, these topics did not include the presence of PCBs

in NCR emulsion, any concerns regarding use of the emulsion, or the re-use or recycling

of broke.

| 81. | 4/1965 | WT Visit to NCR:  During the NCR-WT visits between 1964-65 the following was discussed: "reuse of paper machine broke containing emulsion and the problem which will arise if emulsion gets into the backwater." (used recycling process water to be discharged from a plant).  During that meeting, NCR advised that the best broke recycling method "was to break the capsules chemically and then adsorb oil/dyestuff mixture onto attapulgus clay which can be removed."<br><br>Additionally, NCR told WT that NCR has "been looking for an alternative to Aroclor for the last ten years without success.  They were looking for improvements in toxicity, odour, and cost."  NCR told WT that it was opposed to using other lighter solvents in the emulsion because that 'might upset the balance of the whole dye system."<br><br>The memorandum also states that the microcapsules may be "dissolved, broken by pressure." | JEF Decl. Ex. 70 [Feb 15, 1965 Report on WT visit to ACPC in Appleton]; Ex. 72 [Gough Deposition at 56:12-20] |
|---|---|---|---|

**RESPONSE NO. 81: Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not NCR or WT. The document purports to summarize meetings with representatives of NCR, and provides no information regarding the state of ACPC's knowledge. Moreover, Defendants' definition of "backwater" as being water that is discharged from a plant, does not appear to be the same use of "back water" in the cited memorandum. Indeed, the memorandum goes on to describe the "problem" that would arise from emulsion getting into the back water, as being that "[t]he capsules will be in closer contact with all the normal additives used in 'papermaking' and 'they' will undergo 'a different form of drying operation.'" So the "problem" was actually related to the papermaking operations, and has nothing to do with environmental issues as erroneously suggested by Defendants' citation.

| 82. | 5/17/1965 | WT Visit to Mead: Visit arranged by H. Lauer of NCR Dayton. Mead produces NCR paper; reportedly not as efficient as Appleton. Mead "do not use their NCR broke but sell it to Moraine. . . for about $50 per ton." | JEF Decl. Ex. 74 [May 17, 1965 report on WT visit to Mead]; Ex. 75 [May 17, 1965 report on WT visit to Mead]; Ex. 76 [May 1965 Report on Visit to Mead Paper Corporation] |
|---|---|---|---|

**RESPONSE NO. 82: Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not NCR, WT or Mead. The document purports to summarize meetings with representatives of WT and Mead, and provides no information regarding the state of ACPC's knowledge.

| 83. | 12/5/1965 | WT Visit to Mead: Volume of NCR business, NCR coating plant, phenolic F, and broke is discussed. "They do not re-use any of their broke". All broke is sold at $50 per ton to Morraine Paper Mills at Dayton. Mead at one time did work on repulping NCR broke and found that the CVL dyestuff colour could be destroyed by use of quarternary ammonium compounds. | JEF Decl. Ex. 114 [Dec. 5, 1965 WT report of visit to Mead] |
|---|---|---|---|

**RESPONSE NO. 83:** **Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not NCR, WT or Mead. The document purports to summarize meetings with representatives of WT and Mead, and provides no information regarding the state of ACPC's knowledge.

| 84. | 05/1966 | WT Visits to Mead and ACPC: Purpose of visit was to look at how mills in the US produce base paper for NCR coating. Topics reviewed included: stock preparation, paper making, coating operations, and finishing. Mills use of broke is discussed. WT toured plants. During Mead visit discussed broke. Base paper is made with 30% broke (uncoated) and Mead sells the CF broke at $60/ton. | JEF Decl. Ex. 134 [May 1966 WT Summary of Visits to NCR Producing Mills]; Ex. 135 [May 1966 WT Summary of Visit to Mead]; Ex. 136 [May 1966 WT report on visit to ACPC] |
|---|---|---|---|

