**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | | |
|---|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 08-CV-00016-WCG |
| | ) | |
| GEORGE A. WHITING PAPER<br>COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
FOR DECLARATORY RELIEF FILED BY MENASHA CORPORATION[1]**

---

[1]     In addition to Menasha Corporation ("Menasha") this brief is joined by the following
defendants:  The City of Appleton, Georgia-Pacific Consumer Products LP (f/k/a Fort
James Operating Company), Fort James Corporation, and Georgia-Pacific LLC
(collectively, "Georgia-Pacific"), CBC Coating, Inc. ("CBC"), Neenah-Menasha
Sewerage Commission ("NMSC"), P.H. Glatfelter Company ("Glatfelter"), US Paper
Mills Corporation ("U.S. Paper") and WTM I Company ("WTM").  In this brief,
Menasha and the defendants listed in this footnote are referred to collectively as "the
Defendants."

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

I. INTRODUCTION .........................................................................................................1

    A. The Court's December 16, 2009 Decision Applies to Claims for
        Declaratory Relief on *Future* Response Costs and *Future* Natural
        Resource Damages...................................................................................................1

    B. Each of the Defendants is Entitled to a Declaratory Judgment that NCR
        and API are Jointly and Severally Liable for 100 Percent of Any Response
        Costs, Natural Resource Damage Assessment Costs or Natural Resource
        Damages Paid *After the Date of the Entry of the Judgment* for Any PCBs
        in the Lower Fox River and Green Bay Site...........................................................2

II. STATEMENT OF FACTS ..............................................................................................5

    A. NCR and Plaintiff API Are Legal Successors to Appleton Coated Paper
        Company and Combined Paper Mills, Inc., So *Both* Are Liable Under
        CERCLA for Discharges to the Lower Fox River from the Appleton
        Facility and the Combined Locks Facility...............................................................5

    B. During the Production Period There Were Releases of PCBs from Both
        the Appleton Facility and the Combined Locks Facility. .......................................6

    C. The Plaintiffs Admit that the Vast Majority of the PCBs Discharged to the
        Lower Fox River Were Released by 1971 and that New PCB Releases into
        the Lower Fox River Virtually Ceased in the Early 1970s......................................7

    D. The Facts Not Genuinely at Issue Weigh Heavily In Favor of
        Apportioning All Future Response Costs, Natural Resource Damage
        Assessment Costs and Natural Resource Damages to the Plaintiffs.......................7

    E. API, NCR and Related Entities Have Admitted Liability, Assumed
        Liability, or Have Indemnified Each Other for All Past and All Future
        Response Costs and All Future Natural Resource Damages. ..................................9

    F. Menasha Incurred Response Costs Pursuant to the UAO and the OU1
        Consent Decree. ...................................................................................................11

III. ARGUMENT ...............................................................................................................11

    A. This Motion Meets the Summary Judgment Standard...........................................11

    B. Declaratory Relief Should be Granted to the Defendants Under CERCLA
        Section 113(g)(2) and the Declaratory Judgment Act. ..........................................12

        1. Any Predicate for Granting Declaratory Relief Under Both Section
            113(g)(2) of CERCLA and under the Declaratory Judgment Act is
            Satisfied...................................................................................................13

        2. CERCLA Section 113(f) Provides Authority for Declaratory
            Judgment on the Defendants' *Future* Response Costs, Natural
            Resource Damage Assessment Costs and Natural Resource
            Damages...................................................................................................15

i

3. The Declaratory Judgment Act also Provides Authority for Declaratory Judgment on the Defendants' Future Response Costs, Natural Resource Damage Assessment Costs and Natural Resource Damages.................................................................................17

4. When Granting Declaratory Relief, the Court is Empowered to Allocate 100 Percent Responsibility to Plaintiffs and Should Do So. .....................................................................................................18

5. Granting Declaratory Relief Against NCR and API for All the Defendants is Appropriate. .......................................................20

C. Based on Relevant Equitable Factors, As Between the Plaintiffs and the Defendants, the Plaintiffs Should Be Held 100 Percent Liable for *Future* Response Costs (Provided that Such Response Costs are Necessary And Consistent with the NCP), Natural Resource Damage Assessment Costs and Natural Resource Damages. ........................................................22

1. CERCLA Itself and the Cases relied upon in the Decision Provide the Legal Framework for Granting Menasha's Motion. ...........................22

2. Applying the Facts not Genuinely at Issue to the Law, as the Court Did in the Decision, the Court Should Enter a Declaratory Judgment that the Plaintiffs Are 100 Percent Liable For Any Amounts Paid by the Defendants for *All Future* Response Costs, Natural Resource Damage Assessment Costs and Natural Resource Damages.................................................................................24

IV. CONCLUSION.................................................................................28

Case 2:08-cv-00016-WCG   Filed 04/02/10   Page 3 of 37   Document 915

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 12

*Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc.*
100 F.3d 792 (10th Cir. 1996) ................................................................................................... 14

*Bancamerica Commercial Corp. v. Trinity Industries, Inc.,* 900 F. Supp. 1427 (D. Kan. 1995). 14

*Beazer East Inc. v. Mead Corp.*, 412 F.3d 429 (3d Cir. 2005) ...................................................... 16

*Boeing Co. v. Cascade Corp.*, 207 F.3d 1177 (9th Cir. 2000) ................................................. 16, 17

*Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953 (7th Cir. 1999) .............. 22

*Burlington Northern and Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870 (2009) ................... 3

*California ex rel. California Dept. of Toxic Services v. Neville Chemical Co.*, 213 F. Supp. 2d
1115 (C.D. Cal. 2002) ................................................................................................................ 14

*Clifton v. Schafer*, 969 F.2d 278 (7th Cir. 1996) .......................................................................... 11

*Confederated Tribes and Bands of the Yakama Nation v. United States*, 616 F. Supp. 2d 1094
(E.D. Wa. 2007) ......................................................................................................................... 18

*Durham Mfg. Co. v. Merriam Mfg. Co.*, 294 F. Supp. 2d 251 (D.Conn. 2003.) .................... 14, 16

*Environmental Transp. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503 (7th Cir. 1992) ........... 19, 23

*F.P. Woll & Co. v. Fifth and Mitchell Street Corp.* 2006 WL 2381778 (E.D. Pa. 2006) ....... 15, 16

*Foster v. U.S.*, 922 F. Supp. 663 (D.D.C. 1996) .......................................................................... 15

*GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615 (7th Cir. 1995) ............................. 18

*Gopher Oil Company v. Union Oil Company*, 955 F.2d 519 (8th Cir. 1992) ............................... 23

*International Union v. Allis-Chalmers Corp.*, 643 F. Supp. 342 (E.D. Wisc. 1986) .................... 20

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) ........................................................................ 12

*Kalamazoo River Study Group v. Rockwell International Corporation*, 274 F.3d 1043
(6th Cir. 2001) ............................................................................................................................ 23

*Kelly v. E.I. DuPont De Nemours and Co.*, 17 F.3d 836 .......................................................... 12, 15

iii

*Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321
  (7th Cir. 1994)............................................................................................... 22, 29

*Lone Star Industries, Inc. v. Horman Family Trust*, 1990 WL 640001, *8 (D. Utah 1990) ........ 24

*Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508 (7th Cir. 2008) ................... 11

*New York v. National Service Industries, Inc.,* 460 F.3d 210 (2d Cir. 2006) ................................. 5

*New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir. 1985) ............................................... 14

*Norfolk Southern Ry. Co. v. Gee Co.*, 2002 WL 31163777 (N.D. Ill. 2002).......................... 15, 19

*North Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642 (7th Cir. 1998)............................................. 5

*O'Neil v. Picillo*, 682 F. Supp. 706 (D.R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989).............. 12

*Occidental Fire & Casualty Co. v. Cont'l Bank N.A.*, 918 F.2d 1312 (7th Cir. 1990)................ 12

