# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

| | | |
|---|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION, | )<br>)<br>) | |
|        Plaintiffs, | ) | |
|     v. | ) | No. 08-CV-16-WCG |
| | ) | |
| GEORGE A. WHITING PAPER COMPANY,<br>ET AL., | )<br>) | |
|        Defendants. | ) | |
| NCR CORPORATION, | ) | |
| | ) | |
|        Plaintiff, | ) | |
|     v. | ) | No. 08-CV-0895-WCG |
| | ) | |
| KIMBERLY-CLARK CORPORATION,<br>ET AL., | )<br>) | |
|        Defendants. | ) | |

**PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO DEFENDANTS P.H. GLATFELTER AND WTM I COMPANY'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS**

Pursuant to Civil L.R. 56(b)(2)(B)(ii) of the United States District Court for the Eastern District of Wisconsin, Plaintiffs NCR Corporation and Appleton Papers Inc. respectfully submit the following additional facts that require the denial of summary judgment, and which support Plaintiffs' Memorandum in Opposition to Defendants P.H. Glatfelter Company and WTM I Company's Motion for Summary Judgment on Counterclaims, as well as Plaintiffs' other May 3, 2010 filings. Plaintiffs respectfully submit that they are unable to adequately present with the Court will *all* facts that would require the denial of summary judgment, because to date Plaintiffs have not been permitted the full discovery necessary to respond adequately to Defendants' motions for summary judgment. Plaintiffs' Rule 56(f) Declaration, filed herewith, sets forth in

1

detail the numerous issues that are centrally relevant to Defendants' motions for summary judgment, and on which Plaintiffs have not been permitted to take discovery. The facts identified below represent Plaintiffs' good faith effort to come forward with evidence based on the existing, limited record (or from publicly available sources), in order to respond to Defendants' ten summary judgment motions. Plaintiffs preserve all objections and arguments contained in the record regarding the Court's decision to proceed with Defendants' dispositive motions on their counterclaims without allowing Plaintiffs the opportunity to take the additional discovery necessary to respond adequately to those dispositive motions.

### I. Broke is an Inevitable Byproduct of All Papermaking Operations That Is Viewed as a Valuable Raw Material Because It Can Be Reused or Sold for Recycling.

1. "Broke" is a term used within the paper industry that refers to byproducts that are inevitably generated during the course of papermaking operations. Broke is generated as a byproduct of all papermaking operations and is not unique to the production of NCR Paper brand carbonless copy paper ("CCP"). Declaration of Kathleen L. Roach in Support of Plaintiffs' May 3, 2010, filings ("KLR Decl.") Ex. 1 [May 1, 2010 Declaration of W. Moore]

2. Broke can include materials such as trimmings generated as rolls of paper are rewound; trimmings from product being prepared for shipping; paper collected from machine breaks, roll changes, or coating skips; and product that does not meet final specifications. KLR Decl. Ex.1 [May 1, 2010 Declaration of W. Moore]

3. Broke is a valuable raw material that is used by recycling mills in the manufacture of new paper products. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

4.     Facilities that make paper typically do not treat broke as solid waste because it has value as a raw material that can be reused onsite.  KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

5.     At facilities that cannot use broke onsite, broke is usually collected, sorted, and baled because it can be sold in the recovered fiber market.  KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

6.     There is a constant demand for broke, and it is considered among the more valuable grades of recovered fiber available.  KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

## II. CCP Broke, In Particular, Was Viewed And Handled By ACPC as a Valuable Byproduct That Generated Additional Revenue and Profits.

7.     The Appleton Coated Paper Company ("ACPC") generated broke as a byproduct of its coating operations at its Appleton facility, including coating operations to produce CCP.  KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

8.     The generation of and sale of broke has always been a part of ACPC's business, both before and after Aroclor 1242 was used in the emulsion for CCP.  KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 63:19-24; 132:9-18].

9.     Broke generated specifically from ACPC's production of CCP ("CCP Broke") consisted of trim from the coating production operation, machine breaks, roll changes, coating skips, side rolls, and product that did not meet final specifications.  KLR Decl. Ex.1 [May 1, 2010 Declaration of W. Moore]; KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D.

3

Christensen, 143:3-6, 15-20]; KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 19:22-20:1].

