**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

APPLETON PAPERS INC. and
NCR CORPORATION,

       Plaintiffs,

                                     No. 08-CV-0016-WCG

       v.

GEORGE A. WHITING PAPER COMPANY, et
al.

       Defendants.

**DEFENDANTS CITY OF GREEN BAY AND BROWN COUNTY'S COMBINED
RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS OPPOSING
MOTIONS FOR SUMMARY JUDGMENT**

## I.    BACKGROUND

1.    Renard Island and Bayport are located in or adjacent to Operable Unit 5 ("OU5")
of the Lower Fox River. Declaration of Kathleen L. Roach in Support of Plaintiffs' May 3, 2010,
filings ("KLR Decl.") Ex. 35 [Record of Decision Amendment, June 2007, pp. 9, 16-17, 104-
105].

    <u>Response</u>:    Brown County admits that Renard Island is located within "OU5."  The

City and County are unable to respond as the phrase "adjacent to" is undefined.  The Bay Port

CDF is upland of the Shore of Green Bay.

2.    The OU5 remedy is 30 years of monitoring, unless improving conditions allow
for an earlier completion of the monitoring program. KLR Decl. Ex. 38 [Appendix I, Lower Fox
River Remedial Report, Long-Term Monitoring Plan, December 2009, p. 43].

    <u>Response</u>:    Undisputed for purposes of this motion.

3.    PCB releases have been documented at Bayport and Renard Island. KLR Decl.
Ex. 30 [WDNR Preliminary Green Bay Mass Balance Groundwater Monitoring Report (An

Assessment of the Bayshore Landfills), January 1990, Dkt. 870-3, pp. 8-9]; KLR Decl. Ex. 42 [Final Screening Site Inspection Report for the Bayport Industrial Park, 9/23/1993, pp. 44]; KLR Decl. Ex. 44 [Final Environmental Impact Statement, Green Bay Harbor, Wisconsin, Confined Disposal Facility, July 1985, at EIS-G-37]; KLR Decl. Ex. 3 [April 30, 2010 Declaration of D. Hayes, ¶13].

> Response:    Disputed but not material.  The Green Bay Mass Balance Groundwater Monitoring report does not document releases, but theorizes that releases may occur based on PCB detection in adjacent areas after heavy rainfall, and concludes that any such releases would be inconsequential.  Dkt 870-4.

4.    "Historical and continuing PCB losses" from Bayport and Renard Island "are a contributing reason for the extensive long-term monitoring requirements within Green Bay." KLR Decl. Ex. 3 [April 30, 2010 Declaration of D. Hayes, ¶14].

> Response:    Disputed, but there is no genuine and material dispute of fact.  The proposed finding is not supported by the evidence cited.  The expert declaration of D. Hayes cites no documents to support any connection between any supposed discharges from the facilities and any long term monitoring requirements of OU5.  Conclusory statements by an expert cannot form the basis of a material fact for summary judgment.  The Stage II - Green Bay Mass Balance Groundwater Monitoring Report, Dkt 870-4, explicitly concludes that any such releases are not adversely affecting adjacent surface waters.

A.    *Bayport Disposal Facility*

5.    The Bayport Disposal Facility ("Bayport"), a former wetland, is located along the shore of Green Bay, immediately west of the mouth of the Lower Fox River. KLR Decl. Ex. 30 [WDNR Preliminary Green Bay Mass Balance Groundwater Monitoring Report, January 1990, at NCR-FOX-0097406]; KLR Decl. Ex. 31 [Final Environmental Impact Statement relating to Operation, Maintenance, and Dredging Material Disposal at Green Bay Harbor, Army Corps, November 1977, at p. 2].

<u>Response</u>: Disputed in part, but there is no genuine and material dispute of fact. The Disposal facility is upland of the shore of Green Bay and is separated from the Bay by a remaining wetland marsh.

6. The City of Green Bay and Brown County constructed a perimeter dike around Bayport. Dkt. 870-1, p. 3.

<u>Response</u>: Undisputed for purposes of this motion.

