**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | | |
|---|---|---|
| APPLETON PAPERS INC. and NCR CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 08-CV-16-WCG |
| GEORGE A. WHITING PAPER COMPANY, ET AL., | ) ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| NCR CORPORATION, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 08-CV-0895-WCG |
| KIMBERLY-CLARK CORPORATION, ET AL., | ) ) ) | |
| Defendants. | ) | |

---

## DEFENDANTS P.H. GLATFELTER COMPANY AND WTM I COMPANY'S RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO DEFENDANTS P.H. GLATFELTER AND WTM I COMPANY'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS

Pursuant to Civil L.R. 56.2(b) of the United States District Court for the Eastern District of Wisconsin, Defendants P.H. Glatfelter Company ("Glatfelter") and WTM I Company ("WTM") respond to NCR Corporation ("NCR") and Appleton Papers Inc.'s ("API") (collectively, "Plaintiffs") Statement of Additional Facts in Opposition to Defendants P.H. Glatfelter and WTM I Company's Motion for Summary Judgment on Counterclaims ("PSAF"). Plaintiffs have intentionally phrased their PSAF to elicit disputes. None of the disputes are material to the underlying motion. The parties do not dispute any of the material facts.

## I. Broke is an Inevitable Byproduct of All Papermaking Operations That Is Viewed as a Valuable Raw Material Because It Can Be Reused or Sold for Recycling.

1. "Broke" is a term used within the paper industry that refers to byproducts that are inevitably generated during the course of papermaking operations. Broke is generated as a byproduct of all papermaking operations and is not unique to the production of NCR Paper brand carbonless copy paper ("CCP"). Declaration of Kathleen L. Roach in Support of Plaintiffs' May 3, 2010, filings ("KLR Decl.") Ex. 1 [May 1, 2010 Declaration of W. Moore]

**RESPONSE TO PSAF 1:**

**Disputed in part.** It is undisputed that the generation of broke is not unique to the production of CCP. Broke, however, is a waste, and the implication that broke is merely a "byproduct" is disputed. The reference to broke as a "byproduct" is a characterization, not a fact, is vague and susceptible to multiple meanings. *See, e.g.,* Statement of Undisputed Facts of Defendants P.H. Glatfelter Company and WTM I Company, Dkt. No. 879, ("Glat./WTM SUF"), Nos. 10-26. It is further disputed that Mr. Moore is competent to testify as an expert regarding PSAF Nos. 1, 2, 4, 5, 7, 9, 11, 16, 22, 31, 32, 34, 35, 36, 37, 38, 46, 47, 51, 52, 53, 55, 56, 57, and 58. Mr. Moore is a non-percipient witness, and offering opinions regarding the meaning of documents or statements made or written during the production period falls outside the scope of his expertise. *See* Declaration of Kathleen L. Roach in Support of Plaintiffs' May 3, 2010 filings, Dkt. No. 980, ("KLR Decl.") Ex. 1 [May 1, 2010 Declaration of W. Moore, at 12-14. Glatfelter and WTM incorporate this response regarding Mr. Moore into all of the PSAF cited in this Response regarding Mr. Moore.

- 2 -

2.      Broke can include materials such as trimmings generated as rolls of paper are rewound; trimmings from product being prepared for shipping; paper collected from machine breaks, roll changes, or coating skips; and product that does not meet final specifications. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore]

**RESPONSE TO PSAF 2:**

**Undisputed.**  By way of further response, broke also includes other types of materials.  *See* Glat./WTM SUF, Nos. 11, 14, 19.


3.      Broke is a valuable raw material that is used by recycling mills in the manufacture of new paper products. KLR Decl., Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 3:**

**Disputed.**  Broke is a term used to describe an item made up of various component parts.  The fiber portion of broke will have varying degrees of value to each recycling mill. Contaminants contained within the broke, such as PCB-containing NCR emulsion, contained negative value for recycling mills.  Glat./WTM SUF Nos. 62, 68; April 2, 2010 Declaration of David G. Mandelbaum in Support of the Memorandum of Defendants P.H. Glatfelter Company and WTM I Company in Support of Their Motion for Summary Judgment on Counterclaims, Dkt. No. 875, ("4/2/10 DGM Decl."), Ex. 7 [Strelow Dep., at 27:16 - 29:1, 37:22 - 38:3-8];  4/2/10 DGM Decl., Ex. 8 [Christensen Dep., 47:16 - 48:1].

- 3 -

4. Facilities that make paper typically do not treat broke as solid waste because it has value as a raw material that can be reused onsite. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 4:**

**Disputed and immaterial.** To the extent PSAF 4 is not specific to practices at ACPC or Combined Locks, PSAF 4 is immaterial and is therefore disputed. To the extent that PSAF 4 involves the activities of any other facility that makes paper other than ACPC, PSAF 4 is vague and immaterial and is therefore disputed. By way of further response, it is disputed that Appleton Coated Paper Company ("ACPC") valued broke as a raw material or that ACPC could use broke onsite. 4/2/10 DGM Decl., Ex. 8 [Christensen Dep., 28:9 – 29:10]; 4/2/10 DGM Decl., Ex. 15 [BCFOX00007067]; Deposition of Donald Christensen, 145:17 – 146:18, Ex. BB to the Declaration of Caleb J. Holmes in Support of the Reply Memorandum of Defendants P.H. Glatfelter Company and WTM I Company in Support of Their Motion for Summary Judgment on Counterclaims ("5/24/10 CJH Decl.").

5. At facilities that cannot use broke onsite, broke is usually collected, sorted, and baled because it can be sold in the recovered fiber market. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 5:**

**Disputed in part.** It is undisputed that ACPC collected, sorted, and baled broke. However, it is disputed that such actions are tied solely to the ability to sell broke. In his deposition, former ACPC employee Floyd Strelow described the sorting and baling process

as applying to a miscellaneous grade of wastepaper broke that ACPC did not sell. 4/2/10 DGM Decl., Ex. 7 [Strelow Dep., 29:15 - 30:1].

6.     There is a constant demand for broke, and it is considered among the more valuable grades of recovered fiber available. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 6:**

**Disputed and immaterial.**  PSAF 6 is vague as to time, vague as to the type of broke described, and vague because the phrase "among the more valuable grades of recovered fiber" is not defined.  The price of broke varies greatly depending not only on the time, but on the ease with which it could be recycled, as well as the ratio of fiber to contaminants contained within a given bale of broke.  4/2/10 DGM Decl., Ex. 8 [Christensen Dep., at 47:16 - 48:1; 4/2/10 DGM Decl., Ex. 7 [Strelow Dep., at 37:22 – 38:8];  KLR Decl., Ex. 25 [Strelow Dep. at 27:16 - 29:16].  It is disputed that broke is a "byproduct" to the extent this PSAF implies that broke is not waste.  *See* Glat./WTM SUF Nos. 10-26; Response to PSAF 1, above.

