**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | | |
|---|---|---|
| APPLETON PAPERS INC. and NCR CORPORATION, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 08-CV-00016-WCG |
| | ) | |
| GEORGE A. WHITING PAPER COMPANY, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF PROPOSED
FINDINGS OF FACT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
FOR DECLARATORY RELIEF FILED BY MENASHA CORPORATION**

Pursuant to Civil L.R. 56.2 of the United States District Court for the Eastern District of

Wisconsin, the City of Appleton, Georgia-Pacific Consumer Products LP (f/k/a Fort James

Operating Company), Fort James Corporation, and Georgia-Pacific LLC (collectively, "Georgia-

Pacific" or "GP"), CBC Coating, Inc., Menasha Corporation, Neenah-Menasha Sewerage

Commission, P.H. Glatfelter Company, U.S. Paper Mills Corporation, and WTM I Company

(collectively, the "Defendants"), respond to Plaintiffs' Proposed Findings of Fact in Opposition

to Motion for Summary Judgment for Declaratory Relief Filed by Menasha Corporation, Dkt.

968 ("PFOF").

## RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT

**PFOF #1:** Wastewater discharge from Plaintiffs' predecessors' facilities, which are located in Appleton and Combined Locks, Wisconsin, never migrated into Operable Unit 1 or contributed to the polychlorinated biphenyl ("PCB") deposits located there. (Declaration of Dr. John Connolly ("Connolly Decl."), ¶ 13.)

**Response to PFOF 1**:

Undisputed, incomplete and immaterial. There is no dispute that Plaintiffs' expert Dr. Connolly makes the statement in PFOF 1, however, the May 3, 2010 expert report and declaration of Dr. Connolly is irrelevant and immaterial to the issues in Menasha's Motion for Summary Judgment. As to OU1, the Plaintiffs have CERCLA liability for operations of Appleton Coated Paper Company ("ACPC") and NCR's Appleton Papers Division because they arranged for disposal or treatment hazardous waste to recycling mills in OU1. "Broke" was production scrap that ACPC could not sell as NCR Paper. (Dkt. 875, Declaration of David G. Mandelbaum ("DGM Decl."), Exh. 4 [Hultgren Dep.], 28:2-7; Exh. 5 [Kresch Dep.], 78:14-79:3; Exh. 6 [Heinritz Dep.], 19:4-14, 87:6-12.) ACPC could not use the broke in its operations because the Appleton Facility was strictly a converting plant with no repulping capabilities. (Dkt. 334, ¶ 18; Dkt. 875, DGM Decl., Exh. 8 [Christensen Dep.], 28:9-16.) ACPC had no use for broke. (Dkt. 875, DGM Decl., Exh. 10 [Goetz Dep.], 301:15-21.) "A perfect world would have been to have no broke." (Dkt 875, DGM Decl., Exh. 8 [Christensen Dep.], 56:4-16.) "The less broke we had, the happier we were." (Dkt. 875, DGM Decl., Exh. 10 [Goetz Dep.], 72:3-9.) ACPC worked hard to "minimize broke." (Id., 302:5-7; Exh. 8 [Christensen Dep.], 56:8-10.) So even if ACPC may have made some money off of broke, that really was not what it was trying to sell; it would rather sell NCR Paper. (Dkt. 875, DGM Decl., Exh. 10 [Goetz Dep.], 302:8-15.) ACPC wanted to "get rid of [broke] whatever way they can." (Dkt. 875, DGM Decl., Exh. 29 [Jezerc Dep.], 190:21-23, 192:22-193:9; Exh. 7 [Strelow Dep. Exh. 549].) According to Fred

Heinritz, broke "was an incidental item to us. We just had to get rid of it. We took money for it, but we didn't – we didn't try to – it wasn't a profit center or anything like that." (Dkt 875, DGM Decl., Exh. 6 [Heinritz Dep.], 96:13-20; 27:15-19.) ACPC's profits were made from the sale of NCR Paper – "a lot of profits." (Id., 117:18 – 118:9.) ACPC and NCR understood that broke created during the manufacture of NCR Paper was sold by ACPC for a nominal sum. (Dkt. 875, DGM Decl., Exh. 33 [APIFOX00017534] at 538; Exh. 34 [BCFOX000047465] at 467, 488; Exh. 18 [BCFOX000057204] at 204; Exh. 19 [BCFOX00057352] at 353.) In December 1971 (the same year that ACPC and NCR stopped making NCR Paper with PCBs), ACPC published the November and December 1971 edition of its company newsletter, *Appleton Scene.* It said: "Because of the overwhelming concern for our environment, we are departing from the normal monthly Appleton Scene news format to bring you this special environmental issue relating to Appleton Papers and the paper industry." (Dkt. 875, DGM Decl., Exh. 12 [NCR-FOX-00064575] at 576.) The November and December 1971 *Appleton Scene* contained the following definitions, demonstrating the broke they sold was a waste:

- "*Recycling* – Collection and treatment of a <u>waste product, such as waste paper,</u> and reuse of it as a raw material in manufacture of the same or similar product." (*Id.* at 588, emphasis added.)

