# EXHIBIT 4

**COMMENTS OF NCR CORPORATION AND APPLETON PAPERS INC.**
**ON PROPOSED CONSENT DECREE INVOLVING THE UNITED STATES, THE**
**STATE OF WISCONSIN, THE CITY OF GREEN BAY, BROWN COUNTY, AND**
**VARIOUS DEPARTMENTS AND AGENCIES OF THE UNITED STATES**
**(CASE NO. 10-C-910 (E.D. WIS.); DOJ REFERENCE NUMBER 90-11-2-1045/3)**

NCR Corporation ("NCR") and Appleton Papers Inc. ("API") respectfully submit the following comments in opposition to the Consent Decree proposed to be entered between the United States and the State of Wisconsin (the "Governments"), on the one hand, and Brown County, the City of Green Bay, and various agencies and departments of the United States (collectively, the "Settling Parties"), on the other (the "Consent Decree"). These comments pertain only to that portion of the proposed settlement involving Brown County, the City of Green Bay, and the U.S. Army Corps of Engineers ("ACOE" or the "Corps"). These three entities all participated in the dredging and disposal of sediment from the Lower Fox River and the Bay of Green Bay ("Lower Fox River site" or "site"). They are collectively referred to as the "Dredging Parties."

## SUMMARY OF COMMENTS

Any settlement of CERCLA claims must be fair, reasonable, and consistent with the purposes of CERCLA.[1] The proposed settlement fails to meet this standard, for at least the following five reasons.

*First,* the amount to be paid by the Dredging Parties does not fully compensate the public for the harm they caused. The ACOE engaged in a number of improper practices while dredging the river's navigational channel, including over-dredging (dredging deeper than authorized) and sidecasting (indiscriminately disposing of dredged materials to the side of the navigational channel). Brown County and the City of Green Bay failed to maintain the facilities where the dredged materials were disposed, resulting in releases of PCBs directly into the Bay of Green Bay. These practices caused various adverse impacts on the site, including new PCB deposits that otherwise would not have existed and that will cost at least $28.8 million (and perhaps more than $42.1 million) to remediate. The proposed payment of $5.2 million is thus not commensurate with the harm caused by the Dredging Parties, and therefore is unreasonable.

*Second,* the Governments have failed to provide a valid justification for the settlement amount. The proffered rationale expressly ignores the substantial impacts caused by the ACOE's activities in OU4, on the theory that the ACOE did not "add" any PCBs to OU4. However, that theory is wrong both legally and factually. Courts (and even the Justice Department previously) have rejected the claim that CERCLA liability requires a "net addition" of hazardous substances. And the ACOE did increase the overall mass of PCBs in OU4 when it disposed of dredged material directly back into OU4 rather than removing it to a proper disposal facility.

---

[1] *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003); *United States v. Charter Int'l. Oil Co.*, 83 F.3d 510, 520 (1st Cir. 1996).

*Third,* the proposed settlement was not the result of arms-length negotiations. The lawyers who represented the United States here, opposite the Corps, were among the same lawyers that previously *assisted* the Corps in its defense against the same claims of liability now being settled. Further, there is no evidence in the record of any back-and-forth communications between EPA and the ACOE concerning the terms of the settlement; the ACOE's payment amount has not been shown to be the product of good faith, open and rigorous negotiation. Thus, the settlement fails to satisfy the requirement of procedural fairness.

*Fourth,* the Governments' investigation of the Dredging Parties has not been adequate. The lack of an arms-length transaction warrants heightened review and additional documentation to ensure that the settlement is consistent with the purposes of CERCLA. However, the United States appears to have done nothing more than a simple document review, and has not taken the same investigative measures it has taken with respect to other PRPs. And while the State of Wisconsin could have been an independent check on the United States' settlement with itself, the State apparently conducted no investigation of its own; in responding to a FOIA request for documents relating to the proposed settlement, the Wisconsin Department of Justice stated that it has "*no documents*." This failure to supplement the documentary record, especially given the incomplete nature of that record, makes it impossible to fully weigh the potential litigation risks involved or calculate even a rough approximation of comparative fault. Without this information, neither the parties nor the public can determine whether the proposed settlement is a reasonable compromise.

*Fifth,* the proposed settlement creates a risk that there will be insufficient funds to complete the cleanup. The number of parties available to pay for the remediation work is dwindling as a result of already pending settlements and a bankruptcy. Of these remaining parties, all claim to have defenses to liability or limited financial resources. In these circumstances, the proposed settlement, which would release three more viable PRPs, is plainly *not* in the public's interest. Final approval by the Justice Department should therefore be withheld.

## BACKGROUND

For more than 100 years, the ACOE has maintained navigational access to portions of the Lower Fox River by dredging sediment from the bottom of the river. Model Evaluation Workgroup Technical Memorandum 2g, p. 4 (Exhibit 1)("Tech Memo 2g"). Between 1957 and 2008 (the period for which records are available), the ACOE dredged at least 16 million cubic yards of sediment from the site. Annual Report/Contract Dredging Report, p. 3 (Exhibit 2)(DOJ312341).

