## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | |
|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION,<br><br>   Plaintiffs,<br><br>   v.<br><br>GEORGE A. WHITING PAPER COMPANY, *et al.*,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>) No. 08-CV-16-WCG<br>)<br>)<br>)<br>) |

_____

| | |
|---|---|
| NCR CORPORATION,<br><br>   Plaintiff,<br><br>   v.<br><br>KIMBERLY-CLARK CORPORATION, *et al.*,<br><br>   Defendants. | )<br>)<br>)<br>)<br>) No. 08-CV-895-WCG<br>)<br>)<br>)<br>) |

_____

## NCR'S OPENING MEMORANDUM ON THE
## OUTSTANDING DISCOVERY DISPUTES TO BE ADDRESSED
## AT THE AUGUST 1, 2011 STATUS CONFERENCE
_____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT ....................................................................1

ARGUMENT .................................................................................................2

I.   NCR Is Entitled to Depose Witnesses Who Possess Knowledge Relevant
     to the Issue of Whether NCR Is Liable as an Arranger. ....................................2

     A.   The Testimony of Defendants' Witnesses Is Relevant to Defendants'
          Allegations that NCR Arranged to Dispose of CCP Broke by Selling It
          Through Brokers to Defendants' Mills. ...................................................3

     B.   NCR Has Not Previously Pursued Discovery from Defendants' Witnesses on
          Many Arranger Issues. ....................................................................4

II.  NCR Is Entitled to Information Concerning Defendants' Insurance Recoveries. ..............5

     A.   WTM's Conditional Settlement Agreements Should Be Produced. .....................7

          1.   WTM's Settlement Agreements Are Relevant to the Insurance Issue. .......8

          2.   Production of Insurance Settlement Agreements, Subject
               to a Protective Order, Will Not Prejudice WTM. ........................9

     B.   Documents Relating to Defendants' Claims that Insurance Recoveries
          Have Been Allocated to Defense Costs Alone Should Be Produced. ...................10

     C.   Defendants Should Be Required to Produce Documents that Relate
          to the Allocation of Insurance Payments. ..............................................12

     D.   The Identity of All Insurance Carriers Should Be Disclosed. ...........................13

III. NCR Is Entitled to Discovery on All of GP's Claimed Costs to Determine Which
     Costs Are Recoverable Under CERCLA. ..................................................14

IV.  NCR Is Entitled to Discovery on the FRG Costs Sought by Defendants
     to Determine Whether They Are Recoverable Under CERCLA. ...........................16

V.   NCR Is Entitled to Discovery on the Unspent Money in the OU 1 Escrow Account
     to Determine Whether It Is Recoverable Under CERCLA. .................................17

CONCLUSION ............................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashtabula River Corp. Group II v. Conrail, Inc.*,
549 F. Supp. 2d 981 (N.D. Ohio 2008)................................................................18

*Bennett v. La Pere*, 112 F.R.D. 136 (D.R.I. 1986) ....................................................8, 10

*Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275 (3d Cir. 2000).....................19

*Burlington Northern & Santa Fe Ry. v. United States*, 129 S. Ct. 1870 (2009) ...........................3

*Carter Prods., Inc. v. Eversharp, Inc.*, 360 F.2d 868 (7th Cir. 1966)...............................8

*Chaudry v. Gallerizzo*, 174 F.3d 394 (4th Cir. 1999) ......................................... 11-12

*Fed. Open Market Cmte. v. Merrill*, 443 U.S. 340 (1979)................................................9

*Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85 (2d Cir. 2000)....................................19

*Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447 (N.D. Ill. 2006) ...........................7

*Oldenburg Grp. Inc. v. Frontier-Kemper Constructors, Inc.*, 597 F. Supp. 2d 842
(E.D. Wis. 2009) ..................................................................................11

*Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R.*,
142 F.3d 769 (4th Cir. 1998) ......................................................................3

*RSR Corp. v. Avanti Dev., Inc.*, 69 F. Supp. 2d 1119 (S.D. Ind. 1999) ....................................3, 4

*Union Oil Co. v. Leavell*, 220 F.3d 562 (7th Cir. 2000) ....................................................8

*United States v. Int'l Bus. Machs. Corp.*, 67 F.R.D. 40 (S.D.N.Y. 1979) ................................9, 13

*United States v. Oros*, 578 F.3d 703 (7th Cir. 2009) ..................................................11

*Western Props. Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678 (9th Cir. 2004).................................18

*Young v. United States*, 394 F.3d 858 (10th Cir. 2005) ..................................................19

**Rules**

Federal Rule of Evidence 1006..........................................................................11

Case 2:08-cv-00016-WCG   Filed 07/25/11   Page 3 of 24   Document 1146

## PRELIMINARY STATEMENT

In April 2011, the Court entered a Scheduling Order that provides for discovery and a February 2012 trial on three distinct issues: (i) Plaintiffs' alleged liability as "arrangers" under section 107(a)(3) of CERCLA; (ii) the amount of Defendants' insurance recoveries that offset the claimed costs that Defendants are seeking to recover from Plaintiffs; and (iii) whether Defendants' claimed costs are recoverable under CERCLA. (Dkt. #1115.) Since discovery commenced, a number of discovery disputes have arisen between NCR and certain Defendants. The parties conferred in good faith about each of the disputes, but agreement could not be reached on a number of key issues, so the parties jointly requested a status conference to obtain the Court's assistance in resolving their disputes. (Dkt. #1140.) The Court granted the request and directed the parties to submit background on their discovery disputes in advance of the conference on August 1, 2011. (No. 10-cv-910, Dkt. #184.)

