# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

| | |
|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION,<br><br>    Plaintiffs,<br><br>  v.<br><br>GEORGE A. WHITING PAPER COMPANY, *et al.*,<br><br>    Defendants. | No. 08-CV-16-WCG |

___

| | |
|---|---|
| NCR CORPORATION,<br><br>    Plaintiff,<br><br>  v.<br><br>KIMBERLY-CLARK CORPORATION, *et al.*,<br><br>    Defendants. | No. 08-CV-895-WCG |

___

### NCR'S RESPONSE TO DEFENDANTS' SUBMISSION
### FOR THE AUGUST 1, 2011 STATUS CONFERENCE
___

PRELIMINARY STATEMENT

Defendants' brief raises no issue with respect to their discovery on NCR, as NCR is reasonably complying with all discovery requests. Instead, Defendants' brief is replete with purported justifications for denying NCR the discovery it needs to prepare for the February 2012 trial. In doing so, Defendants fail to acknowledge the Federal Rules' permissive approach toward discovery. Instead, Defendants rely on arguments that lack a legal basis (the Court will note the dearth of authorities cited in their brief) or rely on misconstructions of the Court's March 2011 Order. To help ensure a fair trial, NCR respectfully submits that the Court should grant NCR the discovery it has requested.

ARGUMENT

I. NCR IS ENTITLED TO DEPOSE WITNESSES WITH KNOWLEDGE RELEVANT TO THE ISSUE OF WHETHER NCR IS LIABLE AS AN ARRANGER.

In their opening brief, Defendants concede that NCR is entitled to depose Defendants' witnesses, but Defendants still ask the Court to limit unreasonably the questions that NCR may ask Defendants' witnesses. (Dkt. #1145 at 4 (conceding that NCR should be permitted to depose Defendants' witnesses regarding *Plaintiffs*' knowledge and intent).) Defendants' position is legally incorrect and unfair, and would mire the parties and the Court in recurring and wasteful discovery disputes.

First, contrary to Defendants' contention, the knowledge and intent of both Plaintiffs (the sellers of broke) and Defendants (the buyers of broke) are relevant to whether NCR is liable as an arranger, as demonstrated by the authorities NCR cited in its opening brief. *See, e.g.*, *RSR Corp. v. Avanti Dev. Inc.*, 69 F. Supp. 2d 1119, 1126-27 (S.D. Ind. 1999); *see also Team Enters., LLC v. W. Inv. Real Estate Trust*, No. 10-16916, 2011 WL 3075759, at *4-5 (9th Cir. Jul. 26, 2011) (discussing deposition testimony from both plaintiff's and defendants'

witnesses). By comparison, Defendants fail to cite a single contravening authority, relying instead on out-of-context language in the March 2011 Order. But the question before the Court at that time was whether genuine issues of material fact remain concerning NCR's alleged liability as an arranger, not whether Defendants' testimony is potentially relevant to NCR's liability. (Dkt. #1080 at 9.) Moreover, the Court noted that arrangements come in "many permutations", thus requiring a "fact-intensive inquiry" into the nature of the arrangement. (*Id.* at 4, 9 (internal quotation marks omitted).) Defendants' witnesses—the ultimate purchasers and recyclers of broke—undeniably have knowledge that is potentially relevant to the sales transactions at issue here. *See, e.g.*, *Sheldon v. Vermonty*, 204 F.R.D. 679, 689 (D. Kan. 2001) ("Relevancy is broadly construed, and a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party.").

Second, Defendants' proposal would allow Defendants to call their own witnesses at trial to discuss, for example, their direct and indirect interactions with Plaintiffs. Yet, NCR would be blocked from questioning these witnesses about their *own* knowledge and intent concerning the *same* interactions with Plaintiffs. Allowing Defendants' witnesses to tell only part of the relevant story, immune from fair cross-examination as to their own knowledge and intent, would be fundamentally unfair.

