IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| APPLETON PAPERS, INC. and <br> NCR CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> GEORGE A. WHITING PAPER <br> COMPANY, et al., <br><br> Defendants. | No. 08-CV-00016-WCG |

**GEORGIA-PACIFIC LLC'S SUPPLEMENT TO DEFENDANTS' SUBMISSION
FOR AUGUST 1, 2011 STATUS CONFERENCE**

Georgia-Pacific LLC ("GP") provides this supplemental submission to inform the Court of an important new development (discovered just this morning) with significant implications for future proceedings, and to provide additional clarity to several points that will be at issue during the August 1, 2011 status conference.

**1. GP's Motion for Sanctions:** As the Court knows from prior proceedings in this case and in *Georgia-Pacific Consumer Products LP v. Appleton Coated LLC,* Case No. 11-MC-32 ("*GP v. AC*"), numerous motions to preserve documents and to compel their production have been required to obtain critical evidence from Plaintiffs, and particularly so with respect to Wiggins Teape's Butler's Court files ("BC Files").[1] Notwithstanding the pendency of this litigation, those

---

[1] *See, e.g.*, Memorandum of Law in Support of Georgia-Pacific's Motion to Compel Appleton Papers Inc. to Produce Documents Responsive to Georgia-Pacific's Requests for Production, Dkt. 424 (April 17, 2009), and supporting declaration of Patricia Young, Dkt. 425; Georgia-Pacific's Rule 7.4 Expedited Non-Dispositive Motion for an Order to Preserve Documents, Dkt. 430 (May 6, 2009), and supporting declaration of John Burgess, Dkt. 431.

motions and this Court's orders, extremely significant BC Files have been destroyed since the case was filed. In 2009, the entire hard copy set of the BC Files was shredded, and we now know from API's recent admission that the original BC microfiche Files, which contained but a portion of the hard copy files and were the source for the limited BC Files produced during Phase I, have also been destroyed.

Pursuant to the Court's July 14, 2011 Order in *GP v. AC*, Dkt. 14, Hermes Law Ltd. (on behalf of itself, API and/or Appleton Coated LLC) produced the BC Files database and more than 557,000 tiff images taken from the BC microfiche Files on July 19 and 28, 2011, respectively. GP is in the process of reviewing these materials, and is already discovering that obviously significant evidence – relevant to both Phase I and the arranger case – was *not* produced by API as required by this Court's July 31, 2009 Order compelling the production of the BC Files. For example, Exhibit 1 to the attached Declaration of Patrick Ferguson ("Ferguson Decl.") is an image taken from the BC Files database that Hermes Law just sent to GP. This entry plainly reflects the existence of a March 4, 1965 letter from Wiggins Teape's John Gough to PHJ Abbott concerning: "BROKE; NCR; AROCHLOR DETECTION; AROCHLOR REMOVAL; VISIT TO MONSANTO RESEARCH." Exhibit 2 to the Ferguson Declaration contains the tiff images associated with this entry. The images are of poor quality, and, unfortunately, the microfiche files from which these images were taken have been destroyed. Nevertheless, it is clear from legible portions of the document that NCR's Martin Kelly attended a March 3, 1965 meeting with John Gough and others at Monsanto's Ruabon, UK research facility during which there were extensive discussions about how to remove Arochlor during the recycling of broke – issues that Wiggins Teape was working on extensively during the period of 1964 -1966 and beyond, of which NCR

2

previously disclaimed any knowledge.[2] We just found this document today, and our best present effort to decipher it is presented in Exhibit 3 of the Ferguson Declaration. As can be seen, NCR's Martin Kelly actively participated in these broke recycling discussions, and in fact made recommendations regarding how to sample for Arochlor in recycled broke and also claimed that if "broke is disintegrated in water. . .it may be possible to remove the Arochlor by simply filming off the capsules. . ." Ferguson Decl., Ex. 3.

This document is definitive evidence that NCR knew in 1965 that Arochlor had to be removed in order to recover reusable fibers from NCR broke. NCR was intimately familiar with how much Arochlor was present in broke, and therefore this document also demonstrates that by 1965 at the latest, NCR knew that the recycling of broke would result in the disposal of non-trivial amounts of PCBs. The document is extraordinarily significant, and its existence and relevance were plainly apparent on the face of the BC Files database entry. GP easily located this document in its preliminary review efforts, and it is therefore astonishing that it was not produced to us by API during Phase I or in response to GP's recent arranger document requests. Ferguson Decl. at ¶¶ 7-8. This evidence goes straight to the heart of both the Phase I and arranger issues, and its concealment from the Defendants is a matter of grave concern that will have to be addressed.[3]

---

[2] See e.g., Dkt. 658 [Plaintiffs' Opposition to Defendant's Motion for Summary Judgment], 20-21, fn. 12 ("Finally, notwithstanding Defendants' claims about the 'close working relationship' between NCR and WT, the evidence is undisputed that none of this recycling research was ever shared with NCR prior to 1972. Indeed, while Defendants argue that NCR knew or should have known that the recycling of CCP broke would risk environmental harm, they nowhere cite any evidence that NCR knew, or had any reason to know, anything about the recycling operations and conditions at the Defendants' facilities. Without such knowledge, there is no manner by which NCR could have, or should have, been expected to know that PCBs would be released during the recycling process and discharged from Defendants' facilities into the Lower Fox River.").

