# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

| | | |
|---|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | No. 08-CV-00016-WCG |
| GEORGE A. WHITING PAPER<br>COMPANY, et al., | )<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GEORGIA-PACIFIC LLC'S MOTION FOR SANCTIONS AGAINST APPLETON PAPERS INC., DEWITT ROSS & STEVENS S.C., AND HERMES LAW LTD.**

Karl S. Lytz
CA Bar No. 110895
Patrick J. Ferguson
CA Bar No. 252778
Latham & Watkins LLP
505 Montgomery St., Ste. 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Fax: (415) 395-8095
Karl.Lytz@lw.com
Patrick.Ferguson @lw.com

Mary Rose Alexander
IL Bar No. 6205313
CA Bar No. 143899
Margrethe K. Kearney
IL Bar No. 6286559
Latham & Watkins LLP
233 S. Wacker Dr., Ste. 5800
Chicago, IL 60606
Telephone: (312) 872-7700
Facsimile: (312) 993-9767
Mary.Rose.Alexander@lw.com
Margrethe.Kearney@lw.com

October 20, 2011

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ..................................................................................................1

II. ARGUMENT........................................................................................................3

    A.  API Concealed Critical Evidence from the Defendants and the Court....................3

    B.  API Failed to Preserve BC Documents Despite Its Court-Ordered Obligation to Do So ........................................................................................5

        1.  The Court Has Already Rejected API's Corporate Shell Game Defense ................................................................................................5

        2.  API Had Actual Possession of the Library Set and Knowingly Failed to Preserve It ......................................................................................7

    C.  The Defendants and the Court Have Been Prejudiced by API and Its Counsels' Actions ............................................................................................8

    D.  Reasonable Sanctions Are Warranted......................................................................10

        1.  The BC Documents Should Be Deemed Admissible and Authentic Absent Compelling Contrary Evidence ..........................................................10

        2.  Adverse Inference Sanctions Are Appropriate ..........................................12

        3.  The Phase I Record Should Be Supplemented ..........................................12

        4.  The Court Should Award GP Monetary Sanctions....................................13

III. CONCLUSION....................................................................................................13

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page(s)**

*Gile v. United Airlines*,
   95 F.3d 492 (7th Cir. 1996) ............................................................................................4

*Gurvey v. Fixzit Nat'l Install Servs., Inc*
   2011 WL 550628 (D.N.J. Feb. 8, 2011) ........................................................................11

*Langley by Langley v. Union Elect. Co.*,
   107 F.3d 510 (7th Cir. 1997) ..............................................................................7, 10, 11

*MacNeil Auto. Products, Ltd. v. Cannon Auto. Ltd.*,
   715 F. Supp. 2d 786 (N.D.Ill. 2010) ..............................................................................11

*Park v. City of Chicago*,
   297 F.3d 606, 615 (7th Cir. 2002) .................................................................................12

*Salgado by Salgado v. General Motors Corp.*,
   150 F.3d 735 (7th Cir. 1998) ..........................................................................................11

## DOCKETED CASES

*Georgia-Pacific Consumer Products LP v. Appleton Coated LLC*,
   No 1:11-mc-32 (the "*AC Case*") ......................................................................................2

## FEDERAL STATUTES

Federal Rules of Civil Procedure
   Rule 26(b) ......................................................................................................................4, 5
   Rule 34(a)...........................................................................................................................4
   Rule 37(b) ....................................................................................................................7, 12

## I. INTRODUCTION

Appleton Papers Inc. ("API") and its counsel opposed Georgia-Pacific LLC's motion for sanctions with hyper-technical excuses for many of their bad acts, and attempted to ignore others out of existence. By both what they say and do not say, API and its counsel confirmed the following undeniable facts:

- API and its counsel, Hermes Law Ltd. ("Hermes") and DeWitt, Ross & Stevens S.C. ("DeWitt"), were on written notice that potentially relevant hard copy files existed at Wiggins Teape's former research facility at Butler's Court, Beaconsfield, UK ("BC").

- Despite their obligation to preserve evidence within their control, API and Hermes refused to protect the BC hard copy files from destruction based on their erroneous contention that API had no control over the documents—a claim that this Court rejected just months later. In fact, they did not even try to preserve those files until the control issue had been resolved.

