UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

APPLETON PAPERS INC. and NCR CORP.,

        Plaintiffs,

v.                                    Case No. 08-C-16

GEORGE A. WHITING PAPER CO., et al.,

        Defendants.

**DECISION AND ORDER**

Defendant Georgia-Pacific LLC ("GP") has filed a motion for sanctions against Plaintiff Appleton Papers Inc. ("API") and two of its law firms, Hermes Law Ltd. and Dewitt Ross & Stevens, S.C. For the reasons given below, the motion will be denied.

**I. Documents Withheld**

GP alleges that API withheld key pieces of evidence during Phase I discovery while claiming that such evidence did not exist. For example, GP cites a letter dated March 4, 1965 from Wiggins Teape's John Gough that reflected a company meeting about how to remove Aroclor from broke during the recycling process. (Dkt. # 1151, Exs. 2 & 3.) Another document, from March 26, 1965, discusses "problems" with the re-use of NCR's broke. (Dkt. # 1179, Ex. 312.) These documents, GP argues, demonstrate that NCR had more knowledge of the broke recycling process than it has admitted in this action. GP also suggests that the documents show that the parties were concerned about environmental problems much earlier than originally thought.

GP also cites the existence of numerous other documents that show Wiggins Teape had been

investigating issues involving broke recycling and aroclor capsule breakage as far back as the mid-1950s. Moreover, the documents suggest that NCR, Appleton Coated Paper Company and Wiggins Teape had been closely coordinating their research and development efforts during this period. GP argues that the documents could have been relevant both to the Phase I contribution determination as well as to the arranger liability question at issue in Phase II. It asserts that it has been prejudiced by the lack of disclosure because it will now need to conduct further discovery.

The discovery GP cites is arguably but minimally relevant, as it shows the parties addressing problems relating to the handling of paper during the recycling process. Even so, I do not agree with GP that the documents evidence knowledge of possible environmental harm or that PCBs themselves were environmentally harmful. They are certainly not smoking guns. Although the March 26, 1965 letter refers to "present problems with the re-use of NCR broke," and the earlier letter discussed removing Aroclor from broke, there is no suggestion in these documents that the parties were discussing problems relating to pollution or the environment more generally. Instead, it appears the concerns were related to issues of product quality control. I do not, therefore, find the documents particularly probative of the Phase I issues already addressed in this case. Although it is possible that these and other documents may be relevant to the parties' understanding of the recycling process and their knowledge that Aroclor would end up in waterways, that is a matter yet to be explored. GP is correct that API does not have a great explanation for why it failed to turn the documents over, but even so I cannot conclude that a sanction would be warranted absent some kind of extreme circumstance not alleged here.

**II. Documents Destroyed**

GP argues that in addition to withholding relevant documents, API and / or its counsel

presided over and even directed the destruction of the microfiche copies of countless documents. Specifically, a cache of microfiche had been sent from a company called Arjo Wiggins Fine Papers to this country for possible use in the Kalamazoo River case pending in Michigan. The microfiche were converted to electronic format by a litigation services company. Some kind of problem arose when the microfiche were shipped back to England, however. According to an internal investigation, substantial import duties and other fees were assessed to the crate containing the microfiche, and so it was not delivered to the addressee in England. (Dkt. # 1174, Ex. 26.) Instead, the documents were held in storage until the import agent learned they were owned by Arjo Wiggins Fine Papers. An employee of Arjo Wiggins Fine Papers told the agent to destroy the documents. The agent conferred with Dewitt Ross & Stevens, the shipper, who told the agent to proceed as directed by the Arjo employee. The microfiche were destroyed a month later, in April 2011. GP argues that this was a blatant disregard of this Court's July 2009 order requiring production of (and thus preservation of) that evidence.

API makes a number of arguments in opposition. First, it argues that Arjo Wiggins Fine Papers is not a corporate sibling and therefore API had no ability to control its actions. If it destroyed the microfiche, it did so on its own. API also notes that it spent more than $300,000 to have the microfiche copied by high resolution digital electronic imaging. This created a digital cache of documents that is searchable by computer. Thus, rather than destroying documents API argues that it helped to preserve them.

API's claim that it bears no responsibility for the destruction of the microfiche is not convincing. Why did it send the microfiche back to Arjo Wiggins Fine Papers if Arjo Wiggins Fine Papers did not want it? And why didn't API ask for the microfiche to be returned, or at least notify

3

the other parties, when the import agent asked for directions after Arjo Wiggins declined to take possession of it and directed that it be destroyed? Although Mary Hauser, an office services supervisor at the firm of Dewitt, Ross & Stevens, states in a declaration that she directed the import agent to follow Arjo Wiggins' instructions to destroy the microfiche, noticeably absent from her declaration is any indication whether she consulted with an attorney in the firm before giving such directions. API also points to the labyrinthine corporate structure that may or not connect API with Arjo Wiggins Fine Papers as somehow insulating it from responsibility for the destruction of the microfiche. But while API's lack of authority over Arjo Wiggins Fine Papers was certainly relevant to the question of whether it should have been ordered to produce the microfiche in the first place, it has no bearing on API's, or its attorney's, responsibility to safeguard evidence once it is delivered to its custody or control.

Despite these concerns, I am not convinced that the destruction of the microfiche warrants sanctions, at least on the record before me. The exhibits to the Skadden investigation (*Id.*) make clear that the crate had become something of an orphan sitting in a warehouse and various individuals were simply trying to figure out what to do with it. If the intent had been to destroy the crate of microfiche, there are countless ways of achieving that goal that are more direct than sending the crate to a UK address, having the shipment declined, stored in a warehouse, and then destroyed only upon repeated consultation with multiple parties. More importantly, the evidence strongly suggests that nothing of value was lost. The declaration of Todd Goldberg of NorthStar Litigation Technologies LLC, who made a digital copy of "all images on the microfilm, microfiche and acetates in crate received from Butler's Court" (Goldberg Decl. ¶ 4), indicates that nothing of the original material was lost. According to Goldberg, "the digital imaging provided a consistently high

4

resolution image of each document as it appeared on the microfilm/microfiche." (Id. ¶ 7.) Based on this evidence, I am unable to find any improper intent on the part of counsel for API or prejudice to GP.

Another problem with the proposed entry of sanctions is that *NCR* is not alleged to be involved in any of the destruction or withholding of documents. The relief GP seeks includes a prohibition on either plaintiff's ability to challenge the authenticity of documents and the making of an adverse inference that both NCR and API were knowledgeable about the repulping process for NCR broke and trim. Even if I believed sanctions were warranted, it is difficult to discern a way to impose them without unduly sanctioning a party that had no involvement in the actions complained of. But, as I have concluded above, I do not believe there is a sufficient basis for sanctions in the first place at least on the record now before me.

For the reasons given above, the motion for sanctions is **DENIED**.

**SO ORDERED** this 19th day of December, 2011.

   /s William C. Griesbach
William C. Griesbach
United States District Judge