# Exhibit 7

# April 2, 1999

# NCR letter to
# U.S. Senator Trent Lott



**NCR**

Lars Nyberg
Chairman & Chief Executive Officer

April 2, 1999

Honorable Trent Lott, Majority Leader
United States Senate
Washington, DC 20510-2403

Dear Majority Leader Lott:

Thank you for your recent letter regarding scrap recycling legislation and thank you for the opportunity to clarify why NCR, regrettably, was put in a position to oppose S. 2180 last year. NCR commends you for your interest and efforts to reform the Superfund law with respect to liability related to scrap materials. NCR has been an American manufacturer for over one hundred years and we are very proud of our environmental record which has long included collecting and selling scrap materials in furtherance of the nation's goals.

Given our support for Congressional action to clarify the liability of scrap recyclers, you could understandably question why NCR opposed S. 2180 in the 105th Congress. Unfortunately, S. 2180 contained a discriminatory provision that essentially would have taken away from NCR and hundreds of other scrap recyclers a liability defense which presently exists under the case law and which S. 2180 sought to codify for recyclers generally. It is important to note that NCR is not seeking an exemption from liability for its own discharges nor is it seeking to broaden the materials considered as "commonly recycled" materials within S. 2180. Certain parties who reprocess one of the most commonly recycled materials, scrap paper, had worked to include in S. 2180 a special exclusion that would allow them a luxury enjoyed by no other reprocessing industry group – the ability to hold their suppliers of raw material liable under Superfund for the reprocessors' own discharges.

This "special exclusion" would have created very significant financial liability for NCR. I can shed some light on this by responding to the specific questions in your letter:

Question 1.  What percentage of your total liability at the Fox River can be attributed to direct discharge as a manufacturer of carbonless paper, and what percentage is attributed to NCR as a shipper of mill broke?

1700 South Patterson Boulevard, Dayton, OH 45479-0001. Telephone 937 445-1575, FAX 937 445-7042

Case 2:08-cv-00016-WCG   Filed 02/09/12   Page 2 of 5   Document 1318-7

NCR-FOX-0524592

Answer 1. This question appears to mistakenly assume that NCR has liability at the Fox River as a shipper of broke. This is not accurate. NCR's exposure to liability at the Fox River arises from its own discharge of PCBs to the River during the manufacturing of carbonless copy paper. NCR is confident that, under existing law, it is not liable for the PCBs which were discharged by the reprocessing mills, including PCBs which were discharged by those mills during their reprocessing of broke which NCR sold to brokers who in turn sold it to the mills. NCR, like the entire paper industry, treated broke as a valuable commodity, not as a waste to be "disposed." Accordingly, the sale of broke by NCR constituted the sale of a useful product – not an arrangement for disposal – and NCR is confident that any court or allocator would agree that Superfund case law supports this position.

Assuming for the sake of argument that a court were to reject NCR's "sale of a useful product" defense, however, your question asks how much of the mills' share would be borne by NCR over and above the share NCR would pay for its own discharges. While we can only speculate about what a Judge or allocator might decide in the future, the amount of liability could be very substantial indeed. NCR's studies indicate NCR discharged 10% and the involved reprocessing mills discharged 90% of the PCBs attributable jointly to the mills and NCR. Preliminary government estimates of Fox River costs and damages presently range as high as $800 million. While NCR and the reprocessing mills believe costs at this level would be grossly unreasonable, it nonetheless gives some idea of the stakes. Based on the percentages set forth above, NCR's 10% discharge share would be $80 million and the mills' 90% discharge share would be $720 million. By asserting that recyclers were "arranging for disposal" instead of providing a useful product, you can readily see that the mills are seeking to shift a significant percentage of their 90% discharge share (and perhaps all of it) to NCR and other involved scrap recyclers.

Question 2. How much NCR mill broke was sent by NCR to mills on the Fox River for recycling? Elsewhere? What is the total scrap paper receipts at the receiving mills and the share of those receipts represented by NCR shipments?

Answer 2. NCR sold broke to a number of scrap paper brokers who in turn sold the broke as a raw material to reprocessing mills who used secondary fiber as their principal raw material. NCR estimates that, over the 1954-71 time period, it sold 58 million pounds of broke to brokers, and that most of that broke was bought by the reprocessing mills in the Fox River Valley as raw material for their paper manufacturing activities. NCR does not know the total scrap paper receipts at the receiving mills, but estimates that those mills received at least an additional 84 million pounds of PCB-containing paper from carbonless paper printer/converters and post-consumer recyclers (including federal and state governments).

NCR-FOX-0524593

Question 3. How were the estimates for owner/operator and generator liability determined, and do they coincide with governmental estimates?

Answer 3. NCR's estimate of "discharge" (i.e., "owner/operator") liability is based upon a detailed engineering analysis, a comprehensive review of available records and employee interviews. NCR's approach is consistent with what we understand to be the federal government's approach, although that analysis is not yet available. NCR's analysis is also consistent with the methodology employed by the State of Wisconsin, although NCR and the state differ as to several of the underlying assumptions. In this regard, Wisconsin issued a draft report in February 1999 indicating that NCR facilities may have discharged 40% of the total PCBs attributable to the mills and NCR. The draft report expressly stated that it was not to be used for purposes of allocating shares of Fox River liability. The difference between the 40% figure in the Wisconsin study and the 10% figure in NCR's study is due to differing assumptions.

NCR has not estimated "arranged for disposal" (i.e., "generator") liability, other than to attempt to outline what is at stake (see Answer to Question 1 above). NCR believes that, under current law, each party will be required to pay based on what it discharged. The reprocessing mills, on the other hand, are seeking on an "arranged for disposal" theory to shift all or part of their discharge liability to recyclers who provided raw material.

To our knowledge neither the federal nor state governmental agencies have attempted to estimate "arranged for disposal" liability. This is not surprising because it is standard practice in Superfund cases for the government to leave the companies to sort out their respective shares in litigation among themselves.

In summary, by opposing S. 2180, NCR was not attempting to evade Superfund liability for its own discharges, but was protecting an existing defense to claims by the reprocessing mills that the sale of broke for reprocessing was an arrangement for disposal which would make NCR and all other recyclers of scrap paper liable for the mills' discharges. As principal sponsor of S. 2180, you understand and have decried the unfairness of recyclers being held liable for polluting a site because they provided the materials that created a product that someone else misused in an environmentally damaging way.

Again, Senator, thank you for the opportunity to "set the record straight." We, obviously, believe there to be no basis for granting any industry group a "carve-out." NCR has accepted responsibility for its discharge liability as an owner/operator even though our actions were lawful and pre-dated Superfund. We believe all parties should do the same as opposed to seeking special "exclusions" which have the effect of "carving-out" their liability and transferring it to others.

NCR-FOX-0524594

I would welcome the opportunity to come to Washington to discuss this personally with you if that is convenient for you. NCR would support a recyclers bill that contains no special exclusions and does not discriminate against NCR as a recycler. NCR looks forward to working with you to pass your recyclers bill.

Sincerely,

Lars Nyberg