# Exhibit 8

# December 19, 2008

# First Set of Interrogatories and Requests for the Production of Documents to NCR Corporation by Georgia-Pacific Consumer Products LP's (f/k/a Fort James Operating Company), Fort James Corporation's and Georgia-Pacific LLC's

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | | |
|---|---|---|
| APPLETON PAPERS, INC. and<br>NCR CORPORATION,<br><br>                Plaintiffs,<br><br>    v.<br><br>GEORGE A. WHITING PAPER<br>COMPANY, et al.,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 08-CV-00016-WCG |

GEORGIA-PACIFIC CONSUMER PRODUCTS LP'S (f/k/a FORT JAMES OPERATING COMPANY), FORT JAMES CORPORATION'S AND GEORGIA-PACIFIC LLC'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR THE PRODUCTION OF DOCUMENTS TO NCR CORPORATION

Pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure, Civil L.R. 33.1, and the Court's Case Management Decision and Scheduling Order dated September 23, 2008, Defendants and Counter-Plaintiffs Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation and Georgia-Pacific LLC (collectively, "Georgia-Pacific"), by its undersigned counsel, hereby request that Plaintiff NCR Corporation ("NCR") respond fully in writing to the following Interrogatories and produce for inspection and copying the documents described below, within thirty days of service of these requests, at the offices of its attorneys, Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, Illinois, 60606. These interrogatories and requests for production of documents shall be read and interpreted in accordance with the definitions and instructions set forth below.

## DEFINITIONS AND INSTRUCTIONS

1. As used herein, the terms "you" or "your company" shall mean and include National Cash Register Company, NCR Corporation, any and all current and former subsidiaries, affiliates, divisions, partnerships, officers, directors, employees, agents, attorneys, consultants, investigators or representatives thereof, or any other person or entity acting on the behalf thereof or under the direction or control thereof.

2. As used herein, the term "Appleton" shall mean and include Appleton Coated Paper Company, Appleton Papers, Inc., Appleton Papers Inc., any and all current and former subsidiaries, affiliates, divisions, partnerships, officers, directors, employees, agents, attorneys, consultants, investigators or representatives thereof, or any other person or entity acting on the behalf thereof or under the direction or control thereof.

3. As used herein, the term "Monsanto" shall mean and include Solutia Inc., including any and all current and former subsidiaries, affiliates, divisions and partnerships of the former Monsanto Company (now known as Pharmacia Corporation, a 100% owned subsidiary of Pfizer, Inc.).

4. As used herein, the term "Wiggins" shall mean and include the Wiggins Teape Group Ltd., a specialty paper manufacturer from the United Kingdom, any and all former subsidiaries, affiliates, divisions and partnerships thereof, including Wiggins Teape Research & Development Ltd., Wiggins Teape (Belgium) S.A. and Wiggins Teape Ltd., any and all successors-in-interest including Wiggins Teape Appleton plc, Arjo Wiggins Appleton plc, Arjowiggins SAS and Appleton Coated LLC, and any of its officers, directors, employees, agents, representatives, attorneys, consultants and investigators, as well as any other person or entity acting on its behalf or under its direction or control.

2

5. As used herein, the term "BAT" shall mean and include British American Tobacco PLC, British American Tobacco Ltd., B.A.T. Industries, PLC, any and all current and former subsidiaries, affiliates, divisions, partnerships, officers, directors, employees, agents, attorneys, consultants, investigators or representatives thereof, or any other person or entity acting on the behalf thereof or under the direction or control thereof.

6. As used herein, the term "Mead" shall mean and include The Mead Corporation, Mead Paper Company, any and all current and former subsidiaries, affiliates, divisions, partnerships, officers, directors, employees, agents, attorneys, consultants, investigators or representatives thereof, or any other person or entity acting on the behalf thereof or under the direction or control thereof.

7. As used herein, the term "Mitsubishi" shall mean and include Mitsubishi Paper Mills Ltd., any and all current and former subsidiaries, affiliates, divisions, partnerships, officers, directors, employees, agents, attorneys, consultants, investigators or representatives thereof, or any other person or entity acting on the behalf thereof or under the direction or control thereof.

8. As used herein, the term "Jujo" shall mean and include Jujo Paper Company, any and all current and former subsidiaries, affiliates, divisions, partnerships, officers, directors, employees, agents, attorneys, consultants, investigators or representatives thereof, or any other person or entity acting on the behalf thereof or under the direction or control thereof.

9. As used herein, the terms "PCB" or "polychlorinated biphenyl" shall mean the entire group of industrial compounds produced by the chlorination of biphenyl, including the entire line of Aroclor® products marketed, manufactured, sold, or distributed at any time by Solutia f/k/a Monsanto.

