UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

Appleton Papers Inc. and
NCR Corporation,

        Plaintiffs,

    v.                                              Case No. 08-cv-00016-WCG

George A. Whiting Paper Company, *et al.*,

        Defendants.

---

**BRIEF OF WTM I COMPANY AND P. H. GLATFELTER COMPANY
ON THEIR RIGHT TO RECOVER EARNINGS
ON THE OU1 ESCROW ACCOUNT**

---

The Plaintiffs have questioned whether the interest earnings on deposits made by Defendants/Counter-Plaintiffs WTM I Company ("WTM") and P.H. Glatfelter Company ("Glatfelter") to the OU1 Escrow Account should count as equivalent cash contributions subject to recovery in this case. They should.

During trial, the parties stipulated that they would brief the legal question of whether the interest and other earnings on the OU1 Escrow Account are recoverable by WTM and Glatfelter under their CERCLA Section 113 counterclaims. If the Court decides the threshold legal question in favor of the Plaintiffs, the factual question of the amount of interest owed will be moot. If the Court decides the threshold legal question in favor of WTM and Glatfelter, the parties have agreed that the amount of the interest and other earnings will be determined by reference to the bank statements for the OU1 Escrow Account. WTM contends that, as reflected on the bank statements, its deposits into the OU1 Escrow Account have resulted in earnings totaling $2,239,306 through December 31, 2011. Glatfelter contends that, as reflected on the

bank statements, its deposits into the OU1 Escrow Account have resulting in earnings totaling $1,948,872 through December 31, 2011. If, upon review of the bank statements, the Plaintiffs find a discrepancy, the parties will attempt to resolve any dispute regarding the discrepancy amount. If the parties are then unable to resolve any such dispute, they will submit their positions and evidence on the discrepancy amount to the Court for a determination of the amount to be added to any judgment.

I. **THE OU1 CONSENT DECREE TREATS INTEREST EARNED ON THE OU1 ESCROW ACCOUNT AS THE EQUIVALENT OF ADDITIONAL CASH CONTRIBUTIONS.**

The OU1 Consent Decree for Remedial Design and Remedial Action at Operable Unit 1 of the Lower Fox River and Green Bay Site (as amended) (the "OU1 Consent Decree") itself answers the legal question of whether WTM and Glatfelter are entitled to recover earnings on the OU1 Escrow Account as part of their contribution counterclaims against the Plaintiffs. (*See* Trial Exh. 5327.) The OU1 Escrow Account[1] was established as a form of financial security to assure the availability of funds for response and natural resource restoration activities required by the OU1 Consent Decree. (*See* Trial Exh. 5327, Section VI, ¶ 11.) Management of the OU1 Escrow Account is governed by Appendix C to the OU1 Consent Decree.[2] That appendix instructs the Escrow Agent "to apply, retain, or use the funds in the Escrow Account (<u>and all interest or other income earned on funds deposited in the Escrow Account</u>) in order to finance response actions taken or to be taken at or in connection with OU1 of the Site, but only in accordance with, and to the extent required by, the governing provisions of this Consent Decree." (Trial Exh. 5327, App. C, ¶ 2 (emphasis added).)

---

[1] The term "OU1 Escrow Account" refers both to the original account established in 2004 and to the WTM and Glatfelter sub-accounts established in 2007 (as discussed on pages 3-4 above). The OU1 Consent Decree provides that "[t]he Escrow Account may be established as several accounts or sub-accounts to address the different sources and uses of the funds paid into the Escrow Account." Trial Exh. 5327, ¶ 9.

[2] Under the terms of the OU1 Consent Decree, all appendices are deemed to be part of the Consent Decree itself. See Trial Exh. 5327, Section IV, for the definition of "Consent Decree."

2

QB\16085639.4

In other words, all monies in the OU1 Escrow Account, whether initially deposited into the account *or* income earned by the monies in the account, are treated exactly the same way under the terms of the OU1 Consent Decree. The funds in the account, no matter their origin, are to be drawn down to pay for Allowable RD/RA Costs and Allowable Restoration Costs, as defined by the decree.

But for the requirement that WTM and Glatfelter establish and fund the OU1 Escrow Account as a means of financial assurance, each would have met its obligations under the OU1 Consent Decree on a "pay as you go" basis, meaning that they each would not have made significant upfront payments (both parties made their first payments of $26,250,000 each into the OU1 Escrow Account in 2004). Because WTM and Glatfelter made significant upfront payments, those payments accrued interest and other earnings that increased the available funding for OU1 response work.

By January of 2008, essentially all of the initial deposit amounts (the $26,250,000 each), *plus* more than $3.4 million in earnings on the deposits, had been expended on Allowable RD/RA costs and Allowable Restoration Costs. (Trial Exh. 500, Declaration of Rachel Schneider.) As of January 31, 2008, the remaining balance in the main account of the OU1 Escrow Account was $432, and two separate sub-accounts had been established, one in the name of WTM and one in the name of Glatfelter. (Trial Exh. 500, ¶¶ 15-16.)

