**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

APPLETON PAPERS INC. and )
NCR CORPORATION, )
                    Plaintiffs, )
                          )
             v. )
                          )      No. 08-CV-00016-WCG
GEORGE A. WHITING PAPER )
COMPANY, et al., )
                Defendants. )
                          )

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON
PARTIAL FINDINGS** [1]

---

[1]     This memorandum is filed on behalf of the following Defendants: Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC (collectively, "GP"), CBC Coating, Inc., U.S. Paper Mills Corporation, P.H. Glatfelter Company, WTM I Company, Menasha Corporation, and Neenah Menasha Sewerage Commission.

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   PROCEDURAL STANDARD ....................................................................................3

III.  ARGUMENT ..............................................................................................................3

    A.    Plaintiffs' Proposed Arranger Liability Standard Is Incorrect ................................3

        1.    Arranger Liability Under *BNSF* ................................................................4

        2.    This Court's Arranger Ruling Is Consistent With *BNSF* ............................6

    B.    Defendants Met Their Burden To Prove That ACPC Is an Arranger.....................7

        1.    ACPC Treated Broke As a Production Waste To Be Minimized ...............7

        2.    ACPC Employees Knew That Non-Trivial Amounts of Its Broke
            Waste Would Be Disposed of into the Fox River .....................................10

    C.    Defendants Met Their Burden To Prove That NCR Is An Arranger....................12

        1.    NCR Is Directly Liable Under *BNSF* Because It Knew That a
            Portion of the Emulsion It Conveyed to ACPC Would Inevitably
            Be Disposed of as Broke and Helped Plan for That Disposal .................13

        2.    NCR is Liable under the Formulator Liability Doctrine Because It
            Controlled All Aspects of Its Subcontractors' Production ........................14

IV.   CONCLUSION..........................................................................................................15

# I.      INTRODUCTION

Plaintiffs seek judgment on partial findings on the grounds that Defendants failed to meet their burden to show by a preponderance of evidence that ACPC and NCR arranged for the disposal of a hazardous substance within the meaning of CERCLA Section 107(a)(3).  *See* Dkt. No. 1342 ("Motion").  Plaintiffs make sweeping assertions in this Motion, but ignore the vast majority of the overwhelming evidence Defendants presented at trial.  Specifically,

- Plaintiffs fail to address a single documentary exhibit, including the hundreds of ancient business records—such as company correspondence, meeting minutes, periodicals, and laboratory notebooks—which prove that ACPC and NCR knew that broke was a waste that ACPC had to get rid of, and that this broke was recycled in a way that discharged waste material into the river.

- Plaintiffs ignore the testimony of numerous ACPC employees who were familiar with various parts of the broke recycling process and testified that they treated broke as a "waste," worked tirelessly to "minimize it," simply had to "get rid of it," and knew it was being repulped by the recyclers to remove coatings and recover paper fibers.

- Plaintiffs ignore the testimony of Mr. Dick Wand, who worked in the Fox River paper industry in the 1960s, and testified that everyone working in that industry knew that broke was recycled to get the paper fibers and that the non-fiber materials were disposed of through the wastewater.  Trial Tr. (Wand) 85:3-88:10.

- Plaintiffs ignore the testimony of Dr. Robert Dolan, Professor of Business Administration at the University of Michigan's School of Business, who opined based on the totality of the evidence that ACPC "conceived" of broke as a waste, treated it as a waste, and never made a profit by selling it.  Trial Tr. (Dolan) 219:8-221:4.

1

- Plaintiffs ignore the expert testimony of Dr. James Kittrell, a chemical engineer and toll manufacturing expert, who testified that ACPC and NCR knew exactly how the coatings came off of NCR Paper during repulping because it was their jobs to put the coatings on the paper, Trial Tr. (Kittrell) 501:15-505:13-16, and that NCR controlled all important aspects of production through detailed purchasing, processing and product specifications. Trial Tr. (Kittrell) 514:15-520:7.

- Plaintiffs ignore the expert testimony of Mr. Charles Klass and Dr. John Heitmann, both of whom are experts in the paper industry, who both opined that ACPC employees had the education and work experience to fully understand, and did fully understand, what was common knowledge in the paper making business—that non-fiber materials were removed during the recycling process and disposed of in wastewater. Trial Tr. (Klass) 356:14-361:18; Ex. 6009.

