# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

| | | |
|---|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>GEORGE A. WHITING PAPER COMPANY, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 08-CV-16-WCG |
| NCR CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>KIMBERLY-CLARK CORPORATION, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 08-CV-895-WCG |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
FOR JUDGMENT ON PARTIAL FINDINGS**

Plaintiffs NCR Corporation ("NCR") and Appleton Papers Inc. ("API") (collectively, "Plaintiffs") respectfully submit this reply brief in support of their Motion for Judgment on Partial Findings (Dkt. No. 1341).

## I. LEGAL STANDARD FOR ARRANGER LIABILITY

In their opposition to Plaintiffs' motion (Dkt. No. 1383) and their post-trial submission (Dkt. No. 1382), Defendants dispute the applicable legal standard for arranger liability, which Plaintiffs outlined in their pretrial brief (Dkt. No. 1332 at 8-18). Plaintiffs here respond to Defendants' arguments related to this standard; these responses are also incorporated into Plaintiffs' Brief in Response to Defendants' Post-trial Brief and Proposed Findings of Fact and Conclusions of Law.

### A. Defendants Misstate the Arranger Liability Standard under *BNSF*.

Defendants argue that arranger liability should attach even in cases involving bona fide sales of a useful product if the seller "intends" that some portion of the product will ultimately be disposed of. (Dkt. No. 1382 at 6.) Defendants' position contradicts what Defendant Georgia-Pacific previously (and correctly) told this Court: "In essence, there are no 'intentional steps to dispose of a hazardous substance' when the subject of the transaction is the sale of a new and useful product. That was the case in *BNSF*." (Dkt. No. 1247 at 9.) Under Defendants' new theory, "intent to dispose"—the arranger liability test after *BNSF*—is essentially an afterthought and there would be arranger liability from the sale of virtually any product that contained a hazardous substance that would ultimately be discarded. Such a result would nullify the useful product doctrine, and is plainly not the law. *See G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 384 (7th Cir. 1995) ("[T]he sale of a product which contains a hazardous substance cannot be equated to the disposal of the

substance itself or even the making of arrangements for its subsequent disposal."); *United States v. Gen. Elec.*, 670 F.3d 377, 384-85 (1st Cir. 2012) ("In holding that § 9607(a)(3) liability could not be imposed on Shell, the Supreme Court in *Burlington Northern* endorsed the 'useful product doctrine.'").

The Supreme Court in *BNSF* held that "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." 556 U.S. 599, 611 (2009). The Court stated that "knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Id.* at 612. Following *BNSF*, the Ninth Circuit held that "a company . . . may not be held liable as an arranger under CERCLA unless the plaintiff proves that the company entered into the relevant transaction with *the specific purpose* of disposing of a hazardous substance." *Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 909 (9th Cir. 2011); *see also Hinds Inv., L.P. v. Team Enters., Inc.*, No. CV F-07-0703, 2010 WL 1663986, at *7 (E.D. Cal. Apr. 22, 2010) (confirming that the purpose of arranger liability is "to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their disposal") (citation omitted).

The evidence shows that ACPC did not take intentional steps to dispose of a hazardous substance. *See BNSF*, 556 U.S. at 611. Former ACPC employees testified that ACPC sold CCP broke for the purpose of generating revenue. (Dkt. No. 1384 at PFF ¶ 35.) This revenue was important to ACPC (*id.* at PFF ¶ 31), and accordingly, ACPC invested time and resources in this business endeavor (*id.* at PFF ¶ 23). There is no evidence that ACPC was attempting to dispose of a hazardous substance when it sold CCP broke (*id.* at

2

PFF ¶ 34); broke sales were an integral part of its business before, during and after the Production Period (*id.* at PFF ¶ 33.)

### B. To Be an Arranger, the Primary Purpose of an Entity's Transaction Must Be to Dispose of a Hazardous Substance.

An entity cannot be an arranger unless disposal was the sole or at least the primary purpose of the transaction at issue. Defendants' efforts to construe the law differently are unavailing.