**RESPONSE NO. 84:** **Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not WT or Mead. While the document indicates that WT visited the ACPC facility, the document does not provide any evidence as to the knowledge of ACPC with respect to Phase I issues. Further, while the document evidences WT's efforts to collect information from various companies involved in the production of NCR carbonless copy paper, Defendants have offered no evidence that the information compiled in document like Ex. 134 was ever shared with ACPC or NCR. Finally, the cited language references

| | | "CF broke," a form of broke containing no PCBs. | |
|---|---|---|---|
| 85. | 9/25/1967 | WT Visit to ACPC: Purpose of the visit was to evaluate the performance of the three-roll coating head and Cleveland crane. ACPC told WT that a complete wash up of the system occurs every 12 hours, and the color is pumped to a buffer tank, and the system is washed off with water to the drain. ACPC claimed an overall broke level of 3% (meaning the difference in weight between all raw materials going in and coating paper going out). | JEF Decl. Ex. 165 [Oct. 8, 1967 Notes on Visit to ACPC] |

**RESPONSE NO. 85: Undisputed that the memorandum discusses the topics cited.**

It is notable that while the document provides a detailed summary of topics discussed, these topics did not include the presence of PCBs in NCR emulsion, any concerns regarding use of the emulsion, or the re-use or recycling of broke. As the proposed fact does not state that any of the statements discussed in the referenced memorandum was actually accurate, Plaintiffs have not attempted to compile all evidence demonstrating that the WT memo is actually inaccurate in many respects and disputed by extensive additional record evidence.

| 86. | 5/27/1968 | WT, NCR Visit to ACPC: Purpose of the visit was to have a general exchange of ideas, practices and machinery in the manufacture of NCR Paper, and to discuss a "tandem" coater. ACPC's consideration of the use of broke in place of Solka Floc was discussed, including that ACPC does not believe repulping will cause blueing. | JEF Decl. Ex. 179 [June 1968 WT Report on Visit to ACPC] |

**RESPONSE NO. 86: Undisputed.** It is notable that while the document provides a detailed summary of topics discussed, these topics did not include the presence of PCBs in NCR emulsion, any concerns (including environmental) regarding use of the emulsion, or environmental concerns regarding the re-use or recycling of broke.

| 87. | 6/2/1969 | WT Visit to ACPC: The purpose of WT's visit to ACPC was to determine the efficiency of ACPC's production of NCR Paper and identify any major differences in production. Topics discussed included: ordering process, stock holding, raw materials, production efficiency. WT and ACPC also discussed | JEF Decl. Ex. 187 [WT Visit Report on June 2-6, 1969 Visit to ACPC] |

| | | broke levels at ACPC. | |
|---|---|---|---|

**RESPONSE NO.** 87**: Undisputed.** It is notable that, while the document provides a detailed summary of topics discussed, these topics did not include the presence of PCBs in NCR emulsion, any concerns (including environmental) regarding use of the emulsion, or environmental concerns regarding the re-use or recycling of broke.

**Proposed Finding No. 88:** In the Fall/winter of 1964, WT began another major effort aimed at developing its own broke recycling capabilities for NCR paper, including CB and CBF sheets - i.e., those containing PCB emulsion. JEF Decl. Ex. 39A [Sept. 17, 1964 Technical Liaison Meeting Ely/Treforest]; Ex. 46 [Oct. 28, 1964 Treforest Technical Report].

**RESPONSE NO. 88: Undisputed, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of WT. Defendants have offered no evidence that the cited information was ever communicated to ACPC.

**Proposed Finding No. 89:** Because of WT's knowledge about PCB toxicity and concerns about the potential toxicity of products produced from recycled CB and CFB broke, Mr. John Gough, a fiber specialist at WT, was appointed to design a series of laboratory and large scale trial test runs of recycling options in order to design a system that cost-effectively removed dyes and solvents from waste broke. AMH Decl. Ex. 16 [July 29, 1954 NCR Letter]; JEF Decl. Ex. 70 [WT 1965 Report] at 18-19; Ex. 62 [March 16, 1965 WT Letter re: Aroclor testing] [Gough Depo. Ex. 1010-I]; Ex. 52 [Nov. 5, 1964 Notes of BAT/WT Meeting].

117

**RESPONSE NO. 89:** **Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of WT. Defendants have offered no evidence that the cited information was ever communicated to ACPC.

Moreover, while accurate that Mr. John Gough, a fiber specialist at WT, was appointed to design a series of laboratory and large scale trial test runs of recycling options in order to design a system that cost-effectively removed dyes from waste broke, Mr. Gough expressly testified that he was not at all concerned with the fate of any of the solvents, including PCBs, present in NCR paper, but only tested PCBs as a "proxy" or "surrogate" for the dyes. *See, e.g.*, Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law (Doc. #661), PFF Nos. 157-165.