*Old Republic Ins. Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077 (7th Cir. 1998)............. 20

*PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610 (7th Cir.1998).................................. 19, 20, 23

*RSR Corp. v. Commercial Metals, Inc.*, 494 F. Supp. 2d 690 (S.D. Oh. 2006)........................... 17

*Sears, Roebuck & Co. v. American Mut. Liability Ins. Co.*, 372 F.2d 435 (7th Cir. 1967) .......... 17

*Sides v. City of Champaign*, 496 F.3d 820 (7th Cir. 2007)........................................................ 11

*Soltys v. Costello*, 520 F.3d 737 (7th Cir. 2008)....................................................................... 20

*Springer v. Durflinger*, 518 F.3d 479 (7th Cir. 2008).............................................................. 11

*Sun Co., Inc. (R & M) v. Browning-Ferris, Inc.*, 919 F. Supp. 1523
  (N.D. Okla. 1996), *aff'd in part, rev'd in part*, 124 F.3d 1187 (10th Cir. 1997)...................... 17

*Super Products Corp. v. D P Way Corp.*, 546 F.2d 748 (7th Cir. 1976) ..................................... 18

*United States v. 175 Inwood Associates LLP*, 330 F. Supp. 2d 213 (E.D. N.Y. 2004) .................. 4

*United States v. Capital Tax Corp.*, 545 F.3d 525 (7th Cir. 2008) ............................................... 4

*United States v. JG-24, Inc.*, 331 F. Supp. 2d 14 (D.P.R. 2004) ............................................... 14

*United States v. Chem-Dyne Corp.*, 572 F. Supp. 802 (S.D. Ohio 1983)...................................... 3

*United States v. Davis*, 261 F.3d 1 (1st Cir. 2001) ...................................... 12, 13, 15, 18

iv

*United States v. Hardage*, 982 F.2d 1436 (10th Cir. 1992) ........................................................ 20

*United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988) ..................................................... 23

*United States v. R.W. Meyer*, 932 F.2d 568 (6th Cir. 1991) ........................................................ 23

## STATUTES

28 U.S.C. § 2201(a) ................................................................................................... 12, 17

CERCLA§ 104(e) .................................................................................................................. 7

CERCLA§ 105(a) ............................................................................................................... 14

CERCLA § 106 ................................................................................................................... 14

CERCLA § 107 ......................................................................................................... 13, 14, 15

CERCLA § 107(a) ......................................................................................................... 13, 14

CERCLA § 107(a)(3) .......................................................................................................... 13

CERCLA § 113 ................................................................................................................... 23

CERCLA § 113(f) ..................................................................................................... 13, 15, 16

CERCLA § 113(f)(1) ...................................................................................................... 22, 23

CERCLA § 113(g) .............................................................................................................. 15

CERCLA § 113(g)(2) ................................................................................................... passim

CERCLA § 122 ................................................................................................................... 14

## MISCELLANEOUS

Restatement (Second) of Torts § 886A ................................................................................. 23

Restatement (Second) of Torts, § 875 ................................................................................... 3

## RULES

Fed. R. Civ. P. 54(c) ......................................................................................................... 20

Fed. R. Civ. P. 56(c) ........................................................................... 2, 11

Fed. R. Civ. P. 56(d) .......................................................................... 2, 12

Fed. R. Civ. P. 56(e) ............................................................................. 11

**FEDERAL REGULATIONS**

40 C.F.R. § 300.700(c)(3)(ii) ................................................................. 14

Case 2:08-cv-00016-WCG   Filed 04/02/10   Page 7 of 37   Document 915

# I. INTRODUCTION

**The recycling companies are the innocent victims of circumstance created by carbonless manufacturers. – NCR's Lowell Schleicher (one of the inventors of carbonless copy paper) (1975).[2]**

## A. The Court's December 16, 2009 Decision Applies to Claims for Declaratory Relief on *Future* Response Costs and *Future* Natural Resource Damages.

Based on the reasoning of the Decision, the Court should grant declaratory relief to the Defendants on *future* response costs that the Defendants pay in completing remediation and cleanup of OUs 2-5 of the Lower Fox River,[3] provided that such response costs are necessary and consistent with the National Contingency Plan ("NCP") and *future* natural resource assessment costs and natural resource damages. According to the Decision:

> For purposes of equitable contribution, the key factor is that the overwhelming
> majority – whether 98 percent or 92 percent – of PCBs had been released during
> the production period. And because many of the Defendants did not learn of the
> risks of recycling NCR paper until even later – 1972 or 1973, for example – the
> amount of PCBs released by the time any of the Defendants possessed adequate
> knowledge of the risks of their activities could actually be more like 99 percent.

(Decision at 41.) This key factor is not really open to genuine dispute by the Plaintiffs. First, the Plaintiffs themselves relied upon the statement made in government reports that "98 percent of the total PCB released into the Lower Fox River had occurred by the end of 1971." (Dkt. 610-7 at 14; and Dkt. 552-2 at 12; Dkt. 552-3 at 14.) In parallel insurance recovery action proceedings,

---

[2]   *See* GPSUF # 106 and the Court's December 16, 2009 Decision (Dkt. 795, the "Decision") at 21.

[3]   Currently, the Plaintiffs are performing the work required under the Operable Units ("OUs") 2-5 remediation pursuant to the Unilateral Administrative Order ("UAO") issued by the United States Environmental Protection Agency ("EPA") on November 13, 2007. The UAO was issued to Plaintiffs, CBC Coating, Inc., Georgia-Pacific, Glatfelter, Menasha, US Paper and WTM I.

1

the same expert NCR is using in this case, Marcia Williams, relied on this statement twice in her October 21, 2008 expert report. (Dkt. 610-8 at p. 56 and p. 63.) Second, on January 29, 2009, in a brief filed in the parallel insurance recovery action proceedings, NCR itself stated that "it is not disputed today that the vast majority of the LFR's ['Lower Fox River'] total PCB 'load' had been released in to the LFR, through several pathways by 1971." (Dkt. 788-1 at 5.) Third, NCR has *admitted* that "new PCB releases into the LFR virtually ceased in the early 1970s." (*Id.* at 7.)

This brief discusses ten facts found by the Court in the Decision to be not genuinely at issue (discussed in Section II. D),[4] ten reasons articulated by the Court in the Decision that demonstrate that API and NCR are liable under CERCLA for the declaratory relief sought in this motion (discussed in Section III. B) and API's admissions, assumption of liability and indemnity that make it liable on a on a co-equal basis as NCR (discussed in Section II. E).

**B.    Each of the Defendants is Entitled to a Declaratory Judgment that NCR and API are Jointly and Severally Liable for 100 Percent of Any Response Costs, Natural Resource Damage Assessment Costs or Natural Resource Damages Paid *After the Date of the Entry of the Judgment* for Any PCBs in the Lower Fox River and Green Bay Site.**

A declaratory judgment should be entered against the Plaintiffs for the same reasons that the Decision held them 100 percent liable for their own past costs of response at the Lower Fox River and Green Bay Site. The declaratory judgment should hold:

1.    That each of the Defendants is entitled to a declaration that NCR and API are jointly and severally liable to that Defendant for 100 percent of any response costs for remediation and cleanup of PCBs in the Lower Fox River and Green Bay Site, provided that such response costs are necessary and consistent with the NCP and are paid after the date of entry of the judgment by that Defendant either as a result

---

[4]    *See* Fed. R. Civ. P. 56(c) and (d)(1).

of a judgment or by full or partial settlement of a claim of the United States or the State of Wisconsin under CERCLA;

2. That each of the Defendants is entitled to a declaration that NCR and API are jointly and severally liable to that Defendant for 100 percent of any natural resource damage assessment costs for the Lower Fox River and Green Bay Site, paid after the date of entry of the judgment by that Defendant either by judgment or by full or partial settlement of a claim of the United States, the State of Wisconsin or a Natural Resource Damages Trustee under CERCLA; and,

3. That each of the Defendants is entitled to a declaration that NCR and API are jointly and severally liable to that Defendant for 100 percent of any natural resources damages for the Lower Fox River and Green Bay Site, paid after the date of entry of the judgment by that Defendant either by judgment or by full or partial settlement of a claim of the United States, the State of Wisconsin or a Natural Resource Damages Trustee under CERCLA.