10. CCP Broke was a commercially valuable, useful product. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

11. ACPC collected, sorted and baled CCP Broke for sale in the recovered fiber market. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

12. ACPC would inventory CCP Broke before sale to brokers. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 40:14-15]. CCP Broke was tracked and routed through detailed record-keeping procedures. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 36:1-7, 36:14-25].

13. ACPC would bale CCP Broke before sale to brokers. KLR Decl. Ex. 19 [Excerpts of 1/28/09 Deposition of F. Heinritz, 62:18-19].

14. ACPC sorted broke and sold about 10 different grades of broke, including multiple grades of CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 25:6-8].

15. CCP Broke was sold in multiple grades, including CB white, CFB white, CFB colors and CFB goldenrod. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 25:9-17].

16. CCP Broke was sorted by hand into different grades in order to maximize the selling price. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

4

17. After CCP Broke was sorted into different grades at ACPC, it was sent to the baler area, or box shop, where the carton department baled the broke for sale. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 27:17-28:1].

18. CCP Broke was never sent to a landfill; it was always sold. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 24:20-24].

19. ACPC did not send CCP Broke to landfill because it was a useful product to others to recycle. KLR Decl. Ex. 19 [Excerpts of 1/28/09 Deposition of F. Heinritz, 96:21-23; 119:16-19].

20. ACPC's purchasing department was in charge of ACPC's broke sales. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 19:7-10].

21. Between 1961 and 1973, Floyd Strelow held various positions in the purchasing department, ultimately becoming director of central purchasing. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 10:7-21; 11:7-12]. Mr. Strelow testified that he was not involved at all in any waste disposal operations at ACPC. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 63:12-14].

22. ACPC's strict broke collection and sale procedures show a level of care that indicate ACPC considered CCP Broke to be a valuable product. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore]. Such strict procedures are not generally used in the handling and disposal of waste materials. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

23.     The sale of CCP Broke was a revenue-generating part of ACPC's business.  KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 53:4-8].

24.     ACPC did not consider broke to be "waste" in the sense of garbage or trash.  KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 53:10-14; 60:7-8 (noting that an exhibit "talks about broke; it doesn't talk about waste.")].

25.     ACPC sold CCP Broke to maximize the bottom line.  KLR Decl. Ex. 26 [3/13/07 Deposition of F. Strelow, 54:1-8].

26.     ACPC was not aware of any concerns about PCBs until mid to late 1969, and even at that point, did not believe that the concerns about PCBs applied to Aroclor 1242.  Dkt. 674 [September 30, 2009 Declaration of R. Jezerc].

27.     Aroclor 1242 was the only kind of PCB ever used in CCP.  Dkt. 661, ¶ 20.

28.     Throughout the time that Aroclor 1242 was used in CCP, ACPC did not believe that Aroclor 1242 presented an environmental danger.  Dkt. 674 [September 30, 2009 Declaration of R. Jezerc].

29.     There is no evidence that ACPC sold CCP Broke as part of a plan to dispose of PCBs.

30.     There is no evidence that ACPC intended to sell CCP Broke to dispose of PCBs.

### III. Brokers That Purchased CCP Broke From ACPC Viewed It As A Commercially Valuable Product, And Actively Competed With Each Other to Purchase It.

31.     Brokers are companies that are in the business of buying and selling recyclable pre- and post-consumer paper materials, such as broke.  KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

32. Brokers purchase broke from various sources, and then resell the broke for a profit to recycling mills, who use the broke as a raw material for their papermaking operations. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

33. In order to make a profit, brokers must be able to sell broke for more than they pay to purchase it. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

34. In order to stay competitive, brokers are typically very secretive about both their broke suppliers and their recycling mill customers. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

35. Brokers are not in the business of waste disposal. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

36. Brokers do not sort, process, or bale the broke they purchase. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

37. Brokers do not recycle or repulp the broke they purchase prior to reselling it to recycling mills. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

38. Brokers typically purchase broke in baled form, and sell the material in the same form in which it was purchased from the supplier. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

39. ACPC sold broke exclusively to brokers, with whom they had ongoing relationships, but never directly to recycling mills. KLR Decl. Ex. 17 [Excerpts of 3/25/09

Deposition of D. Christensen, 29:11-24]; KLR Decl. Ex. 19 [Excerpts of 1/28/09 Deposition of F. Heinritz, 20:15-17; 63:18-20].