7. The City of Green Bay owned Bayport until 1990, when Brown County purchased the majority of the facility. Dkt, 870-1, p. 2, 4. After the 1990 sale, Green Bay retained ownership of portions of Bayport that were not otherwise sold to private industry. *Id*.

<u>Response</u>: Disputed in part, but there is no genuine and material dispute of fact. Green Bay transferred ownership of the Bay Port CDF to Brown County in 1990. See Dkt, 870-1, p. 2.

8. Beginning in the late 1950s, Bayport accepted Lower Fox River Site dredged materials for disposal. KLR Decl. Ex. 30 [WDNR Preliminary Green Bay Mass Balance Groundwater Monitoring Report, January 1990, at NCR-FOX-0097406].

<u>Response</u>: Disputed in part, but there is no genuine and material dispute of fact. The Bay Port Facility did not exist until the late 1960's. See Plaintiff's response to City of Green Bay's Proposed Findings of Fact at ¶ 5.

9. Between 1965 and 1998 more than 10 million cubic yards of Lower Fox River dredged materials were disposed of at Bayport. KLR Decl. Ex. 32 [Tech Memo 2g, pp. 25-29, 33 (API-GE009866)].

<u>Response</u>: Disputed in part, but there is no genuine and material dispute of fact. The proposed finding is not supported by evidence cited. Tech Memo 2g lists a total of 9,378,103 cubic yards during that timeframe.

3

10.    The City of Green Bay was responsible for providing an "approved and constructed disposal facility" at Bayport. Dkt. 870-2, p. 37.

Response:    Disputed in part, but finding No.10 states an (incorrect) legal conclusion, not a factual proposition.  The COE participated in the construction of the Bay Port Facility. (See Dkt. 980-32 at p.8).

*B.    Renard Island*

11.    In 1978 construction began on Renard Island, a kidney-shaped island located in the bay of Green Bay, east of the mouth of the Lower Fox River. KLR Decl. Ex. 33 [Ten-Year Dredged Material Disposal Plan for Lower Green Bay, Bay-Lake Regional Planning Comm'n, 1983, GB-DP0008638 at p. 8727]. Construction was completed in 1979. *Id.*

Response:    Undisputed for purposes of this motion.

12.    Between 1978 and 1996, more than 2.7 million cubic yards of Lower Fox River dredged materials were dumped at Renard Island. KLR Decl. Ex. 32 [Tech Memo 2g, pp. 24-29, p. 33 (API-GE009866)].

Response:    Undisputed that pages 24-29 of the Tech Memo 2g contain a chart indicating that approximately 2,713,241 cubic yards of dredge materials were disposed at Renard Isle during the time period noted above.

13.    The United States paid for construction of Renard Island, while "the local sponsor, Brown County," was required to furnish the site, rights-of-way and future maintenance. KLR Decl. Ex. 31 [Final Environmental Impact Statement relating to Operation, Maintenance, and Dredging Material Disposal at Green Bay Harbor, Army Corps, November 1977, p. 1-11].

Response:    Undisputed that the 1977 EIS contains those statements; however, the purpose of an EIS is to analyze potential environmental impacts of a proposed project; the 1977 EIS does not mandate any party's responsibilities related to federally-mandated navigational dredging, nor does it legally bind any party to conduct or participate in any action whatsoever. This proposed fact is irrelevant and immaterial to the equitable determination the Court must make to resolve the issues presented in Defendants' motion for summary judgment.

4

14.     The Corps explained that "Brown County will retain the title to the filled confined disposal facility, any granted easements or rights-of-way, and must maintain the filled facility in a manner which the Secretary of the Army determines to be satisfactory." KLR Decl. Ex. 31 [Final Environmental Impact Statement relating to Operation, Maintenance, and Dredging Material Disposal at Green Bay Harbor, Army Corps, November 1977, p. 1-11].