## II.     CCP Broke, In Particular, Was Viewed And Handled By ACPC as a Valuable Byproduct That Generated Additional Revenue and Profits.

7.     The Appleton Coated Paper Company ("ACPC") generated broke as a byproduct of its coating operations at its Appleton facility, including coating operations to produce CCP. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 7:**

**Disputed in part.** It is undisputed that ACPC generated broke. However, the reference to broke as a "byproduct" is a characterization, not a fact, and is vague, susceptible to multiple meanings, and is therefore disputed. *See* Response to PSAF 1, above.

8. The generation of and sale of broke has always been a part of ACPC's business, both before and after Aroclor 1242 was used in the emulsion for CCP. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 63:19-24; 132:9-18].

**RESPONSE TO PSAF 8:**

**Disputed in part.** It is undisputed that the generation and sale of broke is not causally connected to whether the emulsion for CCP contained PCBs. However, it is disputed that the generation and sale of broke is part of ACPC's business, as broke produced negative value for ACPC. KLR Decl., Ex. 4 [Mead Corporation Debit Memos, 1955-1973, NCR-FOX-0277049, NCR-FOX-0277083, NCR-FOX-0277094]. It is also disputed that the generation and sale of broke was part of ACPC's "business" to the extent that PSAF 8 implies that the broke was a "useful product" under CERCLA. The broke was a waste product. *See* Glat./WTM SUF, Nos. 10-26.

9. Broke generated specifically from ACPC's production of CCP ("CCP Broke") consisted of trim from the coating production operation, machine breaks, roll changes, coating skips, side rolls, and product that did not meet final specifications. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore]; KLR Decl. Ex. 17 [Excerpts of 3/25/09

Deposition of D. Christensen, 143:3-6, 15-20]; KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 19:22-20:1].

**RESPONSE TO PSAF 9:**

**Disputed in Part.** It is undisputed that PSAF 9 described some of the ways in which broke was generated. However, broke was also generated other ways. *See* Response to PSAF 2, above.

10. CCP Broke was a commercially valuable, useful product. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 10:**

**Disputed.** PSAF 10 characterizes facts rather than stating them, suggesting a legal conclusion that is not supported by the evidence. The fiber content in some broke, including CCP broke, had value to some recycling mills and was purchased by those mills for prices corresponding to that value. 4/2/10 DGM Decl., Ex. 7 [Strelow Dep. 28:18-29:1, 38:5-9]. However, broke was a waste product. *See* Glat./WTM SUF, Nos. 10-26; Response to PSAF 1.

11. ACPC collected, sorted and baled CCP Broke for sale in the recovered fiber market. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 11:**

**Disputed.** ACPC records indicate that it collected, sorted and baled all broke, regardless of whether that broke was to be sold or landfilled. 4/2/10 DGM Decl., Ex. 7 [Strelow Dep., 47:16 - 48:1]; 5/24/10 CJH Decl., Ex. CC [ACPC Inter Office Memo - Broke

- 7 -

Inventory, Shipping, and Billing Procedure, dated July 21, 1966, NCR-FOX-318041 through NCR-FOX0318052].

12.     ACPC would inventory CCP Broke before sale to brokers. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 40:14-15]. CCP Broke was tracked and routed through detailed record-keeping procedures. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 36:1-7, 36:14-25].

**RESPONSE TO PSAF 12:**

**Disputed in part.**  The evidence cited in PSAF 12 does not support the characterization of the record-keeping procedures as "detailed," and therefore PSAF 12 is disputed as defective under L.R. 56.2(a).

13.     ACPC would bale CCP Broke before sale to brokers. KLR Decl. Ex. 19 [Excerpts of 1/28/09 Deposition of F. Heinritz, 62:18-19].

**RESPONSE TO PSAF 13:**

**Undisputed.**

14.     ACPC sorted broke and sold about 10 different grades of broke, including multiple grades of CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 25:6-8].

**RESPONSE TO PSAF 14:**

**Undisputed.**

15. CCP Broke was sold in multiple grades, including CB white, CFB white, CFB colors and CFB goldenrod. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 25:9-17].

**RESPONSE TO PSAF 15:**

**Undisputed.**

16. CCP Broke was sorted by hand into different grades in order to maximize the selling price. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 16:**

**Disputed.** The evidence cited in PSAF 17 is defective under L.R. 56.2(a). While it is not disputed that CCP Broke was sorted into different grades, the cited material does not reflect that the sorting was done by hand or done in order to maximize the selling price. Mr. Moore is not a percipient witness and does not claim a field of expertise that allows him to opine on the facts proposed in this paragraph, nor does the cited document support the proposition that sorting was done by hand.

17. After CCP Broke was sorted into different grades at ACPC, it was sent to the baler area, or box shop, where the carton department baled the broke for sale. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 27:17-28:1].

**RESPONSE TO PSAF 17:**

**Undisputed.**

- 9 -

18.     CCP Broke was never sent to a landfill; it was always sold. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 24:20-24].

**RESPONSE TO PSAF 18:**

**Disputed in part.** PSAF 18, as written, is disputed. It is undisputed that broke classified into one of the CCP broke categories, such as "CFB Colors," generally was sold, not landfilled. Donald Christensen did not testify that CCP Broke was "never" sent to a landfill. Rather, he testified that he could not recall it being sent to a landfill during the time that he was involved. KLR Decl., Ex. 17 [Christensen Dep., 24:20-24].

19.     ACPC did not send CCP Broke to landfill because it was a useful product to others to recycle. KLR Decl., Ex. 19 [1/28/09 Deposition of F. Heinritz, 96:21-23; 119: 16-19].

**RESPONSE TO PSAF 19:**

**Disputed in part.** To the extent PSAF 19 states a legal conclusion, it is disputed. It is undisputed that ACPC sought to receive money for the broke it disposed of, rather than to pay money for its disposition. However, broke was a waste product. *See* Glat./WTM SUF Nos. 10-26; Response to PSAF 1.

20.     ACPC's purchasing department was in charge of ACPC's broke sales. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 19:7-10].

- 10 -

**RESPONSE TO PSAF 20:**

**Undisputed.** By way of further response, "Waste Control Clerks" were also involved in many aspects of broke disposal leading up to the actual sales. *See* Glat./WTM SUF, Nos. 21-23.

21.     Between 1961 and 1973, Floyd Strelow held various positions in the purchasing department, ultimately becoming director of central purchasing. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 10:7-21; 11:7-12]. Mr. Strelow testified that he was not involved at all in any waste disposal operations at ACPC. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 63:12-14].