- "*Secondary fiber* – Fibers reclaimed from <u>waste paper</u> or collected during manufacture of paper and paperboard products, and used as raw material for making new paper." (*Id.*, emphasis added.)

- "*Solid Waste*" – All items discharged in a solid state after use. Does not include materials discarded into sewage systems or those emitted with smoke or gas." (*Id.*) This Appleton Scene special environmental edition makes clear that "solid

2

waste" includes paper trim generated by trimming rolls and sheets to achieve a

product's finished roll, or sheet size at Appleton Plants." (*Id.*) "Trim is packed

into bales and sold to waste paper merchants for reuse in the paper industry."

(*Id.*)


**PFOF #2:**    Given the urbanization and industrialization of the Fox River watershed, and the widespread use of non-Aroclor 1242 PCB materials in multiple commercial products, much evidence exists that Aroclor 1242 is not the only PCB material present in Fox River sediments. (See Declaration of Philip Simon ("Simon Decl."), ¶¶ 8-9, 18-37.)

**Response to PFOF 2**:

<u>Vague, ambiguous, incomplete and immaterial</u>.  PFOF 2 is vague and ambiguous as the

terms "urbanization" and "industrialization" are not defined and it is unclear what the terms

mean in the context provided.  The alleged fact is immaterial and does not preclude summary

judgment because the overwhelming majority of PCBs in the Lower Fox River come from

Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971.  (Dkt. 981,

Declaration of Michael L. Hermes ("Hermes Decl."), Exh. 6, at 1-2.)  Further, PFOF 2 is

deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of

this proposed finding of fact.  All Aroclors are mixtures.  Aroclor 1242 contains homologues

from other Aroclors which the Plaintiffs' expert Elizabeth Anderson admitted were 10 to 20

percent of the penta (Aroclor 1254) homologue or higher.  (Declaration of David A. Rabbino

("Rabbino Decl."), ¶ 3, Exh. 1, Deposition of Elizabeth Anderson, 23:22 – 24:15; 25:7-23;

27:11-18.)  The alleged fact does not support that Aroclor 1242 is not the only PCB material

present in Fox River sediments.


**PFOF #3:**    In 1982, Donald F. Kiesling, a Fort Howard senior in-house attorney, wrote the following to the Wisconsin Department of Natural Resources:

Don DeMeuse [a Fort Howard executive] … indicated our concern for some overreaction or misinformed reaction in regard to PCB's. We are concerned that seldom is there a differentiation made between Aroclor 1242 which is the PCB mixture sometimes found in the effluents of recycled pulp and paper mills, and the other Aroclors which are the principal environmental contaminants.

(Declaration of Michael L. Hermes ("Hermes Decl."), Exh. 1 at GPFOX00077177.)

**Response to PFOF 3**:

Undisputed, incomplete and immaterial. The quote is an accurate reproduction of the document referenced. Plaintiffs' characterization of the document, however, is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact. All Aroclors are mixtures. Aroclor 1242 contains homologues from other Aroclors which the Plaintiffs' expert Elizabeth Anderson admitted were 10 to 20 percent of the penta (Aroclor 1254) homologue or higher. (Rabbino Decl., Exh. 1.) The alleged fact is immaterial and does not preclude summary judgment because the overwhelming majority of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971. (Dkt. 981, Hermes Decl., Exh. 6, at 1-2.)

**PFOF #4:** Shortly after Mr. Kiesling made this statement, Fort Howard began to test its wastepaper for Aroclor 1254 in addition to Aroclor 1242. (See Hermes Decl., Exh. 3)

**Response to PFOF 4**:

Undisputed, incomplete and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The document merely references samples collected at Fort Howard in 1983 and 1984 that were tested for Aroclor 1254 and 1242, but does not support the assertion that Fort Howard began to test its wastepaper for Aroclor 1254 and 1242, or that such testing was done for reasons related to Mr. Kiesling's statement. The alleged fact is immaterial and does not preclude summary judgment because the overwhelming majority

4

of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971. (Dkt. 981, Hermes Decl., Exh. 6, at 1-2.)

**PFOF #5:** Testing of Fort Howard wastepaper samples in each year from 1983 through 1989 revealed the presence of Aroclor 1254 in most of Fort Howard's wastepaper samples. (See Hermes Decl., Exh. 3.)

**Response to PFOF 5**:

Undisputed, incomplete and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact. To the extent PFOF seeks to imply that the presence of Aroclor 1254 comes from a non-NCR Paper source, the fact is deficient. All Aroclors are mixtures. Aroclor 1242 contains homologues from other Aroclors which the Plaintiffs' expert Elizabeth Anderson admitted were 10 to 20 percent of the penta (Aroclor 1254) homologue or higher. (Rabbino Decl., Exh. 1.) As a result, the presence of Aroclor 1254 could still have been due to NCR Paper, as a result of the fact that the overwhelming majority of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971. (Dkt. 981, Hermes Decl., Exh. 6, at 1-2.)

**PFOF #6:** When reporting the results of this wastepaper testing, Fort Howard continually referred to PCBs generally, rather than by the specific Aroclors for which Fort Howard tested. (See Hermes Decl., Exh. 4.)