The dredged sediment was disposed of by dumping it either back into the river or Bay, or into two in-water disposal locations. Tech Memo 2g, p. 4. These in-water disposal locations, called Bayport and Renard Island, were owned and operated by Brown County and the City of Green Bay. Bayport was constructed in 1967 and is located within a former marsh in the Bay of Green Bay immediately west of the mouth of the Lower Fox River. Tech Memo 2g, p. 4. Renard Island was constructed in 1978 and is located just east of the mouth of the river. *Id.*

Prior to 1967, all dredged material was dumped back into the river or the Bay, a practice referred to as "open water disposal." Tech Memo 2g, p. 4. Beginning in 1967, some of the dredged material was disposed of at the Bayport facility, although open water disposal continued until at least 1974. *Id.*, at 12. As the Wisconsin Department of Natural Resources ("WDNR") noted, this open water disposal occurred during "a period believed to coincide with the peak use (and discharge) of polychlorinated biphenyls (PCB) in the Lower Fox River." *Id.* Between 1957 and 1974, at least 4.1 million cubic yards of PCB-contaminated material – or nearly one-quarter of all the sediment dredged by ACOE – was disposed of in open water locations. *Id.* WDNR concluded: "Open water disposal may represent a potentially significant PCB transport pathway." *Id.*

In 2008, NCR and API brought CERCLA cost-recovery actions against 28 PRPs, including the ACOE, Brown County and the City of Green Bay. *See Appleton Papers Inc. and NCR Corp. v. George A. Whiting Co., Inc. et al.*, No. 08-C-00016 (E.D. Wis.) *consolidated with NCR Corp. v. Kimberly-Clark Corp., et al.*, No. 08-C-0895 (E.D. Wis.)("*Whiting*"). These actions alleged that PCB releases occurred during the dredging and disposal activities of the Dredging Parties, and that these parties were therefore required to pay the costs of responding to and remediating those sediment areas that they contaminated. However, in an effort to streamline the case, the district court confined discovery to one narrow issue that specifically did not encompass liability associated with dredging and disposal activities. As part of that limited discovery in Phase I, Brown County and the City of Green Bay produced a small number of documents. The ACOE did not produce any documents.

On April 2, 2010, each of the Dredging Parties moved for summary judgment on NCR's and API's claims against them. NCR and API sought an opportunity to take discovery on these claims before briefing was completed, but this request was denied. The Court has yet to rule on these pending motions.

As part of its response to the Dredging Parties' motions for summary judgment, NCR and API retained the services of Dr. Donald Hayes, a nationally-recognized expert on dredging and disposal practices. Dr. Hayes frequently consults for the ACOE and EPA on their sediment remediation projects, and is one of EPA's consultant experts for the Hudson River dredging project. *See* February 2011 Declaration of Dr. Donald Hayes (Exhibit 3)("2011 Hayes Declaration"). Dr. Hayes analyzed the historical dredging and disposal records for the Lower Fox River and concluded that "inappropriate dredging practices by and on behalf of the [A]COE almost certainly increased the scope and cost of remedial actions" at the Lower Fox River site. *See* April 2010 Declaration of Dr. Donald Hayes (Exhibit 4)("2010 Hayes Declaration"). He also concluded that "[h]istorical and continuing PCB losses from Renard Island and Bayport CDFs are a contributing reason for the extensive long-term monitoring requirements within Green Bay." *Id.* NCR and API asked Dr. Hayes to evaluate the proposed settlement in terms of whether it adequately accounted for the impacts of the Dredging Parties' activities.

# COMMENTS

I. **THE AMOUNT TO BE PAID BY THE DREDGING PARTIES DOES NOT ADEQUATELY COMPENSATE THE PUBLIC FOR THE HARM THEY CAUSED.**

A. **Historical Dredging and Disposal Activities by the Army Corps Significantly Exacerbated the PCB Contamination.**

The ACOE's liability at the site results from the fact that it consistently engaged in a number of improper dredging and disposal practices that released PCBs into other parts of the site, creating new areas of contamination *that would not otherwise have required remediation*.

These improper practices included:

- *Sidecasting.* Sidecasting is the practice of removing dredged sediment and dumping it (either mechanically or hydraulically) back into the river just outside the channel being dredged. 2011 Hayes Declaration, ¶ 9. The sediment deposits parallel to the direction of the dredge, in a linear formation. *Id.* Sidecasting was performed by, or on behalf of, the ACOE in the Lower Fox River on numerous occasions. *Id.*

- *Over-dredging.* Over-dredging is the practice of dredging to a depth that is even deeper than what was authorized by the relevant authority. *Id.*, at ¶ 17. For example, the ACOE was authorized to dredge to a depth of 24 feet in certain parts of the Lower Fox River, and 18 feet in other parts. *Id.*, at ¶ 6. However, the ACOE routinely dredged deeper than this. *Id.*, at ¶ 17. Sediment with PCBs from upriver preferentially settled in these dredged-out areas. *Id.*

- *Open Water Disposal.* Open water disposal is the practice of collecting dredged sediments on a barge, transporting them to another location within the Lower Fox River site, and dumping them in that new location. 2010 Hayes Declaration, ¶¶ 5-6. This practice occurred through at least 1974. *Id.*, at ¶ 6.