NCR respectfully submits this memorandum setting forth its positions on the outstanding discovery disputes, which include: (i) whether Defendants may refuse to produce for depositions witnesses who have knowledge relevant to arranger issues (while at the same time seeking similar depositions from NCR); (ii) whether NCR may discover information from Defendants concerning their insurance recoveries, including conditional settlement agreements, substantiation of defense costs, the allocation of payments and the identity of a certain insurance carrier; and (iii) whether NCR may discover information from Defendants concerning the disputed costs NCR has challenged on the grounds that they are not recoverable under CERCLA.

As demonstrated below, NCR's positions are reasonable and supported by the presumption in federal court proceedings in favor of disclosure. By contrast, Defendants' approach is untenable: they are disputing issues related to the merits of the claims that they affirmatively brought, while thwarting NCR's efforts to test Defendants' positions by refusing to

produce crucial responsive discovery that Defendants have no right to withhold.  NCR

respectfully requests that the Court rule at the status conference that NCR is entitled to the

discovery addressed herein—which is needed promptly to enable NCR to prepare for trial and to

ensure a full and fair fact-finding process.

<u>ARGUMENT</u>

**I.      NCR IS ENTITLED TO DEPOSE WITNESSES WHO POSSESS KNOWLEDGE RELEVANT TO THE ISSUE OF WHETHER NCR IS LIABLE AS AN ARRANGER.**

In Phase I of this action, the parties conducted discovery on two narrow questions:

(i) when each party knew, or should have known, about the environmental damage that PCBs

could cause; and (ii) what action, if any, each party took upon acquiring such knowledge.  (Dkt.

#252 at 8.)  The Court stayed discovery on all other issues, including the issue of arranger

liability.  (*Id.* ("Discovery on any other claim or issue is hereby stayed until further Order of the

Court.").)  Although the Court's Phase I case management and scheduling order did not

authorize Plaintiffs to pursue discovery on information necessary to defend themselves against

certain Defendants' allegations of arranger liability, those Defendants nevertheless moved for

summary judgment on that legal theory at the end of Phase I.  (*See* Dkt. #477 at 1-2; #795 at 23

n.20; *see also* Dkt. #861; #878 at 17-24; #894 at 8 n.2; #915 at 13.)  In its February 28, 2011

Decision and Order, filed March 1 (the "March 2011 Order"), the Court denied those motions,

reasoning that Defendants' arranger claims could not be resolved on summary judgment due to

their "fact-intensive nature".  (Dkt. #1080 at 9, 33.)  The Court then entered a scheduling order

for the current phase, which provided for over seven months of fact discovery on "information

regarding . . . Plaintiffs' alleged liability as an 'arranger'".  (Dkt. #1115 at 1.)

Certain Defendants are now attempting to deny NCR's right to discovery on

arranger liability issues.  In particular, GP has indicated that it will refuse to make its own

2

arranger liability witnesses available for depositions.  GP is taking this position despite the fact that it is pursuing full discovery *from* NCR on arranger issues.[1]  While Glatfelter has offered to make its witnesses available, it plans to instruct its witnesses not to answer questions that Glatfelter's counsel deem repetitive or irrelevant (based on unspecified criteria).  That Defendants bear the burden of establishing that NCR is liable as an arranger does not mean that Defendants should be permitted to frustrate NCR's ability to obtain important information needed to defend against the arranger liability allegations.

> **A.**    **The Testimony of Defendants' Witnesses Is Relevant to Defendants' Allegations that NCR Arranged to Dispose of CCP Broke by Selling It Through Brokers to Defendants' Mills.**

Contrary to what Defendants argue, discovery on Defendants' intent in purchasing carbonless copy paper ("CCP") broke and the use of broke at their mills is relevant and necessary to the arranger liability issues before the Court.  In deciding whether a party is liable as an arranger under CERCLA, courts must conduct "a fact-intensive inquiry that looks beyond *the parties'* characterization of the transaction as a 'disposal' or a 'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict liability provisions".  *Burlington Northern & Santa Fe Ry. v. United States*, 129 S. Ct. 1870, 1879 (2009) (emphasis added); *see also Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R.*, 142 F.3d 769, 775 (4th Cir. 1998) ("In determining whether a transaction was for the discard of hazardous substances or for the sale of valuable materials, courts focus on several factors:  the intent of *the parties* to the contract . . . ." (emphasis added)); *RSR Corp. v. Avanti Dev., Inc.*, 69 F. Supp. 2d 1119, 1126 (S.D. Ind. 1999) (noting that to

---

[1] Thus far, GP has served NCR with 42 new document requests and an interrogatory, and has also inquired about the availability of NCR's former employees (domestic *and* abroad) for depositions.