Third, the purported line between evidence that sheds light on Plaintiffs' intent and knowledge versus Defendants' intent and knowledge is, at best, shifting and hazy. Setting such an ill-defined boundary for the scope of NCR's depositions will lead to further disputes between the parties over what is permissible, likely requiring the frequent and continuing assistance of the Court. In the interests of judicial economy, the better approach is to allow NCR

2

to examine Defendants' witnesses on any potentially relevant arranger liability issue. At trial, the Court will still be able to determine what evidence to hear and what weight to accord it.

Finally, NCR has at all times been mindful that Defendants' witnesses are "seventy and eighty year-old former employees", as are many of NCR's own witnesses. (Dkt. #1145 at 2.) That is why NCR will (1) not re-ask questions Defendants' witnesses have already answered in prior depositions, and (2) oppose any effort by Defendants to re-ask NCR's witnesses questions they have already answered. But Defendants' vague request that the parties be precluded from examining witnesses on "subjects" covered in prior depositions is unworkable. If Defendants' positions taken in discovery to date are any guide, "subjects" will be given a broad interpretation and inquiry will be foreclosed, bringing the parties back to the Court on a regular basis. As discussed in Plaintiffs' opening brief, certain subjects were tangentially addressed in Phase I. But, pursuant to the Court's Scheduling Order, Plaintiffs developed *only* Phase I issues for trial. (*See* Dkt. #252 at 8.)

## II.   NCR IS ENTITLED TO INFORMATION CONCERNING DEFENDANTS' INSURANCE RECOVERIES.

Certain Defendants maintain their extreme response to NCR's discovery requests on the insurance issue. Specifically, they maintain that not one dollar of the at least $80 million they have recovered from their insurers can be used to offset their claimed costs *and* that NCR may not discover the information needed to test the veracity of that position. Defendants' effort to hide the extent and nature of their insurance recoveries is legally and equitably untenable.

### A.   WTM's Conditional Settlement Agreements Should Be Produced.

WTM's reasons for withholding key information and documents pertaining to its insurance recoveries do not withstand scrutiny. If anything, WTM's justifications only highlight the concerns NCR raised in its opening brief. (*See* Dkt. #1146 at 10-13.)

3

Contrary to what WTM suggests, there is a material difference between a party that has not entered into an insurance settlement agreement at all and a party that has entered into a settlement agreement with its insurer that contains a *right to receive insurance payments* in the future, even if that right is conditional. WTM admits that it has reached three settlement agreements that contain such a right, but refuses to produce them on the ground that the information they contain is "not discoverable". (Dkt. #1145 at 8.) But a request for discovery is within the scope of Rule 26 if "there is *any possibility* that the information sought may be relevant to the subject matter of the action". *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006) (emphasis added). As NCR explained, WTM's insurance settlement agreements are unquestionably relevant to the disputed issue of whether WTM's claimed costs are—*or should be*—offset by insurance recoveries. (Dkt. #1146 at 11-12.) This is especially true of the settlement agreement pursuant to which payments totaling $3.5 million have already been made. That the insurer is reserving its right to challenge those payments hardly renders the underlying settlement agreement irrelevant to the offset issue.

Allowing WTM to withhold its settlement agreements would not only undermine the Federal Rules, but also create bad public policy. WTM's efforts to shield relevant information, if successful, would create a clear risk of gamesmanship being used to avoid discovery on insurance information. Parties could incorporate even arbitrary conditions into their settlement agreements to prevent disclosure. Moreover, WTM cannot identify any "clearly defined and very serious injury" that it would suffer if required to disclose its settlement agreements. *See Reliance Ins. Co. v. Barron's*, 428 F. Supp. 200, 202-03 (S.D.N.Y. 1977). WTM merely raises the same vague "concerns" that NCR identified and refuted in its opening brief. (*See* Dkt. #1146 at 13.) These agreements should be produced.

4

### B. Documents Relating to Defendants' Claims Regarding How Insurance Recoveries Have Been Allocated Should Be Produced.