[3] Among other things, the concealment of this document would have been prejudicial to the fair resolution of this case, and in any event, the discovery of this and perhaps other

It is also significant to note that, with the BC microfiche Files having been destroyed, Plaintiffs are questioning the authenticity of at least some of the BC Files materials. BCFOX00007067, for example, was produced by API from the BC microfiche Files pursuant to the Court's July 31, 2009 Order. This document is a copy of a May 19, 1965 letter from Appleton Coated Paper Company to Wiggins Teape which states that:

> At present we believe that the Kimberly-Clark Company, Moraine Mill in West Carrolton, Ohio is using the bulk of the CB Broke, and is repulping it very successfully. . . We actually know very little about the processes used in reclaiming the CB Broke, however, we do know that it is done by a conventional de-inking process. The Moraine Mill has a batch process and we believe they have developed some special handling means which enable them to easily remove the CB coating.

Ferguson Decl. Ex. 4. The implications of the BC Files destruction for disputes about the authenticity of documents such as this will also have to be decided, and most likely through the vehicle of GP's impending sanctions motion.

GP is still in the process of investigating what happened to the BC Files and to what degree their destruction has prejudiced Defendants. Clearly the impact is significant, but we have learned, for example, that a smaller set of BC microfiche Files still exists, and perhaps that may mitigate some of the prejudice (albeit at significant expense to GP because of the required extra effort). Clearly, however, GP will be moving for monetary and evidentiary sanctions, and the results of that motion may have significant implications for future proceedings.

In addition to the potential significance of GP's forthcoming sanctions motion for discovery and evidentiary purposes, whatever role API had in the destruction of the BC Files and the manner in which API handled its selective Phase I BC Files production may have significant

---

previously concealed documents will require GP to re-depose Mr. Gough, a resident of the UK, whose prior testimony has already been admitted in this case.

4

implications for API's future involvement in this case, an issue that API wants to discuss on August 1, 2011. We therefore want to alert the Court that, regardless of whatever ruling may occur with respect to API's CERCLA liability, it is clear that considerable thought will have to be given to the conditions of API's withdrawal from this case, should that be allowed, and that those conditions should not be determined until after GP files its sanctions motion, which it will do as soon as possible after completing its investigation of the BC Files destruction.

2. **Depositions of GP Witnesses:** NCR is correct that GP has consistently objected to the necessity of Plaintiffs' re-deposing any of its former employees regarding GP's intent in purchasing broke and GP's recycling operations. GP believes that such testimony is irrelevant to the remaining issues, and in any event, NCR has already taken extensive discovery of GP and its former employees about recycling, as detailed in the Declaration of Mary Rose Alexander in Response to Rule 56(f) Declaration of Kathleen L. Roach. (Dkt. 1048). NCR was also right to correct in its Reply the earlier misstatement that GP was categorically refusing to produce any witness. In fact, GP had stated in the meet and confer of June 29, 2011 that it would reconsider its objections in light of NCR's specific deposition requests, which have not yet been made. We note, however, that NCR's statement that they do not intend to "re-ask" any of the questions from Phase I does not prevent their inquiry in Phase II from being duplicative. NCR should not be allowed to ask "different" questions on all the same topics. Re-doing Phase I discovery now does not make this proceeding more "fair," but it does create considerable expense and burden for the Defendants' elderly witnesses and the Defendants themselves. At a minimum, meaningful constraints should be put on any re-deposition of Defendants' witnesses that is allowed.

3. **GP's Document Requests:** It is clear that more documents relevant to this case exist than Plaintiffs have revealed. GP has engaged in extensive independent investigations to

5

uncover such materials. GP issued new document discovery requests to NCR and API after a March 25, 2011 conference call in which neither could confirm that it had produced all evidence potentially relevant to the arranger proceedings during Phase I discovery. GP's discovery requests on arranger issues were not duplicative of Phase I requests, but instead were based on independent investigations showing additional avenues where Plaintiffs should have relevant documents. This discovery consisted of specific document requests and one interrogatory, and is designed to break through Plaintiffs' failure to produce documents that GP knows should exist.

4. **Depositions of Plaintiffs' Witnesses:** GP does not intend to re-depose any of NCR's or API's witnesses in this case, unless some significant new evidence is produced that would truly warrant the intrusion. That might happen, as indicated by the above discussion of the BC Files, and GP of course reserves the right to depose any new witness identified by Plaintiffs. If GP identifies any NCR or API witness outside of the United States, that would be an entirely new deposition since no examination of any former NCR UK employee, for example, has ever occurred.

Dated: July 29, 2011

Respectfully Submitted,

*/s/ Mary Rose Alexander*
Mary Rose Alexander

Mary Rose Alexander
*IL Bar No. 6205313*
*CA Bar No. 143899*
Margrethe K. Kearney
*IL Bar No. 6286559*
LATHAM & WATKINS LLP
233 S. Wacker Dr.
Ste. 5800
Chicago, IL 60606
Telephone: (312) 872-7700
Facsimile: (312) 993-9767
Mary.Rose.Alexander@lw.com

Margrethe.Kearney@lw.com

Karl S. Lytz
*CA Bar No. 110895*
Patrick J. Ferguson
*CA Bar No. 252778*
LATHAM & WATKINS LLP
505 Montgomery St., Ste. 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Fax: (415) 395-8095
Karl.Lytz@lw.com
Patrick.Ferguson@lw.com

SF\868283.1