- GP discovered that—by a stroke of good luck—two sets of microfiche files remained at BC: the Library Set and the Post Room Set.[1] GP moved to compel the production of the surviving microfiche (collectively, the "BC Documents"). In its July 31, 2009 Order, Dkt. #507, the Court determined that API and Appleton Coated LLC ("AC") had control over the BC Documents, and ordered the production of all material responsive to GP's discovery requests.

- API refused to comply with the Court's Order. GP moved to compel API's compliance, but withdrew the motion when Hermes reported that AC would comply.

---

[1] As discussed below, GP has recently obtained, from Appleton Coated LLC, access to the other set of BC microfiche—the Post Room Set. Until recently, the Post Room Set documents were housed in England, and AC believed them to be a partial copy, or subset, of the now-destroyed Library Set. While still under review, it is clear that the Post Room Set contains other responsive documents that were not in the Library Set, and, therefore, that API's failure to have obtained, reviewed, and produced responsive documents from the Post Room Set has resulted in additional prejudice to GP and the other Defendants. *See* Reply Declaration of Douglas Garrou, filed concurrently herewith ("Garrou Decl."). GP's motion for sanctions had asked for an order compelling API to produce the Post Room Set, but given AC's recent voluntary production of that material, GP withdraws that request.

1

- The Library Set was delivered to API's litigation services contractor, Northstar. Despite Hermes' claim that the BC Documents were produced solely on behalf of AC, and his sworn statement that AC paid for the review and production, AC's General Counsel has since confirmed that AC never had possession of the Library Set, and never paid for its review or production.

- Despite claims of a complete production of responsive Library Set documents in 2009, Hermes and DeWitt did not produce an easily findable and extremely significant March 4, 1965 letter from WT's John Gough describing NCR's participation in a March 3 meeting with Monsanto and WT at Monsanto's Ruabon, UK facility—during which NCR's Martin Kelly was present for a discussion of WT's NCR Paper broke recycling efforts, and offered advice on how to sample and remove PCBs in recycled broke. *See* Dkt. #1170, Ex. 482 ("Ruabon Letter").

- The Ruabon Letter, and at least 481 other responsive documents, were concealed from GP (and therefore from the Court) during two rounds of Phase I summary judgment briefing, in which API and NCR contended that there was no evidence that either company was aware of WT's broke recycling efforts—a claim disproved by the concealed Ruabon Letter and other documents.

- None of these documents would *ever* have come to light but for GP's 2011 motion to compel, and the Court's order that Hermes produce the digital copies of all Library Set documents in Hermes' possession. *Georgia-Pacific Consumer Products LP v. Appleton Coated LLC*, No 1:11-mc-32 (the "*AC Case*"), Dkt. #14.

- API's counsel and/or their agent, Northstar, retained actual physical possession of the Library Set original microfiche for well over a year. But in March 2011, DeWitt sent the Library Set back to Arjo Wiggins Fine Papers Ltd. ("AWFP"), knowing from this Court's summary judgment rulings that these files contained essential documents, and knowing that AWFP was the entity that had destroyed the BC hard copy files in 2009.

- After learning that the documents were in the hands of an intermediary in the UK, and that AWFP had directed that they be destroyed, DeWitt—when expressly asked—directed that the UK agent comply with AWFP's destruction order.

2

- API and NCR now contest the authenticity of certain Library Set documents that are damaging to their case—both in Phase I and II—despite the fact that these documents are obviously both WT's business records and ancient documents.

With respect to their failure to produce critical evidence, API's opposition does not even address their concealment of the Ruabon Letter (which was indefensible). API then quibbles about the "true relevance" of hundreds of other obviously responsive documents that it also wrongly withheld. With respect to the destruction of the Library Set microfiche, API: (1) plays the same corporate shell game that was rejected by the Court in 2009, (2) remarkably claims—based on hair-splitting semantics—that this Court's July 31, 2009 Order did not order it to produce the BC Documents, and (3) touts a purported difference between expressly directing document destruction versus expressly directing that "Worldwide Advantage should proceed as directed by Clive Mountford, of Arjo Wiggins Fine Papers Ltd., owner of the crate," knowing that Mr. Mountford had directed the destruction of the documents. *See* Dkt. #1195, at 13. There is no merit to any of this. API's withholding of evidence (until compelled for a second time to produce it) and destruction of the Library Set has caused substantial prejudice to the Defendants, and would have caused even greater prejudice had API not been caught in the act. GP respectfully requests that appropriate sanctions be awarded.