10. As used herein, the term "carbonless copy paper" or "CCP" shall mean and include paper manufactured as an alternative to traditional carbon paper, using any type of PCB as an emulsion or transfer agent. For purposes of these Requests, "carbonless copy paper" or "CCP" includes any and all paper designed, manufactured, sold and/or distributed by NCR, but only to the extent the resulting paper contained or was manufactured with PCBs. The term "carbonless copy paper" or "CCP" therefore does not include any paper manufactured using non-PCB emulsions or transfer agents. The term "carbonless copy paper" or "CCP" also means and includes that paper sometimes referred to as "carbonless carbon paper."

11. As used herein, the term "refer or relate to" shall mean concerning, addressing, referring, constituting, bearing upon, containing, embodying, incorporating, identifying, affecting, describing, evidencing and/or in any way pertaining to.

12. As used herein, the term "environment" shall mean and include the air, water, fish fauna, biota, sediment and/or soil.

13. In accordance with Civil L.R. 26.3, the term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

14. In accordance with Civil L.R. 26.3, the term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed.R.Civ.P. 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

15. In accordance with Civil L.R. 26.3, the term "identify" when referring to a person means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this paragraph, only the name of that

4

person need be listed in response to subsequent discovery requesting the identification of that person.

16. In accordance with Civil L.R. 26.3, the term "identify" when referring to a document means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s).

17. As used herein, the words "and" and "or" shall be construed conjunctively as well as disjunctively, and "includes" or "including" shall mean "including, but not limited to."

18. In accordance with Civil L.R. 26.3, the term "person" is defined as any natural person or any business, legal, or governmental entity or association.

19. The term "Site" refers to the Fox River and Lower Green Bay in Wisconsin.

20. If a document responsive to any Document Request is no longer in your possession, custody or control, state what disposition was made of the document and the date of such disposition, and identify all persons having knowledge of the document's contents.

21. When describing an oral communication: (i) state the date and place of the communication; (ii) identify each person who participated in the communication; (iii) identify each person who was present during the communication who did not participate in it; (iv) state the substance of the oral communication; and (v) identify each document referring to or relating to the oral communication.

22. Answer each interrogatory fully, without reference to your answers to any other set of interrogatories or to the pleadings. If additional information is necessary to prevent your answers from being misleading or ambiguous, include such additional information. Whenever in the course of answering any interrogatory it becomes necessary to incorporate by reference any

5

document, attach a copy of that document to your answers and indicate the interrogatory to which it is relevant.

23. If you object to a Document Request or an Interrogatory on the grounds of privilege, provide all non-privileged documents and information as is responsive, identify and list the documents and/or information withheld as privileged, and specify the basis for your claim of privilege or protection. When listing each document, include the date, author, addressee, all other recipients, and subject matter, and state in detail your legal basis for withholding production.

24. These Document Requests and Interrogatories are a continuing demand for any and all responsive documents and things. Therefore, any such documents and things discovered by you after the date hereof shall be produced at the time they are discovered. This paragraph shall not be construed to alter your obligations to comply with all other instructions herein.

25. Unless otherwise noted, all Interrogatories and Document Requests are limited to the time period from 1950 to 1978.

## INTERROGATORIES

1. Please identify all factories, mills, and/or facilities worldwide at which any emulsion used in the manufacture of CCP was produced or manufactured by or on behalf of NCR and/or its agents, representatives, or licensees. In responding to this Interrogatory, please state the name and address of each such facility, the specific emulsion produced or manufactured at each such facility, and the years that each such facility produced or manufactured that emulsion.

**RESPONSE:**

6

Case 2:08-cv-00016-WCG   Filed 02/09/12   Page 7 of 15   Document 1318-8

2.      Please identify any and all NCR agents, representatives and/or licensees authorized to manufacture, distribute, produce and/or sell CCP worldwide, including their names, the locations of their production facilities, the authorized territory for each such agent, representative and/or licensee, and the years during which they manufactured, distributed, produced, and/or sold CCP.

**RESPONSE:**


3.      Please describe the procedures used by Appleton, NCR, Jujo, Mitsubishi and/or Wiggins for the management, recycling, sale, or disposal of "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP worldwide, and any changes to those procedures that occurred over time.

**RESPONSE:**


4.      Please identify and explain the relationship between or among NCR and Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi, including but not limited to formal legal relationships and informal relationships, corporate transactions, indemnification, contacts, licenses or agreements including informal agreements and cooperation regarding the identification and assessment of issues raised by the use of PCBs in the production of CCP, the production of CCP emulsion, or the recycling of "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP.