The sub-accounts were established when the money in the OU1 Escrow Account was running short in 2007. At that time, the United States, the State of Wisconsin, Glatfelter and WTM entered into an Agreed Supplement to Consent Decree that expressly authorized the creation of the two sub-accounts. (Trial Exh. 5321, ¶ 5.) The sub-accounts were established because WTM and Glatfelter provided funding at different times, and the parties needed a

3

mechanism to separately account for the different interest earnings on their respective contributions. Since WTM made certain contributions earlier than Glatfelter, interest earned on the WTM sub-account is greater than interest earned on the Glatfelter sub-account.

At the same time as the Agreed Supplement was signed, Glatfelter, WTM and the Escrow Agent signed Amendment No. 1 to Escrow Agreement. (Trial Exh. 5322, "OU1 Consent Decree Appendix D2.") Section 1.b. of OU1 Consent Decree Appendix D2 provides as follows: "All interest and income earned on the funds deposited into the WTM Sub-account shall be deemed part of the WTM Sub-account." Similarly, Section 1.c. provides: "All interest and income earned on the funds deposited into the Glatfelter Sub-account shall be deemed part of the Glatfelter Sub-account." Likewise, in Amendment No. 2 to the Escrow Agreement (Trial Exh. 5328, "OU1 Consent Decree Appendix D3"), governing a payment by Menasha Corporation into the OU1 Escrow Account (discussed in the next section of this brief), Sections 1.f. and 1.g. again provide that interest and income earned on deposits into the WTM and Glatfelter sub-accounts shall be deemed, respectively, part of each sub-account. The OU1 Consent Decree would not provide that interest and income in the sub-accounts remain in the corresponding sub-account *unless* interest and income are to be treated as, in effect, new cash contributions from each party into its corresponding sub-account.

The significance of recognizing the interest earned by each party's deposits is apparent from several other provisions of the decree. Appendix D1 to the OU1 Consent Decree is the original Escrow Agreement. (Trial Exh. 5311.) Pursuant to Section 1 of that agreement, WTM and Glatfelter convey and transfer their rights to all funds deposited in the OU1 Escrow Account, "as well as all interest and income earned on the funds deposited."[3] These terms recognize the

---
[3] Section 1 of Appendix D1 to the Consent Decree provides:

4

fact that interest and earnings on deposits made by WTM and Glatfelter inherently belonged to WTM and Glatfelter respectively. Thus, interest and earnings had to be assigned to the OU1 Escrow Account by WTM and Glatfelter, just as the funds deposited by the two companies had to be assigned. By assigning the interest, WTM and Glatfelter—in effect—made cash contributions equal to the amount of the earnings on their respective deposits into the account.

The Escrow Agreement also provides that the assignment of the deposits in the OU1 Escrow Account, as well as the assignment of interest and other income earned on the deposits, is subject to certain other Consent Decree provisions, including Section 4.a.(6) of the Escrow Agreement and Consent Decree Appendix C. (*See* footnote 2 for the relevant text.) Under those provisions, WTM and Glatfelter are entitled to certain specified refund payments of unexpended funds in the OU1 Escrow Account, if the conditions provided in Sections 5.a.(6) and (9) of Appendix C occur. In other words, the Escrow Agreement recognized that the interest earned on each party's deposits would impact the amount of a refund, if any, to that party.

Similarly, the OU1 Consent Decree, in Paragraph 102, provides that WTM and Glatfelter "are entitled to full credit, applied against their liabilities for response costs and natural resource damages at the Site, for: . . . (iv) the NRD Commitment; . . . (vii) the Allowable RD/RA Costs paid or reimbursed from the Escrow Account under Paragraph 11 of this Consent Decree and Appendix C; . . ." The OU1 Consent Decree resolves the liability of Glatfelter and WTM in two ways. It provides a covenant not to sue and contribution protection for "OU1 Response Actions

---

Glatfelter, WTM and the LLC [meaning GW Partners, LLC—the entity formed by WTM and Glatfelter to perform the OU1 work] hereby absolutely and irrevocably assign, convey, and transfer to the Escrow Account and its successors and assigns, for the benefit of the Beneficiaries, all funds deposited in the Escrow Account (<u>as well as all interest and income earned on the funds deposited in the Escrow Account</u>), subject only to certain provisions of this Escrow Agreement (namely Subsections 4.a.(2), 4.a.(5), and 4.a.(6)) and certain provisions of the Consent Decree (namely Subparagraph 14.a.(2), Subparagraph 48.c, Paragraph 51, Paragraph 113, and Consent Decree Appendix C). (Emphasis added).