- Plaintiffs ignore ancient documents which establish that NCR knew that a portion of the emulsion it conveyed to ACPC would inevitably end up on broke waste that would be recycled to remove and dispose of coatings, and helped plan for this disposal through its own laboratory experiments, coordination of broke recycling information among its production contractors, and consultations with entities such as the Waste Paper Utilization Council ("WPUC"). Trial Tr. (Kittrell) 503:22-513:16.

Confronted with this uncontroverted evidence demonstrating arranger liability, Plaintiffs argue for an overly-strict legal test for arranger liability, which is both contrary to the law and logically inconsistent. Under the proper legal standard—set forth by the Supreme Court, and followed by this Court and others around the country—Defendants easily met their burden to prove that ACPC and NCR are CERCLA arrangers. The Court should deny Plaintiffs' motion.

2

## II.    PROCEDURAL STANDARD

Under Federal Rule of Civil Procedure 52(c) a court in a nonjury trial may, if it chooses, enter judgment once a party has been fully heard on an issue and the court can make an appropriate disposition on the evidence that has been presented.  *See* Fed. R. Civ. P. 52(c).  The trial court should take an "an unbiased view of all the evidence" and give it such weight as the court believes it is entitled to receive.  *Sanders v. Gen. Servs. Admin.*, 707 F.2d 969, 971 (7th Cir. 1983); *Pinkston v. Madry*, 440 F.3d 879, 890 (7th Cir. 2006) ("a trial court ruling on a motion for judgment on partial findings under Rule 52(c) is acting in the capacity of a finder of fact, weighing evidence and assessing the credibility of the witnesses").  Denial of a motion for judgment on partial findings is nothing more than a refusal to enter judgment at that time, and does not preclude a court from later making considered findings of fact and conclusions of law on all of the evidence presented at trial.  *Armour Research Found. of Ill. Inst. of Tech. v. Chicago, Rock Island & Pac. R.R. Co*., 311 F.2d 493, 494 (7th Cir. 1963).

## III.    ARGUMENT

### A.    Plaintiffs' Proposed Arranger Liability Standard Is Incorrect

Plaintiffs' motion is based on a significant overstatement of the legal standards relevant to determining whether ACPC and NCR (either as a successor, or independently based on its own conduct) are arrangers within the meaning of Section 107(a)(3).  According to Plaintiffs, ACPC is only liable if "*the primary purpose*" of its broke sales was to dispose of a hazardous substance.  Mot. at 3.  Additionally, based on their interpretation of this Court's February 2011 Decision, Dkt. No. 1080 ("Order"), ACPC must *also* have sold its broke with "*distinct or specific*" knowledge that "*significant or important*" amounts of broke waste product would— with certainty—end up in the Fox River.  Mot. at 3.  Plaintiffs further argue that this type and level of knowledge had to have been known to a single, senior company representative that must

be specifically proved by direct evidence and not inferred from other facts. Finally, Plaintiffs claim that for NCR to be liable based on its own conduct, Defendants must demonstrate that NCR retained ownership, possession or control of ACPC's broke, and that NCR intended to dispose of ACPC's broke. *Id.* at 3-4. None of this is correct.

### 1.    Arranger Liability Under *BNSF*

In *Burlington Northern and Santa Fe Railway Co. v. United States* ("*BNSF*"), the Supreme Court held that "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." 556 U.S. 599, 611 (2009). There, Shell sold D-D, a pesticide, in bulk to distributors, F.O.B. Destination. Shell knew that minor amounts of its product were accidentally spilled during product transfers that occurred after the distributors had taken title to the product, and took numerous steps to encourage its distributors to reduce the likelihood of such spills. *Id.* The Court concluded that such "evidence does not support *an inference* that Shell intended such spills to occur." *Id.* (emphasis added). Nevertheless, the Court observed that "in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes." *Id.*; *see also U.S. v. Gen. Elec.*, 670 F.3d 377, 387 (1st Cir. 2012) (upholding post-*BNSF* arranger ruling in part because "the record sustain[ed] an inference" that seller "knew or otherwise understood" that PCB-containing Pyranol it sold was disposed of). Even in the context of the sale of a new product, an entity can be liable if it had such knowledge and "planned for" the disposal of at least some of its product. *BNSF* at 556 U.S. at 612. As the Supreme Court explained,

> In order to qualify as an arranger, Shell must have entered into the sale of D-D with the intention *that at least a portion of the product be disposed* of during the transfer process by one or more of the methods described in § 6903(3).

*Id.* (emphasis added).