Defendants first argue that the primary purpose of a transaction should not be controlling because that would make the "prior cases involving the sale of used batteries, spent solvents and metal slag . . . wrongly decided". (Dkt. No. 1382 at 5.) On the contrary, those cases are consistent with the primary purpose standard—where a seller of, for example, used car batteries was primarily motivated to dispose of those batteries, that seller may be found to be an arranger. *See, e.g.*, *United States v. Mountain Metal Co.*, 137 F. Supp. 2d 1267, 1275-76 (N.D. Ala. 2001), *aff'd*, 91 F. App'x 654 (11th Cir. 2004). But, as the trial evidence established in this case, broke is different than used car batteries. ACPC treated CCP broke like a valuable commodity by taking active steps to protect and maximize its value (Dkt. No. 1384 at PFF ¶ 23), recorded it as an asset on its balance sheet (*id.* at PFF ¶¶ 22.2-22.3), recorded broke sales under net revenue (*id.* at PFF ¶ 26), always sold broke for a positive price and never discarded it (*id.* at PFF ¶¶ 24-25), and assigned broke a sales account number (*id.* at PFF ¶ 27.1). Furthermore, ACPC sold broke into an active, long-established market where there was eager demand for CCP broke, demand that never ceased during the entire 17-year Production Period (1954-71). (*Id.* at PFF ¶¶ 38-40.) For the recycling mills that purchased recyclable paper, including CCP broke, it was a critical raw material, "a commodity of tremendous value and worth" (*id.* at PFF ¶ 41), upon

3

which the mills' business model depended (*id.* at PFF ¶ 42). It is because of such undisputed facts, which are distinct from the facts in the battery breaker cases, that ACPC is not an arranger.

Defendants also sought to distinguish *G.J. Leasing* and *Pneumo Abex*, arguing that those cases "involve sales in which hazardous substance disposal had nothing whatsoever to do with the transaction or the cause of the required CERCLA response actions". (Dkt. No. 1382 at 6.) But in each of those cases the alleged arranger sold something containing a hazardous substance (asbestos, slag) the disposal of which later required remediation and spawned a claim of arranger liability against the seller. And, in each case, the court examined the possible motivations for the sale and held that the seller was not an arranger because disposal was not the primary purpose of the transaction.

In *Pneumo Abex*, for example, a foundry remolded railroads' used and broken wheel bearings into new wheel bearings, a process that was designed to "sweat off" dirt and impurities as slag. *Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co.*, 142 F.3d 769, 772-73 (4th Cir. 1998). The Fourth Circuit held that the railroads that sold the bearings to the foundry were not arrangers because the stripping of impurities from the wheel bearings was "incidental" to the primary purpose for which the railroad sold the used bearings—the replacement of worn and broken bearings at a competitive price. *Id.* at 775-76. Thus, the facts of *Pneumo Abex* are directly analogous to the facts here: as admitted by Defendants' own paper industry expert, the purpose of ACPC's broke sales was to monetize the value of broke as a raw material for making new paper, with the possible removal of the coatings from CCP broke being, at most, "incidental" to that purpose. (*See* Dkt. No. 1384 at PFF ¶ 36.)

4

Furthermore, *G.J. Leasing* and *Pneumo Abex* are only two of many cases that examine the primary purpose of the transaction to determine arranger liability. A recent case from the First Circuit, *United States v. General Electric Co.*, is another good example. *See* 670 F.3d 377. In that case, General Electric ("GE") used a PCB-containing fluid, which it processed into a substance called "Pyranol", in its electric capacitors. *Id.* at 380. Unlike CCP broke, Pyranol that GE could not use because it did not meet its purity specifications (called "scrap Pyranol") was at first given away and later sold "at bargain prices" to a paint manufacturer, Fletcher, who added it to paint as a plasticizer. *Id.* at 380, 385 n.9. Toward the end of their business relationship, GE sold Fletcher scrap Pyranol that was of such low quality that Fletcher could not use it. *Id.* at 380-81. Fletcher, unable to convince GE to take back this unusable Pyranol, stockpiled drums of it on its property and these drums eventually leaked, causing environmental contamination. *Id.* at 380-81, 389. In holding that GE arranged for the disposal of a hazardous substance, the First Circuit explained, "the record here contains ample evidence that GE viewed scrap Pyranol as waste material and that any profit it derived from selling scrap Pyranol to Fletcher *was subordinate and incidental* to the immediate benefit of being rid of an overstock of unusable chemicals". *Id.* at 385 (emphasis added). That is, after examining all of the relevant facts, including the fact that GE had previously given Pyranol away and that neither the seller nor the buyer could use the substance, the court determined that GE's primary purpose was disposal and that receiving revenue from the sale was only a subordinate purpose.