**Proposed Finding No. 90:** Because WT lacked the laboratory analytic equipment and expertise to conduct the measurements necessary to determine the extent to which dyes and solvents were removed by recycling, WT sought and received the support of British American Tobacco's laboratories for this effort. JEF Decl. Ex. 62 [March 16, 1965 WT Letter re: testing samples for Aroclor] [Gough Depo. Ex. 1010-I]; Ex. 58 [February 2, 1965 Letter to WT re: Aroclor determination][Gough Depo. Ex. 1010-H].

**RESPONSE NO. 90:** **Disputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the

knowledge of ACPC, not the knowledge of WT. Defendants have offered no evidence that the cited information was ever communicated to ACPC.

Additionally, as stated above, Mr. Gough (and WT) was not interested in measuring the extent to which the "solvents" (including PCBs) were removed by recycling, but only had BAT look at the removal of PCBs as a "proxy" or "surrogate" for the dyes. Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law (Doc. #661), PFF Nos. 157-58.

**Proposed Finding No. 91:** WT consulted with Monsanto and BAT to determine the appropriate analytic techniques for use in this series of experiments and monitored trial testing runs, and together, they decided that analysis of the PCB content in broke was the best means of acquiring the desired information. JEF Decl. Ex. 57 [January 1, 1965 WT Letter re: Aroclor determination] [Gough Depo. Ex. 1010-G]; Ex. 62 [March 16, 1965 WT Letter re: testing samples for Aroclor] [Gough Depo. Ex. 1010-I] ("The samples sent for Aroclor testing "represent paper made with and without N.C.R. broke."); Ex. 113 [WT Letter re: samples with broke tested for Aroclor] [Gough Depo. Ex. 1010-U].

**RESPONSE NO. 91:** **Disputed, but neither relevant nor material to Plaintiffs' motion.** Contrary to the proposed fact, it was actually BAT that determined unilaterally that testing the PCB content in broke was the best means of acquiring the desired information regarding dyes, and the consultations with Monsanto were solely in an effort to determine the best methods for testing PCBs. [Gough Dep. at 38:10-39:1; 98:11-99:2.

Moreover, as set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of WT. Defendants have offered no evidence that the cited information was ever communicated to ACPC.

**Proposed Finding No. 92:** Two large scale flotation trial runs were conducted in June and July of 1965. JEF Decl. Ex. 91 at pp. 1-6.

**RESPONSE NO. 92: Undisputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of WT. Defendants have offered no evidence that the cited information was ever communicated to ACPC.

**Proposed Finding No. 93:** For these broke recycling trial runs by the flotation de-inking process, WT/BAT analyzed the PCB content of broke before it was recycled, the PCB content of the fibers recovered from the process, and the PCB content of the two waste streams produced from the recycling process - backwater (destined for discharge to a river or treatment plant) and solids removed from a centrifuge process employed during flotation de-inking process. JEF Decl. Ex. 91 [WT report "Re-use of N.C.R. Broke - trials on a flotation de-inking plant"].

**RESPONSE NO. 93: Undisputed, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of WT. Defendants have offered no evidence that the cited information was ever communicated to ACPC. Moreover, as referenced above, while the

fate of PCBs was studied by WT/BAT, it was only studied as a "proxy" or a "surrogate" for dyes, and without any relevance to environmental concerns. See Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law (Doc. #661), PFF Nos. 157-58, 165.

**Proposed Finding No. 94:** As a result of these efforts, the analytic results obtained in August and November 1965 definitively established that the recycling of CB and CFB broke would result in the significant discharge of PCB-laden wastewaters from the flotation de-inking process. JEF Decl. Ex. 89 [Aug 4, 1965 letter from BAT to WT] [Gough Depo. Ex. 1010-P]; JEF Decl. Ex. 111 [Nov. 25, 1965 BAT to WT letter] [Gough Depo. Ex. 1010-T].

**RESPONSE NO. 94:** **Undisputed in part, but neither relevant nor material to Plaintiffs' motion.** As set forth in detail in Plaintiffs' Brief in Support of Motion for Summary Judgment on Phase I, the relevant knowledge at issue is the knowledge of ACPC, not the knowledge of WT. Defendants have offered no evidence that the cited information was ever communicated to ACPC. Worth noting, however, is the fact that based upon these studies, and obtaining the results referenced in this proposed fact, Wiggins Teape built its own broke recycling plant, hoping to achieve similar results, and continued to recycle broke through at least February 1970. See Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law (Doc. #661), PFF Nos. 163, 166.