NCR and API are jointly and severally liable because their liability derives from the same cause, namely the activities of ACPC, Combined Paper Mills, Inc.[5] and NCR's Appleton Papers Division. *Burlington Northern and Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870, 1881 (2009), ("[W]here two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm." Citing Prosser, Restatement (Second) of Torts, § 875 at 315-316 and *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 810 (S.D. Ohio 1983).). *See also United States v. Capital Tax Corp.*, 545 F.3d 525, 535 (7th Cir. 2008) (no divisibility when "the

---

[5]     Combined Paper Mills, Inc. owned the Combined Locks Paper Mill which coated NCR Paper during the Production Period.  (GPSUF # 2.)  To avoid confusion, Combined Paper Mills, Inc. is referred to in this brief as "Combined Locks."

facility functioned as a 'dynamic, unitary operation' in which materials were moved from location to location during the production process.") and *United States v. 175 Inwood Associates LLP*, 330 F. Supp. 2d 213, 232 (E.D. N.Y. 2004) ("All of the available case law indicates that apportionment is only appropriate among *multiple polluting defendants* who dispute the effect of their pollution upon the actual cleanup costs." (Emphasis added.) NCR and API bear the burden of proving that a reasonable basis for apportionment exists between them. *Burlington Northern* at 1881 and *Capital Tax Corp.* at 535. As the Court noted in the Decision, "Plaintiffs have not made any other distinctions between their own knowledge and have not suggested that either of their abilities to recover from the Defendants might differ as between themselves." (Decision at 6, fn. 8.) Accordingly, each of the Defendants is entitled to a declaratory judgment that NCR and API are jointly and severally liable for 100 percent of any response costs, natural resource damage assessment costs or natural resource damages paid after the date of entry of the judgment for PCBs in the Lower Fox River and Green Bay Site.

The relief sought in this motion does *not* include:

- A judicial determination that Menasha or any other Defendant is relieved of liability to the United States Government under the UAO;[6] or,

- Recovery of any *past* response costs incurred by Menasha, including the $7 million Menasha paid $7 million for the remediation of OU 1.

As condition of granting the declaratory relief sought by Menasha, Menasha agrees that its claim for *past* response costs against the Plaintiffs will be dismissed voluntarily and *without* prejudice.[7]

---

[6] The Defendants recognize that the Decision did not absolve them of liability under the UAO. (*See* Decision at 47.)

## II.    STATEMENT OF FACTS

### A.    NCR and Plaintiff API Are Legal Successors to Appleton Coated Paper Company and Combined Paper Mills, Inc., So *Both* Are Liable Under CERCLA for Discharges to the Lower Fox River from the Appleton Facility and the Combined Locks Facility.

Following a series of corporate transactions, NCR became the successor to the liability of Appleton Coated Paper Company ("ACPC") and Combined Paper Mills, Inc. ("Combined Locks"). (Menasha Corporation's Statement of Undisputed Facts ("MENSUF") submitted herewith, # 25.) After acquiring ACPC and Combined Locks, NCR assumed the liabilities of those companies as a matter of law by merging all the operations related to the manufacture of NCR Paper into its Appleton Papers Division. (MENSUF # 26.) In 1978, API assumed the liabilities of NCR's Appleton Papers Division. (MENSUF # 27.) At the time of the 1978 assumption of liability by API, it was well aware of PCB contamination arising out of the former operations of ACPC and Combined Locks. (MENSUF # 28.) By operation of law, by contract, or both, NCR and API *both* are legally liable under CERCLA for the release of hazardous substances by ACPC or Combined Locks to the Lower Fox River.[8] (MENSUF # 29.)

---

[7]    This offer does not apply to any of the other Defendants. Importantly, Menasha's willingness to allow entry of a dismissal without prejudice on its claim for *past* response costs should this motion be granted, is not intended as any sort of admission that Menasha's claim for past response costs is not fully viable. Menasha made the decision not to further pursue its claim for *past* response costs against the Plaintiffs solely for strategy reasons beyond the scope of this motion. As Menasha is entitled, it relies on attorney-client privilege and the attorney work product protection for not disclosing these reasons here.

[8]    New York law governs the 1978 agreement wherein API assumed the liabilities of NCR's Appleton Papers Division. (Declaration of Christopher J. Dow, submitted herewith, at ¶ 23.) In the context of CERCLA liability, the Second Circuit recognizes that an express assumption of liability includes CERCLA liabilities. *New York v. National Service Industries, Inc.,* 460 F.3d 210, 209 (2d Cir. 2006). The Seventh Circuit also recognizes the acquisition of CERCLA liability upon an agreement to assume such liabilities. *North Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642, 651 (7th Cir. 1998).

**B.     During the Production Period There Were Releases of PCBs from Both the Appleton Facility and the Combined Locks Facility.**

NCR Paper was manufactured with PCBs from approximately 1954 to approximately April 1971 (the "Production Period").  (MENSUF # 30.)  During the entire Production Period, ACPC operated a facility in Appleton, Wisconsin ("Appleton Facility") that applied coating containing PCBs to make NCR Paper.  (MENSUF # 31.)  Waste water containing PCBs from the Appleton Facility was released into the Lower Fox River through the City of Appleton sewage treatment plant.  (MENSUF # 32.)  In addition, ACPC arranged for the disposal of hazardous waste (broke) to facilities on the Lower Fox River, including facilities in OU1, OU2, OU3 and OU4. (MENSUF # 33.)  A separate motion filed by Glatfelter and joined by Menasha demonstrates *why* NCR and API have "arranger liability" for those activities.  However, this motion concerns only *future* response costs *for OUs 2-5* and *future* natural resource assessment costs and damages.

Combined Locks operated a facility in Combined Locks, Wisconsin.  (MENSUF # 34.)  During a portion of the Production Period and while it was a subsidiary of NCR, Combined Locks applied coating containing PCBs to make NCR Paper.  (MENSUF # 35.)  Waste water containing PCBs from the Combined Locks Facility was discharged directly to the Lower Fox River.  (MENSUF # 36.)

The discharges of PCBs from the Appleton Facility and the Combined Locks Facility were major contributors to the PCB contamination problems that exist today.  (MENSUF # 37.)  The State of Wisconsin Department of Natural Resources ("WDNR"), working together with the EPA, estimated that hundreds of thousands of pounds of PCBs were released into the Fox River during the Production Period.  (MENSUF # 38.)  In their own expert reports, filings, and Section 104(e) responses to the U.S. Fish & Wildlife Service, the Plaintiffs acknowledged that there were

PCB releases from the Appleton Facility and the Combined Locks Facility during the Production Period. (MENSUF # 39.)

### C. The Plaintiffs Admit that the Vast Majority of the PCBs Discharged to the Lower Fox River Were Released by 1971 and that New PCB Releases into the Lower Fox River Virtually Ceased in the Early 1970s.

WDNR and EPA also determined that approximately 98 percent of all PCB discharges into the Fox River occurred before PCB use in NCR paper was stopped. (GPSUF # 32.) The Decision held that 98 percent estimate to be reasonable, and also concluded that only minor and insignificant releases occurred thereafter, as the result of recycling old office files. (Decision at 40 and 43.) The Plaintiffs *admitted* that 98 percent of all PCB discharges took place prior to 1972, that the "vast majority" of PCBs were released by 1971, and that "new PCB releases into the Lower Fox River virtually ceased in the early 1970s." (MENSUF # 3.)