40. The brokers to whom ACPC sold broke were secretive about their recycling mill customers, and did not wish to advertise who they were sending broke to, because of competition among them. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 35:3-6 ]; KLR Decl. Ex. 26 [3/13/07 Deposition of F. Strelow, 56:1-8]; KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 31:20-25].

41. ACPC never sold CCP Broke directly to a recycling mill, in part because it was careful not to undercut the brokers that purchased its CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 41:17-23].

42. ACPC did not know to whom brokers sold CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 116:1-4].

43. There is no evidence that ACPC knew the details or the adequacy of the wastewater treatment processes at Defendants' mills, including Glatfelter's Bergstrom mill and WTM I's mill, during the time period that PCBs were used in the manufacture of CCP.

44. There is no evidence that ACPC knew or intended that the sale of CCP Broke would result in the release of PCBs to the environment.

**IV. The Recovered Fiber Marketplace Valued CCP Broke Highly, As Evidenced By the Constant High Demand For CCP Broke, and the Fact That It Sold For Competitive Prices That Were Commensurate With Higher End Grades of Recovered Fiber.**

8

45. The price that brokers paid for CCP Broke was negotiated with ACPC. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 167:13-22].

46. During the time period that Aroclor 1242 was used in the manufacture of CCP, CCP Broke sold for prices comparable to the prices of other higher end grades of recovered fiber. KLR Decl. Ex. 4 [Mead Corporation Debit Memos from 1955 to 1973, NCR-FOX-0276908 – NCR-FOX-0277409]; KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 168:2-13]; KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

47. For example, as early as 1955, CCP Broke was selling for $30 per ton. During the 1960s and 1970s, prices for CCP Broke ranged from $50 to $100 per ton. KLR Decl. Ex. 4 [Mead Corporation Debit Memos from 1955 to 1973, NCR-FOX-0276908 – NCR-FOX-0277409]; KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore]; KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 168:2-13].

48. Market forces would cause the price of CCP Broke to fluctuate. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 168:2-13].

49. Brokers normally had standing orders to purchase CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 40:23-41:2]. Brokers also would contact ACPC to inquire about the availability of CCP Broke. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 29:18-24].

50. ACPC sold CCP Broke to brokers, including Golper Supply Company in Appleton, Wisconsin, Continental Paper Grading Company and National Fiber Supply, both located in Chicago. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 19:8-14].

9

51. Golper Supply Company, Continental Paper Grading Company and National Fiber Supply, were known to deal in high end grades of recovered fiber. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

52. There was never a time when ACPC was unable to sell CCP Broke; rather, there was a ready, competitive market for CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 114:17-22]. ACPC's broke was "readily salable" and broke dealers "had markets for more than" ACPC could produce. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 114:17-22]; KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

53. The demand for high end recovered fiber, such as CCP Broke, was always greater than the supply. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

54. Different grades of CCP Broke sold by ACPC commanded different prices in the market. KLR Decl. Ex. 20 [Excerpts of 4/15/09 Deposition of B. Hietpas, 38:10-19].

55. A competitive market for broke exists among brokers because broke, including CCP Broke, is a high-end, specialized grade of recovered fiber. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

56. The brokers that purchased CCP Broke from ACPC considered it a useful and valuable product. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**V. The Recycling Mills That Purchased CCP Broke From Brokers, Such As The OU1 Defendants' Mills, Competed For CCP Broke and Considered It a Particularly Valuable Raw Material.**

57.     Recycling mills consider broke, such as CCP Broke, a "clean" grade of recovered fiber, and therefore it is among the more valuable grades of recovered fiber available. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

58.     The recycling mills located along the Lower Fox River that purchased and used CCP Broke, including Glatfelter's Bergstrom mill and WTM I's mill, considered it to be a useful and valuable raw material. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

59.     Recycling mills located along the Lower Fox River that used CCP Broke, including Glatfelter's Bergstrom mill and WTM I's mill, actively competed to purchase bales of CCP Broke. KLR Decl. Ex. 5 [August 10, 1998, Response of the P. H. Glatfelter Company to the Third Section 104(e) of the United States Department of Interior concerning the Fox River/Green Bay site dated June 10, 1998, NCR-FOX-0236695].