Response:     Undisputed that the 1977 EIS contains those statements; however, the purpose of an EIS is to analyze potential environmental impacts of a proposed project; the 1977 EIS does not mandate any party's responsibilities related to federally-mandated navigational dredging, nor does it legally bind any party to conduct or participate in any action whatsoever. This proposed fact is irrelevant and immaterial to the equitable determination the Court must make to resolve the issues presented in Defendants' motion for summary judgment.

15.     A proposed expansion of Renard Island in the 1980s had provisions for the Corps to pay for construction, and for Brown County to take responsibility for operation and maintenance costs. KLR Decl. Ex. 34 [Lower Green Bay Remedial Plan, February 1988, GPFOX00089127].

Response:     Undisputed that the Lower Green Bay Remedial Plan contains those statements; however, statements concerning Brown County's potential future responsibilities for a proposed expansion project that never took place are irrelevant and immaterial to the equitable determination the Court must make to resolve the issues presented in Defendants' motion for summary judgment.

16.     "[A]ppropriate closure" of Renard Island, including proper capping, monitoring and maintenance, are the responsibility of the Corps and Brown County. KLR Decl. Ex. 35 [Record of Decision Amendment, Operable Unit 2 (Deposit DD), Operable Unit 3, Operable Unit 4 and Operable Unit 5 (River Mouth), June 2007, p. 104)].

Response:     Undisputed that the June 2007 Record of Decision ("ROD") contains those statements; however, the purpose of a ROD is to select and explain a remediation program; the 2007 ROD does not mandate any party's responsibilities related to federally-mandated

5

navigational dredging, nor does it legally bind any party to conduct or participate in any action whatsoever. This proposed fact is irrelevant and immaterial to the equitable determination the Court must make to resolve the issues presented in Defendants' motion for summary judgment.

17. In 2008, Brown County announced it "will take ownership of the island and its long-term maintenance responsibilities" upon completion of closure activities. KLR Decl. Ex. 36 [Brown County Port and Solid Waste Department news release, June 5, 2008].

Response: Undisputed that the June 2008 press release contains those statements; however, real estate ownership is established by recorded documents and signed writings, not by statements to the press. Wis. Stat. § 706.02. Brown County can never "take ownership" of Renard Island because the Wisconsin Constitution prohibits the ownership transfer of lakebed property -- such property is held in the public trust by the State of Wisconsin. *See* WI Const. Art. IX, sec. 1; *Muench v. Public Serv. Comm'n*, 261 Wis. 2d 492, 53 N.W.2d 514 (1952); *City of Madison v. State*, 1 Wis. 2d 252, 260, 83 N.W.2d 674 (1957); Melissa Scanlan, Comment, *The Evolution of the Public Trust Doctrine and the Degradation of Trust Resources: Courts, Trustees and Political Power in Wisconsin*, 27 Ecology Law Review Quarterly 135, 134, 147 (2004). Moreover, the press release clearly states that Brown County's "long-term maintenance responsibilities" of Renard Isle will commence upon completion of closure activities; even if the statement could be proven accurate, closure activities have not yet been completed. This proposed fact is irrelevant and immaterial to the equitable determination the Court must make to resolve the issues presented in Defendants' motion for summary judgment.

18. As recently as February 2010, a local newspaper reported that the City of Green Bay "is interested in taking ownership of the island from Brown County." KLR Decl. Ex. 37 [Press-Gazette, City of Green Bay Contests Army Corps' Proposed Location of Renard Isle Causeway, Feb. 8, 2010].

6

Response:    Undisputed that the February 2010 news article contains that statement; however, real estate ownership is established by recorded documents and signed writings, not statements to the press. Wis. Stat. § 706.02. This proposed fact is irrelevant and immaterial to the equitable determination the Court must make to resolve the issues presented in Defendants' motion for summary judgment.

## II.    THE CITY OF GREEN BAY AND BROWN COUNTY KNEW BY 1966 THAT THE LOWER FOX RIVER SEDIMENTS WERE GENERALLY CONTAMINATED WITH UNDESIRABLE MATERIALS.

19.    By the mid-1960s, the City of Green Bay and Brown County knew that the Lower Fox River Site sediments were generally contaminated with pollutants. Dkt. 870-2, pp. 52-54.