**RESPONSE TO PSAF 21:**

**Undisputed.**

22.     ACPC's strict broke collection and sale procedures show a level of care that indicate ACPC considered CCP Broke to be a valuable product. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore]. Such strict procedures are not generally used in the handling and disposal of waste materials. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 22:**

**Disputed.** The substance of ACPC's broke handling procedures are set forth in Deposition Exhibit 16, and was discussed by Floyd Strelow for 16 pages of deposition testimony. KLR Decl., Ex. 25 [Strelow Dep., 26:6 – 42:17]; 5/24/10 CJH Decl., Ex. CC [ACPC Inter Office Memo - Broke Inventory, Shipping, and Billing Procedure, dated July

- 11 -

21, 1966, NCR-FOX-318041 through NCR-FOX0318052]. The evidence cited by Plaintiffs in PSAF 22 does not describe the handling procedures as "strict" and Mr. Strelow did not indicate that the procedure itself was strictly followed. *Id*. The first page of the ACPC Memo discusses poor performance in shipping broke and calls for more efficient performance. *Id*. It is disputed that CCP Broke was a "valuable product" of ACPC. Rather, it was a waste product. *See* Glat./WTM SUF, Nos. 10-26; Response to PSAF 1 above.

23. The sale of CCP Broke was a revenue-generating part of ACPC's business. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 53:4-8].

**RESPONSE TO PSAF 23:**

**Disputed in part.** It is undisputed that the sale of CCP Broke generated some revenue for ACPC. However, it is disputed that ACPC considered CCP Broke to be a product or profit center, or that the generation and sale of broke is part of ACPC's business, as broke produced negative value for ACPC. KLR Decl., Ex. 4 [Mead Corporation Debit Memos, 1955-1973, NCR-FOX-0277049, NCR-FOX-0277083, NCR-FOX-0277094]. *See* Glat/WTM SUF, Nos. 36, 39.

24. ACPC did not consider broke to be "waste" in the sense of garbage or trash. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 53:10-14; 60:7-8 (noting that an exhibit "talks about broke; it doesn't talk about waste.")].

- 12 -

**RESPONSE TO PSAF 24:**

**Disputed.** There is evidence that discusses ACPC sending broke to the "dump" along with other trash. 4/2/10 DGM Decl., Ex. 7 [Strelow Dep. Ex. 19 at 5]; 5/24/10 CJH Decl., Ex. DD [Strelow Dep. 64:24-65:5].

25. ACPC sold CCP Broke to maximize the bottom line. KLR Decl. Ex. 26 [3/13/07 Deposition of F. Strelow, 54:1-8].

**RESPONSE TO PSAF 25:**

**Disputed in part.** It is undisputed that everything ACPC did was directed to maximizing the value of the corporation. It is also undisputed that ACPC received money in exchange for CCP Broke, electing to sell it instead of landfilling it, despite the environmental risks imposed by the PCBs in the coatings. *See*, Glat./WTM SUF, Nos. 34-41. PSAF 25 is disputed to the extent it intends to turn proposed facts regarding the disposition of CCP Broke into a legal conclusion or to infer that "the bottom line" has meaning relative to legal conclusions related to "arranger" liability under CERCLA.

26. ACPC was not aware of any concerns about PCBs until mid to late 1969, and even at that point, did not believe that the concerns about PCBs applied to Aroclor 1242. Dkt. 674 [September 30, 2009 Declaration of R. Jezerc].

**RESPONSE TO PSAF 26:**

**Inadmissible and immaterial.** The September 30, 2009 Declaration of Ronald Jezerc, Dkt. No. 674, is inadmissible evidence. It is "well-settled" that a party "cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit

- 13 -

that contradicts an earlier deposition" in order to "defeat a defendant's motion for summary judgment." *See Ferguson v. Medical College of Wisconsin*, 471 F. Supp. 2d 901, 912 (E.D. Wis. 2007) (citing *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994); *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 379 (7th Cir. 1995); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995). Here, Plaintiffs propose a declaration of an individual who was deposed in this litigation on April 20, 2009 as evidence to support undisputed material fact. The declaration cited conflicts with Mr. Jezerc's earlier deposition testimony. For example, Mr. Jezerc testified as follows:

> Q:    Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB. From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs?
>
> (Objection omitted)
>
> A:    I don't have any idea whether there were other reasons.
>
> Q:    Okay. But **environmental concerns was the reason that you understood at the time they were being phased out; is that correct**?
>
> (Objection omitted)
>
> A:    **Yes**.

Declaration of Andrea M. Hogan in Support of Certain Defendants' Request for Judicial Notice in Support of Motion for Summary Judgment, Dkt. No. 586 ("Hogan Decl."), Ex. 4 [Jezerc Dep. at 171-72] (emphasis added).

In contrast, the September 30, 2009 Declaration of Ronald Jezerc cited in PSAF 26 states "[t]hrough the time that the changeover was completed, I continued to believe that Aroclor 1242 posed no environmental danger." This conflict Plaintiffs attempt to create with the September

- 14 -

30, 2009 Declaration of Ronald Jezerc cannot create a material issue of fact to defeat a motion for summary judgment. *See Ferguson*, 471 F. Supp. 2d at 912.

27. Aroclor 1242 was the only kind of PCB ever used in CCP. Dkt. 661, ¶ 20.

**RESPONSE TO PSAF 27:**

**Disputed.** Aroclor 1242 is a mixture of PCBs and not a "kind" of PCBs. NCR documents indicate that Aroclors were used during the relevant period. 5/24/10 CJH Decl., Ex. EE [NCR-FOX-0566659, at 727.]; Certain Defendants Proposed Findings of Fact, Dkt. No. 779 ("Certain Defendants' PFOF"), Nos. 133, 148, 276, 288, and 290. It is not disputed that Aroclor 1242 was the principal commercial mixture purchased by NCR for us in NCR CCP.

28. Throughout the time that Aroclor 1242 was used in CCP, ACPC did not believe that Aroclor 1242 presented an environmental danger. Dkt. 674 [September 30, 2009 Declaration of R. Jezerc].

**RESPONSE TO PSAF 28:**

**Disputed.** Ronald Jezerc testified regarding the switch from Aroclor to MIPB, and stated that "environmental concerns was the reason that you understood at the time they were being phased out." Hogan Decl., Ex. 4 [Jezerc Dep. at 171:24 – 172:8].

29. There is no evidence that ACPC sold CCP Broke as part of a plan to dispose of PCBs.

**RESPONSE TO PSAF 29:**

- 15 -

**Disputed.** *See* Response to PSAF 30.

30.    There is no evidence that ACPC intended to sell CCP Broke to dispose of PCBs.

**RESPONSE TO PSAF 30:**

**Disputed.**  ACPC knew that PCBs were in the broke, and intended to dispose of the CCP broke, including the PCB-laden emulsion, when it sold the broke to paper recyclers through brokers.  ACPC admits that it could not use the CCP broke in its operations and therefore had to dispose of it.  4/2/10 DGM Decl., Ex. 8 [Christensen Dep., 28:8-16]. Plaintiffs *did* know that the CCP Broke contained PCBs.  *See*, Statement of Undisputed Facts in Support of Georgia-Pacific LLC's and Certain Defendants' Motion for Summary Judgment on Equitable Factors, Dkt. No. 896 ("GP SUF"), No. 42.  Plaintiffs also knew that the recycling process would remove the PCBs from the CCP Broke coatings.  *See,* Glat./WTM SUF, Nos. 62-70.   ACPC also knew that the capsules would be released through recycling. 5/24/10 CJH Decl., Ex. BB, [Christensen Dep. 41:16 – 44:7];  Decision and Order Dismissing Plaintiffs' Claims for Contribution, Dkt. No. 795, at 10 n. 15 (Dec. 16, 2009).