**Response to PFOF 6**:

Undisputed, incomplete and immaterial. The alleged fact is immaterial and does not preclude summary judgment. The United States requires that environmental samples be assessed for total PCBs or specific PCB congeners to account for weathering and degradation processes that can alter the PCB mixtures congener profile. (Dkt. 55, 09-CV-00692-WCG, Rabbino Decl., Exh. 2, at 5-6.) According to the United States, "[t]he expression of PCB concentrations in

5

environmental samples in terms of the technical mixture equivalents (*e.g.*, Aroclors) may be misleading" because "a highly weathered spill of [Aroclor 1242], which originally contained many of the lighter, less chlorinated PCBs, may eventually resemble the more highly chlorinated PCB mixture (*e.g.,* Aroclor 1260) that was used in electrical equipment." (Rabbino Decl., Exh. 2, at 5.) Fort Howard's reference to PCBs generally, rather than by the specific Aroclors, was done in accordance with governmental directives.

**PFOF #7:** The Wisconsin Department of Natural Resources has profiled many dischargers to the Lower Fox River and detected non-1242 Aroclors in discharged effluent, including: Neenah-Menasha Sewerage Commission (Aroclor 1248); City of Appleton (Aroclors 1248 and 1254); U.S. Paper – Menasha Division (Aroclor 1248); Consolidated Paper (Aroclor 1254); (CBC Coating, Inc./Riverside Paper Company (Aroclor 1248); and Fort James Corp./Georgia-Pacific (Aroclor 1248). (Hermes Decl., Exh. 6, pp. 104-123.)

**Response to PFOF 7**:

Undisputed, incomplete and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact, as it omits that the report finds that nearly all of the PCB discharges to the Lower Fox River resulted from the manufacture and recycling of NCR Brand Carbonless Copy Paper manufactured between approximately 1954 and 1971. (*See*, Dkt. 981, Hermes Decl., Exh. 6, at 1-2.) The alleged fact is also immaterial and does not preclude summary judgment because it omits that all Aroclors are mixtures. Aroclor 1242 contains homologues from other Aroclors which the Plaintiffs' expert Elizabeth Anderson admitted were 10 to 20 percent of the penta (Aroclor 1254) homologue or higher. (Rabbino Decl., Exh. 1.) Further, the United States requires that environmental samples be assessed for total PCBs or specific PCB congeners to account for weathering and degradation processes that can alter the PCB mixtures congener profile. (Rabbino Decl., Exh. 2, at 5-6.) According to the United States, "[t]he expression of PCB concentrations in environmental samples in terms of the technical

mixture equivalents (*e.g.*, Aroclors) may be misleading" because "a highly weathered spill of [Aroclor 1242], which originally contained many of the lighter, less chlorinated PCBs, may eventually resemble the more highly chlorinated PCB mixture (*e.g.,* Aroclor 1260) that was used in electrical equipment." (Rabbino Decl., Exh. 2, at 5.) Congener-specific studies of Fox River sediments cited by the United States have "estimated that 95% of the PCBs came from Aroclor 1242, while much smaller amounts came from Aroclor 1254 (2%) and Aroclor 1260 (1%)." (Rabbino Decl., Exh. 2, at 7.) Therefore, the alleged fact does not support that the presence of non-1242 homologues did not in fact come from a mixture of Aroclor 1242.

**PFOF #8:** A report prepared by the Institute of Paper Chemistry regarding PCBs in the Lower Fox River reveals the presence of non-1242 Aroclors, including Aroclors 1248 and 1254. (Hermes Decl., Exh. 7, p. 8.)

**Response to PFOF 8**:

Undisputed, incomplete and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The alleged fact is immaterial and does not preclude summary judgment because the overwhelming majority of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971. Further, the alleged fact omits that all Aroclors are mixtures. Aroclor 1242 contains homologues from other Aroclors which the Plaintiffs' expert Elizabeth Anderson admitted were 10 to 20 percent of the penta (Aroclor 1254) homologue or higher. (Rabbino Decl., Exh. 1.) Further, the United States requires that environmental samples be assessed for total PCBs or specific PCB congeners to account for weathering and degradation processes that can alter the PCB mixtures congener profile. (Rabbino Decl., Exh. 2, at 5-6.) According to the United States, "[t]he expression of PCB concentrations in environmental samples in terms of the technical

mixture equivalents (*e.g.*, Aroclors) may be misleading" because "a highly weathered spill of [Aroclor 1242], which originally contained many of the lighter, less chlorinated PCBs, may eventually resemble the more highly chlorinated PCB mixture (*e.g.,* Aroclor 1260) that was used in electrical equipment." (Rabbino Decl., Exh. 2, at 5.)  Congener-specific studies of Fox River sediments cited by the United States have "estimated that 95% of the PCBs came from Aroclor 1242, while much smaller amounts came from Aroclor 1254 (2%) and Aroclor 1260 (1%)." (Rabbino Decl., Exh. 2, at 7.)  Therefore, the alleged fact does not support that the presence of non-1242 homologues did not in fact come from a mixture of Aroclor 1242.