- *Barge Overflow.* Barge overflow refers to the situation in which dredged material, having been placed in or on a barge through bucket or dipper dredge operations, is permitted to flow back off the barge and into the water (due to inadequate containment on the barge). *Id.*, at ¶¶ 7-8 In response to concerns about barge overflow on the Lower Fox River, the ACOE instituted a policy in 1977 to prohibit the practice where the material to be dredged was "seriously contaminated" with PCBs. *Id.* However, this practice was personally observed by Dr. Hayes in 2002, raising questions about whether the policy was ever enforced. *Id.*; 2011 Hayes Declaration, at ¶ 23.

- *Hopper Dredging.* Hopper dredges use a suction pipe to move sediments from the bottom of the river or Bay onto onboard hoppers. Final Environmental Impact Statement

4

Relating to Operation, Maintenance, and Dredged Material Disposal at Green Bay Harbor, Nov. 1977, p. 1-6 ("1977 Impact Statement")(Exhibit 5). The use of hopper dredges typically results in substantial overflow, as the ACOE acknowledged in 1977. *Id.*

These practices significantly exacerbated the extent of PCBs within Lower Fox River sediments. Over-dredging produced "sinks" where sediment with elevated levels of PCBs from upriver settled, resulting in deep PCB deposits (*i.e.*, below the 18-24 foot authorized depth). 2011 Hayes Declaration, ¶ 17. According to Dr. Hayes, these PCB deposits at depth would not exist but for this over-dredging. *Id.* For example, rather than extending as deep as 41 feet, as is currently the case in many areas within the northern portion of OU4, the contamination would have extended no further than 24 feet. *Id.*

Similarly, sidecasting moved previously confined and buried PCBs to new locations in the river and Bay. *Id.*, at ¶ 11 These newly-created "mounds" of PCB-impacted sediment would not have occurred naturally or otherwise exist but for the ACOE's activities. *Id.*

Finally, all of the ACOE's activities (including open water disposal, barge overflow, and hopper dredging) also (i) made high concentrations of suspended solids available for transport downriver and (ii) removed PCB-impacted sediment from the bottom of the river (where it posed little biological risk) only to move them to shallow and more biologically rich locations. *Id.*, at ¶¶ 11-12; 2010 Hayes Declaration, ¶¶ 9-11. Thus, the linear and vertical extent of PCBs in the Lower Fox River would have been substantially less if the Corps had not engaged in these practices.[2]

None of this had to happen. As Dr. Hayes attests, the practices described above do not represent "best management practices for contaminated sediment dredging operations." 2011 Hayes Declaration, at ¶¶ 7, 26; 2010 Hayes Declaration, at ¶ 11. The Army Corps could have used other "[m]ore environmentally sound practices [that] were available" at the time. *Id.* Instead, it chose not to do so.

Furthermore, the Army Corps made this choice even though it knew that it was potentially contributing to the release of hazardous substances. For example, as early as April 1966, the ACOE acknowledged that certain open-water dumping may not be permissible "because of possible increased pollution in Green Bay." Letter from Army Corps of Engineers to Brown County, April 1, 1966, p. 2 (Exhibit 24). Three years later, in 1969, the ACOE was

---

[2] It is incorrect to argue that it would have been necessary to remediate the sediment in these sidecast areas even if the sediment had been left in the channel and not sidecast. The amount of sediment that can settle in the navigational channel is constrained by the depositional properties of the river in OU4; once the channel fills to a certain elevation, additional deposition tapers off. 2011 Hayes Declaration, ¶ 13. As a result, if no navigational dredging had been conducted, the amount of impacted sediment *in the channel* would not be significantly greater than it is today. *Id.* The same would be true if the ACOE had taken the dredged materials and disposed of them properly at an offsite facility. However, because the ACOE did not do this, but instead re-deposited a large portion of the dredged materials directly back into the river by sidecasting, it is now necessary to remediate *both* the impacted sediments that re-filled the navigational channel *and* the sidecast material. That additional remedial activity would not be necessary if the ACOE had not engaged in the improper practice of sidecasting.

warned by EPA's predecessor that "[n]one of the sediments in [the Green Bay Harbor] channel are suitable for disposal in the open waters of Green Bay or Lake Michigan." 1977 Impact Statement (Exhibit 5). Nonetheless, the ACOE continued to engage in open water disposal from 1966 to 1969, and then for another five years after that, during which time it moved more than 2 million cubic yards of PCB-impacted sediment to other locations within the site. Annual Dredging Report Data, October 20, 1997 (Exhibit 6).