3

determine whether arranger liability exists, the Court "must examine both the subjective intent of *the parties* . . . and whether that intent was justifiable" (emphasis added)).

Under this standard, the intent and actions of NCR *and* Defendants are central to determining whether the transactions involving CCP broke constituted a bona fide sale of a useful product or an arrangement for disposal. As in *RSR Corp.*, it is necessary to investigate the buyers' (Defendants') intent to enable the Court to determine the nature of the transactions at issue. *See* 69 F. Supp. 2d at 1126-28 (holding that the seller was not liable as an arranger, in part because the *buyer* "intended the arrangement with [the seller] to be for a bona fide sale, rather than an effort to assist [the seller] in disposing of or treating hazardous materials".).

NCR is entitled to investigate whether Defendants' witnesses communicated to NCR or brokers about, among other things, the value of broke, their intended use of broke and the recycling processes at Defendants' mills. The same is true with respect to the issue of whether NCR knew that non-trivial amounts of PCBs would be discharged into the river as a result of the sale of CCP broke to brokers. What Defendants knew and communicated to NCR or brokers about the discharge of PCBs is directly relevant to what NCR understood at the time.[2]

## B. NCR Has Not Previously Pursued Discovery from Defendants' Witnesses on Many Arranger Issues.

To determine whether NCR is an "arranger" requires this Court to decide whether the sale of CCP broke constituted a "disposal" of a "hazardous substance" within the meaning of CERCLA or—as NCR contends—the sale of a useful product. As stated above, these issues

---

[2] In lieu of offering its witnesses for depositions, GP sent NCR a list of proposed stipulations. Among other things, GP's stipulations failed to address Defendants' intent in entering broke transactions and what, if any, communications occurred between Defendants and NCR regarding broke. NCR offered counter-stipulations, but GP rejected them. In fact, GP had already served discovery requests relating to arranger liability on NCR, API and a third party while the stipulation negotiations were ongoing. Respectfully, it is GP, not NCR, that is the root cause of this particular discovery dispute.

4

were not subject to discovery in Phase I. Plaintiffs did not have a mandate to pursue discovery on arranger liability issues. (Dkt. #252 at 8.) Further depositions of Defendants' witnesses on arranger liability issues are now needed for NCR to be able to present its case, as NCR anticipated would happen when it sought to modify the Phase I case management order. (Dkt. #560 at 12-15.)

Contrary to Defendants' assertions, discovery on arranger liability issues at this time would not be unreasonably duplicative. Although some questions that touched on arranger liability were asked at these earlier depositions, most of the arranger liability issues were beyond the limited scope of Phase I. Moreover, NCR will not ask questions identical to those that witnesses already answered in Phase I. Defendants cannot object simply because certain witnesses will need to be called again, as this outcome is a product of *Defendants'* preferred case management approach, which was entered over NCR's objection.

Because full and fair discovery is needed to resolve the "fact-intensive" arranger liability issues, NCR respectfully requests that the Court instruct Defendants to allow non-duplicative depositions of their witnesses on issues relevant to arranger liability.

## II.      NCR IS ENTITLED TO INFORMATION CONCERNING DEFENDANTS' INSURANCE RECOVERIES.

In its March 2011 Order, the Court held that Defendants cannot resort to contribution for recovery of their costs if Defendants have recovered them from insurers. (Dkt. #1080 at 24-25.) The Court therefore granted further discovery on "the amount of Defendants' insurance recoveries related to the Lower Fox River, and any other information necessary to determine the amount by which any of the costs sought by Defendants from Plaintiffs are or should be offset by Defendants' insurance recoveries". (Dkt. #1115 at 1.) Following the Court's

5

entry of a stipulated protective order, NCR served discovery requests seeking the very type of discovery that the Court expressly authorized. (*See* Dkt. #1127.)

For various reasons, certain Defendants have taken the same extreme position in response to NCR's discovery requests: not *one dollar* of their substantial insurance recoveries can be used to offset their claimed costs. Comparing the approximate costs claimed by these Defendants to their respective (known) insurance recoveries reveals the significance of the insurance discovery disputes and the questionable basis for Defendants' position:

| Defendant | Costs Claimed | Known Insurance Recoveries |
|-----------|---------------|----------------------------|
| GP | $90 million | $26 million |
| Glatfelter | $59 million | $53 million |
| WTM | $54 million | $3.5 million (plus conditional amounts) |
| CBC | $1.1 million | $1.4 million |

In total, GP, Glatfelter, WTM and CBC are seeking over $200 million in contribution from NCR, and have recovered at least $80 million from their insurers—and likely much more (given the uncertainty about WTM discussed below). Defendants not only claim that *none* of these insurance recoveries can be applied to their Lower Fox River costs, but also refuse to provide key information and documents needed to test that position. If Defendants are allowed to continue using these tactics, NCR—and the Court—will be unable to discover the "full story" regarding these substantial insurance recoveries.