Defendants maintain that *none* of their $80-million-plus in insurance recoveries can be allocated to Lower Fox River cleanup costs. Despite Defendants having the burden of demonstrating how their insurance recoveries should be allocated (if at all), Defendants that have received substantial insurance payments claim that they must produce few, *if any*, documents that reveal how payments were intended to be allocated.

As previously noted, Glatfelter's stance is illustrative. (*See* Dkt. #1146 at 15-16.) Glatfelter has received over $53 million in insurance payments that, as Glatfelter itself admits, cover claims relating to the Lower Fox River site. Yet Glatfelter posits that none of these payments can be used to offset the approximately $58 million in alleged remediation costs that Glatfelter seeks from NCR, purportedly because Glatfelter's insurance recoveries covered liabilities broader than the remediation costs it has paid. Glatfelter has failed to produce any documents, however, that provide support for its extreme position that the insurance proceeds cannot be allocated *at all* to the Lower Fox River costs it has incurred. Moreover, Glatfelter claims that documents that might show evidence of the purported allocation are either privileged or simply do not exist. NCR cannot believe that insurers would be willing to enter into multi-million dollar settlement agreements with sophisticated companies without non-privileged, written communications concerning the allocation of payments.

As for the allocation of insurance payments to defense costs, contrary to the position of GP, WTM and CBC, no blanket privilege automatically shields their legal bills from disclosure when Defendants themselves intend to put the bills at issue. As NCR demonstrated in its opening brief, and as Defendants confirmed through their lack of contravening authority, courts reject broad claims of privilege over appropriately redacted legal bills, including legal

5

bills related to an underlying litigation. *See, e.g.*, *Oldenburg Grp. Inc. v. Frontier-Kemper Constructors, Inc.*, 597 F. Supp. 2d 842, 844 (E.D. Wis. 2009) (noting that attorney-client privilege did not shield legal bills in the underlying case from disclosure).

Moreover, Defendants' underlying legal bills are relevant to Defendants' effort to reduce NCR's insurance offsets through their claimed defense costs. Defendants agree that the issue here is whether they would obtain a double recovery if they recovered their costs from NCR, as well as any insurance carriers. (Dkt. #1145 at 7.) Defendants assert that they would not, but NCR is entitled to test the veracity and legal strength of that position. NCR intends to review the redacted bills that Defendants invoke to determine whether they reflect defense costs incurred in connection with Defendants' potential remediation liabilities for the Lower Fox River. NCR simply cannot review Defendants' defense costs allocations for this purpose with the minimal information that GP and WTM have so far produced—a fact that Defendants do not dispute.[1]

### C. The Identity of All Insurance Carriers Should Be Disclosed.

Defendants tacitly concede that their refusal to disclose the identities of insurance carriers from whom they have obtained or contracted to obtain recoveries is without a basis in law, as Defendants cite no legal authority or principle for their position. Instead, Defendants claim that they have not disclosed the identity of such carriers because their settlement agreements cannot be produced absent a court order. (Dkt. #1145 at 9-10.) NCR thus respectfully requests that the Court issue such an order.

---

[1] CBC, which similarly claims a complete allocation of its insurance recoveries to defense costs, has produced *no* documents relating to this alleged allocation.

## III. NCR IS ENTITLED TO DISCOVERY ON GP'S CLAIMED COSTS.

In its opening brief, NCR addressed how GP's contention that the Court awarded all but $2.7 million of its claimed costs misconstrued the March 2011 Order. (*See* Dkt. #1146 at 17-19.) In an effort to bolster its argument, GP provides a demonstrably false characterization of NCR's summary judgment arguments.