## II. ARGUMENT

### A. API Concealed Critical Evidence from the Defendants and the Court

API's opposition does not even address its failure to produce the Ruabon Letter, which details NCR's active participation in a 1965 roundtable discussion with Monsanto and WT about WT's efforts to remove PCBs from recycled broke—evidence that API and NCR claimed did not exist. This letter squarely answers a critical element of Phase I by demonstrating that NCR knew about the ecological risks of PCB releases caused by broke recycling by 1965 at the latest. GP would have brought this letter to the Court's attention had it been previously produced, and the Court likely would have relied upon this letter in its Phase I Decision and Order, especially given NCR's and API's denial of the existence of any such evidence.

3

Georgia-Pacific located the highly relevant Ruabon Letter within *one day* of receiving the complete collection of Library Set images. Instead of addressing why the Ruabon Letter was withheld (because there is no justification for it), or how it could have been missed by API (because it could not have been), API quibbles about the relevance of the hundreds of other wrongly-withheld Library Set documents that GP submitted with its motion to demonstrate the incredible flaws in API's review and production of the Library Set documents. As an initial matter, API confuses two entirely distinct issues: *responsiveness* and *relevance*. In July 2009, this Court ordered that API and AC "search for and produce any documents in the possession of AWA or Arjowiggins SAS that are *responsive* to Georgia-Pacific's subpoenas." Dkt. #507, at 7 (emphasis added). Accordingly, API and AC were obligated to review and produce—from both the Library Set and the Post Room Set—all materials that were *responsive* to GP's broad discovery requests, not to limit their review and production to material that they deemed to be *relevant* to the case (it is clear that they did not even do that). This squares with the discovery standard under both the Federal Rules and Seventh Circuit law. *See e.g., Gile v. United Airlines*, 95 F. 3d 492, 495 (7th Cir. 1996) ("Rule 34 provides that a party may request, among other things, the production of documents that 'constitute or contain matters within the scope of Rule 26(b)' and are in the custody or control of another party. Fed. R. Civ. P. 34(a). Rule 26(b) prescribes the scope of matters upon which a party may seek discovery: 'Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . . The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.'").

Moreover, even if API was only required to produce documents that it deemed relevant, it is quite clear that API failed to do so. As further explained in the Reply Declaration of Patrick Ferguson, filed concurrently herewith ("Ferguson Reply Decl."), all of the documents that were submitted with GP's motion for sanctions were clearly responsive to GP's discovery requests, and provide significant evidence of the following:

4

- 119 of the 481 BC Documents submitted with GP's motion for sanctions evidence communications between and among WT, NCR, and ACPC during the Production Period related to the production of NCR Paper. Ferguson Reply Decl. at ¶5.

- 69 of the 481 BC Documents submitted with GP's motion for sanctions evidence WT's efforts to deal with problems associated with NCR Paper broke. *Id*. at ¶6.

- 61 of the 481 BC Documents submitted with GP's motion for sanctions evidence efforts to de-ink and recycle NCR Paper, including the "blueing" problems associated with breakage of the PCB-containing capsules. *Id*. at ¶7.

- 111 of the 481 BC Documents submitted with GP's motion for sanctions evidence NCR's extensive control over every aspect of the production of NCR Paper by its licensee, WT. *Id*. at ¶8.

- 25 of the 481 BC Documents submitted with GP's motion for sanctions evidence the environmental and human health risks associated with the production of PCB-containing NCR Paper. *Id*. at ¶9.

- 340 of the 481 BC Documents submitted with GP's motion for sanctions evidence WT's production of NCR Paper. *Id*. at ¶10.

Quite simply, API withheld hundreds of responsive documents from its 2009 production, and its claim that it does not consider such documents relevant is legally, factually, and logically inaccurate.