**RESPONSE:**

7

5.  Please identify and describe any and all steps taken by NCR or any of its agents, representatives and/or licensees to reduce the release of PCBs from the production of CCP emulsion, the production of CCP paper, or the recycling of CCP, including "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP worldwide, and when those steps were taken.

**RESPONSE:**

6.  Please identify each and every patent (whether domestic or foreign) held by NCR regarding or concerning in any respect CCP.

**RESPONSE:**

7.  Identify all witnesses that you expect to call at trial and the subject matter of their testimony, including without limitation fact and expert witnesses.

**RESPONSE:**

8.  Identify all documents that you expect to introduce into evidence at trial.

**RESPONSE:**

8

## DOCUMENT REQUESTS

Please produce the following documents:

1. Any and all "NCR Paper and Supply Products Technical Services Reports," or any equivalent or similar reports, dated from January 1, 1954 through December 31, 1977 that concern in any respect PCBs, the production of CCP emulsion, the production of CCP, or the recycling of CCP, including "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP.

2. Any and all documents related to the Complaint filed by the United States Federal Trade Commission in 1980 challenging BAT's 1978 acquisition of the Appleton Papers Division from NCR, including but not limited to deposition transcripts, discovery requests and responses, stipulations and/or testimony.

3. Any and all documents or communications, including but not limited to communications with Appleton, Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi, that refer or relate in any respect to a 1966 report of Dr. Jensen of Sweden concerning PCBs in the environment.

4. Any and all documents or communications, including but not limited to communications with Appleton, Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi, that refer or relate in any respect to the toxicity or potential toxicity of PCBs and/or carbonless copy paper, "broke," "waste," "trim," "scrap," "cut-offs" or "off-cuts" from CCP, products produced from any of the foregoing, or the emulsion used to manufacture CCP.

5. Any and all documents or communications, including but not limited to communications with Appleton, Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi, that refer or relate in any respect to the actual or potential presence of PCBs in the environment at or in the vicinity of any facility owned or operated by NCR, Monsanto, Wiggins, BAT, Mead

and/or Mitsubishi that was used for (i) the production of CCP, (ii) the production of the emulsion used to manufacture CCP, or (iii) the recycling of CCP, including any "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP.

6. Any and all documents or communications, including but not limited to communications with Appleton, Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi, that refer or relate in any respect to the actual or potential release or discharge of PCBs into the environment by any person or facility that (i) produced CCP, (ii) produced the emulsion used to manufacture CCP and/or (iii) recycled CCP, including "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP.

7. Any and all documents or communications, including but not limited to communications with Appleton, Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi, that refer or relate in any respect to the actual or potential presence of PCBs in process water, wastewater, discharges, sludge, "backwater" or effluent of any facility that produced (i) CCP, (ii) the emulsion used to manufacture CCP, and/or (iii) other paper or products made with recycled CCP, including "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP.

8. Any and all documents or communications, including but not limited to communications with Appleton, Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi, that refer or relate in any respect to encapsulation technology, encapsulated adhesives, capsular adhesives, or analysis of paper coating used in the production of CCP, the production of the emulsion used to manufacture CCP, or in the recycling of CCP, including "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP.

9. Any and all communications involving Clive Capps, H.F. Rance, John Gough, and/or Spencer Hope of Wiggins and/or Cora Ayers of BAT that refer or relate in any respect

10

whatsoever to PCBs, discharges of PCBs into the environment, the production of CCP or the recycling of CCP, including "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP.

10. Any and all contracts or agreements that refer or relate to in any respect whatsoever (i) the spin-off of Appleton Papers Incorporated from Arjo Wiggins Appleton, (ii) any actual or potential liability of Appleton or any third party for clean-up of the Site, or (iii) the clean-up of the Site.

11. Any and all documents or communications that refer or relate in any respect to the development, testing, analysis, manufacture, evaluation or consideration of possible substitutes for or alternatives to PCBs in the emulsion used to manufacture CCP, in both domestic and foreign markets, including but not limited to monoisopropylbenzene ("M.I.P.B."), isopropyl biphenyl and HB-40.

12. Any and all documents that refer or relate in any respect to any meeting(s) between or among you, Appleton, Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi and any agent, employee or representative of any governmental entity (domestic or foreign), including but not limited to the British Ministry of Agriculture, Fisheries and Food, regarding PCBs, CCP, CCP emulsion, or other paper or products made with recycled CCP, including "waste," "broke," "trim," "scrap," "cut-offs," or "off-cuts" from CCP.