5

QB\16085639.4
Case 2:08-cv-00016-WCG   Filed 03/12/12   Page 5 of 10   Document 1351

and Costs"—that is, the costs of the remedy in OU1 implemented after 2003. The OU1 Consent Decree also provides this "full credit" against WTM's and Glatfelter's liabilities for the entire Site.[4]

Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), authorizes contribution claims for amounts spent resolving a contribution plaintiff's liability to the United States or a State. All of the expenditures for Allowable RD/RA Costs and Allowable Restoration Work Costs from the OU1 Escrow Account, including the sub-accounts, in fact act partially to resolve WTM's and Glatfelter's liability to the United States and the State. Those payments are funded not only by WTM's and Glatfelter's initial contributions, but also by the interest earned on the account. Accordingly, the terms of the OU1 Consent Decree make clear that the interest earned on the OU1 Escrow Account is a payment by WTM or Glatfelter to resolve (at least in part) that party's liability for this Site. It is a proper subject of this contribution claim, and should be recovered.

Finally, there is no provision in the OU1 Consent Decree or the appendices relating to the management of the account that alters the normal rules applicable to such accounts. Consequently, the interest earnings are treated as taxable income to WTM and Glatfelter.[5] This unstated feature of the OU1 Escrow Account, like all escrow accounts, recognizes that interest earnings on an escrow account are attributable to the parties making the initial cash contributions.

---

[4] Given the plaintiffs' stated concern about "double recovery," it should be noted that Paragraph 102 further provides that any such credit "shall not include the amount of any recoveries by Settling Defendants [WTM and Glatfelter] of any portion of such payments from other liable persons, . . ."

[5] The Escrow Agent issues a Form 1099 reflecting interest and other earnings on an annual basis. Those forms are transmitted to GW Partners LLC, the limited liability company formed by WTM and Glatfelter to facilitate the execution of contracts for work required under the OU1 Consent Decree. GW Partners, in turn, files its own tax returns, but earnings and expenses are attributed to the underlying members. As such, Form K-1s have been issued each year to WTM and Glatfelter, attributing all interest and other earnings on the OU1 Escrow Account to them.

6

## II. CONTRIBUTIONS TO THE OU1 ESCROW ACCOUNT BY OTHER SOURCES ARE NOT INCLUDED IN THE INTEREST CALCULATIONS FOR WTM AND GLATFELTER.

Plaintiffs might try to muddy the water by pointing out that the OU1 Escrow Account received contributions from two other sources. It remains clear, however, that neither has a bearing on interest calculations for WTM and Glatfelter.

As to the first source of funding other than WTM and Glatfelter, the OU1 Consent Decree anticipated that certain OU1 response activities would be undertaken with funds obtained pursuant to a Consent Decree entered in *United States and the State of Wisconsin v. Appleton Papers Inc. and NCR Corp.,* Case No. 01-C-0816 (E.D. Wis. 2001) (the "API/NCR Decree"). (Trial Exh. 5327, ¶ 10.) Funding made available from the API/NCR Decree was to be placed by EPA into a Disbursement Special Account as a special account within the EPA Hazardous Substance Superfund. From the Disbursement Special Account, $774,503 of funding was paid directly to the Wisconsin DNR for agency oversight costs, bypassing the OU1 Escrow Account entirely. In addition, Glatfelter and WTM could request *reimbursement* from disbursements made from the Escrow Account for response work.[6] Glatfelter and WTM, in fact, requested the reimbursement funds allowed by the OU1 Consent Decree. A total of $9,225,497 was paid to

---

[6] Appendix B to the OU1 Consent Decree outlines requirements for the Disbursement Special Account. Section 1.b.(3) of Appendix B provides:

> Allowable RD/RA Costs for Designated Response Projects shall be paid initially from the Escrow Account described by Consent Decree Paragraph 11 and Appendix C. Approximately every three months, the Escrow Account shall then be replenished pursuant to this Appendix B, through a disbursement from the Disbursement Special Account to the Escrow Account.

(Trial Exh. 5327 (emphasis added).) Section 3 of Appendix B further provides:

> Approximately once every three months, for so long as a balance remains in the Disbursement Special Account, the Settling Defendants may request that the Escrow Account be reimbursed for Allowable RD/RA Costs already paid from the Escrow Account for Designated Response Projects. Any such requests shall be made in a Quarterly Report submitted to Plaintiffs pursuant to Consent Decree Paragraph 32.

(Trial Exh. 5327 (emphasis added).) These provisions make crystal clear that contributions from the Disbursement Special Account were only made to *reimburse* WTM and Glatfelter for expenditures already made from the OU1 Escrow Account.