4

*BNSF* thus conclusively refutes Plaintiffs' contention that arranger liability arises only if "the primary purpose" of the transaction is to dispose of a hazardous substance because, in the Supreme Court's own words, the intention to dispose need only relate to "a portion of the product." Thus, ACPC would be liable as an arranger if it intended and planned for disposal of a portion of the broke sold to recyclers.[2] Furthermore, under *BNSF,* the relevant levels of knowledge and intent may be "inferred" from the surrounding facts.[3]

NCR would be independently liable as an arranger if it intended that a portion of the emulsion it owned and conveyed to ACPC would inevitably be disposed of and helped plan for that disposal. NCR's arranger liability does not turn on whether it owned or controlled the waste

---

[2]     The cases cited by Plaintiffs for their "primary purpose" argument, Mot. at 3-4, are not actually "mixed motives" cases, but instead involve the sale of useful products that ultimately ended in a disposal that had nothing to do with the transaction. In *GJ Leasing Co. v. Union Elec. Co.*, the Seventh Circuit held that the seller of a 52-acre property did not arrange for the disposal of asbestos that was released when the buyer negligently tore down buildings on the property. 54 F.3d 379, 385 (7th Cir. 1995). The court noted the sale had nothing to do with disposal; indeed, the asbestos played absolutely no role in the sale and it would not even have been released but for the "ham-handed" disposal methods of the buyers. *Id.* In *Pneumo Abex Corp. v. High Point, Thomasville & Denton Railroad Co.*, railroad operators sold used wheel bearings to a metal recycler that washed off the dirt and grease, reformed the metal into new wheel bearings, and sold them back to the railroad operators. 142 F.3d 769, 775 (4th Cir. 1998). The court found that "removal of contaminants was not the purpose of the transaction," that the grease and dirt that were removed were not hazardous substances or the cause of the required response actions, and that "the intent of both parties to the transaction was that the wheel bearings would be reused in their entirety in the creation of new wheel bearings." *Id.* In short, there was no intent to dispose of anything in either case. In sharp contrast, the Seventh Circuit has recognized that arrangements for disposal can exist in "mixed motive cases," i.e., those involving both the sale of a material for profit and an intent to dispose (such as the used battery cases), including in cases where a material is sold for reclamation, such as broke being sold to recyclers who would reclaim usable paper fibers by removing and disposing of coatings. *GJ Leasing*, 54 F.3d at 384; *Sycamore Industrial Park Assoc.'s v. Ericsson,* 546 F.3d 847, 852 (7th Cir. 2008).

[3]     Plaintiffs have relied on the "useful product defense" for years, which is a defense to liability as to which of the Plaintiffs bear the burden, and is therefore irrelevant to whether Defendants met their *prima facie* case. As part of their case, Defendants did present documents, fact testimony, and expert testimony, which prove that ACPC and NCR treated broke as a waste rather than a useful product. *See* Defendants' Post-Trial Brief and Proposed Findings of Fact and Conclusions of Law ("PFF"), filed concurrently herewith, Section II.C.2.

broke at the time of its disposal. For example, in *BNSF*, Shell's D-D was delivered to its distributors "F.O.B. Destination." 556 U.S. at 603-04. As a result, the accidental spills at issue in *BNSF* occurred when Shell no longer owned the product. Ownership, possession or control of the "product" at the time of disposal is, therefore, not a prerequisite to arranger liability under *BNSF* as long as the entity owned or controlled the hazardous substance at some point. Numerous other courts have found the same. *See* PFF, Section II.B.4. NCR's defense against liability on the grounds that it did not own, possess, control or itself intend to dispose of ACPC's broke is thus irrelevant.

## 2. This Court's Arranger Ruling Is Consistent With *BNSF*

This Court's arranger liability standard, Dkt. No. 1080 at 9, is consistent with the standard set forth in *BNSF*. Plaintiffs, however, argue that this Court requires a level of proof that far exceeds the standard set forth in *BNSF*. Yet, in its earlier rulings this Court made clear that *BNSF's* decision regarding "the intent to dispose of the hazardous material in a § 6903(3) sense should not be read too narrowly." *Id.* at 6. This Court explained:

> Thus, there does not need to be a specific intent that the substance end up in a landfill or in water; what matters is that the party had an intent to dispose of or discard the material. Put another way, if a possessor of hazardous substances hires a company to discard the substance, *Burlington Northern* does not allow him to avoid arranger liability by burying his head in the sand and claiming indifference or ignorance of how that substance is ultimately disposed.