Defendants also argue that *BNSF* shows that "the intention to dispose need only relate to 'a portion of the product'". (Dkt. No. 1383 at 5.) According to Defendants,

5

this language means that "ACPC would be liable as an arranger if it intended and planned for disposal of a portion of the broke sold to recyclers". (*Id.*) Defendants are contorting the word "portion" to suggest that the Supreme Court was endorsing a separate arranger liability analysis of individual components of a product. In *BNSF*, Shell supplied D-D pesticide to B&B, an agricultural company that applied D-D to its customers' farms. 556 U.S. at 602-03. A percentage of the overall amount of D-D that Shell sold to B&B over many years inevitably spilled or leaked on to B&B's property during delivery, necessitating remediation. *Id.* At issue in the case was Shell's potential liability for arranging for the disposal of this spilled "portion" of the D-D, but it was still D-D that was at issue, not any component part of D-D. *BNSF* and other applicable case law makes clear that the arranger liability analysis focuses on the transaction as a whole and as to the product in its form at the time it was delivered to the other party. *See G.J. Leasing*, 54 F.3d at 384 ("[T]he sale of a product which contains a hazardous substance cannot be equated to the disposal of the substance itself or even the making of arrangements for its subsequent disposal"); *Pneumo Abex*, 142 F.3d at 775 (analyzing the sale of the used wheel bearings as a whole, including their impurities); *Mountain Metal*, 137 F. Supp. 2d at 1275-76 (analyzing each transaction at issue as a whole—the sale of used batteries (not the casings and the lead plates separately) and the sale of the acid-laden lead plates (not the plates themselves and the acid contaminant separately)).

Finally, the Court's "portion" language in *BNSF* in no way undermines the primary purpose standard. According to Defendants, *BNSF* "acknowledges that arranger liability can arise even when the seller of a new and unused product intends that at least a portion of the product be disposed, *even though the seller's predominant goal for the sale is*

6

*to make a profit*". (Dkt. No. 1382 at 6 (emphasis added).) That is a fundamental misreading of *BNSF*. The Supreme Court held that Shell was not an arranger because it did not plan for the disposal of the pesticide, which was both a new and useful product and which Shell attempted to prevent from spilling during transport. It was *because* Shell's primary motivation for the transaction was to obtain revenue for its commercial product that there was no arranger liability. The same is true here.

### C. Recyclable Materials May Be Useful Products and Are Not Categorically "Waste".

According to Defendants, "courts find that a recyclable material that must be processed in order to recover a valuable material is a waste". (*Id.* at 9.) But none of Defendants' cited cases state such a rule and numerous cases hold just the opposite—that a material that has to be processed after its sale is not a waste. *See, e.g.*, *Pakootas v. Teck Cominco Metals, Ltd.*, No. CV-04-256, 2012 WL 370105, at *2-3 (E.D. Wash. Feb. 3, 2012) (holding that ore deposits, although not "useful in their existing state" because they required extraction and processing "to gain access to the [valuable] minerals", were not a "waste"); *United States v. Vertac Chem. Corp.*, 966 F. Supp. 1491, 1508 (E.D. Ark. 1997) (holding that by-product chemical was a useful product even though it "required further processing before it could be put to its intended use"); *Mountain Metal*, 137 F. Supp. 2d at 1275-76 (holding that lead plates "constituted a 'complete useful product,'" because they were "ready for processing, rather than disposal").

Defendants argue that any material that is recycled with processing is necessarily a waste that is being discarded, relying on regulations implementing the Resource Conservation and Recovery Act ("RCRA") and a pre-*BNSF* lead battery case that applied those regulations. (Dkt. No. 1382 at 11 (citing *Catellus Dev. Corp. v. United States,* 34

7

F.3d 748 (9th Cir. 1994).) But the regulations' definition of "solid waste," applies only if the subject material also qualifies as "hazardous waste" under RCRA:

> "The definition of solid waste contained in this part applies only to wastes that also are hazardous for purposes of the regulations implementing subtitle C of RCRA. For example, it does not apply to materials (such as non-hazardous scrap, paper, textiles, or rubber) that are not otherwise hazardous wastes and that are recycled."

40 C.F.R. § 261.1(b)(1). Spent lead batteries are "hazardous waste" under RCRA. *United States v. ILCO, Inc.*, 996 F.2d 1126, 1131 (11th Cir. 1993). Broke, however, is not a "hazardous waste," not even when it contained PCBs.[1] Thus, the RCRA regulations provide no support for Defendants' argument.