**Proposed Finding No. 95:** During this same time period of WT's broke recycling test program, from approximately late 1964 to 1966, over twenty meetings were held between WT, NCR, ACPC, and Mead. JEF Decl. Ex. 1 [Chart: Communications Among ACPC, WT, And NCR].

**RESPONSE NO. 95:** **Disputed.** See response to Proposed Finding Nos. 63-87.

**Proposed Finding No. 96:** Also during this same time period, in August 1965, WT wrote ACPC a letter stating "I agree wholeheartedly with you that it is very much to our mutual benefit to keep in touch, in detail, on the various NCR developments. Our liaison is helped enormously by the fact that we enjoy complete freedom with regard to exchanging information." JEF Decl. Ex. 95 [Aug 18, 1965 WT letter to ACPC].

**RESPONSE NO. 96:** It is undisputed that the letter is accurately quoted, but Defendants' assertion that there was "complete freedom" in the exchange of information is contradicted by documentary evidence Defendants put into the record. See, e.g., Responses to Nos. 65, 67.

**Proposed Finding No. 97:** Around the same time, in April 1965, WT asked whether HB 40, which was an easier substance to remove from the fibers than PCBs, could be substituted for the Aroclor mixture in order to facilitate fiber recovery from CB and CFB broke. NCR denied this request. JEF Decl. Ex. 70 [Apr. 1, 1965 Memo on WT visit to NCR] ("The use of a lighter oil in the capsule, to enable the capsules to be 'floated off', was discussed. Dayton are very much against the idea of changing the oil, as they suggest this might upset the balance of the whole dye system. They added that they have been looking for an alternative to Aroclor for the last ten years without success. There were looking for improvements in toxicity, odor and cost.").

**RESPONSE NO. 97:** Undisputed, but these discussions had nothing to do with environmental concerns, as Defendants' expert, Dr. Rodricks conceded at his

deposition. See Declaration of Ronald R. Ragatz (filed October 19, 2009), Ex. G [Rodricks Dep. Tr.] at 197:11 to 199:1.

**Proposed Finding No. 98:** Based generally on the extensive meetings and consultations regarding broke recycling that occurred among NCR, WT, ACPC and Mead during the period of 1957 through 1964, and based specifically on the analytic work and extensive technical consultations regarding broke recycling that occurred around 1965, there can be no doubt that NCR and ACPC in fact knew in 1965 at the latest that the recycling of broke would result in the release of PCBs into the environment. See generally JEF Decl. at Ex. 1, with supporting documentation at Exhibits 2 through 204.

**RESPONSE NO. 98:** This assertion is a legal argument, rather than a factual assertion in the form required by Civil L.R. 56.2. Therefore, no response is required. Further, Plaintiffs object to Exhibit 1 to the Foley Declaration for the reason stated in the Response to No. 63. Plaintiffs incorporate by reference their previous responses to proposed finding that relief upon Foley Exhibits 2 through 204.

Dated this 19th day of October, 2009.

Respectfully submitted,

APPLETON PAPERS INC.                    NCR CORPORATION

/s/ Ronald R. Ragatz                    /s/ Kathleen L. Roach

Counsel for Appleton Papers Inc.:       Counsel for NCR Corporation:
Michael L. Hermes                       Kathleen L. Roach
HERMES LAW LTD.                         SIDLEY AUSTIN LLP
333 Main Street, Suite 601              One South Dearborn Street
Green Bay, Wisconsin 54301              Chicago, Illinois 60603
(920) 436-9870                          (312) 853-7000
Fax: (920) 436-9871                     Fax: (312) 853-7036

123

Ronald R. Ragatz
DEWITT ROSS & STEVENS S.C.
2 E. Mifflin Street, Suite 600
Madison, Wisconsin 53703
(608) 255-8891
Fax: (608) 252-9243

**COUNSEL FOR APPLETON PAPERS INC.**

J. Ric Gass
GASS WEBER MULLINS LLC
309 North Water Street
Milwaukee, Wisconsin 53202
(414) 224-7697
Fax: (414) 224-6116

**COUNSEL FOR NCR CORPORATION**