### D. The Facts Not Genuinely at Issue Weigh Heavily In Favor of Apportioning All Future Response Costs, Natural Resource Damage Assessment Costs and Natural Resource Damages to the Plaintiffs.

Four motions for summary judgment already have been decided by the Court as a result of extensive briefing and submissions of facts not genuinely at issue.[9] On December 16, 2009, the Court decided that the facts not genuinely at issue entitle the Defendants to summary judgment based on the relative culpability of the Plaintiffs and the Defendants. Primary facts not genuinely at issue on which the Decision was based are:

1. The overwhelming majority of the PCBs (perhaps as much as 98 or 99 percent) were released to the river during the Production Period, i.e., prior to 1972.

   (Decision at 39-40. *See also* MENSUF # 1 to 4.)

---

[9]     *See* Dkts. 553, 565, 570, 572, 670, 711, 719.

2. NCR and ACPC knew PCBs in NCR Paper were toxic starting in the 1950s, at the earliest. (*Id.* at 24. *See also* MENSUF # 5.)

3. Both NCR and ACPC knew NCR Paper was being recycled and could result in a release to a water body by 1965. (*Id.* at 10, fn 15. *See also* MENSUF # 6.)

4. By February 1967, NCR and ACPC were aware of the Jensen Report, linking PCBs to DDT and bioaccumulation. (*Id.* at 12. *See also* MENSUF # 7.)

5. By the late 1960s, NCR and ACPC knew that PCBs were a dangerous environmental toxin. (*Id.* at 26. *See also* MENSUF # 8.)

6. For three years after the Jensen Report, NCR failed to get PCBs out of NCR Paper, during which time about *more than half* of the PCBs would have been released to the river. (*Id.* at 35 and 38. *See also* MENSUF # 9.)

7. After they became aware of the Jensen Report, NCR and ACPC steadily increased the production of NCR Paper.[10] (*Id.* at 30-31 and 36. *See also* MENSUF # 10.)

8. NCR and ACPC kept the presence of PCBs in NCR Paper secret until after the Production Period. (*Id.* at 41. *See also* MENSUF # 11.)

9. The Defendants did not know PCBs were in NCR Paper until after the Production Period ended – in some cases several years later. (*Id.* at 41. *See also* MENSUF # 12.)

10. Once the PCBs were in NCR Paper, there was nothing the Defendants could have done to keep them out of their furnish. (*Id.* at 42-43. *See also* MENSUF # 13.)

---

[10] Indeed, the record made at the time the Decision was entered establishes that after it became aware of the Jensen Report, NCR began production of NCR Paper capsules on the Fox River at Portage and Combined Locks. (GPSUF # 100 to 103; GLATSUP # 2.) These undisputed facts are not in the Decision itself.

In addition, though not specifically mentioned in the Decision, NCR and ACPC never warned waste paper brokers or recyclers that NCR Paper contained PCBs, despite the fact that they knew NCR Paper contained a toxic component and that it was being recycled on the Lower Fox River. (MENSUF # 11 to 12, 22.) Monsanto Corporation, the sole manufacturer of PCBs in the United States gave repeated warnings about PCBs to NCR (MENSUF # 14 and 21), but these warnings were never passed on to waste paper brokers or recyclers. (MENSUF # 22.)

### E. API, NCR and Related Entities Have Admitted Liability, Assumed Liability, or Have Indemnified Each Other for All Past and All Future Response Costs and All Future Natural Resource Damages.

The Plaintiffs and related entities have allocated the liability for Lower Fox River environmental costs and damages among themselves, through assumptions of liability and indemnities that spreads this liability among a number of very large corporations, including B.A.T. Industries, p.l.c. ("BAT"), AT&T, Inc., Alcatel-Lucent and Arjo Wiggins Appleton ("AWA"). (MENSUF # 40.) Assuming that NCR and API would have to pay over $1 billion in total Fox River liabilities, NCR stated in its February 2010 S.E.C. Form10-K that "[i]t is the opinion of the Company that the effect of the Fox River matter will have a moderate, but manageable, impact on our liquidity and capital resources. . ." (MENSUF # 41)

As a result of the 1978 transaction by which API assumed all the environmental liabilities of NCR's Appleton Papers Division and a subsequent settlement agreement among API and BAT, NCR is responsible for paying 45 percent of the first $75 million spent on the Fox River, with API responsible for the remaining 55 percent of that amount. (MENSUF # 42.) NCR then pays 40 percent of all costs in excess of $75 million, while API pays the other 60 percent. (MENSUF # 42.) BAT is jointly and severally liable with API for payment of API's share. (MENSUF # 43.)

Under a 1996 separation and distribution agreement among NCR, AT&T and Alcatel-Lucent, NCR is liable for the first $100 million (net of insurance) it spends on Fox River liabilities. (MENSUF # 44.) NCR then pays 50 percent of all costs and damages in excess of $100 million, AT&T pays 37 percent, and Alcatel-Lucent pays 13 percent. (MENSUF # 45.)

Via merger, API became a subsidiary of AWA. (MENSUF # 46.) In 2001, when API's employees purchased the stock of API from AWA, API obtained a broad indemnity from AWA for Lower Fox River liabilities. (MENSUF # 47.) As part of the 2001 transaction, AWA must pay all of API's costs and damages up to $75 million, and in excess of $100 million. (MENSUF # 48.) As between API and AWA, API is only responsible for the $25 million layer between $75 million and $100 million. (MENSUF # 49.) API already has satisfied that obligation, and has no further contractual obligation to contribute to ACPC or NCR's Appleton Papers Division's liabilities for the Lower Fox River and Green Bay Site. (MENSUF # 50.)

According to NCR's February 2010 S.E.C. Form 10-K, NCR now assumes that "NCR and API will be responsible for the full extent of the cleanup activities they are undertaking and for a substantial portion of the counterclaims filed against them and for natural resource damages . . ." NCR currently estimates that the cleanup will cost $933 million, and that natural resources damages will amount to $76 million. (MENSUF # 51.) NCR is confident that API's share will be paid because BAT "would be financially viable and able to pay the joint and several obligation if API is unable to do so." (MENSUF # 52.) Based on its present estimates, NCR reports that AT&T and Alcatel-Lucent will pay $120 million of NCR's Fox River liabilities. (MENSUF # 53.) Finally, NCR reports that it has reached settlement agreements with certain insurers in the amount of $67 million ($9 million of which is in dispute with a competing party).

(MENSUF # 54.)  API already has obtained a jury verdict against its carriers, and thus may have substantial additional resources to bring to bear.  (MENSUF # 55.)

### F. Menasha Incurred Response Costs Pursuant to the UAO and the OU1 Consent Decree.

Menasha paid $7 million toward the work required under the Consent Decree for OU1. (MENSUF # 23.)  In addition, Menasha paid the response costs incurred by the EPA for overseeing the work required by the UAO in OUs 2-5 during the 2009 fiscal year.  (MENSUF # 24.)  By this motion, Menasha does *not* seek to recover from the Plaintiffs any of the *past* response costs it paid.  For purposes of this motion, the response costs Menasha paid serve solely to meet the CERCLA requirement that a party incur response costs prior to obtaining declaratory relief under CERCLA Section 113(g)(2).

## III. ARGUMENT

### A. This Motion Meets the Summary Judgment Standard.

Summary judgment is proper where there is no showing of a genuine issue of material fact and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."  *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007).

Once a properly supported summary judgment motion has been made under Fed. R. Civ. P. 56(c), the opposing party bears the burden of submitting evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co*., 528 F.3d 508, 512 (7th Cir. 2008).  Further, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008); *See Clifton v. Schafer*, 969 F.2d

278, 281 (7th Cir. 1996). Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).