60.     From 1954-1972, the Bergstrom mill received CCP Broke consisting of plant trimmings, sheeting waste, and material cut from rolls. KLR Decl. Ex. 22 [Excerpts of 8/28/09 C. Missimer Deposition, 39:4-17; 180:9-13]; KLR Decl. Ex. 5 [August 10, 1998, Response of the P. H. Glatfelter Company to the Third Section 104(e) of the United States Department of Interior concerning the Fox River/Green Bay site dated June 10, 1998, NCR-FOX-0236695].

61.     In 1971, Bergstrom was considering whether to take advantage of a potential increase in the available supply of NCR Paper Broke and drop in price. KLR Decl. Ex. 6 [September 24, 1971, Bergstrom Paper Company Interoffice Memo, Polychlorinated Biphenyl (PCB) from Ken Maves to John Valente, GLTFOX00004014].

11

62. In 1975, Glatfelter ranked CCP Broke its seventh most valuable raw material. KLR Decl. Ex. 7 [Bergstrom Paper Company Interoffice Memo, May 13, 1975, NCR-FOX-369551 & 369556].

63. Fort Howard purchased and used CCP Broke in the 1960s and 1970s. KLR Decl. Ex. 24 [Excerpts of 5/27/09 Deposition of D. Schneider, 58:9-20]; KLR Decl. Ex. 16 [Excerpts of 4/21/09 Deposition of W. Charles, 36:16-23]; KLR Decl. Ex. 18 [Excerpts of 4/9/09 Deposition of R. Geigel, 103:15-17; 104:3-5]

64. Fort Howard used at least 45 to 90 tons per month of CCP Broke in each of the years 1967-1970, and at least 15 to 30 tons per month in 1971. KLR Decl. Ex. 8 [March 3, 1998, letter from Fort James to WDNR – Estimate of Fort Howard's PCB Loading to the Fox River, GPFOX00139278]. Roy Geigel, a recovered paper purchaser for Fort Howard, testified that Fort Howard could have used up to 150 tons per month of CCP Broke. KLR Decl. Ex. 18 [Excerpts of 4/9/09 Deposition of R. Geigel, 104:3-5]

65. Fort Howard viewed CCP Broke as a "more expensive" grade that "would be on the very high end of the [recovered paper] categories." KLR Decl. Ex. 18 [Excerpts of 4/9/09 Deposition of R. Geigel, 48:13-49:3]

66. U.S. Paper's DePere mill purchased and used CCP Broke in the late 1960s and early 1970s. KLR Decl. Ex. 9 [Supplemental Response of US Paper Mills Corp. to Information Request of United States Department of Interior, Fish and Wildlife Service of 1996, February 8, 2007 (Exhibit 253 to the Deposition of R. Gerbers)]; KLR Decl. Ex. 23 [Excerpts of 3/13/09 Deposition of J. Patterson, 57:9-12].

12

## VI. PCBs Released In OU2 Could Not Have Traveled Upstream And Resulted In, Or Contributed To, PCB Deposits 30 Miles Upriver in OU1.

67. PCBs discharged into OU2 could not have flowed upriver to OU1. KLR Decl. Ex. 2 [April 30, 2010 Declaration of J. Connolly].

68. Releases of PCBs in OU2 as the result of wastewater discharges in Appleton and Combined Locks did not cause deposits of PCBs in OU1. Dkt. 878, p. 15.

69. Glatfelter's and WTM I's recycling operations and wastewater discharges, along with other Defendants, caused PCBs to be released into OU1. Dkt. 878, p. 15. Glatfelter has argued that "distance from the alleged harm" is a reasonable basis for apportioning the harms in OU1 from those in the rest of the Lower Fox River site. KLR Decl. Ex. 28 [Mem. in Supp. of Mot. of Def. P.H. Glatfelter Co. for Case Management Order, Case 2:03-CV-00949-LA (Dkt. 28), pp. 10-12].

13

**VII.  Publicly Available Documents Indicate that Glatfelter, WTM I, and U.S. Paper May be Seeking an Impermissible Double-Recovery That is Prohibited under CERCLA.**

70. During 2004, Glatfelter received insurance recoveries of $32.8 million under policies related to the "Fox River environmental matter."  KLR Decl. Ex. 10 [Excerpts from PHG Form 10K/A for fiscal year ending 12/31/04].