Response:    Undisputed for purposes of this motion, but no knowledge of the pollutants included PCBs.

20.    In an April 1966 letter to the Brown County Port Director, which copied the City of Green Bay's Public Works Director, the Corps noted that certain open-water dumping may not be permissible "because of possible increased pollution" in Green Bay. Dkt. 870-2, pp. 52-54.

Response:    Undisputed for purposes of this motion.

21.    In 1969, the Federal Water Quality Administration ("FWQA"), the predecessor to the U.S. Environmental Protection Agency ("U.S. EPA"), sampled the Green Bay Harbor Channel. KLR Decl. Ex. 39 [Report on the Degree of Pollution of Bottom Sediments in the Fox River and Green Bay, July 9, 1969, GB-DP0003058, at GB-DP0003181].

Response:    Undisputed for purposes of this motion.

22.    The 1969 FWQA sampling found that the Lower Fox River sediments were moderately to heavily polluted, and concluded that "[n]one of the sediments in this channel are suitable for disposal in the open waters of Green Bay or Lake Michigan." KLR Decl. Ex. 39 [Report on the Degree of Pollution of Bottom Sediments in the Fox River and Green Bay, July 9, 1969, GB-DP0003058, at GB-DP0003181].

Response:    Undisputed for purposes of this motion.

7

23.     In 1971, Green Bay area newspaper articles carried stories relaying the State of Wisconsin's warning to its residents against eating excessive amounts of certain fish due to potential PCB contamination. KLR Decl. Ex. 40 [10/2/1971 Neenah Menasha Northwestern (APIFOX00054850)]. The articles informed the public that PCBs were used in a variety of products, including manufacture of carbonless copy paper, hydraulic fluids, plastics and plywood. *Id*.

Response:     Disputed but there is no genuine or material dispute of fact.  The proposed finding is not supported by the evidence cited.  KLR Decl. Ex 40 shows only one article with one story relating to the dangers of consuming PCB contaminated fish.

24.     The 1972 Interdepartmental Task Force Report on PCBs was well-publicized. Dkt. 660, ¶17 [June 4, 2009 Report of M. Williams].

Response:     Disputed but there is no genuine or material dispute of fact.  The proposed finding is not supported by evidence cited.  Dkt. 660 is a declaration of Kathleen Roach of which paragraph 17 does not refer to a June 4, 2009 Report of Dr. Williams.

25.     By 1975, at the latest, sampling conducted on behalf of the Corps confirmed that the contamination in the Lower Fox River sediments included PCBs. KLR Decl. Ex. 41 [Laboratory Study of the Release of Pesticide and PCB Materials to the Water Column During Dredging and Disposal Operations, December 1975, p. 19-20, 49, 65].

Response:     Undisputed for purposes of this motion that testing was performed.

26.     In the mid-1970s, sediment from the bay of Green Bay was sampled for the presence of PCBs as part of an effort to examine the effects of dredging and open-water discharges on the release of PCBs. KLR Decl. Ex. 41 [Laboratory Study of the Release of Pesticide and PCB Materials to the Water Column During Dredging and Disposal Operations, December 1975, p. 20]. The sampling revealed the presence of PCBs similar to both Aroclor 1242 and Aroclor 1254. *Id*.

Response:     Undisputed for purposes of this motion.

8

III. **DISPOSAL OF LOWER FOX RIVER DREDGED MATERIALS AT THE BAYPORT DISPOSAL FACILITY CAUSED HARM TO THE LOWER FOX RIVER.**

27. The Wisconsin Department of Natural Resources ("WDNR") has found that Bayport, like Renard Island, was an "older" site that was "not designed to completely isolate dredged materials from the environment." KLR Decl. Ex. 34 [Lower Green Bay Remedial Action Plan, WDNR, February 1988, GPFOX00089079, at GPFOX00089211].

Response:    Undisputed for purposes of this motion.