**III.    Brokers That Purchased CCP Broke From ACPC Viewed It As A Commercially Valuable Product, And Actively Competed With Each Other to Purchase It.**

31.    Brokers are companies that are in the business of buying and selling recyclable pre- and post-consumer paper materials, such as broke. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

- 16 -

Case 2:08-cv-00016-WCG   Filed 05/24/10   Page 17 of 43   Document 1024

**RESPONSE TO PSAF 31:**

**Disputed in part and immaterial.** To the extent PSAF 31 is not specific to practices at ACPC or Combined Locks, PSAF 31 is immaterial and is therefore disputed. To the extent PSAF 31 attempts to imply that general industry practices, as opined to in the Declaration of W. Moore, were actually followed at ACPC or Combined Locks, Mr. Moore's ability to opine as an expert on this subject matter is disputed. To the extent PSAF 31 implies that ACPC or Combined Locks followed the general practices described in PSAF 31, it is disputed. Donald Christensen describes brokers as facilitating the transfer of broke from ACPC to a recycling mill. KLR Decl., Ex. 17 [Christensen Dep., 29:11-17].

32. Brokers purchase broke from various sources, and then resell the broke for a profit to recycling mills, who use the broke as a raw material for their papermaking operations. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 32:**

**Disputed.** PSAF 32 goes too far: All brokers cannot always sell all broke for a profit. By way of further response, documents attached to Plaintiffs' declaration indicate that some ACPC broke was not sold for money, but rather, appears to have been transferred for no charge to a recipient. *See*, KLR Decl., Ex. 4 [Mead Corporation Debit Memo, from 1955-1973 - NCR-FOX-0277049, NCR-FOX-0277083, NCR-FOX-0277094]. In addition, recycling mills use the fiber components of the broke as a raw material after breaking down the broke into its constituent parts, not the broke itself. PSAF 32 is also disputed to the extent it implies that the broke and all of its constituents were used as a raw material for

- 18 -

recycling mills' papermaking operations. The recycling mills only wanted the broke for its fiber content. *See* Response to PSAF 3, above.

33. In order to make a profit, brokers must be able to sell broke for more than they pay to purchase it. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 33:**

**Immaterial.**

34. In order to stay competitive, brokers are typically very secretive about both their broke suppliers and their recycling mill customers. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 34:**

**Disputed and immaterial.** This proposed fact is based upon a conclusory assertion by Plaintiffs' expert Moore, who does not cite to any evidence, source or reference. In addition, the phrase "typically very secretive" is vague and unclear and unsupported by any evidence whatsoever. Further, deposition testimony from this case indicates that at least some of the customers of brokers involved with CCP broke were well known. 4/2/10 DGM Decl., Ex. 7 [Strelow Dep., 116:5-12]; 4/2/10 DGM Decl., Ex. 8 [Christensen Dep., 162:21 - 163:5].

35. Brokers are not in the business of waste disposal. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 35:**

**Disputed in part.** PSAF 35 is disputed to the extent it attempts to characterize, or ascribe a legal meaning to the word "waste" or phrase "waste disposal."

36.     Brokers do not sort, process, or bale the broke they purchase. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 36:**

**Disputed in part.** It is undisputed that brokers did not sort or bale most if not all CCP broke. To the extent PSAF 36 is not specific to practices at ACPC or Combined Locks, PSAF 36 is immaterial and is therefore disputed. PSAF 36 is based upon a conclusory assertion by Plaintiffs' expert Moore, who does not cite to any evidence, source or reference whatsoever.

37.     Brokers do not recycle or repulp the broke they purchase prior to reselling it to recycling mills. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 37:**

**Disputed in part.** It is undisputed that brokers did not repulp CCP broke prior to transferring that broke to recycling mills. To the extent PSAF 36 is not specific to practices at ACPC or Combined Locks, PSAF 36 is immaterial and is therefore disputed. PSAF 37 is based upon a conclusory assertion by Plaintiffs' expert Moore, who does not cite to any, evidence, source or reference whatsoever.

38. Brokers typically purchase broke in baled form, and sell the material in the same form in which it was purchased from the supplier. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 38:**

**Undisputed.**


39. ACPC sold broke exclusively to brokers, with whom they had ongoing relationships, but never directly to recycling mills. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 29:11-24]; KLR Decl. Ex. 19 [Excerpts of 1/28/09 Deposition of F. Heinritz, 20:15-17; 63:18-20].

**RESPONSE TO PSAF 39:**

**Disputed.** PSAF 39 is defective under L.R. 56.2(a) because the evidence cited does not support the proposed fact. The citations to the deposition of Christensen state that "generally" the process was to sell the broke "*through* a broker *to* some kind of using operation, a paper mill of some kind, generally." KLR Decl., Ex. 17 [Christensen Dep., 29:11-14]. Christensen stated: "[T]he broker simply facilitated the transaction." *Id.*, at 29:15-17. In any event, there is undisputed evidence that ACPC sold broke directly to CBC without a broker beginning in 1971 or 1972. 5/24/10 CJH Decl., Ex. FF, [August 10, 1994 Memo, CBCFOX00001332]; 5/24/10 CJH Decl., Ex. GG, [Holzknecht Dep., 39:22-24].


40. The brokers to whom ACPC sold broke were secretive about their recycling mill customers, and did not wish to advertise who they were sending broke to, because of competition among them. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow,

35:3-6 ]; KLR Decl. Ex. 26 [3/13/07 Deposition of F. Strelow, 56:1-8]; KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 31:20-25].

**RESPONSE TO PSAF 40:**

**Disputed in part.** As stated in response to PSAF 38, brokers typically gave shipping instructions for CCP broke to the railway. However, Mr. Strelow testified that brokers sometimes gave the shipping instructions to ACPC employees. 4/2/10 DGM Decl., Ex. 8 [Strelow Dep. 35:8 – 13].


41. ACPC never sold CCP Broke directly to a recycling mill, in part because it was careful not to undercut the brokers that purchased its CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 41:17-23].

**RESPONSE TO PSAF 41:**

**Disputed in part.** *See* Response to PSAF 39. The deposition testimony used to support PSAF 41 states only that Mr. Stelow did not recall selling directly to a recycling mill, however, there is no evidence that he was certain that ACPC never sold directly to a recycling mill. KLR Decl., Ex. 25 [Strelow Dep. 41:19].