**PFOF #9:**     The Basis of Design Report, prepared for the Fox River Group and the Wisconsin Department of Natural Resources for the Sediment Removal Demonstration Project in Sediment Management Unit 56/57, immediately adjacent to the Fort Howard/Georgia-Pacific facility, showed that significant levels of Aroclors 1254, 1268 and, particularly, 1260, had been detected. (Hermes Decl., Exh. 8, p. 14.)

**Response to PFOF 9**:

<u>Undisputed, incomplete and immaterial</u>.  Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The fact cited is vague and ambiguous as to the term "significant," particularly since the report states that the core samples being discussed were primarily Aroclor 1242, "with lesser amounts of 1248, 1254, and 1260."  The alleged fact is also immaterial and does not preclude summary judgment because the overwhelming majority of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971.  (Hermes Decl., Exh. 6, at 1-2.)  Further, the alleged fact omits that all Aroclors are mixtures.  Aroclor 1242 contains homologues from other Aroclors which the Plaintiffs expert Elizabeth Anderson admitted were 10 to 20 percent of the penta (Aroclor 1254) homologue or higher.  (Rabbino Decl., Exh. 1.)  Further, the United States requires that

environmental samples be assessed for total PCBs or specific PCB congeners to account for weathering and degradation processes that can alter the PCB mixtures congener profile. (Rabbino Decl., Exh. 2, at 5-6.)  According to the United States, "[t]he expression of PCB concentrations in environmental samples in terms of the technical mixture equivalents (*e.g.*, Aroclors) may be misleading" because "a highly weathered spill of [Aroclor 1242], which originally contained many of the lighter, less chlorinated PCBs, may eventually resemble the more highly chlorinated PCB mixture (*e.g.,* Aroclor 1260) that was used in electrical equipment."  (Rabbino Decl., Exh. 2, at 5.)  Congener-specific studies of Fox River sediments cited by the United States have "estimated that 95% of the PCBs came from Aroclor 1242, while much smaller amounts came from Aroclor 1254 (2%) and Aroclor 1260 (1%)."  (Rabbino Decl., Exh. 2, at 7.)  Therefore, the alleged fact does not support that the presence of non-1242 homologues did not in fact come from a mixture of Aroclor 1242.

 **PFOF #10:** In the PCB Pathway Determination prepared for the U.S. Fish and Wildlife Service, the U.S. Department of Justice, and the U.S. Department of the Interior, 13.4% of Lower Fox River sediment samples contained higher-chlorinated Aroclors. (Hermes Decl., Exh. 9, p. 10.)

 **Response to PFOF 10**:

 <u>Disputed in part, and immaterial</u>.  Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  The report cited discusses the "clustering of samples" for classification.  The report notes the 13.4% of the Lower Fox River samples are clustered into group 3 "with the majority of Lake Michigan samples."  It does not state that 13.4% of Lower Fox River sediment samples contained higher-chlorinated Aroclors.  The alleged fact is also immaterial and does not preclude summary judgment because the overwhelming majority of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper

manufactured between approximately 1954 and 1971. (Hermes Decl., Exh. 6, at 1-2.) The alleged fact omits that all Aroclors are mixtures. Aroclor 1242 contains homologues from other Aroclors which the Plaintiffs' expert Elizabeth Anderson admitted were 10 to 20 percent of the penta (Aroclor 1254) homologue or higher. (Rabbino Decl., Exh. 1.) Further, the United States requires that environmental samples be assessed for total PCBs or specific PCB congeners to account for weathering and degradation processes that can alter the PCB mixtures congener profile. (Rabbino Decl., Exh. 2, at 5-6.) According to the United States, "[t]he expression of PCB concentrations in environmental samples in terms of the technical mixture equivalents (*e.g.*, Aroclors) may be misleading" because "a highly weathered spill of [Aroclor 1242], which originally contained many of the lighter, less chlorinated PCBs, may eventually resemble the more highly chlorinated PCB mixture (*e.g.,* Aroclor 1260) that was used in electrical equipment." (Rabbino Decl., Exh. 2, at 5.) Congener-specific studies of Fox River sediments cited by the United States have "estimated that 95% of the PCBs came from Aroclor 1242, while much smaller amounts came from Aroclor 1254 (2%) and Aroclor 1260 (1%)." (Rabbino Decl., Exh. 2, at 7.) Therefore, the alleged fact does not support that 13.4% of Lower Fox River sediment samples contained higher-chlorinated Aroclors.

**PFOF #11:**    Non-1242 Aroclors, which are present in the Lower Fox River and being remediated, are more environmentally toxic than Aroclor 1242 and are not attributable to Plaintiffs. (See Hermes Decl., Exh. 10, 11.)

**Response to PFOF 11**:

Disputed.  Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact.  Exhibit 10 is merely counsel's letter opposing the de minimis consent decree previously entered by the Court.  Counsel's statements do not qualify as opinion

testimony by a lay witness or expert testimony, and are otherwise inadmissible hearsay.