The ACOE continued these practices even after learning that the sediment contained PCBs and that the improper disposal of PCBs could pose environmental risks. In 1971, the State of Wisconsin warned residents about the presence of PCBs in the Lower Fox River, and such warnings were published in newspaper articles throughout the state, including the local Green Bay area. *See e.g.*, 10/2/1971 Neenah Menasha Northwestern (Exhibit 7). By 1972, the ACOE knew of the risks associated with dredging sediments with PCBs from EPA's policy announcement "that all discharges to the aquatic environment involving PCBs be restricted to the lowest possible level." EPA Letter, April 24, 1972, p. 1 (Exhibit 8); 1972 Interdepartmental Task Force Report (Exhibit 9). And by January 1975, at the latest, the ACOE had actual knowledge that sediments in the Lower Fox River contained PCBs and that dredging those sediments risked resuspending and spreading them; in that year, the ACOE commissioned a study designed precisely to examine the effects of dredging and open water discharge on the release of PCBs and other materials. Laboratory Study of the Release of Pesticide and PCB Materials to the Water Column During Dredging and Disposal Operations, December 1975, p. 19-20, 49, 65 (Exhibit 10). Nevertheless, throughout this time and afterwards, the ACOE continued to use improper dredging and disposal methods, such as barge overflow, that spread PCBs throughout the site.

Having thus caused releases of PCBs, which created new areas of contamination that otherwise would not have existed, the ACOE's activities plainly give rise to liability under CERCLA.[3]

### B. The Failure to Properly Maintain the Reynard Island and Bayport Disposal Facilities Resulted in PCB Releases to the Lower Fox River.

The liability of Brown County and the City of Green Bay arises from their ownership and operation of the Bayport and Renard Island facilities.[4] Between them, Bayport and Renard Island accepted almost 13 million cubic yards of dredging materials. Tech Memo 2g, pp. 24-29. WDNR described Bayport and Renard Island as "older" sites that "were not designed to completely isolate dredged materials from the environment." Lower Green Bay Remedial Action Plan, February 1988, p. 114 (Exhibit 12). Due to this poor design, both have a history of PCB releases.

---

[3] *See e.g.*, *Raytheon Aircraft Co. v. United States*, 435 F. Supp. 2d 1136, 1151 (D. Kan. 2006).

[4] Brown County's and the City of Green Bay's responsibility for Bayport and Renard Island is well-established, as the United States itself has recognized: "At various times, both [Brown County and the City of Green Bay] have owned the Bayport [facility and ] . . . [s]trong arguments exist that the Municipalities owned and operated Renard Island as well." Letter from Joshua Levin and Matthew Oakes, July 23, 2010 (DOJ312351), p. 1 (Exhibit 11).

With respect to Renard Island, WDNR complained that Renard Island "had a history of dike leakage, resulting in direct discharge of untreated carriage water," and that the facility violated its wastewater discharge permit limits for suspended solids. Final Environmental Impact Statement, p. EIS-G-36 ("Final EIS")(Exhibit 13). In 1985, the U.S. Fish & Wildlife Service confirmed that the facility was "not designed to be watertight and leaks have occurred." Final Fish and Wildlife Coordination Act Report, p. 17 (Exhibit 14). PCBs were detected in effluent entering the Bay from the facility. Final EIS, p. EIS-G-37.

With respect to Bayport, WDNR identified PCBs in surface water samples taken from the perimeter ditches that drain the site. Final Screening Site Inspection Report for Bayport Industrial Park, p. 44 (Exhibit 15). Detections of PCBs also were found in a slough in the southwest corner of the site that "flows westward . . . and then out to the bay." Preliminary Green Bay Mass Balance Groundwater Monitoring Report, p. 23 (Exhibit 16).

The Governments agree that Bayport and Renard Island contributed large amounts of PCBs to the river: "Thus, [Brown County and the City of Green Bay] are directly associated with the design, ownership, management, and operation of a facility that may account for the addition of a substantial portion of PCBs to the Bay. . . . [T]he potential releases from the Bayport and Renard Island facilities greatly exceed potential releases by [the so-called de minimis settling parties]." Letter from Joshua Levin and Matthew Oakes, July 23, 2010 (DOJ312351), p. 2 (Exhibit 11).

This failure by Brown County and the City of Green Bay to "isolate dredged materials from the environment" exacerbated the contamination at the site. Dr. Hayes determined that "historical and continuing PCB losses" from Bayport and Renard Island "are a contributing reason for the extensive long-term monitoring requirements within Green Bay." 2010 Hayes Declaration, ¶ 14.

These discharges may also be responsible for some component of the natural resource damages that are claimed to exist within the Bay. With respect to Bayport, WDNR expressed concern that that "uncovered contaminated wastes and substantial use by wildlife . . . have potential for run-off and for contaminants to move through the food chain into fish and wildlife." Lower Green Bay Remedial Action Plan, February 1988, p. 180 (Exhibit 12). With respect to Renard Island, EPA found that "the area around the facility supports a diverse fishery" and that as a result "there is a strong potential for bioaccumulation in aquatic life or contaminants that might leak from the disposal facility." Final EIS, p. EIS-G-7 (Exhibit 13). A more complete investigation into these disposal facilities would likely reveal that their impacts are even greater.

Having thus failed to maintain their disposal facilities so as to prevent these releases of PCBs (and resulting costs and damages), Brown County and the City of Green Bay are liable parties under Section 107(a).[5]

---

[5] *See e.g., Artesian Water Co. v. Gov't of New Castle County*, 605 F.Supp. 1348 (D. Del. 1985); *United States v. Occidental Chem. Corp.*, 965 F.Supp. 408 (W.D. N.Y. 1997); *Pierson Sand & Gravel, Inc. v. Pierson Twp.*, 851 F.Supp. 850 (W.D. Mich. 1994).