There are four principal categories of insurance-related materials that Defendants have refused to produce in response to NCR's requests. First, WTM has refused to produce any of its responsive settlement agreements, all of which purportedly contain conditions that have not yet occurred. Second, Defendants have refused to produce documentation to enable NCR to conduct a meaningful review of whether certain costs incurred were in fact defense costs. Third, Defendants have refused to produce documentation relating to allocation, which NCR has reason

6

to believe exists notwithstanding Defendants' assertions to the contrary.  Fourth, Defendants

have refused to disclose the identity of at least one insurer, claiming that they are prohibited from

doing so (notwithstanding the protective order entered by the Court).

These positions violate the Court's April 2011 scheduling order, which authorized

discovery on such insurance information.  (Dkt. #1115 at 1.)  NCR's efforts to obtain the

relevant information and documents from Defendants through negotiations and discovery have

been unsuccessful, and Defendants have not offered any legitimate reasons for opposing NCR's

requests.  *See Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006)

("The burden rests upon the objecting party to show why a particular discovery request is

improper.").  Since Defendants have effectively made clear that insurance issues cannot be

resolved "very, very promptly", contrary to what they previously stated (Mar. 30, 2011

Transcript, 33:17-18), NCR respectfully requests that the Court compel Defendants to produce

the requested insurance discovery.

### A.     WTM's Conditional Settlement Agreements Should Be Produced.

WTM refuses to disclose almost all documents responsive to NCR's discovery

requests—including its settlement agreements.  WTM admits that it has reached three settlement

agreements with its insurance carriers that conditionally entitle WTM to recoup from those

carriers the costs it seeks from NCR in this action.  WTM further admits that it has already

received a payment of $3.5 million from one of these carriers and that it may receive additional

payments—potentially totaling *more than the $54 million* that WTM has reportedly paid to

remediate the Lower Fox River.  But NCR has no ability to test WTM's position that these

payments cannot be used to offset the costs it seeks to recover in this action.  WTM's reasons for

stonewalling do not withstand scrutiny.

7

1.      <u>WTM's Settlement Agreements Are Relevant to the Insurance Issue.</u>

WTM's three insurance settlement agreements and the related documents pertain directly to the disputed issue of whether WTM's costs claimed are or should be offset by insurance recoveries, which is the precise issue on which the Court authorized discovery.  If WTM has contracted to receive settlement payments in the future, information about those potential payments is relevant to whether an award of costs in WTM's favor would likely constitute a double recovery.  Given that WTM is seeking to recover costs at this time, discovery related to potential setoffs of those costs is not "premature", as WTM claims.

While NCR can only speculate about the nature of WTM's agreements, it is easy to envision conditional settlement agreements that could allow WTM impermissibly to double recover.  For example, WTM's insurance recoveries could be conditioned on the mere "passage of time", which could entitle WTM to a full recovery of the costs it is seeking from NCR (plus interest) at a definite point in the future.  According to WTM, however, this eventuality is irrelevant because WTM has not yet been handed a check for all of its Lower Fox River insurance recoveries.  This reasoning is at odds with the Federal Rules' liberal approach towards discovery.  *See Carter Prods., Inc. v. Eversharp, Inc.*, 360 F.2d 868, 872 (7th Cir. 1966); *see also Union Oil Co. v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000).

Allowing WTM to withhold its settlement agreements based on a secret condition would create a simple mechanism for potentially responsible parties to avoid discovery on their insurance recoveries.  Courts have rejected such efforts to shield insurance recoveries from discovery.  For example, in *Bennett v. La Pere*, 112 F.R.D. 136 (D.R.I. 1986), the defendant moved for the disclosure of the plaintiff's settlement with another tortfeasor.  The settlement agreement in *Bennett* was a structured settlement that did not provide for a definitive recovery.  The Court held that because the defendant might be entitled to a damages offset for the amount

8

of the previous settlement agreement, the agreement had to be produced. Indeed, the Court

found that the uncertainty of the settlement militated *in favor* of complete disclosure. *Id.* at 138.

Prompt disclosure of this information is even more critical given the prospects of mediation. If

"this is an opportune time for the parties to address whether settlement is possible", as WTM and

other Defendants claim, then it is also an opportune time for WTM to disclose information that

would be central to any settlement. (No. 10-cv-910, Dkt. #181 at 1.)

2.    <u>Production of Insurance Settlement Agreements, Subject to a Protective<br>Order, Will Not Prejudice WTM.</u>

WTM's argument that it will somehow be prejudiced by the production of its

conditional settlement agreements is an unfounded and insufficient reason to withhold these

documents. The production of such agreements is routine. Moreover, the Court already entered

a stipulated protective order (to which WTM is a party) that eliminates WTM's confidentiality

concerns. (*See* Dkt. #1127.) In fact, the protective order was entered for precisely this purpose:

to allow the disclosure of sensitive information as needed for discovery purposes. That the

agreements may contain confidential commercial information does not shield them from

disclosure. *See, e.g.*, *Fed. Open Market Cmte. v. Merrill*, 443 U.S. 340, 362 (1979). Courts

rarely forbid disclosure of such confidential information, but rather, as here, enter protective

orders to restrict disclosure of the information.[3] *Id.* at 362 n.24. A party seeking to avoid

disclosure of confidential information bears a heavy burden of demonstrating that "disclosure

will work a clearly defined and very serious injury". *United States v. Int'l Bus. Machs. Corp.*, 67

F.R.D. 40, 46 (S.D.N.Y. 1979).