As an initial matter, GP mistakenly contends that the evidence cited in its motion for summary judgment was sufficient to have shifted the burden of proof to NCR to demonstrate "the existence of a genuine issue of material fact supporting GP's cost claims". (Dkt. #1145 at 6.) It is well-settled that the party seeking contribution (here, GP) needs to "prove affirmatively that its response costs were both necessary and consistent with the NCP in order to recover under CERCLA". *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 561 (S.D. Ill. 1994), *aff'd*, 54 F.3d 379 (7th Cir. 1995). But GP provided "descriptions and documentation" for only *some* of its claimed costs. (Dkt. #1145 at 6.) And even for those costs, GP was *silent* as to how any specific cost qualified as a response cost. Having thus failed to satisfy its burden of proof, GP cannot fault NCR for not having identified every factual dispute with particularity.

Moreover, GP demonstrably mischaracterizes Plaintiffs' contentions at the summary judgment stage by claiming that Plaintiffs "chose to challenge only $2.7 million of GP's costs and damages". (*Id.*) NCR expressly and broadly challenged the recoverability of many of GP's claimed costs, not just the *examples* of claimed costs cited in Plaintiffs' response brief.[2] GP's $2.7 million figure (which GP itself conjured) is thus a red herring.

---

[2] *See, e.g.*, Dkt. #998 at 28 ("[T]here are countless issues of material fact concerning the costs claimed by GP, including whether they have already been reimbursed for such costs, whether the costs qualify as CERCLA 'response costs', and whether they were incurred at all."); *id.* at 31 (challenging "whether many of the claimed costs meet the 'consistent with the NCP' requirement. . . . [including] certain legal fees, public relations costs, and the costs of renegotiating a municipal agreement"); *id.*

7

Nor can Plaintiffs be faulted for pointing only to *examples* of specifically challenged costs. As already discussed, Plaintiffs were not permitted to take formal discovery on issues pertaining to GP's claimed costs during Phase I, as Plaintiffs repeatedly noted in their summary judgment papers. (*See, e.g.*, Dkt. #973 ¶¶ 27-31.) Foreclosing Plaintiffs' ability to challenge GP's claimed costs because Plaintiffs were unable to challenge specific costs *prior* to taking discovery would trap Plaintiffs in a Catch-22. Unsurprisingly, courts reject such results. *See, e.g.*, *Gibson v. Chicago*, 910 F.2d 1510, 1523 (7th Cir. 1990) (reversing the district court's grant of summary judgment where the nonmoving party had been precluded from taking full discovery on the claim at issue); *Select Creations, Inc. v. Paliafito Am., Inc.*, 828 F. Supp. 1301, 1368 (E.D. Wis. 1992) (denying a motion for summary judgment was premature where discovery on the motion's topic was partially stayed).

## IV. NCR IS ENTITLED TO DISCOVERY ON THE FRG COSTS SOUGHT BY DEFENDANTS TO DETERMINE WHETHER THEY ARE RECOVERABLE.

Defendants are attempting to rewrite history in an effort to recover all of their Fox River Group ("FRG") costs from NCR in this action. The Court has already rejected Defendants' argument that FRG costs can be awarded now even if they are not recoverable under CERCLA. Defendants' "belief" to the contrary is based on mischaracterizations of the March 2011 Order. (*See* Dkt. #1145 at 4.)

First, the only type of claim currently before this Court is a CERCLA Section 113 contribution claim. While Defendants argued at the summary judgment stage that FRG costs need not be "necessary or consistent with the NCP" because the *FRG Agreements* do not contain any such requirement, this argument missed the point. (*See* Dkt. #894 at 15-16.) Regardless of

---

at 32 ("[F]or a number of additional 'response costs' claimed by GP, the documentation provided by GP is insufficient to determine [whether] those costs are properly response costs.").