### B. API Failed to Preserve BC Documents Despite Its Court-Ordered Obligation to Do So

There is no justification for API's decision to send the BC Documents—which it was required to keep safe pursuant to this Court's order—back to England in March of 2011, and then to authorize the destruction of those documents by a third party. In opposition, API advances several excuses for this behavior, but none have any merit.

#### 1. The Court Has Already Rejected API's Corporate Shell Game Defense

Repeating the same corporate labyrinth arguments it made unsuccessfully in 2009, API again argues that it really did not have control of the BC Documents. The Court already decided

5

this issue in its July 31, 2009 Order, and there is no new evidence calling that ruling into question. To the contrary, events after July 31, 2009, have merely confirmed that the Court was correct. API's control of the BC Documents is undeniably established by the fact that the Library Set was sent to API's counsel, and then held, copied, reviewed, and returned by them (to a company that did not want them). API also had the ability to control the BC hard copy files in early 2009, but rather than protecting them until the Court had ruled on the control issue, repeatedly refused to take any steps to preserve them and allowed them to be destroyed.[2] This entire case would have had a remarkably different evidentiary basis if GP had not discovered that someone apparently forgot to destroy a set of microfiche housed in a safe at the back of a library in an almost completely abandoned facility.

API now goes a step further than it did in 2009 by contending that this Court's July 2009 Order did not even require API to produce responsive BC Documents, notwithstanding the fact that the very purpose of the motion leading to the order to compel the production of these materials. According to API, the Court only required it to produce "any documents in the possession of AWA," and API now claims that AWA did not possess the BC Documents. Incredibly, in API's view, if the Court thought it was ordering API to produce BC Documents, it was dead wrong, and because the Court was wrong, its Order imposed no legal duty on API to preserve the BC Documents. This is the very type of specious legal hair-splitting that explains why there have been countless letters and three motions to compel related to the BC Documents.

---

[2] API suggests that the BC hard copy files may never have existed, or were never destroyed. Contrary to API's claims, John Burgess' May 6, 2009 declaration, Dkt. #431, clearly identifies the names of the witnesses who saw that destruction, including the facility's librarian. As further assurance to the Court that the hard copies existed, and were destroyed, the Reply Declaration of John Burgess ("Burgess Decl."), filed concurrently herewith, includes photographs of the empty BC hard copy file cabinets that Mr. Burgess personally observed in the BC parking lot, after their contents had been emptied and destroyed by a portable shredder.

6

## 2. API Had Actual Possession of the Library Set and Knowingly Failed to Preserve It

Even setting aside the "control issue" with respect to the Library Set, and regardless of what this Court ordered and what duties arose as a result, the inescapable fact of the matter is that API *attained actual, physical possession* of the Library Set. All it had to do was keep the records safe. Instead, API's counsel, knowing of the material's relevance, sent the microfiche back to the very entity that would have destroyed them in 2009 if GP had not initiated proceedings in the UK to require their preservation.

Both with regard to the BC hard copy files and the Library Set, the issue is whether API failed to preserve them, not whether it intentionally destroyed them (even though that is certainly the case). In the Seventh Circuit, Rule 37 sanctions are based on "fault," which is "unconcerned with the non-complying party's subjective motivation, but rather 'only describe[s] the reasonableness of the conduct – or lack thereof – which eventually culminated in the violation." *Langley by Langley v. Union Elect. Co.,* 107 F.3d 510, 514 (7th Cir. 1997). In *Langley by Langley*, the court found a party at fault for loss of evidence because of its poor judgment in determining where and with whom to store relevant evidence, as well as a lack of candor in reporting its loss. *Id.* At a minimum, that is clearly the case here. API was on direct notice that the BC hard copy files were about to be destroyed, and did nothing to stop AWFP from destroying them. API also sent the Library Set back to AWFP, the very entity that had destroyed the hard copy files in the first place. Worse yet, when DeWitt learned that AWFP wanted to destroy the files, DeWitt directed that the AWFP's destruction order be obeyed.[3]

Even if GP was required to prove that API intentionally destroyed the Library Set (which it is not), that too can clearly be shown. Contrary to API's assertion, there is no practical difference between expressly directing that the Library Set be destroyed, and expressly directing that "Advantage Worldwide should proceed as directed by Clive Mountford, of Arjo Wiggins

---

[3] GP understood from AC's counsel that Mr. Ragatz had authorized Advantage Worldwide to destroy the documents. Mr. Ragatz swears that he did not communicate with Advantage, Dkt. #1197, and one of his employees (Ms. Hauser) swears that she did. Dkt. # 1199. GP accepts that. But Mr. Ragatz is nevertheless responsible for the conduct of his employee, who likely did not act on her own initiative.