13. Any and all licensing or non-disclosure agreements between you and Appleton, Monsanto, Wiggins, BAT, Mead, Mitsubishi, and/or Jujo that concern or relate in any respect to CCP or encapsulation technology, including any documents or communications that refer or relate in any respect to the renewal, negotiation or performance of such agreements.

11

14. The complete patent prosecution file for each and every patent held by NCR (both foreign and domestic) regarding in any respect CCP, including any and all patents that relate to PCBs and possible alternatives to PCBs such as HB-40 and MIBP.

15. Any and all environmental sampling, test data and analysis concerning all facilities listed in response to Interrogatory Nos. 1 and 2 above.

16. Any and all documents regarding NCR or Appleton's use, purchase, or acquisition of any of the following pieces of equipment, including correspondence, billing statements, shipping manifests, quotes, and invoices regarding the same: (a) gas chromatograph, (b) infra-red spectrometer, (c) mass spectrograph, and/or (d) "ATR attachment."

17. Any and all documents that refer or relate in any respect to Wiggins' purchase of, or negotiation for the purchase of, an NCR emulsion facility located at or near Boreham Wood, UK.

18. Any and all documents that refer or relate in any respect to NCR's purchase of, or negotiation for the purchase of, the Combined Locks facility and/or Appleton Papers located in Wisconsin.

19. Any and all documents that refer or relate in any respect to the "Simon-Carves Monsanto Effluent Advisory Service."

20. Any and all documents that refer or relate in any respect to the possibility that NCR paper or other paper or products made with recycled CCP, including "waste," "broke," "trim," "scrap," "cut-offs," or "off-cuts" from CCP, could contaminate food or any packaging materials used in the food industry.

21. Any and all documents that refer or relate in any respect to NCR, Appleton, Monsanto, Wiggins, BAT, Mead, Jujo and/or Mitsubishi's sale or disposal of "waste," "broke,"

12

"trim," "scrap," "cut-offs" or "off-cuts" from CCP. This request includes, but is not limited to, any and all correspondence, profit and loss statements, shipping records, manifests, bills, and invoices reflecting same.

22. Any and all documents that refer or relate in any respect to customer inquiries, complaints, testing, or analysis regarding "CF desensitization," toxicity or the potential toxicity of CCP and/or PCBs.

23. Any and all documents that refer or relate in any respect to efforts by or on behalf of Wiggins to purchase or acquire Appleton Coated Paper Company.

24. Any and all documents that refer or relate in any respect to any enforcement activity or litigation brought by or on behalf of NCR regarding any patent set forth in response to Interrogatory No. 6 above.

25. Any and all documents that refer or relate in any respect to testing or analysis performed on CCP or other paper or products made with recycled CCP, including "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP by Industrial Bio-Test Laboratories, the Wisconsin Alumni Research Foundation, and/or Hill-Top Research Institute a/k/a Hilltop Labs.

26. Any and all documents that refer or relate in any respect to the possibility of environmental contamination resulting from the incineration of CCP or other paper or products made with recycled CCP, including "waste," "broke," "trim," "scrap," "cut-offs" or "off-cuts" from CCP.

27. Any and all documents that evidence or reflect communications (whether written or oral) with any manufacturer of PCBs (both foreign and domestic) including, but not limited to Bayer, Prodelec, Caffaro, Progil or Kuhlman.

13

28. Any and all documents identified or described in response to the foregoing Interrogatories or containing information requested in, relevant to and/or document or support the responses to Interrogatories.

    Georgia-Pacific Consumer Products
    LP (f/k/a Fort James Operating
    Company), Fort James Corporation
    and Georgia-Pacific LLC
    By its Counsel,

    s/ *Margrethe K. Kearney*
    Margrethe K. Kearney

    Mary Rose Alexander
    IL Bar No. 6205313
    CA Bar No. 143899
    Arthur F. Foerster
    IL Bar No. 6271201
    Margrethe K. Kearney
    IL Bar No. 6286559
    Latham & Watkins LLP
    233 S. Wacker Dr.
    Ste. 5800
    Chicago, IL 60606
    Telephone: (312) 872-7700
    Facsimile: (312) 993-9767
    Mary.Rose.Alexander@lw.com
    Arthur.Foerster@lw.com
    Margrethe.Kearney@lw.com

    Ernest J. Getto
    CA Bar No. 55662
    Karl S. Lytz
    CA Bar No. 110895
    Latham & Watkins LLP
    505 Montgomery St.
    Ste. 2000
    San Francisco, CA 94111-6538
    Ernie.Getto@lw.com
    Karl.Lytz@lw.com

Dated: December 19, 2008