7

QB\16085639.4
Case 2:08-cv-00016-WCG    Filed 03/12/12    Page 7 of 10    Document 1351

the OU1 Escrow Account from the Disbursement Special Account for response cost payments *previously* made from the OU1 Escrow Account.

As reimbursement for funds already spent, transfers from the Disbursement Special Account did not generate interest income on their own. They simply reimbursed WTM and Glatfelter for deposits already made by the two of them and spent pursuant to the OU1 Consent Decree. As such, interest was, in effect, only earned on the original WTM and Glatfelter deposits.

The second source of funding for OU1 response activities, other than Glatfelter and WTM, was Menasha Corporation. In 2008, Menasha Corporation contributed $7,000,000 to the OU1 Escrow Account. This deposit, however, was made after all original deposits from WTM and Glatfelter, and corresponding earnings, had been spent on response and natural resource restoration activities pursuant to the OU1 Consent Decree. In other words, the OU1 Escrow Account had been depleted to a near-zero balance ($432) before the Menasha deposit was received into the original account. The original account is also referred to in the OU1 Consent Decree as "Existing Funds." (Trial Exh. 5322, ¶ 1.) After Menasha Corporation made its agreed-upon deposit of $7,000,000 into the near-depleted Existing Funds, all subsequent deposits by WTM and Glatfelter were made into their respective individual sub-accounts. The interest earned on the Existing Funds because of Menasha Corporation's deposit was required to be tracked separately.[7] In fact, the interest earned on the Existing Funds after Menasha

---

[7] Appendix D3 to the OU1 Consent Decree, Section 1.e. provides:

> All funds maintained in the Escrow Account, not including the Sub-accounts, but including without limitation all interest and income earned on the Account funds (but not the Sub-account funds), shall be segregated from the WTM Sub-account and the Glatfelter Sub-account, in one or more accounts or sub-accounts of the Escrow Account, and the aggregate amount of all such funds shall be referred to herein as the "Existing Funds." All amounts paid by Menasha Corporation pursuant to the Second Supplement, and all interest and income earned on such funds, shall be placed with and treated thereafter as Existing Funds.

(Trial Exh. 5328.)

Corporation's deposit was tracked separately, and that interest is not included in the claims asserted by WTM and Glatfelter.

## III. WTM AND GLATFELTER ARE ENTITLED TO RECOVER INTEREST EARNED ON THE OU1 ESCROW ACCOUNT, ASSUMING THE PLAINTIFFS ARE HELD LIABLE AS ARRANGERS IN OU1.

Interest accrued on the OU1 Escrow Account—including both the main account and corresponding sub-accounts—must be recognized as the equivalent of additional cash contributions made by WTM and Glatfelter. More than $3.4 million in earnings on the OU1 Escrow Account have already been spent on OU1 cleanup and restoration work. The remaining (and still growing) earnings on the account are available to meet the on-going and long-term response action obligations under the OU1 Consent Decree, including monitoring and cap maintenance in OU1.

Assuming the Plaintiffs are held liable for OU1 costs, following this Court's ruling at the August 1, 2011 status hearing, the Plaintiffs are liable for the amounts remaining in the OU1 Escrow Account, including any interest accrued on the account prior to the entry of judgment. At the August 1 hearing, the Court rejected NCR's legal argument that the remaining amounts in the OU1 Escrow Account cannot be recovered now.

In rejecting NCR's argument, the Court concluded during the hearing that if WTM and Glatfelter "have expended that money, and it's no longer in their control and at most they might have, if not reimbursed, a claim to it later, placing NCR in [their shoes] would seem to be reasonable based upon my assessment of the various parties' liabilities and the primary liability of NCR." (Dkt. 1163, at 22.) Thus, regardless of whether OU1 Escrow Account funds have already been expended on OU1 cleanup and restoration activities, or remain in the account to secure future long-term obligations under the OU1 Consent Decree, WTM and Glatfelter should

9

be entitled to recover both their monies deposited into the OU1 Escrow Account as well as the earnings on those deposits.

Dated this 12th day of March, 2012.

Respectfully submitted,

Nancy K. Peterson (SBN 1000197)
Peter C. Karegeannes (SBN 1015025)
William H. Harbeck (SBN 1007004)

s/ Nancy K. Peterson
Quarles & Brady LLP
411 E. Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202
Telephone: 414-277-5000
Fax: 414-203-0190
nancy.peterson@quarles.com

**Attorneys for Defendant WTM I Company**

s/David G. Mandelbaum
David G. Mandelbaum
Francis A. Citera
Marc E. Davies
Monique M. Mooney
Caleb J. Holmes
Adam B. Silverman
GREENBERG TRAURIG, LLP
Two Commerce Square, Suite 2700
2001 Market Street
Philadelphia, PA 19103
215-988-7800
mandelbaumd@gtlaw.com

**Attorneys for Defendant P. H. Glatfelter Company**

10