*Id.* at 7. While there must be an "intent to take steps to dispose," as *BNSF* establishes, there need not be an intent that disposal occur in any particular place or manner.[4] Moreover, there is

---

[4] The testimony of Plaintiffs' expert, Dr. Neil Shifrin, is not relevant for Rule 52(c) purposes, but his testimony sets out Plaintiffs' view of this Court's legal standard. Dr. Shifrin testified that, according to Plaintiffs, ACPC employees needed an expert's understanding of the wastewater treatment mechanisms at each recycling facility in order "to know" whether non-trivial discharges would occur. Therefore, as Dr. Shifrin admitted at trial, only an expert in wastewater treatment could qualify as an arranger. Trial Tr. (Shifrin) 1403:16-1405:21.

6

nothing indicating that the Court's use of the phrase "particular knowledge" means that the Court cannot draw reasonable factual inferences about the fifty-year-old knowledge and intention of ACPC and NCR employees, particularly in a case where many of the documents were lost or destroyed and many witnesses are no longer alive or competent to testify.[5]

## B.     Defendants Met Their Burden To Prove That ACPC Is an Arranger

Defendants presented hundreds of ancient documents, deposition testimony, and expert testimony clearly demonstrating that ACPC treated broke as a waste, and that ACPC knew that selling its broke for recycling led to wastewater discharges. Plaintiffs' motion does not address one single historic document or attempt to distinguish any of the deposition testimony of former ACPC and NCR employees. Instead, Plaintiffs point to a handful of cross examination questions posed to Defendants' expert witnesses, taken out of context, and claim that Defendants have not met their burden. The preponderance of the evidence, however, favors a finding that ACPC arranged for the disposal of broke in the "mixed motives" sense—selling it at a nominal price in order to get rid of it, and make a few dollars doing so, well aware that the sale would inevitably result in the discharge of the non-fiber constituents into the Fox River.

## 1.     ACPC Treated Broke As a Production Waste To Be Minimized

Defendants set forth extensive documentary and testimonial evidence which demonstrates that ACPC treated broke as a waste to be minimized in order to lower NCR Paper production costs. *See* PFF, Section II.C.1. Defendants' expert, Dr. Dolan, testified that ACPC

---

[5]     Without citing to a single CERCLA case that supports their position (because there are none), Plaintiffs' pretrial brief relies on the collective corporate knowledge doctrine to argue that the knowledge of one particular senior-level employee needs to satisfy every element of Plaintiffs' artificially-elevated arranger standard, and that none of this knowledge could have been gained outside the scope of that person's employment at ACPC or NCR. *See* Dkt. No. 1330 at 17. This argument should be ignored. In fact, the Supreme Court in *BNSF* indicated that the requisite level of knowledge can be inferred based on a fact-intensive inquiry of the totality of the circumstances, 556 U.S. at 610-11, and numerous other courts have found arranger liability based on a similar test. *See* PFF, at 8, n. 6.

treated broke as a waste rather than a useful product because, among other things: (1) ACPC referred to it and treated it as a production waste; (2) ACPC never attempted to increase its production or develop a market for its sale; (3) there was no economic foundation for selling broke as a product; and (4) ACPC never profited from broke sales. *See* PFF ¶¶ 84-111.

Dr. Dolan's conclusions were supported by the deposition testimony of former ACPC employees Dale Schumaker, Donald Christensen, and Fred Heinritz, who explained under oath that ACPC was at all times interested in minimizing the production of broke because it took up a large amount of space, had little value, and ACPC was in the business of making coated paper products, not broke. Trial Tr. 226:6-228:8. For instance, Mr. Heinritz testified that broke "was an incidental item to us. We just had to get rid of it. We took in money for it, but we didn't – we didn't try to – it wasn't a profit center or anything like that." PFF ¶ 99. Similarly, Mr. Schumaker testified in his video deposition shown at trial that ACPC felt that "obviously at some point you had to get rid of [the broke] or you would have died in it." *Id.*