Finally, Defendants claim that CCP broke cannot be a useful product because otherwise there would have been no need for the recyclable paper exemption in the Superfund Recycling Equity Act. (*See* Dkt. No. 1382 at 11.) This argument is not well-founded. The recyclable paper exemption is an exemption that avoids litigation altogether over a subcategory of recycled paper. There is no reason to believe that the exemption was necessary because such paper would otherwise be a "waste"; the exact opposite reading— that the exemption merely confirmed that such paper was not a "waste"—is more plausible. In addition, as Defendants, many of whom are potentially responsible parties ("PRPs") by virtue of their past ownership of polluting facilities, well know, arranger liability is merely one type of CERCLA liability. *See* 42 U.S.C. § 9607(a). The exemption Defendants cited relates to all types of PRPs, not just arrangers, and thus has a liability-excepting function that goes beyond the arranger-liability useful product doctrine.

---

[1] *See* EPA website, http://waste.supportportal.com/link/portal/23002/23023/Article/14009/Are-polychlorinated-biphenyls-PCBs-regulated-under-RCRA-as-a-hazardous-waste (explaining that "PCBs are not defined as hazardous wastes").

8

### D. Market Value Is an Important Indicator that a Material Is a Useful Product.

Defendants also claim that an established market for a product is a factor to consider in determining whether a material is a useful product, but that it is not determinative. (Dkt. No. 1382 at 10 n.8.) According to Defendants, "[w]hile the law of supply and demand determines whether the trash collector or the trash producer pays for its removal, and how much, it remains trash to its producer because the producer has no other use for it". (*Id.*) But by this logic, every single product, even the paradigmatic "new and useful product" discussed in *BNSF*, 556 U.S. at 610, could be considered "trash" because producers generally have *no* use for the products they make besides selling them.

Unlike Defendants' incorrect "producer has no other use for it" test, the "marketplace provides a reasonable, objective gauge of product worth". *United States v. Wedzeb Enters., Inc.,* 844 F. Supp. 1328, 1336 (S.D. Ind. 1994) ("The evidence in this case indicates that the consumer demand for Wedzeb's capacitors was sufficient to lift them out of any classification as 'waste' or 'refuse.'"); *see also Gen. Elec.*, 670 F.3d at 386 (noting that the "lack of a viable market for scrap Pyranol during the relevant period supplies further proof that GE did not view scrap Pyranol as a legitimate and serviceable product"). A material's consistent value and demand in the marketplace, like the value and demand demonstrated by CCP broke, is the best indicator that it is a useful product. (Dkt. No. 1384 at PFF ¶¶ 38-40, PCL ¶¶ 16-17.)

9

Case 2:08-cv-00016-WCG   Filed 05/23/12   Page 10 of 12   Document 1395

## II. CONCLUSION

The trial evidence proffered by Defendants in their case in chief was insufficient, as a matter of law, to prove that NCR is liable as an arranger. For the reasons set forth in this memorandum and in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Judgment on Partial Findings (Dkt. No. 1342), Plaintiffs' motion should be granted.

Dated: May 23, 2012                                    Respectfully submitted,

| | |
|---|---|
| /s/ Darin P. McAtee | /s/ Ronald R. Ragatz |
| CRAVATH, SWAINE & MOORE LLP | DEWITT ROSS & STEVENS S.C. |
| Evan R. Chesler | Ronald R. Ragatz |
| David R. Marriott | Dennis P. Birke |
| Darin P. McAtee | Megan A. Senatori |
| Worldwide Plaza, 825 Eighth Avenue | Two East Mifflin Street |
| New York, New York 10019 | Madison, WI 53703 |
| Phone: (212) 474-1000 | Phone: (608) 255-8891 |
| Fax: (212) 474-3700 | Fax: (608) 252-9243 |
| dmcatee@cravath.com | |
| | HERMES LAW, LTD. |
| SIDLEY AUSTIN LLP | Michael L. Hermes |
| Evan B. Westerfield | Heidi D. Melzer |
| One South Dearborn Street | Ericka L. Krumrie |
| Chicago, Illinois 60603 | 333 Main Street, Suite 601 |
| Phone: (312) 853-7000 | Green Bay, WI 54301 |
| Fax: (312) 853-7036 | Phone: (920) 436-9870 |
| | Fax: (920) 436-9871 |
| MARTEN LAW PLLC | |
| Linda R. Larson | GREGORY KRAUSS PLLC |
| Bradley M. Marten | Gregory A. Krauss |
| 1191 Second Avenue | 1629 K Street NW |
| Suite 2200 | Suite 300 |
| Seattle, Washington | Washington, DC 20006 |
| 98101 Phone: (206) 292-2600 | Phone: (202) 355-6430 |
| Fax: (206) 292-2601 | gkrauss@krausspllc.com |

**Attorneys for Plaintiff NCR Corporation**      **Attorneys for Plaintiff Appleton Papers Inc.**