Additionally, Federal Rule of Civil Procedure 56(d) allows the Court, "where practicable," to "determine what material facts are not genuinely at issue" and grant partial summary judgment as to those issues. *See Occidental Fire & Casualty Co. v. Cont'l Bank N.A.*, 918 F.2d 1312, 1320 (7th Cir. 1990).

Applying the facts not genuinely at issue discussed above to the law discussed below, summary judgment should be granted.

### B.    Declaratory Relief Should be Granted to the Defendants Under CERCLA Section 113(g)(2) and the Declaratory Judgment Act.[11]

CERCLA Section 113(g)(2) and the Declaratory Judgment Act provide the statutory underpinnings for the Defendants' request for declaratory relief. Granting declaratory relief *now* would conserve judicial and party resources by avoiding ongoing future litigation. *Kelly v. E.I. DuPont De Nemours and Co.*, 17 F.3d 836 at 845 and *United States v. Davis*, 261 F.3d 1, 46 (1st Cir. 2001). It also would promote certainty and allow primarily responsible parties to plan to meet their future obligations, in turn facilitating timely completion of the remaining remediation work. *Id.* and *O'Neil v. Picillo*, 682 F. Supp. 706, 730 (D.R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989) ("Further, the courts are unanimous that declaratory judgments as to future removal costs are consistent with CERCLA's purpose of encouraging prompt, remedial action."). The Plaintiffs themselves sought declaratory relief to achieve certainty related to future response costs and natural resource damages. According to the Plaintiffs, "this lawsuit is intended to bring before this Court every [potentially responsible party ('PRP')] that has not voluntarily

---

[11] 28 U.S.C. § 2201(a).

resolved its responsibility," in order to reach "a global resolution of the share allocation issues in a single action specifically designed for this purpose." Plaintiffs' Brief in Support of Motion for Leave to File an Amended Complaint, Dkt. 9, p. 4. "*Such a comprehensive resolution will promote the most expedient and effective cleanup of the Lower Fox River Site.*" (Dkt. 92 at 1-2, emphasis added.) Though they have disagreed mightily with the Plaintiffs on *who* is responsible, the Defendants have sought *final* resolution of these claims from the beginning of this litigation. Entering the declaratory judgment requested by the Defendants will further the goals of *final* resolution and promote the most expedient and effective cleanup of the Lower Fox River and Green Bay Site.

       **1.**     **Any Predicate for Granting Declaratory Relief Under Both Section 113(g)(2) of CERCLA and under the Declaratory Judgment Act is Satisfied.**

A person seeking contribution under Section 113(f) of CERCLA must prove that: (1) the person from whom response costs are sought falls within one of the four categories of covered entities (i.e. is a current or past owner or operator, a transporter, or an arranger); (2) a "release or threatened release" of hazardous waste involving their facility occurred; (3) the release or threatened release caused the incurrence of response costs by the person seeking contribution; and, (4) response costs were incurred that were 'necessary costs of response . . . consistent with the national contingency plan.' 42 U.S.C. § 9607." *Davis*, 261 F.3d at 29. The Plaintiffs NCR and API admit the first three of these elements. (Dkt. 560 at 13["... unless Plaintiffs, as successors to ACPC,[12] qualify as 'arrangers' under CERCLA § 107(a)(3), their only potential

---

[12]     NCR is the successor by merger to ACPC and Combined Locks. (Dkt. 560 at 12-14 and Dkt. 664 ¶¶ 21-22.) Accordingly, NCR is liable under CERCLA Section 107. (Dkt. 560 at 13-14 and GPSUF # 1 to 13.) API also succeeded to the CERCLA liability of ACPC and Combined Locks. (Dkt. 560 at 12-14 and GPSUF # 11.) This stems from the assumption of liability (and indemnity) undertaken by API in the 1978 acquisition of

liability under CERCLA is for PCBs that ACPC discharged in its wastewater to the Appleton POTW."[13]] and Dkt. 751 at 9 ["Plaintiffs have conceded that they are potentially liable under CERCLA for PCBs that their predecessor company discharged."].)

As to the fourth element, Menasha incurred response costs that were both necessary and consistent with the NCP. *See* 42 U.S.C. §§ 9605(a), 9607(a). All of the response costs incurred by Menasha were pursuant to the UAO or the OU1 Consent Decree. (MENSUF # 23 and 24.) According to the terms of the NCP, "[a]ny response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii); *see also Bancamerica Commercial Corp. v. Trinity Industries, Inc.,* 900 F. Supp. 1427 (D. Kan. 1995), *rev'd on other grounds sub nom.*, *Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc.,* 100 F.3d 792 (10th Cir. 1996). Furthermore, the payment of EPA's oversight costs for fiscal year 2009 constitutes payment of response costs. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir. 1985); *Durham Mfg. Co. v. Merriam Mfg. Co.*, 294 F. Supp. 2d 251, 270 (D.Conn. 2003.); *California ex rel. California Dept. of Toxic Services v. Neville Chemical Co.*, 213 F. Supp. 2d 1115, 1124 (C.D. Cal. 2002); *United States v. JG-24, Inc.*, 331 F. Supp. 2d 14, 64 (D.P.R. 2004).

---

NCR's Appleton Paper Division. (GPSUF # 11.) Accordingly, API is also liable under CERCLA Section 107. Therefore, NCR and API are both liable under CERCLA Section 107.

[13]     The Defendants assert that this is an incomplete list of the basis for the Plaintiffs' CERCLA liability, considering their liability as arrangers and as owners and operators of the Combined Locks Facility. For instance the Appleton Facility discharged at least some of its process waste water to the City of Appleton POTW that in turn discharged into the Lower Fox River. (GPSUF # 34 and 38.) There is no evidence of NCR or its predecessors at the Appleton Facility ever informing the Appleton POTW during or after the Production Period of the presence of PCBs in its products or in its waste water. (MENSUF # 11 to 12.) However, what matters is their admission of at least some CERCLA liability PCBs in the Lower Fox River and Green Bay Site.

In its counterclaim against NCR and API, Menasha has a claim for declaratory relief. (Dkt. 253 at 26.) Accordingly, Menasha meets any predicate requirement for obtaining declaratory relief against the Plaintiffs.

> **2.      CERCLA Section 113(f) Provides Authority for Declaratory Judgment on the Defendants' *Future* Response Costs, Natural Resource Damage Assessment Costs and Natural Resource Damages.**

Section 113(g) provides in relevant part: "In any such action described in this subsection, the court *shall* enter a declaratory judgment on liability *for response costs or damages* that will be binding on any subsequent action or actions to recover further *response costs or damages*." 42 U.S.C. § 9613(g)(2) (emphasis added). The Court already has ruled that this portion of Section 113(g)(2) applies to actions for contribution brought pursuant to CERCLA Section 113(f). (Dkt. 227 at 17.)[14] In applying Section 113(f), some courts have held that declaratory relief under CERCLA Section 113(g)(2) is *mandatory. Kelly,* 17 F.3d at 844 (6th Cir. 1994); *Davis,* 261 F.3d at 46; *Foster v. U.S.,* 922 F. Supp. 663, 664 (D.D.C. 1996); *Norfolk Southern Ry. Co. v. Gee Co.* 2002 WL 31163777 (N.D. Ill. 2002); *F.P. Woll & Co. v. Fifth and Mitchell St. Corp.,* No. 96-CV-5973, 2006 U.S. Dist. LEXIS 57405 (E.D. Pa. August 16, 2006).