71. During 2005, Glatfelter received insurance recoveries of $20.2 million under insurance policies related to the "Fox River environmental matter."  KLR Decl. Ex. 11 [Excerpts from PHG Form 10K for fiscal year ending 12/31/05].

72. During 2006, Glatfelter received insurance recoveries of $0.2 million under insurance policies related to the "Fox River environmental matter."  KLR Decl. Ex. 12 [Excerpts from PHG Form 10K for fiscal year ending 12/31/06].

73. On April 20, 2005, WTM I notified Plaintiffs and many Defendants, including GP and Menasha, that "WTM I Company and many of its carriers have reached a settlement in principal."  KLR Decl. Ex. 27 [April 20, 2005 Email re: WTM I Insurance Settlement Update].

74. In 2008, U.S. Paper Mills Corp., a wholly owned subsidiary of Sonoco Products Company, received settlements totaling $40.8 million from insurance policies covering the Fox River contamination.  KLR Decl. Ex. 13 [Excerpts from Sonoco Form 10K for fiscal year ending 12/31/09].

**VIII.  Glatfelter's and WTM's Own Admissions Establish That Their Claims to Recover Certain Costs Are Time Barred.**

75. Glatfelter is seeking to recover $8,568,930 (exclusive of interest) for assessments paid to the FRG.  Dkt. 879 [Statement of Undisputed Facts of Defendants P.H. Glatfelter

14

Company and WTM I Company in Support of Their Motion for Summary Judgment and in Support of All Motions for Summary Judgment of Certain Defendants ("Glatfelter/Certain Defendants Statement"), ¶ 95]; Dkt. 909 [(Declaration of Arthur A. Vogel, Jr.) ("Vogel Decl.") ¶ 11 at 5 (showing assessments allegedly paid by Glatfelter) and ¶ 13 (confirming that the "Oct – Dec" 2001 assessment was due November 15, 2001)].

76. Of this amount, $8,420,243 was paid before November 23, 2001. Vogel Decl., ¶ 11 at 5 (the sum of the amounts shown as allegedly paid by Glatfelter, omitting the 2002, 2003 and 2007 entries).

77. WTM is seeking to recover $4,394,004 (exclusive of interest) for assessments paid to the FRG. Glatfelter/Certain Defendants' Statement, ¶ 114; Vogel Decl. at ¶ 11 at 5-6 (showing assessments allegedly paid by WTM) and ¶ 13 (confirming that the "Oct – Dec" 2001 assessment was due November 15, 2001).

78. Of this amount, $4,129,594 was paid before November 23, 2001. Vogel Decl., ¶ 11 at 5-6 (the sum of the amounts shown as allegedly paid by WTM, omitting the 2002, 2003 and 2007 entries.).

15

Respectfully submitted,

APPLETON PAPERS INC.             NCR CORPORATION


/s/ Michael L. Hermes             /s/ Kathleen L. Roach

Counsel for Appleton Papers Inc.:       Counsel for NCR Corporation:
Michael L. Hermes  (WI Bar No. 1019623)  William F. Conlon (IL Bar No. 0499072)
HERMES LAW LTD.                   Kathleen L. Roach (IL Bar No. 6191432)
333 Main Street, Suite 601        SIDLEY AUSTIN LLP
Green Bay, Wisconsin 54301        One South Dearborn Street
(920) 436-9870                    Chicago, Illinois 60603
Fax: (920) 436-9871               (312) 853-7000
                                  Fax: (312) 853-7036

Ronald R. Ragatz  (WI Bar No. 1017501)  J. Ric Gass (WI Bar No. 1011998)
DEWITT ROSS & STEVENS S.C.        GASS WEBER MULLINS LLC
2 E. Mifflin Street, Suite 600    309 North Water Street
Madison, Wisconsin 53703          Milwaukee, Wisconsin 53202
(608) 255-8891                    (414) 224-7697
Fax: (608) 252-9243               Fax: (414) 224-6116