28. WDNR has also stated that "uncovered contaminated wastes and substantial use by wildlife … have potential for run-off and for contaminants to move through the food chain into fish and wildlife." KLR Decl. Ex. 34 [Lower Green Bay Remedial Action Plan, WDNR, February 1988, GPFOX00089079, at GPFOX00089275].

Response:    Undisputed for purposes of this motion.

29. Sampling conducted by WDNR at Bayport in the 1990s found "significant PCB and lead detections in the slough flow after the storm event samples"; and that the slough "flows westward … and then out to the bay." Dkt. 870-3, p. 8-9.

Response:    Undisputed for purposes of this motion.

30. In 1993, WDNR "[o]bserved releases" of Aroclor 1248 in surface water samples taken from the perimeter ditches that drain Bayport. KLR Decl. Ex. 42 [Final Screening Site Inspection Report for the Bayport Industrial Park, 9/23/1993, API-GF048710].

Response:    Disputed but there is no genuine or material dispute of fact. The proposed finding is not supported by record evidence cited. The samples in question were sediment samples, not surface water samples.

IV. **DISPOSAL OF LOWER FOX RIVER DREDGED MATERIALS AT RENARD ISLAND CAUSED HARM TO THE LOWER FOX RIVER.**

31. By the mid-1980s, the federal government recognized that Renard Island "was not designed to be tight and leaks have occurred"; and after one such leak, "[n]o PCB measurements were taken to determine loss of contaminants with these solids." KLR Decl. Ex. 43 [Final Fish and Wildlife Coordination Act Report on Confined Disposal of Polluted Sediment, Green Bay Harbor, Wisconsin, May 1985, p. 17].

Response:    Undisputed for purposes of this motion.

9

32.     EPA was also concerned about PCB releases from Renard Island, given that "the area around the facility supports a diverse fishery" and that "there is a strong potential for bioaccumulation in aquatic life or contaminants that might leak from the disposal facility." KLR Decl. Ex. 44 [Final Environmental Impact Statement, Green Bay Harbor, Wisconsin, Confined Disposal Facility, July 1985, at EIS-G-7].

Response:     Undisputed for purposes of this motion.


33.     The WDNR has also noted that Renard Island "had a history of dike leakage, resulting in direct discharge of untreated carriage water," and that the facility violated its wastewater discharge permit limits for suspended solids. KLR Decl. Ex. 44 [Final Environmental Impact Statement, Green Bay Harbor, Wisconsin, Confined Disposal Facility, July 1985, at EIS-G-36].

Response:     Undisputed for purposes of this motion.


34.     WDNR found that in 1983 "detectable levels of PCBs" likely were discharged from Renard Island, but that the Corps "had not supplied the Department with information on the actual effluent concentrations of PCBs." KLR Decl. Ex. 44 [Final Environmental Impact Statement, Green Bay Harbor, Wisconsin, Confined Disposal Facility, July 1985, at EIS-G-37].

Response:     Disputed, but there is no genuine or material dispute of fact.  The proposed finding is not supported by the evidence cited.  KLR Decl. Ex 44 at G-37 states, "Analysis of water samples…indicate that detectable levels of PCBs may have been discharged…."  (Emphasis added.)

Dated this 21st day of May, 2010.

Respectfully submitted,

 /s/ Ian A. J. Pitz
David A. Crass, Esq.; SBN 1000731
Ian A. J. Pitz, Esq.; SBN 1031602
MICHAEL BEST & FRIEDRICH, LLP
One South Pinckney Street, Ste. 700
Madison, WI 53703-4257
Telephone:  (608) 257-3501
Fax:  (608) 283-2275
Email:  dacrass@michaelbest.com
         iapitz@michaelbest.com

*Attorneys for Defendant Brown County*

/s/ Ted A. Warpinski
Ted A. Warpinski.; SBN 1018812
M. Andrew Skwierawski; SBN 1063902
FRIEBERT, FINERTY & ST. JOHN, S.C.
Two Plaza East – Suite 1250
330 East Kilbourn Avenue
Milwaukee, WI 53202
(414) 271-0130
Email:  taw@ffsj.com

*Attorneys for Defendant The City of Green Bay*

11