42. ACPC did not know to whom brokers sold CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 116:1-4].

**RESPONSE TO PSAF 42:**

**Disputed.** Mr. Strelow and Mr. Christensen testified regarding their knowledge of recipients of CCP Broke. 4/2/10 DGM Decl., Ex. 7 [Strelow Dep. 116:8 - 12]; 4/2/10 DGM Decl., Ex. 8 [Christensen Dep. 162:21 – 163:5].

43. There is no evidence that ACPC knew the details or the adequacy of the wastewater treatment processes at Defendants' mills, including Glatfelter's Bergstrom mill and WTM I's mill, during the time period that PCBs were used in the manufacture of CCP.

**RESPONSE TO PSAF 43:**

**Disputed.** It is vague and unclear as to what is meant by knowledge of "the details or the adequacy of the wastewater treatment processes at Defendants mills." Therefore, PSAF 43 cannot be a statement of an undisputed fact and is disputed.

44. There is no evidence that ACPC knew or intended that the sale of CCP Broke would result in the release of PCBs to the environment.

**RESPONSE TO PSAF 44:**

**Disputed.** ACPC knew that recycling mills on or near the Fox River were receiving ACPC's broke and that the recycling mills wanted the fiber content of its CCP Broke. The remainder of the constituents in the CCP Broke, such as PCB-laden coatings, would be removed by the recycling process and released into the wastewater. *See* Glat./WTM SUF, Nos. 62-70; Decision and Order Dismissing Plaintiffs' Claims for Contribution, Dkt. No. 795, at 10 n.15 (Dec. 16, 2009).

**IV. The Recovered Fiber Marketplace Valued CCP Broke Highly, As Evidenced By the Constant High Demand For CCP Broke, and the Fact That It Sold For Competitive Prices That Were Commensurate With Higher End Grades of Recovered Fiber.**

- 23 -

45. The price that brokers paid for CCP Broke was negotiated with ACPC. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 167:13-22].

**RESPONSE TO PSAF 45:**

**Undisputed.**


46. During the time period that Aroclor 1242 was used in the manufacture of CCP, CCP Broke sold for prices comparable to the prices of other higher end grades of recovered fiber. KLR Decl. Ex. 4 [Mead Corporation Debit Memos from 1955 to 1973, NCR-FOX0276908 – NCR-FOX-0277409]; KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 168:2-13]; KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 46:**

**Disputed.** PSAF 46 is vague as to time and as to the type of broke described. The price of broke varies greatly depending not only on the time during which it was sold, but on the ease with which it could be recycled and the ratio of fiber to contaminants contained within a given bale of broke. KLR Decl., Ex. 25 [Strelow Dep., 27:16 - 29:1, 37:22- 38:3-8]; 4/2/10 DGM Decl., Ex. 8 [Christensen Dep., 47:16 - 48:1]. PSAF 46 relies upon the Mead Corporation Debit Memos from 1955 to 1973 (KLR Decl., Ex. 4) and an excerpt from the Christensen deposition (KLR Decl., Ex. 17), neither of which fully support this proposed fact. The Mead Corporation Debit Memos reflect that the price it charged for CCP Broke was routinely about $20-$25/ton during the time frame encompassed. When asked what the price range was, Christensen testified: "I would just be guessing." KLR Decl., Ex. 17 [Christensen Dep. 168:2-9]. Christensen again confirmed that he did not "recall any

- 24 -

specifics about the price during any particular time ….." (*Id*., at 168:20-23.) Christensen also testified several times that he did not know if the price of CCP Broke was higher or lower, in general, relative to other broke that ACPC was generating. 5/24/10 CJH Decl., Ex. BB [Christensen Dep., 169:24-170:21].

47. For example, as early as 1955, CCP Broke was selling for $30 per ton. During the 1960s and 1970s, prices for CCP Broke ranged from $50 to $100 per ton. KLR Decl. Ex. 4 [Mead Corporation Debit Memos from 1955 to 1973, NCR-FOX-0276908 – NCR-FOX0277409]; KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore]; KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 168:2-13].

**RESPONSE TO PSAF 47:**

**Disputed in part.** Neither of the two sources cited in PSAF 47 refer to the prices of CCP Broke as stated, and, thus, PSAF 47 is disputed. The Mead Corporation Debit Memos reflect that the price it charged for CCP Broke was routinely about $20-$25/ton during the time frame encompassed. When asked what the price range was, Christensen testified: "I would just be guessing." KLR Decl., Ex. 17 [Christensen Dep., 168:2-9]. Christensen again confirmed that he did not "recall any specifics about the price during any particular time ..." (*Id.,* at 168:20-23). Christensen also testified several times that he did not know if the price of CCP Broke was higher or lower, in general, relative to other broke that ACPC was generating. 5/24/10 CJH Decl., Ex. BB [Christensen Dep., 169:24-170:21].

Further, Mr. Strelow indicates that grades of CCP broke could have significantly different selling price, again, based on the differences in the component parts within the various CCP broke grades. 4/2/10 DGM Decl., Ex. 7 [Strelow Dep. 34:7 – 13]. In that

- 25 -

testimony, Mr. Strelow describes goldenrod broke as difficult to bleach and "not one of the largest sellers." *Id.*

48.     Market forces would cause the price of CCP Broke to fluctuate. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 168:2-13].

**RESPONSE TO PSAF 48:**

**Disputed in part.** It is undisputed that the price of broke changed with the market. However, it is disputed that the "market" for CCP Broke worked like other product-based market where increased demand or higher prices drive production. Instead, because the broke itself cost more money to produce than the amount for which it could be sold, it was the price of virgin pulp that influenced the value for recycled paper fibers. 5/24/10 CJH Decl., Ex. BB [Christensen Dep., 168:24 - 169:11]; Response to PSAF 46.

49.     Brokers normally had standing orders to purchase CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 40:23-41:2]. Brokers also would contact ACPC to inquire about the availability of CCP Broke. KLR Decl. Ex. 17 [Excerpts of 3/25/09 Deposition of D. Christensen, 29:18-24].

**RESPONSE TO PSAF 49:**

**Disputed in part.** The first sentence of PSAF 49 is defective under Local Rule 56.2(a) because it is not supported by the cited material. Mr. Strelow's testimony pertains to broke in general ("X grade of broke"), not CCP Broke. *See* KLR Decl., Ex. 25 [Strelow Dep., 41:1-9]. The second sentence of PSAF 49 is undisputed.

- 26 -

50.     ACPC sold CCP Broke to brokers, including Golper Supply Company in Appleton, Wisconsin, Continental Paper Grading Company and National Fiber Supply, both located in Chicago. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 19:8-14].

**RESPONSE TO PSAF 50:**

**Undisputed.**


51.     Golper Supply Company, Continental Paper Grading Company and National Fiber Supply, were known to deal in high end grades of recovered fiber. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 51:**

**Disputed in part.**  PSAF 51 is based upon a conclusory assertion by Plaintiffs' expert Moore who does not cite to any evidence, source, or reference.  It is undisputed that these three companies bought or sold recovered fiber at times.  However, PSAF 51 is vague as to the purchasers and whether the reference to high end grades of recovered fiber relates to the parties involved in this litigation.