"Opinions or inferences based on 'scientific, technical, or other specialized knowledge within the scope of Rule 702' are not admissible as lay testimony under Fed.R.Evid. 701. Such opinions or inferences, drawn from facts outside the witness's first-hand knowledge of the case, are admissible only as expert testimony." *U.S. v. York*, 572 F.3d 415, 421 (7th Cir. 2009) (quoting Fed.R. Evid. 701(c)). Additionally, according to the United States, "PCB toxicity depends largely on the toxicity of particular congeners," and "[a]t least one of the most toxic, dioxin-like congeners – Congener 77 – was more prevalent in Aroclor 1242 than in Aroclor 1254." (Rabbino Decl., Exh. 2, at 8.) Further, the relative toxicity of "different congeners and different congener mixtures also differs from species to species. For example, Congener 77 is much more toxic to fish and birds than Congener 114, while Congener 114 is slightly more toxic to mammals than Congener 77. Species-to-species differences preclude generalizations about relative toxicities." (Rabbino Decl., Exh. 2, at 8.) Therefore, the alleged fact does not support that non-1242 Aroclor are more environmentally toxic that Aroclor 1242.

**PFOF #12:** Aroclors with higher chlorine content than Aroclor 1242, e.g., Aroclors 1254, 1260 and 1268, have higher bioconcentration potential and generally greater toxicity to fish and higher organisms, including man. (See Hermes Decl., Exh. 10, 11.)

**Response to PFOF 12**:

Disputed. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact. Exhibit 10 is merely counsel's letter opposing the de minimis consent decree previously entered by the Court. Counsel's statements do not qualify as opinion testimony by a lay witness or expert testimony, and are otherwise inadmissible hearsay. "Opinions or inferences based on 'scientific, technical, or other specialized knowledge within the scope of Rule 702' are not admissible as lay testimony under Fed.R.Evid. 701. Such opinions or

inferences, drawn from facts outside the witness's first-hand knowledge of the case, are admissible only as expert testimony." *U.S. v. York,* 572 F.3d 415, 421 (7th Cir. 2009) (quoting Fed.R. Evid. 701(c)). Additionally, according to the United States, "PCB toxicity depends largely on the toxicity of particular congeners," and "[a]t least one of the most toxic, dioxin-like congeners – Congener 77 – was more prevalent in Aroclor 1242 than in Aroclor 1254." (Rabbino Decl., Exh. 2, at 8.) Further, the relative toxicity of "different congeners and different congener mixtures also differs from species to species. For example, Congener 77 is much more toxic to fish and birds than Congener 114, while Congener 114 is slightly more toxic to mammals than Congener 77. Species-to-species differences preclude generalizations about relative toxicities." (Rabbino Decl., Exh. 2, at 8.) Therefore, the alleged fact does not support that non-1242 Aroclor are more environmentally toxic that Aroclor 1242.

**PFOF #13:** Some areas of Lower Fox River sediments contain approximately 13% non-1242 Aroclors, and other areas contain as much as much as 26.3% non-1242 Aroclors. (See Hermes Decl., Exh. 11.)

**Response to PFOF 13**:

Undisputed, incomplete and immaterial. Plaintiffs' characterization of the document is not accurate and is deficient under L.R. 56(b) because it is not supported by evidentiary material cited in support of this proposed finding of fact. The alleged fact is immaterial and does not preclude summary judgment because the overwhelming majority of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971. (Dkt. 981, Hermes Decl., Exh. 6, at 1-2.) According to the United States, "[t]he expression of PCB concentrations in environmental samples in terms of the technical mixture equivalents (*e.g.*, Aroclors) may be misleading" because "a highly weathered spill of [Aroclor 1242], which originally contained many of the lighter, less chlorinated PCBs, may eventually resemble the more highly chlorinated PCB mixture (*e.g.,* Aroclor 1260) that was used in

electrical equipment."  (Rabbino Decl., Exh. 2, at 5.)  Congener-specific studies of Fox River

sediments cited by the United States have "estimated that 95% of the PCBs came from Aroclor

1242, while much smaller amounts came from Aroclor 1254 (2%) and Aroclor 1260 (1%)."

(Rabbino Decl., Exh. 2, at 7.)  Further, the alleged fact further omits that all Aroclors are

mixtures.  Aroclor 1242 contains homologues from other Aroclors which the Plaintiffs expert

Elizabeth Anderson admitted were 10 to 20 percent of the penta (Aroclor 1254) homologue or

higher.  (Rabbino Decl., Exh. 1.)   Therefore, the alleged fact does not necessarily support that

Lower Fox River sediments contain approximately 13% non-1242 Aroclors, and other areas

contain as much as much as 26.3% non-1242 Aroclors.


**PFOF #14:**     The Record of Decision for Operable Units 3 through 5 identifies that
"significantly elevated levels of PCBs were detected in all species of fish in all [Operable
Units]," and recognizes bioaccumulative properties of PCBs, and the contamination levels in
fish. (See Hermes Decl., Exh. 12.)

**Response to PFOF 14**:

Undisputed.

**PFOF #15:**     If Aroclor 1242 had been the only source of PCBs in the Lower Fox River,
fish tissues in the Lower Fox River, tissues of Lower Fox River fish would contain less than 1%
of PCB homolog groups with six or more chlorines. (Declaration of Denise P. Kay, Ph.D. ("Kay
Decl."), ¶ 23.)