7

C.     **The Harm Caused by The Dredging Parties Activities Is More Than Five Times The Amount They Would Pay to Resolve Their Liability.**

The impact of the Dredging Parties' activities on remedial costs and alleged natural resource damages has been extensive. While it is not possible to identify and quantify all these impacts at this time, given the limited information available and the relatively short time given to provide comments, an analysis by Dr. Hayes of just two of these activities – sidecasting and over-dredging – adequately demonstrates that the settlement vastly underestimates the actual responsibility of the Dredging Parties.

*Sidecasting.* As described in more detail in his Declaration, Dr. Hayes identified each area within OU4 that requires active remediation and that was caused by sidecast disposal rather than natural deposition. *See* Figure 2 to 2011 Hayes Declaration. To make this determination, he relied on multiple sources of information, including historical bathymetry surveys that show the depth of the river at different points in time; primary ACOE documents (to the extent they existed) showing how and where dredged materials were disposed of; and sampling data collected during the remedial design work that describes the physical and chemical properties of the sediment throughout OU4. 2011 Hayes Declaration, ¶ 14. He also used a conservative approach that included only those areas that exhibited unmistakable characteristics of sidecast disposal, including (1) an increase sediment elevation (or decrease in water depth) of more than two feet over time; (2) a "mound"-like appearance running in a linear direction parallel and close to the navigational channel; and (3) physical and chemical properties inconsistent with the underlying sediment. *Id.* In Dr. Hayes's opinion, these sediment "mounds" could not have been caused by natural deposition but were instead created by the ACOE's sidecasting activities. *Id.*, at ¶ 12.

*Over-dredging.* Dr. Hayes also identified those areas within OU4 that were "over-dredged" by the ACOE and that require active remediation. *See* Figure 3 to 2011 Hayes Declaration. He made this determination, as described in his Declaration, by comparing bathymetric survey information. 2011 Hayes Declaration, ¶¶ 19-20. If an area within the navigational channel (i) was recorded as being significantly deeper than its previous measurement, (ii) the change in elevation could not be explained by scour or resuspension, and (iii) records showed that dredging occurred in the area, Dr. Hayes concluded that the ACOE had dredged below the proscribed depth in that area. *Id.* According to Dr. Hayes, these areas would not have contained PCBs but for this unauthorized over-dredging. *Id.*, at ¶ 17.

*Costs.* Dr. Hayes then calculated the total remedial cost associated with these identified sidecast and over-dredged areas. He consulted the design documents to determine what remediation was planned for each area (*i.e.*, dredging or capping) and then applied to each the average unit cost of dredging or capping. *Id.*, at ¶¶ 15, 21. Based on that analysis, Dr. Hayes concluded that the cost to remediate the sidecast deposits ranges from $24.9 million to $36.2 million, and the cost to remediate the over-dredged areas ranges from $3.9 million to $5.9 million. See Tables 2 and 3 to 2011 Hayes Declaration.

All together, Dr. Hayes' analysis demonstrates that the activities of the Dredging Parties created deposits of PCBs that will cost at least $28.8 million – and perhaps more than

8

$42.1 million – to remediate. These are costs that would not have to be incurred but for the improper dredging and disposal activities of the Dredging Parties. This analysis, moreover, does not even account for:

> (1) remedial costs associated with other PCB deposits that also may have been created by sidecasting;
>
> (2) remedial costs associated with PCB deposits that were created by open water disposal, barge overflow or hopper dredging practices;
>
> (3) potential natural resource damages created by moving otherwise buried PCBs to shallower, more biologically active areas;
>
> (4) remedial costs and potential natural resource damages associated with PCB releases from Bayport and Renard Island; and
>
> (5) the presence of TSCA materials in the sidecast and over-dredge areas, which are substantially more costly to remediate.

Dr. Hayes' estimates, then, are almost certainly a lower-bound for the harm caused by the Dredging Parties. Even so, these estimates more than amply demonstrate that the cost of addressing the harm caused by the Dredging Parties is at least five to seven times the amount they are required to pay under the proposed settlement.

Given this vast disparity, the proposed settlement fails the basic CERCLA requirement that the settlement payment must be proportional to the amount of harm caused by the settling party.[6] In addition, under these circumstances approval of the settlement would also constitute a taking of NCR's and API's property without just compensation in violation of the Fifth Amendment of the U.S. Constitution.[7]

## II.    THE GOVERNMENTS HAVE FAILED TO PROVIDE A VALID JUSTIFICATION FOR THE PROPOSED SETTLEMENT AMOUNT.

The Justice Department has provided the following explanation for the total settlement payment amount of $5.2 million:

---

[6] *See e.g.*, *Kelley v. Wagner*, 930 F. Supp. 293, 299 (E.D. Mich. 1996)(consent decree rejected because amount to be paid "does not appear to be 'in the ballpark' of the State's own estimate of [the PRP's] liability"); *State v. SCA Services, Inc.*, No. 83 Civ. 6402, 1993 WL 59407, at *4 (S.D.N.Y. March 1, 1993) (consent decree rejected in part due to the "gross inequity" that settling parties responsible for a large share of the contamination would only have to pay a relatively small share under the settlement).