---

[3] Plaintiffs are willing to stipulate to an additional proper protective order to accommodate any
legitimate concerns regarding confidential information, if the existing order is insufficient.

9

WTM's vague reasons for why it will be prejudiced by disclosure fall far short of the required showing of serious injury. A potentially adverse impact on "litigation strategy" or on "future negotiations" with its insurers, NCR or the Government is not a sufficiently defined injury. *Bennett* is instructive on this point. There, the Court concluded that the plaintiff could not escape its discovery obligations based on a confidentiality provision in an insurance agreement. *See* 112 F.R.D. at 140. The Court specifically rejected the plaintiff's argument that disclosure would be prejudicial, reasoning that "the only 'prejudice' which disclosure will work vis-à-vis the plaintiffs is to rob them of the (unfair) tactical advantage which would attach to keeping the [defendant] uninformed". *Id.* Because the protective order entered by the Court adequately protects WTM's confidentiality concerns, WTM should be compelled to provide the requested discovery.

### B. Documents Relating to Defendants' Claims that Insurance Recoveries Have Been Allocated to Defense Costs Alone Should Be Produced.

GP, WTM and CBC claim that their insurance recoveries should not be used to offset their contribution claims because those recoveries were allocated to or spent on defense costs related to this litigation or insurance defense. Setting aside Defendants' legal position, which NCR intends to dispute, NCR is entitled to review documents that demonstrate how Defendants incurred their alleged costs and, more specifically, whether those costs are actually defense costs. Rather than producing any of the properly requested documents, Defendants have provided only vague summaries and limited correspondence that offer no insight into whether the fees actually represent defense costs related to the Lower Fox River.

Defendants have taken various approaches to avoid production of this information. GP claims that almost all of its $26 million in insurance recoveries is for defense costs related to the Lower Fox River. For most of those costs, GP provided only one-line entries

on a chart.[4]  Most notable is the entry for GP's payments to Latham & Watkins LLP, which reveals only that $10 million total was paid over a two-and-half-year period.  WTM has produced only the cover pages on its invoices from Quarles & Brady, which show aggregate amounts for each matter for a given period.  CBC has not produced any documents relating to its claimed legal costs.

Defendants' selective and limited disclosures to date offer NCR no way to evaluate whether Defendants' expenses in fact constitute defense costs related to the Lower Fox River, as Defendants claim.  The summaries provided by GP and WTM aggregate all fees for a given matter over time.  Such summaries do not reveal the requested information, since lawyers regularly aggregate billing records of various matters for one client.  Moreover, time is usually not allocated rigidly; for example, "block billing" for a period of work for a single client or for related matters is a common practice.

Defendants' refusal to produce documents related to their alleged defense costs based on a blanket claim of privilege should also be rejected.  Legal bills showing fees charged to a client are not privileged communications when, as here, a party has put those fees at issue. *See Oldenburg Grp. Inc. v. Frontier-Kemper Constructors, Inc.*, 597 F. Supp. 2d 842, 844 (E.D. Wis. 2009).  NCR has no interest in obtaining privileged information.  If Defendants' legal bills contain confidential communications, attorneys' mental impressions or strategy, the routine practice is to redact such information, not withhold it altogether.  *See Chaudry v. Gallerizzo*, 174

---

[4] GP's contention that it can, pursuant to Federal Rule of Evidence 1006, produce a chart summarizing its defense costs, rather than producing the evidence supporting that assertion, is incorrect. The purpose of Rule 1006 is to provide a mechanism for production of "writing . . . which cannot conveniently be examined in court".  Fed. R. Evid. 1006.  It is not an escape hatch to avoid producing relevant, non-privileged documents.  Indeed, Rule 1006 requires that the information underlying a Rule 1006 chart "shall be made available for examination or copying, or both, by other parties at reasonable time and place".  *Id.*; *see also United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009).

F.3d 394, 402-03 (4th Cir. 1999). NCR is entitled to test the bases for disputed facts, including the nature of Defendants' costs that must be resolved at the February trial.

      **C.**     **Defendants Should Be Required to Produce Documents that Relate to the Allocation of Insurance Payments.**

Although Defendants assert distinct reasons why no offset should apply to their claimed costs, the underlying general argument is the same: *none* of the substantial recoveries can be allocated to the Lower Fox River cleanup costs. Defendants have the burden of demonstrating how the payments were intended to be allocated—if at all. But each of the Defendants that has received substantial insurance payments claims that few, *if any*, documents exist that reveal how payments were intended to be allocated. They assert that the allocation of payments was resolved orally with their insurance carriers. This position is untenable.