8

whether FRG costs may be recoverable under the FRG Agreements, no claims under those Agreements have been brought.  Defendants' purely contract-based arguments relating to the FRG Agreements were thus entirely misplaced, which is presumably why the Court paid them no heed in the March 2011 Order.  (*See* Dkt. #878 at 18-19; #894 at 15-16.)[3]

Second, Defendants' suggestion that Plaintiffs were somehow estopped from disputing the recoverability of FRG costs on summary judgment is misplaced.  (*See* Dkt. #894 at 16; #1145 at 4.)  Defendants base this argument solely on the inclusion of two paragraphs in Plaintiffs' Seventh Amended Complaint, which describe the total amount of work done and money paid by all FRG members between 1997 and 2001.  (Dkt. #265 ¶¶ 54-55.)  Yet, nowhere in the Complaint (or elsewhere) have Plaintiffs sought to recover in this action *all* FRG costs regardless of their recoverability under CERCLA.  As such, Defendants' estoppel argument is baseless.  (*See* Dkt. #969 at 34-35; #998 at 31 & n.16.)

## V.   NCR IS ENTITLED TO DISCOVERY ON THE UNSPENT MONEY IN THE OU 1 ESCROW ACCOUNT.

Regardless of whether Glatfelter and WTM perceive it to be an issue, NCR disputes the recoverability of the unspent funds paid into the OU 1 escrow account.  The unresolved factual issues include (i) the amount of unspent funds in the OU 1 escrow account, (ii) whether and how Glatfelter and WTM may seek a refund as to those unspent funds, and (iii) whether the funds in the OU 1 escrow account have been (or will be) closely tied to the actual cleanup of the Lower Fox River.

---

[3] The Court did not "expressly grant[] Dkt. No. 893 (which detailed Defendants' FRG costs)", as Defendants claim.  (Dkt. #1145 at 5; *see* Dkt. #1080 at 33.)  On the contrary, the Court expressly denied that motion to the extent it sought costs that are not properly recoverable in contribution under CERCLA. (*See, e.g.*, Dkt. #1080 at 19, 26, 28.)

9

Glatfelter and WTM misstate the relevant legal standard that governs this dispute. (*See* Dkt. #1145 at 10-11.) The way in which funds are spent at a site is not irrelevant but rather *central* to the issue of whether those funds are recoverable under CERCLA. (*See* Dkt. #1146 at 22.) While funds paid pursuant to a consent decree usually qualify as response costs, that is because those funds are usually directed toward specific qualifying cleanup activities at a specific site. To qualify as response costs, however, those funds must still *in fact* be spent on cleanup activities at the site. *See Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005).

Glatfelter's and WTM's purported subrogation solution is an empty offer. (*See* Dkt. #1145 at 11.) They provide no support for how (or whether) subrogation would function in this context. For example, the United States and Wisconsin, as parties to the OU 1 consent decree, could potentially block any such transfer of rights. Or Glatfelter or WTM may have already waived any subrogation rights. In any event, Glatfelter and WTM provide no explanation for why NCR should be required to reimburse Glatfelter and WTM for costs that have not been spent at the site and that may never be spent at the site.

## CONCLUSION

For the foregoing reasons, NCR respectfully requests that the Court grant the relief specified in NCR's opening brief at the August 1, 2011, status conference.[4]

---

[4] With respect to API's request to address its CERCLA liability prior to the February 2012 trial, NCR takes no position. With respect to API's request to hold the February 2012 trial in Green Bay, NCR defers to the Court's preference.

Dated: July 28, 2011						Respectfully submitted,

							NCR CORPORATION

							/s/ Darin P. McAtee
							*Counsel for NCR Corporation*

							CRAVATH, SWAINE & MOORE LLP
							Evan R. Chesler
							Sandra C. Goldstein
							Darin P. McAtee
							Worldwide Plaza, 825 Eighth Avenue
							New York, New York 10019
							Phone: (212) 474-1000
							Fax: (212) 474-3700
							dmcatee@cravath.com

							SIDLEY AUSTIN LLP
							Kathleen L. Roach
							Evan B. Westerfield
							One South Dearborn Street
							Chicago, Illinois 60603
							Phone: (312) 853-7000
							Fax: (312) 853-7036

							MARTEN LAW PLLC
							Linda R. Larson
							Bradley M. Marten
							1191 Second Avenue, Suite 2200
							Seattle, Washington 98101
							Phone: (206) 292-2600
							Fax: (206) 292-2601