7

Fine Papers Ltd., owner of the crate," knowing that AWFP had directed that the Library Set be destroyed. Knowingly authorizing the destruction of the documents is no different from ordering their destruction.

### C. The Defendants and the Court Have Been Prejudiced by API and Its Counsels' Actions

API claims that there should be no sanctions because, in its view, there has been no prejudice to GP. API notes that the Defendants won Phase I, and, therefore, were not prejudiced by API's, Hermes' and DeWitt's wrongful failure to produce critical evidence. Moreover, API states that GP has now been given a complete set of the microfiche images, and there is plenty of time remaining for additional depositions. Such is the cynicism of those caught in bad acts. The fact of the matter is that no one will ever know the true extent of the prejudice caused by the destruction of the hard copy files, nor whether better images of the now-destroyed microfiche could have been reproduced by a qualified expert. Having the additional evidence would have benefitted the Court in all of its prior Phase I rulings, and—but for GP's persistence and the Court's order in the *AC Case*—these documents would have remained hidden during the Phase II proceedings as well.

There is no doubt that the 2009 destruction of the hard copies, and/or the imaging of the microfiche, resulted in the loss of information to Georgia-Pacific and the Court. For instance, as explained in GP's Supplement to Defendants' Submission for the August 1, 2011 Status Conference, Dkt. #1150, GP quickly found the Ruabon letter by querying the indexing database for terms such as "Broke" and "NCR." The database entry for the Ruabon letter contains a detailed description of the document, describing it as a "Letter to PHJ Abbot, Butler's Court Re: Arochlor. Visit to Monsanto Research, Ruabon 3.3.65." *See* Dkt. #1151, Ex. 1. The database further describes the Ruabon letter as "Tech. L. File No. 136/1965." *Id.* Butler's Court personnel must have reviewed and entered this information into the indexing database by reviewing either the now-destroyed Library Set microfiche, or the now-destroyed original hard copy of the Ruabon letter. Yet most of this information—including the subject line, that it was sent to PHJ Abbott, and its file number—is not apparent on Northstar's largely illegible image

8

copy of the Ruabon letter.[4] The loss of such information forever prejudiced GP and the other Defendants, particularly since it would be helpful in addressing Plaintiffs' challenges to the authenticity of certain Library Set documents.

There is also no doubt that API's decision to do nothing when the hard copy files were destroyed in 2009 prejudiced GP, the other Defendants, and this Court: there was a significant amount of material—particularly, informal communications regarding WT's candid communications with NCR and ACPC—that was never transferred to microfiche, and that was, therefore, lost forever when the hard copy files were destroyed. Likewise, API's decision to only produce documents from the Library Set, and to leave the Post Room Set under AWFP's control in England, would have resulted in substantial prejudice had GP not recently negotiated with AC for the review of that material in connection with the *AC Case*. Based on an initial review of the Post Room Set, GP has determined that it contains relevant materials that do not appear to be contained in the Library Set. This includes a 1958 WT document entitled, "Repulping NCR Broke," a document that is highly relevant to Phase I and Phase II issues, and that, to the best of GP's knowledge, API has never produced. *See* Garrou Decl., at ¶¶14-19. Accordingly, API cannot credibly claim that production of the electronic images of the Library Set cures all prejudice that resulted from its obvious failure to produce, per the Court's Order, all responsive BC Documents from the Library Set and the Post Room Set.

The financial prejudice is also significant—GP has been forced to incur substantial costs in investigating and briefing this motion (not to mention its three prior motions to compel). GP has also had to return to the UK to re-take the deposition of John Gough, and to take the deposition of Martin Kelly (of NCR) concerning, in particular, Mr. Kelly's participation in the March 3, 1965 roundtable broke recycling meeting with Monsanto and WT that is the subject of

---

[4] During GP's review of the Post Room Set, Mr. Garrou discovered that, in many cases, the microfiche images of the Post Room Set, when viewed through a microfiche viewer, were easier to read than a printed copy of the same document. *See* Garrou Decl., at ¶22. It is therefore possible that GP would have been able to discern more of the Ruabon letter (particularly the first page), as well as more of the other illegible Library Set documents, if it could have reviewed the actual microfiche images through a microfiche viewer.