Dr. Dolan's conclusions were also supported by ancient ACPC business records. For instance, as soon as ACPC started trial production runs of NCR Paper in 1953, NCR and ACPC executives met to "clarify [the] costs and wastes" associated with the process. PFF ¶¶ 84-86. In the report of this visit, NCR's Howard Lauer used ACPC's "waste figure" to calculate the costs of producing a pound of NCR Paper. *Id.* Likewise, in 1964, ACPC hired consulting firm A.T. Kearney to survey ACPC's operations. PFF ¶¶ 87-89. A.T. Kearney's report detailed ACPC's production and management of broke waste, and recommended ways to reduce broke and manage it more effectively. *Id.* ACPC also established detailed broke handling and shipping procedures—including hiring a "waste control clerk"—in an attempt to minimize the impact that broke had on ACPC's bottom line. PFF ¶ 90. Contrary to Plaintiffs' assertions, Mot. at 4-5,

ACPC's efforts to maximize broke's saleable value does not make it a "useful product," but rather a manufacturing waste that ACPC attempted to recover a bit of money from by selling it into the wastepaper market.

Plaintiffs cite to snippets of cross examination testimony from Defendants' experts, taken out of context, and argue that ACPC's primary motive for selling broke was to make money, and that removal of the coatings by paper recyclers was "incidental" to the sale. Mot. at 4-5. As an initial matter, the cross examination testimony of Mr. Klass specifically related to the paper recyclers' reasons for *buying* broke, not ACPC's purpose in *selling* it. In response, Mr. Klass rightly explained that "the de-inking mill would buy wastepaper as a raw material in making new paper [and that] the purpose was to recover the fiber to use in making new paper." Trial Tr. (Klass) 404:12-18 (question omitted).

Likewise, Defendants' expert, Dr. Heitmann, testified on cross that paper recyclers had to remove and discard the non-fiber constituents of the broke in virtually all circumstances in order to recover the valuable paper fibers. Trial Tr. (Heitmann) 594:8-24. The removal of the coatings was not, as Plaintiffs suggest, "incidental" to the sale of broke, nor does it bear any resemblance to the factual circumstances of *Pneumo Abex Corp.*, where the Fourth Circuit found that used wheel bearings were a useful product because "the removal of the dirt and grease was incidental to remolding new bearings, just as it would have been incidental to the molding of new bearings from virgin materials." *Id.* Conversely, Fox River paper recyclers had to subject broke to a multi-step recycling process in order to remove the valueless coatings and recover the clean paper fibers, a process that was not necessary when recyclers used virgin pulp (this, in part, accounted for the price difference between NCR broke and virgin pulp). PFF ¶¶ 26-30.

Defendants proved by a preponderance of the evidence that ACPC treated broke as a waste it had to get rid of, and sold the broke that it inevitably generated into the wastepaper market for far less than the cost of producing it in order to minimize its production losses.

### 2. ACPC Employees Knew That Non-Trivial Amounts of Its Broke Waste Would Be Disposed of into the Fox River

Ancient documents and the testimony of ACPC's former employees (all ignored by Plaintiffs) prove that ACPC *knew* that the broke it sold into the wastepaper market was subjected to a water-intensive recycling process that inevitably resulted in the discharge of non-fiber constituents into the river. Additionally, Defendants presented extensive fact and expert testimony of what ACPC employees *would have known* based on their education, training, and work history. This testimony allows the Court to make reasonable inferences, based on the presently available evidence, and helps to bridge the inevitable gaps in a trial regarding things that happened fifty years ago.

As soon as ACPC began selling the broke from NCR trial production runs, it received complaints from waste paper brokers about the bluing of fibers caused by the rupture of the microcapsules during recycling. PFF ¶¶ 43-44. Starting in the early 1960s, ACPC engaged in an ongoing technical exchange with Wiggins Teape ("WT") regarding the best ways to handle broke waste, and both companies developed a sophisticated understanding of the various ways to recycle broke. PFF ¶¶ 55-76. For instance, in a 1965 letter to WT's A.E. Burroughs, ACPC's Fred Heinritz explained that paper recyclers were buying ACPC's broke, de-inking it, and removing the coating. PFF ¶¶ 77-79. This letter clearly demonstrates that ACPC knew that broke was recycled and that the coatings were removed during the recycling process. In fact, ACPC scientists conducted their own laboratory research on ways to repulp NCR broke and address the bluing phenomenon. PFF ¶ 54.