In the Decision, the Court allocated to the Plaintiffs 100 percent of the response costs *already* incurred by the Plaintiffs. Section 113(g)(2) is available to declare that the Plaintiffs are liable for 100 percent as their allocated share of the *future* cost of the harm. (Dkt. 227 at 17.) The Decision did not specifically address *future* costs and damages, but given the facts not genuinely at issue as determined in the Decision, declaratory relief provides the appropriate remedy to address all future response costs, natural resource assessment costs and natural

---

14      No Seventh Circuit case has addressed this issue yet. At the motion to dismiss stage, Menasha and Glatfelter argued that the declaratory relief portion of Section 113(g) only applied to CERCLA Section 107 claims. The Court ruled otherwise. (*Id.*)

resource damages, as between the Plaintiffs and the Defendants. Otherwise, additional litigation and significant additional expense might be necessary. As the Court pointed out in the Decision, "it would be a Herculean task to isolate and apportion contribution amounts among the Defendants given the shifting time frames and the fact that the Defendants would only be responsible for a tiny fraction of the entire total in any event." (Decision at 43.) "As the United States has aptly put it, 'equity argues in favor of an early determination that [the Defendants] should not be dragged through a multi-year, costly litigation in order to assess whether they should contribute respective portions of approximately 2% of the costs for remediation of a problem created and perpetuated, in nearly all respects, by the Plaintiffs.'" (*Id.* at 44.) Neither should the Defendants be dragged through future litigation considering that the Decision fully addresses allocation between them and the Plaintiffs.

The Plaintiffs specifically advocated the availability of declaratory relief to their claims for future response costs. (Dkt. 92 at 4-15.) According to the Plaintiffs, "Virtually every court that has interpreted the scope of Section 113(g)(2), including two Courts of Appeal and numerous district courts, has held that Section 113(g)(2) authorizes the issuance of declaratory relief for claims brought under Section 113(f). In fact, the seminal case on this issue is the first case cited by Menasha itself,[15] *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177 (9th Cir. 2000)." (Dkt. 92 at 4.) "This is also the prevailing view among district courts around the country. *See e.g.*, *F.P. Woll & Co.* (E.D. Pa. August 16, 2006) (granting prospective declaratory relief for contribution claims brought under Section 113(f), noting that the Third Circuit "implicitly approved of the use of declaratory judgments in CERCLA contribution actions") (citing *Beazer East Inc. v. Mead Corp.*, 412 F.3d 429 (3d Cir. 2005); *Durham*, 294 F. Supp. 2d at 268 (D. Conn.

---

[15]      Menasha lost on this issue at the motion to dismiss stage.

2003) ('CERCLA . . . permits a declaratory judgment allocating future response costs between PRPs'); *RSR Corp. v. Commercial Metals, Inc.*, 494 F. Supp. 2d 690, 700 (S.D. Oh. 2006) (following *Boeing* and affirmatively rejecting 'the Defendant's premise that Plaintiff's claim for a declaratory judgment must be dismissed, because such relief is unavailable in a contribution action.')." (*Id.* at 6.)

> **3.     The Declaratory Judgment Act also Provides Authority for Declaratory Judgment on the Defendants' Future Response Costs, Natural Resource Damage Assessment Costs and Natural Resource Damages.**

The Declaratory Judgment Act also provides authority for declaratory judgment on the Defendants' future response costs, natural resource damage assessment costs and natural resource damages. The Declaratory Judgment Act states in relevant part:

> In a case of *actual controversy* within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S. C. § 2201(a) (emphasis added).

Courts have applied the Declaratory Judgment Act to future costs under CERCLA. *Sun Co., Inc. (R & M) v. Browning-Ferris, Inc.*, 919 F. Supp. 1523, 1532 (N.D. Okla. 1996), *aff'd in part, rev'd in part*, 124 F.3d 1187, (10th Cir. 1997). ("[T]his Court retains inherent authority, absent an express statutory command to the contrary, to fashion appropriate remedies in civil suits over which it has jurisdiction. *See* 28 U.S.C. § 2201(a).") The Declaratory Judgment Act should be construed to effectuate its purpose to afford relief from uncertainty and insecurity with respect to legal relations. *Sears,*

*Roebuck & Co. v. American Mut. Liability Ins. Co.*, 372 F.2d 435, 438 (7th Cir. 1967). The basic question is whether the facts alleged show a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant a declaratory judgment. *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615, 620 (7th Cir. 1995) and *Super Products Corp. v. D P Way Corp.*, 546 F.2d 748, 753 (7th Cir. 1976). Disputes among PRPs as to their respective liability under CERCLA meet this test. *GNB*, 65 F.3d at 620.

As to declaratory relief under the Declaratory Judgment Act, the Plaintiffs *admit* the requirement of an "actual controversy" is satisfied. (Dkt. 92 at 12-13.) According to the Plaintiffs, "[A]n actual, substantial, and legal controversy has arisen and now exists between API and NCR, on the one hand, and Defendants, on the other, with regard to responsibility for the Lower Fox River Costs and damages and how these should be allocated among the parties. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (*Id.* at 13.) Other courts have applied the Declaratory Judgment Act to CERCLA cases. *Davis*, 261 F.3d at 46-48; *Confederated Tribes and Bands of the Yakama Nation v. United States*, 616 F. Supp. 2d 1094, 1100 (E.D. Wa. 2007). Accordingly, the Court may rely upon the Declaratory Judgment Act as authority for the declaratory relief sought in Menasha's motion.

### 4. When Granting Declaratory Relief, the Court is Empowered to Allocate 100 Percent Responsibility to Plaintiffs and Should Do So.

Having denied the Plaintiffs contribution for 100 percent of the response costs they already incurred in the Decision, the Court should apply the reasoning of the Decision to response costs, natural resource damage assessment costs and natural resource damages that have not been paid as of the date of the judgment. The Seventh Circuit has authorized allocation of

100 percent liability for contribution. *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610 (7th Cir.1998) and *Environmental Transp. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 512 (7th Cir.1992). *See also Norfolk Southern*, 2002 WL 31163777 (N.D. Ill. 2002). After recognizing its authority to issue declaratory relief, the Court in *Norfolk Southern* declined because: "In this case, the court declines to enter a declaratory judgment. Norfolk Southern has not offered evidence of the likelihood (or even the possibility) that it will face further response costs in the future. Further, the issuance of a 'no-further-remediation-letter' from the IEPA signifies the complete remediation of the site." In stark contrast, on November 13, 2007 the EPA issued the UAO for OUs 2-5 to the Plaintiffs, CBC Coating, Inc., Georgia-Pacific, Glatfelter, Menasha, US Paper, and WTM I.[16] As the Court is aware from this proceeding and parallel consent decree proceedings, the total price for the cleanup of OUs 2-5 could approach $1 billion or more. (Dkt. 795 at 3.) Furthermore, the U.S. Fish & Wildlife Service of the U.S. Department of the Interior has issued a Restoration and Compensation Determination Plan ("RCDP") as a part of a Natural Resource Damages Assessment being performed by the Natural Resource Damages Trustees.[17] The Plaintiffs have estimated their exposure for natural resource damages in the high tens of millions of dollars. (GPSUF # 27.) As a result, the Defendants face substantial claims for future response costs, natural resource damage assessment costs and natural resource damages. Accordingly, declaratory relief for 100 percent of any future response costs, natural resource damage assessment costs and natural resource damages the Defendants pay after the date of entry of judgment is appropriate.

---

[16]    http://www.epa.gov/Region5/sites/foxriver/pdf/foxriver_uao_200711.pdf

[17]    http://www.fws.gov/midwest/FoxRiverNRDA/documents/RCDP-1.pdf

5.  **Granting Declaratory Relief Against NCR and API for All the Defendants is Appropriate.**

Granting declaratory relief for all the Defendants is appropriate for at least three reasons. First, as discussed above, the Plaintiffs have a declaratory relief claim against all the Defendants. Second, also as discussed above, when a determination on relative liability is made, as in the Decision, CERCLA Section 113(g)(2) provides that a declaratory judgment shall be entered. Finally, Federal Rule of Civil Procedure 54(c) provides that every final judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). The Court may grant whatever relief is appropriate, even if the parties do not specifically request that relief in their existing complaint or counterclaims, unless there would be unfair prejudice to the adverse party. *See, e.g., Soltys v. Costello*, 520 F.3d 737, 742 (7th Cir. 2008); *Old Republic Ins. Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077 (7th Cir. 1998); *International Union v. Allis-Chalmers Corp.*, 643 F. Supp. 342, 345 (E.D. Wisc. 1986) ("Declaratory relief may be awarded even though it is not prayed for in the complaint.").