Dated: May 3, 2010

# CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2010, I electronically filed **Plaintiffs' Statement of Additional Facts in Opposition to Defendants P.H. Glatfelter Company and WTM I Company's Motion for Summary Judgment on Counterclaims** using the ECF system, which will send notification of such filing to: Philip Munroe at DiRenzo & Bomier LLC, pmunroe@direnzollc.com; Scott Fleming at Weiss Berzowski Brady LLP, sbf@wbb-law.com; David Mandelbaum at Greenberg Traurig, LLP, mandelbaumd@gtlaw.com; Marc Davies at Greenberg Traurig, LLP, daviesm@gtlaw.com; Sabrina Mizrachi at Greenberg Traurig, LLP, mizrachis@gtlaw.com; Monique Mooney at Greenberg Traurig, LLP, mooneym@gtlaw.com; Caleb Holmes at Greenberg Traurig, LLP, holmesc@gtlaw.com; Patrick Zaepfel at Kegel Kelin Almy & Grimm, LLP, zaepfel@kkaglaw.com; Philip Hunsucker at Hunsucker Goodstein & Nelson PC, phunsucker@hgnlaw.com; David Rabbino at Hunsucker Goodstein & Nelson PC, drabbino@hgnlaw.com; Christopher Dow at Hunsucker Goodstein & Nelson PC, cdow@hgnlaw.com; Allison McAdam at Hunsucker Goodstein & Nelson PC, amcadam@hgnlaw.com; Eric Mroz at Hunsucker Goodstein & Nelson, P.C, mroz@hgnlaw.com; David Edquist at von Briesen & Roper, s.c., dedquist@vonbriesen.com; Christopher Riordan at von Briesen & Roper, s.c., criordan@vonbriesen.com; Patrick Wells at von Briesen & Roper, s.c., pwells@vonbriesen.com; Russell Wilson at Ruder Ware, rwilson@ruderware.com; Linda Benfield at Foley & Lardner LLP, lbenfield@foley.com; Sarah Slack at Foley & Lardner LLP, sslack@foley.com; Charles Gering at Foley & Lardner LLP, cgering@foley.com; Michelle Gale at Dykema Gossett PLLC, mgale@dykema.com; Joseph Basta at Dykema Gossett PLLC, jbasta@dykema.com; Daniel Murray at Johnson & Bell, Ltd., murrayd@jbltd.com; Garrett Boehm, Jr. at Johnson & Bell, Ltd., boehmg@jbltd.com; Frederick Mueller at Johnson & Bell,

Ltd., muellerf@jbltd.com; John Cermak, Jr. at Baker & Hostetler LLP, jcermak@bakerlaw.com; Sonja Inglin at Baker & Hostetler LLP, singlin@bakerlaw.com; Timothy Anderson at Remley & Sensenbrenner, S.C., tanderson@remleylaw.com; Thomas O'Donnell at Calfee Halter & Griswold LLP, todonnell@calfee.com; William Coughlin at Calfee Halter & Griswold LLP, wcoughlin@calfee.com; Ted Waskowski at Stafford Rosenbaum LLP, twaskowski@staffordlaw.com; Richard Yde at Stafford Rosenbaum LLP, ryde@staffordlaw.com; Meg Vergeront at Stafford Rosenbaum LLP, mvergeront@staffordlaw.com; Lora L. Zimmer at Hinshaw & Culbertson LLP, lzimmer@hinshawlaw.com; William Mulligan at Davis & Kuelthau, s.c., wmulligan@dkattorneys.com; Kevin Lyons at Davis & Kuelthau, s.c., klyons@dkattorneys.com; Tara Mathison at Davis & Kuelthau, s.c., tmathison@dkattorneys.com; Elizabeth Miles at Davis & Kuelthau, s.c., emiles@dkattorneys.com; Thomas Schrimpf at Hinshaw & Culbertson LLP, tschrimpf@hinshawlaw.com; Paul Kent at Anderson & Kent, S.C., pkent@andersonkent.com; Waltraud Arts at Anderson & Kent, warts@andersonkent.com; James P. Walsh at the Appleton City Attorney's Office, jim.walsh@appleton.org; Ian Pitz at Michael Best & Friedrich, LLP, iapitz@michaelbest.com; Allison Swanson at the City of Green Bay, allisonsw@ci.green-bay.wi.us; Ted Warpinski at Friebert, Finerty & St. John, S.C., taw@ffsj.com; S. Todd Farris at Friebert, Finerty & St. John, S.C., stf@ffsj.com; M. Andrew Skwierawski at Friebert, Finerty & St. John, S.C., mas@ffsj.com; Scott Hansen at Reinhart Boerner Van Deuren s.c., shansen@reinhartlaw.com; Steven Bogart at Reinhart Boerner Van Deuren s.c., sbogart@reinhartlaw.com; John Van Lieshout at Reinhart Boerner Van Deuren s.c., jvanlieshout@reinhartlaw.com; David Frank at Reinhart Boerner Van Deuren s.c., dfrank@reinhartlaw.com; Thomas Gottshall at Haynsworth Sinkler Boyd, P.A.,