52.     There was never a time when ACPC was unable to sell CCP Broke; rather, there was a ready, competitive market for CCP Broke. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 114:17-22]. ACPC's broke was "readily salable" and broke dealers "had markets for more than" ACPC could produce. KLR Decl. Ex. 25 [Excerpts of 2/10/09 Deposition of F. Strelow, 114:17-22]; KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

Case 2:08-cv-00016-WCG   Filed 05/24/10   Page 28 of 43   Document 1024

**RESPONSE TO PSAF 52:**

**Disputed in part.** It is undisputed that the quoted language reflects statements made and transcribed at Mr. Strelow's deposition. However, Mr. Strelow did not testify that there was a "competitive" market for CCP Broke. Mr. Strelow also did not testify that there were markets for more than ACPC "could produce," but instead more than "we produced." It is disputed that such language supports the proposed fact that "there was never a time when ACPC was unable to sell CCP Broke."

53.     The demand for high end recovered fiber, such as CCP Broke, was always greater than the supply. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 53:**

**Disputed in part.** PSAF 53 is based upon a conclusory assertion by Plaintiffs' expert Moore who does not cite to any evidence, source, or reference. It is disputed that all CCP Broke was a "high end recovered fiber," or that there has always been greater demand for high end recovered fiber than the supply. KLR Decl., Ex. 25 [Strelow Dep. 34:1-13]. The amounts demanded and supplied are always equal where prices can fluctuate to clear the market. It is undisputed, however, that there was generally a market for high end recovered fiber.

54.     Different grades of CCP Broke sold by ACPC commanded different prices in the market. KLR Decl. Ex. 20 [Excerpts of 4/15/09 Deposition of B. Hietpas, 38:10-19].

**RESPONSE TO PSAF 54:**

**Disputed in part as unsupported.** It is undisputed that Mr. Hietpas testified about this proposed fact. However, Mr. Hietpas went on to acknowledge that he was not familiar with the pricing of the various grades of broke, but that other people were (*i.e.* Strelow and Christensen). KLR Decl., Ex. 20 [Hietpas Dep. 37:20-38:1].


55.      A competitive market for broke exists among brokers because broke, including CCP Broke, is a high-end, specialized grade of recovered fiber. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 55:**

**Disputed.** PSAF 55 is vague as to what is meant by the statement that CCP Broke is a "specialized" grade of recovered waste paper, and is also vague as to the time period to which it refers. The evidence shows that there was a market for many grades of recovered fiber and that CCP Broke fit into several of these grades. KLR Decl., Ex. 25 [Strelow Dep. 29:10-18]; 5/24/10 CJH Decl., Ex. DD [Strelow Dep. 48:19-25]. Mr. Golper testified that coated grades from ACPC were not considered a high grade of fiber. CJH 5/14/10 Decl., Ex. HH [Golper Dep., 53:5-9]. Competition for these grades was driven by multiple market forces and did not depend upon a classification of "high-end" as is referenced in PSAF 55. 4/2/10 DGM Decl., Ex. 8 [Christensen Dep. 168:5 - 169:11]. PSAF 55 is disputed by the evidence.


56.      The brokers that purchased CCP Broke from ACPC considered it a useful and valuable product. KLR Decl., Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 56:**

**Disputed.** It is not disputed that broke that fetched a positive price had value. The broke itself was not useful or valuable to the customer of a broker, but rather, the fiber content of the broke was valuable as a raw material for papermaking operations. *See* Response to PSAF 58.

**V.    The Recycling Mills That Purchased CCP Broke From Brokers, Such As The OU1 Defendants' Mills, Competed For CCP Broke and Considered It a Particularly Valuable Raw Material.**

57.    Recycling mills consider broke, such as CCP Broke, a "clean" grade of recovered fiber, and therefore it is among the more valuable grades of recovered fiber available. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 57:**

**Disputed.** PSAF 57 is based upon a conclusory assertion by Plaintiffs' expert Moore who does not cite to any evidence, source, or reference.  Recycling mills valued waste paper grades depending on certain factors, such as the amount of color, type of fiber, and the ratio of fiber to contaminants.  KLR Decl., Ex. 25 [Strelow Dep. 27:16 - 29:1, 37:22- 38:3-8]; 4/2/10 DGM Decl., Ex. 8 [Christensen Dep. 47:16 - 48:1].  CCP Broke was coated and therefore had a higher amount of filler or contaminants than other grades of broke.  The price paid, if any, for broke would approximate the net value of the fiber to purchases of that grade of wastepaper at that time and location.

58.    The recycling mills located along the Lower Fox River that purchased and used CCP Broke, including Glatfelter's Bergstrom mill and WTM I's mill, considered it to

be a useful and valuable raw material. KLR Decl. Ex. 1 [May 1, 2010 Declaration of W. Moore].

**RESPONSE TO PSAF 58:**

**Disputed.** Bergstrom and WTM considered the fiber component within CCP Broke valuable to their papermaking operations after that fiber was removed from the broke, and broken down into individual fibers. *See* Certain Defendants' PFOF, at Nos. 18, 60, 186, 227, 664.


59.     Recycling mills located along the Lower Fox River that used CCP Broke, including Glatfelter's Bergstrom mill and WTM I's mill, actively competed to purchase bales of CCP Broke. KLR Decl. Ex. 5 [August 10, 1998, Response of the P. H. Glatfelter Company to the Third Section 104(e) of the United States Department of Interior concerning the Fox River/Green Bay site dated June 10, 1998, NCR-FOX-0236695].

**RESPONSE TO PSAF 59:**

**Disputed.**   There is no evidence that Bergstrom or WTM *actively competed* to purchase bales of CCP Broke.  PSAF 59 is disputed.


60.     From 1954-1972, the Bergstrom mill received CCP Broke consisting of plant trimmings, sheeting waste, and material cut from rolls. KLR Decl., Ex. 22 [Excerpts of 8/28/09 C. Missimer Deposition, 39:4-17; 180:9-13]; KLR Decl. Ex. 5 [August 10, 1998, Response of the P. H. Glatfelter Company to the Third Section 104(e) of the United States Department of Interior concerning the Fox River/Green Bay site dated June 10, 1998, NCR-FOX-0236695].

**RESPONSE TO PSAF 60:**

**Undisputed in part.** PSAF 60 is defective under L.R. 56.2(a) because the evidence cited does not support the proposed fact. Bergstrom purchased CCP Broke at some times during the 1954-1972 period. Its competition is not known.


61. In 1971, Bergstrom was considering whether to take advantage of a potential increase in the available supply of NCR Paper Broke and drop in price. KLR Decl. Ex. 6 [September 24, 1971, Bergstrom Paper Company Interoffice Memo, Polychlorinated Biphenyl ("PCB") from Ken Maves to John Valente, GLTFOX00004014].