**Response to PFOF 15**:

Disputed.  The overwhelming majority of PCBs in the Lower Fox River come from

Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971.  (Dkt. 981,

Hermes Decl., Exh. 6, at 1-2.)  All Aroclors are mixtures.  Aroclor 1242 contains homologues

from other Aroclors which the Plaintiffs expert Elizabeth Anderson admitted were 10 to 20

percent of the penta (Aroclor 1254) homologue or higher.  (Rabbino Decl., Exh. 1.)

**PFOF #16:**    Non-Aroclor 1242, on the other hand, and specifically homolog groups with five or more chlorines, compose approximately 25% of the total PCBs in Lower Fox River fish; therefore, on average, 25% of the total PCB in Lower Fox River fish results from Aroclor mixtures that incorporated heavier non-Aroclor 1242 homolog groups, such as Aroclors 1248, 1254 and 1260. (Kay Decl., ¶ 23.)

**Response to PFOF 16**:

<u>Dispute and immaterial</u>.  Plaintiffs' alleged fact is deficient under L.R. 56(b) because it is

not supported by evidentiary material cited in support of this proposed finding of fact the

overwhelming majority of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper

manufactured between approximately 1954 and 1971.  (Dkt. 981, Hermes Decl., Exh. 6, at 1-2.)

To the extent Plaintiffs seek to connect PFOF 15 and PFOF 16, they are essentially comparing

apples to oranges.  PFOF refers to homologues with 6 or more chlorines, while PFOF refers to

homologues of 5 or more chlorines.  Aroclor 1242 will have very few homologues with 6 or

more chlorines, and may very well have a much higher proportion of homologues with 5 or more

chlorines.  The alleged fact in PFOF 15 is not necessarily related to, and does not necessarily

support, the alleged fact in PFOF 16.   Therefore, the alleged fact does not establish that

percentages of homolog groups with five or more chlorines does not in fact comes from 1242

Aroclor mixtures.


**PFOF #17:**    Aroclor 1242 was formerly utilized in many products, including electrical transformers, hydraulic fluids, rubber plasticizers, adhesives, wax extenders and gas transmission turbine lubricants. (Simon Decl., ¶ 8.)

**Response to PFOF 17**:

<u>Undisputed</u>.

**PFOF #18:**    Several compounds, including mono-isopropyl biphenyl, Santasol 100, Santasol 150, and Suresol 290, are found in Lower Fox River sediment samples that also contain Aroclor 1242. (Simon Decl., ¶ 40.)

**Response to PFOF 18**:

Undisputed, incomplete and immaterial.  The alleged fact is immaterial and does not preclude summary judgment because the overwhelming majority of PCBs in the Lower Fox River come from Aroclor 1242 in NCR Paper manufactured between approximately 1954 and 1971.  (Dkt. 981, Hermes Decl., Exh. 6, pg. 1, 2.)  Aroclor 1242 contains homologues from other Aroclors which the Plaintiffs expert Elizabeth Anderson admitted were 10 to 20 percent of the penta (Aroclor 1254) homologue or higher.  (Rabbino Decl., Exh. 1.)

**PFOF #19:**    Throughout the time that Aroclor 1242 was used in the production of carbonless copy paper, Appleton Coated Paper Company had no knowledge of environmental dangers from the use of Aroclor 1242. (Declaration of Ronald Jezerc, ¶¶ 6-7.)

**Response to PFOF 19**:

Inadmissible and disputed.  The September 30, 2009 Declaration of Ronald Jezerc, Dkt. 674 (and resubmitted as Dkt. 1001), is inadmissible evidence.  It is "well-settled" that a party "cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition" in order to "defeat a defendant's motion for summary judgment."  *See Ferguson v. Medical College of Wisconsin*, 471 F. Supp. 2d 901 (E.D. Wis. 2007) (citing *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994); *Sirvidas v. Commonwealth Edison Co*., 60 F.3d 375, 379 (7th Cir. 1995); *Russell v. Acme-Evans Co*., 51 F.3d 64, 67-68 (7th Cir. 1995).  Here, Plaintiffs propose a declaration of an individual who was deposed in this litigation on April 20, 2009, as evidence to support undisputed material fact.  The declaration cited conflicts with Mr. Jezerc's earlier deposition testimony.  For example, Mr. Jezerc testified as follows:

Q:    Okay. We had talked a little bit about the concerns, the environmental concerns, that were driving the replacement of the PCBs with the MIPB.  From your perspective, were environmental concerns the only factor driving that decision to phase out PCBs?

15

(Objection omitted)

A:     I don't have any idea whether there were other reasons.

Q:     Okay. But **environmental concerns was the reason that you understood at the time they were being phased out; is that correct**?

(Objection omitted)

A:     **Yes**.

(Dkt. 586, Declaration of Andrea Hogan, Ex. 4 [Apr. 20, 2009 R. Jezerc Depo. Excerpts], 171-72 (emphasis added).)

In contrast, the September 30, 2009 Declaration of Ronald Jezerc cited in PFOF 19 states "[t]hrough the time that the changeover was completed, I continued to believe that Aroclor 1242 posed no environmental danger." This conflict Plaintiffs attempt to create with the September 30, 2009 Declaration of Ronald Jezerc cannot create a material issue of fact to defeat a motion for summary judgment. *See Ferguson*, 471 F. Supp. 2d at 912.