[7] *See* U.S. Const. amend. V, XIV; *Pitts v. Unarco Indus., Inc.*, 712 F.2d 276, 279 (7th Cir. 1983) ("An accrued cause of action is a right of property protected by the Fourteenth Amendment."); *Hoyt Metal Co. v. Atwood*, 289 F. 453, 454 (7th Cir. 1923) ("That an accrued right of action is a vested property right is well settled.").

The $5,000,000[8] amount is based [on] historical Corps dredging data. According to our calculations, dredging (including releases from CDFs) resulted in a net removal of PCBs in OUs 1-4, but resulted in a small but positive net addition of PCBs to OU-5. Once we calculated the mass of PCBs added to OU-5, we took a ratio of that amount to the total OU-5 PCB mass. This resulted in a calculation that dredging (including releases from CDFs) resulted in about 4% of the PCB impact to OU-5. That 4% amount was cut in half because the dredging parties only moved contaminated sediment, and did not add PCB mass to the Site. This calculation resulted in a dredging share of roughly 2% of the OU-5 dredging costs. Estimated natural resource damages costs for OU-5 are $250,000,000. Estimated remedial monitoring costs are $39,600,000. The $5,000,000 dredging share is roughly 2% of the combined NRD and remedial monitoring cost estimates.[9]

This justification is inadequate principally[10] because it ignores the impacts of the ACOE's activities in parts of site other than OU5. As described above, those impacts have been substantial, necessitating at least $28.8 million – if not significantly more – in additional costs. A settlement rationale that does not take these impacts into account is *per se* unreasonable.

The Justice Department is apparently operating under the mistaken notions that (i) as a legal matter, ACOE can only be liable for costs and damages in areas where it has caused a "net addition" of PCBs; and (ii) as a factual matter, the ACOE caused a "net addition" only in OU5. Both assumptions are wrong. Numerous courts have rejected the "net addition" theory, holding parties liable for cleanup costs if they exacerbated contamination, even if they did not contribute more hazardous substances in the process.[11] Indeed, the Justice Department itself has previously opposed the very position it espouses today, as when it argued that a party that contributed hazardous substances at levels lower than background – and so did not in fact increase the amount of contamination at all – nonetheless should be jointly and severally liable for all cleanup costs at a site.[12]

---

[8] The Justice Department later increased the settlement payment to $5.2 million for reasons that are not disclosed. *See* DOJ312472 (Exhibit 17).

[9] *See* June 10, 2010 Letter from Matthew Oakes, p. 6 n. 3 (DOJ313485)(Exhibit 18).

[10] This justification fails for the additional reasons that (1) no calculations are provided to substantiate the "no net addition" conclusion; (2) no basis is given for the arbitrary decision to reduce the share from 4% to 2%; and (3) no premium has been applied, as is standard in situations, like here, where there is uncertainty about the extent of liability and potential future costs.

[11] *See e.g.*, *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1133 (D. Idaho 2003), *modified in part on other grounds*, 471 F. Supp. 2d 1063 (D. Idaho 2005); *Raytheon Aircraft Co. v. United States*, 435 F. Supp. 2d 1136, 1151 (D. Kan. 2006); *Kaiser Alum. & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340-42 (9th Cir. 1992).

[12] *See e.g., United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir. 1992). Neither NCR nor API endorse this position.

Finally, as a factual matter, the ACOE's activities *did* result in a net addition of PCBs to OU4. If the ACOE had not dredged the river, the navigational channel would have continued to fill with PCB-impacted sediment from upriver until it reached an equilibrium where little additional deposition was hydrodynamically possible. 2011 Hayes Declaration, ¶ 13. However, because the ACOE's activities moved large amounts of PCB-impacted sediment from the navigational channel, and therefore caused the navigational channel to re-fill to some extent with PCB-impacted sediment from upriver, there is more PCB-impacted sediment in OU4, overall. *Id.* Rather than simply having just the volume of PCB-impacted sediment that can be held in the channel, there is also now a large volume of PCB-impacted sediment alongside the channel that would not have been present but for the ACOE's sidecasting activities.

Given that the rationale for the proposed settlement amount fails both legally and factually, the settlement is not adequately justified and so should not be approved.

## III.    THIS SETTLEMENT DID NOT RESULT FROM AN ARMS-LENGTH NEGOTIATION AS REQUIRED UNDER CERCLA.

A settlement can be approved only if it is "the end result of a procedurally fair, arms-length negotiation process" in which "the cards have been dealt face up and a crew of sophisticated players, *with sharply conflicting interests,* sit at the table . . . ."[13] That showing cannot be made here with respect to the settlement for the ACOE.

First, there was no arms-length negotiation of this settlement agreement between the lawyers who represented EPA in its enforcement capacity (*e.g.*, Randall Stone and Jeffrey Spector) and those who defended the Corps (*e.g.*, Joshua Levin and Matthew Oakes). In fact, the lawyers who represented EPA in negotiating the settlement have previously *served as defense counsel for the ACOE*. For example, at a hearing in the *Whiting* action, Mr. Stone explained his roles as follows:

> My name is Randall Stone. I'm with the environmental enforcement section of the U.S. Department of Justice. I'm joined today by Mr. Richmond of the U.S. attorney's office and Mr. Levin of the environmental defense section and some other colleagues from the defense section, and *we're representing the Army Corps and EPA in its defensive capacity in this case.*"

Transcript from November 9, 2009 Hearing, 57:8-15 (emphasis added)(Exhibit 19). When pressed about this by the Court, Mr. Stone again confirmed that he was actively representing the ACOE:

> THE COURT: You originally appeared in this case as amicus.