Glatfelter best illustrates the extreme nature of Defendants' position. As noted above, Glatfelter has received over $53 million in insurance payments. Glatfelter acknowledges the payments were at least "primarily" associated with liabilities related to the Lower Fox River, and does *not* claim that these payments were for defense costs. But Glatfelter posits that *no portion* of these insurance proceeds can be used to offset the approximately $58 million in alleged costs that Glatfelter seeks from NCR in this action—without offering any evidence that the insurance proceeds were intended to be allocated elsewhere.

If an allocation was intended, NCR cannot believe that insurers would be willing to enter into multi-million dollar settlement agreements with sophisticated companies without memorializing the allocation of payments in agreements, letters, emails, offers, counter-offers, etc. While some of the Defendants have admitted that such documents exist, they are withholding these documents on the grounds of privilege.

The issue of allocation is central to the various insurance discovery disputes. NCR will be severely prejudiced if Defendants can withhold responsive discovery relevant to whether the payments should be allocated as Defendants claim they should be. Accordingly, NCR respectfully requests that Defendants be required to search for *all* of the requested documents and information related to allocation. Such searches should include (but not be limited to) documents in the possession of any business or accounting personnel or received from the insurance carriers.

**D.      The Identity of All Insurance Carriers Should Be Disclosed.**

Certain Defendants have refused to identify at least one insurance carrier (based on that carrier's apparent instruction) with which they have each entered into a settlement agreement.[5] As noted above, a party seeking to avoid the disclosure of commercial information must show that "disclosure will work a clearly defined and very serious injury". *Int'l Bus. Machs. Corp.*, 67 F.R.D. at 46. Defendants have not provided a single authority that supports the nondisclosure of an insurance carrier's identity, nor has NCR discovered any.

That a confidentiality provision was included in Defendants' settlement agreements does not shield or otherwise protect the identity of the carrier from discovery, especially in light of the Court's entry of a protective order. Countenancing such a position could encourage abusive practices in future settlements and create bad public policy. Moreover, given Defendants' position that they will not disclose (or do not possess) certain relevant information, NCR has the right to obtain discovery from the insurance carriers directly via subpoena. But NCR of course cannot serve a subpoena on an unidentified insurer. Whereas

---

[5] GP, Glatfelter and CBC have referred to the carrier in question as "Insurer A", "Carrier X" and "ABC Company", respectively. WTM refuses to identify all of the carriers with whom it has settlement agreements, as discussed above.

neither Defendants nor the insurer itself would be prejudiced by having to reveal the identity of the insurer, NCR will be substantially prejudiced without this information.

## III. NCR IS ENTITLED TO DISCOVERY ON ALL OF GP'S CLAIMED COSTS TO DETERMINE WHICH COSTS ARE RECOVERABLE UNDER CERCLA.

As with the arranger liability and insurance issues addressed above, NCR is being deprived of necessary information about costs by Defendants' refusal to comply with NCR's reasonable discovery requests. Although Defendants put their claimed costs—totaling hundreds of millions of dollars—at issue by affirmatively seeking to recover them from NCR, Defendants are now preventing NCR from investigating the nature of how these costs were incurred. Respectfully, Defendants cannot have it both ways.

For each of the three categories of disputed costs discussed below, Defendants are taking the position that the Court has *already* awarded them the amount sought, even though the Court either expressly *denied* summary judgment on the costs or, at the very least, was silent about them. If accepted, Defendants' unfounded position would substantially prejudice NCR, who has been precluded from taking the discovery needed to evaluate Defendants' claimed costs. (*See* Dkt. #973 ¶¶ 27-31.)

The first cost dispute relates to the recoverability of GP's costs. Because cost discovery was not within the scope of Phase I, NCR could not investigate whether the $83 million (now $90 million) in costs claimed by GP are recoverable under CERCLA. (*See* Dkt. #252 at 8.) GP nevertheless moved for summary judgment on all of its $83 million in claimed costs. In its March 2011 Order, the Court denied GP's motion, finding that "there are still issues of material fact outstanding that would preclude the Court from concluding, as a matter of law, that all of the expenses GP seeks are properly recoverable". (Dkt. # 1080 at 25-26.)