9

the Ruabon Letter.  If the documents had been timely produced, these depositions could have been conducted in 2009, when the parties were already in the UK to take the deposition of Mr. Gough and others.

### D. Reasonable Sanctions Are Warranted

API and its counsel have defrauded the Court, GP, and the other Defendants, and their actions have resulted in significant prejudice.  Neither Plaintiff can be allowed to gain advantage by this conduct, and sanctions are clearly warranted under Federal Rule of Civil Procedure 37(b) for the failure to produce responsive documents and the destruction of such documents.  *Langley by Langley*, 107 F.3d at 514.

GP's motion for sanctions set forth its requested relief.  Other than an order compelling production of the Post Room Set (an issue which is now moot), GP remains entitled to all of the requested relief, specifically:  an order establishing the admissibility of the BC materials, an adverse inference regarding NCR and API's knowledge regarding the re-pulping of broke and trim, a procedure for supplementing the Phase I record, and an order requiring the payment of GP's various expenses incurred as a result of the discovery misconduct.  Indeed, events since the filing of GP's opening brief have actually bolstered these sanctions.

#### 1. The BC Documents Should Be Deemed Admissible and Authentic Absent Compelling Contrary Evidence

First, this Court can and should order that the BC Documents are presumptively admissible and authentic absent compelling evidence to the contrary.  *See* Fed. R. Civ. P. 37(b)(2)(A)(i)-(ii) (court can issue sanctions "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action" and/or (2) "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence").  This sanction should be imposed against both API, on whose conduct it is based, and NCR, who is a co-party with API in this litigation and silently benefitted from API and its counsel's misconduct.  Contrary to the assertions made in NCR's opposition, Dkt. #1193, this Court has broad power to issue sanctions against NCR for its co-party's misconduct.  In fact, in one of the very cases that NCR relies on in its opposition,

10

*Langley by Langley*, the Seventh Circuit upheld the imposition of sanctions against one party for the conduct of its co-party because—much like NCR's relationship to the BC documents—the party had relied on its co-party to maintain the relevant evidence, participated in discovery efforts as a co-party, and, in so doing, assumed responsibility for the maintenance of the evidence. 107 F.3d at 514-15.[5]

Deemed authenticity and admissibility is particularly appropriate against NCR because, while it is not clear that NCR participated in the destruction of the BC Documents, NCR's hands are by no means clean. On September 23, 2011, *after* GP had moved for sanctions, NCR produced—without explanation—its own cache of previously hidden documents. These documents are highly relevant to Phase I issues, were undeniably responsive to Defendants' Phase I discovery requests, and were wrongly withheld by NCR for years. They include:

- A March 6, 1967 letter from NCR's MJ Thomas to NCR's Gordon Taylor regarding "Arochlor Toxicology", in which Dr. Thomas discusses the Jensen report in detail and offers to make copies of the Jensen report for any of the ten NCR employees copied on the letter. Ferguson Reply Decl., at Ex. 1, NCR-FOX-0634305.

- A January 7, 1966 letter from Dr. Thomas to Monsanto's William Hunt, copied to nine NCR employees, thanking him for sending toxicological information on Aroclor 1242 and referencing continued communications on the subject. Ferguson Reply Decl., at Ex. 2, NCR-FOX-0634310.

---

[5] NCR relies on several other inapposite cases for its (incorrect) claim that "the case law is clear that adverse inference sanctions should not be imposed against a co-party…." Dkt. #1193, at 4. In the unpublished opinion of *Gurvey v. Fixzit National Install Services, Inc.,* a New Jersey district court found that spoliation sanctions were not warranted against co-defendants because, in stark contrast to this case, "[p]laintiffs ha[d] provided no evidence that any spoliation took place." 2011 WL 550628, at *5 (D.N.J. Feb. 8, 2011); *see also MacNeil Automotive Products, Ltd. v. Cannon Automotive Ltd.*, 715 F. Supp. 2d 786, 797 (N.D.Ill. 2010) (spoliation sanctions inappropriate because there was no bad faith, no likely or ongoing litigation, and no prejudice to the opposing party based on the destruction of some evidence); *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735 (7th Cir. 1998) (sanctions entered by the lower court were appropriate where the sanctioned party failed to submit expert witness reports in a timely fashion, finally submitted deficient reports with no legitimate excuse for such deficiency, and made no showing that its violation was substantially justified or harmless).