The sworn testimony of former ACPC employees Fred Heinritz and Dale Schumaker also confirms that ACPC knew that broke was repulped using a water-intensive process that removed the coatings. PFF ¶¶ 35-41. For example, Mr. Heinritz testified that he knew that paper recyclers were after the paper fibers, removed the coatings and piled them up, and that the liquids from the recycling process went out into the river. PFF ¶ 37. Moreover, ACPC employees worked with various technical research organizations and trade groups, such as the Institute of Paper Chemistry and the Wisconsin Paper Industry Information Service ("WPIIS"), which gave them a detailed understanding of broke recycling issues. PFF ¶¶ 57-64. ACPC employees Bob Seuss and Paul Truttschel served on the WPIIS executive committee throughout the 1960s, and spearheaded that committee's efforts to address public perceptions of paper industry pollution. PFF ¶¶ 62-64. These efforts included developing a response to a September 1967 *Chicago Tribune* article, which identified the paper mills along the river as the principal sources of Fox River contamination. *Id.*

ACPC employees also knew that the recycling of ACPC's broke resulted in the discharge of thousands of pounds of PCBs into the Fox River. In 1970, Tom Busch, ACPC's Technical Director during the Production Period, drafted a document in which he estimated that ACPC itself sent 98,000 pounds of capsules, containing 58,000 pounds of PCBs, to the sewer. He also estimated that, between 1954 and 1969, ACPC sent Fox River Valley recyclers broke containing *4.64 million pounds* of PCB-containing capsules. PFF ¶¶ 48-50.

Defendants also proved through fact and expert testimony that ACPC employees had the educational background, work experience, and industry group affiliation to know that nontrivial amounts of waste were sent to the Fox River as the result of broke recycling. Many ACPC employees had degrees in papermaking, paper chemistry, and chemical engineering, which

would have given them a detailed understanding of the ways in which paper was recycled, including the disposal of non-fiber constituents through the wastewater. PFF ¶¶ 65-76. As Dr. Kittrell explained, a chemist trained to apply coatings to paper would certainly have known how coatings came off the paper during the repulping process. Trial Tr. (Kittrell) 503:1-11. Other ACPC employees, such as Larry Casey, had worked at paper recycling companies—where they witnessed broke recycling firsthand—before working at ACPC. PFF ¶¶ 75-76. Lastly, Dick Wand, who worked at the Bergstrom Paper Company during the 1960s and was personally familiar with ACPC, testified that it was common knowledge in the Fox River paper industry that broke was recycled in order to get fiber, and that non-fiber materials were discarded through the wastewater. Trial Tr. (Wand) 85:3-88:10. ACPC employees had such knowledge.

Plaintiffs' motion ignores these facts, and insists that there is "absolutely no evidence" that ACPC knew that broke recycling resulted in non-trivial discharges into the river. Mot. at 5-6. Plaintiffs argue that the "particular knowledge" standard is so high that it could not be met by an ACPC employee with advanced paper making training who chaired a committee focused on environmental pollution issues simply because that person did not testify that he knew the efficiency of the wastewater treatment capabilities at each Fox River paper recycler. Plaintiffs are wrong. Under any reasonable application of this Court's standard, Defendants proved beyond a preponderance of the evidence that ACPC had a "particular knowledge that nontrivial amounts of the broke waste product would inevitably end up in the river." Dkt. No. 1080 at 9.

### C. Defendants Met Their Burden To Prove That NCR Is An Arranger

Defendants proved at trial that NCR is directly liable as an arranger under two alternative theories of liability. First, under *BNSF*, NCR took "intentional steps to dispose of a hazardous substance" through its extensive and ongoing involvement in the production of NCR Paper and disposal of the waste that was inevitably created. 556 U.S. at 611. Second, NCR is

independently liable as a toll formulator because it controlled the manufacturing process used by its production subcontractor, which inherently generated waste, and cannot contract away the resulting CERCLA liability.

>    **1.    NCR Is Directly Liable Under *BNSF* Because It Knew That a Portion of the Emulsion It Conveyed to ACPC Would Inevitably Be Disposed of as Broke and Helped Plan for That Disposal**

Ancient documents and testimony, ignored by Plaintiffs but presented at trial, prove that NCR knew that a portion of the emulsion it conveyed to ACPC for NCR Paper production would inevitably end up as broke waste, knew that broke was sold to recyclers that would remove and dispose of the coatings, and assisted in planning for its disposal through the recycling process. PFF ¶¶ 122-142. NCR was keenly interested in lowering manufacturing costs in order to increase its own revenue, and sought to do this both by decreasing the amount of broke that its subcontractors produced and by researching ways to recycle broke so that it would be more valuable in the wastepaper market. *Id.* In 1953, NCR learned that ACPC's wastepaper broker would not buy NCR Paper broke because it turned blue during repulping. PFF ¶¶ 44, 137. To remedy this problem, NCR began working, in 1954, with the WPUC to identify wastepaper recycling alternatives, and Ralph Kumler at the WPUC developed at least three bulletins on these topics. PFF ¶¶ 125-128.