A decision as to the relief to be granted under the Declaratory Judgment Act is within the sound discretion of the district court, and is reviewed only for an abuse of discretion. *Old Republic,* 144 F.3d at 1080. Other courts have held that declaratory relief as to liability for future response costs is proper in a CERCLA contribution action, as it economizes on judicial time and allows the parties to know at the earliest opportunity where they stand. *United States v. Hardage*, 982 F.2d 1436, 1445 (10th Cir. 1992); *see also Sherwin-Williams*, 151 F.3d at 616.

In addition to the three reasons listed above, declaratory relief requested is appropriate because:

- All of the PRPs necessary for resolution of the liabilities at the site are now parties to the litigation;

- In the Decision, the Court held that the Plaintiffs are 100 percent liable for the response costs they incurred at the Lower Fox River and Green Bay Site and applying the same relevant equitable factors, the Plaintiffs should be held 100 percent liable for any *future* response costs, natural resource damage assessment costs and natural resource damages;

- The Plaintiffs are in the best position to control the ultimate costs of the OU 2-5 remedy because they helped design it and have been performing the work required to implement it under the UAO;

- Both the Plaintiffs and Menasha specifically requested declaratory relief. (Dkt. 253 at 36 [Menasha] and Dkt. 265 at 28-29 [Plaintiffs]);

- Granting declaratory relief as to future response, natural resource damage assessment costs and natural resource damages will further the goal of final resolution, avoid future litigation and promote the most expedient and effective cleanup of the Lower Fox River and Green Bay Site; and,

- It is both good policy and fair to enter declaratory judgment now rather than wait until later, when even more witnesses have died or lost their remaining memory, and the Court and the lawyers are no longer fresh and will need to get up to speed all over again. Entering a declaratory judgment now also will enable the parties to better plan to meet future liabilities instead of forcing them to guess how a future court might rule.

**C. Based on Relevant Equitable Factors, As Between the Plaintiffs and the Defendants, the Plaintiffs Should Be Held 100 Percent Liable for *Future* Response Costs (Provided that Such Response Costs are Necessary And Consistent with the NCP), Natural Resource Damage Assessment Costs and Natural Resource Damages.**

**1. CERCLA Itself and the Cases relied upon in the Decision Provide the Legal Framework for Granting Menasha's Motion.**

In the Decision, the Court correctly recited the key legal principles applicable to this motion:

- "Section 113(f)(1) of CERCLA provides that '[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.' 42 U.S.C. § 9613(f)(1).  Not only does the statute allow allocation based on equitable factors, it provides that district judges may determine which factors are 'appropriate.'. .   The Seventh Circuit has called a district judge's power in this context 'broad and loose.' *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 957 (7th Cir. 1999).  Yet of course a court's analysis is not unfettered:  it is governed by traditional principles of equity, such as the relative fault of the parties, any contracts between the parties bearing on the allocation of cleanup costs, and the so called 'Gore factors.'  *Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994)."  (Decision at 21.)

- "In addition, the Seventh Circuit has stated that 'a court may consider any factors appropriate to balance the equities in the totality of the circumstances,' and such factors could include a party's degree of involvement in the disposal of hazardous waste, the amount of hazardous waste involved, and the degree of care exercised by

the parties. *Environmental Transp. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992)."  (Decision at 22.)

On the issue of the relative fault of the PRPs, other CERCLA Section 113 contribution cases often consider the relative fault of each party, without regard to why each party initially qualified as a PRP.  *United States v. R.W. Meyer*, 932 F.2d 568, 572 (6th Cir. 1991).  Indeed, courts consider equitable factors that may be entirely unrelated to the facts that made the party a PRP — such as knowledge, fault, financial wherewithal, contractual indemnities and degree of cooperation with authorities.  *Id*. at 572-73.  Knowledge and fault are commonly found to be important factors in Section 113(f) contribution recovery actions, even though neither can create liability under CERCLA's strict liability regime.  *See, e.g., United States v. Monsanto Co*., 858 F.2d 160, 173, n. 29 (4th Cir. 1988) ("the relative culpability of each responsible party [should] be considered in determining the proportionate share of costs each must bear."); *R.W. Meyer*, 932 F.2d at 577-78; *see also* Restatement (Second) of Torts § 886A, Comment h.

Courts need not examine *every* factor, but are allowed to focus on certain key factors such as the parties' relative knowledge and fault.  *Ensco*, 969 F.2d at 509 (". . . a court may consider several factors, a few factors, or only one determining factor . . . depending on the totality of circumstances").

A number of courts have allocated 100 percent of response costs responsibility under CERCLA Section 113(f)(1) to one party based on equitable factors.  *See, e.g.*, *Ensco*, 969 F.2d at 509-10 (upholding allocation of 100 percent of response costs on summary judgment motion to subcontractor trucking company who was found to be "fully responsible"); *Gopher Oil Company v. Union Oil Company*, 955 F.2d 519, 527 (8th Cir. 1992); *Sherwin-Williams*, 151 F.3d at 616 (7th Cir. 1998); *Ensco*, 969 F.2d at 509-10; *Kalamazoo River Study Group v. Rockwell*

*International Corporation*, 274 F.3d 1043, 1046-48 (6th Cir. 2001); *Lone Star Industries, Inc. v. Horman Family Trust*, 1990 WL 640001, *8 (D. Utah 1990).

> **2.  Applying the Facts not Genuinely at Issue to the Law, as the Court Did in the Decision, the Court Should Enter a Declaratory Judgment that the Plaintiffs Are 100 Percent Liable For Any Amounts Paid by the Defendants for *All Future* Response Costs, Natural Resource Damage Assessment Costs and Natural Resource Damages.**

In the Decision, applying the facts not genuinely at issue to the law, the Court held that the relative fault of the parties weighs heavily in favor of the Defendants for at least the following ten reasons:

1.  "In 1975 Plaintiffs had occasion to comment on a brief regarding PCBs that the Wisconsin Paper Council had submitted to the Wisconsin DNR.  Among other things, NCR's Lowell Schleicher (one of the inventors of carbonless copy paper) commented that the "Brief made a strong and correct plea <u>that the recycling companies are the innocent victims of circumstance created by carbonless manufactures</u> which are still a part of the paper industry. (Ferguson Decl., Ex. 67.)"  (Decision at 21.)

2.  "[I]t is enough for present purposes to conclude that, in NCR's own terms, the evidence showed 'in the late 1960's' that PCBs were a dangerous environmental toxin. . .  But more importantly, as set forth more fully below, it was the known *potential* for environmental harm that is key to the equities in this case.  In the face of increasing red flags, Plaintiffs' approach in the late 1960s was to worry about publicity and wait for the 'second shoe' to drop.  At its essence, Plaintiffs' approach was a risk management strategy to accept the risk of potential environmental harm in exchange for the financial benefits of continued (and increasing) sales of carbonless paper containing Aroclor 1242. . . .  I am satisfied

that by the late 1960's Plaintiffs had access to the vanguard of data suggesting an appreciable *risk* of serious and long-lasting environmental damage resulting from the production and recycling of NCR paper."  (Decision at 26.)

3.    "In fact, there is no evidence that the Defendants even knew NCR broke *contained* PCBs during the production period, much less that PCBs could cause environmental damage.  Accordingly, I will wholly reject Plaintiffs' unsupported claims that any of the Defendants possessed meaningful knowledge of the risks of recycling PCBs during the production period."  (Decision at 28-29.)