tgottshall@hsblawfirm.com; Stephen McKinney at Haynsworth Sinkler Boyd, P.A., smckinney@hsblawfirm.com; William Harbeck at Quarles & Brady LLP, whh@quarles.com; David Strifling at Quarles & Brady, LLP, dstrifli@quarles.com; Nancy Peterson at Quarles & Brady LLP, nkp@quarles.com; Susan Lovern at von Briesen & Roper, s.c., slovern@vonbriesen.com; Thomas Armstrong at von Briesen & Roper, s.c., tarmstro@vonbriesen.com; Michael P. Carlton at von Briesen & Roper, s.c., mcarlton@vonbriesen.com; Kelly Noyes at von Briesen & Roper, s.c., knoyes@vonbriesen.com; Arthur Foerster at Latham & Watkins LLP, Arthur.Foerster@law.com; Margrethe Kearney at Latham & Watkins LLP, Margrethe.Kearney@lw.com; Mary Rose Alexander at Latham & Watkins LLP, Mary.Rose.Alexander@lw.com; Ernest Getto at Latham & Watkins LLP, Ernie.Getto@lw.com; Karl Lytz at Latham & Watkins LLP, Karl.Lytz@lw.com; Andrea Hogan at Latham & Watkins LLP, Andrea.Hogan@lw.com; Patrick J. Ferguson at Latham & Watkins LLP, Patrick.Ferguson@lw.com; Nathan Fishbach at Whyte Hirschboeck Dudek S.C., nfishbach@whdlaw.com; Jan Conlin at Robins, Kaplan, Miller & Ciresi L.L.P., jmconlin@rkmc.com; Sarah Lindsey at Warner Norcross & Judd LLP, slindsey@wnj.com; Steven Kohl at Warner Norcross & Judd LLP, skohl@wnj.com; Thomas Andreoli at Sonnenschein Nath & Rosenthal LLP, tandreoli@sonnenschein.com; Matthew Adams at Sonnenschein Nath & Rosenthal LLP, madams@sonnenschein.com; Randall Stone at U.S. Department of Justice, randall.stone@usdoj.gov; Joshua Levin at U.S. Department of Justice, joshua.levin@usdoj.gov; Matthew R. Oakes at U.S. Department of Justice, matthew.oakes@usdoj.gov; Perry Rosen at U.S. Department of Justice, perry.rosen@usdoj.gov; Michael Hermes at Hermes Law, Ltd., mlh@hermeslawltd.com; Brandon Evans at Hermes Law, Ltd., bje@hermeslawltd.com; Anthony Steffeck at Hermes Law, Ltd., ajs@hermeslawltd.com;

Heidi D. Melzer at Hermes Law, Ltd., hdm@hermeslawltd.com; Dennis Birke at DeWitt Ross & Stevens S.C., db@dewittross.com; Ronald Ragatz at DeWitt Ross & Stevens S.C., rrr@dewittross.com; Megan Senatori at DeWitt Ross & Stevens S.C., ms@dewittross.com; J. Ric Gass at Gass Weber Mullins LLC, gass@gasswebermullins.com David Turek at Gass Weber Mullins LLC, turek@gasswebermullins.com.

    I also hereby certify that on May 3, 2010, I caused a copy of the foregoing to be sent via electronic mail to the following counsel:

>Peter C. Karegeannes
>QUARLES & BRADY LLP
>411 E. Wisconsin Avenue
>Milwaukee, WI 53202
>pck@quarles.com
>*Counsel for WTM I Company*
>
>James E. Braza
>DAVIS & KUELTHAU, S.C.
>111 E. Kilbourn Avenue, Suite 1400
>Milwaukee, WI 53202
>jbraza@dkattorneys.com
>*Counsel for Neenah-Menasha Sewerage Commission*
>
>NCR CORPORATION
>
>s/ Kathleen L. Roach
>By: One of Its Attorneys