**RESPONSE TO PSAF 61:**

**Disputed.** The memorandum cited in PSAF 61 does state that Ken Maves, a Bergstrom employee who did <u>not</u> purchase waste paper, asked one of his technical department employees to investigate CCP broke and the presence of PCBs. However, while the memorandum references a potential drop in price and increased availability, testimony from Mr. Bergstrom, who purchased waste paper for the Bergstrom mill, does not indicate an increase in purchasing of CCP Broke as a result of any drop in price or increase in availability. 5/24/10 CJH Decl., Ex. II [Bergstrom Dep., 112:2 – 114:15]. PSAF 61 is disputed.


62. In 1975, Glatfelter ranked CCP Broke its seventh most valuable raw material. KLR Decl. Ex. 7 [Bergstrom Paper Company Interoffice Memo, May 13, 1975, NCR-FOX-369551 & 369556].

- 33 -

**RESPONSE TO PSAF 62:**

**Disputed**.  PSAF 62 is defective under L.R. 56.2(a) because the evidence cited does not support the proposed fact.

63.　　Fort Howard purchased and used CCP Broke in the 1960s and 1970s. KLR Decl. Ex. 24 [Excerpts of 5/27/09 Deposition of D. Schneider, 58:9-20]; KLR Decl. Ex. 16 [Excerpts of 4/21/09 Deposition of W. Charles, 36:16-23]; KLR Decl. Ex. 18 [Excerpts of 4/9/09 Deposition of R. Geigel, 103:15-17; 104:3-5]

**RESPONSE TO PSAF 63:**

**Unsupported and immaterial.**  None of the cited testimony establishes that Fort Howard purchased NCR broke in the 1960s and 1970s.  Neither Mr. Schneider nor Mr. Charles limit their testimony to any particular time frame.  When asked "How long did you purchase the NCR broke and trip through Golper?"  Mr. Geigel responds "I'm not sure." KLR Decl., Ex. 18 [Geigel Dep., 103:15-17]  Furthermore, the cited testimony relates to the sources from which Fort Howard purchased NCR Broke, not to the use of NCR Broke. KLR Decl. Ex. 24 [Excerpts of 5/27/09 Deposition of D. Schneider, 58:9-20]; KLR Decl., Ex. 16 [Charles Dep., 36:16-23]; KLR Decl., Ex. 18 [Geigel Dep., 103:15-17, 104:3-5].

64.　　Fort Howard used at least 45 to 90 tons per month of CCP Broke in each of the years 1967-1970, and at least 15 to 30 tons per month in 1971. KLR Decl. Ex. 8 [March 3, 1998, letter from Fort James to WDNR – Estimate of Fort Howard's PCB Loading to the Fox River, GPFOX00139278]. Roy Geigel, a recovered paper purchaser for Fort Howard,

- 34 -

testified that Fort Howard could have used up to 150 tons per month of CCP Broke. KLR Decl. Ex. 18 [Excerpts of 4/9/09 Deposition of R. Geigel, 104:3-5]

**RESPONSE TO PSAF 64:**

**Unsupported and immaterial.** The document cited does not provide information on how much CCP Broke Fort Howard actually used between 1967-1970. The document cited does not provide estimates of PCB Loading to the Fox River, which includes estimates of the amount of NCR Broke Fort Howard *may have used*, not how much CCP Broke Fort Howard actually used. Furthermore, the alleged fact mischaracterizes the cited testimony of Roy Geigel. GP Consumer Products LP's (f/k/a Fort James Operating Company), Fort James Corporation's and GP LLC's Response to Rule 56(f) Declaration of Kathleen L. Roach ("5/24/10 MRA Decl."), Ex. 44, [Excerpts of 4/9/09 Deposition of R. Geigel, 104:3-5]. Mr. Geigel testified that Fort Howard purchased 20 tons to 150 tons of CCP Broke per month, but Mr. Geigel did not start working at Fort Howard until April of 1972 and was not involved in paper purchases under 1973. 5/24/10 MRA Decl., Ex. 44 [Geigel Dep., 10:19-23, 12:19-13:1].

65.     Fort Howard viewed CCP Broke as a "more expensive" grade that "would be on the very high end of the [recovered paper] categories." KLR Decl. Ex. 18 [Excerpts of 4/9/09 Deposition of R. Geigel, 48:13-49:3]

**RESPONSE TO PSAF 65:**

**Unsupported and immaterial.** The alleged fact mischaracterizes the cited testimony of Roy Geigel. Mr. Geigel's testimony referred to the general category of "broke," and not to CCP Broke. MRA Decl., Ex. 44 [Geigel Dep., 10:19-23; 12:19-13:1].

66.     U.S. Paper's DePere mill purchased and used CCP Broke in the late 1960s and early 1970s. KLR Decl., Ex. 9 [Supplemental Response of US Paper Mills Corp. to Information Request of United States Department of Interior, Fish and Wildlife Service of 1996, February 8, 2007 (Ex. 253 to the Deposition of R. Gerbers)]; KLR Decl., Ex. 23 [Patterson Dep., 57:9-12].

**RESPONSE TO PSAF 66:**

**Undisputed.**

VI.     **PCBs Released In OU2 Could Not Have Traveled Upstream And Resulted In, Or Contributed To, PCB Deposits 30 Miles Upriver in OU1.**

67.     PCBs discharged into OU2 could not have flowed upriver to OU1. KLR Decl. Ex. 2 [April 30, 2010 Declaration of J. Connolly].

**RESPONSE TO PSAF 67:**

**Undisputed.**

68.     Releases of PCBs in OU2 as the result of wastewater discharges in Appleton and Combined Locks did not cause deposits of PCBs in OU1. Dkt.. 878, p. 15.

**RESPONSE TO PSAF 68:**

**Disputed.** It is undisputed that releases of PCBs in OU2 did not deposit PCBs into OU1 at concentrations that contributed to the need to cleanup up sediment deposits in OU1. However, it is disputed that releases of volatilized PCBs from Appleton or Combined Locks

never re-deposited into OU1. Declaration of Dr. John Connolly, Dkt. No. 999 ("JC Decl."), at 16-17.

69.     Glatfelter's and WTM I's recycling operations and wastewater discharges, along with other Defendants, caused PCBs to be released into OU1. Dkt. 878, p. 15. Glatfelter has argued that "distance from the alleged harm" is a reasonable basis for apportioning the harms in OU1 from those in the rest of the Lower Fox River site. KLR Decl. Ex. 28 [Mem. in Supp. of Mot. of Def. P.H. Glatfelter Co. for Case Management Order, Case 2:03-CV-00949-LA (Dkt. 28), pp. 10-12].

**RESPONSE TO PSAF 69:**

**Disputed.** The use of PCBs in the production of NCR Paper and resulting sale of CCP Broke to recycling mills caused PCBs to be released into OU1. The distance from the release of PCBs does affect the concentration of PCBs in sediments, as noted by Dr. Connolly in support of Plaintiffs' response. JC Decl., at 16-17. However, it is not simply distance that is a reasonable basis for apportionment, but a variety of factors involving the extent to which PCBs from a given discharge do or do not contribute to the need to cleanup.