Should the Court determine the PFOF 19 is not inadmissible, PFOF 19 is disputed because NCR and ACPC knew PCBs in NCR Paper were toxic starting in the 1950s, at the latest. (NCR-FOX-0566603, at 638, 640-641, 657 (Rabbino Decl., Exh. 4); Dkt. 661, ¶ 13; NCR-FOX-350912, at 916 (Rabbino Decl., Exh. 5); APIFOX00055059, at 062-063 (Rabbino Decl., Exh. 6); APIFOX00047615 (Rabbino Decl., Exh. 7); APIFOX00013462, at 464-465 (Rabbino Decl., Exh. 8); APIFOX00032862, at 865 (Rabbino Decl., Exh. 9); APIFOX00023575 (Rabbino Decl., Exh. 10); APIFOX00013488, at 499-503 (Rabbino Decl., Exh. 11); NCR-FOX-0521464, at 474-478 (Rabbino Decl., Exh. 12); JDGFOX00000863, at 866 (Rabbino Decl., Exh. 13); MONSFOX00076299, at 300-309 (Rabbino Decl., Exh. 14); JDGFOX00000873, at 917 (Rabbino Decl., Exh. 15); JDGFOX00000836, at 837 (Rabbino Decl., Exh. 16).) NCR *and* ACPC *knew* that PCBs were a component of NCR Paper *by 1955*. (Dkt. 661, ¶13,

APIFOX00055059, at 062-063.)  As to ACPC alone, a 1955 lab book from Tom Busch, ACPC's

then Technical Director, states:  "Volatilization of the active material (*arachlor*) resulting from

rupture could be assured in the remainder of the oven before it gains contact with the clay

surface and the wind-up reel."[1]  (Id.)  ACPC knew *by 1958* at the latest that broke was recycled

and that the recycling process caused the capsules to rupture, discharging their contents,

including PCBs.  (Dkt. 680-2 , Exh. 32 [January 7, 1958 NCR Memo & Attachments]

[BCFOX00000564].)  By the end of 1965, even Mr. Jezerc admits that ACPC already knew that

the recycling of NCR Paper broke would result in the release of PCBs into the environment.

(Dkt. 667, Exh. 4, Jezerc Dep. (April 20, 2009), 77:4-80:7, 171:17-172:8.)  According to an API

flyer, ACPC became aware of the Jensen Report in the "late 1960s."  (Dkt. 659 at 50.)  Both

NCR and ACPC knew NCR Paper was being recycled and could result in a release to a water

body by 1965.  (Dkt. 680-2, BCFOX00000564, at 564; Dkt. 575, Exh. 14, Kresch Dep., 80:19-

81:19; Dkt 575, Exh. 15, Christensen Dep., 47:5-15; APIFOX00076652, at 654-655 (Rabbino

Decl., Exh. 17); Dkt 667, Exh. 4, Jezerc Dep. (April 20, 2009), 77:4-80:7, 71:17-72:8; Dkt. 680,

Exh. 4, BCFOX0042818, at 43356 (1957); Dkt. 678, Exh. 16, BCFOX00000564, at 564 (1958);

Dkt. 680, Exh. 128, BCFOX00007658, at 660 (1966); Dkt. 680, Exh. 134, BCFOX00007218

(1966); Dkt. 680, Exh. 12, BCFOX00000561, at 561, 564.)  By February 1967, NCR and ACPC

were aware of the Jensen Report, linking PCBs to DDT and bioaccumulation.  (Dkt. 659 ¶ 50;

Anderson Dep., 264:9-14; Dkt. 661, ¶ 46.)  By the late 1960s, NCR and ACPC knew that PCBs

were a dangerous environmental toxin.  (Dkt. 667, Exh. 4, Jezerc Dep. (April 20, 2009), 73:15-

24; MONSFOX00007980, at 8035 (Rabbino Decl., Exh. 18); Dkt. 659, ¶¶ 54-55; Dkt. 575, Exh.

27, Paton Dep., 18:4-23:19, 21:1-23:19.)

---

[1]  This knowledge of ACPC continued into the late 1960s because another lab book entry on February 10, 1968,
describes the NCR Paper as containing "chlorinated diphenyl 'known commercially as arachlor.'"
(APIFOX00047615.)