> MR. STONE: Yes, your Honor.

---

[13] *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)(emphasis added).

THE COURT: Is that still your status, or EPA is a party now so—

MR. STONE: EPA is a party and although our environmental enforcement section and environmental defense section are administratively distinct, my office is about 75 yards from Mr. Levin's on the same floor in our building. We coordinate very closely. And when an issue like this one that really implicates our core enforcement interest, when people are trying to prelitigate defenses to our claim, then we work closely together. And I worked with our defense section on the briefs and also on the prior briefs on the 107/113 issue when we were amicus in this case.

*Id.,* p. 79: 10-25.[14] In other words, the lawyers who were charged with *maximizing* the recovery from the ACOE in this case are concurrently representing the ACOE in a separate proceeding where the ACOE is seeking to *minimize* that very liability.

The Justice Department has even taken the position that the attorney-client privilege protects from disclosure any communications between Messrs. Stone and Spector, on the one hand, and Messrs. Levin and Oakes, on the other. *See* E-mail from Amber Blaha, February 14, 2011 (Exhibit 20); Letter from Joshua Levin, February 16, 2011 (Exhibit 21). Messrs. Stone and Spector are not adversaries with respect to Messrs. Levin and Oakes, but apparently share a dual representation of the ACOE.

This arrangement presents an irreconcilable conflict of interest. EPA will want to obtain as large a settlement as possible from the ACOE, and the ACOE will obviously seek to spend as little as possible. It is untenable – practically or ethically – for the same lawyers to vigorously advocate both positions.[15] Under such circumstances, the negotiations leading to the proposed settlement cannot have been "arms-length."

Second, there is no indication that the ACOE and the Justice Department vigorously negotiated the terms of the settlement – not surprisingly, given the lack of arms-length relationship between the federal attorneys in the case. While there are numerous letters back and forth between the Justice Department and Brown County/the City of Green Bay about the possible terms of a settlement, there are no similar communications between the ACOE and EPA/DOJ. No proposals or counterproposals were apparently made; no draft settlement

---

[14] Messrs Stone and Spector also signed pleadings filed on behalf of the United States *as defendant. See e.g.,* United States Brief in Opposition to Plaintiffs' Motions for Leave to File Amended Complaints in the *Whiting* and *Kimberly-Clark* Cases (Dkt. 614)(pleading signed collectively by Messrs. Stone, Spector, Levin, Oakes and Rosen); United States' Brief in Response to Plaintiffs' Motion for A Declaration that the 98% Statement in the Records of Decision is Not Binding on The Court (Dkt. 615)(same).

[15] *See e.g.*, *Colorado v. United States Department of the Army*, 707 F. Supp. 1562, 1570 (D. Col. 1989) (noting the court's unwillingness to enter a consent decree involving an agency of the United States given that the same lawyers were concurrently representing both the agency and the EPA); Model Rule of Professional Conduct 1.7(1) ("[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest.").

agreements were exchanged. As far as the record is concerned, the payment to be made by the ACOE was not negotiated at all.

If the United States, as enforcer of environmental laws, seeks to settle claims against the United States, as a potentially responsible party, certain steps need to be taken to address this inherent conflict of interest and ensure fidelity to CERCLA's requirement that "sharply conflicting interests" be represented on each side of the table. No such precautions were taken in this case.

The result is a highly preferential settlement for the ACOE, as evidenced not just by the inadequate settlement payment, but also the many other favorable terms that were granted. For example, this settlement does not include a reopener provision, even though such a provision is part of the model EPA consent decree and should be included, according to EPA itself, whenever there are uncertainties about the extent of liability and future costs, as is the case here.[16] This settlement also includes no uncertainty premium, which is again inconsistent with EPA practice and guidance.[17] Finally, this settlement releases the ACOE from potential liabilities, such as claims under the Clean Water Act, which are not even at issue in this case. Thus, even though § 120 of CERCLA makes expressly clear that federal agencies must be treated "in the same manner . . . , both procedurally and substantively, as any nongovernmental entity," that stricture clearly was not followed in this case. As a result, the proposed settlement is neither fair, reasonable, nor consistent with the purposes of CERCLA and thus it should not be approved.

## IV. THE GOVERNMENTS HAVE NOT CONDUCTED AN INVESTIGATION SUFFICIENT TO DETERMINE WHETHER THE SETTLEMENT IS FAIR AND APPROPRIATE.

In order to approve this settlement, there must be a record that is adequate to support a finding that the settlement amount is proportional to the harm caused.[18] Such a record is particularly necessary where, as here, there are grounds to question the manner in which the settlement was negotiated. However, no such record exists for the proposed settlement. Neither the United States nor the State of Wisconsin has developed the information necessary for anyone to properly assess the liability of the Dredging Parties or the merits of this settlement.