14

Based on the Court's ruling, NCR has sought the discovery necessary to determine whether GP's costs are recoverable under CERCLA. But GP has refused to allow any such discovery, insisting that the Court already slogged through GP's lengthy list of costs and determined that all but $2.7 million of the $83 million sought by GP at the time of summary judgment is recoverable under CERCLA. GP's position is thus belied by any fair reading of the Court's March 2011 Order. At bottom, GP's argument rests on a distortion of one snippet of the March 2011 Order, where the Court stated that "Plaintiffs . . . challenge roughly $2.7 million in expenses GP seeks on the grounds that the expenses were not necessary or consistent with the National Contingency Plan". (Dkt. #1080 at 25.) Although the Court went on to reject certain substantive arguments raised by GP regarding the recoverability of its costs, GP has fixated on the *one* passing reference to $2.7 million. But the $2.7 million figure is one that GP—*not Plaintiffs*—provided at the summary judgment stage by aggregating only *certain* of the specific costs challenged by Plaintiffs, while ignoring other types and categories of costs that Plaintiffs also challenged. Given the "mountain of issues" presented in the summary judgment motions, the Court understandably did not address each and every dispute with particularity. (*Id.* at 26.) In citing the $2.7 million figure, the Court was merely providing an example as needed for a point of reference to the briefs. GP's argument that the Court was making a factual finding related to *all* costs by providing context for its discussion of GP's arguments is untenable.[6]

Plaintiffs indisputably challenged more than just $2.7 million of GP's claimed costs at the summary judgment stage. Plaintiffs raised in their opposition brief myriad factual

---

[6] GP's reliance on the "as set forth above" statement in the conclusion of the March 2011 Order is flawed for the same reasons. If anything, this phrase supports Plaintiffs' reading of the Order, not GP's. The Court held that "[i]ssues of fact preclude a ruling on some aspects of damages, as set forth above". (Dkt. #1080 at 33.) If only $2.7 million were at issue, the Court would have expressly so stated, rather than referring generally to "some aspects of damages".

15

and legal issues that precluded summary judgment on GP's claimed costs, including whether certain costs were (i) necessary costs of response, (ii) consistent with the National Contingency Plan ("NCP"), (iii) properly characterized as response costs, and (iv) sufficiently documented. (*See* Dkt. #998 at 28-33.) Plaintiffs provided specific *examples* of such disputed costs, but did not claim to enumerate *every* disputed cost in their summary judgment brief. Nor could they have done so: at the time of filing, Plaintiffs had not been permitted to take the formal discovery needed to identify specifically which of GP's claimed costs were in dispute, and had no idea what costs GP (or others) would seek until it reviewed GP's motion for summary judgment—to which Plaintiffs had only 30 days to respond. (Dkt. #973 ¶ 31.) The Court has acknowledged as much: "Although GP chides Plaintiffs for not being diligent in taking discovery on these issues, I am satisfied that the expedited approach we have taken here would excuse any oversights, especially given the mountain of issues presented in the instant motions." (Dkt. #1080 at 26.) Accordingly, NCR should be permitted to take discovery on all "aspects of damages" claimed by GP that remain in dispute, which include far more than $2.7 million.

## IV. NCR IS ENTITLED TO DISCOVERY ON THE FRG COSTS SOUGHT BY DEFENDANTS TO DETERMINE WHETHER THEY ARE RECOVERABLE UNDER CERCLA.

The second category of disputed costs relates to the Fox River Group ("FRG"), a joint defense group composed at various times of many of the parties in this action. Defendants collectively seek approximately $25 million in assessments paid to the FRG, as well as $15 million in interest. In their response to Defendants' motions for summary judgment, Plaintiffs challenged whether all of these claimed FRG costs were recoverable under CERCLA. Specifically, Plaintiffs argued that certain claimed FRG assessments could not be awarded because there were genuine issues of material fact as to whether those assessments, such as those for lobbying, were "necessary" and "consistent with the NCP". (*See, e.g.*, Dkt. #974 at 16-17;

16

Dkt. #998 at 30-32.)  Defendants contend that, notwithstanding the factual disputes, the Court *already* awarded all of their claimed FRG costs as a matter of law.  On that basis, Defendants have stated that they will not provide NCR any discovery on FRG issues.

Defendants' position again finds no support in the March 2011 Order.  The Court did not grant Defendants their claimed $25 million in FRG assessments or $15 million in interest.  In fact, the Court did not even address the issues raised by Plaintiffs as to the recoverability of certain claimed FRG costs.  On the contrary, the Court made clear that issues of fact remained as to "some aspects of damages", as noted above, which necessarily include the FRG costs that Plaintiffs challenged in their briefs. (Dkt. #1080 at 33.)  These issues of fact therefore must be resolved at trial.  To that end, NCR must be permitted to take discovery on the recoverability of Defendants' claimed FRG costs.[7]

## V.    NCR IS ENTITLED TO DISCOVERY ON THE UNSPENT MONEY IN THE OU 1 ESCROW ACCOUNT TO DETERMINE WHETHER IT IS RECOVERABLE UNDER CERCLA.

Because NCR is not liable as an "arranger" for OU 1, the OU 1 Defendants (Glatfelter and WTM[8]) cannot recover *any* of the costs they incurred at OU 1.  But even if NCR were found liable as "arranger" and the OU 1 Defendants' costs are not entirely offset by their significant insurance recoveries, genuine issues of material fact remain concerning the recoverability of a substantial amount of costs sought by the OU 1 Defendants.

---

[7] Defendants' argument that Plaintiffs are barred from challenging the FRG costs is without merit. Plaintiffs did not take the position in their Complaint (or elsewhere) that all of the FRG costs qualify as response costs.  Nor did Plaintiffs concede the recoverability of these costs under CERCLA simply by participating in the FRG.