NCR should not be allowed to benefit from API's misconduct, particularly in light of its own questionable discovery practices. NCR cannot now credibly challenge the authenticity of the BC Documents after API destroyed the very evidence that GP could have used to establish authenticity—*e.g.*, the hard copy files, more legible microfiche versions of the documents, and the tabbing and storage system that was presumably associated with the Library Set. *See* Garrou Decl., ¶¶ 12-15, 22.

### 2. Adverse Inference Sanctions Are Appropriate

Second, an adverse inference is an appropriate discovery sanction whenever there is evidence of bad faith. *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002). API's bad faith is evident in its refusal to protect the hard copy files in 2009, its failure to produce responsive and highly relevant BC Documents despite the Court's order to do so, and its decision to send the Library Set back to England and order its destruction. NCR does not appear to have been involved in this misconduct, but nevertheless benefitted from it—stating repeatedly to this Court during Phase I that the very evidence that its co-party was hiding did not exist. Moreover, as explained above, NCR's recent production of highly relevant Phase I material calls into question its own discovery practices. Accordingly, this Court can and should establish an inference, adverse to NCR and API, that NCR, WT, and ACPC were at all pertinent times aware of and knowledgeable regarding all material aspects of the repulping of NCR Paper broke and trim, absent compelling evidence to the contrary.

### 3. The Phase I Record Should Be Supplemented

Third, Defendants' Phase I motions for summary judgment, and the Court's Decision and Order granting those motions, would have included many of the BC Documents—particularly the Ruabon letter—that API wrongly withheld. They would also have included the relevant Phase I materials that NCR just recently produced without any explanation for why they had been withheld for years. GP requests that the Court establish a procedure for supplementation of

12

the Phase I record, which allows GP an appropriate amount of time to review the over one million pages of potentially relevant material in the Library Set and the Post Room Set.

### 4. The Court Should Award GP Monetary Sanctions

Lastly, this Court can and should award GP monetary sanctions. *See* Fed. R. Civ. P. 37(b)(2)(C) ("the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust"). API has forced GP to expend extraordinary time, effort, and expense on the BC documents in *Whiting*, the *AC Case*, and earlier UK proceedings—all necessitated because of API's stonewalling at each and every turn, which cannot be legally justified. That stonewalling has only continued in the wake of GP's opening brief, most notably in API's complete failure to address the most serious discovery abuse in this case—its withholding of the easily-locatable Ruabon Letter. GP thinks it only fair that it be reimbursed for at least some of these extraordinary efforts, and that it be reimbursed for the necessity of having to return to the UK for additional depositions that could have been taken more efficiently earlier.

## III. CONCLUSION

For all of the reasons set forth above and in GP's motion for sanctions, GP respectfully requests that the Court, pursuant to its authority under Federal Rule of Civil Procedure 37(b), appropriately sanction API, DeWitt, and Hermes Law.

Dated: October 20, 2011  Respectfully submitted,

　　　*/s/ Karl S. Lytz*

Karl S. Lytz
CA Bar No. 110895
Patrick J. Ferguson
CA Bar No. 252778
Latham & Watkins LLP
505 Montgomery St., Ste. 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Fax: (415) 395-8095
Karl.Lytz@lw.com

Patrick.Ferguson@lw.com

Mary Rose Alexander
IL Bar No. 6205313
CA Bar No. 143899
Margrethe K. Kearney
IL Bar No. 6286559
Latham & Watkins LLP
233 S. Wacker Dr., Ste. 5800
Chicago, IL 60606
Telephone: (312) 872-7700
Facsimile: (312) 993-9767
Mary.Rose.Alexander@lw.com
Margrethe.Kearney@lw.com

SF\879232.1