In 1958, Wiggins Teape ("WT") turned to NCR for advice on NCR broke recycling options. PFF ¶ 129. NCR was well-versed on the options because of its work with the WPUC, its close working relationship with its subcontractors, and its own laboratory experiments. NCR's Bob Sandberg detailed the company's knowledge in a letter to WT, and attached to this letter the two WPUC broke recycling bulletins that Mr. Kumler had prepared in 1956. *Id.* In 1965, NCR and WT held multiple meetings to discuss broke recycling, including whether to switch to an alternative solvent that would be easier for WT to recycle through a flotation

process.  PFF ¶¶ 138-140.  At these meetings, NCR detailed its knowledge of broke recycling and recommended various ways to do it more effectively.  *Id.*  For example, during a March 3, 1965 meeting with WT and Monsanto, NCR's Martin Kelly offered a methodology for Aroclor sampling in repulped broke, described various ways of possibly disintegrating NCR broke in water, floating the capsules to the surface, and skimming them off, and described the possibility of using hydrochloric acid to remove the CB coating from NCR broke without disrupting the capsules.  PFF ¶ 138.

Throughout the 1960s, NCR continued to work on broke recycling experiments in its laboratory, correspond with the IPC on broke recycling issues, and coordinate the exchange of information between its contractors and licensees.  PFF ¶¶ 130-141.  NCR also knew that broke recycling led to massive amounts of PCB discharges into water.  For example, WT's minutes of a 1970 meeting between top management at NCR, WT and Monsanto report that the parties discussed a mass balance chart, in which WT calculated that it had discharged *seventy tons of PCBs* into UK rivers in 1969 as the result of broke recycling.  PFF ¶ 142.

Defendants proved by a preponderance of the evidence that NCR knew that broke recycling led to non-trivial discharges into the river, and that, together with ACPC and its other contractors and licensees, NCR attempted to limit the production of broke waste, identify recycling alternatives, and helped plan for the disposal of a portion of the emulsion contained in the broke.  *BNSF*, 556 U.S. at 610-11.  This evidence stands in stark contrast to Plaintiff's incorrect assertion that "NCR had nothing to do with selling ACPC's broke."  Mot. at 7.

### 2. NCR is Liable under the Formulator Liability Doctrine Because It Controlled All Aspects of Its Subcontractors' Production

The evidence further demonstrates that NCR chose to subcontract out the rights to manufacture its paper to a small, tight-knit group of companies, controlled all aspects of their use

14

and disposition of the most important ingredient (the emulsion), and involved itself in broke recycling research and decision making, all while knowing that the production process inevitably resulted in broke waste that would be disposed of. NCR is therefore also liable as an arranger under the formulator liability doctrine. *See* PFF ¶¶ 143-166.

In a series of 1970 letters between NCR and the United States Department of Justice, NCR explained that it chose to use ACPC as a "production subcontractor" in order to take advantage of its paper-coating skills and resources. PFF ¶¶ 143-144. NCR, however, controlled all aspects of the paper production process, including the use of the emulsion that NCR "consigned" to ACPC, the type of raw materials ACPC used, and the way in which ACPC coated the paper. PFF ¶¶ 147-154. As ACPC's Tom Busch explained, NCR took these steps in order to maintain "complete control" over the NCR Paper production process. PFF ¶ 150.

Defendants proved by a preponderance of the evidence that NCR knew that broke was an unavoidable part of the toll manufacturing process that NCR strictly controlled, knew broke would be sold to recyclers who would remove and dispose of the coatings, and actively assisted ACPC, Mead and WT to better identify broke recycling options. NCR, therefore, both intended and helped plan for the disposal of the hazardous substances in NCR broke, which qualifies NCR as an arranger under both the Supreme Court's standard in *BNSF*, and the standard set forth by the Eighth Circuit (and adopted by others) in *Aceto*.

## IV. CONCLUSION

Defendants respectfully request that this Court deny Plaintiffs' motion for judgment on partial findings.