4.    "Plaintiffs also cite the testimony of a Menasha Corporation purchasing agent, David Austin, who claimed in another proceeding that as early as the 1950s he was instructed not to buy CCP because it might contain PCBs.  This testimony has been repudiated by the deponent.  (Dkt. 727, Ex. 47.)  In fact, even the Plaintiffs themselves have specifically rejected Austin's testimony in their comments on the January 15, 1999 revision of the Technical Memorandum 2nd.  (*Id.,* Ex. 48 at 5.)  In their comments to the DNR, they described Austin's testimony as 'not believable' and sarcastically suggested that Austin must have been 'prescient' to be aware of PCBs as early as the 1950s or 1960s.  (*Id.* n. 8.)  It is disturbing that a decade later, when it is convenient, they now cite Austin's discredited testimony as evidence of the knowledge of one of the Defendants."  (Decision at 27-28.)

5.    "One of Plaintiffs' key lines of argument highlights several Defendants' knowing pollution of the river over the course of many decades.  (Dkt. 655.) . . . But this case is about a very specific toxin – PCBs, primarily in the form of Aroclor 1242

– and it is the presence of that toxin that has given rise to the massively expensive

cleanup action that has itself given rise to this case. . . . Although several of the

Defendants may have polluted the river in other ways, that pollution simply did

not result in an EPA-ordered cleanup. Accordingly, any arguments based on the

existence of *other* kinds of pollution do not speak to the equities of whether any

of the Defendants should pay for the cleanup of PCBs in the Lower Fox River."

(Decision at 29-30.)

6.      ". . . I conclude that even during the period when *no* parties could have been

aware of the dangers inherent in the use and recycling of PCBs (i.e., 1954 through

the mid-1960s), the equities strongly favor the Defendants. . . . It does not

require persuasive precedent, however, to conclude that between parties who

*produced* the product and those who merely processed it and recycled it along

with all other paper products or water sources, these latter parties are significantly

less blameworthy. . . . This is even more true for Defendants who merely

received and released wastewater containing invisible PCBs in it."  (Decision at

32-33.)

7.      "Various red flags and warning signs appeared along the way, as with products

like asbestos or prescription drugs that eventually prove dangerous only after

years of distribution on a large scale.  And so at each new bit of data, corporate

meeting or scientific study, the company faces and makes a choice, either

explicitly or implicitly: move forward, pause, or stop.  Here, the record clearly

shows that Plaintiffs did not pause. . . . Instead, they pressed "Fast Forward" and

ramped up production in the final years that Aroclor 1242 was available. . . . [t]he

decision to move forward and accelerate production in 1969 and 1970 despite having frequent meetings about PCBs and increasing danger signs is enough, in my view, to preclude Plaintiffs from recovering from the Defendants." (Decision at 35-36.)

8. " . . . [T]he strategy of waiting was a deliberate acceptance of a large amount of risk to the environment and public health, and in fact the records suggest that the parties viewed their decisions through the lenses of risk. (At one point, they even discuss treating the future replacement of Aroclor as an "insurance policy.") (Ferguson Decl., Ex. 29.) . . . [b]ut CERCLA contribution is not an insurance policy designed to insure against the bad business judgments of toxin manufacturers. . . . [T]he continued and increased use of Aroclor 1242 at the end of the production period caused so much of the damage that the Plaintiffs should be barred from contribution entirely." (Decision at 37.)

9. "Plaintiffs could have turned off the spigot much earlier than April 1971 – either by ceasing production of CCP using Aroclor 1242 or simply by Appleton Coated ceasing the selling of broke to recyclers – and practically speaking they were the only entities that had such power. By curbing their ability to now recover for cleanup costs, this Court's equitable power will encourage other manufacturers to act swiftly and proactively – rather than wait for the second shoe to drop – as soon as data suggest that their product might cause environmental damage." (Decision at 38.)

10. "[A]lthough I have not relied exclusively on the DNR's conclusion that 98 percent of the PCBs had been discharged by 1971, I agree with the United States

that there is no evidence that would 'substantially undermine' the conclusion that 98 percent of the total PCBs were released by the end of 1971. (Dkt. 649 at 5 n.4.)"  (Decision at 41.)

The Court held in the Decision, it was "the Plaintiffs' own production of the CCP that is the *sine qua non* not just of the environmental damage, but of the entire cleanup effort and its attendant costs."  (Decision at 46.)  "[T]he equities overwhelmingly favor the Defendants."  (*Id.* at 28-30.)  Accordingly, the Court should enter a declaratory judgment that the Plaintiffs are 100 percent liable for all amounts paid by the Defendants for *future* responses costs, provided that such response costs are necessary and consistent with the NCP, natural resource assessment costs and natural resource damages.

## IV.    CONCLUSION

In their summary judgment briefs, the Defendants have demonstrated why the Decision applies to *both* the *past* and *future* response costs, natural resource damage assessment costs and natural resource damages as a matter of equity and fairness.  Nothing the Plaintiffs can say will change the facts that:

1.    NCR, ACPC and Combined Locks used PCBs during the Production Period and that the Defendants did not know about this until after the Production Period;

2.    NCR and API admit that overwhelming amount of initial releases of PCBs to the Lower Fox River and Green Bay Site occurred when the Defendants did not know PCBs were a component of NCR Paper; and,

3.    Once the PCBs got into the recycling stream from NCR Paper, there was nothing recyclers could do.  That is why the Court held in the Decision that NCR and API are 100 percent liable for the past response costs they incurred.

NCR and API are responsible for the cleanup and damage caused at the Lower Fox River and Green Bay Site because of the actions and the failure to act by NCR, ACPC and Combined Locks, in the 1960s and 1970s. If that is the conclusion for the *past*, it must also be the conclusion for the *future*. Under the "cooperation" factor[18] of the Gore Factors, stepping up to incur a response cost *never increases* a party's allocated share. Because under the Decision, NCR and API bear 100 cents of every dollar that they stepped up to pay, they should not bear a *lower* allocated share of a dollar that one of the Defendants steps up to pay.

Based upon the undisputed facts, the Defendants are entitled to a declaratory judgment awarding them 100 percent contribution for all *future* response costs, natural resource damage assessment costs and natural resource damages. That judgment would preclude re-litigation of the same issues in subsequent lawsuits. If the Court is convinced, as it should be, that the reasoning in the Decision would cover *future* costs, a declaratory judgment would promote judicial efficiency. The Court should make explicit that the judgment entered applies to *future* response costs, natural resource damage assessment costs and natural resource damages. Accordingly, the Defendants respectfully request that the Court enter a declaratory judgment as requested in Section I.B.

Dated: April 2, 2010

Respectfully Submitted,

HUNSUCKER GOODSTEIN & NELSON PC


*/s/ Philip C. Hunsucker*
Philip C. Hunsucker

---

[18]     Specifically, "the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment." *Kerr-McGee*, 14 F.3d at 330, n. 4.

Philip C. Hunsucker
David A. Rabbino
Christopher J. Dow
Hunsucker Goodstein & Nelson PC
3717 Mt. Diablo Blvd., Suite 200
Lafayette, CA 94549
Telephone:  (925) 284-0840
Fax:  (925) 284-0870
phunsucker@hgnlaw.com

On behalf of the following defendants, we hereby join in Menasha's brief.


/s/ Waltraud A. Arts
Counsel for City of Appleton


/s/  Michael Carlton
Counsel for Defendant CBC Coating, Inc.

/s/ Mary Rose Alexander
Counsel for Defendant Georgia-Pacific
Consumer Products LP (f/k/a Fort James
Operating Company), Fort James Corporation,
Georgia Pacific LLC

/s/ David Mandelbaum
Counsel for Defendant P.H. Glatfelter
Company

/s/ William Mulligan
Counsel for Defendant Neenah-Menasha
Sewerage Commission

/s/ Thomas Gottshall
Counsel for Defendant U.S. Paper Mills
Corporation

/s/ William Harbeck
Counsel for Defendant WTM I Company