**VII.    Publicly Available Documents Indicate that Glatfelter, WTM I, and U.S. Paper May be Seeking an Impermissible Double-Recovery That is Prohibited under CERCLA.**

70.     During 2004, Glatfelter received insurance recoveries of $32.8 million under policies related to the "Fox River environmental matter." KLR Decl. Ex. 10 [Excerpts from PHG Form 1 0K/A for fiscal year ending 12/31/04].

**RESPONSE TO PSAF 70:**

- 37 -

**Disputed in part, immaterial.** Glatfelter did receive insurance recoveries in the amount of $32.8 million. However, it is disputed that those recoveries were solely related to the Fox River environmental matters. It is further disputed that recoveries on insurance policies are related to the amount of money for past costs that Plaintiffs owe to Glatfelter.

Moreover, insurance recoveries fall within the collateral source rule and like any investment paid for by Glatfelter, should not inure to the benefit of Plaintiffs, who did not pay any premiums for the coverage. *See* U.S. Paper's Reply Brief in Support of its Motion for Summary Judgment that it is Entitled to 100 Percent Contribution From Plaintiffs, Dkt. No. 858 ("5/24/10 USPM Brief").


71. During 2005, Glatfelter received insurance recoveries of $20.2 million under insurance policies related to the "Fox River environmental matter." KLR Decl. Ex. 11 [Excerpts from PHG Form 10K for fiscal year ending 12/31/05].

**RESPONSE TO PSAF 71:**

**Disputed in part, immaterial.** Glatfelter did receive insurance recoveries in the amount of $20.2 million. However, it is disputed that those recoveries were solely related to the Fox River environmental matters. It is further disputed that recoveries on insurance policies are related to the amount of money for past costs that Plaintiffs owe to Glatfelter.

Moreover, insurance recoveries fall within the collateral source rule and like any investment paid for by Glatfelter, should not inure to the benefit of Plaintiffs, who did not pay any premiums for the coverage. *See* 5/24/10 USPM Brief.

72. During 2006, Glatfelter received insurance recoveries of $0.2 million under insurance policies related to the "Fox River environmental matter." KLR Decl. Ex. 12 [Excerpts from PHG Form 10K for fiscal year ending 12/31/06].

**RESPONSE TO PSAF 72:**

**Disputed in part, immaterial.** Glatfelter did receive insurance recoveries in the amount of $0.2 million. However, it is disputed that those recoveries were solely related to the Fox River environmental matters. It is further disputed that recoveries on insurance policies are related to the amount of money for past costs that Plaintiffs owe to Glatfelter.

Moreoever, insurance recoveries fall within the collateral source rule and like any investment paid for by Glatfelter, should not inure to the benefit of Plaintiffs, who did not pay any premiums for the coverage. *See* 5/24/10 USPM Brief.


73. On April 20, 2005, WTM I notified Plaintiffs and many Defendants, including GP and Menasha, that "WTM I Company and many of its carriers have reached a settlement in principal." KLR Decl. Ex. 27 [April 20, 2005 Email re: WTM I Insurance Settlement Update].

**RESPONSE TO PSAF 73:**

**Undisputed.**


74. In 2008, U.S. Paper Mills Corp., a wholly owned subsidiary of Sonoco Products Company, received settlements totaling $40.8 million from insurance policies covering the Fox River contamination. KLR Decl., Ex. 13 [Excerpts from Sonoco Form 10K for fiscal year ending 12/31/09].

- 39 -

Case 2:08-cv-00016-WCG   Filed 05/24/10   Page 40 of 43   Document 1024

**RESPONSE TO PSAF 74:**

**Undisputed, but immaterial.** Insurance recoveries fall within the collateral source rule and like any investment paid for by U.S. Paper, should not inure to the benefit of Plaintiffs, who did not pay any premiums for the coverage. *See* 5/24/10 USPM Brief.

**VIII.  Glatfelter's and WTM's Own Admissions Establish That Their Claims to Recover Certain Costs Are Time Barred.**

75.     Glatfelter is seeking to recover $8,568,930 (exclusive of interest) for assessments paid to the FRG. Glat./WTM SUF at Dkt. 879 [Statement of Undisputed Facts of Defendants P.H. Glatfelter Company and WTM I Company in Support of Their Motion for Summary Judgment and in Support of All Motions for Summary Judgment of Certain Defendants ("Glatfelter/Certain Defendants Statement"), ¶ 95]; Dkt. 909 [(Declaration of Arthur A. Vogel, Jr.) ("Vogel Decl.") ¶ 11 at 5 (showing assessments allegedly paid by Glatfelter) and ¶ 13 (confirming that the "Oct – Dec" 2001 assessment was due November 15, 2001)].

**RESPONSE TO PSAF 75:**

**Undisputed.**

76.     Of this amount, $8,420,243 was paid before November 23, 2001. Vogel Decl., ¶ 11 at 5 (the sum of the amounts shown as allegedly paid by Glatfelter, omitting the 2002, 2003 and 2007 entries).

**RESPONSE TO PSAF 76:**

**Undisputed.**

77.    WTM is seeking to recover $4,394,004 (exclusive of interest) for assessments

paid to the FRG. Glatfelter/Certain Defendants' Statement, ¶ 114; Vogel Decl. at ¶ 11 at 5-6

(showing assessments allegedly paid by WTM) and ¶ 13 (confirming that the "Oct – Dec"

2001 assessment was due November 15, 2001).

**RESPONSE TO PSAF 77:**

**Undisputed.**


78.    Of this amount, $4,129,594 was paid before November 23, 2001. Vogel Decl.,

¶ 11 at 5-6 (the sum of the amounts shown as allegedly paid by WTM, omitting the 2002,

2003 and 2007 entries.).

**RESPONSE TO PSAF 78:**

**Undisputed.**


Dated:  May 24, 2010

Respectfully submitted,


s/ David G. Mandelbaum__
David G. Mandelbaum
Marc E. Davies
Monique M. Mooney
Sabrina Mizrachi
Caleb J. Holmes
GREENBERG TRAURIG, LLP
Two Commerce Square, Suite 2700
2001 Market Street
Philadelphia, PA  19103
215.988.7800
mandelbaumd@gtlaw.com

- 42 -

Attorneys for Defendant P.H. Glatfelter Company


s/ William H. Harbeck
William H. Harbeck (Wis. Bar No. 1007004)
Peter C. Karegeannes (Wis. Bar No. 1015025)
Nancy K. Peterson (Wis. Bar No. 1000197)
Quarles & Brady LLP
411 E. Wisconsin Avenue
Milwaukee, WI 53202
Telephone: 414-277-5000
whh@quarles.com

Attorneys for Defendant WTM I Company

- 43 -