In 1972, NCR concluded that: "In the late 1960's accumulative evidence began to show that PCBs may have adverse effects on certain forms of animal life. . . . The resistance to breakdown – such as thermal and biodegradation – was shown to lead to accumulations in the environment." (1972 NCR internal report entitled "The Status of Polychlorinated Biphenyl Uses at NCR.") This document was authenticated as a result of resolution of discovery dispute between API and Menasha, testimony from the Plaintiffs' witnesses in this case, and how ancient documents are authenticated under Federal Rule of Evidence ("FRE") 901(b)(8) governing authentication of ancient documents. On November 9 2009, in order to resolve a discovery dispute with Menasha, API stipulated to all the predicate facts necessary to authenticate the report as an ancient document under FRE 901(b)(8). (Dkt. 746-1.) In addition, Helmut Schwab who worked for both NCR and API, authenticated the report consistent with FRE 901(b)(8) by his testimony that he recognized the report and that he forwarded the report to Carl Rench, NCR's Vice President of Research on or about November 10, 1972. (Rabbino Decl., Exh. 3, Schwab Dep., 203:1-24; 205:8-14.) Dr. Schwab also testified that he gave Mr. Hoover the assignment to write the report, after getting the assignment by someone in NCR upper management. (Id., 172:1-15.) The Court's order (Dkt. 746-1), coupled with Dr. Schwab's testimony that authenticates the report under FRE 901(b)(8). Thus, as the Court previously held, unlike the Defendants, NCR and ACPC were in a position to address the risks of PCBs in NCR Paper during the Production Period. (Dkt. 795 at 31.)

**PFOF #20:** It has been judicially determined that Appleton Papers Inc. did not contribute in any way to the PCB contamination in the Lower Fox River. (Hermes Decl., Exh. 2.)

**Response to PFOF 20**:

Disputed and immaterial. Appleton Papers Inc. succeeded to the liabilities of NCR's Appleton Papers Division in 1978. (Dkt. 993-4 at 4; Dkt. 993-5; and, Dkt. 993-6.) By 1978,

NCR's Appleton Papers Division included all the former operations of NCR's Portage, Wisconsin and Dayton, Ohio capsule production plants, NCR's research and development departments related to the production of NCR Paper, and the operations formerly of Combined Paper Mills, Inc. and Appleton Coated Paper Company.

**PFOF #21:** In 1978, when the immediate predecessor to Appleton Papers Inc. purchased assets formerly owned by Appleton Coated Paper Company and Combined Paper Mills, Inc., Appleton Papers Inc.'s immediate predecessor was not aware of any Lower Fox River PCB liabilities, and the agreement formalizing said purchase of assets makes no reference to such liabilities. (Declaration of Ronald R. Ragatz in Support of Plaintiffs' Memorandum of Law in Opposition to Georgia-Pacific LLC's and Certain Defendants' Motion for Summary Judgment on Equitable Factors, Exh. 4 [November 28, 2005, Arbitration Award].)

**Response to PFOF 21**:

<u>Disputed and immaterial</u>. Appleton Papers Inc. succeeded to the liabilities of NCR's Appleton Papers Division in 1978. (Dkt. 993-4; Dkt. 993-5; and, Dkt. 993-6.) By 1978, NCR's Appleton Papers Division included all the former operations of NCR's Portage, Wisconsin and Dayton, Ohio capsule production plants, NCR's research and development departments related to the production of NCR Paper, and the operations formerly of Combined Paper Mills, Inc. and Appleton Coated Paper Company. The arbitration award between the Plaintiffs and B.A.T. determines that API/B.A.T. is 60% liable for cleanup costs at the Lower Fox River. (Dkt. 993-4 at 3.) According to the arbitration award, "the Panel concludes that the language is not sufficiently clear and unambiguous with respect to the issue of responsibility for the environmental costs at issue to permit an award *solely* on the contract language" and:

> The Panel has considered the knowledge of the parties about the risk presented as that knowledge might inform the Panel on the intent of the parties and finds that both parties had knowledge that PCBs were a growing environmental concern and that NCR had already engaged in a cleanup of sediments contaminated with PCBs in Japan and that BAT (through Wiggins Teape) was aware of concerns associated with PCB discharges in the Bristol Channel. The Panel further considered the disclosures made in Schedule A to the parties' Assumption Agreement ( JTX 3) and finds that they were sufficient to create the potential for some kind of environmental risk relative to the Appleton Papers Division operations.

(Id. at 4, emphasis added.)  Thus, Appleton Papers Inc. has CERCLA liability at the Lower Fox River as a result of its assumption of liability for the Appleton Papers Division operations.

Dated:  May 24, 2010

Respectfully Submitted,

HUNSUCKER GOODSTEIN & NELSON PC


*/s/ David A. Rabbino*

Philip C. Hunsucker
David A. Rabbino
Christopher J. Dow
Hunsucker Goodstein & Nelson PC
3717 Mt. Diablo Blvd., Suite 200
Lafayette, CA 94549
Telephone:  (925) 284-0840
Fax:  (925) 284-0870
drabbino@hgnlaw.com

On behalf of the following defendants, we hereby join in this response.

/s/ Waltraud A. Arts
Counsel for City of Appleton


/s/  Michael Carlton
Counsel for Defendant CBC Coating, Inc.

/s/ Mary Rose Alexander
Counsel for Defendant Georgia-Pacific
Consumer Products LP (f/k/a Fort James
Operating Company), Fort James Corporation,
Georgia Pacific LLC

/s/ David Mandelbaum
Counsel for Defendant P.H. Glatfelter
Company

/s/ William Mulligan
Counsel for Defendant Neenah-Menasha
Sewerage Commission

/s/ Thomas Gottshall
Counsel for Defendant U.S. Paper Mills
Corporation

/s/ William Harbeck
Counsel for Defendant WTM I Company