Given the inherent conflict of interest affecting the federal lawyers negotiating the settlement, the State of Wisconsin had an important role to play as an independent check throughout the settlement process. Nevertheless, the State apparently took no steps to evaluate the harm caused by the Dredging Parties, the increased costs resulting from such harm, or the fairness of the settlement. NCR submitted a FOIA request to the Wisconsin Department of

---

[16] *See e.g.*, Submittal of Ten-Point Settlement Analyses for CERCLA Consent Decrees, 8/11/89, at pp. 18-19 (http://www.epa.gov/compliance/resources/policies/cleanup/superfund/10pnt-settel-rpt.pdf).

[17] *See e.g.*, Guidance on Premium Payments in CERCLA Settlements, 11/17/88, p. 4 (http://www.epa.gov/compliance/resources/policies/cleanup/superfund/prem-settle-mem.pdf).

[18] *See e.g.*, *Virgin Islands v. Century Alumina*, No. 2007-114, 2008 WL 4693550, at *3 (D.V.I. Oct. 22, 2008).

Justice, which is representing the State of Wisconsin in this action. NCR requested, among other things, all documents relating to the dredging and disposal activities by the ACOE; the operation of the Bayport and Renard Island disposal facilities; and the environmental impact of any of these activities. It also specifically requested all records relating to the State's determination that the settlement was fair and reasonable. *See* NCR FOIA Requests, December 22, 2010 (Exhibit 22). The State answered this request with the following: "The WDOJ possesses no documents that meet the above specific descriptions."[19] *See* Letter from Kevin Potter dated January 24, 2011 (Exhibit 23). This response suggests that the State of Wisconsin rubber-stamped this settlement without considering a single document concerning the liability of the Dredging Parties or the fairness of the settlement.

The United States did more investigation than the State, but only marginally so. While the Justice Department had available to it certain historical documents obtained directly from the ACOE, as well as documents produced by City of Green Bay and Brown County in the *Whiting* action, it did not take any affirmative steps to investigate the Dredging Parties' liability. Judging from the record produced to NCR, the United States did not (1) interview or depose any persons who may have knowledge about the dredging and disposal activities; (2) conduct PCB sampling around the perimeter of the disposal facilities to determine the extent of past releases; (3) engage consultants to perform aerial or other scientific analyses of the disposal facilities; or (4) engage consultants to develop estimates of the total liability associated with the Dredging Parties' activities. The United States took these steps for most of the other PRPs at the site, but chose not to for the Dredging Parties. The United States also never required that the ACOE respond to a § 104(e) request, as is standard practice for PRPs.

This failure to investigate is particularly troubling given the fragmented nature of the documentary record. The ACOE record is an incomplete source of information given that the ACOE has acknowledged destroying many of its historical records. Discovery in the *Whiting* action, from which the remaining documents were obtained, is similarly incomplete, as such discovery was confined to one narrow issue that specifically excluded dredging and disposal activities. The collected documents therefore reflect only a fraction of the relevant information that should inform the settlement. Given this sparse record, no one is in a position to make an informed evaluation of the relative merits of the settlement.[20]

## V.     THE SETTLEMENT PUTS FUTURE CLEANUP EFFORTS AT RISK.

A settlement must take into account whether "there will be adequate resources available to fund the permanent remediation of the site."[21] The Governments have not done so here. The proposed settlement would excuse from liability three additional financially viable parties – thereby increasing the risk that any cleanup shortfall will have to be borne by the public.

---

[19] Nor were any documents withheld based on FOIA exemptions or claims of privilege.

[20] *See e.g.*, *United States v. Montrose Chem. Corp.*, 50 F.3d 741 (9th Cir. 1995).

[21] *See e.g.*, *United States v. Pesses*, No. 90-654, 1994 WL 741277 (W.D. Pa. Nov. 7, 1994).

14

Future cleanup activities will cost hundreds of millions of dollars, but the number of parties available to fund those activities is relatively small. NCR and API originally identified 28 entities that bore responsibility for the contamination, but settlements and a bankruptcy have reduced that number by more than half. In addition, all of the remaining parties claim that they have defenses to liability and/or limited ability to pay. As a result, there is a non-trivial possibility that there will not be sufficient funds to complete the cleanup – which is inconsistent with CERCLA's policy of ensuring cost-effective and complete remediations by potentially responsible parties, not the public.

No justification has been given for releasing three more entities, each with significant resources. Nor is there one. The justification given for the purported "de minimis" settlement – protection against "crippling" litigation costs – has no applicability here given that the *Whiting* claims remain in procedural purgatory, awaiting appeal. The justification given for the GP settlement – to secure funding for oversight costs – also does not apply because EPA has already received enough to cover more than three years of oversight work. The only conceivable basis for this settlement, in view of its timing, is to protect these governmental entities from a potentially adverse ruling on the pending motions in *Whiting* – a motivation that is plainly inconsistent with the public policies of CERCLA.

## CONCLUSION

This settlement is the product of a compromised negotiation process and is not fair, reasonable, or consistent with the purposes of CERCLA. When the proposed settlement is presented for final approval within the Justice Department, it should be rejected.