[8] Plaintiffs are not seeking insurance discovery from Menasha at this time, in light of the stipulation approved by this Court on June 2, 2011.  (Dkt. #1135.)

Specifically, there exists a key issue concerning an escrow account established pursuant to a consent decree for OU 1 remediation (the "OU 1 escrow account"). Approximately $12 million deposited into that account by Glatfelter and WTM, collectively, has not been spent to remediate the Lower Fox River site—and may never be spent. The OU 1 Defendants concede that most OU 1 remediation was completed in 2009, and that they are entitled to *at least* a partial refund of any funds remaining when the project is completed. (*See* Dkt. #696 at 35-36.) But the circumstances under which Glatfelter and WTM can obtain a refund are not known to NCR. Glatfelter and WTM refuse to provide any information about the escrow account on the grounds that the Court has already ruled that the unspent OU 1 funds are recoverable.

Glatfelter's and WTM's position is incorrect. The Court stated in the March 2011 Order that it was not awarding *any* OU 1 costs. (*See* Dkt. #1080 at 33 ("[R]esolution of expenses relating to OU1 will require a determination of 'arranger' liability.").) Moreover, Plaintiffs specifically raised this concern about the OU 1 escrow account in their response to Glatfelter's and WTM's motion for summary judgment. In denying Glatfelter's and WTM's motion, the Court did not even address this argument.

Discovery on this issue is critical. If Glatfelter and WTM have a right to a refund of the unspent escrow funds, then awarding these funds would constitute a double recovery prohibited by CERCLA. *See Western Props. Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678, 691 (9th Cir. 2004); *Ashtabula River Corp. Group II v. Conrail, Inc.*, 549 F. Supp. 2d 981, 985-86 (N.D. Ohio 2008). Even if no refund is available (or if Glatfelter and WTM choose not to not request one), the funds likely cannot be recovered. Based on the information currently available to NCR, it appears that non-refunded money in the escrow account will be allocated to the general Superfund site, not spent on remediation efforts at the Lower Fox River site, and thus cannot be

18

recovered.  As courts have consistently held, response costs must be "closely tied to the *actual cleanup* of hazardous releases" at a site in order to constitute "necessary costs of response" recoverable under CERCLA.  *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005); *see also Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 297 (3d Cir. 2000) (finding certain costs not "necessary" where they were not spent on remediation at the site); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000) (affirming the district court's finding that costs were unrecoverable where they "were not closely tied to the actual cleanup of the Gussack Property so as to constitute a necessary cost of response").

Although NCR contends that the OU 1 Defendants will not be able to recover *any* OU 1 costs, as NCR is not liable as an arranger, should the Court disagree, these disputed issues regarding the OU 1 escrow account will have to be resolved at trial.  NCR therefore respectfully requests that the Court compel Defendants to comply with any reasonable discovery requests concerning the remaining funds in the escrow account.

19

<u>CONCLUSION</u>

For the foregoing reasons, NCR respectfully requests that the Court rule as follows at the August 1, 2011, status conference:

(i)  NCR may depose witnesses who have knowledge of arranger liability issues, even if the witness has been previously deposed in this action;

(ii)  WTM shall produce unredacted versions of its insurance settlement agreements, including conditional agreements;

(iii)  Defendants shall produce the legal invoices or other sufficient documentation supporting their claimed defense costs (if applicable), subject to appropriate redaction;

(iv)  Defendants shall produce any documents relating to the allocation of insurance payments (if applicable), subject to appropriate redaction;

(v)  Defendants shall disclose the identity of any insurance carrier responsive to NCR's requests (if applicable);

(vi)  NCR may take discovery on whether GP's claimed costs are recoverable under CERCLA;

(vii)  NCR may take discovery on whether Defendants' FRG costs are recoverable under CERCLA; and

(viii)  NCR may take discovery on whether the remaining money in the OU 1 escrow account is recoverable under CERCLA.

Dated: July 25, 2011                    Respectfully submitted,


                                        NCR CORPORATION

                                        /s/ Darin P. McAtee
                                        *Counsel for NCR Corporation*

                                        CRAVATH, SWAINE & MOORE LLP
                                        Evan R. Chesler
                                        Sandra C. Goldstein
                                        Darin P. McAtee
                                        Worldwide Plaza, 825 Eighth Avenue
                                        New York, New York 10019
                                        Phone: (212) 474-1000
                                        Fax: (212) 474-3700
                                        dmcatee@cravath.com

                                        SIDLEY AUSTIN LLP
                                        Kathleen L. Roach
                                        Evan B. Westerfield
                                        One South Dearborn Street
                                        Chicago, Illinois 60603
                                        Phone: (312) 853-7000
                                        Fax: (312) 853-7036

                                        MARTEN LAW PLLC
                                        Linda R. Larson
                                        Bradley M. Marten
                                        1191 Second Avenue, Suite 2200
                                        Seattle, Washington 98101
                                        Phone: (206) 292-2600
                                        Fax: (206) 292-2601