Dated: April 26, 2012                                          Respectfully Submitted,

| | |
|---|---|
| /s/ Mary Rose Alexander<br><br>Mary Rose Alexander<br>Margrethe K. Kearney<br>LATHAM & WATKINS LLP<br>233 S. Wacker Dr.<br>Ste. 5800<br>Chicago, IL 60606<br>Telephone: (312) 872-7700<br>Facsimile: (312) 993-9767<br>Mary.Rose.Alexander@lw.com<br>Margrethe.Kearney@lw.com<br><br>Karl S. Lytz<br>Patrick J. Ferguson<br>LATHAM & WATKINS LLP<br>505 Montgomery St., Ste. 2000<br>San Francisco, CA 94111-6538<br>Telephone: (415) 391-0600<br>Fax: (415) 395-8095<br>Karl.Lytz@lw.com<br>Patrick.Ferguson@lw.com<br><br>**Attorneys for Defendants Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC** | /s/ Philip C. Hunsucker<br>Philip C. Hunsucker<br>David A. Rabbino<br>Hunsucker Goodstein & Nelson PC<br>3717 Mt. Diablo Blvd., Suite 200<br>Lafayette, CA 94549<br>Telephone: 925-284-0840<br>Email: phunsucker@hgnlaw.com<br>Email: drabbino@hgnlaw.com<br><br>**Attorneys for Defendant Menasha Corporation** |
| /s/ William H. Harbeck<br>William H. Harbeck (Wis. Bar No. 1007004)<br>Peter C. Karegeannes (Wis. Bar No. 1015025)<br>Nancy K. Peterson (Wis. Bar No. 1000197)<br>Quarles & Brady LLP<br>411 E. Wisconsin Avenue<br>Milwaukee, WI 53202<br>Telephone: 414-277-5000<br>whh@quarles.com<br><br>**Attorneys for Defendant WTM I Company** | /s/ David G. Mandelbaum<br>David G. Mandelbaum<br>Frank A. Citera<br>Marc E. Davies<br>Caleb J. Holmes<br>Adam B. Silverman<br>GREENBERG TRAURIG, LLP<br>Two Commerce Square, Suite 2700<br>2001 Market Street<br>Philadelphia, PA 19103<br>215.988.7800<br>mandelbaumd@gtlaw.com<br><br>**Attorneys for Defendant P.H. Glatfelter Company** |

| | |
|---|---|
| /s/ Susan E. Lovern<br>Susan E. Lovern (#1025632)<br>Michael P. Carlton (#1016037)<br>Thomas Armstrong (#1016529)<br>Kelly J. Noyes (#1064809)<br>von Briesen & Roper, s.c.<br>411 East Wisconsin Avenue, Suite 700<br>Milwaukee, WI 53202<br>Telephone: (414) 276-1122<br>Fax: (414) 276-6281<br>slovern@vonbriesen.com<br>mcarlton@vonbriesen.com<br>tarmstro@vonbriesen.com<br>knoyes@vonbriesen.com<br><br>**Attorneys for Defendant CBC Coating, Inc.** | /s/ Scott W. Hansen<br>Scott W. Hansen<br>Steven P. Bogart<br>Reinhart Boerner Van Deuren s.c.<br>1000 North Water Street, Suite 1700<br>P.O. Box 2965<br>Milwaukee, WI 53202<br>Telephone: 414-298-1000<br>Facsimile: 414-298-8097<br>sbogart@reinhartlaw.com<br>shansen@reinhartlaw.com<br><br>Thomas R. Gottshall<br>Stephen F. McKinney<br>Haynsworth Sinkler Boyd PA<br>1201 Main Street, Suite 2200<br>P.O. Box 11889<br>Columbia, SC 29211-1889<br>Telephone: 803-779-3080<br>Facsimile: 803-765-1243<br>tgottshall@hsblawfirm.com<br>smckinney@hsblawfirm.com<br><br>**Attorneys for Defendant U.S. Paper Mills Corp.** |
| /s/ William J. Mulligan<br>William J. Mulligan (WI Bar No. 1008465)<br>Kevin J. Lyons (WI Bar No. 1013826)<br>Elizabeth K. Miles (WI Bar No. 1064284)<br>Davis & Kuelthau, s.c.<br>111 E. Kilbourn Avenue, Suite 1400<br>Milwaukee, WI 53202<br>Telephone: (414) 276-0200<br>Facsimile: (414) 276-9369<br>Email: wmulligan@dkattorneys.com<br>klyons@dkattorneys.com<br>emiles@dkattorneys.com<br><br>**Attorneys for Defendant Neenah Menasha Sewerage Commission** | |

17